# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

------------------------------------------------------------ x
:
In re:                                         :     Chapter 11
:
MODIVCARE INC., *et al.*,                :     Case No. 25-90309 (ARP)
:
             Debtors. [1]          :     (Joint Administration Requested)
:
------------------------------------------------------------ x

## EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING PAYMENT OF PREPETITION TRADE CLAIMS IN THE ORDINARY COURSE OF BUSINESS AND (B) GRANTING RELATED RELIEF

<div style="border:1px solid black; padding:10px;">

**Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on August 21, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on August 21, 2025, at 2:30 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "JudgePérez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

</div>

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/ModivCare. Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

ModivCare Inc. and its debtor affiliates in the above-captioned cases, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of an interim order (the "***Proposed Interim Order***") and a final order (the "***Proposed Final Order***," and together with the Proposed Interim Order, the "***Proposed Orders***"), substantially in the forms attached hereto, (a) authorizing, but not directing, the Debtors to pay in their discretion and in the ordinary course of business, allowed prepetition claims of certain creditors, including those entitled to priority under the Bankruptcy Code (the "***Trade Vendors***"),[2] that provide goods or services related to the Debtors' operations (collectively, the "***Trade Claims***") and (b) granting related relief.

2.      The Debtors further request that the Court confirm the administrative priority status of all undisputed obligations of the Debtors owing to vendors and suppliers arising from the postpetition delivery of goods and/or provision of services ordered before the Petition Date (as defined below) under the Prepetition Purchase Orders (as defined below) and authorize the Debtors to pay such obligations in the ordinary course of business.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]    "***Trade Vendors***" means each of the Critical Vendors, Foreign Vendors, Lienholders, and Other Trade Claimants (all as defined below), regardless of the existence of prepetition amounts owed or creditor status.

4.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b)(9), and 1107(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

5.     On the date hereof (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.     Contemporaneously with the filing of this Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

7.     The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Chad J. Shandler in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[3]

---

[3]     Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the First Day Declaration.

8.     ModivCare is a technology based healthcare services company that helps people (especially those in vulnerable situations) get the care and support they need.  The Company works with government and private health insurance plans, as well as individuals, to provide: (a) transportation to and from medical appointments (non-emergency medical transportation totaling over 36 million rides per year); (b) in-home personal care (*e.g.* helping with daily activities); (c) remote monitoring patients' health from home; and (d) community health kiosks and wellness programs.  ModivCare employes approximately 23,675 people and operates across 48 states and the District of Columbia, including Texas, with corporate offices in Denver, Colorado.  Its goal is to make it easier for patients to get care, remove barriers that keep people from staying healthy, and improve overall health outcomes.

9.     As described in the First Day Declaration, the Debtors are party to that certain Restructuring Support Agreement (the "***RSA***") with certain creditors who collectively hold approximately 90% of the First Lien Claims and approximately 70% of the Second Lien Claims. Pursuant to the RSA, the consenting creditors have agreed to provide $100 million in debtor-in-possession financing to fund the Chapter 11 Cases and support the comprehensive restructuring transactions set forth in the term sheet attached to the RSA (the "***RSA Term Sheet***").  The RSA Term Sheet contemplates, among other things:  (a) the equitization of approximately $871 million in First Lien Claims and approximately $316 million in Second Lien Claims; (b) the commitment of the consenting creditors to provide exit financing through the Exit Term Loan Facility; (c) the reorganized Debtors' entry into an exit revolving credit facility to support ongoing operations; and (d) the discharge of the Unsecured Notes Claims and General Unsecured Claims; with holders of such claims entitled to participate in an equity rights offering of up to $200 million, subject to the

terms of the RSA.  In total, the transactions contemplated by the RSA Term Sheet are expected to reduce the Debtors' funded debt obligations by approximately $1.1 billion.

## DEBTORS' BUSINESS AND TRADE VENDORS

10.     As described in detail in the First Day Declaration, the Debtors' businesses primarily involve (a) procuring non-emergency medical transportation for public and private payors and their members, (b) providing personal care services, and (c) supplying medical equipment for remote health monitoring.  Through these businesses, ModivCare coordinates millions of annual rides for patients to and from doctors' offices, dialysis centers, and hospitals. ModivCare also provides in-home personal care services that enable seniors and persons with disabilities to live independently in the comfort of their homes.  Lastly, ModivCare offers connected-care monitoring and digital engagement tools that promote preventive health and reduce avoidable hospitalizations, often in rural settings.  ModivCare therefore plays a critical role in supporting access to healthcare and addressing social determinants of health for some of the nation's most at-risk communities.

11.     To provide such important services, the Debtors rely upon Trade Vendors for critical goods and services.  The Trade Claims include, among other things, the following:

a.     prepetition claims held by vendors who provide services, materials, and systems necessary for the Debtors to continue to serve their members' needs (the "***Critical Vendors***," and the claims of such Critical Vendors "***Critical Vendor Claims***"). There are three categories of Critical Vendors:

(1)     vendors that provide non-emergent transport to patients (the "***Transportation Vendors***," and the claims of Transportation Vendors, the "***Transportation Vendor Claims***").  Without the Transportation Vendors, the Debtors would be unable to facilitate access to critical healthcare services for those in need.  The Debtors has a network of approximately 4,100 Transportation Vendors that are compensated on a per-trip or mileage reimbursement model;

(2)     vendors that provide critical parts to, and or transport, health monitoring equipment (the "***Monitoring Vendors***," and the claims of Monitoring

Vendors, the "***Monitoring Vendor Claims***").  This equipment enables people to monitor vital health signs from home, allowing individuals to avoid moving to long-term care facilities, and preventing avoidable emergency room visits and hospitalizations; and

(3)     vendors that provide medical supplies and operational support to the Debtors, such as in relation to information technology systems, products, and administrative services (the "***Operational Vendors***," and the claims of "***Operational Vendor Claims***").  These vendors provide key supplies and services relating to systems that are necessary to all of the Business Segments, including, but not limited to, electronic medical record systems, and other patient service platforms;

b.     prepetition claims held by suppliers, service providers, and distributors based outside the United States (the "***Foreign Vendors***," and the claims of Foreign Vendors, the "***Foreign Vendor Claims***");

c.     prepetition claims held by common carriers, capital equipment providers and servicers, and construction contractors, in each case that may have or may be capable of asserting liens against the Debtors' property (collectively, the "***Lienholders***," and the claims of Lienholders, the "***Lienholder Claims***"); and

d.     prepetition claims held by other general unsecured creditors, including additional 503(b)(9) claims and claims of those that provide supplies and/or services utilized by the Debtors (collectively, the "***Other Trade Claimants***," and the claims of Other Trade Claimants, the "***Other Trade Claims***").

12.     The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Vendors in the ordinary course of business.  The following table provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date:

| Category | Estimated Prepetition Amount | Interim Order Amount |
|---|---|---|
| Transportation Vendor Claims | $91,600,000 | $91,600,000 |
| Monitoring Vendor Claims | $1,700,000 | $1,700,000 |
| Operational Vendor Claims | $660,000 | $660,000 |
| Foreign Vendor Claims | $340,000 | $253,000 |
| Lienholder Claims | $470,000 | $350,000 |
| Other Trade Claims | $8,790,000 | $4,395,000 |

| Category | Estimated Prepetition Amount | Interim Order Amount |
|---|---|---|
| **Total Trade Claims:** | **$103,560,000** | **$98,958,000** |

13.     In order to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders, the Debtors are critically focused on ensuring the uninterrupted and continued delivery of their products and services to customers.  The Debtors' ability to signal to their customers and vendors that their current situation is temporary only and that their business—and the relationships underpinning it—will continue uninterrupted in the ordinary course is therefore of the utmost importance at the outset of the Chapter 11 Cases.  For the reasons described herein, the Debtors require the flexibility to pay the Trade Claims subject to the limitations set forth in the Proposed Orders, when they believe that doing so is in the best interests of their estates.  The Debtors have real concerns that certain of Trade Vendors will refuse to perform postpetition unless paid the prepetition amounts owed to them or that they may be entitled to assert liens and administrative expense claims against the Debtors' estates.  Lastly, given the unique role the Debtors play in providing critical services to individuals in need of assistance, the failure to maintain certain relationships with the Trade Vendors can have disastrous consequences for the Debtors' business, the Trade Vendors' businesses, and the individuals who have come to rely on both the Debtors and the applicable Trade Vendor.

14.     The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts, subject to the limitations set forth in the Proposed Orders, as they become due and payable in the ordinary course of the Debtors' business. Concurrently with the filing of this Motion, the Debtors have filed the *Emergency Motion of the Debtors for entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense*

*Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Relating Relief* (the "**DIP Motion**") which, if and when granted, in addition to the cash generated by the Debtors' business, will provide the necessary additional liquidity for the Debtors to continue operating in the ordinary course of business during the pendency of the Chapter 11 Cases.  As set forth in the budget annexed to the DIP Motion, the Debtors' proposed expenditures include payment of the Trade Claims the Debtors seek authority to pay in this Motion on an interim and final basis.

15.     As discussed in detail in the First Day Declaration, the RSA contemplates a chapter 11 plan of reorganization (the "**Plan**") that will deleverage the Debtors' balance sheet while keeping their ongoing business operations intact.  Any disruption to the Debtors' timely receipt of essential goods and services would materially impact the Debtors' ability to deliver critical health services to patients.   Further, operational interruptions could harm the Debtors' business relationships, market reputation, and jeopardize critical revenue streams and existing contracts with states and MCOs.  A critical aspect of the Debtors' proposed restructuring is the continuity of their business, which can only be accomplished by maintaining relationships with the Trade Vendors whom the Debtors rely on to operate their businesses.  Accordingly, the Debtors must maintain positive relationships with these suppliers of goods and services throughout the course of the Chapter 11 Cases.

## I.     CRITICAL VENDOR CLAIMS

16.     As of the Petition Date, the Debtors estimate that they owe approximately $94.0 million on account of Critical Vendor Claims.  The Debtors request authorization to pay the Critical Vendor Claims, subject to the stringent identification criteria below, because payment of such claims is necessary to provide operational stability, achieve the Debtors' chapter 11 objectives, continue providing much needed services to people in need of medical assistance, and

preserve the value of their business for the benefit of all stakeholders.  Furthermore, and as set forth below, the Debtors propose to condition the payment of each Critical Vendor Claim on the agreement of the applicable Critical Vendor to continue supplying goods and/or services to the Debtors on the same or better trade terms (including, without limitation, credit limits, pricing, timing of payments, allowances, rebates, discounts, and other applicable terms and programs) that such Critical Vendor offered the Debtors immediately prior to the Petition Date or, if more favorable, within the six-month period prior to the Petition Date, or pursuant to such other terms, trade practices, and programs that the Debtors deem, in their reasonable business judgment, more favorable to the Debtors.

17.     To properly identify the Critical Vendors, certain of the Debtors' employees and professionals have conducted, and will continue to conduct, an extensive analysis and review, of the Debtors' books and records and contracts, and analyze applicable law, regulations, and historical practices to identify the vendors that supply the products and services most vital to the Debtors' go-forward operations.  Given the Debtors' business, without vendors that provide such critical goods and services, the Debtors will not be able to effectively operate and serve individuals in need, which would materially harm the Debtors' business as well as risk harm to the people who require the Debtors' services.

18.     As part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine, which of the Debtors' vendors and service providers should be designated as Critical Vendors:  (a) whether a vendor or service provider provides goods and services to the Debtors pursuant to a contractual agreement and, if so, whether negotiations on new agreements with such vendors or service providers will occur within the near-term; (b) whether the vendor or service provider is a sole-source or limited-source provider; (c) whether

the vendor or service provider relies on the Debtors such that the vendor or service provider would no longer be able to serve patients absent payment from the Debtors; (d) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement of the vendor or service provider would result in significantly higher costs; (e) whether quality requirements, certifications, regulations that apply to the Debtors' business, or specifications prevent the Debtors from obtaining the necessary goods or services from alternative sources within a reasonable timeframe; (f) whether the Debtors can afford the time and expense of an enforcement action if a vendor or service provider that is contractually obligated to continue to provide goods and services to the Debtors wrongfully refuses to perform; (g) whether, pursuant to contract or regulation applicable to the Debtors' business, the Debtors are required to pay such vendor or service provider in order for the Debtors to be compensated for their services; and (h) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (g) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is likely financially unable to provide goods or services to the Debtors on a postpetition basis if the prepetition balances owed to such vendor or service provider are not paid. The Debtors are confident that this process has and will continue to result in designating as Critical Vendors only those vendors and service providers that are truly critical to the Debtors' business and the services the Debtors provide.

19.     In addition to the criteria noted in the above paragraph, given certain unique aspects of the Debtors' business, there are specific vendors who the Debtors have deemed critical.  For example, this includes the Transportation Vendors utilized in the Debtors NEMT Business, which is their largest business segment.  In 2024, the NEMT business segment coordinated an average of over three million trips to and from doctors' appointments, dialysis centers, and hospitals per

month.  To coordinate this critical support at such scale, the Debtors engage approximately 4,100 Transportation Vendors at an aggregate monthly cost of $120 million.

20.     The Transportation Vendors are critical in enabling the Debtors to facilitate access for people in need to critical healthcare services.  Without the Transportation Vendors, the Debtors would be unable to meet the needs of the individual who rely on their services.  The Transportation Vendors thus provide invaluable and irreplaceable services to the Debtors.  In turn, the Debtors are a major source of revenue for a substantial number of the Transportation Vendors, who are small businesses that are dependent on the Debtors' business.  Accordingly, the failure to timely pay the Transportation Vendor Claims may have a ripple effect, harming not just the Debtors' business, but the Transportation Vendors' business and the ultimate end user of the Debtors' services, individuals in need of access to medical care.

21.     In addition to the importance of the Transportation Vendors to NEMT, the products and services that the Monitoring Vendors provide, enable ModivCare to provide seniors, chronically ill patients, and people with disabilities with health monitoring and emergency response equipment.  The equipment is highly specialized, and in many cases, proprietary, resulting in the Debtors only being able to procure such equipment from the Monitoring Vendors. Any disruption in the Debtors ability to obtain such equipment, would negatively impact the Debtors' ability to provide these specialized equipment to those who need it most.

## II.     503(B)(9) CLAIMS

22.     The Debtors have received certain goods and other materials from various parties within the twenty (20) days prior to the Petition Date.  The outstanding amount of these claims is

approximately $500,000.[4]  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by formal long-term contracts; rather, the Debtors typically place such orders on an order-by order basis.  As a result, 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims.  Further, the 503(b)(9) Claims will be entitled to administrative priority under the Bankruptcy Code.  Accordingly, the Debtors seek authority to pay the 503(b)(9) Claims in full in the ordinary course of business.

## III.    FOREIGN VENDOR CLAIMS

23.    In the ordinary course of business, the Debtors rely on certain Foreign Vendors located throughout world to supply certain goods and services necessary to the operation of the Debtors' business.  To the Debtors' knowledge, these Foreign Vendors have limited, if any, assets, employees or offices within the United States.  As of the Petition Date, the outstanding Foreign Vendor Claims total approximately $340,000.  Any disruption stemming from the failure to pay the Foreign Vendor Claims could have a material adverse impact on the day-to-day operations of the Debtors' business.  Accordingly, the continued and uninterrupted access to these Foreign Vendors is critical to ensuring the stability of the Debtors' ongoing operations during the pendency of the Chapter 11 Cases.

24.    The Debtors believe that certain of the Foreign Vendors may be unfamiliar with the chapter 11 process and/or, may not be (or may assert that they are not) subject to the jurisdiction of the Court.  Although (a) the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal and (b) the obligation of contract parties to continue performance postpetition applies to domestic and foreign counterparties alike, the Debtors believe that there is

---

[4]    This amount may also be included in the estimate of Critical Vendor Claims.  However, the Debtors are nevertheless seeking separate authority in this Motion to pay any amounts due to 503(b)(9) Claimants in the event that certain 503(b)(9) Claimants are subsequently determined not to be Critical Vendors.

a serious risk that certain of the Foreign Vendors holding prepetition claims against the Debtors (even those who are party to contracts) may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay and other provisions of the Bankruptcy Code, and engage in conduct that would disrupt the Debtors' operations. Thus, efforts by the Debtors to enforce the Court's orders and the applicable provisions of the Bankruptcy Code against such vendors could be cost-prohibitive, time-consuming, and, possibly, of little practical value as these Foreign Vendors are located primarily or exclusively in jurisdictions outside of the United States.

25.     For the foregoing reasons, by this Motion, the Debtors seek authority, but not direction, to pay prepetition amounts owed to the Foreign Vendors in the ordinary course subject to the limitations set forth in the Proposed Orders. To the extent possible, the Debtors propose to condition the payment of each Foreign Vendor Claim on the agreement of the applicable Foreign Vendor to continue supplying goods or services to the Debtors according to (a) Customary Trade Terms (as set forth below) or (b) such other trade terms and practices as agreed to by the Debtors and the Foreign Vendor. The Debtors also request authorization to make payments on account of Foreign Vendor Claims in the absence of Customary Trade Terms if the Debtors determine, in their business judgment, that the failure to pay such Foreign Vendor Claims will result in harm to the Debtors' estates.

## IV.     LIENHOLDER CLAIMS

26.     In the ordinary course of their business, the Debtors utilize the services of certain Lienholder Claimants that, because of the nature of their business and the work that they perform for the Debtors, may be able to assert that prepetition amounts owed to them are secured by statutory liens on the Debtors' property. As of the Petition Date, certain of the Lienholder Claimants have outstanding invoices or have accrued but unbilled charges relating to the transport or storage of equipment goods and the performance of certain services prior to the Petition Date.

The Debtors estimate that the total amount owed to Lienholders on account of prepetition services is approximately $470,000. In the event the Debtors fail to pay the Lienholder Claims, the Lienholder Claimants may take the position that applicable non-bankruptcy law permits them to assert various statutory liens against property of the Debtors' estates. Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.

27.     Unless the Debtors are able to satisfy the Lienholder Claims as provided herein, these parties may refuse to provide services to the Debtors or may seek to enforce liens against the Debtors' property on account of such claims. Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, Lienholder Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors' property or equipment, regardless of whether such Lienholder already have perfected their interests. Where feasible, the Debtors intend to seek to condition payment to the Lienholders on the acceptance of the Customary Trade Terms discussed below.

## V.     CONDITIONS TO PAYMENT OF TRADE CLAIMS IN THE ORDINARY COURSE

28.     Unless otherwise ordered by the Court, the Debtors request authority to pay Trade Claims, in their discretion, on the following terms and conditions:

a.     The Debtors, in their discretion and subject to the limitations set forth below, shall determine which Trade Claims, if any, will be paid pursuant to the Proposed Orders.

b.     If a creditor accepts payment under the Proposed Orders, such creditor is deemed to have agreed to continue to provide goods or services to the Debtors on terms that are as good as or better than the terms and conditions, including credit terms, that existed 180 days before the Petition Date (before any unilateral acceleration), or on other terms satisfactory to the Debtors in their business judgment (the "***Customary Trade Terms***"), during the pendency of the Chapter 11 Cases. Any Trade Vendor that accepts an order of goods or services from the Debtors after the entry of the Proposed Orders shall be deemed to have agreed to provide goods or services on Customary Trade Terms, regardless of the existence of prepetition amounts owed.

c.     In the event that the relationship between a creditor accepting payment under the Proposed Orders and the Debtors does not extend to 180 days before the Petition Date, the Customary Trade Terms shall mean the terms that the creditor generally extends to its customers or such terms as are acceptable to the Debtors in their business judgment.

d.     If a creditor accepts payment under the Proposed Orders and thereafter does not continue to provide goods or services on at least the Customary Trade Terms during the pendency of the Chapter 11 Cases, then (i) any payment on a prepetition claim received by such creditor shall be deemed to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, recoverable by the Debtors in cash upon written request (or to deem such payment to apply instead to any postpetition amount that may be owing to such creditor) and (ii) upon recovery by the Debtors (or deemed postpetition payment), any such prepetition claim shall be reinstated as if the payment had not been made, and (iii) the Debtors are authorized to pursue any other remedy available to them under the Proposed Orders, applicable law, or any executed agreement with such party.

e.     If the Debtors seek to recover a payment from (or reallocate a payment to) a creditor because the creditor does not continue to provide goods or services to the Debtors on at least the Customary Trade Terms during the pendency of the Chapter 11 Cases, the creditor may contest such action by making a written request (a "***Request***") to the Debtors to schedule a hearing before this Court.  If a Request is made, the Debtors shall provide notice of a hearing on such Request to the creditor making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

f.     Before making a payment to a creditor under the Proposed Orders, the Debtors may, in their discretion, settle all or some of the prepetition claims of such creditor for less than their face amount without further notice or hearing.

## **BASIS FOR RELIEF**

## I.     **PAYMENT OF TRADE CLAIMS IS WARRANTED UNDER SECTIONS 363(B) AND 105(A) OF THE BANKRUPTCY CODE.**

29.     The Court may grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g., Black v. Shor*

*(In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines*, *Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard . . . [t]he business judgment standard in section 363 is flexible and encourages discretion."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

30.    In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491-93 & n.6 (holding that

sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56. Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estates.

31.    Payment of the Trade Claims as they become due in the ordinary course of business is a proper exercise of the Debtors' business judgment because doing so will avoid a value-destructive business interruption, while not prejudicing the Debtors' other stakeholders. The Debtors' ability to pay Trade Vendors in the initial days of these cases will send a clear signal to their suppliers and those that rely on the Debtors' services that the Debtors are willing and able to conduct business as usual after the Petition Date. The goal of the Chapter 11 Cases is to deleverage the Debtors' balance sheet with minimal interruption to the Debtors' business operations. Failure to pay the Trade Claims may disrupt the Debtors' timely receipt of necessary goods and services, and therefore the ability of the Debtors to provide critical medical services to patients. This would harm the Debtors' business, damage their market reputation, result in a loss of revenue, and put the health of patients at risk. Accordingly, the Debtors must maintain positive relationships with their suppliers and service providers, which are essential to the Debtors' business operations, throughout the course of the Chapter 11 Cases.

32.    Further, because the Trade Vendors are already familiar with the Debtors' business needs, often as a result of years-long relationships, they are in the best position to provide goods

and services to the Debtors and are the most likely to do so on commercially reasonable terms. Forcing the Debtors to source replacement goods and services—if replacements are even an option—likely would cause substantial delay and significant costs.  That concern is particularly acute with respect to the Critical Vendors, whose potential substitutes are limited given the nature of the industries in which the Business Segments operate.  Moreover, due to the scale of those Business Segments, and the extent to which the Critical Vendors are entrenched with the Debtors, it would likely be impossible to engage substitute suppliers without serious interruptions to the Debtors' business.  Paying the Trade Claims in the ordinary course is prudent when compared to the harm that such disruption could cause to the Debtors' members, and the amount the Debtors' stakeholders stand to lose if the Debtors' business were interrupted.

II.    **MANY TRADE VENDORS ARE NECESSARY TO ENSURE CONTINUATION OF SERVICE TO AT-RISK COMMUNITIES AND THE DEBTORS' OPERATIONS.**

33.    As described above, the Debtors' largest business segment is NEMT.  If the Transportation Vendors refuse to continue providing services on account of unpaid prepetition claims, the Debtors will be unable to facilitate access to critical healthcare services for people in need.  This may have potentially devastating consequences for those people, many of whom have limited mobility or financial resources to be able to use alternative transport.  Accordingly, the Trade Vendors provide indispensable support that directly impacts the health and well-being of everyday people.  Further, a significant number of the Transportation Vendors are small businesses that depend on the Debtors' business and timely payment to support themselves.  Accordingly, failure to timely pay to the Transportation Vendors may jeopardize the Transportation Vendors' businesses and their ability to continue providing transport to people who rely on such services.

34.    The Debtors are also obligated to pay the Transportation Vendors under applicable regulations and certain of their contracts with state agencies and MCOs.  Under those agreements,

the Debtors' entitlement to be paid is contingent upon their own payment of the Transportation Vendors. Those contracts represent a substantial portion of the Debtors' overall revenue. Therefore, failure to timely pay the Transportation Vendor Claims may compromise the Debtors' ability to collect substantial receivables, jeopardizing the viability of the Debtors' business going forward.

35.     Ultimately, failure to pay the Transportation Vendor Claims may (a) disrupt vulnerable peoples' access to critical healthcare services, (b) threaten the businesses of the Transportation Vendors, and (c) threaten the ability of ModivCare to restructure. The amounts proposed to be paid to the Transportation Vendors herein are significantly lower than the potential costs and consequences of those risks.

36.     As described above, the products and services that the Monitoring Vendors provide enable ModivCare to provide seniors, chronically ill patients, and people with disabilities with health monitoring and emergency response equipment. Such equipment enable seniors, the chronically ill, and people with disabilities to maintain their independence by avoiding moves to long-term care facilities and preventable emergency room visits and hospitalizations. The equipment is highly specialized, and in many cases, proprietary. Accordingly, if the Monitoring Vendors were to refuse to provide products and services on account of unpaid prepetition claims, such goods and services would not be able to be sourced from elsewhere without serious business interruption. Such a disruption would materially impact the Debtors' RPM business segment, which plays a critical role in preventative healthcare and in reducing avoidable hospitalizations.

37.     Given the scale of the Debtors' business, the Debtors rely upon the Operational Vendors for key administrative services such as, but not limited to, records and software maintenance. Such records often contain sensitive patient data which must be stored securely.

Additionally, the Operational Vendors provide medical supplies that are used in all of the Debtors'
business segments.  While substitute providers theoretically could be available for such services
and supplies, transitioning to them would take considerable time, and it would likely interrupt the
Debtors' ability to continue providing critical services to persons in need, and put at risk sensitive
data.

38.     Accordingly, payment of the Critical Vendors is necessary for the Debtors to
maintain operations, to preserve the value of the Debtors' business, and to enable the Debtors to
function and provide critical services in the ordinary course.  Failure to authorize the Debtors to
pay the Critical Vendors as provided herein may have significant consequences for the vulnerable
communities that the Debtors serve, as well as jeopardize the Debtors' chapter 11 restructuring
strategy, and, ultimately, the success of the Chapter 11 Cases.  Therefore, given the nature of the
services provided by the Critical Vendors, consequences of the Critical Vendors ceasing to provide
such services, resulting loss of value to the Debtors' estates if they were not to pay, and the benefits
to be derived from payment of Critical Vendor Claims, the relief requested herein is necessary and
appropriate.

## III.    THE RELIEF REQUESTED IS SUPPORTED BY SECTION 503(B)(9) OF THE BANKRUPTCY CODE.

39.     Moreover, certain of the Trade Claims may be entitled to statutory priority for
goods delivered to the Debtors in the ordinary course of business within 20 days prior to the
Petition Date.   Section 503(b)(9) of the Bankruptcy Code provides that such claims are
administrative expense claims against the applicable Debtor's estate.  *See* 11 U.S.C. § 503(b)(9).
The Debtors, therefore, are required to pay such claims in full in order to confirm a plan of
reorganization (which payment in full is contemplated by the RSA).   *See* 11 U.S.C. §
1129(a)(9)(A) (requiring payment in full of claims entitled to administrative expense priority).

Instead of paying such claims in full on the effective date of their chapter 11 plan of reorganization, the Debtors seek authority to pay these Trade Claims in the ordinary course of business and consistent with past practices, which only affects timing of payment, not amount or priority, and provides benefits to the Debtors by signaling financial strength to vendors and suppliers. Thus, payment of Trade Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code will effect only a change in the timing of such payments, not the amounts or priority thereof. Finally, authorizing the Debtors to pay the Trade Claims entitled to 503(b)(9) priority pursuant to the terms set forth herein should eliminate the burden on this Court and the Debtors arising from numerous individual motions requesting payment on account of such Trade Claims.

## IV.   THE RELIEF REQUESTED IS SUPPORTED BY POTENTIAL FOR LIENS ON ESTATE PROPERTY.

40.   Further, many of the Trade Claims are held by Trade Vendors that may be entitled to assert liens against certain of the Debtors' assets under various state and federal laws. Failure to pay certain Lienholder Claims could result in the Lienholders refusing to turn over the Debtors' essential medical equipment and inventory until their respective Trade Claims are paid in full. This disruption to the Debtors' business would impact their ability to operate effectively and ensure utmost patient care, which in turn could prevent them from maximizing recoveries for all stakeholders in the Chapter 11 Cases.

41.   Further, non-payment of these Trade Vendors with statutory liens could give rise to additional complications and expenses in the Chapter 11 Cases. For example, under section 363(e) of the Bankruptcy Code, Lienholders may be entitled to adequate protection of their liens, which may impose additional costs on the Debtors' estates. Safety concerns also support payment of both Lienholders and other vendors. The Debtors strive to maintain a perfect compliance and safety record for their customers, their business partners, and the general public. Many of the

Lienholders and other vendors provide or hold goods and services that are crucial to the achievement of that goal.  For example, immediate and ongoing access to critical parts and services is necessary to maintain compliance with regulatory standards and ensure uninterrupted service delivery.

42.      For the foregoing reasons, payment of Trade Claims in the ordinary course and consistent with past practices is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in the Chapter 11 Cases.  Accordingly, the Court should authorize the Debtors to pay such claims.

## V.      CONFIRMATION OF ADMINISTRATIVE EXPENSE STATUS OF PREPETITION PURCHASE ORDERS IS APPROPRIATE AND NECESSARY TO THE DEBTORS' REORGANIZATION.

43.      Furthermore, as of the Petition Date, the Debtors have certain prepetition purchase orders (the "***Prepetition Purchase Orders***") outstanding with various third-party vendors and suppliers for goods or services ordered by the Debtors that have not yet been delivered or provided to the Debtors.  These vendors may be concerned that, because the Debtors' obligations under the Prepetition Purchase Orders arose before the Petition Date, such obligations will be treated as general unsecured claims in the Chapter 11 Cases.  Accordingly, certain vendors may refuse to provide goods or services to the Debtors purchased pursuant to the Prepetition Purchase Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (a) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services subject to Prepetition Purchase Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

44.      It is necessary to the uninterrupted operation of the Debtors' business that obligations owed under the Prepetition Purchase Orders for goods or services delivered or provided

postpetition be explicitly granted administrative expense status. Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services are afforded administrative expense priority status. *See Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (Matter of Whistler Energy II, L.L.C.)*, 931 F.3d 432, 440 (5th Cir. 2019) (noting that section 503(b)(1)(A) of the Bankruptcy Code "grants priority status to certain necessary expenses incurred after the filing of a bankruptcy petition that benefit the bankruptcy estate"). Thus, the granting of the relief requested herein will not provide the vendors with any greater priority than they otherwise would have if the relief were not granted, and will not prejudice any other parties in interest.

## CAUSE EXISTS TO AUTHORIZE THE BANKS TO HONOR CHECKS AND ELECTRONIC FUND TRANSFERS

45.     The Debtors further request that the Court authorize applicable banks and other financial institutions (collectively, the "***Banks***") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Trade Claims (whether such checks or fund transfers were presented before or after the Petition Date), to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment. The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Trade Claims dishonored or rejected as a result of the commencement of the Chapter 11 Cases.

## EMERGENCY CONSIDERATION

46.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief

is necessary to avoid immediate and irreparable harm.  As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

<div align="center">

**DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE
6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)**

</div>

47.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

<div align="center">

**RESERVATION OF RIGHTS**

</div>

48.     Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is

valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **NOTICE**

49.     Notice of this Motion will be served on: (a) the Office of the United States Trustee for the Southern District of Texas; (b) Paul Hastings LLP, counsel to the First Lien Agent and the Consenting Creditors; (c) counsel to the DIP Lenders; (d) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (e) the United States Attorney for the Southern District of Texas; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

50.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global, at https://www.veritaglobal.net/ModivCare.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  August 20, 2025                    Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Catherine A. Rankin (Texas Bar No. 24109810)
Brandon Bell (Texas Bar No. 24127019)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@hunton.com
        catherinerankin@hunton.com
        bbell@hunton.com

-and-

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Keith A. Simon (NY Bar No. 4636007)
George Klidonas (NY Bar No. 4549432)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
        keith.simon@lw.com
        george.klidonas@lw.com
        jon.weichselbaum@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**<ins>CERTIFICATE OF SERVICE</ins>**

I certify that on August 20, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

<div align="right">

*<ins>/s/ Timothy A. ("Tad") Davidson II</ins>*
Timothy A. ("Tad") Davidson II

</div>