**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
MODIVCARE INC., et al.,                                      :    Case No. 25-90309 (ARP)
                                                             :
                    Debtors.¹                                :    (Joint Administration Requested)
                                                             :
------------------------------------------------------------ x
```

**DECLARATION OF CHAD J. SHANDLER IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Chad J. Shandler, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.     I am the Chief Transformation Officer ("***CTO***") of ModivCare Inc. ("***ModivCare***" or the "***Company***") and its debtor affiliates (collectively the "***Debtors***").  I submit this first day declaration (this "***Declaration***") in support of (a) the Debtors' prearranged Chapter 11 Cases to implement a consensual and comprehensive restructuring of the Debtors' balance sheet, and (b) the Debtors' Petitions and all "first-day" motions and applications filed by the Debtors (collectively, the "***First Day Pleadings***").

2.     I was appointed as CTO on January 9, 2025.  Prior to my appointment as CTO, I provided financial advisory services to the Debtors in connection with my role as a Senior Managing Director at FTI Consulting, Inc. ("***FTI***").  Since commencing work for the Debtors on November 29, 2024, together with the FTI team, I have been personally involved with the Debtors' business and operations and their restructuring process.  Accordingly, I have acquired significant knowledge of the Debtors, their businesses, and the circumstances that led to the commencement

---

¹     A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/ModivCare.  Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

of the Chapter 11 Cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.[2]

3.      I have been a Senior Managing Director at FTI for approximately seven years and serve as the Co-Leader of the Healthcare Practice and Co-Leader of Healthcare Restructuring Services.  My practice focuses on identifying restructuring alternatives, developing financial and operating plans and building consensus with stakeholders across a wide spectrum of healthcare assignments.   My expertise includes serving as a chief restructuring officer and advising stakeholders with an emphasis in a variety of healthcare sectors including hospitals, senior living and housing, freestanding emergency rooms, physician practices, and life sciences.  I am often asked to serve in an interim management or financial advisory role to lead the restructuring and/or business transformation efforts of companies including but not limited to assessing financial performance, liquidity management, negotiating with stakeholders, comparing operating results to industry norms, developing "bottoms-up" multi-year financial forecasts, support asset sales and due diligence processes, arranging financing and evaluate marketing plans, marketing efforts, and demographics of primary market areas and otherwise advise with respect to restructuring options. A representative list of my previous clients involving restructuring matters includes Steward Health Care, Prospect Healthcare, Northwest Senior Housing Corporation, Tarrant County Senior Living Centre, Inc., Neighbors Health, CUE Health, Amsterdam House Continuing Care Retirement Community, Dowling College, and Beverly Community Hospital.

4.      As set forth above, I am knowledgeable about, and familiar with, the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that led to the commencement of the Chapter 11 Cases.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement (including the restructuring term sheet attached thereto), as applicable (each as defined below).

experience, knowledge, and information concerning the Debtors' operations and financial condition, my own reasonable inquiry, and/or my discussions with the Debtors' other officers, directors, and restructuring advisors, including professionals at Latham & Watkins LLP ("*Latham*"), Hunton Andrews Kurth LLP ("*Hunton*"), Moelis & Company ("*Moelis*"), FTI,[3] and Kurtzman Carson Consultants, LLC d/b/a Verita Global ("*Verita*" and, together with Latham, Hunton, Moelis, and FTI, the "*Advisors*"). If called upon to testify, I would testify to the facts set forth in this Declaration.

## PRELIMINARY STATEMENT

5. ModivCare comes before the Court having entered into a restructuring support agreement for a comprehensive restructuring, deleveraging its balance sheet, and injecting much needed liquidity into the businesses (the "*Restructuring*"). The Company has secured substantial creditor support. Specifically, the Restructuring is supported by holders of approximately (a) 90% of the aggregate outstanding principal amount under the First Lien Facility, and (b) 70% of the aggregate outstanding principal amount under the Second Lien Notes (as defined herein and collectively, the "*Consenting Creditors*") that are party to that certain *Restructuring Support Agreement* dated as of August 20, 2025, annexed hereto as **Exhibit A** (as amended from time to time and including all exhibits and schedules thereto, the "*Restructuring Support Agreement*").

6. The Restructuring contemplated by the Restructuring Support Agreement will substantially reduce the Company's balance sheet liabilities from approximately $1.4 billion in total funded debt to approximately $300 million in total funded debt upon emergence. It also provides for, among other things:

- the funding of the Chapter 11 Cases through a backstopped $100 million new money debtor-in-possession financing facility (the "*DIP Financing*");

- the commitment to convert all outstanding DIP Loans and claims on the Effective Date of the Plan to term loans under a takeback loan facility (the "*Exit Term Loan Facility*");

---

[3] In addition to providing the services of a CTO, FTI provides temporary employees to assist the CTO and otherwise provide financial advisory services to the Debtors.

- the ability for the Reorganized Debtors to enter into a $250 million Exit Revolver Credit Agreement, inclusive of a $150 million sublimit for the issuance of letters of credit, which are often required by the Company's contract counterparties, and which may facilitate greater free cash flow, given the current collateral requirements of the Company's surety providers; and

- an equity rights offering, open to holders of Unsecured Notes and Other General Unsecured Creditors.

7.     ModivCare Inc. traces its roots back over thirty years, and certain of its business segments began providing non-emergency medical transportation ("***NEMT***") services to government-sponsored healthcare programs in the 1980s.  Since its founding, ModivCare has grown into a leading technology-enabled healthcare services company, connecting members to essential care through NEMT, personal care services ("***PCS***"), and remote patient monitoring ("***RPM***").  The Company's corporate segment includes general corporate services as well as the Company's virtual care and community-based monitoring innovation programs; additionally, the Company's ownership stake and minority interest in a national provider network of community-based clinicians delivering in-home and on-site services ("***Corporate***," and together with NEMT, PCS, and RPM, the "***Business Segments***").  Over the past decade, ModivCare has transformed into one of the nation's largest providers of supportive care solutions, serving millions of members annually across 48 states and the District of Columbia, including Texas, through a workforce of approximately 23,675 employees and thousands of contracted third-party transportation providers and their respective drivers who are employed by the Debtors and their non-Debtor affiliates.

8.     ModivCare's services are engrained in the everyday lives of vulnerable populations.  For example, ModivCare coordinates millions of annual rides to and from doctors' offices, dialysis centers, and hospitals for Medicaid and Medicare members; provides in-home personal care services that allow seniors and persons with disabilities to live independently; and offers connected-care monitoring and digital engagement tools that promote preventive health and reduce avoidable hospitalizations, often in rural settings.  Through these services, ModivCare plays

a critical role in supporting healthcare access and addressing social determinants of health for some of the nation's most at-risk communities.

9.      For the fiscal year ending December 31, 2024, ModivCare generated approximately $2.79 billion in service revenue and $161.1 million in adjusted EBITDA.  Despite the strength and societal importance of its platform, ModivCare is weighed down by approximately $1.4 billion in funded debt, substantial annual interest expense, and persistent cash flow pressure.  ModivCare reported a net loss of $201.3 million in 2024 and negative free cash flow of $34.0 million, and in the first quarter of 2025, revenues declined nearly 5% year-over-year, with adjusted EBITDA of $32.6 million.  The Company's revolving credit facility is fully drawn, including $75 million principal coming due and owing in January 2026, and its leverage ratio is unsustainable.

10.      In addition to its balance sheet challenges, macroeconomic and industry-wide factors have further pressured the business.  Plan changes in Medicare Advantage and working capital mismatches have reduced cash inflows and put further liquidity timing demands on the Debtors.  Contract counterparties have increasingly demanded more restrictive terms, while rumors of a potential restructuring and perceptions of financial instability have led to counterparty de-risking.  These dynamics, combined with rising costs of care delivery, have exacerbated ModivCare's liquidity strain.

11.      In January 2025 and March 2025, ModivCare exchanged approximately $271 million of Unsecured Notes for Second Lien Notes and raised approximately $105 million—comprising $75 million in new first lien secured debt and an additional $30 million via the issuance of Second Lien Notes—to secure vital liquidity and covenant relief and stave off an immediate chapter 11 filing.  While the measures bought time and temporarily stabilized operations, they did not address ModivCare's fundamental leverage and increasing liquidity challenges, making a comprehensive restructuring ultimately unavoidable.

12.      Following the events of January 2025, ModivCare continued to struggle with a heavy debt load—approximately $1.4 billion as of March 2025—and high cash interest costs that constrained liquidity and growth.  At the same time, the Company has faced persistent industry

headwinds, including reimbursement pressure from state Medicaid programs, labor cost inflation, and mounting competition from regional and tech-driven entrants. These challenges have been compounded by regulatory changes that cut Medicaid funding and eligibility, as well as Medicare Advantage plan design changes reducing supplemental benefits, further pressuring revenues. Moreover, customer non-renewals, delays in customer contract repricing, increased volume under certain of its customer contracts, delays in patient approvals for certain services, surety collateral demands, and looming covenant breaches have left the Company with rapidly deteriorating liquidity, ultimately necessitating a comprehensive restructuring.

13.     Recognizing the urgency of the situation, in June 2025 the Company retained Latham to assist in evaluating strategic alternatives, as well as assist with particular matters related to the healthcare sector. Latham, along with Moelis and FTI, quickly helped the Company evaluate a number of strategic alternatives, including out of court and sale transactions. However, after serious consideration of all viable and theoretical options, it was determined that a substantial deleveraging and capital infusion was required to ensure that the Company's capital structure, and its ability to continue providing solutions to its customers, remained stable and best positioned for the long-term. Accordingly, the only viable, executable, and responsible near term option was an in-court restructuring through a pre-arranged chapter 11 with its existing first and second lien lenders. The Company thus entered into the Restructuring.

14.     The Restructuring Support Agreement also provides the Company with a quick path to exit consistent with the milestones set forth below:

| Event | Deadline |
| --- | --- |
| Interim DIP Order | 3 days after the Petition Date |
| Filing of Plan and Disclosure Statement | 15 days after the Petition Date |
| Final DIP Order | 45 days after the Petition Date |
| Disclosure Statement Order | 45 days after the Petition Date |
| Confirmation Order | 90 days after the Petition Date |
| Effective Date | 110 days after the Petition Date |

15.     The Restructuring is the product of extensive arm's-length negotiations among the Debtors and their key stakeholders and is the best available path for the Debtors to strengthen their

business, while allowing business operations to continue without unnecessary disruption. The commencement of the Chapter 11 Cases is a crucial step in the Company's journey to right-size its capital structure and maintain customer confidence in its ability to continue providing crucial and innovating healthcare products. With the support of their key stakeholders, the Debtors expect to emerge from chapter 11 on an expeditious timeframe, with a healthier balance sheet and the ability to continue serving their customers.

16. On the date hereof (the "***Petition Date***"), ModivCare and its affiliates filed voluntary petitions in the United States Bankruptcy Court commencing cases for relief under Chapter 11 of title 11 of the United States Code. To minimize disruption to its operations and protect stakeholder value, ModivCare has filed motions and pleadings seeking various forms of "first day" relief (the "***First Day Pleadings***"). I am familiar with the contents of each First Day Pleading and believe that the relief sought therein is critical to preserving ModivCare's business, maintaining continuity of services for its members, stabilizing relationships with counterparties, and ensuring the success of these Chapter 11 Cases. The facts set forth in the First Day Pleadings are incorporated herein by reference.

17. To familiarize the Court with ModivCare, its businesses, the circumstances leading to these chapter 11 cases, and the relief ModivCare is seeking in the First Day Pleadings, I have organized this declaration as follow:

- Part I describes the Company's business, its history, its current operations, and its organizational and capital structures.

- Part II describes the events leading to the filing of the Chapter 11 Cases and the Debtors' efforts to identify a viable strategic alternative.

- Part III lists the First Day Pleadings and provides support for the relief requested therein.

I.      **BACKGROUND**

A.  **History & Corporate Structure**

18.      Founded in 1996 as The Providence Services Corporation, ModivCare concentrates on connecting people to their healthcare providers to improve outcomes and overall patient health. ModivCare became publicly traded in 2003 through an initial public offering and currently trades on the NASDAQ under the ticker MODV.  The Company has grown from a stand-alone non-emergency medical transportation provider to a multi-faceted supportive care solutions provider. The Company has expanded organically and by acquiring several businesses, including: (a) Charter LCI Corporation, the parent company of LogistiCare, Inc. (which is now ModivCare Solutions, LLC) in 2007; (b) Matrix Medical Network ("***Matrix***") in 2014 (which ModivCare later sold the majority interest to Frazier Healthcare Partners); (c) Circulation, Inc. in 2018; (d) National MedTrans, LLC in 2020; (e) OEP AM, Inc. (d/b/a Simplura Health Group) in 2020; (f) WellRyde in 2021; (g) Care Finders Total Care in 2021; (h) VRI Intermediate Holdings, LLC in 2021; and (i) Guardian Medical Monitoring in 2022.

19.      The Company's headquarters are located in Denver, Colorado.  Today, the Company has operations throughout 48 states and the District of Columbia.  The Company has developed a complex corporate structure to support these operations.  The chart attached hereto as **<u>Exhibit B</u>** provides a detailed overview of the Debtors' corporate structure.

B.  **Current Business Operations**

20.      ModivCare's four Business Segments—NEMT, PCS, RPM, and Corporate—provide patient-centric services to its customers.  These Business Segments roll up into centralized and standardized operations, which enable the Company to cultivate best practices and efficiencies.  Through these processes, the Company generally seeks to have a positive impact by closing certain health gaps and addressing the social determinants of health by serving those in need.  The Business Segments are designed to achieve these goals, improve access to care, and adapt to the ever changing healthcare industry, which must prepare for and react to anticipated shifts in the demographic dynamics of the United States, including an aging population with

increased life expectancies (which is expected to increase general demand for healthcare services), an increasing prevalence in chronic illness (which require active and ongoing monitoring of patient health and data), an increasing demand for value-based versus fee-for-service care, and an increasing demand for in-home care. [4]



### C.  Business Segments

21.    ***NEMT***.    Through NEMT, the Company provides non-emergency medical transportation to members of public and private insurance providers (the "***Payors***"), including the

---

[4]    A complete March 2025 Investor Presentation *available at* https://investors.modivcare.com/events-presentations/default.aspx.

state Medicaid and Medicare agencies, and managed care organizations ("**MCOs**"). The Company's primary customers are typically Medicaid or Medicare eligible members whose limited mobility or financial resources impede their ability to access necessary healthcare and social services. The Company applies its proprietary technology platform to a network of approximately 4,100 transportation resources, including on-demand transportation network companies, mass transit entities, mileage reimbursement programs, taxis. and county-based emergency service providers. Through these partnerships, ModivCare has become one of the nation's largest manager of non-emergency medical transportation for state governments and MCOs. In 2024, the Company managed approximately 36.8 million trips for approximately 29.5 million average monthly members.

22. **PCS**. Through PCS, the Company provides in-home personal care services to customers by placing non-medical personal care assistants, home health aides, and skilled nurses in the home setting. The Company places these in-home resources with Medicaid patients in need of assistance, including senior citizens and disabled adults. ModivCare's PCS segment Payors include government agencies, MCOs, commercial insurers and private individuals. In 2024, ModivCare had approximately 14,000 caregivers throughout seven states who provided approximately 28 million hours of patient care.

23. **RPM**. Through RPM, the Company provides in-home monitoring services to support patient self-management and care management operations. The RPM business segment enables seniors, the chronically ill, and people with disabilities to maintain their long-term independence by avoiding moves to long-term care facilities and preventable emergency room visits and hospitalizations. ModivCare provides a variety of services that leverage personal emergency response systems, monitoring devices, relationship-based care and data-driven patient engagement solutions. In 2024, the Company served approximately 247,000 members of government insurance programs, members of healthcare provider organizations, and private individuals through RPM.

*24.    **Corporate.** Through Corporate, the Company's subsidiary, Higi Care LLC ("**Higi**"), provides data-driven personal health technologies through the placement of health monitoring systems at certain third-party brick and mortar stores, and community health monitoring services (under a management services organization "friendly PC" model).  Corporate also includes the Company's revenue from its non-controlling interest in a joint venture that maintains a national network of community-based clinicians who provide in-home and on-location services.  Finally, Corporate includes the Company's activities related to accounting, finance, internal audit and tax, and key corporate development functions.

### D.  Expansion Efforts

25.    Over the last several years, and as illustrated in the chart below, ModivCare made substantial acquisitions to expand its services and offerings.  Those efforts were made in response to increased demand for the Company's services before and during the Covid-19 pandemic.  With these investments, ModivCare is now the leader in the non-emergency medical transportation industry and continues to grow in other key healthcare segments.

| Date | Segment | Target | Purpose |
|------|---------|--------|---------|
| May 2020 | NEMT | National MedTrans, LLC | • Added more than 5,000,000 annual trips on behalf of Medicaid agencies and MCOs |
| November 2020 | PCS | OEP AM, Inc. (d/b/a Simplura Health Group) | • Formed the foundation of PCS operations |
| May 2021 | NEMT | WellRyde | • Increased technology platform for use in NEMT |
| September 2021 | PCS | Care Finders Total Care | • Expanded PCS |
| September 2021 | RPM | VRI Intermediate Holdings, LLC | • Formed the foundation of RPM operations |
| May 2022 | RPM | Guardian Medical Monitoring | • Expanded RPM |

26.    Since 2022, ModivCare and its management team has proactively reshaped its operations and governance to meet evolving market demands, including:  (a) establishing a new $325 million senior secured revolving credit facility in early 2022 to strengthen liquidity and

financial flexibility; (b) centrally consolidating and digitizing core platforms across NEMT, PCS, and RPM to boost operational efficiency and scale cost-savings; (c) launching targeted cost-control and restructuring initiatives that reduced expenses and streamlined operations; and (d) refreshing governance and leadership by appointing new independent board members and transitioning senior executives to drive modernization and transformation.  The Company is also in the process of exploring artificial intelligence and automation to optimize its businesses, but these efforts have been delayed by imminent liquidity shortfalls, debt maturities, and looming covenant defaults.

### E.  Revenue Breakdown

27.     The Company's revenue streams are primarily driven by the NEMT segment and complemented by the PCS, RPM, and Corporate segments, as shown below[5]:

| Segment | Year Ended December 31, 2023[6] | Year Ended December 31, 2024 | Quarter Ended March 31, 2025 |
|---|---|---|---|
| NEMT | $1,951,447 | $1,957,275 | $449,007 |
| PCS | $715,615 | $745,299 | $181,787 |
| RPM | $77,941 | $77,739 | $18,125 |
| Corporate and Other | $6,167 | $7,273 | $1,735 |
| **Consolidated ModivCare** | **$2,751,170** | **$2,787,586** | **$650,654** |

### F.  Employee Workforce

28.     The Debtors employ approximately 20,160 employees in the United States.  To supplement the services performed and duties executed by the employees, the Debtors currently have approximately 1,620 engagements with contract workers and temporary staff.  Contracted labor, who complete discrete projects and fulfill duties similar to the job functions of employees, are a critical and cost-effective supplement to the employees.  Certain members of the workforce employed by Debtor All Metro Aids, Inc. are represented by United Healthcare Workers East and are party to a collective bargaining agreement.

### G.  Governance & Management

29.     ModivCare is governed by its board of directors (the "***Board***").  On June 17, 2025, ModivCare held its annual meeting of shareholders, during which the Board was elected for a one-year term.  The current Board consists of the seven directors listed below:

---

[5]     Figures are in thousands and based on ModivCare's public filings for the relevant periods.

[6]     Excludes $5,037k of grant income for the year ended December 31, 2023.

| Name | Position |
|---|---|
| Todd J. Carter | Director |
| Alec Cunnigham | Director |
| David Mounts Gonzalez | Director |
| Leslie V. Norwalk | Director, Chairperson of the Board |
| Erin L. Russell | Director |
| L. Heath Sampson | Director and CEO |
| Daniel B. Silvers | Director |

30.     In connection with the terms of the Fifth Amendment (as defined and described below), the Company was required by the terms of its debt documents to appoint three independent directors from a list of directors provided by the First Lien Lenders.  The final of these new independent directors was seated on April 24, 2025.  The candidate list was highly negotiated with the Debtors and each independent director candidate had to have requisite expertise (including serving on public companies and within the healthcare industry) and independence.  The Board also established a committee comprised of three directors to oversee sales and marketing processes for the PCS and RPM segments (the "***Strategic Alternatives Committee***").[7]  Since April 2025, the members of the Strategic Alternatives Committee have been Alec Cunningham, Erin L. Russell (Chairperson), and Daniel B. Silvers.

31.     In addition, on June 20, 2025, the Board established a special committee of the Board (the "***Capital Structure Committee***") to investigate, review, evaluate, analyze, negotiate, and make recommendations to the Board to approve or reject, any changes to the Company's capital structure including all restructuring matters.  The members of the Capital Structure Committee are Todd J. Carter, Alec Cunningham, David Mounts Gonzales, Erin L. Russell, and Daniel B. Silvers (Chairperson).  In the lead up to the Chapter 11 Cases, each of the Strategic Alternatives Committee and the Capital Structure Committee met at least weekly and have been coordinating amongst each other to discuss the various issues facing the Company and to explore

---

[7]     *See* Form 8-K for ModivCare Inc., dated April 24, 2025.

all available options, including out-of-court options, sale, processes, and in-court processes, for the Company to address its financial challenges and maximize value.

32.     The Board also has three other committees:  (a) a committee to oversee management's conduct of the Company's financial reporting process (the "***Audit Committee***"); (b) a committee to assist the Board in discharging its responsibilities relating to executive compensation (the "***Compensation Committee***"); and (c) a committee to establish criteria for selecting new directors, to recommend a slate of nominees for election at the annual shareholder meeting, and to oversee healthcare compliance (the "***Nominating and Governance Committee***"). All directors, regardless of whether such director is a member of a committee of the Board, are invited to attend meetings of the various committees of the Board.

### H.  Capital Structure

33.     The Debtors have both secured and unsecured funded debt claims.  A summary of the approximate outstanding principal amounts of the Debtors' funded debt obligations as of the Petition Date is set forth below.

| Facility | Outstanding Principal Balance | Maturity | Rate |
|---|---|---|---|
| Incremental Term Loan | $78.8 million | January 10, 2026 | SOFR + 7.50% |
| First Lien Revolving Credit Facility | $270.7 million | February 3, 2027 | SOFR + 4.25% |
| First Lien Term Loan B | $522.2 million | July 1, 2031 | SOFR + 4.75% |
| Second Lien Notes | $316.2 million | October 1, 2029 | 5.0% Cash (10% PIK Toggle) |
| **Total Secured Debt** | **$1,187.9 million** | | |
| Unsecured Notes | $228.8 million | October 1, 2029 | 5.0% |
| **Total Funded Debt** | **$1,416.7 million** | | |

### i.      First Lien Facility

34.     ModivCare is party to that certain *Credit Agreement*, dated as of February 3, 2022 (as amended by (a) the *Amendment No. 1 to Credit Agreement*, dated as of June 26, 2023, (b) the *Amendment No. 2 to Credit Agreement*, dated as of February 22, 2024, (c), the *Amendment No. 3 to Credit Agreement*, dated as of July 1, 2024, (d) the *Amendment No. 4 to the Credit Agreement*,

dated as of September 30, 2024, and (e) the *Amendment No. 5 to Credit Agreement*, dated as of January 9, 2025 (the "***Fifth Amendment***"), and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***First Lien Credit Agreement***"), with, among other parties, JPMorgan Chase Bank, N.A., as administrative agent (including any successor thereto,[8] the "***First Lien Agent***"), Wells Fargo and the other lenders party thereto (collectively, the "***First Lien Lenders***"), and certain subsidiaries of ModivCare from time to time party thereto as guarantors.  The First Lien Credit Agreement is secured by a first priority lien on substantially all of the property and assets of ModivCare and its guarantor subsidiaries.

35.     As of the Petition Date, the Company has approximately $871.7 million outstanding under the First Lien Credit Agreement, comprising (a) $270.7 million in unpaid principal amount of revolving loans, plus accrued and unpaid interest, fees, costs (the "***First Lien RCF Facility***"), (b) $522.2 million in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due July 2031 (the "***First Lien Term Loans***"), and (c) $78.8 million in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due January 2026 (the "***First Lien Incremental***" and together with the First Lien RCF Facility, and the First Lien Term Loans, the "***First Lien Facility***").  The First Lien Incremental was provided to the Company pursuant to the Fifth Amendment.

### ii.     Second Lien Notes

36.     As described more fully in paragraph (iii) below, ModivCare is party to an Unsecured Notes Indenture (as defined below).  Pursuant to the Fifth Amendment, ModivCare entered into an exchange agreement (the "***Exchange Agreement***"), dated January 9, 2025. As required by the Exchange Agreement, certain of the Unsecured Notes (as defined below) were exchanged pursuant to certain *Second Lien Senior Secured PIK Toggle Notes due October 1, 2029* (the "***Second Lien Notes***"), issued by ModivCare and pursuant to that certain *Second Lien Senior*

---

[8]     JPMorgan Chase Bank, N.A. has provided notice of intention to resign as First Lien Agent and will be replaced by Wilmington Trust National Association.

*Secured PIK Toggle Notes Indenture*, dated as of March 7, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Second Lien Notes Indenture***"), by and between ModivCare, as issuer, Ankura Trust Company, LLC, as trustee and notes collateral agent, the subsidiaries of ModivCare from time to time party thereto as guarantors, and holders of Second Lien Notes (the "***Second Lien Noteholders***").  The Second Lien Notes are secured by a second priority lien substantially all of the property and assets of ModivCare and its guarantor subsidiaries.  As of the Petition Date, the principal amount under the Second Lien Notes is approximately $316.2 million.

### iii.  <u>Unsecured Notes</u>

37.     ModivCare is the issuer of certain *5.000% Senior Unsecured Notes due October 1, 2029* (the "***Unsecured Notes***") issued pursuant to that certain *Senior Notes Indenture*, dated August 24, 2021 (as amended prior to the date hereof, the "***Unsecured Notes Indenture***"), by and between ModivCare, as issuer, and Wilmington Saving Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company, N.A.) as trustee, and the subsidiaries of ModivCare from time to time party thereto as guarantors.  In connection with the Exchange Agreement, the requisite holders of Unsecured Notes entered into that certain Fifth Supplemental Indenture, dated as of March 7, 2025, which, among other things, released all the guarantors of their guarantees under the Unsecured Notes Indenture.  Accordingly, the Unsecured Notes are only an obligation of ModivCare, as issuer under the Unsecured Notes Indenture.  The remaining balance of these Unsecured Notes are those that were not exchanged pursuant to the Exchange Agreement.  As of the Petition Date, the principal amount under the Unsecured Notes is approximately $228.8 million.

### I.  **Other Non-Funded Debtor Obligations**

### i.  <u>Trade Claims</u>

38.     In the ordinary course of business, the Debtors utilize certain vendors and service providers (the "***Trade Creditors***").  As of the Petition Date, the Debtors estimate that the aggregate amount of trade claims outstanding is approximately $123.9 million, the majority of which is owed

to transportation providers.   These transportation providers, and certain other Trade Creditors, are a vital part of the Company's ability to continue providing much needed services to the Debtors' customers and patients.   Any interruption, even briefly, in the flow of goods and services from such creditors would have an immediate and adverse impact on the Debtors' ability to continue operating in the ordinary course.   Accordingly, as noted below, the Debtors' filed the Critical Vendor Motion to ensure that the Debtors can pay prepetition amounts owed to those Trade Creditors who are critical to the Debtors' business.[9]

### ii.      Other General Unsecured Claims

39.      As of the Petition Date, the Debtors anticipate approximately $25 million on account of claims against the Debtors (other than the Unsecured Notes, intercompany claims and claims of Trade Creditors described herein) as of the Petition Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code.

## II.      KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

40.      The need to commence these Chapter 11 Cases was a result of a number of factors, including an unsustainable capital structure, rapidly deteriorating liquidity, negative industry trends, and customer de-risking by reducing exposure with ModivCare.   In an attempt to preserve and maximize value, ModivCare and its management team have been, and continue to seek to, implementing turnaround initiatives to assure that the Company is operating at an optimal level despite the challenging capital structure.

### A.  Financial Challenges

41.      The Debtors' financial challenges date back to prior to the Fifth Amendment.   As of the twelve-month period ending March 2025, the Company's funded debt is approximately $1.4 billion and adjusted EBITDA is $162 million.   The Debtors' current balance sheet has had a corresponding negative and restrictive impact on the Debtors' liquidity and growth prospects.

---

[9]      "***Critical Vendor Motion***" means that certain *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Payment of Prepetition Trade Claims in the Ordinary Course of Business and (B) Granting Related Relief*, filed concurrently herewith.

The Debtors' unhedged annual cash interest expense for fiscal year 2025 under the prepetition capital structure would be in excess of $100 million[10] at current interest rates.

### B. Persistent Negative Industry Trends

42.     The non-emergency medical transportation and personal care services industries have faced persistent headwinds over the past several years.  Demographic shifts, evolving government reimbursement models, and tightening regulatory oversight have created sustained pressures on both cost structures and margins.  In particular, state Medicaid programs and MCOs— the Company's primary customers—have steadily increased their focus on cost containment, frequently driving reimbursement rates downward while simultaneously raising service quality expectations.  At the same time, the broader healthcare services sector has experienced significant wage inflation, particularly for caregivers and transportation providers, as labor shortages and competition for skilled workers have intensified.

43.     Further compounding these challenges, companies like ModivCare must navigate heightened insurance premiums and dynamic reimbursement and regulatory requirements tied to evolving federal and state regulatory frameworks.  In addition, the industry has seen mounting competitive pressures from smaller, more nimble regional operators and technology-driven entrants seeking to capture market share through lower-cost models, but without the same geographic range and scale.  The net effect has been a highly competitive pricing environment in which customers prioritize cost savings, while providers struggle to absorb rising operating expenses.

44.     Historically, ModivCare has sought to address these industry headwinds through investment in technology, strategic acquisitions, and efforts to achieve economies of scale and operational efficiencies.  However, the Company's ability to fully mitigate the impact of these structural industry changes has been constrained by its capital structure and liquidity profile.  As a result, persistent adverse industry dynamics, combined with escalating operating costs and

---

[10]     Assumes all cash interest and no PIK is elected.

pricing pressures, have materially impacted ModivCare's revenues, margins, and financial flexibility.

### C. Changes in the Regulatory Landscape

45.     In addition to the aforementioned challenges, the Debtors' are also responding to certain regulatory challenges. The Debtors' significant customers are anticipating or have already begun implementing various state budget cuts, largely arising from: (a) the One Big Beautiful Bill Act (the "***BBB***"), which marks a sizeable regulatory change in the healthcare industry and imposes significant reductions in the funding of and services covered by the Medicaid program, as well as the number of persons enrolled in Medicaid; and (b) the Budget Control Act of 2011 (the "***BCA***") and American Rescue Plan Act of 2021 (the "***ARPA***" and, together with the BBB and BCA, the "***Acts***"), which have resulted or will result in additional Medicare payment reductions, and thus a reduction in supplemental benefits (including NEMT services) offered by Medicare Advantage plans.[11] Because many, if not all, of the Debtors' most significant customers are implementing, and/or considering the implementation of, budget cuts in response to the Acts, the Debtors anticipate adverse effects on their businesses and revenues in 2026.

46.     Further, it is difficult to predict whether, when or what other deficit reduction initiatives may be proposed by Congress. The Company anticipates that the federal budget deficit will continue to place pressures on government healthcare programs and impose additional spending reductions. These pressures have increased uncertainty in the healthcare industry, and this uncertainty has affected government agencies, companies operating in the industry (including the Debtors), and patients.

### D. Emergency Funding and the Fifth Amendment

47.     The growth of ModivCare's services through the acquisitions has required substantial investment of capital, and the service of debt associated with the acquisitions has placed substantial stress on the Debtors. Recognizing the potential risks relating to the Company's

---

[11]   The ARPA was to take effect in January 2022. However, Congress delayed implementation of the reduction until 2025 and has yet to take action related to the ARPA payment reduction for 2025 or 2026.

indebtedness, the Company began the process of evaluating strategic alternatives in the second-half of 2024.  The Company hired FTI and Moelis to assist with this process and to help rationalize its business, reduce discretionary capital expenditures, and preserve liquidity.  The Company also sought to raise funds in the public markets, including from its existing lenders, to provide additional liquidity and address leverage concerns.

48.     Ultimately, in January 2025, the Company undertook a series of capital structure initiatives designed to bolster liquidity and stabilize operations.  These initiatives included entering into the Fifth Amendment, which infused $75 million of new liquidity into the Company.  In March 2025, the Company consummated two transactions pursuant to which it issued $30 million of new Second Lien Notes and exchanged approximately $271 million of existing Unsecured Notes for additional Second Lien Notes.  Together, these transactions raised over $105 million in new financing and facilitated broad-based support across the Company's capital structure.  Absent the Fifth Amendment and Second Lien Notes and their incremental critical liquidity, the Company may have been forced to commence these Chapter 11 Cases at that time.  In exchange, the First Lien Lenders limited certain  baskets and imposed certain covenants on the Debtors.

### E.  Rapidly Deteriorating Liquidity

49.     While the aforementioned actions provided important near-term liquidity, they ultimately proved insufficient to overcome persistent industry headwinds and the Company's overall leverage profile.  During the first half of 2025, and through July of 2025, the Company has continued to experience operational challenges, including non-renewals from certain key customers, delays in key customer repricing, increased volume of per-member rides under shared- risk contracts[12], and the Debtors' failure to transition to fee-for-service contracts.  These developments further intensified the Company's already difficult situation and raised broader concerns about its ability to maintain and grow its commercial relationships.  The Company also

---

[12]   A majority of the Company's contracts are on a capitated risk-sharing model under which payment is not based on services provided, but is generally paid on a per member per month basis. An increase in rides requested per enrolled member impacts the liquidity of the Company and puts added operational and resource strain on available drivers within a given geographic network.

recognized the legitimate risk that additional customers—many of whom have contracts terminable for convenience—could choose to disengage.  As a result, customer derisking and stabilization became a central focus for the Company and its stakeholders.

50.     The Company's precarious financial condition also heightened concerns with its surety providers.  Historically, certain sureties have required some level of collateral, typically a letter of credit, to support performance obligations and could demand additional collateral in light of the Company's deteriorating financial position.  Any additional demands would further strain liquidity, which has been the case in 2025.  In January 2025, the Company had no posted collateral. As of June 30, 2025, however, with no ability to provide further letters of credit, the Company has posted $38.3 million of cash collateral relating to $76.5 million outstanding surety bonds.  The Company had no choice but to meet the demands for collateral because if the Company were unable to satisfy these collateral requirements, it could be deemed in breach of certain customer contracts, potentially leading to contract terminations and a downward spiral that would further destabilize the business.

51.     In addition to these ongoing operational issues, the Company recognized that it would be unable to satisfy certain financial conditions and covenants under the First Lien Credit Agreement, especially if the Company were to repay the Incremental Facility upon its maturity in January 2026.  Given these mounting pressures, the Company refocused on potential strategic alternatives, including a potential third-party equity investment, an out-of-court restructuring, and an in-court restructuring process.

**F.  Negotiation of the Restructuring**

52.     In the months leading up to the Petition Date, the Debtors and their advisors engaged in a thorough and good-faith process to evaluate and pursue a range of strategic alternatives.  These efforts included incremental amendments, potential equity infusions, junior capital solutions, and targeted asset sales, alongside extensive negotiations with key creditor constituencies.  Although the Debtors explored each of these paths with diligence, none proved actionable on the required timeline or adequate to address the Company's capital structure and

liquidity challenges. The Debtors ultimately determined that a comprehensive, court-supervised restructuring represented the best and only viable path forward.

53. While the Debtors had hoped the Fifth Amendment and incremental Second Lien Notes would give them the liquidity and time to holistically address, they ultimately determined that commencing the Chapter 11 Cases was necessary to implement a comprehensive deleveraging and strengthen their financial position. In evaluating their options, the Debtors also considered whether incremental amendments, extensions, or covenant relief could provide a bridge solution, but these measures proved inadequate to resolve the Company's structural balance sheet challenges. Accordingly, the Debtors initiated these cases to effectuate a restructuring that will: (a) reduce funded debt (including accrued but unpaid interest) by approximately $1.1 billion, (b) lower annual cash interest expense in light of the reduced funded debt; and (c) enable the Company to continue operating with a substantially improved balance sheet and liquidity profile.

54. In early July 2025, the Debtors executed non-disclosure agreements with a group of First Lien Lenders and Second Lien Noteholders that ultimately became the Consenting Creditors to explore strategic alternatives. As an initial step, the Debtors sought to elicit a proposal that would provide additional liquidity to address near-term maturities and covenant pressure, but those efforts did not yield a viable solution given the lenders lack of interest in providing out-of-court financing so soon after the Incremental Facility. The Debtors also analyzed a potential out-of-court junior investment, which was presented by the Debtors and their advisors, together with certain members of the Board, to the lenders and their advisors. None of these proposals gained traction. Following these efforts, the Debtors and their advisors commenced protracted, arm's-length negotiations with the Consenting Creditors regarding a comprehensive restructuring transaction.

55. At the same time, the Debtors pursued other strategic options, including potential equity investments and sales of PCS and RPM. In the weeks leading up to the Petition Date, the Debtors executed non-disclosure agreements with two existing equity holders expressing interest in a potential investment and with over 15 potential strategic and financial bidders who expressed

interest in acquiring PCS and RPM from the Debtors.  The Debtors carefully evaluated these alternatives with their advisors but concluded that neither the existing equity holders nor the contemplated asset sales proposed actionable transactions to address the Company's liquidity and debt burdens.

56.     After weeks of negotiations with the Consenting Creditors and discussions with potential equity investors and potential bidders, the Debtors, with the assistance of the Advisors, determined that the proposed Restructuring with the Consenting Creditors was the only actionable option and the best path forward.  The process involved weeks of intense, arm's-length negotiations, including the exchange of multiple iterations of term sheets addressing both the Restructuring and the DIP Financing.  Having exhausted other strategic alternatives, these negotiations culminated in the agreement now before the Court, which the Debtors believe provides the most viable path to maximize value and ensure the Company's long-term stability.

### G.  Restructuring Support Agreement

57.     On August 20, 2025, following extensive, good faith, arms' length negotiations, the Debtors entered into the Restructuring Support Agreement with the Consenting Creditors.[13] Pursuant to the Restructuring Support Agreement, the Consenting Creditors agreed to support the Restructuring by, among other things:

- providing $100 million in DIP financing to fund these Chapter 11 Cases and agreeing to roll such claims into an Exit Term Loan Facility;

- agreeing to exchange First Lien Claims for up to $200 million of an Exit Term Loan Facility and 98% of the pro forma equity of the Company, subject to dilution[14];

- agreeing to exchange Second Lien Claims for 2% of the pro forma equity of the Company, subject to dilution;

- providing the opportunity for certain holders of claims to participate in an equity rights offering of up to $200 million; and

---

[13]   The Restructuring Support Agreement is attached hereto as **Exhibit A**.

[14]   Subject to dilution by the DIP Backstop Premium, Equity Rights Offering, Series A Warrants, Series B Warrants, Series C Warrants, and the MIP.

- permitting the Reorganized Debtors to enter into a $250 million Exit Revolver Credit Agreement, which provides for a $150 million LC sublimit.[15]

58.     Upon consummation, the Restructuring will affect a significant deleveraging of the Debtors' capital structure by reducing the Company's total funded debt (including accrued but unpaid interest) by at least $1.1 billion.

### III.     FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY PLEADINGS

59.     In furtherance of their objective of preserving value for all stakeholders, the Debtors have filed the following First Day Pleadings and related orders (the "**_Proposed Orders_**") contemporaneously herewith, and have therein requested that the Court consider entering the Proposed Orders granting the relief sought in First Day Pleadings.  The facts set forth in each of the First Day Pleadings are incorporated herein in their entirety.  The First Day Pleadings include:

### A.  Administrative and Procedural Pleadings

i.  _Emergency Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases_

ii.  _Emergency Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to (I) File a Consolidated Creditor Matrix, and (II) to Redact Certain Personally Identifiable Information; (B) Waiving the Requirement to File a List of Equity Security Holders; (C) Authorizing Service of Parties in Interest by Electronic Mail; (D) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases; and (E) Granting Related Relief_

iii.  _Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants, LLC dba Verita Global as Claims, Noticing, and Solicitation Agent_

iv.  _Emergency Motion of Debtors for Entry of an Order (A) Establishing Notification Procedures and Approving Restrictions on (I) Certain Transfers of Interests in the Debtors, and (II) Claims of Certain Worthless Stock Deductions; and (B) Granting Related Relief_

v.  _Notice of Designation as Complex Bankruptcy Case_

vi.  _Notice of Emergency Virtual Hearing on First Day Motions_

---

[15] The Consenting Creditors are not committing to provide this facility, however, the entry into the Exit Revolver Credit Agreement is permitted under the Restructuring Support Agreement and the Debtors intend to seek financing sources for such facility during the Chapter 11 Cases.

  vii. *Emergency Motion of Debtors for Entry of an Order (A) Extending the Time to File Schedules and Statements and 2015.3 Reports; (B) Modifying the Requirements of Bankruptcy Local Rule 2015-3; and (C) Granting Related Relief*

**B.  Business Operations Motions**

  i. *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Continue Existing Cash Management System, (II) Maintain Existing Business Forms, and (III) Continue Intercompany Transactions; and (B) Granting Related Relief*

  ii. *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Payment of Prepetition Trade Claims in the Ordinary Course of Business and (B) Granting Related Relief*

  iii. *Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to (I) Honor their Prepetition Obligations to Customers, and (II) Continue their Customer Programs; and (B) Granting Related Relief*

  iv. *Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to (I) Continue Insurance Programs, and (II) Pay All Obligations with Respect Thereto; (B) Modifying Automatic Stay to Permit Employees to Proceed with Workers' Compensation Claims; (C) Modifying Automatic Stay to Permit Insurers to Advance and/or Reimburse Defense Costs and Fees under Policies; and (D) Granting Related Relief*

  v. *Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (II) Maintain Employee Benefits Programs and Pay Related Obligations; and (B) Granting Related Relief*

  vi. *Emergency Motion of Debtors for Entry of an Order (A) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief*

  vii. *Emergency Motion of Debtors for Entry of an Order (A) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (B) Establishing Procedures for Resolving Objections by Utility Providers, (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, and (D) Granting Related Relief*

  viii. *Emergency Motion of Debtors for Entry of an Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, (B) Approving the Form and Manner of Notice Thereof, and (C) Granting Related Relief*

**C.  Other Motions**

  60. Together, the Restructuring Support Agreement and the transactions and agreements contemplated under the foregoing will accomplish a substantial restructuring of the

Debtors' balance sheet.  As a result of the diligent negotiations and hard work by the various constituents, including the Debtors, the Consenting Creditors, and the advisors to each, the Debtors have preserved the going concern value of the business, maximized creditor and stakeholder recovery, and minimized disruption to the day-to-day operations.  Accordingly, the expedited Chapter 11 Cases will best position the Debtors for future success while providing the most value for the Debtors' estates and stakeholders.

61.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their businesses, and without loss of productivity or value.  I further believe that the relief sought in each of the First Day Pleadings constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates and represents a prudent exercise of the Debtors' business judgement.

### D.  DIP Motion

62.     In parallel with the restructuring transaction negotiations, and as further detailed in the *Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors' to (I) Obtain Senior Secured Priming Superpriority Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing and (F) Granting Related Relief* (the "***DIP Motion***"), filed contemporaneously herewith, the Debtors engaged in good faith, arm's-length negotiations with the Required Consenting Term Lenders regarding the DIP Facilities and the consensual use of the Cash Collateral.

63.     Pursuant to the relief requested in the DIP Motion and proposed orders, the Debtors will use the proceeds of the DIP Facility and Cash Collateral to fund operating expenses associated

with the Debtors' businesses and the administrative expenses of the Chapter 11 Cases, consistent with an agreed Approved DIP Budget. In return, the Debtors have agreed to provide the Prepetition Secured Parties with a typical adequate protection package that includes liens and superpriority claims against the Debtors, payment of professional fees, expenses, and certain reporting and budgeting obligations. This will, in turn, maximize value for all of the Debtors' stakeholders.

64.     The Debtors' access to the DIP Facilities and Cash Collateral during the Chapter 11 Cases is critical to achieving a successful restructuring. To continue to operate their businesses in the ordinary course, the Debtors require access to cash to fund ordinary course operations, payroll obligations, and other costs. Without access to the DIP Facilities and Cash Collateral, the Debtors would be unable to fund ongoing operations even for the short projected duration of the Chapter 11 Cases. Thus, the Debtors require immediate access to the DIP Facilities and Cash Collateral pursuant to relief requested in the DIP Motion to ensure that they have sufficient liquidity to operate their business and pursue a restructuring transaction.

## IV.     CONCLUSION

65.     The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief set forth in the First Day Pleadings. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   August 20, 2025
         New York, New York

*/s/ Chad J. Shandler*
Name: Chad J. Shandler
Title:   Chief Transformation Officer

## CERTIFICATE OF SERVICE

I certify that on August 20, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

## **Exhibit A**

Restructuring Support Agreement

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS RESTRUCTURING SUPPORT AGREEMENT IS CONFIDENTIAL AND IS SUBJECT TO THE CONFIDENTIALITY AGREEMENTS ENTERED INTO AND BY THE RECIPIENTS OF THIS RESTRUCTURING SUPPORT AGREEMENT AND THE COMPANY ENTITIES, AND MAY NOT BE SHARED WITH ANY THIRD PARTY OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENTS. NO NON-EXECUTED DRAFT OF THIS RESTRUCTURING SUPPORT AGREEMENT WILL BE CONTAINED IN ANY CLEANSING MATERIALS IN CONNECTION WITH ANY SUCH CONFIDENTIALITY AGREEMENTS.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated August 20, 2025, is entered into by and among:

(a)     ModivCare Inc. ("***ModivCare***") and certain of its direct and indirect subsidiaries listed on Annex 1 to the Restructuring Term Sheet (as defined below) (collectively, the "***Company Entities***" and, each, a "***Company Entity***");

(b)     the undersigned holders of approximately $805,000,000 in aggregate principal amount outstanding of first lien loans pursuant to that certain Credit Agreement, dated as of February 3, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 5 to the Credit Agreement, dated as of January 9, 2025, the "***First Lien Credit Agreement***"), by and among ModivCare, as borrower, certain subsidiaries of ModivCare, as guarantors, the lenders party thereto (whether or not party to this Agreement, the "***First Lien Lenders***"), and JPMorgan Chase Bank, N.A., as administrative agent (the "***First Lien Agent***"), comprising: (i) $325,000,000 of outstanding revolving loans and LC Exposure (the "***First Lien RCF***"); (ii) $78,750,000 in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due January 2026 (the "***First Lien Incremental***"); and (iii) $522,239,938 in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due July 2031

(the "**First Lien Term Loans**"), and all Claims relating to the First Lien RCF (the "**First Lien RCF Claims**"), the First Lien Incremental (the "**First Lien Incremental Claims**"), and the First Lien Term Loans (the "**First Lien Term Loan Claims**," together with the First Lien RCF Claims and the First Lien Incremental Claims, the "**First Lien Claims**," and such undersigned holders of First Lien Claims, solely in their capacity as First Lien Lenders, the "**Initial Consenting First Lien Lenders**" and, together with any First Lien Lender that subsequently becomes a party to this Agreement solely in its capacity as First Lien Lender, the "**Consenting First Lien Lenders**");

(c) the undersigned holders of approximately $223,000,000 in aggregate principal amount of second lien notes outstanding under that certain Second Lien Senior Secured PIK Toggle Notes Indenture, dated as of February 25, 2025 ("**Second Lien Indenture**"), by and between ModivCare, as issuer, certain subsidiaries of ModivCare, as guarantors, and Ankura Trust Company, LLC, as trustee (the "**Second Lien Trustee**"), governing ModivCare's $316,223,250 aggregate principal amount of Second Lien Senior Secured PIK Toggle Notes due 2029 (the "**Second Lien Notes**"), plus accrued and unpaid interest, fees, costs, and expenses, and all Claims relating to the Second Lien Notes (the "**Second Lien Claims**", and such undersigned holders of the Second Lien Claims, solely in their capacity as Second Lien Noteholders, the "**Initial Consenting Second Lien Noteholders**" and, together with any Second Lien Noteholder that subsequently becomes a party to this Agreement solely in its capacity as Second Lien Noteholder, the "**Consenting Second Lien Noteholders**" and, the Consenting Second Lien Noteholders together with the Consenting First Lien Lenders, the "**Consenting Creditors**").

The Company Entities and each of the Consenting Creditors, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually, as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet. The Restructuring Term Sheet is hereby incorporated by reference and made part of this Agreement as if fully set forth herein.

## <u>RECITALS</u>

**WHEREAS**, the Parties have negotiated in good faith at arm's-length and agreed to enter into certain restructuring and recapitalization transactions with respect to the Company Entities' capital structure on the terms set forth in this Agreement and in the term sheet attached hereto as <u>Exhibit A</u> (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, and related transactions or steps to be taken in connection therewith, the "**Restructuring**");

**WHEREAS**, the Company Entities intend to implement the Restructuring through commencement by the Company Entities of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

**WHEREAS**, as of the date hereof, the Initial Consenting First Lien Lenders, in the aggregate, hold, own, or control approximately 90% of the aggregate outstanding principal amount of First Lien Claims;

**WHEREAS**, as of the date hereof, the Initial Consenting Second Lien Noteholders, in the aggregate, hold, own, or control approximately 70% of the aggregate outstanding principal amount of Second Lien Claims;

**WHEREAS**, the Parties have agreed to support the Restructuring subject to and in accordance with the terms of this Agreement and desire to work together to complete the negotiation of the terms of the documents and each of the actions necessary or desirable to effectuate the Restructuring in accordance with the terms in this Agreement and the Restructuring Term Sheet; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

## 1. Certain Definitions.

As used in this Agreement, the following terms have the following meanings:

"***Agreement***" has the meaning set forth in the preamble to this Agreement (for the avoidance of doubt, this "Agreement" includes all of the exhibits, including the Restructuring Term Sheet).

"***Alternative Restructuring***" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring of the Company Entities, or other transaction of similar effect, other than the Restructuring; *provided* that any Alternative Restructuring that is implemented pursuant to a valid amendment of this Agreement shall not be an Alternative Restructuring.

"***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Company Entities arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

"***Backstop Parties***" has the meaning set forth in the Restructuring Term Sheet.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any

local rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

"***Business Day***" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"***Cash***" means the legal tender of the United States of America.

"***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims against, or Interests in, a Company Entity; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any state law fraudulent transfer claim; and (vi) any Avoidance Actions.

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"***Company Entities' Advisors***" means Company Entities' Counsel, Moelis & Company LLC, and FTI Consulting, Inc.

"***Company Entities' Counsel***" means Latham & Watkins LLP, as legal advisors to the Company Entities.

"***Company Entity***" or "***Company Entities***" has the meaning set forth in the preamble to this Agreement.

"***Company Entity Termination Event***" has the meaning set forth in Section 7.04.

"***Confidentiality Agreement***" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with a potential Restructuring, and between any Company Entity and any Consenting Creditor, First Lien Agent and Consenting Creditor Advisors, or any holder of any Claims or Interests against the Company Entities.

"***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order.

"***Confirmation Hearing***" means the hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code (if previously approved) and (ii) confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and if not previously approved, approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"***Consenting Claims***" means all Claims against any Company Entity held by or on behalf of or in the control of Consenting Creditors from time to time.

"***Consenting Creditors***" has the meaning set forth in the preamble to this Agreement.

"***Consenting First Lien Lender Termination Event***" has the meaning set forth in Section 7.02.

"***Consenting First Lien Lenders***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Second Lien Noteholders***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Second Lien Noteholder Termination Event***" has the meaning set forth in Section 7.03.

"***Definitive Documents***" means, each consistent with this Agreement: (i) the Plan and the Plan Supplement; (ii) the Disclosure Statement, the Solicitation Materials, and any motion seeking approval of, and any notices related to, the foregoing; (iii) the Solicitation Procedures Order; (iv) the Confirmation Order; (v) the DIP Documents; (vi) the First Day Pleadings and the First Day Orders; (vii) the New Common Interest Documents, and (viii) any other agreement, document, instrument, pleading and/or order entered or entered into, or utilized, in connection with or to implement the Restructuring (together with any exhibit, amendment, modification or supplement thereto); *provided that*, notwithstanding any Definitive Documents listed herein, any monthly or quarterly operating reports, retention applications, fee applications, fee statements, and declarations in support thereof or related thereto shall not constitute Definitive Documents under this Agreement.

"***DIP Backstop Commitment Letters***" means those certain backstop commitment letters to be entered into by the Company Entities and the Backstop Parties, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities and consistent with the DIP Facility Term Sheet.

"**DIP Credit Agreement**" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement to be entered by and among ModivCare, as borrower, the guarantors party thereto, the administrative agent and the collateral agent, and lenders party thereto (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms) in respect of the DIP Facility, in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities and consistent with the DIP Facility Term Sheet.

"**DIP Documents**" means the DIP Credit Agreement, the other "Credit Documents" as defined in the DIP Credit Agreement, the DIP Backstop Commitment Letters, the DIP Motion, the DIP Orders, and any other agreement, document and/or instrument entered or entered into in connection with any of the foregoing, each in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"**DIP Facility**" means a secured, multi-draw, first lien debtor-in-possession financing facility in the aggregate principal amount not to exceed $100 million under the DIP Credit Agreement and subject to the terms and conditions thereof and under the DIP Documents.

"**DIP Facility Term Sheet**" means the term sheet attached as Annex 2 to the Restructuring Term Sheet describing the material terms of the DIP Facility in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"**DIP Motion**" means the motion seeking approval by the Bankruptcy Court of the DIP Facility and entry of the DIP Orders, including any declarations, notices, exhibits and/or annexes thereto (as amended, modified or supplemented from time to time) in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan, in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities, including all exhibits, schedules, supplements, modifications, amendments, annexes and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Effective Date**" means, with respect to the Plan, the date that is a Business Day on which all conditions precedent to the effectiveness or consummation of the Plan have been satisfied or waived in accordance with the terms of the Plan and this Agreement.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Rights Offering**" has the meaning set forth in the Restructuring Term Sheet.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fiduciary Out Determination**" means the board of directors, board of managers, or such similar governing body (including any special committee) of any Company Entity reasonably determines in good faith after consultation with outside counsel that proceeding with the

Restructuring, any part thereof, or any of the Company Entities' obligations hereunder, would be inconsistent with the exercise of its fiduciary duties under applicable law.

"***Final DIP Order***" means the order entered by the Bankruptcy Court authorizing the Company Entities to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility and the Company Entities' use of Cash Collateral (as defined in the DIP Orders), and the parties' rights with respect thereto on a final basis (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"***Final Order***" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (i) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (ii) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"***First Day Orders***" means any interim or final order of the Bankruptcy Court granting the relief requested in the First Day Pleadings (as may be amended, supplemented or modified from time to time).

"***First Day Pleadings***" means all material motions, applications, notices and/or other pleadings that the Company Entities file or propose to file in connection with the commencement of the Chapter 11 Cases and all orders sought thereby (any of the foregoing as amended, supplemented or modified from time to time), including the First Day Orders.

"***First Lien Agent and Consenting Creditor Advisors***" means, collectively, Paul Hastings LLP and Lazard Freres & Co. LLC as, respectively, legal advisor, financial advisor, and investment banker, to the First Lien Agent acting at the direction of the Consenting Creditors.

"***First Lien Agent***" has the meaning set forth in the preamble to this Agreement and any successor thereto.

"***First Lien Agent and Consenting Creditor Counsel***" means Paul Hastings LLP.

"***First Lien Claims***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Credit Agreement***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Credit Documents***" means the First Lien Credit Agreement together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

"***First Lien Incremental***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Incremental Claims***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Lenders***" has the meaning set forth in the preamble to this Agreement.

"***First Lien RCF***" has the meaning set forth in the preamble to this Agreement.

"***First Lien RCF Claims***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Term Loans***" has the meaning set forth in the preamble to this Agreement.

"***First Lien Term Loan Claims***" has the meaning set forth in the preamble to this Agreement.

"***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Initial Consenting First Lien Lenders***" has the meaning set forth in the preamble to this Agreement.

"***Initial Consenting Second Lien Noteholders***" has the meaning set forth in the preamble to this Agreement.

"***Interests***" means any equity interest in a Company Entity, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Company Entities, whether or not transferable, and any option, warrant or right, contractual or otherwise, including equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Company Entities, to acquire any such interests in a Company Entity that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement); *provided* that the foregoing shall not apply to any entitlement to participate in or receive any Interests of the Reorganized Company Entities on or following the Effective Date.

"***Interim DIP Order***" means the order, in the form attached hereto as <u>Exhibit D</u>, entered by the Bankruptcy Court authorizing the Company Entities to enter into the DIP Credit Agreement and approving, among other things, the DIP Backstop Commitment Letters, the DIP Facility, the DIP Commitments, the DIP Loans (as each term is defined therein), the Company Entities' use of Cash Collateral, and the parties' rights with respect thereto on an interim basis (as may be

amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"*Joinder Agreement*" has the meaning set forth in <u>Section 4.02</u>.

"*Loaned Claims*" has the meaning set forth in <u>Section 10.02(b)</u>.

"*Milestones*" means the "Milestones" set forth in <u>Exhibit C</u> hereto (as may be amended, modified, or supplemented in accordance with the terms of this Agreement).

"*ModivCare*" has the meaning set forth in the preamble to this Agreement.

"*New Common Interests*" means a single class of new common equity interests of Reorganized Parent to be issued (i) on the Effective Date or (ii) as otherwise permitted pursuant to the Plan, the New Corporate Governance Documents and the New Common Interests Documents.

"*New Common Interests Documents*" means any and all documents required to implement, issue, or distribute the New Common Interests.

"*New Corporate Governance Documents*" means all documents, agreements, and disclosures concerning, or relating to the formation, capitalization, administration or governance of, the Reorganized Company Entities, any of their respective subsidiaries, which may include any form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, shareholders' agreement, trust agreement, and such other applicable formation, capitalization, organizational, administrative, and governance document, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"*Notice Period*" has the meaning set forth in <u>Section 7.01(b)</u>.

"*Party*" or "*Parties*" has the meaning set forth in the preamble to this Agreement.

"*Permitted Transferee*" has the meaning set forth in <u>Section 4.02(b)</u>.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

"*Petition Date*" means the date on which the Company Entities commence the Chapter 11 Cases by filing petitions with the Bankruptcy Court.

"*Plan*" means the Company Entities' prearranged joint chapter 11 plan of reorganization including all appendices, exhibits, schedules, and supplements thereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan and this Agreement, which shall incorporate the terms of, and shall be consistent with, this Agreement (including the Restructuring Term Sheet) and shall

be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"***Plan Supplement***" means any supplemental appendix to the Plan, in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended modified or supplemented from time to time in accordance with the terms of the Plan and this Agreement, and the Bankruptcy Code and the Bankruptcy Rules, which shall include, but shall not be limited to: (i) the New Corporate Governance Documents; (ii) the New Common Interests Documents; (iii) the Exit Facilities; (iv)  the schedule of rejected contracts; and (v) any disclosures required under section 1129(a)(5) of the Bankruptcy Code (including, to the extent known and determined, a document disclosing the identity of the directors and officers of the Reorganized Company Entities).

"***Prepetition Funded Debt Documents***" means, collectively, the First Lien Credit Documents, and the Second Lien Notes Documents, and the Unsecured Notes Indenture.

"***Qualified Marketmaker***" means an Entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

"***Qualified Marketmaker Joinder Date***" has the meaning set forth in Section 4.02(c).

"***Reorganized Company Entities***" means a Company Entity, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

"***Reorganized Parent***" means from and after the Effective Date, ModivCare or such other Entity, as may be determined by the Company Entities and the Required Consenting First Lien Lenders, to be the Company Entities' new corporate parent, as reorganized pursuant to the Plan or as otherwise agreed between the Company Entities and the Required Consenting First Lien Lenders.

"***Required Consenting Creditors***" means, collectively, the Required Consenting First Lien Lenders and the Required Consenting Second Lien Noteholders.

"***Required Consenting First Lien Lenders***" means, as of any date of determination, the Consenting First Lien Lenders holding at least 50.1% in aggregate principal amount outstanding of the First Lien Claims held, beneficially owned, or managed by all of the Consenting First Lien Lenders as of such date.

"***Required Consenting Second Lien Noteholders***" means, as of any date of determination, the Consenting Second Lien Noteholders holding at least 50.1% in aggregate principal amount

outstanding of the Second Lien Claims held, beneficially owned, or managed by all of the Consenting Second Lien Noteholders as of such date.

"***Restructuring***" has the meaning set forth in the recitals to this Agreement.

"***Restructuring Fees and Expenses***" means all reasonable and documented fees, costs, and expenses of each of the First Lien Agent and Consenting Creditor Advisors (including First Lien Agent and Consenting Creditor Counsel), in each case: (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, the other Definitive Documents, the Restructuring, and the transactions contemplated hereby and thereby; and (b) as otherwise provided  under the First Lien Credit Documents, or engagement letters or fee reimbursement letters entered into between the applicable Company Entities, on the one hand, and any First Lien Agent and Consenting Creditor Advisor, on the other hand, with respect to the fees, costs, and expenses of any First Lien Agent and Consenting Creditor Advisor.

"***Restructuring Proceeding***" means, other than the Chapter 11 Cases or any other action or proceeding taken in furtherance of or in connection with the Restructuring with the consent of the Company Entities and the Required Consenting First Lien Lenders, the appointment of an administrator, liquidator, provisional liquidator, bankruptcy or proposal trustee, receiver, administrative receiver, or similar officer in respect of any Company Entity or any subsidiary of any Company Entity, or the winding up, liquidation, provisional liquidation, dissolution, administration, reorganization, composition, compromise, or arrangement of or with any Company Entity or any subsidiary of any Company Entity, or any equivalent or analogous appointment or proceedings under the law of any other jurisdiction.

"***Restructuring Term Sheet***" means the restructuring term sheet, attached hereto as <u>Exhibit A</u> and incorporated herein as if fully set forth herein (including any schedules, annexes and exhibit attached thereto, each as may be modified in accordance with the terms of this Agreement), which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"***SEC***" has the meaning set forth in <u>Section 10.01(c)</u>.

"***Second Lien Claims***" has the meaning set forth in the preamble to this Agreement.

"***Second Lien Indenture***" has the meaning set forth in the preamble to this Agreement.

"***Second Lien Notes***" has the meaning set forth in the preamble to this Agreement.

"***Second Lien Noteholders***" means the holders of the Second Lien Notes.

"***Second Lien Notes Documents***" means the Second Lien Indenture together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

"***Second Lien Trustee***" has the meaning set forth in the preamble to this Agreement.

"**_Securities Act_**" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any rules and regulations promulgated thereby.

"**_Solicitation_**" means the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**_Solicitation Materials_**" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan pursuant to the Solicitation Procedures Order, each of which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"**_Solicitation Procedures Order_**" means the order of the Bankruptcy Court approving the Solicitation procedures and scheduling the Confirmation Hearing, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities.

"**_Support Effective Date_**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company Entities, (ii) each of the Initial Consenting First Lien Lenders so long as they collectively hold at least 66.67% of the aggregate outstanding principal amount of First Lien Claims, and (iii) each of the Initial Consenting Second Lien Noteholders so long as they collectively hold at least 66.67% of the aggregate outstanding principal amount of Second Lien Claims.

"**_Support Period_**" means the period commencing on the Support Effective Date and ending on the Termination Date, and in the case that the Termination Date is the Effective Date, the Support Period shall include the Termination Date.

"**_Termination Date_**" means the date on which termination of this Agreement is effective as to a Party in accordance with Article 7 of this Agreement.

"**_Transfer_**" has the meaning set forth in Section 4.02.

"**_Unsecured Notes_**" means the notes issued under the Unsecured Notes Indenture.

"**_Unsecured Notes Indenture_**" means that certain Senior Notes Indenture, dated as of August 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between ModivCare, as issuer, and Wilmington Saving Fund Society, FSB, as trustee, governing ModivCare's $228,835,000 aggregate principal amount of 5.00% Senior Notes due 2029.

2.   **Passage of Time.**   With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt,

that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability.

3.    **Restructuring.**

Section 3.01    Confirmation of the Plan.  Subject to the terms of this Agreement, the Parties will use their commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date, and by no later than the applicable Milestone, in accordance with the Bankruptcy Code and on terms consistent with this Agreement. Each Party shall use its commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Company Entities in connection therewith.  Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring).

Section 3.02    Definitive Documents.    The documents related to or otherwise utilized to implement or effectuate the Restructuring shall include, among others, the Definitive Documents, each of which shall be consistent in all respects with the terms and conditions of this Agreement, including the Restructuring Term Sheet, and, in each case, shall be in form and substance acceptable to the Parties that have consent rights with respect to the applicable Definitive Documents.

4.    **Agreements of the Consenting Creditors.**

Section 4.01    Support.  Subject to the terms of this Agreement and the applicable Definitive Documents, each Consenting Creditor, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a)    timely vote or cause to be voted, following commencement of the Solicitation and by the applicable deadline set forth in the Solicitation Materials, all of its Claims (or Claims under its control), including all Claims that are impaired under the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor, effective immediately upon written notice to the Company Entities (with email among counsel being sufficient), may withhold, change, or withdraw (or cause to be withheld, changed, or withdrawn) its vote (and, upon such withdrawal be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to such Consenting Creditor, other than on account of a breach by such Consenting Creditor;

(b)    (i) consent, and to be deemed to have consented, to the incurrence of the DIP Facility on the terms set forth in the DIP Facility Term Sheet and the DIP Documents; (ii) consent, and, if necessary, direct any administrative agent, collateral agent, or indenture trustee (as applicable) to consent, to the Company Entities' use of their Cash Collateral pursuant to the DIP Orders; and (iii) if necessary, give any notice, order, instruction, or direction to the applicable administrative agent, collateral agent, or indenture trustee necessary to give effect to the foregoing;

13

(c)　　give any notice, order, instruction, or direction to the applicable administrative agent, collateral agent, or indenture trustee necessary to give effect to the Restructuring;

(d)　　not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, and if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor will use its reasonable efforts to direct such administrative agent, collateral agent, or indenture trustee to cease, desist, and refrain from taking any such action, and to take such action as may be necessary to effect the Restructuring;

(e)　　act in good faith to negotiate, complete, enter into, execute, effectuate, and implement the Definitive Documents (as applicable) and any other necessary filings, documents, pleadings, agreements, contracts and requests for regulatory approvals to which it is a party within the timeframes contemplated herein;

(f)　　act in good faith to support, not object to, and take all reasonable actions (to the extent practicable and consistent with the terms of this Agreement and/or the Definitive Documents) reasonably necessary or reasonably requested by the Company Entities to facilitate the Solicitation, approval of and entry of orders regarding the Definitive Documents, and confirmation and consummation of the Plan and the Restructuring contemplated herein;

(g)　　if applicable, use commercially reasonable efforts to obtain, or assist the Company Entities in obtaining, any and all required governmental, regulatory and/or third-party approvals to effectuate the Restructuring on the terms contemplated by this Agreement, including the Restructuring Term Sheet, and the Plan;

(h)　　to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate with the Company Entities and the other Consenting Creditors in good faith with respect to additional or alternative provisions to address any such legal or structuring impediment to the Restructuring;

(i)　　with respect to the Consenting First Lien Lenders that are Backstop Parties, fund the DIP Facility in accordance with the DIP Documents and the other Definitive Documents;

(j)　　to the extent it is permitted to elect whether to (i) opt out of the releases set forth in the Plan, or (ii) if the Bankruptcy Court requires opting in to give effect to the releases set forth in the Plan, not elect to opt out of, or elect to opt in to (as applicable), the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(k)　　provide, within two (2) Business Days of the Support Effective Date, its current holdings of Claims to the Company Entities' Advisors, *provided*, that such information will be held on a confidential basis by the Company Entities and the Company Entities' Advisors;

(l)　　immediately notify each of the other Parties hereto of any breach of which such Consenting Creditor has knowledge in respect of any of its or another Consenting Creditor's

obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the other Parties within two (2) Business Days of knowledge of such breach; and

(m)     not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)     propose, file, support, or vote for any Alternative Restructuring;

(iii)     seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet;

(iv)     exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its or any other Person's Claims or Interest against the Company Entities other than in accordance with this Agreement and the Definitive Documents;

(v)     file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not consistent with this Agreement and the Restructuring Term Sheet (nor directly or indirectly cause or instruct any other Person to make such a filing);

(vi)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Definitive Documents, or the Restructuring contemplated herein against the Company Entities or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement (nor directly or indirectly cause or instruct any other Person to initiate such litigation or proceeding);

(vii)     object to, delay, impede, or take any other action to interfere with the Company Entities' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code (nor directly or indirectly cause or instruct any other Person to take such action); or

(viii)     exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its or any other Person's Claims or Interests other than in accordance with this Agreement and the Definitive Documents (nor directly or indirectly cause or instruct any other Person to take or exercise such right or remedy).

Section 4.02    Transfers.

(a)    Each Consenting Creditor agrees that, during the Support Period, it shall not sell, assign, loan, issue, pledge, hypothecate, transfer, participate, or otherwise dispose of ("*Transfer*"), directly or indirectly, in whole or in part, any Claims against or Interest in the Company Entities, option thereon, or right or interest therein (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act, or by granting any proxies, depositing any Claims or Interest into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void *ab initio* and without effect unless the transferee thereof either:

(i)    is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Claims and/or Interests transferred) to Company Entities' Counsel and the First Lien Agent and Consenting Creditor Counsel within three (3) Business Days following the consummation of such Transfer; or

(ii)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims against and Interests in the Company Entities it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as Exhibit B (a "*Joinder Agreement*") and delivering an executed copy of such Joinder Agreement to Company Entities' Counsel and the First Lien Agent and Consenting Creditor Counsel within one (1) Business Day of the consummation of such Transfer.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Creditor agrees that any Transfer of any Claim against the Company Entities that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(b)    Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims against the Company Entities to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become an Entity identified in Section 4.02(a) hereof (a "*Permitted Transferee*"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) any transferee satisfies Section 4.02(a) of this Agreement, (iii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 4.02(b), and (iv) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirements of this Section 4.02(b).  To the extent that a Consenting Creditor is acting in its capacity as a Qualified

Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in the Claims against or Interest in the Company Entities that the Qualified Marketmaker acquires from a holder of the such Claims or Interest who is not a Consenting Creditor without the requirement that the transferee be a Permitted Transferee.

(c)     If at the time of a proposed Transfer of any Claims against the Company Entities to a Qualified Marketmaker, such Claims: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims in accordance with Section 4.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Plan and/or the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third (3rd) Business Day before the expiration of an applicable voting or consent deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the Transfer documentation between the applicable Consenting Creditor and such Qualified Marketmaker shall provide that such Qualified Marketmaker shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claim at such time as such Claim has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

Section 4.03     Additional Claims.  This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Claims or Transferring Claims in accordance with this Article 4, and each Consenting Creditor agrees that to the extent any Consenting Creditor (i) acquires additional Claims against the Company Entities entitled to vote on the Plan or (ii) Transfers any Claims against the Company Entities in accordance with this Article 4, then, in each case, each such Consenting Creditor shall promptly notify Company Entities' Counsel and the First Lien Agent and Consenting Creditor Counsel, and each such Consenting Creditor hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote.

Section 4.04     The covenants and agreements of the Consenting Creditors in this Article 4 are several and not joint.

Section 4.05     The Company Entities understand that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, each Company Entity acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditors that manage and/or supervise each Consenting Creditor's investment in or Claim against the Company Entities and shall not apply to any other trading desk or business group of the Consenting Creditor, so long as it is not acting at the direction or for the benefit of such Consenting Creditor or unless it becomes party hereto.  It is further understood and agreed that the covenants, representations, and warranties in this Agreement by a Consenting Creditor that is the nominee, investment advisor, sub-advisor, or manager to funds and/or accounts that hold or beneficially hold Claims are made with respect to, and on behalf of, such funds and/or managed accounts and not such nominee,

investment advisor, or manager in its individual capacity or any other affiliate of such nominee, investment advisor, or manager and, if applicable, are made severally (and not jointly) with respect to the funds and/or accounts managed by it.

Section 4.06    Nothing in this Agreement shall (i) prohibit any Consenting Creditor from taking any action that is not in violation of this Agreement, (ii) prevent any Consenting Creditor from enforcing this Agreement or any Definitive Document or contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, (iii) be construed to limit any Consenting Creditor's rights under any applicable note, other loan document, instrument, and/or applicable law, including the right to purchase, sell, or enter into any transactions regarding any Claim, subject to the terms hereof and any applicable agreements or law governing such Claim, (iv) constitute a waiver, amendment or modification of any term or provision of the First Lien Credit Agreement or the Second Lien Indenture, (v) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Entities that secure the obligations under the relevant Claims, (vi) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Entities, or any other party in interest in the Chapter 11 Cases (including any other official committee or the United States Trustee) so long as such consultation does not violate such Consenting Creditor's support obligations set forth herein, any applicable Confidentiality Agreement, or applicable law, including the Bankruptcy Code, (vii) impair or waive the rights of any Consenting Creditor to assert or raise any objection in any court having jurisdiction over the Company Entities or the Restructuring to the extent such action is consistent with this Agreement, (viii) prohibit any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and any positions advocated in connection therewith are not in violation of this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Term Sheet, the Plan or the Restructuring contemplated thereby, (ix) prevent any Consenting Creditor from taking any action that is required by applicable law, (x) require any Consenting Creditor to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege, (xi) require any Consenting Creditor to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Creditor, or (xii) require any Consenting Creditor to fund or commit to fund any additional amounts (other than as agreed in connection with the DIP Facility) without such Consenting Creditor's written consent.

Section 4.07    Forbearance.

(a)      Subject to any rights or remedies granted to the Consenting Creditors pursuant to this Agreement, the Definitive Documents, including the DIP Documents, or any order of the Bankruptcy Court, during the Support Period, the Consenting Creditors agree to forebear from exercising (and agree to direct any agent or trustee to forbear from exercising) any rights or remedies they may have under the Prepetition Funded Debt Documents (whether under U.S. or non-U.S. law) with respect to any breaches, defaults, events of default or potential defaults by the Company Entities (including any such breaches, defaults, events of default, or potential defaults resulting from any maturities occurring during the Support Period).  Each Consenting Creditor

agrees that this Agreement constitutes a direction to the First Lien Agent and the Second Lien Trustee to refrain, during the Support Period, from exercising any remedy available or power conferred to the First Lien Agent or Second Lien Trustee against the Company Entities or any subsidiaries or any of their assets except as necessary to effectuate the Restructuring.

(b)     Except to the extent provided or expressly contemplated under this Agreement or any Definitive Documents, including the DIP Documents, each Consenting Creditor further agrees that if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with any such Consenting Creditor's obligations under this <u>Section 4.07</u>, such Consenting Creditor shall use commercially reasonable efforts to direct and cause such administrative agent, collateral agent, or indenture trustee (as applicable) to cease and refrain from taking such actions.  For the avoidance of doubt, the foregoing forbearance shall not be construed to impair the ability of the Consenting Creditors to take any remedial action, subject to the terms of the Prepetition Funded Debt Documents or otherwise, as applicable, at any time from and after the Termination Date (unless the Termination Date occurs solely as a result of the occurrence of the Effective Date).

**5.     <u>Agreements of the Company Entities</u>.**

<u>Section 5.01</u>    Subject to the terms of this Agreement (including <u>Section 6.01</u>) and the Definitive Documents, the Company Entities hereby covenant and agree during the Support Period:

(a)     to (i) take any and all actions reasonably necessary to implement and consummate the Restructuring in accordance with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet, and (ii) pursue any necessary or appropriate federal, state, and local regulatory or governmental approvals to enable confirmation of the Plan and consummation of the Restructuring, including approvals from the Bankruptcy Court and/or any Governmental Unit whose approval or consent is determined by the Company Entities and/or the applicable Required Consenting Creditors to be necessary or appropriate to consummate the Restructuring;

(b)     to (i) prepare or cause to be prepared the Definitive Documents (including all relevant motions, applications, orders, agreements and other documents) each of which shall be consistent with this Agreement and shall be in form and substance acceptable to the Required Consenting First Lien Lenders and the Company Entities, (ii) provide draft copies of all material motions, orders, other pleadings, documents and/or applications relating to the Restructuring or that the Company Entities intends to file with the Bankruptcy Court, including the Plan, the Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, all First Day Pleadings, all First Day Orders, the DIP Documents, any other Definitive Document, and/or any responses or oppositions that the Company Entities intend to file or submit, to the First Lien Agent and Consenting Creditor Counsel, as soon as reasonably practicable before the filing, execution, distribution or use (as applicable) of such document, and consult in good faith with the First Lien Agent and Consenting Creditor Counsel, regarding the form and substance of any of the foregoing documents in advance of such proposed filing, execution, distribution or use (as applicable), but in no event less than two (2) Business Days prior to such filing, execution, distribution or use (as applicable); *provided* that each such document shall be consistent in all

material respects with this Agreement and such other terms and conditions as are acceptable to Required Consenting First Lien Lenders and the Company Entities; *provided*, *further*, that the foregoing shall not apply to any retention applications, fee applications, or related declarations hired by the Company Entities' Advisors;

(c)     if applicable, to use commercially reasonable efforts to obtain, or assist the Consenting Creditors in obtaining, any and all required governmental, regulatory and/or third-party approvals (including Bankruptcy Court approvals) to effectuate the Restructuring on the terms contemplated by this Agreement and the Plan;

(d)     in connection with the Chapter 11 Cases, to timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by any Entity seeking the entry of an order (i) directing the appointment of an examiner with enlarged powers relating to the operation of the Company Entities' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) for relief that (y) is materially inconsistent with this Agreement or (z) would frustrate the purposes of this Agreement, including by preventing consummation of the Restructuring, or (v) modifying or terminating the Company Entities' exclusive right to file and/or solicit acceptances of a plan of reorganization (except if such relief is granted pursuant to a motion filed with the consent of the Required Consenting First Lien Lenders);

(e)     except as otherwise provided in this Agreement or any order of the Bankruptcy Court, to operate the business of the Company Entities and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement, the most current business plan provided to the Initial Consenting First Lien Lenders and the Initial Consenting Second Lien Noteholders, past practices, and, except as expressly contemplated or provided in this Agreement, use commercially reasonable efforts to preserve intact the Company Entities' business organization and relationship with third parties (including lessors, licensors, suppliers, distributors and customers) and employees;

(f)     that regardless of whether the Restructuring is consummated, the Company Entities shall promptly pay in full and in Cash all Restructuring Fees and Expenses when incurred and invoiced in accordance with this Agreement, the relevant engagement letters and/or fee arrangements, and shall continue to pay such amounts as they come due, and otherwise in accordance with this Agreement, the applicable engagement letters and/or fee arrangements (including under any DIP Order) of the First Lien Agent and Consenting Creditor Advisors (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases);

(g)     to promptly notify the Consenting Creditors, in writing, of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(h)     to timely file a formal written response in opposition to, or take all appropriate actions to oppose (if circumstances do not allow for the filing of a formal written

response), any objection filed with the Bankruptcy Court by any Entity with respect to the entry of the Interim DIP Order and/or Final DIP Order;

(i)    to use commercially reasonable efforts to cause each of the Milestones to be satisfied; and

(j)    to not directly or indirectly take any action that would be inconsistent with this Agreement, the Definitive Documents, or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement or the Definitive Documents).

Section 5.02    Subject to Section 6.01, the Company Entities covenant and agree that, during the Support Period, each of the Company Entities shall not directly or indirectly:

(a)    through any Entity, (i) seek or solicit any Alternative Restructuring, or (ii) object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the Solicitation, approval of, and entry of orders regarding the Definitive Documents, or the confirmation and consummation of the Plan and the Restructuring (including by filing any motion, pleading, or other document with the Bankruptcy Court or any other court that is inconsistent with this Agreement, the Plan or any of the other Definitive Documents);

(b)    amend or modify any of the Definitive Documents in a manner that is inconsistent with any such document, this Agreement, or the Plan;

(c)    without prior written consent of the Required Consenting First Lien Lenders, consummate or enter into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pay any dividend, or incur any indebtedness for borrowed money, in each case outside the ordinary course of business and other than as contemplated by the Plan, this Agreement, and the Restructuring (including incurrence of indebtedness in connection with the DIP Facility consistent with this Agreement and the DIP Documents); and

(d)    except, in each case, (i) to the extent reasonably necessary to consummate the Restructuring or (ii) otherwise to achieve tax efficiency (taking into account the tax and non-tax considerations and the associated costs of the Company Entities and the Consenting First Lien Lenders), take any action or inaction that would cause a change to the tax classification, for United States federal income tax purposes, of any Company Entity; *provided* that any change to the tax classification for United States federal income tax purposes of any Company Entity pursuant to clause (ii) hereof shall be subject to the prior written consent of the Required Consenting First Lien Lenders.

## 6.    **Additional Provisions Regarding Company Entities' Commitments**.

Section 6.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Entity or the board of directors, board of managers, or similar governing body of a Company Entity to take any action or to refrain from taking any action that is inconsistent with a Fiduciary Out Determination, written notice of which shall be given by

the Company Entities to the Consenting Creditors (and the First Lien Agent and Consenting Creditor Counsel) by not less than one (1) Business Day after the date of such Fiduciary Out Determination (email among counsel being sufficient).  Upon written notice of a Fiduciary Out Determination, the Company Entities, the Required Consenting First Lien Lenders, or the Required Consenting Second Lien Noteholders may terminate this Agreement in accordance with <u>Article 7</u> hereof.

Section 6.02   Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 6.01</u>), if the Company Entities receive a written or oral proposal or expression of interest from any Person or Entity regarding any Alternative Restructuring that their board of directors, board of managers, or similar governing body determines in good faith, upon the advice of outside counsel, that failure to take action would be inconsistent with the fiduciary duties, if any, of the members of such board or governing body under applicable law, the Company Entities shall have the right to: (i) consider, respond to, facilitate, discuss, negotiate, support, or otherwise pursue such Alternative Restructuring, (ii) provide access to non-public information concerning the Company Entities to any Person or Entity and enter into any confidentiality agreement with such Person or Entity in connection therewith, and (iii) otherwise cooperate with, assist, or participate in any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring *provided*, *however* the Company Entities shall (i) notify (including delivering a summary notice of material terms of any Alternative Restructuring proposal reasonably necessary to inform the Required Consenting Creditors) the Required Consenting Creditors and the First Lien Agent and Consenting Creditor Counsel of any of the actions set forth in this <u>Section 6.02</u> within two (2) Business Days; *provided* that to the extent any Company Entity is bound by a confidentiality agreement with the party providing the Alternative Restructuring proposal, such Company Entity shall ensure that such confidentiality agreement does not prohibit the Company Entities from disclosing the terms of the Alternative Restructuring in accordance with its obligations hereunder; (ii) respond promptly to information requests and questions from the First Lien Agent and Consenting Creditor Advisors with respect to any of the actions set forth in this <u>Section 6.02</u>; and (iii) keep the First Lien Agent and Consenting Creditor Advisors reasonably informed with respect to any amendments, modifications, or other changes to, or any further developments of, any such Alternative Restructuring, in any such case as is necessary to keep such counsel reasonably informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments.

Section 6.03   Nothing in this Agreement shall:  (i) impair or waive the rights of the Company Entities to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (ii) prevent the Company Entities from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**7.     Termination of Agreement.**

Section 7.01   <u>Generally</u>.

(a)     This Agreement will automatically terminate upon the Effective Date (as to all Parties).

(b)       This Agreement will terminate, unless cured in accordance with this Agreement, three (3) Business Days following the receipt of written notice (the "***Notice Period***"), delivered in accordance with Article 22 hereof, to the other Parties (as applicable) from (i) the Required Consenting First Lien Lenders, at any time after the occurrence of any Consenting First Lien Lender Termination Event, (ii) the Required Consenting Second Lien Noteholders, who may only terminate this Agreement as to the Consenting Second Lien Noteholders, at any time after the occurrence of any Consenting Second Lien Noteholder Termination Event, or (iii) the Company Entities at any time after the occurrence of any Company Entity Termination Event.  No Party may terminate this Agreement based on a Consenting First Lien Lender Termination Event, Consenting Second Lien Noteholder Termination Event, or Company Entity Termination Event, as applicable, caused (directly or indirectly) by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (including the failure to meet a Milestone, which has not been waived or extended) unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement (including the failure to meet a Milestone, which has not been waived or extended).   For the avoidance of doubt, termination of this Agreement by the Required Consenting Second Lien Noteholders shall not terminate this Agreement as between the Consenting First Lien Lenders and the Company Entities.

(c)       Each of the dates and time periods referenced in: (i) Section 7.02 may be extended by notice from, and with the consent of, the Required Consenting First Lien Lenders to the other Parties; (ii) Section 7.03 may be extended by notice from, and with the consent of, the Required Consenting Second Lien Noteholders to the other Parties; and (iii) Section 7.04 may be extended by notice from, and with the consent of, the Company Entities to the other Parties.  Notice provided in accordance with this Section 7.01(c) may be provided to the other Parties by electronic mail from and to the respective counsel to the Parties.

Section 7.02    A "***Consenting First Lien Lender Termination Event***" will mean any of the following:

(a)       the Company Entities withdraw or modify the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before five (5) Business Days after the Company Entities receive written notice (email among counsel being sufficient) from the Required Consenting First Lien Lenders that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement or the Plan;

(b)       the breach in any material respect by the Company Entities of any of the representations, warranties, covenants, or other obligations of the Company Entities set forth in this Agreement, which breach has not been cured within five (5) Business Days of written notice from the Required Consenting First Lien Lenders of such breach;

(c)       if the Company Entities give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(d)       the issuance by any Governmental Unit, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining

23

the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) seven (7) Business Days after such issuance;

(e)      the failure to meet a Milestone, which has not been waived or extended by the Required Consenting First Lien Lenders;

(f)      the occurrence of an "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived in accordance therewith;

(g)      the failure by one or more of the Company Parties to pay the Restructuring Fees and Expenses in accordance with the terms of this Agreement;

(h)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the earlier of (A) the Confirmation Date and (B) five (5) Business Days after the Required Consenting First Lien Lenders provide written notice to the other Parties that such order is inconsistent with this Agreement or (iv) establishing any official committee of equityholders of ModivCare;

(i)      (x) any Company Entity (i) files any motion seeking to avoid, disallow, subordinate, invalidate, limit or recharacterize, in any respect, any First Lien Claim or interest arising under the First Lien Credit Agreement, or (ii) supports any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action; or (y) the entry of an order by a court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting or recharacterizing, in any respect, any First Lien Claim or interest arising under the First Lien Credit Agreement.

(j)      a filing by any Company Entity of any Definitive Document, motion, or pleading with the Bankruptcy Court that is inconsistent with this Agreement, and such filing is not withdrawn within five (5) Business Days following written notice thereof (email among counsel being sufficient) to the Company Entities by the Required Consenting First Lien Lenders (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court, such order is not stayed, reversed, or vacated within seven (7) Business Days following the entry of such order);

(k)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company Entities having an aggregate fair market value in excess of $1,000,000 and such order materially and adversely affects the Company Entities' ability to operate their business in the ordinary course or to consummate the Restructuring;

(l)      the Bankruptcy Court enters an order terminating the Company Entities' exclusive right to file and solicit acceptances of a chapter 11 plan; unless such relief is granted pursuant to a motion filed with the consent of the Required Consenting First Lien Lenders;

(m)      other than the Chapter 11 Cases, if any Company Entity, without the consent of the Required Consenting First Lien Lenders, (i) voluntarily commences any Restructuring Proceeding with respect to any Company Entity or for a substantial part of any Company Entity's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors; or

(n)      the Company Entities inform the Consenting First Lien Lenders of a Fiduciary Out Determination, upon occurrence of which, the Required Consenting First Lien Lenders may terminate this Agreement as it relates to the Consenting First Lien Lenders and their obligations hereunder.

Section 7.03      A "***Consenting Second Lien Noteholder Termination Event***" will mean any of the following:

(a)      the breach in any material respect by the Company Entities of any of the representations, warranties, covenants, or other obligations of the Company Entities set forth in this Agreement, which breach has not been cured within five (5) Business Days of written notice from the Required Consenting Second Lien Noteholders of such breach;

(b)      if the Company Entities give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(c)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (A) the Confirmation Date and (B) five (5) Business Days after the Required Consenting Second Lien Noteholders provide written notice to the other Parties that such order is inconsistent with this Agreement;

(d)      (x) any Company Entity (i) files any motion seeking to avoid, disallow, subordinate, invalidate, limit or recharacterize, in any respect, any Second Lien Claim or interest relating to any of the Second Lien Notes, or (ii) supports any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action; or (y) the entry of an order by a court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting, or recharacterizing, in any respect, any Second Lien Claim or interest relating to the Second Lien Indenture or arising under the Second Lien Notes;

(e)     other than the Chapter 11 Cases, if any Company Entity, without the consent of the Required Consenting Second Lien Noteholders, (i) voluntarily commences any Restructuring Proceeding with respect to any Company Entity or for a substantial part of any Company Entity's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors; or

(f)     the Company Entities inform the Consenting Second Lien Noteholders of a Fiduciary Out Determination, upon occurrence of which, the Required Consenting Second Lien Noteholders may terminate this Agreement as it relates to the Consenting Second Lien Noteholders and their obligations hereunder.

Section 7.04    A "***Company Entity Termination Event***" will mean any of the following:

(a)     the Consenting Creditors entitled to vote on the Plan will have failed to timely vote their Claims against the Company Entities in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided* that this termination event will not apply if sufficient Consenting Creditors have timely voted (and not withdrawn) their Claims to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)     if, as of 11:59 p.m. prevailing Eastern Time on August 20, 2025, the Support Effective Date has not occurred;

(c)     the breach in any material respect by the Consenting Creditors of any of the representations, warranties, undertakings, commitments, or covenants of the Consenting Creditors that remains uncured for a period of five (5) Business Days after receipt by the Consenting Creditors of notice of such breach;

(d)     the Company Entities provide written notice to the Consenting Creditors that a Fiduciary Out Determination has been made, or the board of directors, board of managers, or such similar governing body of any Company Entities determines pursuant to Section 6.02, in the exercise of its fiduciary duties, to pursue an Alternative Restructuring;

(e)     if the Required Consenting First Lien Lenders give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(f)     the issuance by any Governmental Unit, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) ten (10) Business Days after the Company Entities provide written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement;

(g)      a filing by any Consenting Creditor of any Definitive Document, motion, or pleading with the Bankruptcy Court that is inconsistent with this Agreement, and such filing is not withdrawn within three (3) Business Days following written notice thereof (email among counsel being sufficient) to the Consenting Creditors by the Company Entities (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court, such order is not stayed, reversed, or vacated within seven (7) Business Days following the entry of such order);

(h)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (A) the Confirmation Date and (B) seven (7) Business Days after the Company Entities provide written notice to the other Parties that such order is materially inconsistent with this Agreement.

Section 7.05   Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Company Entities, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders.  The Company Entities will deliver written notice of any such termination to all Parties in accordance with Article 22 hereof.

Section 7.06   Effect of Termination.  Upon the termination of this Agreement in accordance with this Article 7 as to a Party, this Agreement will be void and of no further force or effect and each Party subject to such termination will, except as provided in this Section 7.06 and in Article 16, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law and the Prepetition Funded Debt Documents; *provided* that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

Section 7.07   No Waiver.  If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms.

**8.      Additional Documents.**  Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents subject to the consent rights otherwise contained in this Agreement.  Notwithstanding anything herein to the contrary, nothing herein shall require any Initial Consenting First Lien Lender or Initial

Consenting Second Lien Noteholder to provide any information that it determines, in its sole discretion, to be sensitive or confidential.

**9.**     <u>**Inconsistency of Terms.**</u>  In the event there is any inconsistency between the terms of the Restructuring Term Sheet and this Agreement (excluding the Restructuring Term Sheet), the terms of the Restructuring Term Sheet shall prevail.

**10.**     <u>**Representations and Warranties.**</u>

    <u>Section 10.01</u>  Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company Entities, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

    (a)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

    (b)    the execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (ii) conflict with, result in a breach of or constitute a default under (with or without notice or lapse of time or both) any material contractual obligation to which it is a party or it or its assets are bound, in each case, other than any such violation, conflict, breach or default with respect to which a waiver has been obtained prior to the Support Effective Date and which waiver has not been subsequently revoked;

    (c)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except (i) such filings that may be reasonably necessary in connection with the Chapter 11 Cases, (ii) filings that ModivCare is required to make with the U.S. Securities and Exchange Commission (the "***SEC***"), and (iii) such filings as may be necessary or required for disclosure to any applicable regulatory body or Governmental Unit whose approval or consent is determined by the Company Entities to be necessary to consummate the Restructuring; and

    (d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

    <u>Section 10.02</u>  Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)      is not a Qualified Marketmaker with respect to the First Lien Claims or Second Lien Claims (as applicable) set forth below its name on its signature page to this Agreement; and

(b)      (i) is the beneficial owner of the Claims set forth below its name on the applicable signature page of this Agreement, (ii) has, with respect to such beneficial ownership of such Claims (or upon the return of any Loaned Claims (as defined below), will have), (A) sole investment or voting discretion with respect to such Claims, (B) full power and authority to vote on and consent to matters concerning such Claims, and (C) full power and authority to bind or act on the behalf of, the beneficial owners of such Claims; or (iii) to the extent it has loaned or transferred any Claims to any third-party on a temporary basis pursuant to any loan or repurchase agreement (any such Claims, the "***Loaned Claims***"), it has recalled any Loaned Claims to the extent possible, and will use commercially reasonable efforts to beneficially own any such Loaned Claims as soon as reasonably practicable), and, having made reasonable inquiry, is not the beneficial or record owner or the nominee, investment manager, advisor or sub-advisor for a beneficial or record owner of any Claims other than those reflected in, such Consenting Creditor's signature page to this Agreement or a Joinder Agreement, as applicable (as may be updated).

(c)      For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, any Consenting Creditor's inability to vote, consent, or take any other action with respect to Loaned Claims shall not be a breach or default of such Consenting Creditor's obligations under this Agreement or any Definitive Document.

## 11.    <u>Disclosure; Publicity</u>.

Section 11.01  The Company Entities shall submit drafts to the First Lien Agent and Consenting Creditor Counsel of any press releases, public filings, public announcements, other public documents (including any and all filings with the SEC) or other communications with any news media or to be filed with the SEC, in each case, to be made by the Company Entities relating to this Agreement (or the transactions contemplated hereby) or that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) Business Day, or as soon as reasonably practicable, before making any such disclosure or filing and shall afford them a reasonable opportunity to comment on such documents and disclosures, and shall consider any such reasonable comments in good faith.

Section 11.02  Except as required by law (or as requested by any regulatory or self-regulatory authority consistent with ordinary business practice and to the extent not specifically related to the Company Entities or in connection with the Restructuring) or otherwise permitted under the terms of any other agreement between the Company Entities and the applicable Consenting Creditors, no Party or its advisors will disclose to any Person, other than to Company Entities' Counsel (which shall not disclose any Consenting Creditor's individual holdings absent such Consenting Creditor's express prior written consent), the principal amount or percentage of any First Lien Claims and/or Second Lien Claims, or any other securities of ModivCare held by any Consenting Creditor, in each case, without the Consenting Creditor's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, to the extent permitted by applicable law, the disclosing Party will afford the applicable Consenting Creditor a reasonable opportunity to review and comment in advance of such

disclosure and will take all reasonable measures to limit such disclosure to the extent required by such law, subpoena or other legal process or regulation, and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the First Lien Claims and/or Second Lien Notes held by all the Consenting Creditors collectively. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor (*provided* that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

12. **Amendments and Waivers.** Except as otherwise expressly set forth herein, this Agreement, including the exhibits hereto, may not be waived, modified, amended or supplemented except in a writing signed by the (i) Company Entities and the (ii) Required Consenting First Lien Lenders. Notwithstanding anything herein to the contrary, for the avoidance of doubt, (A) no amendment, modification, waiver, or supplement of the definition of "Required Consenting Creditors" shall be effective without the consent of each Consenting Creditor; *provided*, *however*, that such Consenting Creditor is not in material breach of this Agreement; (B) no amendment, modification, waiver, or supplement of the definition of "Required Consenting First Lien Lenders" shall be effective without the consent of each Consenting First Lien Lender; *provided*, *however*, such Consenting First Lien Lender is not in material breach of this Agreement; (C) no amendment, modification, waiver, or supplement of the definition of "Required Consenting Second Lien Noteholders" shall be effective without the consent of each Consenting Second Lien Noteholder; *provided*, *however*, such Consenting Second Lien Noteholder is not in material breach of this Agreement; (D) no amendment modification, waiver, or supplement that would adversely and disproportionally impact the Consenting Second Lien Noteholders as to any other class of Consenting Creditors hereunder or adversely alter the treatment of the Second Lien Claims set forth in the Restructuring Term Sheet shall be effective without the prior written consent of (x) the Required Consenting Second Lien Noteholders and (y) each Consenting Second Lien Noteholder party hereto as of the Support Effective Date; (E) no amendment modification, waiver, or supplement that would beneficially impact the Consenting Second Lien Noteholders as to any other class of Consenting Creditors hereunder or beneficially alter the treatment of the Second Lien Claims set forth in the Restructuring Term Sheet shall be effective without the prior written consent of the Required Consenting First Lien Lenders determined without including any First Lien Claims held by any Consenting First Lien Lender that also holds Second Lien Claims with a face amount greater than 20% of the face amount of such Consenting First Lien Lender's First Lien Claims; (F) no amendment modification, waiver, or supplement that would beneficially impact the Consenting Second Lien Noteholders as to any other class of Consenting Creditors hereunder or beneficially alter the treatment of the Second Lien Claims set forth in the Restructuring Term Sheet shall be effective without the prior written consent of the Required Consenting Second Lien Noteholders; (G) no amendment, modification, supplement or waiver which materially, adversely and disproportionately affects the Claims held by any Consenting First Lien Lender as compared to any other Consenting First Lien Lender shall be effective without the written consent of such Consenting First Lien Lender; (H) no amendment, modification, supplement or waiver which materially, adversely and disproportionately affects the Claims held by any Consenting Second Lien Noteholder as compared to any other Consenting Second Lien Noteholder shall be effective without the written consent of such Consenting Second Lien

Noteholders; and (I) no amendment, modification, waiver, or supplement of this <u>Article 12</u> shall be effective without the consent of each Consenting Creditor.

**13.**    **Effectiveness.**  This Agreement will become effective and binding (i) as to the Company Entities, Initial Consenting First Lien Lenders, and Initial Consenting Second Lien Noteholders on the Support Effective Date, (ii) as to any Consenting Creditor that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery to the Company Entities and the Required Consenting Creditors of such validly completed Joinder Agreement; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement; *provided*, that signature pages executed by Consenting Creditors will be delivered to (A) the Company Entities, the other Consenting Creditors, and in a redacted form that removes such Consenting Creditor's holdings of the First Lien Claims or Second Lien Claims and (B) the Company Entities' Advisors in an unredacted form (to be held by the Company Entities' Advisors on a professionals' eyes only basis) and the First Lien Agent and Consenting Creditor Counsel (to be held by each such counsel on a professionals' eyes only basis).

**14.**    **<u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. THIS AGREEMENT AND ANY DISPUTE, CLAIM, COUNTERCLAIM OR CAUSE OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY) WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT (WHETHER IN TORT, CONTRACT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY) WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER IN TORT, CONTRACT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY) OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS ARTICLE 14 SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, WITH RESPECT TO SUCH CLAIMS, (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, AND (III) WAIVES ANY OBJECTION THAT THE BANKRUPTCY COURT IS AN**

**INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO.**

**15.**     **Remedies/Specific Performance.**  All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to each non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided* that in connection with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages.  All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

**16.**     **Survival.**  Notwithstanding the termination of this Agreement pursuant to Article 7 hereof, Section 7.07, Articles 9, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26, (and, to the extent applicable to the interpretation of such surviving sections, Article 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

**17.**     **Headings.**  The headings of the Articles, Sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**18.**     **Successors and Assigns; Severability; Several Obligations.**  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns. The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the

greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

19. __No Third-Party Beneficiaries__.  Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof or have any rights hereunder.

20. __Prior Negotiations; Entire Agreement__.  This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior agreements and negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any Confidentiality Agreements or agreements with respect to shared or common interest heretofore executed between the Company Entities and any Consenting Creditor (or the First Lien Agent and Consenting Creditor Advisors) and any engagement letters and/or fee arrangements will continue in full force and effect in accordance with the terms thereof.

21. __Counterparts__.  This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  The words "execution," "signed," "signature," and words of like import in this Agreement including any Joinder Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

22. __Notices__.  All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

      (1)     If to the Company Entities, to:

      ModivCare Inc.
      6900 E Layton Avenue, 12th Floor
      Denver, CO 80237
      Attention:  Faisal Khan, Esq.
      E-mail:  Faisal.Khan@modivcare.com

      with a copy (which shall not constitute notice) to:

      Latham & Watkins LLP
      1271 Avenue of the Americas
      New York, NY 10020
      Attention:   Ray C. Schrock, Esq. (Ray.Schrock@lw.com)
                 Keith Simon, Esq. (Keith.Simon@lw.com)
                 George Klidonas, Esq. (George.Klidonas@lw.com)
                 Jon Weichselbaum, Esq. (Jon.Weichselbaum@lw.com)

(2)      If to the Consenting Creditors, to the addresses or electronic mail addresses set forth below the Consenting Creditor's signature, with a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Kris Hansen, Esq. (KrisHansen@paulhastings.com)

and

Paul Hastings LLP
71 S. Wacker Drive
Chicago, IL 60606
Attention:   Matt Warren, Esq. (MattWarren@paulhastings.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

**23.**      **Reservation of Rights; No Admission.**  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the First Lien Claims and/or Second Lien Claims, (iii) enforce any right under or with respect to the First Lien Credit Agreement and any related documents, the Second Lien Indenture and any related documents, any of the First Lien Claims and/or any of the Second Lien Claims, subject to the terms hereof, (iv) consult with other Consenting Creditors, other holders of First Lien Claims and/or Second Lien Claims, or any other Party regarding the Restructuring, or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents.  Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to Articles 7, 14, and 15 in the case of any claim for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

**24.**      **Relationship Among Parties.**  It is understood and agreed that no Consenting Creditor has any fiduciary duty, any duty of trust or confidence of any kind or form, or any other duty or responsibility, to or with any other Consenting Creditor, any of the Company Entities, or any other creditor or interest holder of the Company Entities, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement.  In this regard, it is understood and agreed that any Consenting Creditor may acquire First Lien Claims, Second Lien Claims, or other debt or equity securities of the Company Entities without the consent of the Company Entities or any other creditor, subject to applicable securities laws, the terms of this Agreement, and the terms of any applicable Confidentiality Agreement; *provided* that no

34

Consenting Creditor will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

**25.      No Solicitation; Representation by Counsel; Adequate Information.**

Section 25.01  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

Section 25.02  Each Party acknowledges that it has had an opportunity to receive information from the Company Entities and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

Section 25.03  Each Initial Consenting Creditor (and, to the extent applicable, each other Consenting Creditor) acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (A) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (B) that some or all of such securities will be offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

**26.      Restructuring Fees and Expenses.**  Whether or not the transactions contemplated by this Agreement are consummated, the Company Entities hereby agree, on a joint and several basis, to pay in Cash the Restructuring Fees and Expenses as follows: (i) all accrued and unpaid Restructuring Fees and Expenses for which an invoice has been received by the Company Entities on or before the date that is two (2) days prior to the Support Effective Date shall be paid in full in Cash on the Support Effective Date; (ii) after the Support Effective Date and prior to the Termination Date, all accrued and unpaid Restructuring Fees and Expenses shall be paid in full in Cash by the Company Entities on a regular and continuing basis, in accordance with the terms of this Agreement, the applicable engagement letter or reimbursement letter and the provisions of the First Lien Credit Documents; (iii) upon termination of this Agreement, all accrued and unpaid Restructuring Fees and Expenses incurred up to (and including) the applicable Termination Date shall be paid under this Agreement, any engagement letters, or fee reimbursement letters and  the provisions of the First Lien Credit Documents, in full in Cash promptly (but in any event within five (5) Business Days); and (iv) on the Effective Date, all accrued and unpaid Restructuring Fees and Expenses of the First Lien Agent and Consenting Creditor Advisors through the Effective Date

shall be paid under this Agreement, any engagement letters or fee reimbursement letters and the provisions of the First Lien Credit Documents, in full in Cash.

27.   **Miscellaneous.**   When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

## Company Entities Signature Pages to
## the Restructuring Support Agreement

By: _____

Name: Chad J. Shandler
Title:   Chief Transformation Officer

On behalf of:

**MODIVCARE INC.**
**A & B HOMECARE SOLUTIONS, L.L.C**
**A.E. MEDICAL ALERT, INC.**
**ABC HOMECARE LLC**
**ALL METRO AIDS, INC.**
**ALL METRO ASSOCIATE PAYROLL SERVICES CORPORATION**
**ALL METRO CGA PAYROLL SERVICES CORPORATION**
**ALL METRO FIELD SERVICE WORKERS PAYROLL SERVICES CORPORATION**
**ALL METRO HEALTH CARE SERVICES, INC.**
**ALL METRO HOME CARE SERVICES OF FLORIDA, INC.**
**ALL METRO HOME CARE SERVICES OF NEW JERSEY, INC.**
**ALL METRO HOME CARE SERVICES OF NEW YORK, INC.**
**ALL METRO HOME CARE SERVICES, INC.**
**ALL METRO MANAGEMENT AND PAYROLL SERVICES CORPORATION**
**ALL METRO PAYROLL SERVICES CORPORATION**
**AM HOLDCO, INC.**
**AM INTERMEDIATE HOLDCO, INC.**
**ARSENS HOME CARE, INC.**
**ARU HOSPICE, INC.**
**ASSOCIATED HOME SERVICES, INC.**
**AT-HOME QUALITY CARE, LLC**
**AUDITORY RESPONSE SYSTEMS, INC.**
**BARNEY'S MEDICAL ALERT-ERS, INC.**
**CALIFORNIA MEDTRANS NETWORK IPA LLC**
**CALIFORNIA MEDTRANS NETWORK MSO LLC**
**CARE FINDERS TOTAL CARE LLC**
**CAREGIVERS ALLIANCE, LLC**
**CAREGIVERS AMERICA HOME HEALTH SERVICES, LLC**
**CAREGIVERS AMERICA MEDICAL STAFFING, LLC**
**CAREGIVERS AMERICA MEDICAL SUPPLY, LLC**
**CAREGIVERS AMERICA REGISTRY, LLC**
**CAREGIVERS AMERICA, LLC.**
**CAREGIVERS ON CALL, INC.**
**CGA HOLDCO, INC.**
**CGA STAFFING SERVICES, LLC**
**CIRCULATION, INC.**

**FLORIDA MEDTRANS NETWORK LLC**
**FLORIDA MEDTRANS NETWORK MSO LLC**
**GUARDIAN MEDICAL MONITORING, LLC**
**HEALTH TRANS, INC.**
**HEALTHCOM, INC.**
**HEALTHCOM HOLDINGS LLC**
**HELPING HAND HOME HEALTH CARE AGENCY INC**
**HELPING HAND HOSPICE INC.**
**HIGI CARE HOLDINGS, LLC**
**HIGI CARE, LLC**
**HIGI SH HOLDINGS INC.**
**HIGI SH LLC**
**INDEPENDENCE HEALTHCARE CORPORATION**
**METROPOLITAN MEDICAL TRANSPORTATION IPA, LLC**
**MLA SALES, LLC**
**MODIVCARE SOLUTIONS, LLC**
**MULTICULTURAL HOME CARE INC.**
**NATIONAL MEDTRANS, LLC**
**NEW ENGLAND EMERGENCY RESPONSE SYSTEMS, INC.**
**OEP AM, INC.**
**PANHANDLE SUPPORT SERVICES, INC.**
**PERSONAL IN-HOME SERVICES, INC.**
**PHILADELPHIA HOME CARE AGENCY, INC.**
**PROVADO TECHNOLOGIES, LLC**
**RED TOP TRANSPORTATION, INC.**
**RIDE PLUS, LLC**
**SAFE LIVING TECHNOLOGIES, LLC**
**SECURA HOME HEALTH HOLDINGS, INC.**
**SECURA HOME HEALTH, LLC**
**SOCRATES HEALTH HOLDINGS, LLC**
**TRIMED, LLC**
**UNION HOME CARE LLC**
**VALUED RELATIONSHIPS, INC.**
**VICTORY HEALTH HOLDINGS, LLC**
**VRI INTERMEDIATE HOLDINGS, LLC**

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**ALLIANCEBERNSTEIN L.P.**,
as investment advisor to and on behalf of certain managed accounts

By: _____

Name: Tayah L. Woodard
Title: Assistant Secretary

Address: ███████████████████████████

E-mail address(es): ███████████████████████
████████████████████████████████████████
███████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**ALLSPRING GLOBAL INVESTMENTS LLC**,
on behalf of its various funds and accounts



By: _____

Name: Chris M Lee

Title: SR Portfolio Manager

Address:

█████████████

█████████████

E-mail address(es):

████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**BEACH POINT CAPITAL MANAGEMENT LP,**
on behalf of certain funds and accounts it manages or advises

By: _____

Name:  Allan Schweitzer

Title:  Portfolio Manager

Address:

E-mail address(es):

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**BIRCH GROVE CAPITAL LP**,
on behalf of its various funds and accounts

By: _____
Name: Todd Berry
Title: Authorized Signatory

Address: ███████████████

E-mail address(es): ███████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**BNP PARIBAS S.A.,** solely in its capacity as a Term Loan lender and solely in respect of its New York High Yield Distressed Desk,

By: _____

Name:   Joseph Beggans

Title:   Managing Director

By: _____

Name:   Martin Higgins

Title:   Director

Address: ███████████████████████

E-mail address(es): ███████████████████████

███████████████████████

[Signature Page to Restructuring Support Agreement]

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**BRIGADE CAPITAL MANAGEMENT, LP**,
on behalf of its various funds and accounts

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


Address: ███████████████████████████

E-mail address(es): █████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**DEUTSCHE BANK AG NEW YORK BRANCH, as Consenting Lender solely in respect of the First Lien Claim indicated below managed by Deutsche Bank AG New York Branch's Leveraged Debt Capital Markets business unit**

By:_____
Name: Philip Tancorra
Title:  Director

By:_____
Name:  Suzan Onal
Title:   Director

Address: ███████████████████████████████

E-mail address(es): ████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**HalseyPoint Asset Management, LLC,** solely in its capacity as Portfolio Manager pursuant to the Portfolio
Management Agreements for the Following:

      HalseyPoint CLO I, Ltd.
      HalseyPoint CLO II, Ltd.
      HalseyPoint CLO 4, Ltd.
      HalseyPoint CLO 5, Ltd.
      HalseyPoint CLO 6, Ltd.
      HalseyPoint CLO 7, Ltd.
      Sagard-HalseyPoint CLO 8, Ltd.

By: _____
Name: Agata Marczak
Title: Managing Director


Address:

      ██████████████████████████
      ████████████████████████████
      ██████████████████


E-mail address: ███████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**HG VORA CAPITAL MANAGEMENT, LLC**,
on behalf of certain funds and accounts managed or advised by it

By: _____

Name: Mandy Lam

Title:  Authorized Signatory

Address: ███████████████████████████

E-mail address(es): ███████████████████████
███████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**HSBC BANK PLC,**
on behalf of its various funds and accounts

By:_____

Name:

Title:

Timothy J Brown
Head of Financial and Enterprise Risk
Markets & Securities Services
HSBC Bank plc

Address:

E-mail address(es): t████████████████

[*Signature Page to Restructuring Support Agreement*]

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**JEFFERIES FINANCE LLC**,
on behalf of its various funds and accounts

By: _J.R. Young_____

Name: J.R. Young

Title: Managing Director

Address:

██████████████████

████████████████████

E-mail address(es): ██████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**[CONSENTING CREDITOR]** *KEY BANK, NA*

By: _____

Name: *Adam Cebula Jr.*

Title: *Vice President*

Address: ███████████████████████

E-mail address(es): ███████████████████

████████████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**POLAR ASSET MANAGEMENT PARTNERS INC.,**
on behalf of its various funds and accounts

By: _____
Name: Elisabeth Summers
Title:    General Counsel

By: _____
Name:  Andrew Ma
Title: Chief Compliance Officer

Address:

██████████████████████████

E-mail address(es):

███████████████

████████████████

██████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**TEXAS EXCHANGE BANK**

By: *Rebecca Kiel*
   Rebecca Kiel (Aug 15, 2025 18:09:31 CDT)
Name: Rebecca Kiel
Title: Chief Financial Officer

Address: █████████████████████████

Email Address(es): ████████████

█████████████████████████████████
█████████████████████████████████
█████████████████████████████████
█████████████████████████████████
█████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**Q5-R5 Trading, Ltd.**
By: Q Global Capital Management, L.P., as Investment Manager
By: Q Global Advisors, LLC, its General Partner

*Nelson Holm*

By:_____
Name: Nelson Holm
Title: Assistant Secretary

Address: ████████████
████████████████████

E-mail address(es): ████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

**REDWOOD CAPITAL MANAGEMENT, LLC**,
on behalf of its various funds and accounts

By: _____
Name: Sean Sauler
Title: Deputy CEO

Address:

███████████████████████

█████████████████

E-mail address(es):

███████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Consenting Creditor Signature Page to**
**Restructuring Support Agreement**

[CONSENTING CREDITOR] REGIONS BANK

By: _____

Name: ROBERT KORTE

Title: SENIOR VICE PRESIDENT

Address: ███████████████████████████

E-mail address(es): ████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[*Signature Page to Restructuring Support Agreement*]

Restricted

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**SILVER ROCK FINANCIAL LP**,
on behalf of its various funds and accounts

By: _____

Name: Patrick Hunnius

Title: General Counsel and Chief Compliance Officer

Address:

▮▮▮▮▮▮▮▮▮▮▮▮

E-mail address(es): ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**SILVER ROCK MANAGEMENT LLC**,
on behalf of its various funds and accounts

By: _____

Name: Patrick Hunnius

Title: General Counsel and Chief Compliance Officer

Address:

████████████████

E-mail address(es): ██████████████████████

████████████████████████████████████

*[Signature Page to Restructuring Support Agreement]*

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**SUMMIT HOUSE CAPITAL MANAGEMENT, LLC**,
acting solely in its capacity as Investment Manager to the following entities:
Summit House Credit Opportunities Fund II, L.P.
Summit House Credit Opportunities Fund III, L.P.
SHCOF III Holdings, Inc.

By: *Jed Walsh*

Name: Jed Walsh
Title:    Authorized Signatory

Address: ██████████████████

E-mail address(es): ██████████████



[*Signature Page to Restructuring Support Agreement*]



[*Signature Page to Restructuring Support Agreement*]

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**TCW ASSET MANAGEMENT COMPANY LLC
TCW INVESTMENT MANAGEMENT COMPANY LLC
METROPOLITAN WEST ASSET MANAGEMENT, LLC,**
each on behalf of their respective managed funds and accounts

By: *Steven Purdy*
Name: Steven Purdy
Title: Managing Director

Address:
███████████████
███████████████

Email address: ████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

**Consenting Creditor Signature Page to
Restructuring Support Agreement**

**WELLS FARGO BANK, NA**

By: *Scott J. Manookin*
Name: Scott J. Manookin, Executive Director
Title:  Executive Director

E-mail address(es): ████████████████

Address: ██████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

## **Exhibit A**

**Restructuring Term Sheet**

## MODIVCARE INC.

## RESTRUCTURING TERM SHEET

**August 20, 2025**

THIS RESTRUCTURING TERM SHEET (THIS "**RESTRUCTURING TERM SHEET**") DESCRIBES CERTAIN KEY TERMS AND CONDITIONS OF A RESTRUCTURING FOR MODIVCARE INC. ("**MODIVCARE**"), A DELAWARE CORPORATION, AND ITS SUBSIDIARIES AND AFFILIATES THAT WILL BE EFFECTED PURSUANT TO A CHAPTER 11 PLAN CONTAINING TERMS SET FORTH HEREIN TO BE CONFIRMED IN THE CASES COMMENCED IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS (THE "**BANKRUPTCY COURT**") UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. [1] THIS RESTRUCTURING TERM SHEET IS A KEY COMPONENT OF THE OFFER OF DEBTOR-IN-POSSESSION FINANCING PURSUANT TO DIP DOCUMENTS BEING DELIVERED BY CONSENTING CREDITORS CONTEMPORANEOUSLY HEREWITH.

THIS RESTRUCTURING TERM SHEET IS NOT (AND SHALL NOT BE CONSTRUED AS) AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS.  ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING APPLICABLE SECURITIES LAWS.

THIS RESTRUCTURING TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN (COLLECTIVELY, THE "**RESTRUCTURING TRANSACTIONS**"), WHICH WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS INCORPORATING, AND CONSISTENT WITH, THE TERMS SET FORTH HEREIN AND THE RESTRUCTURING SUPPORT AGREEMENT, AND THE CLOSING OF ANY RESTRUCTURING SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

---

[1]     Capitalized terms used but not defined in this Restructuring Term Sheet shall have the meanings given to such terms in the Restructuring Support Agreement.

| **GENERAL PROVISIONS** |
| --- |

| **Company Entities** | The entities described in the list of entities attached as Annex 1 hereto, being the Company Entities, shall be the debtors in possession (as that term is defined in section 1101 of the Bankruptcy Code) in the Chapter 11 Cases. |
| --- | --- |
| **Existing Capital Structure** | First Lien Incremental: consisting of the $78,750,000 of outstanding principal amount of term loans under the First Lien Credit Agreement (*plus* accrued and unpaid interest, premiums, fees, costs, and other amounts that may be due and payable under the First Lien Incremental) (the "**First Lien Incremental**").<br><br>First Lien Term Loans: consisting of the $522,239,938 of outstanding principal amount of term loans under the First Lien Credit Agreement (*plus* accrued and unpaid interest, premiums, fees, costs, and other amounts that may be due and payable under the First Lien Term Loans) (the "**First Lien Term Loans**").<br><br>First Lien RCF: consisting of the $325,000,000[2] of outstanding revolving loans and LC Exposure under the First Lien Credit Agreement (*plus* accrued and unpaid interest, premiums, fees, costs, and other amounts that may be due and payable under the First Lien RCF) (the "**First Lien RCF**", and together with the First Lien Incremental and the First Lien Term Loans, the "**First Lien Loan Facility**").<br><br>The portion of the First Lien Credit Agreement that is determined pursuant to section 506(a) of the Bankruptcy Code or similar provision to be unsecured, the "**First Lien Deficiency Claims**."<br><br>Second Lien Notes: consisting of the $316,223,250 of outstanding principal amount of second lien notes issued pursuant to the Second Lien Indenture (*plus* accrued and unpaid interest, premiums, fees, costs, and other amounts that may be due and payable under the Second Lien Indenture) (the "**Second Lien Notes**"). The portion of the Second Lien Notes that are determined pursuant to section 506(a) of the Bankruptcy Code or similar provision to be unsecured, the "**Second Lien Deficiency Claims**."<br><br>Unsecured Notes: consisting of the $228,835,000 of outstanding principal amount of notes issued pursuant to the Unsecured Notes Indenture (*plus* accrued and unpaid interest, premiums, fees, costs, and other amounts that may be due and payable under the Unsecured Notes Indenture) (the "**Unsecured Notes Claims**").<br><br>General Unsecured Claims: consisting of all claims (other than Administrative Claims, Priority Tax Claims, First Lien Claims, Second Lien Claims, Other Secured Claims, and Other Priority Claims), including, for the avoidance of doubt, First Lien Deficiency Claims and Second Lien Deficiency Claims, against the Company Entities that are non-priority and unsecured (the "**General Unsecured Claims**"). |

---

2       $270,699,086.86 (excluding LC exposure)

| | |
|---|---|
| | Subordinated Claims: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)-(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**"). |
| | Existing Parent Equity Interests: consisting of all issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, other instrument evidencing an ownership interest, and/or any other Interest, in ModivCare, whether or not transferable, together with any warrants, options, equity-based awards, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date (collectively, the "**Existing Parent Equity Interests**"). |
| **Overview of the Restructuring** | A Plan will be filed and prosecuted with the support of the Consenting Creditors on the terms and conditions set forth in the Restructuring Support Agreement (including this Restructuring Term Sheet). |
| | The Chapter 11 Cases will be funded by the DIP Facility (as defined below) and the Company Entities' use of cash collateral, each on the terms and conditions set forth in the Restructuring Term Sheet (including the DIP Facility Term Sheet). |
| | The Company Entities' emergence from the Chapter 11 Cases will be funded by the proceeds of a combination of the Exit Revolving Facility, the Exit Loan Facility and cash on hand. |
| | As of the Effective Date, each holder of a DIP Claim, a First Lien Claim, a Second Lien Claim, an Unsecured Notes Claim, a General Unsecured Claim, a Subordinated Claim, an Intercompany Claim, an Intercompany Interest and/or an Existing Parent Equity Interests shall, in each case, to the extent such Claim or Interest is Allowed, receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge, and in exchange for such Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Company Entities, the Required Consenting First Lien Lenders, and the holder of such Allowed Claim or Allowed Interest. |
| | For the avoidance of doubt, any action required to be taken by the Company Entities on the Effective Date pursuant to this Restructuring Term Sheet may be taken either (a) on the Effective Date or (b) with the consent of the Required Consenting First Lien Lenders, as soon as is reasonably practicable thereafter. |
| **DIP Financing and Use of Cash Collateral** | The Chapter 11 Cases will be financed by (i) the use of cash collateral and (ii) a DIP Facility provided by First Lien Lenders (such lenders, the "**DIP Lenders**") and backstopped by the Backstop Parties that commit to do so in accordance with the DIP Backstop Commitment Letters on the terms and conditions set forth in this Restructuring Term Sheet (including the DIP Facility Term Sheet) and in the Definitive Documents. |
| | The DIP Facility will be issued in the aggregate principal amount of $100 million.  The terms of the DIP Facility are set forth in further detail in the DIP Facility Term Sheet. |

|  | Pursuant to syndication procedures acceptable to the Required Consenting First Lien Lenders (the "**Syndication Procedures**"), all holders of First Lien Claims (who become parties to the Restructuring Support Agreement in accordance with its terms) prior to the closing of the DIP Facility syndication process will be eligible to subscribe for their pro rata share of the DIP Facility based on their respective pro rata holdings of their First Lien Claims by committing to purchase such share of the DIP Facility from Jefferies Capital Services, LLC.

To the extent that a holder of First Lien Claims (i) does not execute the Restructuring Support Agreement (in which case, such holder shall have no right to subscribe for any portion of the DIP Facility) or (ii) executes the Restructuring Support Agreement but does not subscribe for its pro rata share of the DIP Facility in accordance with the Syndication Procedures, then (in either case) each Backstop Party shall, severally and not jointly, increase its pro rata share of the DIP Facility for any portion of the DIP Facility that is not subscribed for by the holder of such First Lien Claims.

The Consenting Creditors shall consent to the use of cash collateral on the terms and conditions set forth in the DIP Facility Term Sheet (subject to Definitive Documents and entry of the DIP Orders, in each case, acceptable to the Required Consenting First Lien Lenders), which shall be consistent with the terms of the Restructuring Support Agreement (including this Restructuring Term Sheet) and otherwise reasonably acceptable to the Required Consenting First Lien Lenders.  The DIP Orders shall provide for the adequate protection of the First Lien Claims, including payment in-kind of interest at a rate equal to 2% above the default rate of interest under the First Lien Credit Documents, as such amounts become due and payable. |
| **DIP Backstop Commitment** | Contemporaneously with the execution of the Restructuring Support Agreement, certain Consenting Creditors (in such capacities, the "**Backstop Parties**") will execute the DIP Backstop Commitment Letters, pursuant to which the Backstop Parties will commit to provide, severally and not jointly, 100% of the DIP Facility.  The Backstop Parties will receive, in the allocations set forth in their respective DIP Backstop Commitment Letters, a backstop premium (the "**DIP Backstop Premium**"), which premium shall be earned upon execution of the DIP Backstop Commitment Letters (subject to approval of the Bankruptcy Court) and payable on the Effective Date, in full in-kind in the form of New Common Interests equal to 20% of the aggregate New Common Interests, subject to dilution by the MIP, the New Warrants and the New Common Interests issued pursuant to the Equity Rights Offering. |
| **Exit Revolving Facility** | On the Effective Date, the Reorganized Company Entities shall enter into a credit agreement as the borrower in respect of a revolving credit facility (the "**Exit Revolving Facility**") providing for commitments of up to $250 million (which shall include up to a $150 million sublimit for the issuance of letters of credit), secured by a first priority security interest and lien on substantially all the Reorganized Company Entities' assets, subject to customary limitations and exclusions acceptable to the Required Consenting First Lien Lenders; provided that the commitment amounts under the Exit Revolving Facility shall be determined at the sole discretion of the Required Consenting First Lien Lenders. |

| | The terms of the Exit Revolving Facility shall be negotiated prior to the Effective Date and shall be mutually acceptable to the Company Entities and the Required Consenting First Lien Lenders. |
|---|---|
| **Exit Term Loan Facility** | On the Effective Date, the Reorganized Debtors will enter into a credit agreement for a takeback loan facility (the "**Exit Term Loan Facility**", and any loans made thereunder, "**Exit Term Loans**", and together with the Exit Revolving Facility, the "**Exit Facilities**") secured by a first priority security interest and in lien on substantially all the Reorganized Company Entities' assets, subject to customary limitations and exclusions acceptable to the Required Consenting First Lien Lenders. The Exit Term Loans will be funded by rolling the DIP Facility and up to $200 million of the First Lien Loan Facility into the Exit Term Loan Facility; provided, further, that the amount by which the takeback portion of the Exit Term Loan is reduced below $200 million shall ratably reduce the aggregate amount of New Common Interests and New Warrants for distribution to the Second Lien Claims pool of New Common Interests and New Warrants. The Exit Term Loan Facility shall have a five (5) year term and the remaining terms will be negotiated prior to the Effective Date and shall be mutually acceptable to the Company Entities and the Required Consenting First Lien Lenders. |
| **Equity Rights Offering** | In connection with the Restructuring, ModivCare intends to offer certain Eligible Holders[3] of Allowed General Unsecured Claims, the transferable right to purchase New Common Interests for an aggregate amount of up to $200,000,000, pursuant to applicable exemptions from registration under the Securities Act[4] and/or section 1145 of the Bankruptcy Code (the "**Equity Rights Offering**"). The Equity Rights will allow the Eligible Holders thereof, on a record date to be determined prior to the Effective Date, to purchase New Common Interests at a valuation at which First Lien Lenders would recover 100% on account of their Allowed First Lien Claims, and the Second Lien Noteholders would recover 75% on account of their Allowed Second Lien Claims. The proceeds of the Equity Rights Offering shall fund Cash payments to holders of Allowed First Lien Claims. |
| **New Common Interests** | On the Effective Date, the Reorganized Company Entities shall issue one or more classes of New Common Interests. New Common Interests distributed pursuant to the Equity Option (as defined below) shall not reduce the aggregate amount of Exit Term Loans available for distribution. <br><br> The terms of the New Common Interests shall be consistent in all respects with the terms and conditions set forth in this Restructuring Term Sheet and otherwise agreed between the Company Entities and the Required Consenting First Lien Lenders. |

---

[3]    An "**Eligible Holder**" means a holder of an Allowed Unsecured Notes Claim or Allowed Other General Unsecured Claim that is an Accredited Investor or Qualified Institutional Buyer (each as defined in the Securities Act).

[4]    The "**Securities Act**" means the Securities Act of 1933, as amended.

| New Warrants | On the Effective Date, the Company Entities will (i) enter into definitive documents to issue the New Warrants, which shall be on terms and conditions that are consistent in all respects with the terms and conditions in this Restructuring Term Sheet and otherwise agreed between the Company Entities, the Required Consenting First Lien Lenders and the Required Consenting Second Lien Noteholders, and (ii) issue to the Second Lien Noteholders the Series A Warrants, the Series B Warrants, and the Series C Warrants (each as defined in the New Warrants Term Sheet (as defined below), and collectively, the "**New Warrants**") on terms and conditions consistent with the term sheet attached hereto as <u>Annex 3</u> (the "**New Warrants Term Sheet**") and otherwise in a form and substance reasonably acceptable to the Required Consenting Creditors and the Company Entities.  For the avoidance of doubt, the New Warrants are subject to dilution by the MIP. |

| **TREATMENT OF CLAIMS AND INTERESTS** | |
|---|---|
| **Administrative Expense Claims** | Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9)(A) of the Bankruptcy Code. |
| **Priority Tax Claims** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **DIP Claims** | Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of Exit Term Loans.<br><br>For the avoidance of doubt, DIP Professional Fees and Restructuring Fees and Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. |
| **Other Secured Claims** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Company Entities (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Company Entities, (i) such holder shall receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim unimpaired. |

| | |
|---|---|
| | **Unimpaired – Presumed to accept.** |
| **Other Priority Claims** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall, at the option of the Company Entities (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Company Entities, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.<br><br>**Unimpaired – Presumed to accept.** |
| **First Lien Claims** | The First Lien Claims shall be deemed Allowed.  Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed First Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such Allowed First Lien Claim, a Pro Rata Share of the following:<br><br>i. the Exit Term Loans; provided, however, that, at the election of the Required Consenting First Lien Lenders prior to the Effective Date, Holders of Allowed First Lien Claims may be permitted to elect to receive (i) additional New Common Interests in lieu of receiving some or all of their pro rata share Exit Term Loans (the "**Equity Option**") or (ii) additional Exit Term Loans in lieu of receiving some or all of their portion of the New Common Interests; and<br>ii. 98% of the New Common Interests, subject to dilution by the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP.<br><br>**Impaired – Entitled to vote.** |
| **Second Lien Claims** | The Second Lien Claims shall be deemed Allowed.  Except to the extent that a holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Second Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each holder of an Allowed Second Lien Claim shall receive, in full and final satisfaction of such Allowed Second Lien Claim, a pro rata share of the following:<br><br>i. 2% of the New Common Interests, subject to dilution by the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and<br>ii. the New Warrants.<br><br>**Impaired – Entitled to vote.** |

| | |
|---|---|
| **General Unsecured Claims (including Unsecured Notes Claims** | All General Unsecured Claims (including, for the avoidance of doubt, First Lien Deficiency Claims and Second Lien Deficiency Claims) shall be canceled, released, and extinguished as of the Effective Date, and Holders of Allowed General Unsecured Claims shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claims; provided that, if the Equity Rights Offering is commenced, Eligible Holders of General Unsecured Claims (but excluding holders of First Lien Deficiency Claims and Second Lien Deficiency Claims) shall receive their Pro Rata Share of the transferable right to purchase up to $200,000,000, in aggregate, of New Common Interests pursuant to the Equity Rights Offering. **Impaired – Entitled to vote.** |
| **Intercompany Claims** | All Intercompany Claims shall be either:  (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Company Entities with the consent of the Required Consenting First Lien Lenders. **Unimpaired – Presumed to accept.** |
| **Subordinated Claims** | All Subordinated Claims, if any, shall be canceled, released, extinguished, and of no further force and effect and holders of Subordinated Claims shall not receive any property or distribution under the Plan on account thereof. **Impaired – Deemed to reject.** |
| **Existing Parent Interests** | On the Effective Date, all Existing Parent Equity Interests shall be canceled, released, extinguished, and of no further force and effect.  Holders of Existing Equity Parent Interests shall not receive or retain any distribution, property, or other value on account of such Existing Equity Parent Interests. **Impaired – Deemed to reject.** |
| **Intercompany Interests** | All Allowed Intercompany Interests shall be, at the option of the Company Entities, either:  (i) Reinstated for administrative convenience or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Company Entities. **Unimpaired – Presumed to accept.** |

| **ADDITIONAL TERMS** | |
|---|---|
| **Definitive Documents** | This Restructuring Term Sheet does not set forth all of the terms of the Restructuring Transactions, and any definitive or binding agreement shall be subject to the Definitive Documents, which such Definitive Documents shall be consistent with the terms of this Restructuring Term Sheet, the DIP Facility Term Sheet, and the Restructuring Support Agreement.<br><br>Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the Effective Date shall be subject to the rights and obligations set forth in the Restructuring Support Agreement and shall otherwise be in form and substance acceptable to the Company Entities and the Required Consenting First Lien Lenders. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Tax Structure** | The Restructuring Transactions shall be structured in a manner that optimizes the tax efficiency (including by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions to the Company Entities and to the Consenting Creditors, as a result of the consummation of the Restructuring Transactions, in each case, as determined by the Company Entities and the Required Consenting First Lien Lenders. |
| **Executory Contracts & Unexpired Leases** | The Company Entities shall assume those executory contracts and unexpired leases acceptable to the Required Consenting First Lien Lenders. |
| **New Board** | The Board of Directors of the Reorganized Company Entities shall be appointed by a pre-emergence committee consisting of the Required Consenting First Lien Lenders who will be the largest holders of New Common Interests, in consultation with the Company Entities, and disclosed prior to emergence under 1129(a)(5). |
| **Organizational Documents & Governance** | Corporate governance for the Reorganized Company Entities, including charters, bylaws, operating agreements, or other organizational documents, as applicable, shall contain terms acceptable to the Required Consenting First Lien Lenders. Reorganized Parent shall not be subject to any reporting requirements promulgated by the United States Securities and Exchange Commission. |
| **Management Incentive Plan** | 8% of the New Common Interests on a fully diluted basis as of the emergence date will be reserved for issuance under a post-emergence management incentive plan or certain employees, officers and directors of the Reorganized Parent (the "**MIP**"). The quantum, form, terms, allocation, and vesting of all awards under the MIP will be determined by the New Board for the Reorganized Company Entities. |
| **Releases** | Subject to the Company Entities' investigation into estate claims and causes of action, the Plan shall include customary releases (including consensual third-party releases), to the fullest extent permitted by law, for the benefit of the Company Entities, the Consenting Creditors, the DIP Lenders, and the |

| | |
|---|---|
| | Company Entities' current and former officers and directors and each of such preceding entities' directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, officers, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives, each solely in their capacities as such, subject to a carveout for any act or omission that constitutes actual fraud or willful misconduct as determined by final order of a court of competent jurisdiction; *provided that* any person or entity that files an objection with the Bankruptcy Court to any substantive pleading in the Chapter 11 Cases, including to approval of the DIP Facility or the confirmation of the Plan, or commences any cause of action in the Bankruptcy Court or any other court of competent jurisdiction against any director or any Consenting Creditor relating to such Consenting Creditor's secured Claims shall not be entitled to a release under the Plan. |
| | Such release shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions that the Company Entities would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date arising from or related in any way in whole or in part to the Company Entities, the purchase, sale, or rescission of purchase or sale of any security of the Company Entities, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company Entities that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documents or related agreements, instruments, or other documents. |
| **Exculpation** | The Plan shall provide for customary exculpation provisions in favor of released parties to the extent permitted under applicable law. |
| **Discharge & Injunction** | The Plan shall contain customary discharge and injunctive provisions. |
| **Employee Compensation and Benefit Programs** | Employment agreements (including but not limited to offer letters) and severance policies, and all employment, compensation and benefit plans, retention plans, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, healthcare plans, disability plans, severance plans, incentive plans, life and accidental and dismemberment insurance plans, and policies and programs of each of the Company Entities applicable to any of its employees and retirees, in each case existing as of the Effective Date (other than any individual employment agreement or offer letter for which the parties separately agree to different treatment), shall be assumed |

| | |
|---|---|
| | (and assigned to the Reorganized Company Entities, if necessary) and any Claims arising thereunder shall be unimpaired under the Plan. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al*.** | Indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Entities, as applicable, shall remain in full force and effect after the Effective Date, and shall survive unimpaired under the Plan, irrespective of when such obligation arose, as applicable.   To the extent necessary, the governance documents adopted as of the Effective Date shall include provisions to give effect to the foregoing.  For the avoidance of doubt, nothing herein shall be deemed to require or be deemed to require the assumption or rejection of executory contracts. |
| **Survival of Indemnification; D&O Policy/Tail** | The Company Entities shall maintain and continue in full force and effect all insurance policies (and purchase any reasonable and customary related tail policies providing for coverage for at least a six-year period after the Effective Date) for directors', managers' and officers' liability.  On the Effective Date, the Company Entities shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy" on terms no less favorable than the Company Entities' existing director, officer, manager, and employee coverage), and the Company Entities shall obtain any insurer consents to the extent required to assume such policies.  Prior to the Effective Date, the Company Entities shall arrange for directors' and officers' liability insurance coverage for each of the members of the New Board, with such coverage to take effect on the Effective Date. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the Milestones set forth in Exhibit C of the Restructuring Support Agreement. |
| **Other Provisions** | The Plan shall contain other terms and conditions as agreed to by the Company Entities and the Required Consenting First Lien Lenders. |
| **Asset Sales** | Any asset sales outside the ordinary course of business from and after the Support Effective Date shall be subject to approval by the Required Consenting First Lien Lenders in conjunction with management. |

11

## ADDITIONAL DEFINED TERMS

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Company Entities' estates and operating businesses, including fees and expenses Allowed by the Bankruptcy Court as compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; and (ii) all fees and charges assessed against the Company Entities' estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"**Allowed**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (i) except with respect to any Claim arising from the rejection of unexpired leases by the Company Entities, there is no requirement to file a proof of claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (ii) the Company Entities may affirmatively deem unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

"**DIP Agent**" means the "Administrative Agent" and the "Collateral Agent" (each, as defined in the DIP Credit Agreement), solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Claims**" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents.

"**DIP Professional Fees**" means all fees, costs, and expenses of each of the Consenting Creditors and Wilmington Trust, N.A., as the DIP Agent, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of the DIP Documents, the Restructuring Support Agreement, the Plan, and any of the other Definitive Documents, and the transactions contemplated thereunder. For the avoidance of doubt, the DIP Professional Fees shall include the fees, costs, and expenses of Paul Hastings LLP and Lazard Freres & Co. LLC.

"**Impaired**" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"**Intercompany Claims**" means any Claim against a Company Entity held by another Company Entity.

"**Intercompany Interests**" means an Interest in a Company Entity held by another Company Entity.

"**New Corporate Governance Documents**" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of each of the Reorganized Company Entities.

"**Other Priority Claim**" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Other Secured Claim**" means any secured claim that is not a First Lien Claim or Second Lien Claim.

## ADDITIONAL DEFINED TERMS

"**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, except as provided in this Term Sheet and Restructuring Support Agreement, with respect to any distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its class.

"**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement to which this Term Sheet is annexed, in form and substance acceptable to the Required Consenting Creditors and the Company Entities.

"**Subordinated Claims**" means any claim subject to subordination under section 510 of the Bankruptcy Code.

"**Unimpaired**" means, with respect to a class of Claims or Interests, a class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**Annex 1**

**Company Entities**

A & B Homecare Solutions, L.L.C
A.E. Medical Alert, Inc.
ABC Homecare LLC
All Metro Aids, Inc.
All Metro Associate Payroll Services
Corporation
All Metro CGA Payroll Services
Corporation
All Metro Field Service Workers Payroll
Services Corporation
All Metro Health Care Services, Inc.
All Metro Home Care Services of Florida,
Inc.
All Metro Home Care Services of New
Jersey, Inc.
All Metro Home Care Services of New
York, Inc.
All Metro Home Care Services, Inc.
All Metro Management and Payroll Services
Corporation
All Metro Payroll Services Corporation
AM Holdco, Inc.
AM Intermediate Holdco, Inc.
Arsens Home Care, Inc.
ARU Hospice, Inc.
Associated Home Services, Inc.
At-Home Quality Care, LLC (f/k/a At-Home
Quality Care, Inc.)
Auditory Response Systems, Inc.
Barney's Medical Alert-ERS, Inc.
California MedTrans Network IPA LLC
California MedTrans Network MSO LLC
Care Finders Total Care LLC
CareGivers Alliance, LLC
CareGivers America Home Health Services,
LLC
CareGivers America Medical Staffing, LLC
CareGivers America Medical Supply, LLC
CareGivers America Registry, LLC
Caregivers America, LLC.
Caregivers On Call, Inc.
CGA Holdco, Inc.
CGA Staffing Services, LLC
Circulation, Inc.
Florida MedTrans Network LLC
Florida MedTrans Network MSO LLC
Guardian Medical Monitoring, LLC

Health Trans, Inc.
Healthcom, Inc.
Healthcom Holdings LLC
Helping Hand Home Health Care Agency
Inc
Helping Hand Hospice Inc.
Higi Care Holdings, LLC
Higi Care, LLC
higi SH Holdings Inc.
higi SH LLC
Independence Healthcare Corporation
Metropolitan Medical Transportation IPA,
LLC
MLA Sales, LLC
ModivCare Solutions, LLC
Multicultural Home Care Inc.
National Medtrans, LLC
New England Emergency Response
Systems, Inc.
OEP AM, Inc.
Panhandle Support Services, Inc.
Personal In-Home Services, Inc.
Philadelphia Home Care Agency, Inc.
Provado Technologies, LLC
Red Top Transportation, Inc.
Ride Plus, LLC
Safe Living Technologies, LLC
Secura Home Health Holdings, Inc. (f/k/a
Hearts at Home Holdings, Inc.)
Secura Home Health, LLC (f/k/a Hearts at
Home, LLC)
Socrates Health Holdings, LLC
TriMed, LLC
Union Home Care LLC
Valued Relationships, Inc.
Victory Health Holdings, LLC
VRI Intermediate Holdings, LLC

**<u>Annex 2</u>**
**DIP Facility Term Sheet**

*Final Version*

**Senior Secured Debtor in Possession Facility**

**Summary of Terms and Conditions**[1]

Set forth below is a summary of the principal terms and conditions for the DIP Facility (as defined herein). This summary of terms and conditions (together with all annexes, exhibits, and schedules attached hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "**DIP Term Sheet**") does not purport to summarize all of the terms, conditions, representations, warranties, and other provisions with respect to the DIP Facility which would be contained in the DIP Credit Agreement (as defined herein) and the other DIP Facility Documents (as defined herein). The obligations of the DIP Lenders (as defined herein) to provide the DIP Facility are conditioned upon entry of the DIP Orders (as defined herein) and the other terms and conditions set forth herein.

| | |
|---|---|
| **Borrower:** | ModivCare Inc., a Delaware corporation (the "**Borrower**"), in its capacity as a debtor and debtor in possession in a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") (the date of such filing, the "**Borrower Petition Date**"). |
| **Guarantors:** | The obligations of the Borrower under the DIP Facility will be guaranteed by each material domestic subsidiary of the Borrower (collectively, the "**Guarantors**" and, together with Borrower, the "**Debtors**" or the "**Loan Parties**"; the obligations of the Loan Parties under the DIP Facility that are payable as set forth herein, collectively, the "**DIP Obligations**"), each of which will be a debtor and a debtor in possession in cases commenced under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "**Guarantors' Chapter 11 Cases**" and, together with the Borrower's chapter 11 case, collectively, the "**Chapter 11 Cases**"), filed subsequent to, but jointly administered with, the Borrower's chapter 11 case (the date of such filing, the "**Guarantor Petition Date**"; "**Petition Date**" shall mean the Borrower Petition Date or the Guarantor Petition Date, as the context requires).  For the avoidance of doubt, each Debtor shall be a Guarantor under the DIP Facility. |
| **Prepetition Credit Facility and First Lien Lenders:** | The Borrower is party to that certain Credit Agreement, dated as of February 3, 2022 (as amended, waived, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Credit Agreement**" and the facilities thereunder, the "**Prepetition Facilities**"), by and among the Borrower, the lenders party thereto from time to time (the "**First Lien Lenders**"), JPMorgan Chase Bank, N.A., as agent (the "**Prepetition Agent**"), governing the following indebtedness: |
| | (a) **Prepetition Revolving Loans**: indebtedness currently outstanding under the Prepetition Credit Agreement in the aggregate principal amount (exclusive of PIK interest on consent fees) of approximately $270,975,000 in respect of the "Revolving Loans" (as defined in the Prepetition Credit Agreement) thereunder (the "**Prepetition Revolving Loans**"), plus all accrued and unpaid interest thereon, fees, letter of credit reimbursement obligations, and expenses incurred in connection therewith, but excluding undrawn |

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement (as defined herein) or the backstop agreement to which this DIP Term Sheet is attached, as the context requires.

outstanding letters of credit (collectively, the "**Prepetition Revolving Loan Obligations**");

    (b)  <u>**Prepetition Initial Term Loans**</u>: indebtedness currently outstanding under the Prepetition Credit Agreement in the aggregate principal amount of approximately $522,239,937.63 in respect of the "Initial Term Loans" (as defined in the Prepetition Credit Agreement) thereunder (the "**Prepetition Initial Term Loans**"), plus all accrued and unpaid interest thereon, fees, and expenses incurred in connection therewith (collectively, the "**Prepetition Initial Term Loan Obligations**"); and

    (c)  <u>**Prepetition Incremental Term Loans**</u>: indebtedness currently outstanding under the Prepetition Credit Agreement, in the aggregate principal amount of approximately $78,750,000 in respect of the "Amendment No. 5 Incremental Term Loans" (as defined in the Prepetition Credit Agreement) thereunder (the "**Prepetition Incremental Loans**", together with the Prepetition Initial Term Loans, the "**Prepetition Term Loans**", and collectively, with the Prepetition Revolving Loans, the "**Prepetition Loans**"), plus all accrued and unpaid interest thereon, fees, and expenses incurred in connection therewith (collectively, the "**Prepetition Incremental Term Loan Obligations**", and together with the Prepetition Initial Term Loan Obligations, the "**Prepetition Term Loan Obligations**", and collectively with the Prepetition Revolving Loan Obligations, the "**Prepetition Obligations**").

| | |
|---|---|
| **DIP Lenders:** | The DIP Facility shall be provided by the DIP Lenders as set forth herein. |

The term "**DIP Lenders**" shall mean, subject to the Syndication Procedures below, each "Lender" or "Affiliate" thereof with a DIP commitment (the "**DIP Commitment**") listed in <u>Schedule 2.01(A)</u> to the DIP Credit Agreement that elects to fund such DIP Commitment through providing DIP Loans, together with their successors and assigns.

Pursuant to the DIP Credit Agreement and Restructuring Support Agreement (as defined herein), the DIP Commitments shall be fully backstopped and structured by certain First Lien Lenders or their affiliates (the "**Backstop Parties**"). The DIP Loans shall be available to all First Lien Lenders on a pro rata basis in accordance with procedures acceptable to the Backstop Parties.

Pursuant to syndication procedures acceptable to the Backstop Parties (the "**Syndication Procedures**"), all holders of First Lien Claims (who become parties to the Restructuring Support Agreement in accordance with its terms prior to the closing of the DIP Facility syndication process) will be eligible to subscribe for their *pro rata* share of the commitments to fund DIP Loans based on their respective *pro rata* holdings of their First Lien Claims by committing to purchase such DIP Loans from Jefferies Capital Services, LLC. The subscription period for these commitments pursuant to the Syndication Procedures shall be twenty (20) days from the Borrower Petition Date.

To the extent that a holder of First Lien Claims (i) does not execute the Restructuring Support Agreement (in which case, such holder shall have no right to subscribe for any portion of the DIP Facility) or (ii) executes the Restructuring Support Agreement

but does not subscribe for its *pro rata* portion of the DIP Facility in accordance with the Syndication Procedures, then (in either case) each Backstop Party shall, severally and not jointly, increase its *pro rata* share of the DIP Facility for any portion of the DIP Facility that is not subscribed for by the holder of such First Lien Claims.

The DIP Loans will initially be funded by Jefferies Capital Services, LLC, as fronting lender (the "**Fronting Lender**") and subsequently assigned to the initial DIP Lenders pursuant to the terms of a letter agreement between the Borrower and the Fronting Letter (the "**Fronting Letter**").

**DIP Agent:** Wilmington Trust, N.A. shall act as administrative agent and collateral agent with respect to the DIP Facility (in such capacity, the "**DIP Agent**").

**DIP Facility:** A senior secured superpriority priming debtor in possession facility in an aggregate principal amount of $100,000,000 (the "**DIP Facility**") comprised of two or more draws of new money term loans (collectively, the "**DIP Loans**") which (i) $62,500,000 of DIP Loans shall be made available to the Borrower in a single draw following entry of an order approving the DIP Facility on an interim basis on terms acceptable to the Required DIP Lenders (as defined herein) (the "**Interim DIP Order**") and (ii) $37,500,000 of DIP Loans shall be made available to the Borrower following entry of an order approving the DIP Facility on a final basis on terms acceptable to the Required DIP Lenders (the "**Final DIP Order**" and together the Interim DIP Order, the "**DIP Orders**"), in each case in accordance with the terms of this DIP Term Sheet and the DIP Facility Documents.

All DIP Loans shall become due and payable on, and all unfunded DIP Commitments shall be terminated upon, the occurrence of a DIP Termination Event (as defined herein). Once repaid, DIP Loans shall not be reborrowed.

**DIP Termination Event:** The "**DIP Termination Event**" with respect to the DIP Facility shall be the earliest to occur of:

(a) the date that is six (6) months after the Closing Date, subject to a single three (3) month extension at the request of the Borrower and with the consent of the Required DIP Lenders in their sole discretion;

(b) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;

(c) the date on which the DIP Loans are accelerated as a result of an Event of Default and all unfunded DIP Commitments (if any) have been terminated in accordance with the DIP Credit Agreement, by operation of law or otherwise;

(d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; and

(e) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or appointment of a Chapter 11 trustee or examiner.

| | |
|---|---|
| **Amortization:** | None. |
| **DIP Priority Account and Use of Proceeds:** | The proceeds of the DIP Loans shall be funded into a restricted account (such account, the "**Restricted Account**") and released solely in accordance with the Approved Budget (as defined herein). |

The proceeds of the DIP Loans shall be used, in each case, subject to the DIP Orders and in accordance with the Approved Budget:

(i) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business;

(ii) for the payment of the fees, costs, and expenses of administering the Chapter 11 Cases;

(iii) to pay obligations arising from or related to the Carve-Out (as defined in the DIP Orders);

(iv) to pay such other prepetition obligations as approved by the Bankruptcy Court;

(v) for the payment of the agency fees and reasonable and documented fees and expenses of the DIP Agent and the DIP Lenders owed under the DIP Facility Documents; and

(vi) for other general corporate purposes.

| | |
|---|---|
| **DIP Facility Documents:** | "**Documentation Principles**" means that the DIP Facility will be documented (i) in a credit agreement (the "**DIP Credit Agreement**"), which shall be based upon the Prepetition Credit Agreement and other customary guarantee, security, and other relevant documentation as mutually agreed by the Borrower and the Required DIP Lenders and (ii) through the terms of the DIP Orders (collectively, the "**DIP Facility Documents**"). It is agreed and understood that the DIP Credit Agreement will permit all transactions approved by Approved Budget and any subsequent Approved Budget, including any investments in foreign subsidiaries, and will permit the issuance or extension of two "Specified Letters of Credit" and the "Intact Contract", each to be defined therein. Notwithstanding anything herein to the contrary, the DIP Liens on the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation or action (other than UCC-1 financing statements), including mortgages, control agreements, landlord waivers, foreign law perfection actions, third party consents or orders, or delivery of stock certificates or any other possessory collateral shall be required; provided that, upon the reasonable request of the DIP Lenders, the Loan Parties shall make filings or take any other actions with respect to the perfection of liens. |

-4-

| **Interest Rates and Fees:** | As set forth on <u>Annex A-1</u> attached hereto and in any applicable fee letters. |
|---|---|

| **Optional Prepayments:** | The Borrower shall have the right at any time and from time to time to prepay any DIP Loan in whole or in part, without premium or penalty, subject to payment of the Exit Fee and without prejudice to the Backstop Premium. |
|---|---|

| **Mandatory Prepayments:** | Mandatory prepayments of the DIP Loans shall be required with 100% of the net cash proceeds from (A) the sale or other disposition of DIP Collateral outside the ordinary course of business, (B) any casualty events, insurance, and condemnation proceeds in respect of any DIP Collateral, (C) any non-permitted sale or issuance of debt for borrowed money, evidenced by bonds, notes, or debentures, and (D) any extraordinary receipts; provided however, any amounts otherwise required to be prepaid pursuant to clauses (B) or (D) above that have been deposited into the Restricted Account shall not be required to be repaid. The DIP Credit Agreement shall contain customary provisions permitting the DIP Lenders to decline to accept mandatory prepayments. |
|---|---|

| **Security and Priority:** | The DIP Obligations shall be, subject solely to (i) the Carve-Out and (ii) certain liens senior in priority by operation of law to the liens of the First Lien Lenders under the Prepetition Credit Agreement, but solely to the extent such liens were valid, properly perfected, and non-avoidable as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Liens**"): |
|---|---|

    (a)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to joint and several superpriority administrative expense claim status in all of the Chapter 11 Cases (the "**DIP Superpriority Claims**"); and

    (b)    pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, secured by fully perfected senior security interests and liens on the DIP Collateral (as defined herein) (collectively, the "**DIP Liens**"),

in each case, as described in further detail in the DIP Orders.

The DIP Liens shall be effective and perfected upon entry of the DIP Orders without the necessity of the execution, filing, or recordation of mortgages, security agreements, pledge agreements, financing statements, account control agreements, or other agreements.

"**DIP Collateral**" means, subject to Documentation Principles (i) the Loan Parties' interest in all assets and properties, whether tangible, intangible, real, personal, or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Loan Parties (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Loan Parties, and regardless of where located, in each case to the extent such assets and properties constitute "Collateral" (as defined in the Prepetition Credit Agreement); and (ii) property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted

by Bankruptcy Code section 546(b)) (subject only to the Carve-Out), including, without limitation, all unencumbered assets of the Loan Parties, all prepetition property and postpetition property of the Loan Parties' estates, and the proceeds, products, rents, and profits thereof, whether arising from Bankruptcy Code section 552(b) or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Loan Parties (whether maintained with the DIP Agent or otherwise), all equipment, all goods, all accounts, cash, payment intangibles, bank accounts, and other deposit or securities accounts of the Loan Parties (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all commercial tort claims, and all claims and causes of action (including the proceeds of any claim or cause of action arising under Chapter 5 of the Bankruptcy Code or any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), and any and all proceeds of the foregoing, excluding the Excluded Assets.  Notwithstanding anything to the contrary herein, to the extent a DIP Lien cannot attach to the DIP Collateral pursuant to applicable law, the DIP Liens granted pursuant to the DIP Orders shall attach to the Loan Parties' economic rights, including, without limitation, any and all such proceeds of such DIP Collateral and any Excluded Assets.

"**Excluded Assets**" means, subject to the Documentation Principles, (i) property that cannot be subject to liens pursuant to applicable law, rule, contract, or regulation (including any requirement to obtain the consent (after the use of commercially reasonable efforts to obtain such consent) of any governmental authority or third party, unless such consent has been obtained) or restrictions of contract (including, without limitation, federal concessions as well as equipment leases and financing arrangements) existing on the Closing Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the Uniform Commercial Code or other applicable law), (ii) any asset to the extent the provision of a security interest with respect to such asset would result in material and adverse tax consequences to the Borrower or any of its subsidiaries, to the extent consented by the Required DIP Lenders, and (iii) any asset where the cost of obtaining a security interest therein exceeds the practical benefit to the DIP Lenders, as determined in the sole discretion of the Required DIP Lenders; provided, however, that Excluded Assets referred to in clauses (i) through (iii) shall not include any proceeds, substitutions, or replacements of any Excluded Assets.  Except as specified by the Required DIP Lenders, no Debtor shall be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

**Carve-Out and Related Provisions:**     As set forth in the DIP Orders.

| | |
|---|---|
| **Limitation on Use of Proceeds of DIP Facility:** | As set forth in the DIP Orders. |
| **Adequate Protection & Other Protections:** | As set forth in the DIP Orders. |
| **Termination of Consent to Use Cash Collateral:** | Subject to the terms of the DIP Orders, the consensual use of cash collateral will be terminated upon the expiration of the Remedies Notice Period as described below. |
| **Conditions Precedent to the Extension of Credit:** | The extension of credit (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") under the DIP Facility shall be subject to the following conditions, unless waived by the Required DIP Lenders: |

A.  DIP Agent's fee letter and the Fronting Letter, in form and substance satisfactory to the DIP Agent and the Fronting Lender, respectively, shall have been executed and delivered by each party thereto.

B.  The DIP Credit Agreement and all other applicable DIP Facility Documents shall have been executed and delivered by each party thereto.

C.  The Interim DIP Order, which shall be in form and substance satisfactory to Debtors, the DIP Agent, and the Required DIP Lenders, shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect.

D.  All fees and invoiced costs and expenses (including, without limitation, reasonable, documented, and invoiced legal fees and expenses) required to be paid to the Backstop Parties, the DIP Agent, and the DIP Lenders on or before the Closing Date shall have been paid.

E.  The DIP Agent and the DIP Lenders shall have received, prior to the Closing Date, in a form and substance reasonably satisfactory to the Required DIP Lenders, a thirteen (13)-week rolling cash flow budget for the period from the Closing Date through the end of such thirteen (13)-week period (such initial approved budget and subsequent budgets approved by the Required DIP Lenders as described below, the "**Approved Budget**").

F.  The DIP Agent and the DIP Lenders shall have received, on or prior to the Closing Date, customary closing deliverables with respect to each Debtor addressing such customary matters as the DIP Lenders shall reasonably request, secretary's certificates with organizational documents, resolutions, and incumbency certificates attached and officer's closing certificate, in each case, in form and substance reasonably satisfactory to the Required DIP Lenders; *provided*, that, notwithstanding anything herein to the contrary, no legal opinions shall be required in connection with the DIP Facility.

G. There shall exist no known unstayed action, suit, investigation, litigation, or proceeding with respect to the Borrower and its subsidiaries pending in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that would reasonably be expected to result in a Material Adverse Effect.

"**Material Adverse Effect**" shall mean any circumstance or condition that would individually or in the aggregate, have a material adverse effect on (i) the business, assets, operations, properties, or financial condition of the Borrower and its subsidiaries, taken as a whole (other than as a result of events leading up to and customarily resulting from the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including any decline in business relationships, reputation, or financial performance resulting from the Chapter 11 filing), (ii) the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under the DIP Orders and the other DIP Facility Documents (other than as a result of events leading up to and resulting from the commencement of the Chapter 11 Cases and the continuation and prosecution thereof), or (iii) the rights and remedies of the DIP Lenders or the DIP Agent under the DIP Orders and the other DIP Facility Documents; provided, that any effects resulting from changes in general economic conditions, financial markets, industry conditions, or geopolitical events, except to the extent such effects have a materially disproportionate impact on the Borrower relative to similarly situated companies, shall not constitute a Material Adverse Effect.  No event shall constitute a Material Adverse Effect to the extent such event is expressly addressed by the Milestones or Budget Variances set forth in the DIP Facility Documents.

H. Since the Petition Date, there shall not have occurred any circumstance or conditions, which individually or in the aggregate, constitutes or is reasonably expected to constitute, a Material Adverse Effect.

I. All necessary and material governmental and third-party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained on or prior to the Closing Date.

J. The DIP Agent and each DIP Lender who has requested the same at least seven (7) business days before the Closing Date shall have received, no later than three (3) business days before the Closing Date, all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act.

K. Granting to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, valid and perfected liens, satisfactory to the Required DIP Lenders, via entry of the DIP Order, on the security interests in the DIP Collateral of the Loan Parties set forth in the "Security and Priority" section above; the Borrower shall have delivered Uniform Commercial Code financing statements with respect to the Borrower and the other Loan Parties, in suitable form for filing satisfactory to the Required DIP Lenders.

L. The Restructuring Support Agreement, dated as of the date hereof, among the Company Parties and Consenting Creditors (as each such term is defined therein)

(the "**Restructuring Support Agreement**"), shall be in full force and effect, shall not have been amended or modified without the consents required therein, and shall not have been terminated as to the Company Entities or the Consenting First Lien Lenders.

M.  All "first day orders" entered at the time of commencement of the Chapter 11 Cases and all "second day orders" shall be reasonably satisfactory to the Required DIP Lenders.

N.  No default or Event of Default shall exist or would result from such proposed funding or from the application of the proceeds therefrom.

O.  Representations and warranties of the Loan Parties in the DIP Facility Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects (after giving effect to any qualification therein)) on and as of the date of such funding or issuance, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

P.  The DIP Facility shall not violate any requirement of law, the violation of which constitutes or is reasonably expected to constitute a Material Adverse Effect, after giving effect to the DIP Orders, and any other order of the Bankruptcy Court, and shall not be enjoined, temporarily, preliminarily, or permanently.

Q.  The DIP Agent shall have received, a borrowing notice one (1) business day prior to funding in the form set forth in the DIP Facility Documents.

R.  All material "first day" orders shall have been entered on an interim basis or final basis, as applicable, and shall be reasonably satisfactory to the Required DIP Lenders.

S.  Satisfaction by the Debtors of all DIP Milestones (as defined herein) that were required under the DIP Facility Documents to have been satisfied as of the date of each borrowing.

T.  The DIP Order, which shall be in form and substance satisfactory to DIP Agent and the Required DIP Lenders, shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect.

U.  The Fronting Letter shall have been duly executed and delivered by each of the parties signatory thereto.

V.  The Fronting Lender shall have received the master consent to assignment duly executed and delivered by the Borrower and the DIP Agent.

The conditions precedent to subsequent borrowing and the withdrawals under the DIP Facility after the Closing Date shall be subject to the following conditions, unless waived by the Required DIP Lenders:

A.  entry of the Final DIP Order.

B.  The DIP Agent, for the benefit of the DIP Secured Parties (as defined in the Interim DIP Order), shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected DIP Liens on, and security interest in, the DIP Collateral, in each case, as set forth in and having the priorities set forth in the Final DIP Order.

C.  The DIP Agent shall have received, a borrowing notice one (1) business day prior to funding in the form set forth in the DIP Facility Documents.

D.  The Restructuring Support Agreement shall be in full force and effect and shall not have been amended or modified without the consents required therein.

E.  Representations and warranties of the Loan Parties in the DIP Facility Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects (after giving effect to any qualification therein)) on and as of the date of such funding or issuance, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

F.  At the time of and immediately after giving effect to such borrowing, no default or Event of Default shall have occurred and be continuing.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Facility Documents shall contain usual and customary representations and warranties, subject to the Documentation Principles. |
| **Affirmative Covenants:** | The DIP Facility Documents shall contain usual and customary affirmative covenants, subject to the Documentation Principles. |
| **DIP Milestones:** | The Debtors shall comply with all milestones set forth in Exhibit C to the Restructuring Support Agreement, as extended pursuant to the terms thereof (the "**DIP Milestones**"). |
| **Negative Covenants:** | The DIP Facility Documents shall contain usual and customary negative covenants, subject to the Documentation Principles. |
| **Financial Covenants:** | The DIP Facility will contain the following financial covenants: |

**Variance Covenant**. As of the last date of each Test Period, (1) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating cash receipts of the Debtors shall not exceed 15% and (2) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating disbursements (other than professional fees and expenses incurred by the Debtors, the DIP Agent, and the advisors to the Backstop Parties) shall not exceed 15%, in each case, (collectively, the "**Permitted Variances**"). "**Test Period**" shall mean (i) initially, the period commencing on the Petition Date and ending on September 28, 2025 and (ii) thereafter, the four or five week period ending on the last Sunday of the month.

-10-

For the avoidance of doubt, *see* Schedule 5.1(f) for the reporting period and Test Periods.

**Minimum Liquidity Covenant**. As of the last day of any month following the Closing Date, the Debtors shall maintain Liquidity of not less than $50,000,000.

"**Liquidity**" means as at any date of determination the amount of unrestricted cash of the Debtors at such time (including, for the avoidance of doubt, the proceeds of the DIP Facility including amounts that remain in the Restricted Account).

|  |  |
|---|---|
| **Budget and Reporting Requirements:** | The Borrower shall provide: (i) on or prior to the Friday of each week, Approved Budget variance reports on a line-item basis and Liquidity reports, in each case, for the cumulative reporting period pursuant to Schedule 5.01(f) and a computation of Liquidity as of the preceding calendar week-end; and (ii) in accordance with Schedule 5.01(f) (or, at the option of the Borrower, more frequently), an updated forecast on a rolling 13-week basis, in form and substance reasonably satisfactory to the Required DIP Lenders in their sole discretion (the "**Updated Budget**"), which shall become the then Approved Budget upon approval by Required DIP Lenders in their sole discretion (and to the extent any Updated Budget is not approved by the Required DIP Lenders, the Approved Budget that is then in effect shall continue to constitute the Approved Budget for purposes of the DIP Facility); provided, however, that (i) the Updated Budget will be deemed approved unless the Required DIP Lenders provide written notice of their objection thereto (email being sufficient) within three (3) Business Days of the delivery of such Updated Budget, and during such period, the Initial DIP Budget or most recent Approved Budget, as applicable, shall remain in effect (the "**Interim Approval Period**"), (ii) following the Interim Approval Period, if no objection is received from the Required DIP Lenders pursuant to clause (i) of this proviso, the Updated Budget shall be deemed the Approved Budget (it being understood that the Approved Budget shall be the initial Approved Budget until superseded by an approved Updated Budget), and (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget. |
| **Events of Default:** | The DIP Credit Agreement will contain events of default typical for facilities of this type and otherwise based on the events of default set forth in the Prepetition Credit Agreement and reasonably acceptable to the Required DIP Lenders (collectively the "**Events of Default**"), including, without limitation, the following:<br><br>(i) the entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;<br><br>(ii) the entry of an order appointing a chapter 11 trustee or a responsible officer having expanded powers, or similar person, in any of the Chapter 11 Cases;<br><br>(iii) the entry of an order staying, reversing, vacating, or otherwise modifying any of the DIP Orders, in each case, in a manner adverse in any respect to the DIP Agent or any DIP Lenders;<br><br>(iv) the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers relating to the operation of the Debtors' business (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code); |

(v) the entry of an order in any of the Chapter 11 Cases confirming a plan that is inconsistent with the Restructuring Support Agreement;

(vi) the entry of an order in any of the Chapter 11 Cases granting adequate protection to any other person other than as set forth in the DIP Orders or as consented to by the Required DIP Lenders;

(vii) other than with respect to the Carve-Out, the entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Loan Parties or imposing any additional conditions thereon;

(viii) the entry of a final, non-appealable order in any of the Chapter 11 Cases charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent, any DIP Lenders, the First Lien Lenders or any holders of Second Lien Notes;

(ix) other than the DIP Orders, the entry of an order in any of the Chapter 11 Cases seeking authority to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code;

(x) the entry of a final, non-appealable order in any of the Chapter 11 Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to (i) proceed against any assets of the Loan Parties in excess of $5,000,000 in the aggregate or (ii) pursue other actions that would have a Material Adverse Effect on the Debtors or their estates;

(xi) the filing of any pleading by any Loan Party seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (x) above;

(xii) the Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist, or otherwise participate as an adverse party in any suit or other proceeding against the DIP Agent, any of the DIP Lenders, any First Lien Lenders or any holders of Second Lien Notes and their respective rights, remedies, and claims under or related to the DIP Facility or the DIP Orders in any of the Chapter 11 Cases or inconsistent with the DIP Facility Documents and the DIP Orders, including with respect to the Debtors' stipulations, admissions, agreements, and releases contained in the applicable orders;

(xiii) filing of a chapter 11 plan or disclosure statement that is not reasonably acceptable to the Required DIP Lenders in their sole discretion;

(xiv) entry of an order or filing of any document by any of the Debtors in any of the Chapter 11 Cases granting or seeking to grant, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable DIP Facility Documents or the DIP Orders, any superpriority administrative expense claim status in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the DIP Agent and

-12-

the DIP Lenders under the DIP Facility or secured by liens *pari passu* with or senior to the liens securing the Prepetition Obligations or the adequate protection liens granted to the First Lien Lenders or holders of Second Lien Notes, as applicable;

(xv) any of the Loan Parties or any of their subsidiaries shall seek, support (including by filing a pleading in support thereof) or fail to contest in good faith any of the matters set forth in clauses (i) through (xiv) above;

(xvi) the making of any payments in respect of Prepetition Obligations, Second Lien Notes or indebtedness under the Unsecured Notes Indenture other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" orders satisfactory to the Required DIP Lenders, (c) as set forth under the Approved Budget (subject to Permitted Variances) or (d) approved by the Required DIP Lenders in their sole discretion;

(xvii) the Loan Parties or any of their subsidiaries shall fail to comply with the terms of any of the DIP Orders;

(xviii) the Loan Parties or any of their subsidiaries, or any person claiming by or through the Loan Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist, or otherwise participate as an adverse party in any suit or other proceeding against the agents under the Prepetition Facilities, the Second Lien Claims or any of the lenders or creditors under the Prepetition Facilities or Second Lien Noteholders relating to the Prepetition Facilities or Second Lien Notes Claims, as applicable, in their capacities as such;

(xix) without the consent of the Required DIP Lenders, any Debtor shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties;

(xx) the Bankruptcy Court shall enter an order denying, terminating, or modifying (a) the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code or (b) the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, unless such order was entered as a result of a request by, or received support from, the Required DIP Lenders;

(xxi) without the consent of the Required DIP Lenders, the Bankruptcy Court enters an order approving a sale transaction;

(xxii) the termination of the Restructuring Support Agreement;

(xxiii) failure to comply with DIP Milestones; or

(xxiv) additional customary events of default relating to the Chapter 11 Cases.

Upon the occurrence and during the continuation of a DIP Termination Event, following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of written notice, on not less than 5 business days' notice date (the "**Remedies Notice**

Period"), to the Debtors and Debtors' counsel, the U.S. Trustee, and any Creditors' Committee, the automatic stay under section 362 of the Bankruptcy Code shall be deemed modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders under the DIP Facility Documents) to declare the occurrence of a DIP Termination Event and, upon expiration of the Remedies Notice Period unless otherwise order by the Bankruptcy Court, to (i) terminate, reduce, or restrict the DIP Commitments (to the extent any such commitment remains), (ii) accelerate and declare all DIP Obligations to be immediately due and payable, (iii) terminate the DIP Facility and the DIP Facility Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations, (iv) terminate, restrict, or revoke the ability of the Debtors to use cash collateral, (v) charge interest at the default rate set forth in the DIP Facility Documents, and/or (vi) exercise or enforce any rights and remedies against the DIP Collateral as set forth in the DIP Facility Documents or under applicable law (subject to any applicable intercreditor provisions set forth in the DIP Orders and the relative rights and priorities set forth in the DIP Order); *provided*, *however*, that the Debtors and the Creditors' Committee (if appointed) may, during the Remedies Notice Period, be entitled to seek emergency relief before the Bankruptcy Court, subject to the Bankruptcy Court's availability ("**Emergency Motion**") (in which case, the Remedies Notice Period shall automatically extend until the Bankruptcy Court's adjudication of such Emergency Motion). Unless the Bankruptcy Court orders otherwise, upon the expiration of the Remedies Notice Period (subject to extension in the event an Emergency Motion is filed), the automatic stay shall automatically be deemed terminated, without further notice, hearing, or order of the Bankruptcy Court, and the DIP Agent (acting at the instruction of the Required DIP Lenders under the DIP Facility Documents) shall be permitted to exercise all remedies set forth in the DIP Orders and in the DIP Facility Documents or applicable law, and the Debtors' right to use any cash collateral shall immediately cease.

| | |
|---|---|
| **Right to Credit Bid:** | Subject to the terms of the DIP Order, to the extent provided in section 363(k) of the Bankruptcy Code and applicable law, the DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required DIP Lenders and on behalf of the DIP Lenders, shall have the right to credit bid up to the full amount of the DIP Obligations in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Agent and the DIP Lenders shall have the absolute right to assign, sell, or otherwise dispose of their respective rights to credit bid in connection with any credit bid by or on behalf of the DIP Agent and/or the DIP Lenders to any acquisition entity or joint venture formed in connection with such bid. |
| **Expenses and Indemnification:** | The Borrower and each Guarantor shall jointly and severally pay or reimburse the reasonable and documented fees and out-of-pocket costs and expenses incurred by the DIP Agent and the Backstop Parties (including the fees and out-of-pocket costs and expenses of Paul Hastings LLP), in each case, in connection with (i) the Chapter 11 Cases generally, (ii) the preparation, negotiation, and execution of the DIP Facility Documents, (iii) the funding of the DIP Facility, (iv) the creation, perfection, or protection of the liens under the DIP Facility Documents (including all search, filing, |

-14-

and recording fees) and (v) the on-going administration of the DIP Facility Documents (including the preparation, negotiation, and execution of any amendments, consents, waivers, assignments, restatements, or supplements thereto).

The Borrower and each Guarantor shall jointly and severally pay or reimburse the reasonable and documented fees and out-of-pocket costs and expenses incurred by the DIP Agent and the Backstop Parties.

The DIP Facility Documents will contain customary indemnification provisions by the Borrower and each Guarantor (jointly and severally) in favor of the DIP Agent and the Backstop Parties and each of their respective affiliates, successors and assigns and the respective partners, officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing and attorneys and representatives of each of the foregoing (each, an "**Indemnified Person**"); *provided* that no Indemnified Person will be indemnified for any losses, claims, damages, liabilities, or related expenses to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the gross negligence or willful misconduct of such Indemnified Person.

The payment of all professional fees and expenses shall be made without the necessity of filing fee applications with the Bankruptcy Court or compliance with the U.S. Trustee's guidelines and shall not be subject to further application to or approval of the Bankruptcy Court; provided, however, each such professional shall provide summary copies of its invoices (which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (collectively, the "**Review Parties**").  Any objections raised by any Review Party with respect to such invoices must be in writing (emailing being sufficient) and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "**Review Period**").   If no written (email being sufficient) objection is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall promptly pay such invoices following the expiration of the Review Period. If an objection is received within the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of the Bankruptcy Court.

The Borrower and each Guarantor shall jointly and severally pay or reimburse the Fronting Lender for all reasonable and documented out-of-pocket costs and expenses as set forth in the Fronting Letter.

| | |
|---|---|
| **Assignments and Participations:** | Subject to Documentation Principles, the DIP Lenders may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the Borrower, which consent shall not be unreasonably withheld, conditioned, or delayed; *provided* that no consent of the Borrower shall be required (i) during the continuance of an Event of Default, (ii) for any assignment to a DIP Lender, an |

-15-

Affiliate of a DIP Lender, an Approved Fund, or any other person that has become a party to the Restructuring Support Agreement pursuant to the terms thereof; or (iii) for any assignment by the Fronting Lender pursuant to the syndication in accordance with the Fronting Letter.   The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in a form acceptable to the DIP Agent (an "**Assignment Agreement**").   Subject to receipt and recording thereof by the DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party to the DIP Credit Agreement and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a DIP Lender thereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations thereunder.  The DIP Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment (it being understood that such fee shall only be required to be paid once with respect to a block of trades by any DIP Lenders and/or Affiliate or Approved Fund thereof), except with respect to any assignment to a DIP Lender, an Affiliate of a DIP Lender, an Approved Fund, or any other person that has become a party to the Restructuring Support Agreement pursuant to the terms thereof, or in connection with any assignment by the Fronting Lender of DIP Loans.  The minimum assignment amount (other than with respect to the assignment by the Fronting Lender) shall be $250,000 (or if less than $250,000, the total amount held by such assigning DIP Lender).  As used herein, the term "**Approved Fund**" means, with respect to any DIP Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding, or otherwise investing in commercial loans or notes and similar extensions of credit in the ordinary course of its activities that is administered, advised, or managed by (a) such DIP Lender, (b) an Affiliate of such DIP Lender or (c) an entity or an Affiliate of an entity that administers, advises, or manages such DIP Lender.

No assignment of DIP Loans or DIP Commitments shall be permitted unless the applicable assignee executes and agrees to be bound by the Restructuring Support Agreement and the transactions contemplated therein.

|              |              |
|--------------|--------------|
| **Amendments:** | Amendments, consents, waivers, supplements, or other modifications to DIP Facility Documents shall require the prior written (email being sufficient) consent of the Loan Parties and the DIP Lenders holding greater than 50.01% of outstanding DIP Loans and unfunded DIP Commitments in effect at such time (the "**Required DIP Lenders**"). |

Notwithstanding the foregoing: (a) any amendment, consent, waiver, supplement or modification to any DIP Facility Document that (i) increases the DIP Commitments of any DIP Lender, (ii) decreases the amount of or postpones the payment of any scheduled principal, interest, or fees payable to any DIP Lenders, (iii) altering the pro rata nature of disbursements by or payments to DIP Lenders or the application of mandatory prepayments in this DIP Term Sheet, (iv) amends or modifies the definition of "Required DIP Lenders" or any provision of this section "Amendments", (v) releases all or substantially all of the value of the guarantees by the Guarantors, or (vi) releases the security interest in all or substantially all of the DIP Collateral other than in connection with a disposition approved by an order of the Bankruptcy Court with the prior written consent of the Required DIP Lenders, in each case, shall require the written consent of each DIP Lenders directly and

adversely affected thereby and (b) no amendment, consent, waiver, supplement, or other modification shall amend, modify or otherwise affect the rights or obligations of, or any provision for the benefit of, or duties of the DIP Agent without the prior written consent of the DIP Agent.  In addition, the (x) subordination of the DIP Liens to liens securing any other debt and/or (y) subordination of any DIP Obligations in right of payment to the payment of any other debt, in each case, shall require the consent of each DIP Lenders directly and adversely affected thereby; provided that, notwithstanding the foregoing, the DIP Liens may be subordinated to liens securing such other debt and/or the DIP Obligations may be subordinated in right of payment to such other debt, in each case, solely to the extent that such debt is provided by one or more existing DIP Lenders and each other DIP Lenders is offered a bona fide right to provide its pro rata share of such other debt on not less than five (5) Business Days' notice.

| | |
|---|---|
| **Miscellaneous:** | The DIP Facility Documents will include the following (in each case consistent with the Documentation Principles and customary for debtor in possession financings of this type): (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs (including the Dodd-Frank Act and Basel III related gross-ups notwithstanding the date of enactment of the applicable law or regulation thereunder, subject to prompt notice requirements) and payments free and clear of withholding taxes (in each case, subject to customary exceptions and qualifications)), (ii) waivers of consequential damages and jury trial, and (iii) customary agency, set-off and sharing language. |
| **Governing Law and Submission to Exclusive Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code and Bankruptcy Court), without giving effect to any conflicts of laws provision that would dictate the application of another jurisdiction's laws. The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury. |
| **DIP Orders Govern:** | Notwithstanding anything to the contrary in any DIP Facility Documents, the provisions of the DIP Facility Documents shall be subject to the terms of the DIP Orders.  In the event of a conflict between the terms of the DIP Orders and the DIP Facility Documents, the terms of the DIP Orders shall govern and control. |
| **Treatment Under Plan** | The DIP Facility shall be converted into an exit term loan upon in connection with a chapter 11 plan in accordance with the Restructuring Support Agreement. |

**ANNEX A-1**

**Senior Secured Debtor in Possession Facility**

**Interest Rates and Fees**

| | |
|---|---|
| **Interest Rates:** | At the option of the Borrower, DIP Loans will bear interest at a rate per annum equal to (a) Term SOFR plus 7.00% per annum or (b) Alternate Base Rate plus 6.00% per annum. Interest shall be payable in cash. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year. Interest shall be payable in arrears on the last Business Day of each month, regardless of whether interest accrues based on Term SOFR or the Alternate Base Rate. |
| **OID:** | All DIP Loans shall be made net of 2.00% original issue discount. |
| **Exit Fee:** | 3.00% payable in cash upon any repayment, prepayment, maturity or acceleration (including, for the avoidance of doubt, conversion to exit term loans in connection with a chapter 11 plan in accordance with the Restructuring Support Agreement). |
| **Backstop Premium** | The Backstop Premium (as defined in the Backstop Commitment letter), as applicable. |
| **Default Rate:** | 2.00% per annum at all times automatically following the occurrence and during the continuation of a payment Event of Default under the DIP Facility. |
| **Definitions:** | Each capitalized term used in this Annex A-1 that is not defined in this Annex A-1 has the meaning assigned to such term in Annex A-2, unless such term is otherwise defined in this DIP Term Sheet. |

## ANNEX A-2

### Senior Secured Debtor in Possession Facility

### Certain Definitions

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the sum of the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the sum of the Term SOFR for a one-month tenor in effect on such day plus 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR, respectively.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, or Wilmington, Delaware are required or authorized to remain closed; *provided*, *however*, that when used in connection with the borrowing or repayment of DIP Loans that bear interest at a rate based on Term SOFR, the term "Business Day" shall mean any U.S. Government Securities Business Day.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the DIP Agent from three Federal funds brokers of recognized standing selected by it; *provided* that, if the Federal Funds Effective Rate shall be less than the Floor, such rate shall be deemed to be the Floor.

"**Floor**" shall mean 1.0% per annum.

"**Interest Period**" shall mean, as to any borrowing of DIP Loans that bear interest at a rate based on Term SOFR, the period commencing on the date of such borrowing or issuance (including as a result of a conversion of DIP Loans that bear interest at a rate based on the Alternate Base Rate to a rate based on Term SOFR) or on the last day of the preceding Interest Period applicable to such borrowing or issuance and ending on (but excluding) the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one month thereafter; *provided* that if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.

"**Prime Rate**" shall mean the rate of interest last quoted by *The Wall Street Journal* as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by DIP Agent) or any similar release by the Federal Reserve Board (as determined by DIP Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Term SOFR**" means:

(a)      for any calculation with respect to DIP Loans that bear interest a rate based on Term SOFR, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date (to be defined in the DIP Credit Agreement) with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to DIP Loans that bear interest a rate based on the Alternate Base Rate, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day;

*provided* that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the DIP Lenders in their reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**<u>Annex 3</u>**
**New Warrants Term Sheet**

*Final Version*

## Warrant Term Sheet

This term sheet (including all exhibits, annexes, appendices and schedules to this term sheet, as amended, supplemented or otherwise modified from time to time, this "<u>Term Sheet</u>") summarizes certain material terms and conditions of each tranche of Warrants (as defined below) to be structured pursuant to the terms and conditions of the Restructuring Support Agreement to which this Term Sheet is attached (the "<u>Restructuring Support Agreement</u>") and issued in connection with the Plan contemplated under the Restructuring Support Agreement. This Term Sheet does not summarize all terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the Definitive Documents with respect to each tranche of Warrants and further determined in accordance with the Restructuring Support Agreement and the Plan. Capitalized terms used herein but not otherwise defined have the meanings given to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| **Issuer** | Reorganized Parent (the "<u>Issuer</u>")[1] |
| **Security** | The following securities (the "<u>Warrants</u>") will be issued by the Issuer on the Effective Date to the Second Lien Noteholders: |

- New Series A warrants (the "<u>Series A Warrants</u>") exercisable for an aggregate 15%[2] of the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full exercise of the Series A Warrants but subject to dilution by New Common Interests issued pursuant to the Series B Warrants (as defined below), the Series C Warrants (as defined below) and the MIP;

- New Series B warrants (the "<u>Series B Warrants</u>") exercisable for an aggregate 15%[3] of the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full exercise of the Series A Warrants and the Series B Warrants but subject to dilution by New Common Interests issued pursuant to the Series C Warrants and the MIP; and

- New Series C warrants (the "<u>Series C Warrants</u>") exercisable for an aggregate 15%[4] of the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full

---

[1]   This Term Sheet assumes that the Reorganized Parent will be formed as a corporation. If the Reorganized Parent is instead organized as a limited liability company, the Warrants may be replaced with "unit" series providing for substantially the same rights and economics as would have been provided for Warrants if the Reorganized Parent were instead formed as a corporation.

[2]   To be adjusted depending on takeback term loan sizing.

[3]   To be adjusted depending on takeback term loan sizing.

[4]   To be adjusted depending on takeback term loan sizing.

|                    | exercise of the Warrants but subject to dilution by New Common Interests issued pursuant to the MIP. |
|--------------------|---|

**Exercise Price**

The Series A Warrants will have an initial exercise price per share equal to (i) the total equity value implied by a total enterprise value of the Issuer as of the Effective Date (after giving effect to the Restructuring) of $971,000,000 divided by (ii) the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full exercise of the Series A Warrants.

The Series B Warrants will have an initial exercise price per share equal to (i) the total equity value implied by a total enterprise value of the Issuer as of the Effective Date (after giving effect to the Restructuring) of $1,058,100,000 divided by (ii) the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full exercise of the Series A Warrants and the Series B Warrants.

The Series C Warrants will have an initial exercise price per share equal to (i) the total equity value implied by a total enterprise value of the Issuer as of the Effective Date (after giving effect to the Restructuring) of $1,145,200,000 divided by (ii) the number of New Common Interests issued and outstanding on the Effective Date after giving effect to the consummation of the Restructuring and assuming the full exercise of the Warrants.

**Expiration Date**

The Warrants will automatically expire on the five (5) year anniversary of the Effective Date (such date, the "Expiration Date").

**Exercisability**

Each whole Warrant may be exercised for one New Common Interest, subject to adjustment. Each Warrant may be exercised at any time and from time to time at the option of the holder thereof.

The issuance of New Common Interests pursuant to the exercise of Warrants will be subject to payment in full by the holder of such Warrants of the applicable aggregate exercise price by wire transfer of immediately available funds to the Issuer or by "cashless" exercise based on the value of New Common Interests as of the time of exercise as set forth in the Definitive Documents with respect to the Warrants.

**Issuance**

The Warrants and the New Common Interests issuable upon exercise of the Warrants will be exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code or another available exemption from registration.

| | |
|---|---|
| **Adjustments** | The number of New Common Interests issuable upon exercise of, and the exercise price per New Common Interest of, each Warrant will be adjusted for, among other events, (i) corporate structural events (*e.g.*, recapitalizations, reclassifications, splits, reverse splits, reorganizations, consolidations, mergers, dividends and distributions in New Common Interests, tender offers and exchange offers), (ii) dividends and distributions of property or securities (including cash and rights to participate in equity issuances) and (iii) issuances of New Common Interests below a threshold price with such threshold and adjustment mechanics to be set forth in the applicable Definitive Documents. No adjustment will be made for issuances pursuant to the MIP. |
| **Change of Control Protection** | The Warrants will not have Black Scholes protection. Any outstanding Warrants will be automatically exercised on a cashless basis in connection with any change of control transaction or listing event, each as will be defined in the Definitive Documents governing the Warrants. |
| **Notices** | The Issuer will provide holders of the Warrants at least 15 Business Days' prior written notice before establishing a record date of the New Common Interests for purposes of customary equityholder events (*e.g.*, recapitalizations, reclassifications, splits, reverse splits, reorganizations, consolidations, mergers, dividends and distributions in New Common Interests, tender offers and exchange offers). |
| **Redemption** | The Warrants will not be subject to redemption by the Issuer or any other Person. |
| **Transfer Restrictions** | The Warrants will be transferable, subject to, among other things, restrictions under applicable law and customary restrictions to prevent the Reorganized Parent from being required to register as a public company under the Exchange Act. |
| **Amendments** | All amendments to the Warrants (other than purely administrative amendments) will require the consent of holders of not less than a majority of the applicable series of Warrants, except that any amendment that has the effect of increasing the exercise price of such Warrants or amending the Expiration Date to an earlier date will require the consent of each affected Warrant holder. |
| **Voting Rights; Participation** | Holders of the Warrants will have no voting or other rights to participate as a holder of New Common Interests on account of such Warrants unless and until such Warrants are exercised for New |

Common Interests, in which case the holder will have the same voting rights with respect to the New Common Interests acquired on exercise (but not any remaining Warrants) as applicable to any other New Common Interest.

**ERISA**

By accepting a Warrant, the holder of such Warrant will be deemed to represent that either (i) it does not hold "plan assets" subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code.

**Form; Documentation**

The Warrants will be evidenced by certificates or issued in direct registration format. In addition to the terms specified in this Term Sheet, the Definitive Documents for each of the Warrants will contain customary terms for transactions of this nature.

**Warrant Agent**

A Person acceptable to the Required Consenting Creditors.

**Governing Law**

New York.

## Exhibit B

## Joinder Agreement

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [_____], 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Agreement***"), between the Company Entities, and the Consenting Creditors, each as defined in the Agreement, is executed and delivered by _____ (the "***Joining Party***") as of _____, 2025. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company Entities, the Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representation and warranties of the Consenting Creditors, as set forth in <u>Article 10</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
Name:
Title:


| Claims (principal amount) | |
|---|---|
| - First Lien Claims | US$ |
| - Second Lien Claims | |


Notice Address:


_____
_____
_____
Fax: _____
Attention:      _____
Email:        _____

Acknowledged:

**MODIVCARE INC.**
**(on behalf of the Company Entities)**


By:_____
Name:
Title:

**Exhibit C**

**Milestones**

The following milestones shall apply to the Chapter 11 Cases (the "***Milestones***"), unless the applicable Milestone is extended or waived with the prior written consent of the Required Consenting First Lien Lenders (email from the First Lien Agent and Consenting Creditor Counsel being sufficient):

1. <u>Commencement of the Chapter 11 Cases</u>.  The Company Entities shall commence the Chapter 11 Cases for each of the Company Entities by not later than 11:59 p.m. prevailing Eastern Time on August 20, 2025.

2. <u>Entry of the Interim DIP Order</u>.  The Bankruptcy Court shall have entered the Interim DIP Order by not later than three (3) calendar days following the Petition Date.

3. <u>Filing of the Plan and Disclosure Statement</u>.  The Company Entities shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials by not later than 15 calendar days following the Petition Date.

4. <u>Entry of the Final DIP Order</u>.  The Bankruptcy Court shall have entered the Final DIP Order by not later than 45 calendar days following the Petition Date.

5. <u>Entry of the Solicitation Procedures Order</u>.  The Bankruptcy Court shall have entered the Solicitation Procedures Order by not later than 45 calendar days following the Petition Date.

6. <u>Confirmation Order</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is 90 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

7. <u>Occurrence of the Effective Date</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is 110 calendar days following the Petition Date, the Effective Date shall have occurred.

## Exhibit D

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x
          :
In re:          :   Chapter 11
          :
MODIVCARE INC., *et al.*,   :   Case No. 25-_____ (____)
          :
       Debtors.[1]   :   (Jointly Administered)
          :
---------------------------------------------------------- x

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

Upon the emergency motion, dated August [20], 2025 (the "DIP Motion"), of ModivCare Inc. and the other debtors and debtors-in-possession (collectively, the "Debtors"), in the above-referenced chapter 11 cases (these "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order") pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552 of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures"), that, among other things:

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/ModivCare.  Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

(i)    authorizes the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) (the "<u>Borrower</u>") to obtain, and the other guarantors (the "<u>DIP Guarantors</u>") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, senior secured priming and superpriority postpetition financing, which if approved on a final basis would consist of a term loan facility for up to $100 million in principal amount (the "<u>DIP Facility</u>") and loans extended under the DIP Facility, (the "<u>DIP Loans</u>"), pursuant to the terms of (x) this Interim Order, (y) that certain Superpriority Secured Debtor in Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"),[2] by and among the Borrower, the DIP Guarantors, Wilmington Trust, as administrative agent and collateral agent (in such capacity, collectively, the "<u>DIP Agent</u>"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (collectively, the "<u>DIP Lenders,</u>" and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "<u>DIP Secured Parties</u>"), in substantially the form attached as **Exhibit A** hereto, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "<u>DIP Loan Documents</u>"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors (including Allowed Professional Fees), (B) pay certain adequate protection amounts to the Prepetition First Lien Secured Parties (as defined below) as described below, (C) pay certain transaction fees and other costs and expenses of administration of the Chapter 11 Cases, and (D) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest owed to the DIP Secured Parties under the DIP Loan Documents and this Interim Order;

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents (including, without limitation the DIP Backstop Commitment Letters and the Backstop Premium thereunder) and authorizes and empowers the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

(iii)    grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) and shall be junior solely to the Carve-Out (as defined below) and any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) and Prepetition Second Liens (as defined below) after giving effect to any intercreditor or subordination

---

[2]   Unless otherwise specified herein, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement.

agreement (all such Liens, collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims (junior solely to the Carve-Out) having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of this Interim Order, any proceeds of actions brought under section 549 of the Bankruptcy Code, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below), and in all respects with respect to clauses (x) and (y) shall be subject to the relative priorities set forth on **Schedule 2** hereto;

(iv)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition First Lien Secured Parties (as defined below), the Prepetition Second Lien Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)    modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vi)    authorizes the Borrower between the entry of the Interim Order and the entry of the Final Order to borrow under the DIP Facility in an aggregate outstanding principal amount of $62.5 million which shall be funded into the DIP Account (as defined below) with release subject to the terms and conditions of the DIP Credit Agreement, and authorizes the DIP Guarantors to unconditionally guaranty such obligations jointly and severally;

(vii)    grants the Prepetition First Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition First Lien Adequate Protection (as defined below), which consists of, among other things, First Lien Adequate Protection Liens (as defined below), First Lien Adequate Protection Superiority Claims (as defined below) and current payment of accrued and unpaid prepetition and postpetition reimbursable fees and expenses;

(viii)    schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no later than two business days prior to the Chapter 11 Milestone (as defined below) for entry of a Final Order to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court) acceptable to the Debtors and the "Required Lenders" (the "Required DIP Lenders") under and as defined in the DIP Credit Agreement (the "Final Order");

---

[3]    As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation."

(ix)   waives, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(x)   provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Zul Jamal in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing* (the "Jamal Declaration") and the *Declaration of Chad J. Sandler in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration," and together with the Jamal Declaration, the "DIP Motion Declarations"), and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d), and 9014 and all applicable Bankruptcy Local Rules, notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an Interim Hearing having been held and concluded on August [21], 2025; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.   **Petition Date**.  On August [20], 2025 (the "Petition Date"), each of the

---

[4]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "Court").  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Chapter 11 Cases.

B.       **Jurisdiction and Venue**.  This Court has jurisdiction over these Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Bankruptcy Local Rules.

C.       **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee"), (ii) those entities or individuals included on the Debtors' list of thirty (30) largest unsecured creditors on a consolidated basis, (iii) counsel to the Prepetition First Lien Agent (as defined below), (iv) the Prepetition First Lien Agent, (iv) counsel to the Prepetition Second Lien Trustee (as defined below), (v) the Prepetition Second Lien Trustee, (vi) the DIP Agent, (vii) counsel to the DIP Agent, (viii) all other known lienholders, (ix) the United States Attorney for the Southern District of Texas; (x) the

5

Internal Revenue Service; (xi) the Securities and Exchange Commission; and (xii) the state attorneys general for states in which the Debtors conduct business.  Under the circumstances, such notice of the DIP Motion, the relief requested therein, and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Bankruptcy Local Rules, and no other or further notice need be provided for entry of this Interim Order.

    D.  **Debtors' Stipulations Regarding the Prepetition First Lien Facility**. Subject only to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraphs D and E hereof shall be referred to herein collectively as the "Debtors' Stipulations") as follows:

    (i)  Prepetition First Lien Facility.  Pursuant to that certain Credit Agreement, dated as of February 3, 2022 (as amended, restated or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), among (a) ModivCare Inc., as borrower, and the other Debtors that are Subsidiary Guarantors (as defined in the Prepetition First Lien Credit Agreement), (b) the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition First Lien Lenders"), and (c) JPMorgan Chase Bank, N.A. and any successor in interest thereto, as administrative agent and collateral agent (in such capacities, the "Prepetition First Lien Agent" and, together with the Prepetition First Lien Lenders and any other party to which Prepetition First Lien Obligations are owed, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Secured Parties agreed to extend loans and other financial

accommodations to, and issue letters of credit for the account of, the Borrower pursuant to the Prepetition First Lien Loan Documents.  All obligations of the Debtors arising under the Prepetition First Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition First Lien Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "Prepetition First Lien Obligations."

           (ii)        Prepetition First Liens and Prepetition First Lien Collateral.  Pursuant to the Collateral Documents (as defined in the Prepetition First Lien Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Collateral Documents"), by and among each of the Subsidiary Guarantors party thereto (the "Grantors") and the Prepetition First Lien Agent, each Grantor granted to the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing Lien (the "Prepetition First Liens") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition First Lien Credit Agreement granted or pledged by such Grantors pursuant to any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the "Prepetition First Lien Collateral."  As of the Petition Date, (I) the Prepetition First Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are

subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), and (C) the Prepetition Prior Liens, and (II) (w) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, (y) no portion of the Prepetition First Lien Obligations or any payments made to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Guarantees (as defined in the Prepetition First Lien Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition First Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii) <u>Amounts Owed under Prepetition First Lien Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued and other financial accommodations made by the Prepetition First Lien Secured Parties, (x) an aggregate principal amount of not less than $78,750,000 with respect to the Incremental Term Loans (as defined in the Prepetition First Lien Credit Agreement) (y) an aggregate principal amount of not less than $270,699,086 with

respect to the Revolving Facility (as defined in the Prepetition First Lien Credit Agreement), but excluding outstanding letters of credit, and (z) and an aggregate principal amount of not less than $522,239,937 with respect to the Term Loan Facility (as defined in the Prepetition First Lien Credit Agreement), *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents.

(iv)     <u>Release of Claims</u>.  Subject to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition First Lien Secured Parties and their respective affiliates, assigns or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively, the "<u>Prepetition First Lien Secured Party Releasees</u>") from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition First Lien Obligations, the Prepetition First Liens, or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of

applicable state law, federal law, or municipal law, and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Obligations or any payments or other transfers made on account of the Prepetition First Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition First Lien Secured Party Releasees.

E.  **Debtors' Stipulations Regarding the Prepetition Second Lien Facility**. Subject only to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)  Prepetition Second Lien Facility.  Pursuant to that certain Second Lien Senior Secured PIK Toggle Notes Indenture, dated as of March 7, 2025 (as amended, restated or otherwise modified from time to time, the "Prepetition Second Lien Indenture," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents" together with the Prepetition First Lien Loan Documents, the "Prepetition Loan Documents"), among (a) ModivCare Inc., as issuer, and the other Debtors that are guarantors, (b) the Holders of Notes (as defined in the Prepetition Second Lien Indenture) issued in connection therewith (collectively, the "Prepetition Second Lien Noteholders"), and (c) Ankura Trust Company, LLC, as notes collateral agent (in such capacity, the "Prepetition Second Lien Trustee" and, together with the Prepetition Second Lien Noteholders and any other party to which Prepetition Second Lien Obligations are

owed, the "<u>Prepetition Second Lien Secured Parties</u>"), the Prepetition Second Lien Secured Parties agreed to extend financial accommodations to the Borrower pursuant to the Prepetition Second Lien Loan Documents.  All obligations of the Debtors arising under the Prepetition Second Lien Indenture (including the "Obligations" as defined therein, whether or not arising under the Prepetition Second Lien Loan Documents) or the other Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "<u>Prepetition Second Lien Obligations</u>."

(ii)     <u>Prepetition Second Liens and Prepetition Second Lien Collateral</u>. Pursuant to the Security Documents (as defined in the Prepetition Second Lien Indenture) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Second Lien Collateral Documents</u>"), by and among each of the Grantors and the Prepetition Second Lien Trustee, each Grantor granted to the Prepetition Second Lien Trustee, for the benefit of itself and the other Prepetition Second Lien Secured Parties, to secure the Prepetition Second Lien Obligations, a second priority security interest in and continuing Lien (the "<u>Prepetition Second Liens</u>") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All "Collateral" as defined in the Prepetition Second Lien Indenture granted or pledged by such Grantors pursuant to any Prepetition Second Lien Collateral Document or any other Prepetition Second Lien Loan Document shall collectively be referred to herein as the "<u>Prepetition Second Lien Collateral</u>."  As of the Petition Date, (I) the Prepetition Second Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or

applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Prepetition First Liens, (C) the Carve-Out (as defined below), and (D) the Prepetition Prior Liens, and (II) (w) the Prepetition Second Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Second Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Second Lien Obligations exist, (y) no portion of the Prepetition Second Lien Obligations or any payments made to any or all of the Prepetition Second Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Subsidiary Guarantees (as defined in the Prepetition Second Lien Indenture) shall continue in full force and effect to unconditionally guaranty the Prepetition Second Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii) <u>Amounts Owed under Prepetition Second Lien Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued and other financial accommodations made by the Prepetition Second Lien Secured Parties, an aggregate principal amount of not less than $316, 233, 250 with respect to the Notes Obligations (as defined in the Prepetition Second

Lien Indenture), *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents.

(iv) Release of Claims.  Subject to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Second Lien Secured Parties and their respective affiliates, assigns or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively, the "Prepetition Second Lien Secured Party Releasees") from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Second Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Second Lien Obligations, the Prepetition Second Liens, or the debtor-creditor relationship between any of the Prepetition Second Lien Secured Parties, on the one hand, and any of  the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Second Lien Obligations or any payments or other transfers made on account of the Prepetition Second Lien

13

Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Second Liens securing the Prepetition Second Lien Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Second Lien Secured Party Releasees.

F.      <u>Cash Collateral</u>.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties.

G.      <u>Intercreditor Agreement</u>.  The Intercreditor Agreement, dated as of March 7, 2025 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "<u>Intercreditor Agreement</u>"), sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Secured Parties and their respective Prepetition First Lien Obligations and Prepetition First Liens, on the one hand, and the Prepetition Second Lien Secured Parties and their respective Prepetition Second Lien Obligations and Prepetition Second Liens, on the other hand.  Pursuant to section 510 of the Bankruptcy Code, such Intercreditor Agreement and any other intercreditor agreement or subordination agreement between and/or among the Prepetition First Lien Agent, the Prepetition Second Lien Trustee, any Prepetition First Lien Lender, any Prepetition Second Lien Noteholder, any Debtor or affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or

amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, and for avoidance of doubt, any acts or omissions by any Prepetition Second Lien Secured Party in connection with any chapter 11 plan of reorganization or liquidation in these Chapter 11 Cases (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code), and any distributions on account of, or other treatment of, any Prepetition Second Lien Obligations pursuant to any such plan, shall remain subject to the Intercreditor Agreement (including its turnover provisions) or any other applicable intercreditor or subordination provisions.

        H.       **Findings Regarding the DIP Facility**.

        (i)       <u>Need for Postpetition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

        (ii)       <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other

than the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents, (c) granting to the Prepetition First Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition First Lien Adequate Protection, and (d) granting to the Prepetition Second Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition Second Lien Adequate Protection (all of the foregoing described in clauses (a), (b), (c) and (d) above, collectively, the "**DIP Protections**").

I. **Interim Financing**.  During the Interim Period (as defined below), the DIP Secured Parties and, as applicable, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties are willing to provide financing to the Debtors and/or consent to the use of Cash Collateral by the Debtors, subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Loan Documents.

J. **Adequate Protection for Prepetition Secured Parties**.  The Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties have agreed to permit the Debtors to use the Prepetition First Lien Collateral and Prepetition Second Lien Collateral,

respectively, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition First Liens and the Prepetition Second Liens pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition First Lien Secured Parties.  Prepetition First Lien Lenders holding more than 50% of the aggregate principal balance of the Loans (as defined in the Prepetition First Lien Credit Agreement) (which Prepetition First Lien Lenders constitute "Required Lenders," as defined in the Prepetition First Lien Credit Agreement, the "Required Prepetition First Lien Lenders") have expressly consented to the entry of this Interim Order and the relief provided herein and pursuant to the terms of the Prepetition First Lien Credit Agreement, the consents of such Prepetition First Lien Lenders are binding on all Prepetition First Lien Secured Parties.  [None of the remaining Prepetition First Lien Secured Parties has filed an objection to the entry of this Interim Order or the relief provided herein], and in any event, the prepetition Liens and security interests of such parties are adequately protected pursuant to the terms of this Interim Order.  Notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties' consent to the DIP Facility and to the priming of the Prepetition First Liens by the DIP Liens is expressly limited to

the present DIP Facility and the DIP Liens securing same and shall not be applicable to any other debtor-in-possession credit facility, even if it contains substantially the same economic terms as this DIP Facility.  Pursuant to the terms of the Intercreditor Agreement, the Prepetition Second Lien Noteholders are deemed to have consented to the entry of this Interim Order and the relief provided herein.

       K.        **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to the Carve-Out and the DIP Liens, each of the Prepetition First Lien Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

       L.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

       (i)       The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

       (ii)       The terms and conditions of the DIP Facility and the DIP Backstop Commitment Letters (as defined in the Restructuring Support Agreement) as set forth in the DIP Loan Documents, and the DIP Backstop Commitment Letters and this Interim Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith (including, without limitation, the Backstop Premium (as defined in the DIP Backstop Commitment Letters)), are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)      The DIP Secured Parties, the Prepetition First Lien Secured Parties and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility, the Debtors' use of the DIP Collateral and the Prepetition First Lien Collateral (including Cash Collateral), the DIP Loan Documents and the DIP Protections (including the Prepetition First Lien Adequate Protection and the Prepetition Second Lien Adequate Protection).  The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents) and the Debtors' use of the DIP Collateral, the Prepetition First Lien Collateral and the Prepetition Second Lien Collateral (including Cash Collateral) shall be deemed to have been extended and/or consented to by the DIP Secured Parties, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection, the Prepetition Second Lien Adequate Protection and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

M.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Bankruptcy Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates will be immediately

and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash
Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the
best interests of the Debtors' estates and consistent with their fiduciary duties. Based on all of the
foregoing, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy
Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with
respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Agent
and the requisite Prepetition First Lien Secured Parties (on behalf of all of the Prepetition First
Lien Secured Parties), the Prepetition Second Lien Trustee (on behalf of all of the Prepetition
Second Lien Secured Parties) and the DIP Agent (on behalf of all of the DIP Secured Parties) to
the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted**.  The DIP Motion is hereby granted on an interim basis in
accordance with the terms and conditions set forth in this Interim Order and the DIP Loan
Documents.  Any objections to the DIP Motion with respect to the entry of this Interim Order that
have not been withdrawn, waived, or settled, and all reservations of rights included therein, are
hereby denied and overruled.

2.    **DIP Loan Documents and DIP Protections**.

(a)    <u>Approval of DIP Loan Documents</u>.  The Debtors are expressly and immediately
authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan
Documents and this Interim Order, to incur the DIP Obligations (as defined below), in accordance
with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute,
deliver, and perform under all other instruments, certificates, agreements, and documents that

may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized and empowered to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including all closing fees, administrative fees, commitment fees, and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect; provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) shall be subject to the provisions of Paragraph 20(b).  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.  Each officer of a Debtor (including the Chief Transformation Officer) acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)      DIP Obligations.  For purposes of this Interim Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including all "Obligations" as defined in the DIP Credit Agreement) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable

or reimbursable under the DIP Loan Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.

(c)      Authorization to Incur DIP Obligations and Use Cash Collateral.  To enable the Debtors to continue to operate their businesses and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration (as defined below), in each case unless extended by written agreement of the Required DIP Lenders and Required Prepetition First Lien Lenders (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), (I) the Borrower is hereby authorized to (a) incur DIP Obligations in an aggregate principal amount not to exceed $62.5 million under the DIP Facility and (b) use Cash Collateral and (II) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget and the Budget Covenants as defined and contained in Paragraph 2(e) below.  Following the entry of the Final Order, the Borrower's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Loan Documents.  All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents.

(d)      DIP Account. The Debtors shall, immediately upon receipt of any proceeds of the DIP Facility, deposit such amounts into a segregated account (the "DIP Account") of the Borrower, which amounts may only be drawn in accordance with the Approved Budget (subject to Budget Covenants), the terms and conditions of this Interim Order, and the DIP Credit Agreement, and with all funds held in the DIP Account deemed to be DIP Collateral. Once withdrawn from the

DIP Account, the funds shall continue to be DIP Collateral until such funds are first used by the Debtors, and at all times the Debtors shall, notwithstanding any potential commingling, establish commercially reasonable internal cash management procedures to allow for the continued tracing of such funds. Funds in the DIP Account will become available to be drawn by and/or shall be disbursed to the Debtors in accordance with the Approved Budget (subject to Budget Covenants), this Interim Order, and the DIP Credit Agreement.

(e) _Budget_. Attached hereto as <u>Schedule 1</u> is a rolling 13-week cash flow budget (the "<u>Initial Approved Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases, capital expenditures, and estimated fees and expenses of the DIP Agent (including counsel and financial advisors therefor) and any other fees and expenses relating to the DIP Facility), (iii) the sum of weekly unrestricted cash on hand and cash in the segregated account (collectively, "<u>Liquidity</u>"). The Debtors shall prepare and deliver to the DIP Agent (for distribution to the DIP Lenders) an updated "rolling" 13-week budget in accordance with Schedule 5.01(f) to the DIP Credit Agreement (or, at the option of the Borrower, more frequently) (the "<u>Updated Budget</u>"), which shall become the then "Approved Budget" upon approval by Required DIP Lenders in their sole discretion (and to the extent any Updated Budget is not approved by the Required DIP Lenders, the Approved Budget that is then in effect shall continue to constitute the Approved Budget for purposes of the DIP Facility); <u>provided</u>, <u>however</u>, that (i) the Updated Budget will be deemed approved unless the Required DIP Lenders provide written notice of their objection thereto (email being sufficient) within three (3) Business Days of the delivery of such Updated Budget, and during such period, the Initial Approved Budget or most recent Approved Budget, as

applicable, shall remain in effect (the "Interim Approval Period"), (ii) following the Interim Approval Period, if no objection is received from the Required DIP Lenders pursuant to clause (i), the Updated Budget shall be deemed the "Approved Budget" (it being understood that the Approved Budget shall be the initial Approved Budget until superseded by an approved Updated Budget), and (iii) the Required DIP Lenders shall not have any obligation to approve any Updated Budget.  The Borrower shall provide, on or prior to the Friday of each week, Approved Budget variance reports on a line-item basis and Liquidity reports, in each case, for the cumulative Reporting Period pursuant to Schedule 5.01(f) to the DIP Credit Agreement and a computation of Liquidity as of the preceding calendar week-end.  Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs and expenses of the DIP Agent's advisors and the Prepetition First Lien Agent's advisors, respectively, shall be due, payable and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants (as defined in 2(f)) to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.  For the avoidance of doubt, the foregoing shall not limit the timely payment of Allowed Professional Fees that benefit from the Carve-Out as set forth in Paragraph 7.

(f)     Budget Covenants.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the Approved Budget (and in the case of the costs and expenses of the Required DIP Lenders and the Required Prepetition First Lien Lenders, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the following Permitted Variances (as defined

below).  As of the last date of each Test Period, (1) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating cash receipts of the Debtors shall not exceed 15% and (2) the unfavorable variance (as compared to the Approved Budget) of the cumulative operating disbursements (other than professional fees and expenses incurred by the Debtors, the DIP Agent, and the advisors to the Backstop Parties) shall not exceed 15%, in each case, (collectively, the "Permitted Variances").  "Test Period" shall mean (i) initially, the period commencing on the Monday immediately prior to the Petition Date and ending on September 28, 2025, and (ii) thereafter, the four- or five-week period ending on the last Sunday of the month.  For the avoidance of doubt, see Schedule 5.01(f) to the DIP Credit Agreement for Variance and Liquidity reporting.  The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."  For the avoidance of doubt, the foregoing shall not limit the timely payment of Allowed Professional Fees that benefit from the Carve-Out as set forth in Paragraph 7.

(g)     Interest, Fees, Costs, Indemnities and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all fees, costs, indemnities, expenses (including, subject to Paragraph 20(b), reasonable out-of-pocket legal and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Loan Documents.  All such fees, costs, indemnities, expenses and disbursements, whether incurred, paid or required to be paid prepetition or post-petition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its

professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 20(b) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect.

(h)     <u>Use of DIP Facility and Proceeds of DIP Collateral</u>.  The Borrower shall use the proceeds of all DIP Collateral solely in accordance with this Interim Order and the DIP Loan Documents; <u>provided</u>, that the foregoing shall not limit the timely payment of Allowed Professional Fees that benefit from the Carve-Out as set forth in Paragraph 7.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments from the DIP Collateral, the proceeds of DIP Loans or otherwise on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Prepetition First Lien Obligations as set forth in this Interim Order and a Final Order; (b) as provided in the First Day Orders, which First Day Orders shall be in form and substance reasonably acceptable to the Required DIP Lenders and the Required Prepetition First Lien Lenders; (c) as expressly provided in other orders of this Court in form and substance reasonably acceptable to the Required DIP Lenders and the Required Prepetition First Lien Lenders; or (d) as otherwise expressly provided in the DIP Credit Agreement.

(i)     <u>Conditions Precedent</u>.  The DIP Secured Parties, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral, Prepetition First Lien Collateral or Prepetition Second Lien Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of

credit and/or use of DIP Collateral, Prepetition First Lien Collateral, Prepetition Second Lien Collateral or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders and the Required Prepetition First Lien Lenders in accordance with the DIP Loan Documents or Prepetition First Lien Credit Agreement or Intercreditor Agreement, as applicable, and this Interim Order.

(j)     DIP Liens.  As security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"), on all property of the Debtors, now existing or hereinafter acquired, including all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries and in other entities, tax and other refunds, insurance proceeds, commercial tort claims, the proceeds of Avoidance Actions (subject to entry of the Final Order), and other causes of action, and proceeds relating thereto, proceeds arising under section

549 of the Bankruptcy Code (whether received by judgment, settlement or otherwise), all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located; provided, however, that the DIP Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order and the DIP Liens shall not include any "Excluded Assets" (as defined in the DIP Loan Documents) (all of the foregoing collateral collectively referred to as the "DIP Collateral"):

> (I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien (junior only to the Carve-Out) on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (collectively, the "Avoidance Actions", which for avoidance of doubt, excludes proceeds arising from the Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law), whether received by judgment, settlement, or otherwise;

> (II)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral that is subject to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve-Out; and

> (III)    pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens and senior and priming to (A) the Prepetition First Liens, (B) the Prepetition Second Liens and (C) any other Liens that are junior to the Prepetition First Liens or the First Lien Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "Primed Liens") and shall be junior only to the Prepetition Prior Liens and the Carve-Out.

(k)     <u>DIP Lien Priority</u>.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens and the Carve-Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity (including the Primed Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(l)     <u>Enforceable Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case (as defined below)), and their creditors and other parties-in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)     <u>Superpriority Administrative Claim Status</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall

constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in full in cash in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the First Lien Adequate Protection Superpriority Claims and the Second Lien Adequate Protection Superpriority Claims (each as defined below)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "DIP Superpriority Claims"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions. Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Interim Order.

(n)  <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Without affecting, modifying or limiting the scope or priority of the Carve-Out, the DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Chapter 11 Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" orders.

3.  **<u>Adequate Protection for Prepetition First Lien Secured Parties</u>**.  In consideration for the use of the Prepetition First Lien Collateral (including Cash Collateral) and the priming of the Prepetition First Liens, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, shall receive the following adequate protection (collectively referred to as the "<u>Prepetition First Lien Adequate Protection</u>"):

(i)  <u>First Lien Adequate Protection Liens</u>.  To the extent there is a diminution in value of the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting

of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Prepetition First Lien Collateral Value"), the Prepetition First Lien Agent, for the benefit of all the Prepetition First Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361 and 363(e) of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "First Lien Adequate Protection Liens"), which First Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, and the Carve-Out.

(ii)      First Lien Adequate Protection Superpriority Claims.  To the extent of Diminution in Prepetition First Lien Collateral Value, the Prepetition First Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "First Lien Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve-Out, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions; provided, however, that the

Prepetition First Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations have been Paid in Full (as defined below).  Subject to the relative priorities set forth above, the First Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, Prepetition First Lien Obligations and/or Prepetition Second Lien Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Loan Documents, Prepetition First Lien Loan Documents or Prepetition Second Lien Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all credit commitments under the DIP Loan Documents, Prepetition First Lien Loan Documents and/or Prepetition Second Lien Loan Documents, as applicable; provided, however, that the First Lien Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Chapter 11 Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Paid in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.

(iii)    Priority of First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims.  Without affecting, modifying or limiting the scope or priority of the Carve-Out, the First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (as defined below) (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the

Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Chapter 11 Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" orders.

(iv)     <u>Professional Fees and Interest</u>.   Without limiting any rights of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition First Lien Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall (i) pay or reimburse in cash the Prepetition First Lien Agent for any and all fees, costs, expenses, and charges (including, subject to Paragraph 20(b) below, the reasonable fees, costs, and expenses of counsel and financial advisors for the Prepetition First Lien Agent) to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date and (ii) pay to the applicable Prepetition First Lien Secured Parties interest on the Prepetition First Lien Obligations under the Prepetition First Lien Credit Agreement accruing at a rate of 2.00% above the applicable rate set forth in Section 2.13(c) of the Prepetition First Lien Credit Agreement, to be capitalized to the

outstanding principal of the Loans on the last Business Day of each calendar month after the Petition Date whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 20(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, this Court.

(v)     The Debtors shall deliver to the Prepetition First Lien Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(vi)     Unless otherwise expressly set forth herein, any consent or approval rights or similar rights granted or referenced in this Interim Order in favor of any or all of the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(vii)     Consent to Priming and Adequate Protection.  The Prepetition First Lien Agent, on behalf of the Prepetition First Lien Secured Parties, consents to the Prepetition First Lien Adequate Protection and the priming provided for herein; provided, however, that such consent of the Prepetition First Lien Agent to the priming of the Prepetition First Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition First Lien Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(viii)     Right to Seek Additional Adequate Protection.     Under the

circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition First Lien Secured Parties. However, the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection (except as provided in the Intercreditor Agreement); provided that any such additional or alternative adequate protection shall at all times be subordinate and junior to (i) the Carve-Out and (ii) the claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents.  The consent of the Prepetition First Lien Secured Parties to the priming of the Prepetition First Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition First Lien Secured Parties that their respective interests in the Prepetition First Lien Collateral are adequately protected pursuant to this Interim Order or otherwise.

4.    **Adequate Protection for Prepetition Second Lien Secured Parties**.    In consideration for the use of the Prepetition Second Lien Collateral (including Cash Collateral) and the priming of the Prepetition Second Liens, the Prepetition Second Lien Trustee, for the benefit of the Prepetition Second Lien Secured Parties, shall receive the following adequate protection (collectively referred to as the "Prepetition Second Lien Adequate Protection"):

(i)    Second Lien Adequate Protection Liens.  To the extent there is a diminution in value of the interests of the Prepetition Second Lien Secured Parties in the Prepetition Second Lien Collateral (including Cash Collateral) from and after the Petition Date,

whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Second Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Second Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Prepetition Second Lien Collateral Value"), the Prepetition Second Lien Trustee, for the benefit of all the Prepetition Second Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361 and 363(e) of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "Second Lien Adequate Protection Liens"), which Second Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition First Liens, the First Lien Adequate Protection Liens and the Carve-Out.

(ii)    Second Lien Adequate Protection Superpriority Claims.  To the extent of Diminution in Prepetition Second Lien Collateral Value, the Prepetition Second Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Second Lien Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior

only to the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims and the Carve-Out, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all the proceeds of Avoidance Actions); provided, however, that the Prepetition Second Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations and Prepetition First Lien Obligations have been Paid in Full; provided, further, that the Second Lien Adequate Protection Superpriority Claims granted to the Prepetition Second Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Chapter 11 Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Paid in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.  Subject to the relative priorities set forth above, the Second Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

(iii)       Priority of Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims.  Without affecting, modifying or limiting the scope or priority of the Carve-Out, the Second Lien Adequate Protection Liens and the Second Lien Adequate Protection Superpriority Claim (as defined below) (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or

otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Chapter 11 Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" orders.

(iv)     Second Lien Reporting.  The Debtors shall deliver to the Prepetition Second Lien Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(v)     Consent to Priming and Adequate Protection.  The Prepetition Second Lien Trustee, on behalf of the Prepetition Second Lien Secured Parties, consents to the Prepetition Second Lien Adequate Protection and the priming provided for herein; provided, however, that such consent of the Prepetition Second Lien Trustee to the priming of the Prepetition Second Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Second Lien Trustee) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

5.        **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the Prepetition First Lien Agent and, after Payment in Full of the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Trustee shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens or to entitle the DIP Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent, the Prepetition First Lien Agent  (in the latter case, solely with respect to the First Lien Adequate Protection Liens) and the Prepetition Second Lien Trustee  (in the latter case, solely with respect to the Second Lien Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent, the Prepetition First Lien Agent

and/or the Prepetition Second Lien Trustee, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens, the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Agent, the Prepetition First Lien Agent and the Prepetition Second Lien Trustee may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties in accordance with this Interim Order. To the extent that the Prepetition First Lien Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of

the Debtors' insurance policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition First Lien Secured Parties and third, subsequent to the Payment in Full of all Prepetition First Lien Obligations, for the benefit of the Prepetition Second Lien Secured Parties.  The Prepetition First Lien Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

6.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon the estates and each other party in interest, including the Committee, except to the extent and only to the extent such Committee or any other party in interest with standing (including any chapter 11 trustee) other than the Debtors (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), upon the earlier of (x) with respect to any Committee, sixty (60) calendar days after the formation of any Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or any Committee, sixty (60) calendar days following the date of entry of

this Interim Order (such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph 6, shall be referred to as the "Challenge Period," and the date that is the next Business Day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), has (I) commenced (A) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, (B) a contested matter or adversary proceeding against any or all of the Prepetition First Lien Secured Parties in connection with or related to the Prepetition First Lien Obligations, or the actions or inactions of any of the Prepetition First Lien Secured Parties arising out of or related to the Prepetition First Lien Obligations or the Prepetition First Lien Loan Documents, including any claim against any or all of the Prepetition First Lien Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition First Lien Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties), or (C) a contested matter or adversary proceeding against any or all of the Prepetition Second Lien Secured Parties in connection with or related to the Prepetition Second Lien Obligations, or the actions or inactions of any of the Prepetition Second Lien Secured Parties arising out of or related to the Prepetition Second Lien Obligations or the Prepetition Second Lien Loan Documents, including any claim against any or all of the Prepetition Second Lien Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Second Lien Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code

or by way of suit against any of the Prepetition Second Lien Secured Parties) (clauses (i) and (ii) collectively, the "Challenges" and, each individually, a "Challenge"), and (II) obtained a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"). If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty-one (21) days after the date on which such trustee is appointed or elected.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), (i) all payments made to or for the benefit of the Prepetition First Lien Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party

in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  The Challenge Period may be extended only with the written consent of the Prepetition First Lien Agent, with respect to the Prepetition First Lien Obligations, or by the Prepetition Second Lien Trustee, with respect to the Prepetition Second Lien Obligations, in their respective sole discretion.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 6 or to require or permit an extension of the Challenge Period Termination Date; provided, however, that if the Committee files a motion for standing to assert any Challenge prior to the Challenge Period Termination Date (and provided that the relevant pleading asserting such Challenge is attached as an exhibit to such motion), then the Challenge Period Termination Date shall be tolled, solely for the Committee and solely with respect to such Challenge set forth in the exhibit to such motion, until three (3) Business Days after the Court rules on such motion.

7.  **Carve-Out**.

(i)  As used in this Interim Order, the term "Carve-Out" means the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in sub-

paragraph (ii) below); (b) all reasonable fees, costs, and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in sub-paragraph (ii) below); (c) to the extent allowed by the Court at any time, whether by interim or final compensation order, procedural order, or otherwise, all unpaid fees, costs, and expenses (collectively, the "Allowed Professional Fees") earned, accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") at any time before or on the first Business Day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice and without regard to whether such Allowed Professional Fees are provided for in the Approved Budget or when invoiced; (d) to the extent allowed by the Court at any time, whether by interim or final compensation order, procedural order, or otherwise, all Allowed Professional Fees earned, accrued or incurred in accordance with and subject to the Approved Budget by persons or firms retained by the Creditors Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice or when invoiced, and subject to the investigation budget set forth in Paragraph 16 below (the aggregate amounts set forth in clauses (a) through (d) above, the "Pre-Carve-Out Trigger Notice Amount"); and (e) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $2,500,000 and Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $250,000, in each case earned, accrued or incurred after the first Business Day following the date of delivery by the DIP Agent of the Carve-

Out Trigger Notice in accordance with sub-paragraph (ii) below (such date, the "Trigger Date"), to the extent allowed by the Court at any time, whether by interim or final compensation order, procedural order, or otherwise (the amounts set forth in this clause (e) being the "Post-Carve-Out Trigger Notice Amount" and, together with the Pre-Carve-Out Trigger Notice Amount, the "Carve-Out Amount").

(ii)    For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Borrower, counsel to the Borrower (Latham & Watkins), the U.S. Trustee, and counsel to the Committee (if any), which notice (A) shall expressly state that the Post-Carve-Out Trigger Notice Amount has been invoked and (B) may be delivered only following the occurrence and during the continuation of Termination Event (as defined herein), the acceleration of the DIP Obligations under the DIP Loan Documents, and the termination of the Debtors' consensual use of Cash Collateral under this Interim Order.

(iii)   From and after the Petition Date, the Debtors shall utilize cash on hand, the proceeds from the DIP Facility, amounts held in the DIP Account, and/or any other available cash thereafter held by any Debtor to fund, on a weekly basis, the Pre-Carve-Out Trigger Notice Amount into the Escrow Account (as defined below) in an amount equal to the greatest of (A) the aggregate unpaid amount of estimated fees, costs, and expenses of Professional Persons included in all weekly estimates timely received by the Debtors in respect of the preceding week, (B) the aggregate unpaid amount of actual fees, costs, and expenses of Professional Persons earned, accrued or incurred at the applicable time, and (C) the aggregate amount of fees, costs, and expenses of Professional Persons provided for in the Approved Budget at the applicable time.  As used herein, the term "Escrow Account" means a segregated account of the Borrower not subject

to the control of any DIP Secured Party, Prepetition First Lien Secured Party, and/or Prepetition Second Lien Secured Party (collectively, the "Funded Debt Secured Parties").

(iv)    Upon delivery of a Carve-Out Trigger Notice in accordance with sub-paragraph (ii) above, such Carve-Out Trigger Notice shall constitute a demand to, and approval for, the Debtors to utilize all cash on hand as of such date (including in the DIP Account) and any available cash thereafter generated by the Debtors to fund the Escrow Account in an amount equal to the Carve-Out Amount and to hold such amount in trust to pay the obligations benefitting from the Carve-Out.

(v)    Upon delivery of a Carve-Out Trigger Notice in accordance with sub-paragraph (ii) above, and prior to the payment to any Funded Debt Secured Party on account of any claim or administrative expense held by such person or entity (whether postpetition, super priority, adequate protection, prepetition, or otherwise), the Debtors shall deposit into the Escrow Account cash available on the Trigger Date (or available thereafter) in an aggregate amount equal to the Carve-Out Amount.  The funds in the Escrow Account shall be available only to satisfy the obligations benefitting from the Carve-Out in Paragraph 7(i) above, and the Funded Debt Secured Parties (A) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of assets) of the Debtors unless and until the Escrow Account is funded in full in cash as provided above and (B) shall have a valid and perfected security interest upon any residual amount in the Escrow Account available following payment in full in cash of all obligations benefiting from the Carve-Out, subject to the lien and claim priorities set forth in this Interim Order.

(vi)    Notwithstanding anything to the contrary in this Interim Order, the DIP Loan Documents, the Prepetition First Lien Loan Documents, and/or the Prepetition Second Lien Loan

Documents (collectively, including this Interim Order, the "Funded Debt Documents"), all claims and administrative expenses arising under, with respect to, or in connection with any Funded Debt Document (including the DIP Obligations, the DIP Superpriority Claims, the Prepetition First Lien Obligations, the First Lien Adequate Protection Superpriority Claims, the Prepetition Second Lien Obligations, and the Second Lien Adequate Protection Superpriority Claims) and all security interests and liens securing such claims and administrative expenses (including the DIP Liens, the Prepetition First Liens, the First Lien Adequate Protection Liens, the Prepetition Second Liens and the Second Lien Adequate Protection Liens) shall, in each case, be subject and subordinate to the payment in full in cash of the Carve-Out.

(vii)    Notwithstanding anything to the contrary in any Funded Debt Document, (a) the failure of the Escrow Account to satisfy in full the Allowed Professional Fees of the Professional Persons shall not affect, limit, or otherwise modify the scope or priority of the Carve-Out, (b) in no way shall any Approved Budget, the Carve-Out, the Carve-Out Amount, the Escrow Account, or any other budget or financial projection delivered in connection with any Funded Debt Document be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (including on an interim basis), and (c) the Debtors' authority to use proceeds from the DIP Facility, the DIP Collateral, and/or Cash Collateral on account of, and to timely pay, the Allowed Professional Fees and the other obligations benefitting from the Carve-Out shall in no way be limited or deemed limited by any Approved Budget (other than as expressly set forth above as to the Allowed Professional Fees for the Committee Professionals).

(viii)    Prior to the occurrence of the Termination Declaration Date (as defined below), the Debtors shall be permitted to pay Allowed Professional Fees (including on an interim basis), and

such payments shall not reduce or be deemed to reduce the Carve-Out.  Moreover, for the avoidance of doubt, any amounts paid prior to the Carve-Out Trigger Notice shall not reduce or be deemed to reduce the Post-Carve-Out Trigger Notice Amount.

(ix)    The DIP Agent shall be entitled to establish and maintain reserves against borrowing availability under the DIP Facility on account of the Carve-Out (including, for avoidance of doubt, the DIP Agent's estimate of future fees and expenses of the Debtor Professionals, the Committee Professionals and the Committee members that may be incurred before or after the delivery of Carve-Out Trigger Notice) in accordance with the terms of the DIP Credit Agreement.

(x)    Without affecting, limiting, or otherwise modifying the scope or priority of the Carve-Out, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtor Professionals, Committee Professionals or Committee members incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Without affecting, limiting, or otherwise modifying the scope or priority of the Carve-Out, nothing in this Interim Order or otherwise shall be construed (i) to obligate any DIP Secured Party or any Prepetition First Lien Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtor Professionals, the Committee Professionals or Committee members, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtor Professionals, Committee Professionals or Committee members are higher in fact than the Carve-Out Amount.  Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, Cash Collateral, Prepetition First Lien Collateral, DIP Collateral or proceeds of

the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 16 hereof; <u>provided</u> that the foregoing shall not be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (including on an interim basis).  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition First Lien Secured Party to object to the allowance and payment of any such fees and expenses.

        8.      **<u>Waiver of 506(c) Claims</u>**.  Upon entry of this Interim Order in the case of the DIP Secured Parties (and their DIP Liens and their other rights in respect of the DIP Collateral, the Prepetition First Lien Collateral and Cash Collateral), and subject to the entry of the Final Order solely in the case of the Prepetition First Lien Secured Parties (and their Prepetition First Liens and their other rights in respect of the DIP Collateral, the Prepetition First Lien Collateral and Cash Collateral) and the Prepetition Second Lien Secured Parties (and their Prepetition Second Liens and their other rights in respect of the DIP Collateral, the Prepetition Second Lien Collateral and Cash Collateral), and as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties to the payment of the Carve-Out to the extent provided herein) and (ii)  the Debtors' use of Cash Collateral pursuant to this Interim Order and a Final Order, (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition

First Lien Secured Parties, the Prepetition Second Lien Secured Parties, the Prepetition First Lien Collateral, the Prepetition Second Lien Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent, the Prepetition First Lien Agent and the Prepetition Second Lien Trustee, and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Chapter 11 Cases or any Successor Cases from or against the Prepetition First Lien Secured Parties or their Prepetition First Liens or the Prepetition Second Lien Secured Parties or their Prepetition Second Liens on or other interests in any or all of the DIP Collateral, the Prepetition First Lien Collateral, the Prepetition Second Lien Collateral and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition First Lien Collateral, the Prepetition Second Lien Collateral and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties.

9.    **After-Acquired Property**.    Subject to and upon entry of the Final Order (but retroactive to the Petition Date), pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date

solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

10.     **Protection of DIP Secured Parties' and Prepetition First Lien Secured Parties' Rights**.

(a)     Unless the DIP Agent and the Prepetition First Lien Agent shall have provided their prior written consent or all DIP Obligations and First Lien Adequate Protection Superpriority Claims have been Paid in Full, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition First Lien Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, the Prepetition Second Liens, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Superpriority Claims and/or the other DIP Protections; (ii) the use of Cash Collateral for any purpose other than Payment in Full of the DIP Obligations and the First Lien Adequate Protection Superpriority Claims or as otherwise permitted in the DIP Loan Documents and/or this Interim Order; provided that the foregoing shall not affect, modify or limit the scope or priority of the Carve-Out, (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to

section 553 of the Bankruptcy Code or otherwise, or (iv) any modification of any of  the DIP Secured Parties' or the Prepetition First Lien Secured Parties' rights under this Interim Order, the DIP Loan Documents or the Prepetition First Lien Loan Documents with respect to any DIP Obligations.

(b)　The Debtors shall, until all DIP Obligations, Prepetition First Lien Obligations and First Lien Adequate Protection Superpriority Claims have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate with, consult with during normal business hours, and provide to the DIP Secured Parties and the Prepetition First Lien Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable written request by any of the DIP Secured Parties or the Prepetition First Lien Secured Parties) to provide under the DIP Loan Documents, the Prepetition Loan Documents (in the absence of the pendency of these Chapter 11 Cases) or the provisions of this Interim Order, (iii) during normal business hours and upon reasonable written request, permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition First Lien Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents and/or the Prepetition First Lien Loan Documents, (iv) during normal business hours and upon reasonable written request, permit the DIP Agent and the Prepetition First Lien Agent and their respective consultants, advisors and other

representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) during normal business hours and upon reasonable written request, permit the DIP Agent and the Prepetition First Lien Agent to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition First Lien Collateral.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition First Lien Agent, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.  For avoidance of doubt, the Prepetition First Lien Agent shall have the same access and cooperation rights as the DIP Agent for purposes of this subparagraph (b).

11.    **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of Paragraph 10 above, if at any time prior to the Payment in Full of all the DIP Obligations and the First Lien Adequate Protection Superpriority Claims (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then, after payment or reservation in full in cash of the Carve-Out, all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full and then to the First Lien Adequate Protection Superpriority Claims until Paid in Full.

12.     **Cash Collection**.  From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition First Lien Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition First Lien Collateral were deposited under the Prepetition First Lien Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the liens of the DIP Agent and the Prepetition First Lien Agent (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order and the DIP Loan Documents).  Upon the direction of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition First Lien Agent, at any time after the occurrence of a Termination Event and subject to the provisions of Paragraph 7 and Paragraph 15, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and then to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations until Payment in Full, and the DIP Agent and the Prepetition First Lien Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing. Unless otherwise agreed to in writing by the DIP Agent and the Prepetition First Lien Agent, the Debtors shall maintain no accounts except those identified in the *Interim Order (A) Authorizing Debtors to (I) Continue Existing Cash Management System, (II) Maintain Existing Business Forms, and (III) Continue Intercompany Transactions; and (B) Granting Related Relief* (the "Interim Cash Management Order") and the *Final Order (A) Authorizing Debtors to (I) Continue Existing Cash Management System, (II) Maintain Existing Business Forms, and (III) Continue*

*Intercompany Transactions; and (B) Granting Related Relief* (the "<u>Final Cash Management Order</u>" together with the Interim Cash Management Order, the "<u>Cash Management Orders</u>"). Subject to the provisions of Paragraph 7 and Paragraph 15, the Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in the Cash Management Orders) are authorized and empowered to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition First Lien Agent.

13.     **Disposition of DIP Collateral; Credit Bid**.

(a) Unless the DIP Obligations and the Prepetition First Lien Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition First Lien Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition First Lien Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Agent and the Prepetition First Lien Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition First Lien Secured Party or any order of this Court), except in the ordinary course of business or as otherwise permitted in the DIP Loan Documents and/or the Prepetition First Lien Loan Documents, as applicable, and this Interim Order. Except to the extent otherwise expressly provided in the DIP Loan Documents and subject to Paragraph 7 of this Interim Order, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral outside the ordinary course of business shall be remitted to the DIP Agent for application to the DIP Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents or the Prepetition First Lien Loan Documents, as the case may be. In addition, the

Debtors are authorized and empowered to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition First Lien Agent is a party without the need to enter into new blocked account agreements.

(b)  Subject to Paragraph 6 of this Interim Order, the Prepetition First Lien Agent  (or one or more of its designees, affiliates or assignees) (at the direction of Required Prepetition First Lien Lenders) shall have the unqualified right to credit bid up to the full amount of any Prepetition First Lien Obligations in any sale of the Prepetition First Lien Collateral (or any DIP Collateral subject to any First Lien Adequate Protection Liens) under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in payment in full of all of the DIP Obligations on the effective date of such plan, or (iii) section 725 of the Bankruptcy Code. Subject to Paragraph 6 of this Interim Order, the Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Prepetition First Lien Collateral (or any DIP Collateral subject to any First Lien Adequate Protection Liens) that does not include an unqualified right to credit bid up to the full amount of the Prepetition First Lien Obligations would mean that the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties will not receive the indubitable equivalent of their claims and interests.  The DIP Agent (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  If the DIP Agent or the Prepetition First Lien Agent or their respective

designees, affiliates or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral or Prepetition First Lien Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent and/or Prepetition First Lien Agent shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

14.    **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition First Lien Agent (each, a "Termination Event"):

(a)    The occurrence and continuation of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "DIP Default Termination Event"), including, for avoidance of doubt, (x) the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Agent and the Prepetition First Lien Agent, on or before 11:59 p.m. prevailing Eastern Time on the date that is 45 days from the Petition Date and (y) the Debtors' failure to timely and strictly comply with any of the obligations and deadlines set forth on **Exhibit B** hereto thereto (the "Chapter 11 Milestones").

(b)    Any material breach by the Debtors of their obligations under the Restructuring Support Agreement (subject to any applicable cure periods), and any termination of the Restructuring Support Agreement by the Debtors or the Prepetition First Lien Lenders.

(c)    Any other material breach, default or other violation by any of the Debtors of the terms and provisions of this Interim Order (subject to any applicable cure periods).

15.    **Rights and Remedies Upon Termination Event**.

(a)     Upon the occurrence and during the continuation of a Termination Event, following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of written notice (a "Remedies Notice"), of not less than five (5) Business Days', to the Debtors and Debtors' counsel, the United States Trustee, and counsel to the Committee (if any) (the "Remedies Notice Period"), unless prior to such time the Court orders otherwise, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the DIP Loan Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral as provided in subparagraph 15(b) below), including the right to (1) declare all DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (3) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and/or (ii) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration under any of clauses 15(a)(i)(1), (2) or (3) or (ii) shall be made to the respective lead counsel to the Debtors, the Committee and the U.S. Trustee, and shall be referred to herein as a "Termination Declaration" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date").

(b)     In addition to the rights and remedies described above, on the later of: (i) the expiration of the Remedies Notice Period, including as such period may be tolled as provided

herein, and (ii) five (5) Business Days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, subject to the payment or reservation in full in cash of the Carve-Out as set forth in Paragraph 7.    Prior to the expiration of the Remedies Notice Period, the Debtors and/or any Committee shall be entitled to request an emergency hearing with the Court.  If a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto.  During such Remedies Notice Period, (i) the Debtors may use Cash Collateral or any amounts previously or thereafter advanced under the DIP Credit Facility (a) to fund operations in accordance with the DIP Facility and the Approved Budget and (b) the Carve-Out; and (ii) the Debtors and the DIP Lenders consent to a hearing on an expedited basis to consider whether a Termination Event has occurred, and if a hearing to consider the foregoing is requested to be heard before the end of the Remedies Notice Period but is scheduled for a later date by the Bankruptcy Court, the Remedies Notice Period shall be automatically extended to the date of such hearing. Unless the Bankruptcy Court orders otherwise, upon the expiration of the Remedies Notice Period (subject to extension in the event an Emergency Motion is filed), the automatic stay shall automatically be deemed terminated, without further notice, hearing or order of the Bankruptcy Court, and the DIP Agent (acting at the instruction of the Required DIP Lenders under the DIP Loan Documents) shall be permitted to exercise all remedies set forth in the DIP Orders and in the DIP Loan Documents or applicable law, and the Debtors' right to use any Cash Collateral shall

immediately cease, subject to the payment or reservation in full in cash of the Carve-Out as set forth in Paragraph 7.

(c)    Subject to Paragraph 6, upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 15(b) hereof, the Prepetition First Lien Agent shall have relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition First Liens and the First Lien Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition First Lien Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition First Lien Obligations) or otherwise exercise remedies against the DIP Collateral or Prepetition First Lien Collateral permitted by this Interim Order, the Prepetition First Lien Loan Documents and/or applicable non-bankruptcy law; provided however, that any such foreclosure or other enforcement by the Prepetition First Lien Agent of any Prepetition First Liens or the First Lien Adequate Protection Liens or any other such exercise of remedies by the Prepetition First Lien Agent against the DIP Collateral or Prepetition First Lien Collateral shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Agent, and any proceeds received by the Prepetition First Lien Agent in connection with such foreclosure, enforcement or other exercise of remedies shall, subject to the payment or reservation in full in cash of the Carve-Out as set forth in Paragraph 7, be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

(d)    Subject to the provisions of Paragraph 6 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the

Prepetition First Lien Secured Parties shall be turned over <u>first</u> to the Debtors to fund the Carve-Out in full in cash, then to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until Payment in Full of all of the DIP Obligations and <u>then</u> to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations under, and in accordance with the provisions of, the Prepetition First Lien Loan Documents and this Interim Order until Payment in Full of the Prepetition First Lien Obligations.

(e) Subject to entry of the Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) Business Days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a Lien of any third party and that are used by Debtors in their businesses, in the case of either subparagraph (i) or (ii) of this Paragraph 15(e) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law;

provided, however, that the DIP Agent, on behalf of the DIP Secured Parties, shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent, or the other DIP Secured Parties to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(e).

(f)      Subject to the entry of the Final Order and Payment in Full of the DIP Obligations, notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Prepetition First Lien Agent or the other Prepetition First Lien Secured Parties contained in this Interim Order or the Prepetition First Lien Loan Documents, or otherwise available at law or in equity, the Prepetition First Lien Agent shall succeed to, and be entitled to, all of the rights, remedies, benefits and protections accorded to the DIP Agent pursuant to Paragraph 15(e), as if all references therein to the "DIP Agent" and the " DIP Parties" are references to the "Prepetition First Lien Agent" and the "Prepetition First Lien Secured Parties."

(g)      The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition First Lien Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) subject to Paragraph 7, authorize the DIP Secured Parties and the Prepetition First Lien Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents and/or this

Interim Order, (iii) to permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties to perform any act authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

16.     **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, but subject to the last sentence of this Paragraph 16, no loans and/or proceeds from the DIP Facility (including the DIP Account), DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition First Lien Collateral, Prepetition Second Lien Collateral or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, or any other person, party, or entity  (including any of the Debtors' Professionals, the Committee's Professionals or the Committee members) to investigate (except as set forth below) or prosecute any Challenge (including any litigation or other action) against the DIP Secured Parties, the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or the Committee members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any modification to this Interim Order not approved by the DIP Agent and, to the extent such modification would affect the rights of any of the Prepetition First Lien Secured Parties, the

Prepetition First Lien Agent and, to the extent such modification would affect the rights of any of the Prepetition Second Lien Secured Parties, the Prepetition Second Lien Trustee; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, the Prepetition First Lien Obligations, and/or the Prepetition Second Lien Obligations or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, the Prepetition Second Liens, the First Lien Adequate Protection Liens or the Second Lien Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the First Lien Adequate Protection Liens, the other Prepetition First Lien Adequate Protection, the Prepetition Second Liens, the Second Lien Adequate Protection Liens, or the other Prepetition Second Lien Adequate Protection; (D) any action preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties', and, after the Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Parties' and/or the Prepetition Second Lien Secured Parties', assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral, the Prepetition First Lien Collateral or the Prepetition Second Lien

Collateral in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents or the Prepetition Second Lien Loan Documents, as applicable, or this Interim Order); and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties hereunder or under the DIP Loan Documents, the Prepetition First Lien Loan Documents or the Prepetition Second Lien Loan Documents, as applicable, or any payments made thereunder or in respect thereof; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any Prepetition Second Lien Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents and/or the Liens of the Prepetition Second Lien Trustee and the other Prepetition Second Lien Secured Parties under the Prepetition Second Lien Loan Documents (but in any case not the claims and/or Liens of the DIP Agent and the other DIP Secured Parties) so long as such investigation occurs within the Challenge Period; or (iii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition First Lien Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent.  For the avoidance of doubt, the foregoing limitations shall not (i) prevent or otherwise limit the Debtors and their professionals from being heard on whether a Termination Event has occurred and is continuing, (ii) be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (including on an interim basis), or (iii) prohibit the Debtors' use of the DIP Collateral, Prepetition First Lien

Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other funds to respond to investigations by the Committee.

17.     **Proofs of Claim**.  The Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties in respect of all Prepetition First Lien Obligations and Prepetition Second Lien Obligations, respectively.  In addition, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Interim Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition First Lien Obligations or Prepetition Second Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, the Prepetition Second Lien Trustee, for the benefit of itself and the other Prepetition Second Lien Secured Parties, and the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Chapter 11 Cases or Successor Cases (i) in the case of Prepetition First Lien Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition First Lien Obligations, (ii) in the case of the Prepetition Second Lien Trustee, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition Second Lien Obligations, and (ii) in the case of each of the Prepetition

First Lien Agent, Prepetition Second Lien Trustee, and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition First Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable.

18.     **Preservation of Rights Granted Under the Interim Order**.

(a)     No Non-Consensual Modification or Extension of Interim Order.   The Debtors shall not seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent and the Prepetition First Lien Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition First Lien Secured Parties.   In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents, in each case incurred or arising prior to the actual receipt of written notice by the DIP Agent or the Prepetition First Lien Agent, as applicable, and in either case counsel thereto, of the effective date of such reversal, modification, vacatur, or stay.   Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or

stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition First Lien Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or the Prepetition First Lien Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)     <u>Dismissal</u>.  If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations and all Prepetition First Lien Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections,

and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively.

(d)     <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition First Lien Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, pursuant to this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Chapter 11 Case or Successor Case, converting any Chapter 11 Case to a case under chapter 7, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases or any Successor Case in this Court, or terminating the joint administration of these Chapter 11 Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition First Lien Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections and benefits pursuant to this Interim Order and the DIP Loan Documents, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their

respective priorities as provided by this Interim Order.  Without the express written consent of the DIP Lenders, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.   **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agent (with respect to the Prepetition First Lien Adequate Protection) and the other Prepetition First Lien Secured Parties (with respect to the Prepetition First Lien Adequate Protection) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition First Lien Agent from time to time to evidence or effectuate the foregoing.

20.   **Other Rights and Obligations**.

(a)   <u>Expenses</u>.  To the extent provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors shall pay all reasonable expenses incurred by the DIP Agent (including the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the DIP Agent and/or its counsel) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b)    <u>Notice of Professional Fees</u>.   Professionals for the DIP Agent and the Prepetition First Lien Agent (including professionals engaged by counsel to the DIP Agent or Prepetition First Lien Agent, as applicable) (collectively, the "<u>Lender Professionals</u>") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.   Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, counsel for any Committee, and such other parties as this Court may direct. If no objection to payment of the requested fees and expenses is made in writing (email being sufficient) by any of the Debtors, any Committee, or the United States Trustee within ten calendar days after delivery of such invoices, such invoices shall be promptly paid by the Debtors and, in any event, no later than three Business Days after expiration of such ten day period.   The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; <u>provided</u>, <u>however</u>, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.   If the Debtors, United States Trustee or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten days of receipt of such invoices, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "<u>Fee Objection</u>") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten day period shall constitute a waiver of any right of such party

to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.  All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order.  Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

(c)    Binding Effect.  Subject only to Paragraph 6 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Chapter 11 Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition First Lien Secured Parties, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person

appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that except to the extent expressly provided in Paragraph 6, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Chapter 11 Case or Successor Case.

(d)      No Waiver.  The failure of the Prepetition First Lien Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition First Lien Secured Party or any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of the Debtors to contest or object to such assertion).  Except as provided by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition First Lien Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Chapter 11 Cases or any Successor Cases to cases under chapter 7, dismissal of the Chapter 11 Cases or any Successor Cases, or the appointment of a trustee or examiner in the Chapter 11 Cases or any

Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition First Lien Secured Parties, respectively, under the DIP Loan Documents or the Prepetition First Lien Loan Documents, the Bankruptcy Code or otherwise, in each case with the rights of the Debtors to contest or object thereto reserved.  Except to the extent otherwise expressly provided in this Interim Order or by law, neither the commencement of the Chapter 11 Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition First Lien Loan Documents, applicable law, or equity.

(e)   <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal,

state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)     <u>No Marshaling</u>.  Subject to entry of the Final Order, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

(g)     <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver is material.   No waiver, modification, or amendment of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of the Borrower and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.  Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition First Lien Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition First Lien Agent on behalf of the Prepetition First Lien Secured Parties (after obtaining the approval of the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement).

(h)     <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions

of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a "first day order", the provisions of this Interim Order shall govern and control.

(i)      Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(j)      Reservation of Rights.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, and except as expressly provided in the DIP Loan Documents, each of the foregoing expressly reserve the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to satisfy Payment in Full of the DIP Obligations and the Prepetition First Lien Obligations on the closing date of such sale.

(k)      Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

21.     **Necessary Action**. The Debtors are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder.

22.     **Final Hearing**

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [ ● ], 2025, at [ ● ] [a.m./p.m.] (prevailing Central time) at the United States Bankruptcy Court for the Southern District of Texas.  The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)     <u>Final Hearing Notice</u>.  Within three (3) days of entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than [ ● ], 2025, at 4:00 p.m. (prevailing Central time), which objections shall be served so that the same are received on or before such date by:

(i) proposed counsel for the Debtors, Latham & Watkins LLP, Attn: Ray C. Schrock, Esq. (ray.schrock@lw.com), Keith A. Simon, Esq. (keith.simon@lw.com), George Klidonas (george.klidonas@lw.com), and Jonathan J. Weichselbaum (jon.weichselbaum@lw.com); (ii) counsel for the Prepetition First Lien Agent, Consenting Creditors, and DIP Lenders, Paul Hastings LLP (Attn: Kris Hansen (krishansen@paulhastings.com), Matt Warren (mattwarren@paulhastings.com), and Lindsey Henrikson (lindsey.henrikson@paulhastings.com)); (iii) the Office of the United States Trustee for the Southern District of Texas; and (iv) counsel to the Creditors' Committee, if any.

23. **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2025
        Houston, Texas

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

## SCHEDULE 1

## INITIAL APPROVED BUDGET

(see attached)

## SCHEDULE 2

## LIEN/CLAIM PRIORITIES

| Priority | DIP Collateral | Priority Claims |
|---|---|---|
| *First* | Carve-Out | Carve-Out |
| *Second* | Permitted Prior Liens | DIP Superpriority Claims |
| *Third* | DIP Liens | First Lien Adequate Protection Superpriority Claims (subject to payment in full of the DIP Obligations) |
| *Fourth* | First Lien Adequate Protection Liens | Second Lien Adequate Protection Superpriority Claims (subject to payment in full of the DIP Obligations and the Prepetition First Lien Obligations) |
| *Fifth* | Prepetition First Liens | - |
| *Sixth* | Second Lien Adequate Protection Liens | - |
| *Seventh* | Prepetition Second Liens | - |

## EXHIBIT A

## DIP CREDIT AGREEMENT

(see attached)

## **EXHIBIT B**

## **CHAPTER 11 MILESTONES**

1. As of 11:59 p.m. prevailing Eastern Time on the date that is 45 days from the Petition Date, the Final Order shall have been entered by the Court;

2. As of 11:59 p.m. prevailing Eastern Time on the date that is 45 days from the Petition Date, the Court shall have entered an order approving a disclosure statement with respect to solicitation of the Plan (as defined in the Restructuring Support Agreement);

3. As of the 11:59 p.m. prevailing Eastern Time on the date that is 90 days from the Petition Date, the Court shall have entered a confirmation order providing for confirmation of the Plan; and

4. As of the 11:59 p.m. prevailing Eastern Time on the date that is 110 days from the Petition Date, the effective date of the Plan shall have occurred.

## **Exhibit B**

Corporate Structure

