<pre>
                   UNITED STATES BANKRUPTCY COURT

                   SOUTHERN DISTRICT OF TEXAS

                        HOUSTON DIVISION

MODIVCARE INC.,                .    CASE NO. 4:25-BK-90309
                               .
                               .    HOUSTON, TEXAS
                    DEBTOR      .    THURSDAY AUGUST 21, 2025
                               .    02:30 P.M. TO 04:10 P.M.
. . . . . . . . . . . . . . . .
</pre>

**FIRST DAY HEARING**

**ALL PARTIES APPEARING VIA VIDEOCONFERENCE**

**BEFORE THE HONORABLE ALFREDO R. PEREZ**
**UNITED STATES BANKRUPTCY JUDGE**


<pre>
        APPEARANCES:                 SEE NEXT PAGE

        ELECTRONIC RECORDING OFFICER: NOT IDENTIFIED

        OFFICIAL INTERPRETER:        NONE PRESENT

        COURTROOM DEPUTY:            NOT IDENTIFIED
</pre>


TRANSCRIPTION SERVICE BY:


**Trinity Transcription Services**
1081 Main Street
Surgoinsville, TN 37873
281-782-0802
battshott@aol.com


**Proceedings recorded by electronic sound recording;**
**Transcript produced by transcription service.**

<pre>
                    UNITED STATES BANKRUPTCY COURT

                     SOUTHERN DISTRICT OF TEXAS

                          HOUSTON DIVISION

MODIVCARE INC.,                 .    CASE NO. 4:25-BK-90309
                                .
                                .    HOUSTON, TEXAS
                   DEBTOR        .    THURSDAY AUGUST 21, 2025
                                .    02:30 P.M. TO 04:10 P.M.
. . . . . . . . . . . . . . . .


                         FIRST DAY HEARING

               ALL PARTIES APPEARING VIA VIDEOCONFERENCE

                BEFORE THE HONORABLE ALFREDO R. PEREZ
                  UNITED STATES BANKRUPTCY JUDGE


Appearances:

For THE DEBTOR:                 RAY SCHROCK, Esq.
  Proposed Co-Counsel           GEORGE KLIDONAS, ESQ.
                                MEGHANA VUNNAMADALA, ESQ.
                                BRIAN HERSKOWITZ, ESQ.
                                MONTANA LICARI, ESQ.
                                STEPHEN (ESTEBAN) WOO KEE, ESQ.
                                JONATHAN WEICHSELBAUM, ESQ.
                                Latham & Watkins
                                1271 Avenue of the Americas
                                New York, NY 10020

For THE DEBTOR:                 CATHERINE RANKIN, ESQ.
  Proposed Co-Counsel           BRANDON BELL, ESQ.
                                Hunton Andrews Kuth LLP
                                600 Travis Steret, Suite 4200
                                Houston, TX 77002


For UNITED STATES TRUSTEE:      JANA S. WHITWORTH, ESQ.
                                Office of the United States
                                  Trustee
                                515 Rusk Street, Suite 3516
                                Houston, TX 77002
</pre>

Appearances (cont.):


**For FIRST LIEN AGENT AND**    **MATTHEW L. WARREN, ESQ.**
  **CONSULTING CREDITORS:**    **KRISTOPHER HANSEN, ESQ.**
Paul Hastings LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606

Transcriber:                Cheryl Battaglia
Trinity Transcription Services
1081 Main Street
Surgoinsville, TN 37873

**(See also electronic appearances)**

1

1      **Houston, Texas; Thursday, August 21, 2025; 02:30 p.m.**

2      **(All Parties Appearing Via Videoconference.)**

3           **THE COURT:**  Good afternoon.

4      **(Voices speaking off the record.)**

5           **THE COURT:**  Please everyone mute their lines.  We're

6   getting some feedback.  We have a lot of people on the line.

7   So, all right.

8           Good afternoon.

9      **(Voices speaking off the record.)**

10          **THE COURT:**  All right.  Unfortunately, I'm going to

11  have to activate the hand raising feature.  So hit five star

12  one time.

13     **(Pause in the proceeding.)**

14          **THE COURT:**  All right.  Good afternoon.  It is

15  Thursday, August 21st, 2025.  We're here in *Case Number 25-*

16  *90306, ModivCare, Inc.* for the first day hearings.

17          Please make sure to go to my website and note your

18  appearance.  That's the way we keep track of —— of appearances

19  formally.  So why don't we get appearances of counsel.  And

20  then we can go forward.

21     **(Pause in the proceeding.)**

22          **MR. SCHROCK:**  Good afternoon, your Honor.  It's Ray

23  Schrock, Latham Watkins, proposed counsel for the Debtors.

24          **THE COURT:**  Good afternoon, Mr. Schrock.  Nice to see

25  you.

2

1          **MR. SCHROCK:**  Nice seeing you as well.

2          **MR. KLIDONAS:**  Good afternoon, your Honor.  George

3   Klidonas of Latham and Watkins on behalf of Debtors.

4          **THE COURT:**  All right.

5       **(Pause in the proceeding.)**

6          **MS. WHITWORTH:**  Good afternoon, Judge Perez.  Jana

7   Whitworth for the U.S. Trustee.

8          **THE COURT:**  Good afternoon.

9       **(Pause in the proceeding.)**

10          **MR. HANSEN:**  Good afternoon, Judge Perez.  Good to

11   see you again twice in one week.

12          **THE COURT:**  This time I'm a lot ──

13          **MR. HANSEN:**  It's Chris Hansen with ──

14          **THE COURT:**  This time I'm a lot farther from where

15   you are.

16       **(Pause in the proceeding.)**

17          **MR. HANSEN:**  I was thinking about that earlier.

18          All right.  It's nice to see you again, your Honor.

19   I'm joined by my partner, Matt Warren.  We're both here as

20   counsel for the agent and the RSA parties.

21          **THE COURT:**  Good afternoon.

22       **(Pause in the proceeding.)**

23          **THE COURT:**  All right.  Anyone else wish to make an

24   appearance?

25       **(No response.)**

3

1    **(Pause in the proceeding.)**

2        **THE COURT:**  All right.  If —— if anyone wishes to

3    make an appearance, hit five star one time.

4    **(Pause in the proceeding.)**

5    **(No response.)**

6        **THE COURT:**  All right.  Go ahead, Mr. Schrock.

7        **MR. SCHROCK:**  Okay.  Great.  Thanks very much, Judge.

8    Hopefully, you can hear me okay.

9        **THE COURT:**  I can hear you fine, sir.

10       **MR. SCHROCK:**  Great.

11       Your Honor, I'm going to be handling the opening

12   comments for —— for the case and tell you and the other

13   stakeholders just a little bit about MotivCare, you know, who

14   we are.  How we got here.  Some of the key players that are

15   involved thus far.  And also just where we hope to go in these

16   cases.

17       But we did prepare a demonstrative at Document Number

18   41, Josem (phonetic) and Simon Tsuzana (phonetic) the LW Trial

19   Tech.  I think he's asking to share a screen, your Honor.  I

20   can —— I could put it on the screen for you if you want.

21       **THE COURT:**  All right.  I've made him the presenter.

22       **MR. SCHROCK:**  Great.  Thank you.

23   **(Pause in the proceeding.)**

24       **MR. SCHROCK:**  Great.  Okay.

25   **(Pause in the proceeding.)**

4

1          **MR. SCHROCK:**  Go ahead and go to the next page,

2    please.

3          **(Pause in the proceeding.)**

4          **MR. SCHROCK:**  So we just hit the road map.  Let's go

5    ahead and flip it one more, please.

6          So, the Debtors are a leading technology and personal

7    healthcare services company.  They're one of the nation's

8    largest providers for the care.

9          The business is broken into a few segments.

10   Essential care through non-emergency medication transportation,

11   which we refer to as NEMT, personal care services, actually

12   going into peoples' homes, remote patient monitoring, as well

13   as what we call general corporate services.  But are, you know,

14   can —— largely are still patient-related services.

15         This is a very large business, Judge.  It touches

16   millions of people every year, people who need medical care,

17   people who need help.  And it's a very large business.

18         We're across 48 states and the District of Columbia

19   through a workforce of over 23,000 employees.  We also have on

20   top of that thousands of contracted drivers and caregivers.

21   And through the PCS business, you know, there's —— there's

22   thousands of —— of nurses aides and, you know, related care

23   professionals that provide services in patients' homes every

24   year.

25         **(Pause in the proceeding.)**

1          **MR. SCHROCK:**  Go ahead and flip, please.

2        **(Pause in the proceeding.)**

3          **MR. SCHROCK:**  This is just a little bit more about

4     those businesses as well as just how substantial they are when

5     you see, you know, the trips that are made, you know, annually.

6     It's, you know, 30 point —— 36.8 million trips in 2024 for, you

7     know, roughly 30 million members.

8          Those are provided through, you know, contracts that

9     the company has through both state parties they act through

10    like Medicaid, Medicare is the federal level, as well as

11    through health care insurance providers.

12          On the PCS front, personal care assistance, as I

13    mentioned in 2024 they had about approximately 14,000

14    caregivers who provided 28 million hours of patient care.

15    Remote patient monitoring provides health monitoring devices

16    and emergency response systems to support patient self-

17    management and preventative care.

18          It enables seeing the seniors chronically ill and

19    people with disabilities to maintain their independence.  We

20    have about 247,000 members on that front.

21          And the corporate is really the personal health

22    technologies business that provides health monitoring systems

23    at third-party brick and mortar stores, community health

24    monitoring services.  It also includes revenue from a non-

25    controlling interest in a joint venture and a network of

1  clinicians that provide in-home and on-location services.

2      **(Pause in the proceeding.)**

3          **MR. SCHROCK:**  Let's talk a little bit about the

4  employees.

5          Go ahead and flip.

6          Oh, sorry, the key members of management, the Board.

7  These are the folks who have been involved, you know, really

8  day-to-day on the front lines of the restructuring.  The

9  Debtor's CEO is Pete Sampson (phonetic).  He's dealing with, as

10  you might imagine, your Honor, quite a bit just, you know,

11  making sure the company's stabilized and, frankly, spreading,

12  you know, the very good news that we do have, you know, putting

13  this company on solid footing.

14          We have the Office of the Chief Financial Officer,

15  Scott Kern (phonetic), Rebecca Orcutt, (phonetic), and Ken

16  Shepherd.  The Chief Transformation Officer, which is Chad

17  Sandler (phonetic) of FTI, and the General Counsel.

18          Our Chairperson is Lesley (phonetic) Norwalk

19  (phonetic), as well as Keith Sampson's also on the Board.  And

20  then we've really trying to run the restructuring activities

21  through an independent capital structure committee.

22          The Chairperson of that is Dan Silvers.  We have

23  three other independent directors, Ty Carter, Alan Cunningham,

24  and Aaron Russell.  And we have a substantial shareholder, or

25  the general —— the general partner of the substantial

7

1    shareholder, David Mounts-Gonzalez, who also participated in

2    those activities.

3            To say that that —— that committee was active would

4    be an understatement, Judge.  We were meeting multiple times a

5    day some days.  And we were meeting, certainly, several times

6    per week.

7            But as you'll see, as we present evidence that move

8    forward in these cases, the level of diligence and, frankly,

9    looking under every rock to try and bring this business to a

10   stable landing was quite substantial.

11           Go ahead and flip, please.

12       **(Pause in the proceeding.)**

13       **MR. SCHROCK:**  The Debtor's professionals, Latham,

14   Hunton Andrews, Mollis (phonetic) is our investment banker,

15   Zula (phonetic) Jamal (phonetic), Adam Steinberg (phonetic) are

16   the two leads.  On FTI, it's really Mr. Chandler (phonetic)

17   that's running point day-to-day.

18           The consenting creditors, Paul Hastings, as proposed

19   counsel.  You've met Mr. Hansen when he introduced himself.

20   Lessard (phonetic) is the investment banker for that group.

21           Go ahead and flip.

22       **(Pause in the proceeding.)**

23       **MR. SCHROCK:**  So, this is the pre-petition capital

24   structure.  The Debtors were heavily levered and are heavily

25   levered.  But the good news is, this is a very substantial de-

8

1   leveraging supported overwhelmingly by, you know, the Debtor's

2   capital structure.

3          You know, there's an incremental first lien term loan

4   that was put in place earlier this year that was for $78

5   million.  That is a *pari passu* loan.  You see the interest rate

6   that's up there.  There was also a first lienholder revolving

7   credit facility that's already —— also *pari passu*, the amounts

8   outstanding set forth there.  The first loan, term loan B,

9   which is, you know, a $522 million balance, as well as second

10  lien notes, and unsecured notes of 228 million.

11         But, you know, as we'll talk about, Judge, in the

12  months leading up to these cases, you know, this just —— this

13  business was really facing an enormous amount of pressure.  And

14  it was extremely difficult, you know, for the Debtors to, you

15  know, frankly, keep the business stabilized.

16         But we are in a great spot where now I think our

17  counter-parties can have extreme confidence that the business

18  has been re-capitalized, you know, is being de-leveraged.

19  There's only going to be a $300 million take-back note on the

20  back end of this transaction.  And, you know, there's going to

21  be a substantial infusion of incremental liquidity which this

22  company desperately needed.

23         **(Pause in the proceeding.)**

24         **MR. SCHROCK:**  Go ahead and keep going, please.

25         **(Pause in the proceeding.)**

9

1          **MR. SCHROCK:**  The org chart, I —— we wanted to

2    provide this so parties could have it.  I'm not going to, you

3    know, go in here.  I think it's helpful, frankly, just for, you

4    know, stakeholders to have a reference point so they can see

5    who the actual obligated parties are the funded debt.

6          The only thing of note that I would note here is

7    that, you know, the Debtor's employees are primarily domestic.

8    There are some foreign employees that the Debtors have

9    contracted and, you know, are actually employed through some

10   foreign subsidiaries as well in India.

11          But overwhelmingly, this worked for us.  And what

12   we're really focused on is making sure that , you know, our

13   patients are getting care.  That the, you know, that we're also

14   getting care to the, you know, to our employees, and making

15   sure that, you know, frankly, our creditors are supporting us

16   moving forward.

17          Go ahead and flip, please.

18      **(Pause in the proceeding.)**

19          **MR. SCHROCK:**  So the events leading to Chapter 11,

20   you know, it's pretty self-evident here.  But just to walk

21   through it with a little bit more specificity.

22          The, you know, the company's capital structure was

23   really unsustainable.  You know, we did everything we could to

24   try and avoid having to commence these cases.

25          We got the incremental term loan.  We started

1   commencing asset sale processes.  You know, we weren't able to

2   get it done in time.  But the Debtors starting facing

3   business —— business disruption really in the form of cash

4   collateral calls from sureties, trading partners that were

5   coming for us.  We had, you know, negative industry trends

6   that, you know, from demographicships, government reimbursement

7   models, and frankly, tightening regulatory insight.

8           We had contract challenges.  You know, parties who

9   are going to contract for these type of critical services for

10  employees, they need to know that your counter-party is on

11  solid financial footing.  And what became evident is, we really

12  approached the summer as, we had to do something.

13          We had to do something to de-leverage the business

14  and infuse capital.  Most of our contracts, many of them are

15  kind of terminable for convenience upon a notice period.

16          So we started facing some customer non-renewals or

17  terminations.  There's processes to go through for appeals.

18  But, you know, when you have that type of contracts and those

19  types of risks on the business, you're not going to know if

20  it's, you know, too much for the business until, frankly, it's

21  too late.

22          And that's what the Board recognized.  That's what

23  the management team recognized.  Certainly, the advisors were

24  very focused on this.  Cause they need to stabilize the

25  business.

1          There's also changes in the regulatory landscape

2   through what I'll just, you know, generically call, people are

3   looking hard at the spend at the state and federal level for

4   services.  That puts increased pressure on the business as well

5   as, you know, on our private contract counter parties are also

6   looking, you know, they're subject also to those same

7   pressures.  Those issues roll downhill to us.

8          And then finally, the impact of acquisitions.  I

9   think that the Debtors had a, you know, tremendous growth, you

10  know, over the last several years as we outlined in the first

11  day declaration and a substantial investment of capital.  It's

12  just servicing debt associated with those acquisitions ——

13  acquisitions has placed a lot of stress on the business.

14         And so much so that, you know, we were rolling into,

15  you know, this middle of the summer, you know, the Debtor's

16  first lien debt had traded down to roughly, I believe, 40

17  cents.  The second lien had traded down into single digits.

18  The unsecured debt had been at four cents for some time.  And

19  the Debtor's, you know, market cap had traded well into

20  distressed and option territory of about a $30 million market

21  cap.  Which for a public company was very telling.

22         So I would say that, you know, there was a dire need

23  to get parties under NDA.  To really talk about how are we

24  going to fix the business and position it well for the future.

25         And, you know, the good news is there's a very good

1   business that underlies all of these financial challenges.

2   These, you know, the creditors recognize that.  They're

3   recommitting to the business.  They're equitizing a substantial

4   portion of their debt.  They're coming into this company

5   knowing that, you know, if you have a strong contract

6   counterparty, we've got great market position that, you know,

7   we're going to be in a great spot to be competitive for several

8   years to come.

9           And, importantly, you know, for our patients.  We

10  have to be on solid footing to make sure that we're going to be

11  there to provide these very necessary and critical services so

12  people can get to, you know, their —— their, you know, their ——

13  their critical appointments with healthcare providers.

14          Let's go ahead and flip again, please.

15      **(Pause in the proceeding.)**

16      **MR. SCHROCK:**  A little more specificity.  Around the

17  second half of 2024 an 2020 —— 2025, the Debtors hired FTI

18  Mollis to evaluate strategic alternatives.  They also sought ——

19  sought to raise funds in the public markets.  They entered into

20  an amendment in —— in early 2025, they entered into the stip

21  amendment, which I believe Mr. Klidonas will speak a little bit

22  more about.

23          They issued another 30 million of second lien notes.

24  And in exchange for allowing those capital infusion, the first

25  lien lenders, as you might expect, they limited certain

1  basket —— baskets.  They imposed certain covenants on the

2  Debtors.  They wanted us to pursue, you know, an asset sale

3  process, which we did.

4        And we've really spent the last several months

5  undertaking those efforts until it became clear that we needed

6  to undertake this comprehensive restructuring.  But we've, even

7  when we've been faced with all these challenges, up until, you

8  know, frankly, even in the last several days, we were looking

9  at every alternative that was feasible.  We were look —— still

10  talking to other parties in the capital structure.  We were

11  talking to equity holders.  We were talking to unsecured

12  creditors.  We were talking to other junior capital providers.

13        Ultimately, the best deal and the, you know, the

14  value maximizing proposition for this business, was really to

15  pursue the restructuring that's before you and in the forward,

16  you know, exploring the fiduciary duties —— of fulfilling its

17  fiduciary duties, decided that we needed to commence these

18  cases and move forward with the support of advisors.

19        **(Pause in the proceeding.)**

20        **MR. SCHROCK:**  Let's go ahead and flip, please.

21        **(Pause in the proceeding.)**

22        **MR. SCHROCK:**  You know, as I mentioned before, you

23  know, this is some of the, you know, the hallmarks of, you

24  know, what we think is a very successful, you know,

25  negotiation.

1          We do want to thank, by the way, the, you know, our

2     consenting creditors for their support.  You know, we've been

3     working with them extremely closely over the last several

4     weeks.

5          We explored out-of-court options with them as well.

6     But we're going to be reducing funded debt by at least 1.1

7     billion, we've ⸺ raising substantial new capital, lowering

8     annual cash interest expenses, and enabling the Debtors to

9     continue operating with a substantially improved balance sheet.

10          And I think those numbers really do speak for

11     themselves.  And you have 90 percent and 70 percent,

12     respectively, of your first lien and second lien creditors,

13     especially at those trading prices.  You know, we think there's

14     overwhelming support for this restructuring already.

15          Go ahead and flip, please.

16          **(Pause in the proceeding.)**

17          **MR. SCHROCK:**  The LSA (phonetic) contemplates 100

18     million in DIP financing to fund these cases rolled into a

19     take-back term loan facility, exchanging those first lien

20     claims for up to 200 million of the take-back term loan

21     facility, 98 percent of the pro forma reorganized equity

22     subject to dilution.

23          Exchanging second lien note claims for two percent of

24     the pro forma reorganized equity, subject to dilution plus

25     warrants.  Unsecured claims are also going to have the

15

1   opportunity to participate in equity and equity rights offering

2   for up to 200 million.

3          And we're also going to enter into a $250 million

4   exit revolver inclusive of a $150 million letter of credit

5   supplement.

6          **(Pause in the proceeding.)**

7          **MR. SCHROCK:**  Go ahead and flip.

8          **(Pause in the proceeding.)**

9          **MR. SCHROCK:**  This is just a little bit more around

10  the treatment of claims.  I think that I've already gone ——

11  already gone over.  Wanted to make sure that there's some more

12  detail for the stakeholders that are out there.  There's, you

13  know, a series of warrants that have been highly negotiated in

14  good faith.  They're ready to participate in equity rights

15  offering.

16         Unfortunately, with these values we were not able to

17  get an equity recovery, although we certainly did try.  The

18  treatment of other general unsecured claims is still subject to

19  diligence.  You know, so, you know, we talked about the

20  unsecured notes and, you know, I recall qualified institutional

21  investors that'll be able to just to participate in equity

22  rights offering.

23         But we should be in position here over the next few

24  weeks to put out the treat —— the proposed treatment for

25  general unsecured claims.  And of course, we'll be talking to

1    an Unsecured Creditors Committee as soon as they're formed.

2         Go ahead and flip.

3    **(Pause in the proceeding.)**

4         **MR. SCHROCK:**  The governance is set forth here.

5    there's a management incentive plan that has not been

6    allocated.  But it's eighty percent of the fully-diluted

7    reorganized equity.

8              There's releases and exculpations, subject to the

9    outcome in an investigation.  That investigation has been

10   commenced.  It is being led by the independent director, Dan

11   Silvers, with the support of Latham and Watkins.

12             And there's, importantly, you know, as you would

13   expect, there's a fiduciary out.  If we receive an alternative

14   proposal, you know, there's going to be an ability if the Board

15   and the company determine the fiduciary duty is conducive to be

16   able to pursue it, we —— where we'd consider like a market-

17   based and, frankly, customary fiduciary out.

18        **(Pause in the proceeding.)**

19        **MR. SCHROCK:**  Go ahead and flip.

20        **(Pause in the proceeding.)**

21        **MR. SCHROCK:**  The DIP facility —— I'm not going to

22   get into the terms here.  I'm going to allow Mr. Klidonas to

23   present that.  But I will just note that there's really nothing

24   unusual, you know, about the DIP facility.

25             And, your Honor, will ultimately be the judge of

1   that, of course.  But there's, you know, there is, you know,

2   what was very compelling for us is the ability to roll this DIP

3   into an exit and then it comes coupled with, you know, the

4   ability to pursue a prayer —— pre-arranged plan with the

5   support of our creditors.

6          So, we'll allow Mr. Klidonas to go through the

7   specifics in that during the DIP facility presentation.  But,

8   you know, we are very pleased with where we ended upon around

9   the support from our creditors to —— with incremental capital

10  in the company.

11         **(Pause in the proceeding.)**

12         **MR. SCHROCK:**  Go ahead.  Flip, please.

13         The exit facility.  We already talked about.  A lot

14  of the terms are still to come.  And, you know, we'll be

15  rolling those out over the —— over the next several weeks.

16         **(Pause in the proceeding.)**

17         **MR. SCHROCK:**  Then flip.

18         **(Pause in the proceeding.)**

19         **MR. SCHROCK:**  And then finally, there's proposed RSA

20  milestones.  You know, I think that note, you know, of note,

21  Judge, we're going to be filing a plan and disclosure statement

22  very soon, given that we've already negotiated this.  That's

23  got to be filed within 15 days after the petition date.

24         We're looking for a final DIP order within 45 days

25  after the petition date.  I think that we've already had some

18

1    informal discussions with the Chambers just around, you know, a

2    proposed second day hearing date.

3            We're looking for a disclosure statement order 45

4    days after the petition date.  Not seeking to set that, of

5    course, here today.  And then the confirmation order 90 days.

6            And we realize this is an aggressive schedule.  But

7    for a business like this, we really think it's important to

8    move quickly.  It's an expensive process.  This business is not

9    going to thrive, we believe, inside of Chapter 11.  And it's

10   critical to move very quickly.

11           And you could take the ―― you could take the

12   presentation down, please.

13           But it's critical to move very quickly so that we can

14   get this company out of Chapter 11.  We're not looking to cut

15   off anybody's rights, of course.  But, we want to make sure

16   that we're able to, you know, give due process, but also get

17   the plan and disclosure statement on file.

18           Get, you know, everybody in the right orientation.

19   Actually understand where it is.  If we have to deal with any

20   of our contract counterparties, to do so expeditiously.  Make

21   sure that we get the commitments in place here necessary to get

22   the ―― the capital infusions on the back end of this.

23           And then finally, Judge, you know, probably should

24   have started here.  But I do want to thank your chambers, you

25   know, the Office of the United States Trustee, again the

1  consenting creditors, and, frankly, the entire Motiv team as

2  well as, you know, the Board for supporting us to — to get us

3  to this point.

4         But, you know, it's a new day for this company.

5  We're very excited about the prospect for MotivCare to have,

6  you know, a bright future.  And, you know, we're grateful for

7  the opportunity to be before you.

8         But I'm happy to answer any questions.

9         **THE COURT:**  No.  I think that was very well presented

10 both — both the declarations I thought were also very, very

11 helpful in — in understanding the business.  And, frankly,

12 the — the scope.

13        I mean, it — it really is —

14        **MR. SCHROCK:**  A massive business.

15        **THE COURT:**  Yeah.  A massive business.

16        All right.  Let me hear anyone else who wishes to be

17 heard kind of by way of an opening statement.

18     **(Pause in the proceeding.)**

19        **THE COURT:**  Mr. Hansen?

20        **MR. HANSEN:**  Thank you, your Honor.  So again, your

21 Honor, Kris Hansen, with Paul Hastings.  I'm here with my

22 partner, Matt Warren.  And we represent the consenting

23 creditors and the agent for the first lien.

24        Your Honor, as you heard Mr. Schrock say, our — our

25 clients hold, at this point, we have executed the RSA, are more

1  than 90 percent than the aggregate first lien and more than 70

2  percent of the aggregate second lien debt.

3          And they —— they executed the RSA that includes the

4  terms that Mr. Schrock just walked you through.  And they've

5  also committed —— most of those parties have committed to fund

6  the DIP.  And then the DIP is fully underwritten by a subset of

7  them.

8          In terms of process, your Honor, our lenders have

9  supported the company since the —— the initial period in which

10 these loans were issued, including through a very unexpected

11 liquidity crisis that hit right around Christmas of the prior

12 year.  And we and they worked tirelessly through the Christmas

13 and New Year's holiday to make sure that the company had access

14 to $75 million of incremental financing in January.

15          And —— and the —— the lenders came together really on

16 short notice there in a very unexpected way in support of the

17 company.  That also led to the creation of the Strategic

18 Alternatives Committee and most of the independents that are on

19 the Board being appointed.

20          To that —— since that point in time, the lenders have

21 engaged constructively and repeatedly with the company.  And

22 most recently, your Honor, with a period of the last two weeks,

23 to negotiate the terms of the RSA that allowed for the signing

24 to come in as smoothly as it has, including by providing that

25 very critical $100 million DIP commitment, which also includes,

21

1   and it's important for the Court to understand, that it will

2   roll into an exit on a subordinated basis behind a large

3   revolving credit facility under the terms of the plan.

4          So, as I know your Honor's always concerned, we have

5   a way in and we have a way out.  And that is a very critical

6   piece to any company that's coming with a bankruptcy, but

7   especially one that operates within this business segment.

8          So, your Honor, it also goes along with, as you heard

9   Mr. Schrock say, a significant reduction of existing debt.  So

10  that's more than a billion dollars.  But to put it in

11  perspective, it's in excess of 85 percent of the existing debts

12  of the company would be taken out in connection with this

13  restructuring.

14         So that's a very significant deleveraging.  And,

15  again, lenders remain supportive of the company and the

16  process.  They look forward to the ability to move these cases

17  very quickly and efficiently so that MotivCare can exit

18  bankruptcy as an operationally stronger company, but also with

19  a balance sheet that positions it with growth and success in

20  its core markets.

21         We really appreciate the efforts of the Debtors,

22  their management team, and all the professionals in getting to

23  this point.  And we're happy to answer any questions that your

24  Honor has.  But we also, obviously, support all of the relief

25  that the Debtors are seeking today.

1           Thank you, your Honor.

2           **THE COURT:**  Thank you.

3        **(Pause in the proceeding.)**

4           **THE COURT:**  Miss Whitworth?

5        **(Pause in the proceeding.)**

6           **MS. WHITWORTH:**  Good afternoon, again, Judge Perez.

7           The U.S. Trustee doesn't have any opposition.  We've

8    worked out —— I think there's only one motion that —— that we

9    may need you to call balls and strikes on.  And we

10   appreciate —— my office really appreciates the cooperation that

11   we have received from —— from both Huntington —— Hunton group

12   and the Latham Watkins group.

13          **THE COURT:**  All right.  Thank you.

14          **MS. WHITWORTH:**  Thank you, Judge.

15          **THE COURT:**  All right.  Mr. Schrock?

16          **MR. SCHROCK:**  Yes, your Honor.  I'll turn it over to

17   Mr. —— Mr. Klidonas to take us to from here.

18          **THE COURT:**  Go ahead, Mr. Klidonas.

19       **(Pause in the proceeding.)**

20          **MR. KILDONAS:**  Good afternoon, your Honor.  George

21   Kladonis from Latham and Watkins on behalf of the Debtors for

22   the record.

23          As a housekeeping matter and before getting into the

24   DIP motion, I'd like to just address that the Debtors filed an

25   amended witness and exhibit list as Docket Number 42.

23

1        **(Pause in the proceeding.)**

2            **MR. KILDONAS:**  For purpose of today's hearing, I'd

3    like to move into evidence the Debtor's Exhibit 1 through 23,

4    which are at Docket Number 42-1 through 42-23.

5            There are three declarations among these exhibits.

6    And those are the declaration of Chad Chandler, the Debtor's

7    Chief Information Officer in support of the first day.  The

8    declaration of Jules (phonetic) Jamal of Mollis and Company,

9    proposed investment banker to the Debtors in support of the DIP

10   motion.  And Mr. Chandler's declaration in support of the DIP

11   as well.

12           Mr. Chandler's declaration in support of the first

13   day motions is Exhibit Number 1 at Docket Number 42-1, and his

14   declaration in support of the DIP is Exhibit Number 23 at

15   Docket Number 42-23.

16           And finally, Mr. Jamal's declaration is Exhibit

17   Number 2 at Dockets Number 42-2.  And just for the record, both

18   Mr. Chandler and Mr. Jamal are on the line and they're

19   available for cross.

20           **THE COURT:**  Okay.  All right.  So with respect to

21   let's take first Mr. Chandler.  With respect to Mr. Chandler's

22   declaration at Exhibit ——

23        **(Pause in the proceeding.)**

24           **THE COURT:**  —— 42-1 and 42-23, does anyone object to

25   the admission of Mr. Chandler's declarations as his direct

24

1    testimony in connection solely with this first day hearing.

2        **(No response.)**

3        **THE COURT:**  All right.  Hearing no objection, it will

4    be admitted as his direct testimony, subject to cross

5    examination at the appropriate time to the extent anyone you —

6    anyone who wishes to do so.

7        **(Debtor's Exhibit Numbers 42-1 and 42-23 were received**

8    **into evidence.)**

9            As it relates to the declaration of Mr. Jamal, which

10   is at Docket 42-2, does anyone object to the declaration of

11   Mr. Jamal as his direct testimony in connection with this

12   hearing?

13       **(No response.)**

14       **THE COURT:**  Hearing no objections, I will admit that

15   as his direct testimony, subject to cross examination at the

16   appropriate time to the extent anyone wishes to do so.

17       **(Debtor's Exhibit Number 42-2 was received into evidence.)**

18       **THE COURT:**  So those three declarations are admitted

19   as their direct testimony, Mr. Klidonas.

20       **(Pause in the proceeding.)**

21       **MR. KILDONAS:**  Thank you.

22       **(Pause in the proceeding.)**

23       **THE COURT:**  And then with respect to Exhibits 42-3 to

24   42-22, does anyone object to the admission of any of those

25   exhibits?

1      **(No response.)**

2      **(Pause in the proceeding.)**

3          **THE COURT:**  All right.  Hearing no objection, I will

4    admit Exhibits 42-3 to 42-22 for purposes of this hearing.

5          **(Debtor's Exhibits Number 42-3 to 42-22 were received into**

6    **evidence.)**

7              **THE COURT:**  Go ahead, Mr. Klidonas.

8          **MR. KILDONAS:**  Thank you, your Honor.

9      **(Pause in the proceeding.)**

10         **MR. KILDONAS:**  So turning to DIP motion just filed on

11   Docket Number 4 and Agenda Number 1.

12           Before getting into the details of the DIP itself, I

13   think it's important to understand kind of how we got here very

14   briefly.  I know we discussed the Fifth Amendment.

15           From the company's perspective, at the end of

16   December, the company had about $100 million of cash.  But it

17   was projecting to run out of money some time in January, mostly

18   due to working capital needs and switching to fee for service.

19           So the company immediately engaged with the first

20   liens.  And the only option at the time under the credit

21   agreement was either —— with an incremental facility.  There

22   was no room for senior debt, no room for any kind of drop down.

23           So a handful of lenders, those that are importantly

24   backstopping this DIP today, got together.  Backstopped at 75.

25   And notably allowed the lenders who were in the credit facility

1  at the time didn't agree to expend new money.

2          We also had another party that came in and put in $30

3  million of second lien, who signed the inner-creditor, they

4  signed the exchange agreement.  So at the end, the company had

5  about $105 million of new money.

6          If you fast forward, Latham gets involved in mid-

7  June.  We start doing work with the company.  And the Board and

8  the company start doing the responsible thing by negotiating

9  with those same lenders about a potential maturity extension

10  coming up in January of '26, as well as covenant relief coming

11  up in September and October of this year.

12          But due to the leverage profile, due to going concern

13  qualifications, the company had significant, you know,

14  potential for customer delisting.  And I was dealing with non-

15  renewals as well.

16          There were also sales, M and A processes, going on

17  that weren't — seemed to be going nowhere that would have

18  cleared the debt.

19          So the ideal was that we made a proposal to try to

20  deal with that maturity, deal with that covenant, and get new

21  money on the balance sheet.  But quickly we had to pivot to an

22  in-court process to — to start negotiating new money coming in

23  in the form of a DIP.

24          We were at the same time exploring all viable options

25  with Mollis, and Latham, and FTI, particularly with existing

27

1    shareholders and other parties in the capital structuring.

2              As a result, your Honor, the company concluded that

3    the only viable executable and responsible near term option was

4    this in-court restructuring through a pre-arranged Chapter 11

5    with existing first and second lien lenders.

6              So we entered into the restructuring support

7    agreement, which included the DIP.  And we signed up 90 percent

8    of the first liens and 70 percent of the second liens.

9         **(Pause in the proceeding.)**

10         **MR. KILDONAS:**  In addition to the shareholders I

11   mentioned before, Mollis reached out to 18 parties to see if

12   they were willing to do a junior DIP or a senior non-consensual

13   DIP.  Nobody was.  We wouldn't be surprised.

14             There was also another party that was willing to put

15   in a senior DIP.  But that DIP had to come with the consent of

16   the first liens.  And that consent was not granted.

17        **(Pause in the proceeding.)**

18        **MR. KILDONAS:**  So, if we go into the terms, there are

19   a number of terms that I think are fair and reasonable that we

20   negotiated pretty hard.

21             There's a backstop premium that's earned on the —— on

22   an interim basis, payable once the plan is confirmed for 20

23   percent.  There's no liquidated damages with that backstop

24   premium.  It's subject to the plan being approved.  There's no

25   cash toggle.

1        So it doesn't make it difficult for a third party to

2  come in and propose an alternative proposal.  And on the flip

3  side, it doesn't make it that much more difficult for the

4  company to — Mr. Schrock's point exercise its fiduciary out.

5        This backstop, I just want to make clear because

6  Mr. Hansen raised it.  Backstop's not just a six to nine month

7  facility.  The backstop's a six to nine month facility plus a

8  five year maturity for exit, which is going to be junior to an

9  exit revolving facility.

10     **(Pause in the proceeding.)**

11     **MR. KILDONAS:**  The lenders are agreeing to fund 2/3's

12  of the facility up front.  It provides for adequate protection

13  consistent with our documents.  It gives all first lien lenders

14  an opportunity to participate, as long as they sign the RSA.

15  And most importantly, this DIP provides access to cash

16  collateral and new money to pay for and protect 20,000 plus

17  jobs, maintain operations, preserve enterprise value, and make

18  sure people are getting the very important service that

19  Mr. Schrock laid out earlier.

20     **(Pause in the proceeding.)**

21     **MR. KILDONAS:**  I do just want to say that this DIP,

22  the 66 plus million needed on the first day, is important.  The

23  company, as it works on an operational basis day-to-day, is

24  subject to extreme liquidity swings because of the company's

25  receivables and payables.

1    So just think about certain situations.  There are a

2  number of factors that the company sort of keeps very close eye

3  on.  The nature of the receipts could swing week-to-week from

4  10 to 30 million.  So the cash receipts are somewhat

5  invariable.

6    Unfortunately, the disbursement are very fixed and

7  have to go at a particular time.  So we owe 90 plus million on

8  an interim basis.  There's over $100 million coming up in the

9  next few weeks on what we call NEMT or the transportation

10  costs.

11    Those costs by the way are not just Uber, and Lyft,

12  and big companies.  It's an individual driving their loved one

13  to go get care who needs a mileage reimbursement to go through

14  Medicare and Medicaid.

15    You have payroll, which putting aside corporate, or

16  call centers, you have people, 14,000 people, in peoples' homes

17  annually.  And 34 million trips a year that this company does.

18    And furthermore, if you look at the budget, we need

19  at least comfortably, right, so we don't — we not running kind

20  of at the redline, $70 million to run this business.  The

21  reality is if we're doing a full blown restructuring, the

22  company should feel comfortable to run its business —

23    **(Pause in the proceeding.)**

24    **MR. KILDONAS:**  — in — in a way that's responsible

25  and be focused on its core business plan, which is technology

1   innovation, take health care where it's supposed to go, and

2   where it is going, frankly, that we all see, home and

3   virtually.

4          So, from our perspective, this DIP is very necessary.

5   It's ——

6       **(Pause in the proceeding.)**

7          **MR. KILDONAS:**  It's needed immediately for liquidity.

8   The company conducted a market test.  There are no other

9   alternatives here.  Nobody's proposed anything executable.

10  There are protections for all secured lenders in the form of

11  adequate protection for first and second liens.

12         The DIP provides for a consensual resolution through

13  the RSA.  It provides for a —— for a clear path to exit without

14  contingencies.  And the parties negotiated absolutely very

15  strongly and quickly, and in good faith, frankly, between each

16  other.

17         So in our view, this DIP is in the best interest of

18  the company.  And it should be approved consistent with the

19  proposed DIP order attached at Docket Number 48.

20         Let me stop there, your Honor.  But that's the

21  conclusion of my presentation.

22         **THE COURT:**  All right.  Thank you.  Mr. Hansen, Miss

23  Whitworth, wish to be heard?

24      **(Pause in the proceeding.)**

25         **MR. HANSEN:**  No, your Honor.  Everything —— I would

31

1   just say that, again, it's Chris Hansen with Paul Hastings.

2         Your Honor, everything that Mr. Klidonas said is

3   accurate.  We worked really hard and in good faith to get this

4   in front of the Court to insure the soft landing in the exit.

5   And we also ask that the order be entered.

6         **(Pause in the proceeding.)**

7         **THE COURT:**  Miss ——

8         **MS. WHITWORTH:**  Jana Whitworth for the U.S. Trustee.

9   Thank you, Judge.

10        We have no comments.  We worked with the Debtor's

11  counsel to provide with challenges to protect the —— the

12  Committee and —— and other stakeholders.  And we appreciate

13  their cooperation.

14        **(Pause in the proceeding.)**

15        **THE COURT:**  All right.

16        **(Pause in the proceeding.)**

17        **THE COURT:**  So in terms of a final hearing, I think

18  in speaking to chambers there were two dates.  And one of the

19  dates didn't work.  So the 16th of September at 9:00 a.m.

20  and ——

21        **(Pause in the proceeding.)**

22        **THE COURT:**  —— unfortunately, it's going to have to

23  be a virtual hearing, cause that's the week of NCBJ and as a

24  baby Judge I got invited to go.  So, I'll be traveling.

25        **(Pause in the proceeding.)**

1          **THE COURT:**  So —— so, and then we'll set back the

2    objection deadline the week before that.  So September 9th.

3          **(Pause in the proceeding.)**

4          **MR. SCHROCK:**  Perfect.

5          **THE COURT:**  The only —— the only question I had

6    and —— and I —— I don't have any problem with this form of

7    interim order.  And I know that in —— and there was a

8    subsequent —— you know, there was the order filed at 48.  I

9    don't —— I didn't have a chance to compare it to the one that

10   was filed at Docket Number 4.  And I haven't seen a redline.

11         The only —— the only question I had, and I've read

12   the provision in paragraph 15(b), which is the exercise of

13   remedies.  And generally speaking, I don't have an issue with

14   upon notice the secured party, you know, accelerating, stopping

15   funding, doing all of those things.

16         But generally before the stay lifts, I —— I —— I want

17   to convene an —— an emergency, you know, an emergency hearing.

18   The way this order —— the way I read paragraph 15(b), in

19   essence, it's kind of a little hybrid where —— where they ——

20   where they can exercise rights.  But if there's a —— there's

21   a —— a hearing called and the exercise of rights is —— is

22   suspended pending the hearing.

23         So in —— in terms of this order, I don't —— I'm going

24   to go ahead and sign the proposed form of order.  But with

25   respect to the final order, I really would like to see kind of

1   a more traditional, you know, they could — they — if there's

2   a default, they can call the loan do default interest —

3       **(Pause in the proceeding.)**

4       **THE COURT:**  — accelerate no more funding, et cetera.

5   But if they're going to —

6       **MR. SCHROCK:**  Yeah.

7       **THE COURT:**  — exercise remedies that, you know,

8   they — we need to come back to court to have a hearing on

9   that.  And we can do that on 24 hours' notice.

10      So anyone else wish to be heard?  Mr. Dutton?

11      **(Pause in the proceeding.)**

12      **(No response.)**

13      **THE COURT:**  If you want to speak, hit five star one

14  time, sir.

15      **(Pause in the proceeding.)**

16      **THE COURT:**  All right.  You had — you had the — the

17  objection deadline September 10th.  That's fine.

18      **(Pause in the proceeding.)**

19      **THE COURT:**  All right.

20      **(Pause in the proceeding.)**

21      **THE COURT:**  All right.  That order has been signed

22  and sent to docketing.

23      **MR. KLIDONAS:**  Thank you, your Honor.  I really

24  appreciate it.

25      **(Pause in the proceeding.)**

1      **MR. KLIDONAS:**  For the next steps, I'd like to turn

2 it to over to Hunton, Andrews and Kurth.  Catherine Rankin will

3 take the next item on the agenda.

4      **(Pause in the proceeding.)**

5      **THE COURT:**  Good —— good morning, Miss Rankin ——

6 afternoon.

7      **MS. RANKIN:**  Good afternoon, your Honor.  For the

8 record, Catherine Rankin of Hunton Andrews Kurth proposed co-

9 counsel for the Debtors.  Pleased to be before you today.

10      **(Pause in the proceeding.)**

11      **MS. RANKIN:**  I'll be presenting the creditor matrix

12 motion, which is Agenda Item Four, filed at Docket Number 20.

13      **(Pause in the proceeding.)**

14      **MS. RANKIN:**  Your Honor, by this motion, the Debtors

15 seek entry of an order granting the following four primary

16 forms of relief authorizing the Debtors to file a consolidated

17 creditor matrix and a consolidated list of top 30 unsecured

18 creditors, waiving the requirement to file a list of equity

19 security holders, and to provide direct notice, authorizing the

20 Debtors to redact certainly personally-identifiable information

21 from the documents filed in these cases, and approving the form

22 and manner of the Notice of Commencement.

23      First, as it pertains to the top 30 list, and

24 consistent with complex case procedures, the Debtors are

25 seeking authority to file a consolidated top list of unsecured

35

1    creditors as well as a consolidated creditor matrix.

2         There are 71 Debtors in these jointly-administered

3    cases.  And a consolidated creditor matrix and a top 30 list

4    will promote considerable efficiency and reduce administrative

5    burden.

6         **(Pause in the proceeding.)**

7         **MS. RANKIN:**  Moving next to the relief regarding

8    equity security holders, your Honor.

9         **(Pause in the proceeding.)**

10        **MS. RANKIN:**  The Debtor, MotivCare, Inc. is a

11   publicly-traded company.  The Debtors do not maintain a list of

12   the beneficial holders of their stock.  And have no feasible

13   way to determine the identities of the overwhelming majority of

14   such holders.

15        **(Pause in the proceeding.)**

16        **MS. RANKIN:**  As such, requiring the Debtors to file a

17   notice of equity security holders would be rather burdensome

18   and impractical.  Likewise, direct notice to equity security

19   holders would also be burdensome.

20        However, the Debtors either already are, or plan on

21   taking, several steps to provide notice to the case —— of the

22   case to equity holders, including issuing a press release and

23   filing an 8-K with the SEC, establishing a case website

24   maintained by Verda (phonetic), providing notice to registered

25   holders of the stock, who can then provide notice to beneficial

1    holders, as well as publishing notice of the filing in the New

2    York Times.

3         Under the circumstances, we believe these steps will

4    provide adequate notice to equity security holders without

5    imposing undue burdens on the Debtor's estates.

6         Moving next to the redaction portion of the motion,

7    the Debtors, sorry, excuse me, the Debtors creditor matrix and

8    schedules include actual persons who would be listed by name,

9    along with their addresses and other personally identifiable

10   information.

11        Unfortunately, I'm sure as your Honor is well aware,

12   there are a number of bad actors out there who might use this

13   information to harm such individuals.

14        **(Pause in the proceeding.)**

15        **MS. RANKIN:**  The Debtors also operate in

16   jurisdictions with data privacy laws that may prohibit the

17   disclosure of this personal information of individuals.

18        **(Pause in the proceeding.)**

19        **MS. RANKIN:**  And these laws carry steep penalties

20   most oftentimes.

21        Accordingly, the Debtors believe redacting such

22   personal information is appropriate.

23        **(Pause in the proceeding.)**

24        **MS. RANKIN:**  Last, the Debtors are asking the Court

25   to approve the form and manner of form of the notice of

1   commencement that will be mailed to the full consolidated

2   creditor matrix, giving notice of the filing of these cases.

3            The form of notice is attached as an Exhibit A to the

4   proposed order, provides all of the relevant information ——

5        **(Pause in the proceeding.)**

6        **MS. RANKIN:**  —— that creditors and other parties in

7   interest would need regarding the filing of these cases,

8   including the scheduling of the initial meeting of creditors,

9   which is scheduled for September 22nd at 10:30 a.m. central.

10       **(Pause in the proceeding.)**

11       **MS. RANKIN:**  In sum, your Honor, the Debtors believe

12  the requests —— the relief requested is appropriate in this

13  case and is in the best interest of the Debtors, their estates,

14  and all parties in interest.

15           It balances providing notice to creditors and parties

16  in interest, while alleviating the Debtors of administrative

17  burdens and associated costs, as well as protecting

18  individuals' information.

19       **(Pause in the proceeding.)**

20       **MS. RANKIN:**  Prior to filing, we did share a copy of

21  this motion with the United States Trustee and we understand

22  they have no objection for the ruling requested.

23           Unless your Honor has any questions, we respectfully

24  request that you grant the motion and enter the proposed order

25  at Docket Number 20-1.

38

1          **THE COURT:**  All right.  Anyone else wish to be heard

2    with respect to the creditor matrix order?  Miss Whitworth?

3          **(Pause in the proceeding.)**

4          **MS. WHITWORTH:**  No —— no comments, Judge.  We ——

5    we —— everything we requested is incorporated.  Thank you.

6          **THE COURT:**  All right.  So I did have an opportunity

7    to review the form of order.  And I think the relief requested

8    is appropriate under the circumstances.  And —— and it's a

9    reasonable exercise of the Debtor's business judgment.

10         So I'm going to go ahead and approve this motion.

11   And so I've signed it.  And ——

12         **(Pause in the proceeding.)**

13         **THE COURT:**  —— it has been sent to docketing.

14         **(Pause in the proceeding.)**

15         **THE COURT:**  All right.

16         **MS. RANKIN:**  Thank you very much.

17         **THE COURT:**  All right.  Thank you.

18         **(Pause in the proceeding.)**

19         **MS. RANKIN:**  That concludes my portion of today's

20   hearing.  And I will now cede the virtual podium to Miss

21   Vunnamadala.

22         **THE COURT:**  Good morning.

23         **MS. VUNNAMADALA:**  Good afternoon.

24         **THE COURT:**  Good afternoon.

25         **MS. VUNNAMADALA:**  Good afternoon, your Honor.

1      **THE COURT:**  Good afternoon.

2           Meghana Vunnamadala of Latham and Watkins on behalf

3  of the Debtors.  I will be presenting the next couple of

4  motions.

5           I would like to proceed to the schedules extension

6  motion filed at Docket Number 18 and is Agenda Item Number 5.

7           Your Honor, the Debtors request entry of an order

8  extending the deadline by while the Debtors must file their

9  schedules and statements and 2015.3 reports to Wednesday,

10  September 17th, which if 14 additional days past the deadline

11  for a total of 28 days past the petition date.

12           Given the size and complexity of the Debtor's

13  business and financial affairs, and the critical matters that

14  the Debtor's management and professionals were required to

15  address prior to the commencement of the Chapter 11 cases, the

16  Debtor's primary focus has been preparing for these cases to

17  insure a smooth transition into Chapter 11.

18           The additional time requested will allow the Debtors

19  to properly prepare the required reporting.  And our goal will

20  be to file these schedules and statements as soon as possible.

21           Unless your Honor has any further questions, we would

22  respectfully ask the Court to enter the proposed order.

23      **THE COURT:**  Miss Whitworth?

24      **(Pause in the proceeding.)**

25      **MS. WHITWORTH:**  No objection, Judge.  This is a very

40

1    complicated case.

2            **THE COURT:**  Yeah.

3            **MS. WHITWORTH:**  And September 17th is more than

4    reasonable we believe ——

5            **THE COURT:**  Yes.

6            **MS. WHITWORTH:**  —— for the Debtors to get accurate

7    schedules on file.

8            **THE COURT:**  Absolutely.

9            **MS. WHITWORTH:**  Thank you, Judge.

10           **THE COURT:**  So —— so I've reviewed the order.  And

11   I'm going to go ahead and approve it.

12           Obviously, I think, you know, 14 days is probably not

13   enough.  So —— but —— but —— it —— my —— my concern is really

14   going to be on the bar date motion that that's a big —— that's

15   a much bigger concern for me.

16           So I'm going to go ahead and approve this.  But

17   you've now set up a situation where statements and schedules

18   are likely not going to be filed until actually the 17th.  You

19   have 71 different schedules.  And then you have the bar date on

20   the 22nd.

21           So, 23rd?  Okay.

22       **(Pause in the proceeding.)**

23           **THE COURT:**  I'm sorry, Miss ——

24           **MS. VUNNAMADALA:**  Twenty-second.

25           **THE COURT:**  Miss Whitworth?

41

1          **MS. WHITWORTH:**  I — I'm sorry, Judge.  I was just —

2   I was just participating as, I think, there will be three

3   business days to respond.

4          **THE COURT:**  Right.  Right.

5          **MS. WHITWORTH:**  From the date that the schedules —

6          **THE COURT:**  And as a practical matter —

7          **MS. WHITWORTH:**  — go out and —

8          **THE COURT:**  — it's not really three business days.

9   It's really one business day.

10          **MS. WHITWORTH:**  Exactly.

11          **THE COURT:**  So — so, I'm — I am concerned about

12   that.

13          And then the other question I'm going to have is are

14   you going to notice your 24,000 existing employees and

15   hundreds, if not thousands, of employees?  So are you basically

16   anybody who you cut a check to in the last two years, are they

17   going to be subject to the bar date?  Or are — are the

18   employees riding through?  And — but let me just enter this

19   order first.

20          **(Pause in the proceeding.)**

21          **THE COURT:**  So I've entered this SOFA (phonetic)

22   extension order and sent it to docketing.

23          **MS. VUNNAMADALA:**  Thank you, your Honor.

24          Next, as you — as you previewed, we would like to

25   proceed to the bar date motion filed at Docket Number 19 and is

42

1   Agenda Item Number 6.

2           Your Honor, the Debtors request entry of an order

3   establishing the bar date as Monday, September 22nd as you

4   noted.  We have a milestone for entry of the DS order, which is

5   45 days after the petition date.  This date falls on a

6   Saturday, October 4th, so the milestone will be Monday, October

7   6th.

8           The Debtors would like to have sufficient time after

9   September 22nd bar date to adequately understand the claims

10  landscape and draft a comprehensive and accurate disclosure

11  statement prior to the milestone.

12      **(Pause in the proceeding.)**

13          **MS. VUNNAMADALA:**  We understand you have some

14  concerns.  And so, we're open to considering potentially moving

15  the bar date to Friday, September 26th.

16      **(Pause in the proceeding.)**

17          **MS. VUNNAMADALA:**  And we will be noticing all known

18  creditors.

19          **THE COURT:**  By when?

20          **MS. VUNNAMADALA:**  Including ——

21          **THE COURT:**  By Monday?

22      **(Pause in the proceeding.)**

23          **MS. VUNNAMADALA:**  Five business days from today.

24          **THE COURT:**  So —— so let's —— let's look at the

25  calendar.

43

1          So five business days from today is that means it

2    goes out on the 28th.

3              **MS. VUNNAMADALA:**  Yes.

4          **THE COURT:**  And so likely people aren't going to

5    receive it until the 2nd or 3rd?

6      **(Pause in the proceeding.)**

7          **THE COURT:**  And then —— so they would have basically

8    three and a half weeks?  I —— I think we need —— and are you

9    going to notice the employees or not?

10             **MS. VUNNAMADALA:**  Yes.

11         **THE COURT:**  You're going to notice all ——

12             **MS. VUNNAMADALA:**  We will be.

13         **THE COURT:**  —— all employees.  Current employees plus

14   all —— any —— basically anybody who you've done business with

15   during the past two years?

16             **MS. VUNNAMADALA:**  That's correct.  Yes.

17         **THE COURT:**  All right.

18         I think we —— I think —— so —— and then there's a

19   provision in the —— in the —— in the order that talks about

20   the ——

21     **(Pause in the proceeding.)**

22         **THE COURT:**  —— the fact that they —— they don't have

23   a file it it's in the statements and schedules.

24     **(Pause in the proceeding.)**

25         **THE COURT:**  Is that going to be really realistic for

1  people to be able to see the statements and schedules?

2      **(Pause in the proceeding.)**

3          **MS. VUNNAMADALA:**  Your Honor, would you mind

4  repeating that question?

5          **THE COURT:**  Yes.  So, the —— your bar date order is

6  written just like any other bar date order which says if —— if

7  you are listed in the statements and schedules as not disputed,

8  contingent, or liquidated, you don't have to file a proof of

9  claim.

10         The way it was proposed it was basically be one or

11  two business days.  Now it's going to be probably five business

12  days.

13     **(Pause in the proceeding.)**

14         **THE COURT:**  So, is that —— is ——

15     **(Pause in the proceeding.)**

16         **THE COURT:**  And —— and so, my question is, you know,

17  it seems to me that if you're going to notice all —— all your

18  employees and all former employees, that they're really not

19  going to be able to see whether they're listed or not.

20         Are —— is —— as opposed to —— right?  I mean, cause

21  it seems to me, I mean, the way I understand your —— your

22  employee wage motion, pretty much everybody's riding through.

23         So I —— I don't know exactly what —— what the

24  proposal is.

25     **(Pause in the proceeding.)**

1      **MS. VUNNAMADALA:**  Would it be possible to take a

2  minute to discuss?

3      **THE COURT:**  Sure.  Sure.  We could —— I'm —— I don't

4  have a problem doing an early bar date.  I just want to make

5  sure that people are getting real notice and have an

6  opportunity to see whether they —— they have notice.

7      So —— and I understand the fact that you have a —— a

8  milestone for October 4th for the disclosure statement.  But,

9  again, you know, oftentimes disclosure statements get changed.

10      So I just want to make sure that the way it's set up,

11  you know, logistically works.  And do you really need five days

12  to —— to get out the —— the —— the package.

13      And then —— and then the issue is by including the

14  employees you basically added maybe, you know, 25 or 30,000

15  additional packets of information.  And then how would people

16  know that they can —— that they should go to the claims agent

17  website to see whether they're listed.  What, I mean, are you

18  going to provide individualized proofs of claim, or are you

19  going to just provide a form of proof of claim.

20      I mean, those are all questions that I had.  So we

21  can —— we can come back to this.  It's —— it's just —— it ——

22  it —— I'm not concerned about having an early bar date.  I'm ——

23  what I'm concerned about is making sure that it works and we

24  get appropriate notice.

25      **(Pause in the proceeding.)**

46

1          **MS. VUNNAMADALA:**  Your Honor, would it — would it

2    quell some of your concerns if we push the bar date to October

3    1st?

4          **THE COURT:**  I mean, I think — I think that would —

5    that would help a lot.  Because if you get it out by the 28th,

6    and it comes back October 1st, I think that — that in my mind,

7    you know, that's one two, three.

8        **(Pause in the proceeding.)**

9          **THE COURT:**  Yeah.  That — that —

10          **MS. VUNNAMADALA:**  I believe so.

11        **(Pause in the proceeding.)**

12          **MS. VUNNAMADALA:**  Sorry.

13        **(Pause in the proceeding.)**

14          **THE COURT:**  Yeah.  That — that's four and a half

15    week.  I think that would make it — make me feel a lot better.

16          **MS. VUNNAMADALA:**  Okay.  Great.

17          **THE COURT:**  Miss — Miss Whitworth, are you okay with

18    that?

19        **(Pause in the proceeding.)**

20          **THE COURT:**  It's basically 4 ½ weeks.

21          **MS. WHITWORTH:**  So just so I'm clear —

22          **THE COURT:**  — after the service.

23          **MS. WHITWORTH:**  The bar date — okay.  So the bar

24    date is going to be October 2nd; is that correct?

25          **THE COURT:**  First.  First.

47

1          **MS. WHITWORTH:**  Oh, so that's October 1st?

2          **THE COURT:**  Yeah.

3          **MS. WHITWORTH:**  And then the packages of the —— the

4    motion of bar date package is going to be distributed ——

5          **THE COURT:**  The 28th.

6          **MS. WHITWORTH:**  —— no later than ——

7          **THE COURT:**  The 28th.

8          **MS. WHITWORTH:**  August 28th.  Okay.

9          Those dates —— those dates, while my client is

10   probably not going to be super happy, I think I'll be able to

11   keep my job.  So, yes, Judge.  That's fine.

12         **THE COURT:**  And —— and we certainly want that.

13      **(Pause in the proceeding.)**

14         **THE COURT:**  No.  That —— that —— that makes me feel a

15   lot better.  Because I think —— I think, you know, you're

16   providing, basically, four weeks' notice, which is appropriate

17   under these circumstances.  Especially when you have, you know,

18   such, I mean, you're going to probably be sending out 35,000

19   packages.  So it's going to be quite bit.

20         All right.  So you want to just do a revised form of

21   order to include those.  And I'll —— I'll sign it.

22         All right.  So ——

23         **MS. VUNNAMADALA:**  Yes.

24         **THE COURT:**  —— so based —— based on the changes to

25   the bar date motion, I'll go ahead and approve it.

1          **MS. VUNNAMADALA:**  Great.  Thank you, your Honor.  I

2  will now turn the podium over to our colleagues at Hunton,

3  Brandon Bell.

4          Thank you.

5          **MR. BELL:**  Good afternoon, your Honor.

6          **THE COURT:**  Good afternoon.

7          **MR. BELL:**  For the record, Brandon Bell, Hunton —— of

8  Hunton Andrews Kurth, proposed co-counsel of the Debtors.

9          So Item Number 7 on our agenda, the Debtor's NOL

10  (phonetic) motion filed at Docket Number 5.

11          By this motion, your Honor, we seek to establish

12  procedures to protect the value of certain fact attributes of

13  the Debtors under federal and state law.  Those include the

14  carry forward of disallowed business interest expenses and

15  certain statement operating losses.

16          As your Honor's aware, these cash attributes are

17  valuable estate assets.  And, in fact, the Debtors estimates

18  the value of their business interest expenses as of the end of

19  last year of $293 million.

20          Those assets could, however, your Honor, be greatly

21  diminished or lost entirely as certain trading activities occur

22  during the pendency of these cases.

23          With that in mind, the motion seeks to establish

24  procedures that shareholders who meet the relevant ownership

25  threshold, and threshold, your Honor, is 4 ½ percent of

1   MotivCare, Inc.'s common stock would have to comply with prior

2   to taking certain actions, including the acquisition or

3   disposition of certain common stock or asset prior to claiming

4   a worthless stock deduction.

5        Prior to filing this motion, your Honor, we did share

6   a copy of that with Miss Whitworth.  As I understand it, the

7   U.S. Trustee's office does not have an objection.  I also note,

8   prior to filing the motion, we did provide copies to the

9   Debtor's largest shareholders, that is, Colosseum Capital

10  Management, LLC.  Provided it to their counsel, Light and Case.

11  And AI Catalyst Fund, LP, through their counsel Olshan Frome

12  and Wolosky, as evidenced on the certificate of service at

13  Docket Number 44.  The motion was also served on the remainder

14  of the Debtor's equity holders.

15       We believe that the proposed order and the procedures

16  and the procedures that we seek to approve here are consistent

17  with those regularly sought and approved in similarly-sized

18  cases in this district.

19       And unless your Honor has any questions, we'd

20  respectfully request that you grant the motion and enter the

21  proposed order at Docket Number 5-1.

22       **THE COURT:**  All right.  Any comments with respect to

23  the NOL motion?

24     **(No response.)**

25       **THE COURT:**  All right.  Hearing not comments, I've

50

1   reviewed the motion.  I think under prudential lines, the

2   Debtor's tax attributes are property of the estate.  And I

3   think it's appropriate to set up a procedures in order to

4   protect, you know, very valuable potential assets of the

5   estate, especially in connection with a reorganization.  And

6   there's likely —— and there's a billion dollars being written

7   off, there's likely going to be some forgiveness of debt

8   implications.  And this would be at least a way to —— to

9   address some of those issues.

10          So I will go ahead and ——

11      **(Pause in the proceeding.)**

12          **THE COURT:**  All right.  I have signed and sent to

13   docketing the NOL order.

14          **MR. BELL:**  Thank you very much, your Honor.

15          I will cede the podium, to Mr. Herskowitz who will be

16   covering the utility motion and insurance motion.

17          **THE COURT:**  All right.

18          **MR. BELL:**  Thank you.

19          **THE COURT:**  Thank you.

20      **(Pause in the proceeding.)**

21          **MR. HERSKOWITZ:**  Good afternoon, your Honor.  Brian

22   Herskowitz of Latham and Watkins, proposed counsel to the

23   Debtors.

24          The next item on the agent, your Honor, is the

25   Debtor's utilities motion, which is Agenda Item Number 8,

51

1    Docket Number 8.

2            Your Honor, the utilities motion requests approval of

3    standard adequate assurance procedures for utility providers.

4    We propose to deposit around $157,000 in adequate assurance

5    accounts for the benefit of utility provides, and to establish

6    procedures of the utility provider only if a greater deposit is

7    needed.

8            I the meantime, utility providers would be —— would

9    be prohibited from discontinuing service.  And the Debtor's

10   intend to continue paying utility providers for bills incurred

11   during the case.

12           The deposit equals approximately 50 percent of the

13   Debtor's monthly utility spend, less amounts already held by

14   utility providers in the form of security deposits.

15           The Debtors shared the motion and proposed order with

16   the Office of the United States Trustee.  And we believe that

17   the United States Trustee has signed off.

18           Unless your Honor has any questions, we would ask

19   that the relief sought in the motion would be granted.  And the

20   proposed order at Docket Number 8-1 be entered.

21       **(Pause in the proceeding.)**

22       **THE COURT:**  All right.  Anyone else wish to be heard

23   on the utilities order?

24       **(No response.)**

25       **THE COURT:**  All right.  Under 366, I —— I think it's

52

1    appropriate to enter a —— a procedures order to allow the

2    Debtors to implement the —— the provisions of Section 366.

3           So, to the extent anyone objects, we're going to use

4    the second day hearing, which is within the 30 days, to address

5    any requests for additional adequate assurance.  So, I will go

6    ahead and enter the order.

7           **(Pause in the proceeding.)**

8           **MR. HERSKOWITZ:**  Thank you, your Honor.

9           The next item on the agenda is the Debtor's insurance

10   motion, which is Agenda Item Number 9, Docket Number 7.

11          By this motion, the Debtors seek authorization to

12   maintain their insurance programs, bonding programs, and

13   letters of credit in the ordinary course, and pay any pre-

14   petition obligations thereunder.

15          The Debtors maintain 36 insurance policies that are

16   administered by 16 insurers, each of which is described in the

17   motion and listed in Exhibits —— Exhibit A of the proposed

18   order.

19          The Debtors believe they owe approximately $285,000

20   on account of premium obligations associated with the insurance

21   policies, and $80,000 on account of the deductibles or self-

22   insured retentions.

23          Additionally, the Debtors pay certain brokers and

24   claims administration fees in connection with the insurance

25   policies in the ordinary course.  Certain of the insurance

53

1   policies, and the Debtor's customers, require the Debtors to

2   issue letters of credit as well.

3          The Debtors have 13 outstanding letters of credit

4   totaling approximately $55.6 million in the aggregate.

5          Your Honor, in order for the Debtors to continue

6   operating their business during the pendency of these cases,

7   they must be able to provide financial assurance to certain of

8   the insurers and certain of their customers.  And that requires

9   the Debtors to maintain these letters of credit.

10          The Debtors are also required by customer contracts

11   with state agencies and managed care organizations to maintain

12   surety bonds.  A detailed list of those surety bonds is

13   attached to the proposed order at Exhibit C.

14          The Debtors have 27 outstanding surety bonds totaling

15   approximately $76.7 million.  And have provided sureties with

16   cash collateral of around 44 million.

17          Your Honor, absent the relief requested here — in

18   the motion with respect to the bonding program, the Debtors may

19   not be able to win new business and may lose current customers

20   who requires the Debtors to maintain these surety bonds.

21          The U.S. Trustee also received this motion.  And we

22   believe the proposed order is acceptable to the U.S. Trustee.

23          With all that said, unless your Honor has any

24   questions, the Debtors would request that the Court enter the

25   proposed order.

54

1          **THE COURT:**  All right.  Thank you.  Miss —— Miss

2   Whitworth?

3          **MS. WHITWORTH:**  Your Honor, can't think of a business

4   that needs coverage more than the type of services these folks

5   provide.  And U.S. Trustee is satisfied with the —— the form of

6   order and the information contained therein and does not oppose

7   entry.

8          **THE COURT:**  All right.

9          So I've reviewed the —— I've reviewed the form of

10  order.  Obviously, this is a —— a business that needs —— needs

11  insurance.  It's a proper exercise of their business judgment,

12  as well as a requirement of not only I'm sure various of the

13  state agencies, but the U.S. Trustee requirement.

14         So, I'm going to go ahead and approve the order.  So

15  just give me a minute.

16      **(Pause in the proceeding.)**

17         **THE COURT:**  All right.  That's been granted.  And

18  it's been entered and sent to docketing.

19      **(Pause in the proceeding.)**

20         **MR. HERSKOWITZ:**  Thank you, your Honor.

21         Well, with that, I will pass the virtual podium to my

22  colleague, Miss Licari.

23      **(Pause in the proceeding.)**

24         **MS. LICARI:**  Good afternoon, your Honor.

25         **THE COURT:**  Good afternoon.

1    **(Pause in the proceeding.)**

2        **MS. LICARI:**  For the record, Montana Licari, from

3    Latham and Watkins, proposed counsel to the Debtors.  I'll be

4    covering Agenda Items 10 and 11, the Debtor's taxes and cash

5    management motions.

6        Your Honor, the tenth item on the agenda is the taxes

7    motion, which is located at Docket Number 15.  Pursuant to this

8    motion, the Debtors are seeking authority to pay certain pre-

9    petition taxes and fees, including those to their tax

10   processors and auditors, and continue to pay those in the

11   ordinary course.

12       The Debtors are also seeking authority to satisfy

13   obligations related to audits and assessments, and authority

14   for financial institutions to process and honor checks and

15   transfers.

16       The taxes and fees here fall into five categories,

17   including sales and use, property taxes, income, franchise, and

18   gross receipts taxes, amounts owing on account of regulatory

19   assessments and licensing fees, and audit assessments.

20       As of the petition date, the Debtors estimate that

21   approximately $930,000 in taxes and fees have accrued and will

22   become due and owing in the post-petition period.

23       We've attached a list of the Debtor's taxing and

24   regulatory authorities as Exhibit A.

25       **(Pause in the proceeding.)**

1      **MS. LICARI:**  Your Honor, the Debtors submit that it

2  goes without saying that the payment of taxes and fees are in

3  the best interest of the Debtors and their estates.  If the

4  Debtors are unable to pay their taxes in a timely manner, their

5  operations could be materially disrupted and there may be

6  liability for directors and officers.

7      The Debtors submit that the relief requested are

8  necessary to avoid immediate and irreparable harm, and that

9  it's a proper exercise of the Debtor's business judgment to

10  keep their taxes current and pay those taxes as they come due.

11      The Debtor's previewed this motion with the U.S.

12  Trustee and counsel to the DIP lenders, and their comments have

13  been incorporated.

14      Unless your Honor has any questions, the Debtors

15  request that the Court enter the proposed order at Docket 15-1.

16      **(Pause in the proceeding.)**

17      **THE COURT:**  All right.  Any — any comments with

18  respect to the taxes motion, Miss Whitworth?

19      **(Pause in the proceeding.)**

20      **MS. WHITWORTH:**  Jenna Whitworth for the U.S. Trustee,

21  your Honor.  No.  No comments.

22      **THE COURT:**  All right.

23      So I've reviewed the taxes motion.  Obviously, this

24  is not only a necessity but a prudent and — and requirement of

25  law.  So I'm going to go ahead and approve the order.  So give

57

1    me a minute.

2         **(Pause in the proceeding.)**

3         **THE COURT:**  All right.  That's been signed and sent

4    to docketing.

5         **(Pause in the proceeding.)**

6         **MS. LICARI:**  Thank you, your Honor.

7         The next and 11th item on the agenda is the cash

8    management motion, which is located at Docket Number 16.

9         **THE COURT:**  Okay.

10        **MS. LICARI:**  Your Honor, through this motion, the

11   Debtors are seeking authority to continue operating their

12   existing cash management system and business forms, continue

13   honoring the inter-company transactions and provide

14   administrative expense priority to the claims, to honor and pay

15   the cash management systems fees, continue using the corporate

16   card programs, and —— and any pre-petition amounts that are

17   owning.  And lastly, to direct the financial institutions to

18   continue service and administration of those accounts.

19        The Debtors are also requesting a conditional 45-day

20   waiver for certain requirements under Section 345 of the

21   Bankruptcy Code and the U.S. Trustee guidelines.

22        As a high level overview for your Honor, the Debtors

23   maintain a sophisticated cash management system that includes

24   116 accounts.  The majority of those accounts are with Wells

25   Fargo, which is an authorized depository.  And the remainder of

58

1    the accounts are either authorized depositories or top

2    financial institutions that are insured by the FDIC.

3            **THE COURT:**  Okay.

4        **(Pause in the proceeding.)**

5            **MS. LICARI:**  The cash —— the cash schematic is

6    attached to the motion as Exhibit A.  I won't go into too much

7    detail about the schematic or the flow of funds, given its

8    complexity.  But I do want to note that the accounts are

9    largely divided as between the main segments of the business;

10   personal care services, corporate, remote patient monitoring,

11   and non-emergency medical transportation, with separate flows

12   for collateral accounts and DIP proceeds and insurance.

13           Generally, there are two main concentration accounts

14   for operations, which disburse funds to vendors, and for

15   payroll, and for payments to the non-Debtor affiliates.

16           I do want to note for your Honor that the Debtors

17   engage in business transactions with each —— with each other

18   and with certain non-Debtor subsidiaries and affiliates to fund

19   and support the enterprise's operations as a whole.

20           Those transactions are essential to the Debtor's

21   operations and their ability to process payroll, process

22   payments to vendors, and provide management and support

23   services.

24       **(Pause in the proceeding.)**

25           **MS. LICARI:**  The efficient —— efficient and

1    economical operation of the Debtor's business requires that the

2    cash management system continue.  And we think that the relief

3    sought herein is an appropriate exercise of the Debtor's

4    business judgment.

5           As with the taxes and other motions presented, we

6    shared a draft with the U.S. Trustee and the counsel to the DIP

7    lenders.  And we believe the parties are aligned with the

8    proposed order as docketed.

9           **THE COURT:**  All right.  Miss Whitworth.

10          **MS. LICARI:**  Unless your Honor has ——

11          **THE COURT:**  Okay.  Go ahead.  Sorry.

12          **MS. LICARI:**  Pardon me.

13          **THE COURT:**  No.  Go ahead.

14          **MS. LICARI:**  Unless your Honor has any questions, we

15   respectfully request entry of the interim order at Docket

16   Number 45.

17          **THE COURT:**  Miss Whitworth?

18          **MS. WHITWORTH:**  Your Honor.  Yes, your Honor.  Jana

19   Whitworth for the —— for the record.

20          Judge, just one quick clarification.  The order, the

21   proposed order, that —— that is before this Court, this —— this

22   Document 45 does not waive the new requirements.  What it does

23   is extend the deadline to comply.  I want to be clear on the

24   record that the U.S. Trustee does not waive any of the —— the

25   requirements.

1           And — and just as a reminder to the Court, you know,

2   the — the guidelines are set up to protect the — the amount

3   on deposit.  That's the requirement.  It's — it's to get

4   the — the funds into institutions that have — that have an

5   agreement that, with the U.S. Trustee's programs, that protects

6   the funds on deposit.

7           In the event the bank fails, God forbid, it, you

8   know, for — for years and years, that was never an issue until

9   I want to say spring of 2023.  And when — then when there were

10  a couple of banks that failed.

11          So that's — that's the point I'd like to make,

12  Judge, is that the — this order does not waive compliance.  It

13  merely extends the deadline by which the Debtors must bring

14  those accounts into compliance.  Thank you.

15          **THE COURT:**  Yeah.  And I think Paragraph 12, I — I

16  did review that.  I think Paragraph 12 just basically says, you

17  know, to the extent the accounts are not in compliance, they

18  have until October 2nd to bring them into compliance, subject

19  to, yeah.  So, I — I understand the distinction.

20          And — and the schematic was dizzying of — of the

21  cash management system.

22      **(Pause in the proceeding.)**

23          **THE COURT:**  So, I will, yeah.  So I've reviewed this.

24  Obviously, this is a very sophisticated cash management system.

25  And — and it, you know, because of the scope and breadth of

1  the —— of the operations and —— and the way that they go about

2  contracting, it —— it's necessary.  And having this flexibility

3  to come into compliance is —— is absolutely critical in order

4  to maintain the integrity of the cash management system.

5          So I'm going to go ahead and approve that.

6     **(Pause in the proceeding.)**

7          **THE COURT:**  All right.

8          I think that has already —— that's —— that's been

9  signed and sent to docketing.

10    **(Pause in the proceeding.)**

11         **MS. LICARI:**  Thank you, your Honor.  I'll now pass

12 the podium to my colleague, Mr. Woo Kee.

13    **(Pause in the proceeding.)**

14         **MR. WOO KEE:**  Good afternoon, your Honor.  Esteban

15 Woo Kee of Latham and Watkins, proposed counsel for the

16 Debtors.  I should note for the relevant licensing authorities

17 that I'm admitted to practice this law under the name —— in

18 this Court under the name Stephen Woo Kee.  But I do prefer to

19 be called Esteban.

20         The next item on our agenda is the customer programs

21 motion, which was filed at Docket Number 17.  May I proceed?

22         **THE COURT:**  Yes.  Absolutely.

23    **(Pause in the proceeding.)**

24         **MR. WOO KEE:**  The Debtors request entry of a final

25 order allowing them to maintain their customer programs in the

1   ordinary course of business and honor and pay certain pre-

2   petition obligations arising under those customer programs.

3          In total, the Debtors estimate that they have

4   approximately $11,400,000 in unpaid obligations owed as of the

5   petition date on account of these customer programs.

6          And these customer programs relate to two of the

7   Debtor's business segments, NEMT and —— and the corporate

8   segments.

9          So the non-emergency medical transportation segments

10   whereby the Debtors provide an average of 3 million rides per

11   month to people needing transportation for non-emergency

12   medical services.

13          The —— the payments for those services all come from

14   really two types of payers, which are managed care

15   organizations on the one hand and state Medicare and Medicaid

16   agencies on the other hand.

17          So they're paid for by insurance companies.  And

18   these payers make payments pursuant to various very

19   sophisticated contractual arrangements where they often pre-pay

20   the Debtors based on capitation contracts where the costs of

21   the Debtor's services are estimated every 6 to 12 months, and

22   then reconciled, requiring the issuance of refunds.

23          Even where these payers remit payments after services

24   are provided, so not in advance, refunds may be owed for over-

25   payments, which can occur because of duplicates, or other

1   miscalculations, invoice corrections made by the Debtors, or ——

2   or payments made by a NEMT payer where the recipients of the ——

3   of the ride has had their coverage terminated on their —— their

4   insurance coverage terminated.

5            So that —— that describes the refund category of

6   the —— of the customer programs that the —— that the Debtors

7   seek to honor.

8            Another important obligation of the Debtors owing to

9   these payers of the NEMT services are liquidated damages that

10  are owed under what are called service level agreements.  Where

11  in order to qualify for payments from these insurance

12  companies, the Debtors have to meet certain performance

13  standards, like call center metrics.

14           They have to —— they have to provide claims

15  processing deliverables that meet certain standards.  And ——

16  and they have to perform in various ways.  And if they fall

17  below these standards, the Debtors become liable for fixed

18  amounts of liquidated damages.  And —— and if they can't —— if

19  they aren't allowed to pay those amounts, then those service

20  level agreements would —— would terminate.  And that would

21  cause a major disruption with their ability to receive payments

22  from the payers.

23           As of the petition date, it's estimated that $380,000

24  is owed for liquidated damages.

25       **(Pause in the proceeding.)**

64

1           **MR. WOO KEE:**  Lastly, I mentioned that other

2   customer —— the last category of customer programs falls under

3   the HIGGY (phonetic) segment.

4           So this is a revenue share program whereby the

5   retailers who host the —— the Debtor's Higgy branded monitoring

6   stations.

7           So if you go to certain community health centers or

8   pharmacies, you may see a Hagger —— Higgy monitoring station

9   where you can get certain vital signs checked, you can see your

10  BMI if you're curious.  And, you know, kind of get a report of

11  that health data.

12          So certain of the parties that —— that host those

13  stations in their stores are entitled to receive a percentage

14  of advertising revenues based on ads that run in the —— on the

15  displays in the stations.  And —— and there's a modest amount

16  owed, like $30,000 as of the petition date.

17          Pursuant to Bankruptcy Code Section 362 —— 2(c), the

18  Debtors as Debtors-in-possession are authorized to transact in

19  the ordinary course of business.

20          And to the extent that honoring the pre-petition

21  obligations is considered an outside of the ordinary course

22  transaction, or an outside of the ordinary course use of

23  property of the estate, we believe this is also authorized

24  under Section 363(b).

25          **(Pause in the proceeding.)**

1      **MR. WOO KEE:**  This motion and the proposed order were

2  discussed with the United States Trustee and the proposed DIP

3  lender.  And all comments made by these parties have been

4  resolved.

5      If your Honor has no further questions, we would

6  kindly request entry of the proposed order.

7      **THE COURT:**  All right.  Any comments from the U.S.

8  Trustee, Miss Whitworth?

9      **(Pause in the proceeding.)**

10     **MS. WHITWORTH:**  No, Judge.  We just ask that the ——

11  the one change we asked for was in transparency in the form of

12  a report, it will be provided to our office and to the DIP

13  lender also and the Committee.

14     And that's —— that's plugged in at 17-1.  And so,

15  we're happy.

16     **(Pause in the proceeding.)**

17     **THE COURT:**  I've —— yeah.

18     **MR. WOO KEE:**  Your ——

19     **THE COURT:**  Yes, go ahead.

20     **MR. WOO KEE:**  With that, your Honor, that concludes

21  the presentation for the customer programs motion.  But I ——

22  sorry.  It seemed like the connection was breaking up a little

23  bit.  I don't know if you were going to say anything else

24  about ——

25     **THE COURT:**  No.  No.  I was just —— I was just —— I

1   was —— I was looking to make sure that —— that I have the

2   correct —— the correct order.

3            And so, I —— I have reviewed the order.  And I think

4   this is appropriate exercise of the Debtor's business judgement

5   and authorized under the —— the facts and circumstances under

6   Section 363.

7            So I am going to go ahead and sign the order.  So

8   just give me a minute.

9        **(Pause in the proceeding.)**

10       **THE COURT:**  All right.  So that's been signed and

11  sent to docketing.

12       **(Pause in the proceeding.)**

13       **MR. WOO KEE:**  Thank you.  Thank you, your Honor.

14           Next, I will proceed with Agenda Item Number 13, the

15  trade creditors motion.  And this motion was filed at —— this

16  motion was filed at Docket Number 6.  There was a slight tweak

17  to the proposed interim order just to clean up a change

18  regarding the —— the time of the next hearing.

19           And so the docket —— the —— the revised ——

20       **THE COURT:**  Forty-seven.

21       **MR. WOO KEE:**  That's right, 47.

22           So this motion requests entry of interim and final

23  orders that authorize the Debtors to make payments to certain

24  of their trade creditors, both for outstanding pre-petition

25  amounts and trade payables that become due in the ordinary

67

1    course of business.

2             To — to start with the highlight of this motion,

3    your Honor, the total amount that the Debtors asked this Court

4    to approve in an interim basis is significant at 99 million.

5             And this is based on an estimate of approximately

6    $103,560,000 that the Debtors think — that the Debtors

7    estimate is owed to their trade creditors as of the petition

8    date.

9        **(Pause in the proceeding.)**

10       **MR. WOO KEE:**  And the identity of the trade creditors

11   is very important to discuss.  The — the Debtors estimate that

12   approximately 91.6 million is owed to their transportation

13   vendors of this over $103 million amount.

14            And I'll discuss the transportation vendors at some

15   length.  The remaining 9 million is owed to categories of

16   vendors for whom relief is routinely sought and granted in

17   complex Chapter 11 cases like this one.

18            And those categories are foreign vendors, lien

19   holders, and entities who may be qualified to assert 503(b)(9)

20   claims.

21            So back to the transportation vendors.  These are the

22   drivers who are the lifeblood of the Debtor's largest business

23   segment, the NEMT business.

24            These drive — these drivers are — are not the

25   Debtor's employees.  But they're — they're people who provide

68

1   rides to elderly, sick, and disabled people who need to seek

2   medical and rehabilitative treatment.

3          And the drivers themselves fit into more or less

4   three categories.  You have individual drivers who use their

5   private vehicles and —— and obtain —— and identify people in

6   need of —— of rides on the mode of care platform.

7          And then we have Uber and Lyft drivers who are —— are

8   similar in that they also use their personal vehicles.  But

9   they find their mode of care ride recipients via relationships

10  with Uber and Lyft and their —— their user status under User

11  and Lyft —— under Uber and Lyft.

12         The last category, which Mr. Klidonas previewed in

13  the DIP motion, are the mileage reimbursement drivers who are

14  individuals who can use the mode of care platform to submit a

15  reimbursement for taking a family member to a —— a non-

16  emergency medical visit.

17         Timely payments to all of these categories of drivers

18  is essential because, among other things, the —— the —— these

19  drivers, other than the mileage reimbursement drivers, rely

20  on —— on payments from mode of care to support their

21  livelihoods.

22      **(Pause in the proceeding.)**

23      **MR. WOO KEE:**  But all three categories of drivers,

24  the individuals, the Uber and Lyft drivers, and the mileage

25  reimbursement drivers, fit into what the Debtors see as one

1   cohesive network of —— of the drivers who —— who form the

2   backbone of the NEMT business.

3            Failure to pay any subset of these drivers, or to

4   only pay drivers a portion of the amounts that they are fairly

5   entitled to as of the petition dates, would cause distrust

6   to —— to have ripple effects across this driver network.

7            And it may even cause distress among the Debtor's

8   other customers and vendors while —— while the Debtors attempt

9   to confirm a Chapter 11 plan.

10       **(Pause in the proceeding.)**

11       **MR. WOO KEE:**  The amount sought in the interim order

12   is reasonable in light of the fact that the Debtors spend an

13   average of $120 million a month on —— on driver services.

14            So though, frankly, some payables have been stretched

15   in advance of the petition date, the amount that we are

16   seeking —— that the Debtors are seeking relief for in the

17   motion, is not —— it's not the result of some delinquency or

18   some failure of the Debtors to make good on their payments.  It

19   really does —— it really does —— does demonstrate and —— and ——

20   and it —— it does signal an ordinary course honoring of the

21   Debtor's commitments to the —— to this very important —— to his

22   very important constituency.

23            If the Debtors are to have any chance to reorganize

24   the viability of this business segment, the NEMT business

25   segment, their largest, must be preserved.

1          The relief requested in the motion has been previewed

2    with the United States Trustee and a super majority of the

3    Debtor's senior secured lenders, agree to this relief.  And

4    this relief has been negotiated and allotted for in the — in

5    the proposed DIP budget.  Or — or now that the DIP budget.

6          Unless your Honor has questions, the Debtors politely

7    request that this Court enter the proposed interim order at the

8    conclusion of this hearing.  Thank you.

9          **THE COURT:**  Miss Whitworth?

10         **MS. WHITWORTH:**  No comment, Judge.

11         **THE COURT:**  All right.

12         So I did — I did have a chance to review the —

13   the — the proposed order.  And this is really almost like a

14   employee wage motion, because the — the most of the critical

15   vendors that are being paid are really the people who do — who

16   do the work, although they're not — you're contracting with

17   the — with other parties, or you may be contracting with

18   people individually on the — on the mode of — mode of care

19   platform.

20         So I've reviewed the motion and the form of order.

21   And I'm going to approve it.  Give me a minute.

22     **(Pause in the proceeding.)**

23         **THE COURT:**  All right.  I have signed and sent to

24   docketing the order at 47.

25     **(Pause in the proceeding.)**

1        **MR. WOO KEE:**  Thank you, your Honor.  I will now pass

2   the podium to my colleague, Mr. Weichselbaum.

3        **MR. WEICHSELBAUM:**  Good afternoon, your Honor.  Can

4   you hear me?

5        **THE COURT:**  Yes.  I can hear you.  Yes.

6      **(Pause in the proceeding.)**

7        **MR. WEICHSELBAUM:**  Afternoon.  Jonathan Weichselbaum

8   of Latham and Watkins, proposed co-counsel to the Debtors.

9        Your Honor, I will be presenting the Debtor's

10  employee wages motion, Agenda Item Number 14 and filed at

11  Docket Number 9.

12       Your Honor, by this motion, the Debtors are seeking

13  authority to pay pre-petition obligations to the workforce,

14  including wages and compensation, and to continue their

15  workforce programs that are offered to their employees, which

16  include, among other things, health plans such as dental,

17  medical, vision, various life and disability insurance, workers

18  compensation, PTO, 401k, severance benefits and other bonus

19  plans.

20       Your Honor, as ⸺ as everyone knows, like most

21  companies, Debtor's employees are the lifeblood and the

22  backbone of their ⸺ of their business.  Without their

23  employees, which consists of over 2,000 ⸺ over 20,000 full

24  time employees and over 1600 temporary employees, the Debtors

25  would be unable to provide the critical services they provide

72

1   to countless everyday people.

2          Your Honor, it's due to Debtor's workforce that

3   they're able to provide all the critical services that you've

4   heard about here today that enable people to have greater

5   access to medical services and medical care.

6          Your Honor, I'd just like to note, the Debtors are

7   not seeking authority under this motion to pay any retention or

8   incentive bonuses to insiders nor did —— nor are we seeking

9   any —— any severance payments to insiders under this motion.

10          In addition, your Honor, the Debtors are not seeking

11  to pay any employees, insiders or not, above the priority wage

12  cap pursuant to this motion.

13          So, your Honor, as with all the pleadings, we've

14  shared with the United States Trustee and believe the U.S.

15  Trustee has signed off.  Again, your Honor, we believe this

16  motion is extremely important to the Debtor's employees, to

17  morale, and to keeping their employees working to maximize

18  value for the —— for all parties in interest.

19          And unless your Honor has any questions, we —— the

20  Debtors request that your Honor enter the proposed order.

21          **THE COURT:**  All right.  Miss Whitworth.

22          **MS. WHITWORTH:**  No comment, Judge.

23          **THE COURT:**  All right.

24          I've reviewed the —— I've reviewed the proposed

25  motion and —— and the order.  And, obviously, this is a people

1    driven business.  And paying the employees is absolutely

2    essential to be able to deliver the services.

3            So this is a proper exercise of the Debtor's business

4    judgment.  So I'm going to go ahead and approve the employee

5    wage motion.  So give me a minute.

6        **(Pause in the proceeding.)**

7            **THE COURT:**  All right.  That has been signed and sent

8    to docketing.

9            **MR. WEICHSELBAUM:**  Your Honor, I —— I'm told that we

10   filed the revised bar date order at Docket Number 62.

11           **THE COURT:**  All right.  Hold on a second.  Hold on.

12       **(Pause in the proceeding.)**

13           **THE COURT:**  All right.  That has been signed and sent

14   to docketing.

15           **MR. WEICHSELBAUM:**  Thank you, your Honor.  I'm going

16   to turn it over to Mr. Schrock.

17           **MR. SCHROCK:**  I think that's it, Judge.  I think

18   we're —— Ray Schrock, counsel for the proposed Debtors.  Thanks

19   once again to your chambers, to you for taking the time with

20   the stay.  We greatly appreciate it.  All this relief was

21   absolutely critical.

22           Thanks, again, to Mr. Hansen.  And we're very much

23   looking forward to progressing these cases and moving us

24   swiftly toward filing of the plan and confirmation.

25           But thanks again, your Honor.  And thanks to the

74

1   entire Latham team as well as the parties.

2           **THE COURT:**  All right.  Thank you very much.

3           Anything further, Mr. Hansen and Miss Whitworth?

4       **(Pause in the proceeding.)**

5           **MR. HANSEN:**  Your Honor, I just thank all the

6   gratitude that Mr. Schrock mentioned, your Honor.  Thank you so

7   much for your time today and for the hard work of all the

8   parties, and also to the United States Trustee who worked with

9   us behind the scenes on the orders.

10          **THE COURT:**  All right.  All right.

11          **MR. SCHROCK:**  Ditto.

12      **(Pause in the proceeding.)**

13          **THE COURT:**  All right.  Thank you all.  Enjoy your

14  weekend.  And we'll see you all on the 16th.  And we're in

15  recess till tomorrow.  Thank you.

16          **MR. SCHROCK:**  Thank you.

17          **MR. HANSEN:**  Thank you.

18      **(This proceeding was adjourned at 04:10 p.m.)**

19                      CERTIFICATION

20          I certify that the foregoing is a correct transcript

21  from the electronic sound recording of the proceedings to the

22  best of my ability in the above-entitled matter.

23      /s/*Cheryl L. Battaglia*                 September 4, 2025

24          Transcriber                         Date

25  25-90309      08/21/25 - 09/04/25