IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE: § CASE NO. 25-90309-11
§ HOUSTON, TEXAS
MODIVCARE INC, ET AL, § TUESDAY,
§ SEPTEMBER 30, 2025
        DEBTORS. § 3:01 P.M. TO 8:33 P.M.

## **MOTION HEARING**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

CASE MANAGER:                         TYLER LAWS

ELECTRONIC RECORDING OFFICER:  AKEITA HOUSE

COURTROOM DEPUTY:                     AKEITA HOUSE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES:**

FOR THE DEBTORS:                    LATHAM & WATKINS, LLP
                                    George Klidonas, Esq.
                                    Ray Schrock, Esq.
                                    Keith Simon, Esq.
                                    Jamie L. Wine, Esq.
                                    1271 Avenue of the Americas
                                    New York, NY  10020
                                    212-906-1200

                                    LATHAM & WATKINS, LLP
                                    Elizabeth Marks, Esq.
                                    200 Clarendon Street
                                    Boston, MA  02116
                                    617-948-6000

                                    HUNTON ANDREWS KURTH, LLP
                                    Timothy A. Davidson, II, Esq.
                                    600 Travis, Ste. 4200
                                    Houston, TX  77002
                                    713-220-3810

FOR THE PROPOSED LENDERS:           PAUL HASTINGS
                                    Kris Hansen, Esq.
                                    Matt Warren, Esq.
                                    200 Park Avenue
                                    New York, NY  10166
                                    212-318-6000

FOR THE OFFICIAL COMMITTEE          WHITE & CASE, LLP
OF UNSECURED CREDITORS:             Charles R. Koster, Esq.
                                    609 Main St., Ste. 2900
                                    Houston, TX  77002
                                    832-786-6118

                                    WHITE & CASE, LLP
                                    Christopher Shore, Esq.
                                    Scott Greissman, Esq.
                                    Ashley R. Chase, Esq.
                                    1221 Avenue of the Americas
                                    New York, NY  10020
                                    212-819-8394

                                    WHITE & CASE, LLP
                                    Jason N. Zakia, Esq.
                                    111 S. Wacker Dr., Ste. 5100
                                    Chicago, IL  60606
                                    312-881-5400

3

APPEARANCES (CONT'D):


FOR THE U.S. TRUSTEE:                Office of the U.S. Trustee
                                     Jana Whitworth, Esq.
                                     515 Rusk Ave., Ste. 3516
                                     Houston, TX  77002
                                     713-718-4650


(Please also see Electronic Appearances.)

4

**INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| CHAD SHANDLER | | | | | |
| By Ms. Marks | 11 | . | 68 | . | 80 |
| By Mr. Shore | . | 26 | . | 71 | . |
| JUL JAMAL | | | | | |
| By Ms. Marks | 82 | . | . | . | . |
| By Mr. Shore | . | 101 | . | . | . |
| DAVID MCGREEVY | | | | | |
| By Mr. Zakia | 137 | . | 170 | . | . |
| By Ms. Marks | . | 155 | . | . | . |

| EXHIBITS: | Received |
|---|---|
| Debtors' Exhibits ECF 364-3 to 364-9 | 8 |
| Debtors' Exhibits ECF 364-11 to 364-18 | 8 |
| Committee's Exhibits ECF 398-1, 398-4, 398-5 | 11 |
| Committee's Exhibits ECF 398-7 through 398-20 | 11 |
| Committee Exhibit 21 | 34 |

**\*\*\***

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

5

**HOUSTON, TEXAS; TUESDAY, SEPTEMBER 30, 2025; 3:01 P.M.**

THE COURT:  Please be seated.  All right.  Good afternoon.  Please make sure to go to my web page and note your appearance.  That's the way we note appearances, formal appearances on the webpage.

And everyone please mute their phones unless you're going to be speaking.  We have a lot of people on the line and I don't want to have to go to the hand-raising feature.

So good afternoon.  It is Tuesday, September 30, 2025.  We're here for the 3:00 o'clock docket, Case Number 25-90309, ModivCare Inc.

So why don't we get appearances of counsel in the courtroom, and then on the line, and we can proceed?

MR. KLIDONAS:  Good afternoon, Your Honor.  George Klidonas from Latham & Watkins.  I'm here with my colleagues Keith Simon and Betsy Marks and Jamie Wine in the courtroom, and Ray Schrock on the line too.

THE COURT:  Thank you.

MR. KLIDONAS:  And then also with our cocounsel, Tad Davidson from Hunton Andrews and Kurth.

THE COURT:  Okay.  All right.  Thank you.

MR. HANSEN:  Good afternoon, Your Honor.  Kris Hansen with Paul Hastings.  I'm here with my partner Matt Warren, and we're here on behalf of the lenders.

THE COURT:  Good afternoon.

MR. KLIDONAS:  Good afternoon, Your Honor.  Good to see you.  Charles Koster, White & Case, proposed counsel for the committee.  Joined at counsel table by Chris Shore, Jason Zakia, Scott Greissman, and Ashley Chase.

THE COURT:  All right.  Thank you.

All right.  Ms. Whitworth?

MS. WHITWORTH:  Good afternoon, Judge.  Jana Whitworth from the United States Trustee.  Apologize for appearing by video.  We've got a of matters to resolve before midnight tonight so I'm actually appearing from my desk and handling all those issues too.  Thank you, Judge.

THE COURT:  All right.  Thank you.  All right.

Anyone else wish to make an appearance?

(No verbal response.)

THE COURT:  All right.  So I'm going to go ahead and activate the hand-raising feature.

Ms. Whitworth, could you hit five star one time?  All right.  Ms. Whitworth, you're unmuted.

If anybody else wants to speak, just hit five star.  But it seems like most of the people are here in the courtroom.

All right.  Go ahead.

MR. KLIDONAS:  Thank you, Your Honor.  We're here before you on the DIP motion.  We have been able to work cooperatively despite what the -- despite the agenda with the

U.S. Trustee and the UCC on all second-day orders, including the cash management and the vendor order which have been entered.  So the only item right now is the DIP motion.

Unfortunately, we were not able to get there on the DIP order with the committee.  The committee has filed an objection.  We filed a reply.  There have been a number of depositions and discovery production that have been done over the past few weeks.

But the plan, at least the proposed plan today is to have witnesses up for live testimony, short live testimony, and at the end of the testimony, prepare statements, and then have Your Honor rule.  But I think that's the plan.

So at this time, I'd turn it over to my partner, Betsy Marks, who will put forward the first witness.

THE COURT:  Okay.

MR. KLIDONAS:  Thank you, Your Honor.

THE COURT:  So let me ask you this before you sit down.

And also, I don't know who's going to take the lead for the committee, but Mr. -- hopefully, it's Mr. Zakia, but who knows?

MR. SHORE:  Sorry to disappoint, Your Honor.

THE COURT:  But the question is, you know, I've read both documents.  Is everything still in dispute, or are there some things that are no longer in dispute?

MR. SHORE:  I think pretty much everything in the --

THE COURT:  Okay.

MR. SHORE:  -- in the pleadings are in dispute.

THE COURT:  Okay.  All right.

MR. SHORE:  All right.  Yeah.

THE COURT:  Okay.  All right, Ms. Marks.

MS. MARKS:  Good afternoon, Your Honor.  Betsy Marks from Latham & Watkins on behalf of the Debtors.  And before we start with the witnesses, we were able to reach agreement with the committee on exhibits.  So both sides were going to move in their exhibits at the outset, if that's all right.

THE COURT:  Go ahead.  Okay.

MS. MARKS:  Your Honor, for the Debtors, I'd like to move in the exhibits from docket number 364, excluding declarations.  The parties have not agreed to move the declarations in, so I would like to move in 364-3 to 9, and then 364-11 to 18.

THE COURT:  All right.  So is there any objection to the admission of 364-3 to and including 364-9, 364-11 to and including 364-18?

MS.  CHASE:  No objections, Your Honor.

THE COURT:  Okay.  Hearing no objection, they'll be admitted.

(Debtors' ECF 364-3 to 364-9 and 364-11 to 364-18 received in evidence.)

MS. MARKS:  And, Your Honor, the committee, I believe, will --

THE COURT:  Yeah, let's do that.

MS. MARKS:  -- move in their exhibits now.

THE COURT:  Let's do theirs.

MS. CHASE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. CHASE:  Ashley Chase from White & Case for the committee.  We filed an amended witness and exhibit list this afternoon at docket 398.  On that list, we would move in Exhibits 1, 4, 5, 7 through 20 into evidence, subject to any additional exhibits we may use on cross.

THE COURT:  Okay.  So it's 1 --

MS. CHASE:  4.

THE COURT:  -- 4, --

MS. CHASE:  5, and then 7 through 20.  It's the same agreement.  It's all the exhibits except for the declarations.

THE COURT:  Okay.  All right.  So generally speaking, with respect to the motion and the objection, I'll admit those for purposes of the record, but they're -- but not for the truth of the matter asserted in the document.

So just with that clarification that generally, the motion and the objection are really viewed more as to they've been filed.  The objections have been raised, but not as to the truth of the matter.

But with that caveat, does anyone have any objection to 398, admission of 398-1, 398-4, 398-5, and 398-7 to and including 396-19?

MS. MARKS: No, Your Honor.

THE COURT: Okay. They'll be admitted.

MS. MARKS: Apologies, Your Honor. It's also 398-20.

THE COURT: Oh, you know what. I didn't copy that one.

(Pause)

THE COURT: Were there two amended witness and exhibit lists filed?

MS. CHASE: There were indeed. One was just filed about an hour ago.

THE COURT: Okay. All right. So that's the only thing that was added, because I have the amended --

MS. CHASE: Correct.

THE COURT: -- the first amended one. Okay. So this is just Exhibit A to the declaration that is not being included?

MS. CHASE: That's right.

THE COURT: Okay. Any objection to 398-20?

MS. MARKS: No, Your Honor.

THE COURT: All right. It's admitted. They're all admitted.

MS. MARKS:  Thank you.

(Committee's Exhibits ECF 398-1, 398-4, 398-5, and 398-7 through 398-20 received in evidence.)

THE COURT:  Okay.

MS. MARKS:  Your Honor, I'd like to call the Debtors' first witness to the stand, Mr. Shandler.

THE COURT:  Go ahead.

Mr. Chandler, take the stand.

THE COURT:  Do you solemnly swear or affirm to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Okay.  Please be seated.

DIRECT EXAMINATION

BY MS. MARKS:

Q    Good afternoon, Mr. Shandler.

A    Good afternoon.

Q    Where are you currently employed?

A    FTI Consulting.

Q    What is your position at FTI?

A    I'm a senior managing director.  I'm also the co-lead of our healthcare practice and co-leader of their healthcare restructuring services.

Q    How long have you worked at FTI?

A    Seven years.

Q    And where did you work before that?

A    I was a partner at the accounting consulting firm of Cohnreznick.

Q    How many years of experience do you have in the restructuring industry?

A    Over 30.

Q    And approximately how many restructurings would you estimate that you have worked on?

A    Probably between 200 and 300.

Q    And how many of those matters have you worked on or been involved with sizing a DIP?

A    Most of those matters did require a DIP in some fashion, depending upon who I was representing.  But in terms of sizing, probably about 25 percent of them.

Q    In addition to being employed by FTI, do you also hold a position with the Debtors?

A    I do.

Q    And what is that position?

A    I'm the chief transformation officer.

Q    When were you appointed as chief transformation officer?

A    January 9th, 2025.

Q    What are your primary responsibilities in that role?

A    They include liquidity management, cash flow forecasting, assisting the company also with longer-term projections, interaction with its lenders, cost-reduction efforts, interacting with the board, subcommittees of the board, and

monitoring general operations of the company.

Q    As a result of your work for the Debtors, have you become familiar with their capital structure, liquidity needs, and business operations?

A    I have.

Q    Is FTI also engaged by the Debtors?

A    Yes.  FTI is the financial advisor or proposed financial advisors to the Debtors.

Q    And when was FTI engaged?

A    Our initial engagement began November 29th, 2024.

Q    What was FTI engaged to do at that time?

A    We were financial advisors to the company, assisting it with evaluating its liquidity needs at that point in time. There were significant concerns that the company was running out of liquidity before the end of the year, and it was our job to work with the company and determine factually if that was the case and what the potential funding requirements would be required.

Q    In addition to the liquidity, was the company facing other challenges at that time in late 2024 into early 2025?

A    It was.  It was facing both regulatory challenges, in particular with regard to redetermination of who would be receiving benefits, which is an adjustment that was coming out of the COVID pandemic, it was facing customer losses, and it was facing the liquidity challenges associated with that.

Q    Let's take a step back and talk about the Debtors' business.  Can you describe the Debtors' business at a high level?

A    The Debtor primarily operates within four business segments.  The first is what we call non-emergency medical transportation, or NEMT, which is the largest segment of the Debtors' business, and it sounds like what it is.

We more or less are a broker, and we coordinate rides for individuals who are beneficiaries of either Medicaid plans or supplemental benefits under managed care organizations to basically go from their home, for example, to the physician's appointment and back.

Or if it was, for example, dialysis treatment, we go to the dialysis center and back, and that's what the primary function of that business is.

Our second-largest segment is personal care services, which sounds -- it is -- it's akin to home health care, but it is not home health care.  We don't provide any clinical-level support.

There's more assistance with daily needs such as showering, shopping, things within the person's own environment.  That's our second-largest business.

Our third segment is we call remote monitoring.  So we purchase and deliver equipment to -- to patients that need monitoring of some of their vitals at home, for example blood

pressure.

The device takes the person's blood pressure, sends the result to that person's physician or a caregiver, who is then able to monitor their activity and continue their -- their level of treatment.

The -- the -- the last segment is really what we call Higi, which is akin to remote monitoring.  It's as if you were going into like a retail pharmacy and sometimes you see that big machine that says we'll take your blood pressure here.  That is what Higi provides, that big machine that takes your blood pressure there.

And then aside from that, we have a minority stake in a business that relates to physician services.

Q    Who are the Debtors' customers?

A    Primarily it's Medicaid, usually Medicaid agencies on a state-by-state basis.  Or it is also managed care organizations who provide supplemental benefits to their members.

Q    Who are the beneficiaries or recipients of the technology and transportation services provided by the Debtors?

A    It would be those people who are the members of the managed care organization who qualify for those benefits.  Or it will be for those people within the Medicaid programs within those particular states again who qualify for those services.

Q    And members are patients?

A    Or individuals, yes.

Q    Did the Debtors enter into contracts with their customers to provide services to these members?

A    We do.

Q    And are those customer contracts the Debtors' primary asset for its business segments?

A    Yes, it is.

Q    What other material assets do the Debtors have?

A    They do not have other material assets.

Q    Given that the Debtors' main assets are customer contracts, how important are the Debtors' relationships with its customers and customer satisfaction with the Debtor services?

A    They're paramount to the business.

Q    Can customers terminate these contracts at any time?

A    Yeah.  Many -- most of the -- most of our customer contracts have clauses that allow for termination upon convenience.  They're also up for routine RFPs cycle.  So both.

Q    If the Debtors lose contracts because customers lose confidence in the Debtors due to a protracted Chapter 11 case, what will happen to the business?

A    The business will decline both operationally as well as value.

Q   Let's talk briefly about the Chapter 11 filing.  When did the Debtors make the decision to file for chapter 11?

A   August 20th, 2025.

Q   And when did the Debtors first begin to consider an in-court restructuring?

A   Well, the Debtors first did not start with a concept of an in-court restructuring.  I don't think anyone wants to start with any -- with the concept of any in-court restructuring.

So upon completion of a revision to the company's 2025 forecast and a preparation of its initial 2026 forecast, with the help of our investment banker Moelis, we engaged with the lenders on what was initially an out -- an out-of-court restructuring and providing a draft term sheet for that.

It was then determined that the lenders or the (indiscernible) of the lenders did not have an interest in an out-of-court restructuring and would only engage with an in-court restructuring.  So that was one of the -- the first steps towards moving in that process.

Q   Did the Debtors pursue other alternatives in addition to an in-court or out-of-court restructuring?

A   We did.  We through again, through our investment banker, we wound up engaging with other parties within our capital structure.  They also reached out to the unsecured bonds within our capital structure, as well as major equity holders

of the -- of the Debtors.

Q    As of the petition date, were there any other viable options either with existing lenders, equity holders, or other third parties?

A    No, there was not.

Q    During the months preceding the petition date, what were the -- what challenges were the Debtors facing?

A    The Debtors again were facing challenges related to, one, changes within the regulatory environment, including pricing was having a delay with regard to the renegotiation of pricing with regard to some of its major customer contracts, which was originally anticipated to start occurring in the beginning of 2025.

It had delays with regard to transitioning some of its existing contracts from one type of payment term like a shared risk situation, to a fee-for-service environment, which also would have had significant positive impacts from a cash-flow basis to the business.  That was not occurring on the path for which it was being sought.

Our sureties, who provide bonds that support many of our customer contracts, were at the beginning of the year, they were not -- we had no cash collateral being posted for any of the sureties.

We're now asking for cash collateral under those contracts what -- although they asked for a lot more, the

ultimate agreement was on average about 50 percent of the bonds were being cash collateralized by the time we filed, as well as many of our corporate insurance policies were also now requiring cash collateral, taking other liquidity out of the business.

We also began to lose some of our incumbent customers, even those that we were under RFP, which is quite unusual for the business.  Many citing having concerns over our liquidity position, our leverage position, and looking to de-risk themselves from the business.

Q   We'll hear more about this topic from our next witness from Moelis, but once the Debtors began to consider a Chapter 11 filing in late July 2025, can you describe the negotiations that occurred between the Debtors and their existing lenders at a high level from your perspective?

A   Yeah, I think it was a very active negotiation, although over a very short period of time.  I think everyone realized that while it wasn't just a liquidity situation; it was a customer credibility situation as well, as we were beginning to lose certain customers.

And everyone wanted to understand that the quicker we could establish a new capital structure and support from -- from whoever would be willing to provide that support, both liquidity wise as well as revamping of the balance sheet, would be -- would be of great assistance.

So it took place over about a three- or four-week period of time with multiple turns of a term sheet within that period of time, negotiating certain terms that either our board or our subcommittees of our board were providing guidance to both myself as well as our investment banker.

Q   What was your role as chief transformation officer and FTI's role with respect to the proposed DIP facility in this case?

A   We provided -- we prepared the DIP budget, and there -- I also provided guidance on that the sizing of the DIP was required.

Q   And this DIP is sized to provide 100 million in new money?

A   Correct.

Q   And who was responsible for sizing the DIP?

A   That would be me.

Q   Can you walk us through the process that you used to determine the size of the DIP?

A   First, I think it's important to realize that it is not just a DIP, and that makes this really important.  It is a DIP that rolls into exit financing.

And it actually is -- is anticipated that that -- that exit financing will have a five-year term.  So it is of importance to the Debtor also that it is not going to look to have to refinance or replace the DIP upon emergence.  It is

also the financing for which we'll have an emergence from bankruptcy.

In terms of the process that we went through, being very familiar with the Debtors' liquidity at this point in time, having been working as the CTO since the middle of January and be responsible for forecasting on a monthly basis since more or less the middle of February, we used the same procedures that we did over this period of time, which had been refined, understanding a great understanding of how cash receipts and disbursements work with regard to the company, and then also layered in the bankruptcy cost, all of this assuming that we would emerge from bankruptcy by the end of the year.

Q    Why did the Debtors need the final draw on the DIP?

A    If you look at our cash-flow forecast, while we sized the initial draw to take us to this point, which was actually the -- the first milestone or the second milestone under the DIP, if the budget actually has us forecast to have our next -- use a portion of our next draw starting next week.

And then that will come in, and then the next piece will come in from our segregated account within the next couple of weeks.

So in order to maintain a certain level of liquidity within the business, based upon our analysis, we will need that second draw from the segregated account.

Q    And what is the minimum liquidity that the Debtors need

to comfortably maintain business operations, in your view?

A    In my view, the number is between $65- and $75 million at any point in time.

Q    What was the Debtors' cash balance as of the petition date?

A    $66 million.

Q    Given that the Debtors had enough cash on hand as of the petition date to maintain the minimum liquidity figure that you just mentioned, why was a DIP necessary at all?

A    That was again a amount of cash that was available at a point in time, the date of filing.  What we knew was that we had many expenses that were coming due within the days very subsequent to our filing, many of that which is now covered as we've discussed previous in other -- other hearings with regard to our critical vendors, paying our transportation providers, our employees and the like.

The DIP was required to be able to meet all of our requirements to those third parties and to continue to operate the business, as well as to give comfort and -- to our customers, as well as to our vendors, and being able to continue to operate the business in the ordinary course.

Q    In your view, would the Debtors be able to operate their business solely on a cash collateral basis?

A    No, it would not.

Q    And you mentioned the exit facility earlier.  Is this DIP

sized to sustain the Debtors solely through the Chapter 11 process?

A    No, it's not.

Q    So this DIP rolls into a five-year exit facility?

A    Yes.

Q    If this DIP did not include additional funding in an exit facility, would the Debtors need to raise additional funds upon emergence?

A    Yes, it would.

Q    And what would the consequences be, in your view, if the DIP is not approved?

A    It'll -- it'll send a message to our vendors with regard to the overall restructuring tor what the company is trying to achieve on this timeline.  It will have a vote of lack of confidence.

It will start to question whether or not we can actually make it through this process in the way we have described to them and come out on the other end stronger than we were and better than we were before, giving them comfort to be able to continue to work with us.

It will also have a negative impact with regard to our vendors, who will also wind up questioning whether or not we have the -- the ability and liquidity to continue to provide payment to them for the services that they're providing.

Q    Are there case milestones as a part of this DIP facility?

A     Yes, there are.

Q     Can you briefly describe the major milestones?

A     The first milestone was the interim DIP approval.  We are past that.  The second milestone is the hearing we're at today, which is approval, the final approval of the DIP.

I think the third milestone is the approval of the plan of reorganization and disclosure statement, which is teed up for this coming Monday.

We then have our confirmation hearing scheduled for November 18th, and then a presumed emergence from bankruptcy on or about December 8th.

Q     How were the case milestones determined?

A     I think that they were -- they were negotiated with the lenders.  I think everyone realized that one of the most important things in this case is to emerge from bankruptcy as quickly as possible.

And that goes to the overall confidence from our customers, confidence to the people who we're providing services to, confidence to our vendors.  We are in a number of RFPs, very substantial RFPs right now.  The sooner that the company can get through this process, the more comfort and likely it would be that -- that we would be able to continue appropriately and hopefully retain those contracts.

To the extent we have an extended process, the risk associated with being able to retain those businesses goes

down dramatically, as well as the questioning whether or not our vendors will continue to -- whether they have confidence in our ability to continue to perform.

Q    And why are these milestones appropriate in this case?

A    To be able to maintain that value, to be able to be able to maintain that confidence.  And given the substantial contracts that are under RFP right now, to be able to provide the confidence to those people who are currently evaluating -- evaluating us, who otherwise might be looking to de-risk us from their business.

Q    Are the milestones in this case typical of milestones in other large Chapter 11 cases in your view?

A    Yes.

Q    What is the maturity date on the 100 million in new money funding under the DIP?

A    Six months.

Q    Given that there's a six-month maturity, can the Debtors stay in Chapter 11 for six months from the petition date until February 20th, 2026?

A    Well, I think the answer is the DIP is sized ultimately to be in bankruptcy for a certain period of time.  And this is not about how -- nobody wants to be in bankruptcy longer than they need to be.

In this particular case, even though the -- the term of the DIP loan may be six months, it was imperative when we were

evaluating both the milestones and the operations of the Debtor, to be able to come out as soon as possible, to be able to maintain value of the Debtor, as well as be able to maintain the contracts and the services for which we're providing to our -- to our ultimate customers.

Q    Thank you.

MS. MARKS:  No further questions at this time.

THE COURT:  All right.

Mr. Shore?

MR. SHORE:  Sorry to disappoint Your Honor.  Chris Shore from White & Case, proposed counsel to the UCC.

CROSS-EXAMINATION

BY MR. SHORE:

Q    Good afternoon, Mr. Shandler.  I'm sorry I didn't get to meet you at your deposition the other day.  I may jump around a little because you answered a bunch of the questions that were in my outline.  So just let me know if I'm moving too fast or you're losing the train of thought.

You answered some questions about the initial engagement of FTI.  That work began on November 29th, 2024?

A    Correct.

Q    And the initial scope of FTI's engagement was to act as the financial advisor for the company at that point in time, right?

A    That's correct.

Q    And the company needed a financial advisor because of significant concerns about the company's liquidity in 2024.

A    That's correct.

Q    Indeed, there was a general belief in 2024 that the company would be running out of money before the end of the year.

A    Correct.

Q    And the company then looked to FTI for assistance with regard to liquidity management and liquidity projections, right?

A    We were not doing liquidity management at that point in time, but we were assisting with liquidity projections.

Q    Okay.  And at that time, FTI was not retained to assist in the preparation of a possible Chapter 11 filing, right?

A    That's correct.

Q    Okay.  And then you became a chief transformation officer on the date you said.  But even at that time, the company wasn't looking at a potential Chapter 11 filing, right?

A    That's correct.

Q    When was the first time the company started thinking that it might be going into bankruptcy?

A    The first time would have been -- it would have been considered or on the table in late 2024 to the extent that the company wasn't able to achieve additional financing through the efforts that were being pursued at that particular point

in time.  It was a potential that was considered.

Q    Okay.  And when did the company start taking action to prepare for a potential Chapter 11?

A    On that point, it was a relatively slow burn, but it would have been late December, early January.

Q    Okay.  So when you were appointed or soon after you were appointed chief transformation officer, the company began planning for a potential Chapter 11?

A    No, that's not correct.

Q    They began considering the option of going -- I said, when was the first time the company took any action to start planning for a bankruptcy?

A    Yes, and I said late December 2024, early -- early January 2025.

Q    Okay.  Now we don't have this in the record.  There were some transactions that the Debtors did in January 2024 and January -- March 20-- sorry -- January 2025 and March 2025, which we generally call the uptier transactions?

A    We call it the fifth amendment, but yes.

Q    Okay.  Okay.  Could you describe generally for the Court what happened with the fifth amendment?  What did the lenders give?  What did the lenders get?  What did the company give? What did the company get in a high level?

A    The company generally got $75 million in January of 2025. That was considered what we call accordion or additional first

liens.  And at the same time, certain of the unsecured lenders uptiered a portion of their obligations to second-lien debt.

And then in March of 2025, the company received an additional $30 million, and also issued roughly $20 million, I believe, of 2-L paper.

Q    Okay.  Just with respect to the uptier from the -- and that second transaction in March was with the Coliseum, right?

A    That is correct.

Q    Okay.  The first transaction, the unsecured bondholders who uptiered into a second-lien position, what discount did the Debtors get for exchanging the unsecured notes for new second-lien notes?

A    I -- I don't know.

Q    Okay.  Now at the time of that transaction, are you aware that there were projections which were shared with the participating lenders to induce them to exchange their paper or provide new-money loans?

A    There were projections that were prepared.  I can't say the word induced, but there were projections that were prepared to support the 25 -- the $75 million financing that -- that the company received.

Q    Okay.  At this point, I'd like to hand out -- up some binders.

MR. SHORE:  We can hand out -- Your Honor, I'm going to go forward rather than putting things on the screen because

the cross contains materials which have been designated confidential.  I'm just going to work on a binder.

THE COURT:  That's fine.  There's --

MR. SHORE:  If I may approach the witness, Your Honor?

THE COURT:  Yes, please.

MR. SHORE: And I'm going to use the same binder for the two witnesses so we can --

THE COURT:  Would you happen to have an extra binder for my --

MR. SHORE:  Yeah.

THE COURT:  -- law clerk?

MR. SHORE:  I can give this one.  And I can take my own.

THE COURT:  Yeah.  Thank you.  He loves to accumulate paper.

MR. SHORE:  Do you need another one, Your Honor?

THE COURT:  No, I got one.

MR. SHORE:  Okay.

BY MR. SHORE:

Q    All right.  Mr. Shandler, can you turn to Exhibit 8 in the binder which is not in evidence yet.

A    I'm there.

Q    Have you seen this document before?

A    Yes.

Q    Okay.  I'm going to ask, and what is this, if you understand it?

A    Dated January 8th, 2025.  These were cleansing materials that were prepared by the company.

Q    And are these project -- do these include projections that were given to the lenders in connection with their business decision to enter into the fifth amendment?

A    Yes, I believe so.

Q    Okay.  Can you turn to the -- you'll see numbers on the bottom right of the page -- page 328 of 333.

A    Yes.

Q    Okay.  And from that, can you tell what the Debtors were giving as a preliminary outlook for 2025 EBITDA for the company?

A    Yes.  It would have been $166 million.

Q    And did you play a role as chief transformation officer in the preparation of these projections?

A    One, I was not the chief transformation officer at this point in time.

Q    Okay.

A    I was the financial advisor to the company.

Q    Okay.

A    And these were the company's projections, but we assisted them in preparing the -- the formatting and the -- and the presentation of the materials.

Q    Okay.  And at the time, did you believe that these projections had been prepared in good faith by the company?

A    Yes.

Q    And did you feel like FTI had done its job in reviewing these projections?

A    Well, again, we had made it clear to those parties at the time that these were the company's projections.  We were not -- we were not involved in the actual detailed preparation of these projections.

     These were solely the company's numbers.  But based upon the information that was available to us at the time, you know, we thought this was reasonable.

Q    Yeah, I'm sorry.  I didn't hear that.

A    We thought this was reasonable.

Q    Oh, and the -- well, my question was a little different.  Did you think FTI had fulfilled its duties to the company in the advice it gave with respect to the preparation of these projections?

          MS. MARKS:  Your Honor, and I hate to break up the flow of the questioning, but I don't believe this exhibit is on the exhibit list.  Mr. Shore said it's not in evidence and this is not rebuttal, so --

          MR. SHORE:  Well, that's fine.  I reserved the right on the exhibit list, as we had discussed, to move in documents that came in on cross, depending upon what came in, because we

weren't sure what the direct testimony was going to be today since they weren't putting in declarations.

Given that the witness has already identified this document, I would move it into evidence.

MS. MARKS: Your Honor, there's no Bates number on it. I don't know whether or not it's from the data room. We didn't produce it. So I don't actually even know what this document is. And it wasn't disclosed to us on the exhibit list.

THE COURT: Well, this appears to be a document, an 8-K that was filed by ModivCare. So at a very minimum, it's an admission against interest, and it's reliable. I mean, it's a document filed publicly as an 8-K. So I'm going to admit it.

I mean, but I think, Mr. Shore, I think what the testimony is, is that FTI didn't prepare it. They prepared the formatting, but not the numbers. I think that's what the testimony is.

MR. SHORE: Right. And we'll just clear this up.

BY MR. SHORE:

Q    FTI at that time was under engagement to assist the company in the preparation of projections, right?

A    Not long-term projections, no. We were involved with the assist -- in the assistance of them primarily as it related to forecasting liquidity and how much liquidity would be needed

in terms of the fundraising that was occurring.

Q   Okay.  But you did say that you concluded that these projections were, in FTI's view, reasonable?

A   Based upon the information that was presented to us by the company at that point in time.

Q   Okay.

MR. SHORE:  I think I just need a ruling from Your Honor on whether the document is or is not in evidence.

THE COURT:  No, I'm going to admit it.

MR. SHORE:  I could mark it as Committee 1.

THE COURT:  Yeah, yeah.  I'm going to admit it.

MR. SHORE:  Okay.  Thank you.

Committee 20 --

MS. CHASE:  21.

MR. SHORE:  -- 21, yeah.

(Committee's Exhibit 21 received in evidence.)

BY MR. SHORE:

Q   Okay.  Now just for the Record, are you aware of whether at that time in January 2025, whether the Debtor had a five-year business plan with a projected EBITDA beyond year end 2025?

A   I don't recall.

Q   Okay.  Now these -- this fifth amendment, in your view, you participated in discussions regarding the fifth amendment?

A   Yes.

Q    Okay.  In your view, were the fifth amendment transactions conducted in good faith by all parties?

A    Well, I was not an active participant in those negotiations.  Those were left to the company and counsel as the financial advisor.  But so -- I don't know if I have a rendering of opinion as to -- as to that.

Q    Okay.  Are you aware of whether they were conducted at arm's length?

A    I think as far as I am aware, they were conducted at arm's length.

Q    And in connection with an arm's length transaction, how much new money did the Debtors raise in the fifth amendment?

A    As I testified before, $75 million.

Q    And how much of that was a second lien, new money, second-lien loan?

A    None.  That was all first lien new money.

Q    No, there was a commitment in January.  When did Coliseum fund its new money second-lien loan?

A    Coliseum funded it in March.

Q    And how much was that?

A    $30 million of new money.

Q    Okay.  So in March of this year and as far as you know, an arm's length transaction, a lender gave $30 million in new money on a second-lien basis to these Debtors?

A    As far as I know, yes.

Q    Are you aware of any other projections that were given to lenders as to what the company was expecting for future EBITDA?

A    At what point in time?

Q    Between January 2025 and the closing of the transaction in March.

A    I know that -- that the company under the fifth amendment was required to provide cash -- cash-flow projections through 2025 to the private-side lenders by mid-February of 2025.

Q    Okay.  And are you aware of whether those projections or any projections were given to the lenders other than what's been identified in Committee 21?

A    I'm not sure I understand that question.

THE COURT:  Do you know whether any other projections were provided to the lenders?

THE WITNESS:  Well, the projections that would have been required to have been prepared and provided to the lenders pursuant to the fifth amendment, which required them to be delivered on or about February 14th, 2025, would have been delivered to the lenders.

BY MR. SHORE:

Q    Okay.  And I just asked, were you aware of whether they projected any numbers other than what are set forth in Committee 21?

A    Yes, they would have.

Q    And how -- what was the difference?

A    I don't recall off the top of my head, but they were different.

Q    Okay.  Now let's talk about the sizing of the DIP.  You got asked a bunch of questions about that.  The minimum liquidity, who made the determination with respect to the minimum amount of liquidity that this company needed to have in its three-month stay in bankruptcy?

A    Well, I don't think it is the minimum amount of liquidity that the company needs in the three-month stay within bankruptcy; I think it's the minimum amount of liquidity that the company appropriately needs to operate its business.  So that would be me in conjunction with management.

Q    Okay.  Well, I was talking about the sizing of the DIP versus the sizing of an exit facility.  With respect to the sizing of the DIP, who came to the determination that the Debtors needed to have $65-$75 million dollars in available liquidity during its three-month stay in bankruptcy?

A    Well, you're asking two different questions.  You're talking about the minimum liquidity and you're talking about the sizing of the DIP.  So can we clarify what you're asking about at the moment?

Q    Well, if you dropped your minimum liquidity requirement, you could drop the size of the DIP, right?

A    Not necessarily in terms of what we need to operate, but

it wouldn't be materially different, and it would have an impact on the business.

Q    Well, I'm just -- can you answer the question I asked? If you reduce the amount of minimum liquidity to -- well, first of all, how much liquidity were the Debtors maintaining prepetition?

A    It depended on the point in time.

Q    Well, what was its lowest prepetition that you saw?

A    Probably the lowest we got to was roughly around $20 million.

Q    Okay.  And what was the highest amount of liquidity it had?

A    Over 100.

Q    Okay.  And then you decided that during this three-month stay in bankruptcy, the Debtors needed to have $65- to $75 million liquidity, right?

A    No, just because I -- just because the company should be operating with $65- to $75 million' worth of liquidity doesn't mean it always had that amount of liquidity available to it.

The fact that it may have had less liquidity than that available to it doesn't mean that it should be operating at that level.

Q    I'm not talking about woulds and shoulds or anything else.  Simple math question.  If you dropped the amount of the minimum liquidity threshold, wouldn't the amount of DIP you

needed to maintain that minimum liquidity threshold drop except for potential short-term variations?

A     Well, the minimum liquidity threshold is at -- is at the level that we deem to be appropriate to be able to handle the fluctuations within a given month with regard to the cash receipts of the business versus the cash disbursements that need to go out the door.

So the minimum liquidity isn't an arbitrary number.  It's there to help balance out the business.

Q     I'm not -- I'm just going to ask one last time on this question, then I'll move on.  If you drop -- if you came to a determination that you could get by on $50 million of liquidity, your DIP need would go down, right?  Just during the case.

A     I'd have to evaluate that with the -- with the projections that have been prepared.

Q     Okay.  So you've never thought about what would happen if minimum liquidity was dropped from $75 million to $50 million?

A     Not in terms of preparing the Debtor -- the DIP forecast, no.

Q     Okay.  Now, I think your counsel went into this.  The DIP has a maturity of six months, right?  But the Debtors are only going to borrow DIP money for three months.

A     It was -- we went into bankruptcy on August 21st.  The DIP was sized to take us through the end of the calendar year.

So that would be roughly four and a half months.

Q   Right.  But you're planning on exit.  The milestone requires an exit by December 8th.

A   Yes.

Q   Okay.  And you didn't prepare any projections, did you, extending past the end of this year?

A   No.

Q   Okay.  Have you done it yet?  Have you looked at any projections of what, as to what it would take to get to a valuation trial on February 1?

A   No.

Q   Okay.  And you haven't, again, you haven't looked at what happens if I try to just get by on $50 million on -- of liquidity on the balance sheet at any given time?  You haven't looked at that.

A   (No verbal response.)

Q   Okay.  And this idea that we're going to have our confirmation hearing on November 18th, that was based on an assumption on your part that there wasn't going to be a heavily-litigated confirmation, right?

A   Well, it -- correct.  It's a milestone within the DIP.

Q   Okay.  Let's get this concept of a milestone.  Just -- the failure to meet a milestone gives the DIP lenders a right to call a default, right?

A   Yes.

Q    Okay.  Does that require that the Debtors can't seek a shorter filing date for things?  In other words, you're speaking as if the milestones are what are driving your business decision.  Why can't your business decision be the milestones are going to be moved out, but the Debtors want to go quicker than that.  Why didn't you do it that way?

A    The milestones are the -- identified as the last date within a given period of time.  You are correct.  There is Nothing that says we cannot move faster other than what would be required by the Bankruptcy Code in terms of noticing periods and the like.

Q    Well, isn't the Debtors' position right now that the milestones that are set up are the minimum amount of time that the Debtors can use without seeking to shorten deadlines under the Bankruptcy Code?

A    I think -- I don't know that that's the position that we're taking, but we can certainly move faster except for conditions of the Bankruptcy Code.

Q    Okay.  Can you please turn to Exhibit 6 in the binder.

A    I'm there.

Q    Can you identify for the Court what these are?

A    Exhibit 6 are financial projections prepared, I believe, in conjunction with the disclosure statement.

Q    Right.

MR. SHORE:  And for the record, they're document 350

on the docket, filed on the docket by the Debtors.

BY MR. SHORE:

Q    You --

THE COURT:  Do you have an exhibit number for me?

MR. SHORE:  This will be Debtors' 21 or -- sorry, Committee 22.

BY MR. SHORE:

Q    You participated in creating the financial projections, right?

A    Yes.

Q    Did you write any of the assumptions?

A    Yes, I participated in one of those.

Q    Okay.  So when I say you worked on the projections, that's not just the data that are set forth on the last page, but the assumptions that are listed?

A    Yes.

Q    Okay.

A    They're all part and parcel.

Q    Who else at FTI had any material role in preparing the projections?

A    Those people working under my direct supervision.

Q    Who are they?

A    David Kerasaki (phonetic), Jill Shapiro, Scott Johnson, Jacob Oteras (phonetic).

Q    Okay.  Who from the company had any material role in

preparing these projections?

A    That would have been Ken Shapiro.  And those reporting under his direct supervision being the FP&A teams of the company.

Q    Okay.  And how many people is that?

A    Probably six to ten people.

Q    And who would be the point person on behalf of the Debtors to be able to answer questions with respect to the actual data and the financial projections on the last page of Exhibit -- Committee Exhibit 22?

A    Other than the people within the FTI team, it would have been the people -- each one of the different business segments which this is built up from has a different responsibility.  So it all depends upon which segment of the business.

Q    Okay.  So if I wanted to learn about how a particular segment of the business is forecasted and how it rolls up into projections over time, I have to talk to each of the heads of the groups?

A    Of the FP&A groups or the operating divisions, yes.

Q    And how many people is that?

A    As I just indicated, you know, each -- between each one of those teams, depending upon which segment of the business we're talking about, will have a different number of people associated with it.  Typically, it's anywhere from what could be two to six people.

Q    Okay.  And this one, if you look on the last page, is showing that the company is going to produce $126.6 million in EBITDA in 2026.

A    Correct.

Q    What is it -- do you know what it's projected to produce for fiscal year 2025?

A    I think it's, based upon my current recollection, roughly about the same number, I believe.  I don't recall exactly.

Q    Okay.  So between March of 2025 and the publishing of these projections, the Debtors have the view that their EBITDA has fallen by $40 million?

A    Yes.

Q    Okay.  Now have you had any discussions with any committee professionals on the phone or in a meeting to go through the business plan and talk about the changes and justify why the EBITDA has now fallen $40 million in a period of a couple of months, six months?

A    Either myself or those members of my team who report to me -- to me have had discussions with financial advisors to -- proposed financial advisor to the -- to the committee.

Q    Do you know when the committee first asked for the model underlying the projections?

A    I think when we first got engaged.

Q    Okay.  And do you know when they first asked for the actual projections?

A    If we're talking about the projections which were attached to the disclosure statement, I believe it was right on or about when they first got engaged.

Q    All right.  Do you recall any discussions with any committee professional before the publishing of the projections by hitting the docket to talk about the business plan and what it was going to show?

A    I know we talked about the business, but I don't believe we had any specific discussions about these projections with the committee professionals.

Q    Okay.  And you say you want to move quick and it's going to save the business if you move quick.  Do you know when the Debtors first produce the underlying business model to the projections to the committee?

A    I know that they were -- they were -- the projections were being worked on right up until the filing.

Q    Oh, I'm talking about the underlying model.  There are two things, right?  They're actually the numbers on this page which the committee got when the projections were filed.

I'm talking about the underlying model which you understood to have been asked for when the committee was first appointed.  Do you know when the underlying model was produced to the committee?

A    Best of my recollection, the middle of last week.

Q    Would a production on Friday afternoon surprise you?

A    No.

Q    Okay.  So as far as you know, the committee first got the model which shows the underlying data that goes through all these business segments on Friday?

A    When it was available.

Q    The underlying model.  You published these projections ten days ago.  When did you give the underlying model which would show how this was built up?

A    These projections were filed, if I'm not mistaken, last Tuesday or Wednesday.

Q    Okay.  And the model came?

A    I would not call that ten days ago.

Q    Okay.

A    And it's not unusual when you file, when you -- when you prepare projections to have a model that then needs to be cleaned up and evaluated for any kind of extra stuff, that this is not unusual for a financial -- for a financial advisor or when you're preparing projections to then have it in a distributable form.  Does that sometimes take an extra day or two?  It does.

Q    Okay.  And --

A    But these were not available prior to last week.

Q    And to be clear, if you want to understand the business plan and how the business plan works and how EBITDA has been affected over the last six months, you need the underlying

model, right?

A    Well, so you're asking two different things.  To understand how the business operated over the course of the last six months, one does not need future projections.  One needs the historical activity for which the company operated under.

What you're asking here is a different story, which is have there been discussions with regard to these projections with the unsecured committee's financial advisors?  And I believe that there have been calls that have been scheduled with them since this has been made available.

Q    Okay.  So from the perspective of the committee understanding how the business plan works and what the underlying data show, that's a -- start on Friday, last Friday?

A    No, that's an understanding of gaining, if you want to understand from an underlying model of how it -- how the -- what the projections show, I can understand it was middle of next -- last week or -- or up until Friday.

If you want to understand how the business has changed the underlying aspects of the business, how the business has operated, which are ultimately the basis for these projections, that information was available and produced to the unsecured creditors committee for financial advisors.

Q    Except for all the people who actually made the changes,

like the heads of the business units?

A    It was the -- my team was -- as you well know, it is not unusual that the financial advisor, in this case the chief transformation officer of the company, who's a member of management, engages with the unsecured creditor committee financial advisor.

Q    Let's turn to the backstop fee.  Now the backstop fee -- we all know this -- has been expressed as 20 percent of the Debtors' pro forma exit equity, right?

A    That is my understanding.

Q    Okay.  And prior to the agreement to pay the backstop fee, the Debtors did not make any effort to determine what the value of that equity was expressed in U.S. dollars, right?

A    There was no formal analysis that was done.

Q    Okay.  I'm going to come back to that with Mr. Jamal with respect to what that fee calculates to in U.S. dollars.  But what's your business understanding as to when that fee gets paid?

A    On the -- upon the emergence from bankruptcy.

Q    Okay.  Pursuant to any plan?

A    Pursuant to this plan.

Q    Okay.  Can you make any changes to this plan and still have the fee payable?

A    I don't know.

Q    Okay.  So you have no business understanding as to

whether or not the Debtors can make any change to the plan on file and still pay the fee?

A    I don't know.

Q    Okay.  What if the DIP is repaid in cash, in full, outside of plan?  What if the Debtors just decide to retire the DIP?  We have just so much cash on hand, we're just going to retire the DIP.  Is the fee payable then?

A    I don't know.

Q    Okay.  But so in your mind, you could have to give away 20 percent of your equity in the event that the DIP is just repaid?

A    It's part of a fee of -- of this DIP.

Q    Okay.  Now let me ask a question.  Do you recall answering any questions with respect to payments to vendors in your direct testimony?

A    No.

Q    Okay.  So I'm not going to ask you anything about the reasons why you've decided to pay vendors, okay?  I just want to talk about some of the analysis that the Debtors did, okay?

At the time of your deposition, the Debtors had spent about $100 million of available cash to pay the prepetition claims of vendors?

A    Yes.

Q    To date, how much have they paid to vendors on account of prepetition claims?

A     Probably about 120.

Q     And in that 13-week cash flow, which I'll get to, how much of the Debtor is projecting to pay to prepetition trade vendors in total?

A     I think the current estimate is approximately 180 million.

Q     180 or 181?  I didn't hear.

A     180, I believe.

Q     Okay.  180.  And as part of determining who -- which -- well, you understand that these -- all these trade vendors were unsecured trade vendors, right?

A     Yes.

Q     Okay.  And in determining which unsecured creditors would get payment of their prepetition claims and which ones weren't, the Debtors broke down their vendors into particular categories, right?

A     Yes.

Q     And by far the largest such category is transportation providers, right?

A     Correct.

Q     And 99 to 95 percent of the $180 million budgeted for payment of prepetition vendor claims is related to these transportation providers, right?

A     Yes, that sounds correct.

Q     And to be clear, the Debtors have budgeted to pay 100

percent of the claims of every transportation vendor on account of their prepetition claims.

A    Yes.

Q    The Debtors didn't do any vendor-by-vendor analysis, right, of these transportation providers?

A    Correct.

Q    Made no effort to distinguish between transportation vendor A from transportation vendor B?

A    Correct.

Q    Didn't make a determination of whether any of those transportation providers had a prepetition executory contract?

A    Correct.

Q    Didn't do any analysis as to whether or not any of them would just agree to perform even if they didn't get their prepetition fees paid, right?

A    Correct.

Q    Didn't pick up -- as far as you know, no one at the Debtors picked up a phone to call any prepetition transportation vendor to determine whether or not they would be willing to perform postpetition?

A    We did not specifically make phone calls to those vendors.

Q    Well, okay.  And as far as you know, the Debtors never reached out to any alternate transportation provider to ask whether they would step in and perform if a particular

transportation vendor refused to perform?

A    Correct.

Q    Can you tell the Court how many alternative transportation vendors exist in the United States, that is people who provide transport services who the Debtors don't employ?

A    I know that we are sending out in excess of 10,000 checks every single week to transportation providers throughout the 48 states that we operate in.

Q    And would you agree with me some of these checks are as small as $5?

A    I don't know if it's $5, but some of them can be relatively small.

Q    Okay.

A    Some of them are also mileage reimbursement, not all -- not all direct transportation.

Q    Right.  So if someone takes their mother in a car for three miles to the hospital and submits a form to ModivCare for $6 for the prepetition delivery, the Debtors determined that that person should be getting $6 of reimbursement.

A    Yes.

Q    Okay.  And to be clear, when sizing the budget for this case, the Debtors were anticipating that they were going to be paying all prepetition transportation vendors, right?

A    In the ordinary course of business, yes.

Q    Whether or not they were prepetition claims or postpetition claims?

A    Yes.

Q    Okay.  Part of DIP sizing also involved estimating professional fees that would need to be paid during the course of the case, right?

A    Yes.

Q    One of the aspects of the DIP facility is that it provides for the Debtors taking cash on the balance sheet on a periodic basis, putting it in an escrow account for the benefit of professionals that the estate's paying for, right?

A    It does account for a professional fee escrow, yes.

Q    And just so we're clear, what happens is the professionals will make their fee applications, and the Debtors will then take money out of the escrow and pay it to the professionals for their allowed fees?

A    Correct.

Q    Okay.  And when do you expect that first interim fee application to be granted in this case?

A    I think it depends upon when the first -- when the interim compensation order is entered by His Honor.  So that will set the schedule as far as when the first distribution is set to occur from that.

Q    And if you get your way in that order, when is that?

A    I believe it is -- well, where we are right now, probably

early November.

Q    Okay.  And how much is in the escrow now?

A    I don't recall.

Q    How much is the escrow going to be in the escrow in November?

A    Several million dollars.

THE COURT:  I would expect it to be more.

MR. SHORE:  I think it will be, Your Honor.

BY MR. SHORE:

Q    Do you know how much is expected to be in there, how much money is expected to go into that escrow account during the 13-week cash flow?

A    I don't recall off the top of my head.

Q    Okay.  Who proposed this escrow fee concept or fee escrow concept?

A    I believe counsel.

Q    When you say counsel, you mean?

A    Latham.

Q    Okay.  Did Latham tell you they would not work for the Debtors if they didn't have a fee escrow?

A    No.

Q    Did they tell you that they weren't willing to perform work if they just operated under an interim order like in every other case in which the application is submitted, and it's granted, and then the fees are paid?

A    Well, first I would say that professional fee escrows have become more common.  So I wouldn't say in every other case, but no, they did not say they would not.

Q    So you just voluntarily agreed to reduce your liquidity during the case to fund escrows for professionals?

A    I don't see it as a reduction of liquidity during the case.

Q    Well, you're taking money off the balance sheet and putting it in an escrow account, right?

A    That would -- yes.

Q    So that's reducing your liquidity during that period.

A    During that period, but we're talking about a timing issue here.

Q    But that's what liquidity is.  It's timing, right?

A    Liquidity is about cash that you have available to you to spend --

Q    Over time.

A    -- and timing.

Q    Right.  Over time.  So you're -- if you're putting money in escrow, your minimum cash threshold is going up.

A    The amount of cash I have available on the balance sheet is higher.

Q    Now who determined the -- now in the 13-week cash flow are professional fee estimates?

A    Yes.

Q    Who determined that those professional fee estimates were reasonable and workable for the Debtors?

A    I -- I went to -- to each professional and asked them to provide me their budget for a period of time in the case and then evaluated it accordingly.

Q    Okay.  When you published the 13-week cash flow and filed the motion, you didn't have committee in place, right?

A    We did not.

Q    Okay.  So you didn't go to committee counsel and ask, how much do you need, right?

A    No, we did not.

Q    Okay.  So who determined -- do you know how much is in the budget for all committee professionals?

A    I believe around 1.75 million.

Q    Okay.  And who determined that that was a reasonable amount for a committee?

A    I did, with -- in discussions with -- with Latham, my counsel.

Q    Okay.  How much does Latham have in the budget?

A    I forget off the top of my head.

Q    Okay.  How much does Paul Hastings have in the budget?

A    I forget off the top of my head.

Q    Would it surprise you that the two of them together have $24.7 million on the budget?

A    It would not.

Q    The Debtors have decided to hire Quinn Emanuel.  We're going to get to that in a bit, right?

A    It was the Debtors are hiring it at the request of our independent director.

Q    Right.  The Debtors will be paying for Quinn Emanuel.

A    Yes.

Q    What is Quinn Emanuel's budget?

A    We are waiting for that number.  I believe that last I heard, it was -- I think they provided a number of around 1.5 million, 1.3 million.

Q    The Debtors also in that budget is $10 million for Moelis, right?

A    That is paid on exit.

Q    I understand, but it's got to be -- the Debtors have to be prepared to pay that, right?

A    Upon the exit of bankruptcy, yes.

Q    Okay.  And that's, since you don't, you're rolling to an exit facility, that'll just come off cash off the balance sheet, right?

A    (No verbal response.)

Q    Okay.  Now with respect to that, what's Moelis doing right now?

A    Right now, they are -- they are working to raise the revolver credit facility.

Q    Okay.  What else?

A    They're providing testimony here today, and they prepared the valuation that was attached to the disclosure statement.

Q    Okay.  Now to be clear, they have a financing fee in their agreement with the Debtors, right?

A    Yes, I believe.

Q    They're getting a million dollars for that.

A    For the Debtor in possession financing?

Q    Yeah.

A    Yes.

Q    Okay.  So for $10 million, they're raising a credit facility which, by the way, is going to be senior -- it's senior or junior to the exit facility?

A    It will be senior.

Q    Okay.  So and how much are they -- are you planning on doing that?

A    We're working to raise $250 million.

Q    Okay.  $250 million on a business you believe is worth between 650 or no -- is worth as much as $800-plus million?

A    I don't recall the exact range, but yes, with the --

Q    Okay.  So they -- for that, they get $10 million and they provide testimony on valuation.

A    Well, plus the work that they did prepetition.

Q    They're getting paid a fee for work they did prepetition?

A    I think their engagement letter is holistic with regard to the work that they've provided.

Q    Okay.  Okay.  One of the features of the interim DIP -- I want to just roll back in time -- was that the Debtor had made certain stipulations regarding the extent, validity, and priority of the first-lien claims?

A    Yes.

Q    And Latham & Watkins was the law firm that advised the Debtors as to the appropriateness of that structure.

A    Yes.

Q    And they provided the Debtors with advice that they could go ahead and stipulate to these -- the amount, the extent, validity, and priority of the 1-L claims?

A    Yes.

Q    And under that structure, the Debtor was or the official committee was given the challenge period and the challenge budget, right?

A    Yes, I believe.

Q    Under that old structure.  And that was $200,000, right?  No, I'm sorry.  It was $50,000 under the interim order.

A    I don't recall.

Q    And do you recall how long the challenge period was to run?

A    I don't recall.

Q    Okay.  But Latham & Watkins was the firm that provided the Debtors with advice with respect to how much money the committee should have to investigate the extent, validity, and

priority of the liens and how long they should be given, right?

A    I don't recall who provided specifically the numbers or -- or at the time.

Q    Okay.  And by signing the credit agreement, the company followed that advice, right?

A    Yes.

Q    Okay.  You were the declarant on the DIP motion, right?

A    Yes.

Q    Okay.  At the time of the signing of that declaration, did you know that Latham had represented the 1-L agent when the facility was put in place?

A    I -- I think I did.

Q    Okay.  How did you learn that?

A    I think it had come up in discussion.

Q    Okay.  And did they ask you for a waiver?

A    No.

Q    Have you ever given Latham & Watkins a waiver for the representation of the 1-L's in connection with putting the 1-L facility in place?

A    Not from my recall.

Q    Now you've seen instances in which a -- when a credit facility is formed, there are mistakes by the agent for a lender?

A    I suppose it happens.

Q    Yeah.  Sometimes, for example, they write the wrong amount in the financing statement, or they list the wrong Debtor, or they make mistakes.  In a classic example, filing a termination statement, right?

A    Mistakes do happen.

Q    That's why we have Chapter 11 challenge periods for committees, to give them time to make sure that it all buttons up, right?

A    Give them time to make their own evaluations.

Q    What's your understanding as to how the challenge period now works?

A    I don't know.

Q    Do you know whether the Debtors are stipulating to anything?

A    I'm not sure I understand the question.

Q    Well, what happened to the stipulations in the interim DIP order?

A    I -- I -- I don't know.

Q    What work is Quinn doing?

A    Excuse me?

Q    What work is Quinn doing?

A    The investigation currently is being done by one of our independent board members, and he has decided to use Quinn Emanuel as counsel to him in his investigation.

Q    To investigate, among other things, the extent, priority,

and validity of the 1-L liens?

A    Yes.

Q    When is the report coming out?

A    I don't know.

Q    Okay.  Under the current DIP order, you have a business understanding as to what happens if Quinn comes to the conclusion at confirmation that the 1-L liens are not valid?

A    I do not.

Q    Well, do you have the -- an understanding of what happens if they come to the opposite conclusion that all the liens are valid?

A    I -- I do not have a (indiscernible).

Q    Does the committee still get to challenge?

A    I don't know.

Q    Okay.  What's the committee's budget for that challenge?

A    I think the -- already said that the committee's budget initially was $50,000.

Q    Okay.  Let's go to Exhibit 10 in your binder, which is Debtors', I think, Exhibit 2.  These are the -- this is the DIP budget?

A    It's identified as the DIP budget as of 8/20.  I don't know if this is the same as what it was filed with the motion.

Q    Okay.  Each of the -- each, whatever DIP budgets, all of the DIP budgets that you've seen include the payment of all prepetition transporters claims, right?

A      Yes.

Q      Whether prepetition or postpetition, right?

A      Correct.

Q      So the $181 million is built into this budget, right?

A      That's correct.

Q      And the additional $60 million of payments that you haven't made yet are built into this budget?

A      That's correct.

Q      Now just as a math question, if the Debtors find a way to get through without paying those $60 million of additional trade vendor claims, just as a math matter, that means they'll have -- and you perform the budget -- you'll have an additional $60 million of cash through the 13 weeks.

A      If we do not pay those $60 million, that's not necessarily entirely true.

Q      Just as a -- look, I get it.  If you don't pay it, it may affect the business and everything else.  I'm just saying is it from a cash perspective --

A      It's more than it will -- may affect the business.  The -- under the -- under both the company's contracts, as well as certain of the state regulations with regard to prompt pay, the customer -- the company is required to pay its transportation providers within a certain period of time.

If it does not, yes, it can have a material impact on the -- on the customer's contracts and whether or not they will

continue to honor those contracts.  But it also may have future ability on the -- on the -- or the -- the -- on its ability to collect from those customers if we do not make the payments to our vendors.

MR. SHORE:  Motion to strike as nonresponsive, Your Honor.

THE WITNESS:  You asked --

MR. SHORE:  That wasn't the question.

THE WITNESS:  -- you asked me --

MR. SHORE:  I'm not arguing with the witness, Your Honor.

THE COURT:  No, I'm going to let him -- I'm going to -- overruled.  I'm going to let him answer the question.

THE WITNESS:  You asked me if we did not make those $60 million' worth of the payments, would we have $60 million more cash on the balance sheet.

BY MR. SHORE:

Q    As a matter of math, not as a matter of policy or anything else.  Can you answer my question with respect to that?

A    It is not just a matter of math.

Q    Okay.

A    It is a matter of policy.  Because if I -- if the company does not make those $60 million' worth of payments, that means in all likelihood that the amount of cash receipts that we

have coming into the business in the future will also wind up going down.

So just because we do not make those $60 million of payments today does not mean we will have $60 million, that same $60 million in payment -- $60 million on the balance sheet in perpetuity.

Q   Right.  What you're saying is revenues may come down.

A   No, I'm saying cash receipts may not come in.

Q   Right.  Those are revenues, right?

A   No, revenue and cash receipts are different.

Q   And how are they different?

A   Revenue is the amount of income, basically amount that we -- that we generate on an accrual basis from operating the business.  How that revenue comes in comes in a lot of different ways over the course of time.

Cash receipts and revenue do not necessarily agree on the same time period basis.

Q   Okay.  And this is a cash budget, right?

A   This is a cash budget.

Q   I mean, so I didn't ask you what happens with your revenue and how you're booking your revenue.  I'm just talking about cash coming in.  If your cash receipts go down, your cash position will go down, right?

A   Inherently, yes.

Q   And if your disbursements go down, your cash position

goes up.

A    And you just tried to tie those two separate from each other.

Q    No, I didn't.

A    You did.

Q    Well, I'm not here to argue with you, sir.  I'm just here to have you answer the questions that I ask.  As a matter of math, if your disbursements to the prepetition vendors go down, your cash will go up, at least at that line item.

        MS. MARKS:  Your Honor, at this point, I'm going to object as to asked and answered.

        THE COURT:  Sustained.

BY MR. SHORE:

Q    And when you say these people have the contracts and they can terminate the contracts, you're talking about prepetition executory contracts of the Debtors, right?

A    Yes.

Q    So if you don't pay a prepetition amount, your concern is that a party to a prepetition executory contract is just going to walk away?

A    Under the terms of that agreement, yes.

Q    Just -- you've been in bankruptcy area a while.  You ever heard of the case, Bill Disco?

A    Bill Disco?

Q    Bill Disco?

A     I don't recall that.

Q     Do you have any understanding as to whether or not a party to a prepetition executory contract is required to perform even if the Debtors don't?

MS. MARKS:  Objection.

BY MR. SHORE:

Q     Not as a legal matter, just as a business matter; are you aware of that?

MS. MARKS:  (Indiscernible)  Reiterate my objection.

THE COURT:  Sustained.

BY MR. SHORE:

Q     With respect to the Moelis fee, you have no view whether the $10 million success fee is reasonable, right?

A     I do not.

Q     And that $10 million is on top of its monthly retainer?

A     Yes, but I think that there is some crediting of the monthly retainers against that, but I don't recall specifically.

Q     Okay.

MR. SHORE:  I think I have no further questions, Your Honor.

THE COURT:  Thank you.

Ms. Marks?

MS. MARKS:  Just a very short redirect.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. MARKS:

Q    Mr. Shandler, what happens if the trade vendors don't get paid on a timely basis?

A    Well, as I've testified before, these are not large, all large vendors, and I think even proposed committee counsel identified that many of these are small vendors as well.

These are people who depend upon the company to receive these payments to continue to operate their business, to continue to operate their business in the ordinary course.

To the extent they don't receive these payments, there's high likelihood that they will no longer service the company. And in some of these markets, although we have not necessarily talked about alternative vendors, there are only in some cases few vendors within some of these markets.

And the cost to transition these -- these services to somebody else and contract with them, especially with a company in bankruptcy that then would be known to have defaulted on their vendors, would be extremely detrimental and would have difficulty of the company fulfilling its requirements under its customer contracts.

Q    Why are all transportation vendors considered critical here?

A    That's the backbone of the business.  That is what people contract us to do.  If we do not -- if we do not pay those

critical vendor contracts, these are people who are critical to the business and not easily replaceable or the cost of replacing them and the time of replacing them would bring significant harm to the business.

That is generally what a -- what a critical vendor is. If we do not pay these vendors, the business will very much wind up slowing down or coming to a halt in many of the markets for which we are operating in which we've contracted to provide these services. And that will also have detrimental impact to those people who depend on these services.

Q    Are these vendors willing to be paid late?

A    No.  In fact, when prepetition or when we're trying to manage liquidity early on in our involvement with the Debtors, even if we went so much as paying them one day late, and I do mean this in all seriousness, we would either start receiving phone calls from those vendors because they know when they expect to receive these payments.

We would receive immediate phone calls as to where is my check or my ACH, whatever the method of payment is.  And many of them would then wind up going to the regulatory bodies in those states to complain that they did not receive their payment timely from ModivCare.

Q    If the vendors don't get paid on a timely basis, how might that impact clients?

A    It would ultimately be reported to them.  And as I've said before, many of our contracts have terminations for convenience.  They would then wind up seeing that we are not performing at the criteria that are required under our contracts and may very well seek to terminate those contracts or seek replacement as we move forward with our RRP process.

Q    And you mentioned some of these vendors have reported late payments to regulatory bodies.  Are there regulatory concerns with paying these vendors as well?

A    Yes, there are.

Q    And what are -- why?

A    Many of the states require prompt payment regulations and statutes within the contracts for which they operate.  They consider the fact that if we are accepting state money or corporate money, depending upon the type of contract, but really state money, people's money, and that's to pay for services to recipients of those services within their states, they take that very seriously.

MR. SHORE:  Just move to strike with respect to the legal aspect of that.  A lawyer's just briefed it, but (indiscernible).

THE COURT:  Okay.

MS. MARKS:  You --

BY MS. MARKS:

Q    Mr. Shandler, do you recall Mr. Shore asked you about

whether you've updated the budget?

A    Yes, I think.

Q    He had some questions about the DIP budget and whether or not you've updated it.  Do you recall that?

A    Yes.

Q    Have you asked White & Case for the committee's budget?

A    We -- we have.

Q    And have they provided it to you?

A    Well, we asked for them to provide us their fees since they've been retained as part of the policy to escrow professional fees into the professional escrow in the case. The response we got back was, we will provide you the number after today's hearing.

          MS. MARKS:  Thank you, Your Honor.  No further questions.

          THE COURT:  Okay.

          MR. SHORE:  May I just follow up on a few points?

          THE COURT:  Sure.

                    RECROSS-EXAMINATION

BY MR. SHORE:

Q    Let's first deal with the B point.  With respect to the consequences of the budget.  First of all, the Debtors have put $1.75 million in for the committee, right?

A    Yes.

Q    Are you aware of the fee feature in the DIP as to what

happens if His Honor says fees of $2.2 million are reasonable and should be paid and the Debtors pay it?

A    I -- I don't recall.

Q    So you're not aware of whether or not that's an event of default under the DIP that allows the lenders to foreclose?

A    I -- I don't recall.

Q    Okay.  And what happens if the Debtors don't pay administrative expenses that His Honor has awarded as necessary and appropriate and reasonable?

A    Well -- well, that is a legal conclusion you're asking me to make with regard to administrative claims.  My understanding from having worked in the profession is that to confirm a plan of reorganization, administrative claims need to be paid in full unless otherwise agreed to.

Q    Okay.  Now let me ask you a series of questions with respect to what I didn't think I opened the door on, but now that the door is open and it's in, I've got to follow up on it.  I'm going to hand you another document, not on the exhibit list.

MR. SHORE:  Your Honor, may I approach?

THE COURT:  Sure.

MR. SHORE:  This wasn't produced to us in discovery, but it was found in the data room.  And if we have a problem with the Debtors with that, our witness can identify it as such.

BY MR. SHORE:

Q    Have you seen this document before, which will be Committee 23?

MS. CHASE:  Yes.

THE WITNESS:  Yes.

BY MR. SHORE:

Q    Okay.  And what is it?

A    Well, the date I believe is incorrect.  And I think that this was actually raised at my deposition.  But this is -- was the initial estimate as support for the critical vendor motion.

Q    Right.  If you -- if in the live, what happens is in a live model, if you print it out, it updates the date, right?

A    Depending upon the formula in that particular --

Q    Yeah.  Okay.  So this is what the Debtors were thinking when they came in on the initial critical vendor motion of what constituted the amount of money they needed to pay, right?

A    It was what we had currently in accounts payable at the time of filing.

Q    Right.  And so if you go to the first page in, that starts listing the amount of what the Debtors thought the prepetition claim was in the beginning.

A    Based upon the invoices that the Debtor had in hand at the time of filing.

Q    Okay.  Now I'm not going to put it on the screen because it's marked privileged and confidential and all that.  But with respect to that first vendor at the top, the one that starts with L --

A    Yes.

Q    -- you're not aware the Debtors made any calls to them or any -- had any discussion as to whether or not they would continue to perform if the amount listed there on the right wasn't paid in cash within days of the first days of the case?

A    Well, that --

MS. MARKS:  I'm just going to object.  This question was already asked at a general level in the cross-exam, so it's unclear to me how this is now --

THE COURT:  Why isn't it cumulative?

MR. SHORE:  Because the testimony that counsel adduced was that the nonpayment of any particular item is going to -- was going to cause harm to the Debtors.  Just following up on that.

MS. MARKS:  Your Honor, the question was whether he's called vendors, and he's already testified he's not.

MR. SHORE:  On that one, that one, I get.

BY MR. SHORE:

Q    But with respect to this particular vendor, are you aware of whether or not it has a prepetition contract with the Debtor?

A     I believe it has a prepetition agreement.

Q     That is a non -- that is a unexpired prepetition executory contract?

A     I have not necessarily made the determination of it being executory, but I believe there is a prepetition agreement.

Q     All right.  Now the doom and gloom testimony you gave with respect to the nonpayment of any of these could cause a collapse of the business, let's just turn back a few pages.  You'll see that what happens is these start descending in amounts.

A     Yes.

Q     And we get into amounts that are $848, $606, page after page of dollars.  And the testimony you gave is that the nonpayment of any of these -- $868 is going to cause the Debtors' business to collapse?

A     I said each one of these basically of our transportation providers, or in this case, those are mileage reimbursement parties that you were -- that you were talking about, yes, that would have a very detrimental impact to the business.

Q     So the nonpayment of a single -- so a single person, how much, do you know how much you reimburse per mile?

A     I don't recall.

Q     Do you know how the process works?  Someone picks up their mom and takes them to the hospital.  You know how they submit a form to the company?

A    I know there's a form they have to submit.

Q    Yeah.  Have you seen the form?

A    No, I haven't seen the specific form.

Q    So have you seen any actual form that people submitted?

A    I have not been at that level of detail.

Q    Okay.  And with respect to these, they take them for ten miles and they submit a calculated form saying I got to get this money paid, right?

A    Yeah.

Q    Okay.  And your testimony is that if you didn't pay 115 million -- sorry, $115 million -- $115 of a form that was submitted to the Debtors and you didn't do it within days of filing the case that the Debtors were going to collapse?

A    I never used the word collapse, but yes, I said it would have a material impact on the Debtors' business.

Q    Well, filing for bankruptcy usually has a material impact on a Debtors' business, right?

A    Sometimes it does, yes.

Q    Yeah.  And it's because they -- you have a whole bunch of people you owe money to who you were sending out checks after checks after checks and you stop paying them.

A    Is that a question?

Q    Yeah, right?  Isn't that -- part of the problem of going into bankruptcy is you have a whole bunch of people, whether they're bondholders or trade claimants or litigation claimants

or executory contract counterparties whose contracts are getting rejected, they're not getting paid, right?

A    Some people don't get paid into bankruptcy.

Q    Right.  And some people don't get paid even if there's a contract that says they need to be paid.

A    Sometimes.

Q    And sometimes even if there are regulations that say you got to pay this timely, right?

A    No.  Now you're asking for that as a legal conclusion.

Q    No, I'm just asking -- you testified as to your understanding sometimes the Debtors have to -- don't pay money that they're regulatorily required to pay.

A    I'm not going to comment on regulatorily, but I'm going to say yes, sometimes creditors in a bankruptcy do not get paid 100 cents on the dollar.

Q    Okay. And let me ask another question.  You told the Court there are these regulatory consequences.  Not asking for a legal conclusion, what's your understanding of the regulatory consequence on timely payment?

A    That we are expected to pay our vendors timely for the services that have been provided or it could have a material impact on both our ability to collect funds going forward from those same contracts or could potentially be grounds for termination.

Q    Okay.  His Honor doesn't have it because the counsel

didn't brief it, but do you have any understanding of whether the Debtors just owe penalties and fees for late payment?

A    I don't know.

Q    Okay.  So it could be that the regulatory consequence for the Debtors if they didn't pay the $115 chit that was submitted prior to the bankruptcy, they might just have to pay fees and interest if His Honor allowed that as part of a claim, a penalty fee and charge?

MS. MARKS:  Objection.  Calls for legal conclusion.

THE COURT:  Sustained.

BY MR. SHORE:

Q    Are you saying that the Debtors would -- your business understanding is the Debtors, there would be a consequence if they didn't pay the $115, quote, timely other than the accrual of penalty fees and interest or you don't know that much about it?

A    No, I'm saying in my business judgment, there would be a detrimental impact to the business if the Debtors do not, did not and do not make these payments.  You are singling out one specific small-dollar payment, which I appreciate and I understand why.

I am making the comment with regard to operating the Debtors' entirety of its business and whether or not paying these -- these trip providers or the mileage reimbursement would have a detrimental impact on the business and my

business judgment, as well as my understanding, is yes.

Q   Okay.  We're talking about the trip providers.  I'm sorry.  We were talking about the mileage reimbursement.  By the way, again, the Debtors did not make a single call to anybody, $115.  Hey, can you just wait around for three months for the reimbursement?  We filed for bankruptcy.  We're not allowed to pay this money now.

            MS. MARKS:  Objection.  Asked and answered.

            THE COURT:  Sustained.

            MR. SHORE:  Okay.

BY MR. SHORE:

Q   Now with respect to the trip providers, which of these markets that these trip providers work in don't have a competitor that the Debtor doesn't do business with?

A   I don't --

            MS. MARKS:  Your Honor, I need to object at this point.  Mr. Shore asked about critical vendors during his cross-exam.  I then did a short rebuttal.  It feels like we're going way out of the scope of rebuttal or redirect, I should say.

            THE COURT:  Well --

            MR. SHORE:  The testimony was -- she adduced the testimony that I wasn't thinking I was opening the door to that the nonpayment of any of these would cause harm to the business.  That was not even remotely within the scope of what

I opened the door on.

But he then testified with respect to that.  So now I'm just testing that the nonpayment of any of these would affect the business.  And he just said it again.  So I'm moving away from the mileage reimbursement to the trip providers.  And just asking one question.

BY MR. SHORE:

Q    Do you know enough to tell His Honor which of the trip providers here do not have a competitor in the market that the Debtor doesn't already employ?

A    No, I don't.

Q    Okay.  Thank you.

MR. SHORE:  No further questions, Your Honor.

MS. MARKS:  Your Honor, I know that you have a hearing.  I just have one question.

THE COURT:  Okay.  Yeah.  Then we're going to talk about how to finish this.

FURTHER REDIRECT EXAMINATION

BY MS. MARKS:

Q    Mr. Shandler, last question.  On Committee's Exhibit 23 that you were just asked about, do you understand that all of the vendors on this exhibit whom the Debtors are paying are part of the committee's constituency?

A    Yes.

MS. MARKS:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.

Thank you, Mr. Shandler.  You may step down.

THE WITNESS:  Thank you, Your Honor.

(Witness steps down.)

THE COURT:  All right.  So you have another witness, and do you have any witnesses, Mr. Shore?

MR. SHORE:  We have one, Your Honor.

THE COURT:  Okay.  So I have a 4:30 hearing and then I have a 5:30 first day hearing in Anthology or Blackboard. So we could come back after that or -- and that's, I mean everybody's here.  So you're just going to miss your flight tonight.

Alternatively, we could find some time.  Probably not tomorrow, but later in the week.  So --

MS. MARKS:  So I think our preference is to at least get through all of the witnesses today.

THE COURT:  Okay. All right. Let's do that.  All right.  So we'll just go as late as we have to, to get done. Okay?  And --

MS. MARKS:  We're prepared.  I think we've probably all canceled our flights preemptively.

THE COURT:  Okay. Sounds good. All right.  Thank you.

MS. MARKS:  Thank you.

THE COURT:  All right.

MR. SHORE:  Your Honor, can we leave our materials?

THE COURT:  Yeah, leave your materials in here, yes. Everything else is going to be for virtual.

(Recess taken from 4:36 p.m. to 6:33 p.m.)

THE COURT:  All right.  We are back on the Record in Case Number 25-90309.

Ms. Marks?

MS. MARKS:  Good evening, Your Honor.  Thank you for having us back at this hour.  The Debtor --

THE COURT:  I was pretty -- I was pretty -- I guess pretty good.  I mean I was only 1 minute late.

MS. MARKS:  Your Honor, the Debtors' next witness is Mr. Zul Jamal of Moelis.

THE COURT:  All right.

(Pause in the proceedings.)

(Witness sworn.)

THE COURT:  Okay.  Yes.

DIRECT EXAMINATION

BY MS. MARKS:

Q    Mr. Jamal, where are you currently employed?

A    At Moelis & Company.

Q    What is your position at Moelis?

A    I'm a managing director and US co-head of the capital structure advisory group.

Q    How long have you worked at Moelis?

A    17 years.

Q    And what did you do before Moelis?

A    I worked at Jeffries and Company.

Q    How many years of experience do you have in investment banking?

A    25.

Q    Approximately how many restructurings have you worked on prior this one?

A    Dozens.

Q    And if you had to estimate, how many DIPs would you say that you've worked on?

A    40 or 50.

Q    As a result of your work for the Debtors have you become familiar with their capital structure, liquidity needs and business operations?

A    I have.

Q    How many different engagements has Moelis had for the Debtors?

A    2.

Q    When was Moelis first engaged?

A    November 2024.

Q    And what were you brought on to do for the company at that time?

A    At that time we were engaged to assist the company with raising capital and also potential negotiating covenant relief

under its 1st lien debt.

Q    What kinds of challenges was the company facing at that time?

A    The company had experienced some customer losses and had a liquidity need as a result of its working capital position which was challenged because of certain of the receivables being long lived.

Q    What strategic alternatives did Moelis assist the Debtors in considering during that first engagement?

A    We evaluated a range of potential ways to bring in liquidity to the company.

Q    And were those efforts successful?

A    They were.

Q    Were the funds raised in those transactions sufficient to address the Debtors' long term capital needs?

Q    At the time of the consummation of those transactions the expectation was those funds would be sufficient to provide the company with liquidity that would allow the company to then subsequently sell assets which would be used to repay some borrowings and provide incremental capital that then should -- would have proved sufficient to satisfy the company's long term needs.

Q    And the transactions we're talking about, is this what Mr. Shandler referred to earlier as the 5th amendment and related transactions?

A    Yes, it was the 5th amendment and then subsequently there was a $30 million 2nd lien financing that came in as well.

Q    And were those asset sales that were going to be pursued successful?

A    They were not.

Q    When was Moelis -- let me ask this first, once the financing transactions closed in the first quarter of 2025 did Moelis's engagement end at that time?

A    Our work substantively ended, we maintained a dialogue with the company but we were not doing any regular work with them.

Q    And was Moelis re-engaged at some point?

A    We were.

Q    When Moelis was re-engaged what challenges were the Debtors facing?

A    So we were re-engaged in June 2025.  At that time the company had not yet consummated the asset sales that they had been pursuing, and the financing that we had secured in early 2025 had a 1-year maturity, and so that needed to be repaid. In addition the covenant amendments that we had negotiated were coming back into place in the third quarter and the company did not expect to be in compliance with those covenant.  And the company additionally, based on both the business performance as well as challenges with their surety bonds, was going to have liquidity challenges in the third

quarter of 2025.

Q    And why was Moelis re-engaged at that time in June?

A    We were re-engaged to help the company navigate all those challenges and identify alternatives they could pursue to address them.

Q    What alternatives did you consider?

A    Initially we thought through a range of -- a range of alternatives on an out-of-court basis around raising capital and negotiating relief with the company's existing lenders.

Q    And is that -- was that an out-of-court restructuring that was being pursued?

A    It as an out-of-court restructuring and/or a capital raise.

Q    Were the existing lenders willing to engage in an out-of-court restructuring?

A    They were not.

Q    Were there new investors willing to come in?

A    We did not reach out to new investors at that time.

Q    At some point did the Debtors start considering whether to pursue an in-court restructuring?

A    They did.

Q    And when was that when they started to consider that?

A    It became a consideration in the latter part of July 2025.

Q    In your understanding, why was the decision made to pivot

to an in-court Chapter 11 rather than continuing to pursue other options?

A    So there were a number of factors.  Initially once the lenders told us they weren't interested in an out-of-court restructuring it became clear that in order to consummate a transaction out of court we need to raise a significant amount of junior capital before we could embark on an extensive process with outside parties.

The company experienced the loss of significant customer contracts, including its largest customer, and there was a concern that the continued situation of the company would exacerbate customer losses and destroy significant value, and as a result the decision was made that an in-court restructuring was the best way to preserve the value of the company.

Q    What has Moelis's role been with respect to the Debtors' preparation for a Chapter 11 filing?

A    We assisted the Debtors in negotiating the DIP financing as well as the terms of the RSA.

Q    What did Moelis do to evaluate the terms and fees of this DIP facility to determine whether they're reasonable and consistent -- what did Moelis do to evaluate whether the terms and fees of this DIP facility are reasonable and consistent with comps?

A    We examined a series of transactions that we were able to

identify that we thought would be -- that we thought were somewhat similar to this financing.

Q    Did Moelis prepare a chart reflecting comparable DIP facilities you analyzed?

A    We did.

MS. MARKS:  And, Your Honor, on the screen someone from our law firm named Mitch McQueen is on.  If we could give him permission to present?

(Pause in the proceedings.)

MS. MARKS:  And, Mr. McQueen, if we could pull up Debtors' Exhibit 18.

BY MS. MARKS:

Q    What does this slide reflect?

A    This slide represents a chart that we prepared reflecting term loan DIPs we were able to identify that were approved between June of 2021 and the date this was put together which was some time in September.

MS. MARKS:  And if we can zoom -- zoom -- let's see, out a little bit just to see the title of the slide, Mr. McQueen?

THE COURT:  No, I do that.

MS. MARKS:  Oh, okay.  And actually could we flip to the firs slide?

BY MS. MARKS:

Q    Mr. Jamal, is this deck dated September 2025?

A     It is.

Q     Is this the same version you created in August when the Debtors were negotiating the DIP?

A     It's not.

Q     Why did you update the comps in September?

A     We updated the comps to reflect additional financings that were approved subsequent to our initial work that we did, and then we added some additional information on this chart that we were kind of aware of just to make clear some additional terms.

Q     Okay.

          MS. MARKS:  And we can scroll down to the next slide again, with the comps.  And, Your Honor, feel free to zoom in as much as you need to.

          THE COURT:  No, I'll look at it over here.

          MS. MARKS:  I know it's very small.

          THE COURT:  Yeah.

BY MS. MARKS:

Q     Mr. Jamal, can you just walk us through at a high level what are the key terms and fees of this DIP and how do they compare to the comps?

A     Of course.  So when we looked at this DIP we looked at, from a comparable standpoint, the interest rate and the DIP facility fees which can comprise both an up-front fee and exit fee, and compared the ModivCare DIP to the comps.  And as

you'll see from this chart, the interest rate and the aggregate facility fees here are around and slightly below the mean and median of this data set.

We also looked at the backstop economics of the ModivCare DIP and looked at that in relation to the backstop economics of those -- these other DIPs, although in my view the backstop economics are not necessarily as easily directly comparable as the interest rate and the facility fees because it's much more situation-specific and is dependent on a host of factors that are going to vary case-by-case.

Q    Does this DIP include a rollup?

A    It does not.

Q    Do many of the DIPs include a rollup?

A    I believe a number of these DIPs include a rollup, yes.

Q    Is the lack of a rollup beneficial to the Debtors?

A    I believe it is, yes.

Q    Why?

A    Because it can effectively -- my understanding is it effectively converts pre-petition debt into post-petition debt and limits the type of treatment that debt can get in a plan of reorganization.

Q    And does this DIP roll into an exit facility?

A    It does.

Q    And how long is that exit facility?

A    It's 5 years.

Q    Do many of the DIPs roll into exist facilities?

A    Some of them do, some of them are required to be repaid in cash.

Q    And is a 5-year exit facility a favorable aspect of this DIP for the Debtors?

A    I believe it's very favorable, particularly because in this case not only is it a 5-year exit facility, but it is going to be junior to up to 250 million of new financing that we need to raise to provide the company with the liquidity it will need to operate the business on a going forward basis.

Q    So let's talk a little bit more about the backstop.  The backstop fee in this DIP is 20 percent payable entirely in equity of the reorganized Debtors.  Is that right?

A    Yes.

Q    What happens if the restructuring support agreement here falls apart and the Debtors have to pursue an alternate plan, is the backstop fee still required to be paid?

A    My understanding is if the Debtors pursue an alternate plan, as long as that alternate plan pays the DIP in full, there is no backstop consideration payable, so there's no liquidated damages and no equity issued under the backstop.

Q    Is a backstop fee paid in equity a common feature in DIPs?

A    I would say it's not uncommon, it's become more common, but I wouldn't say it's totally typical either.

Q    How many other backstop fees in your comp set have equity fee components?

A    I think it's around a half dozen, maybe a little bit more.

Q    And of those how many had no cash component?

A    So my understanding is a number of these had -- may not have had a direct cash component, but they had liquidated damages in an alternative case where they didn't get their equity.  So if they were repaid in cash, there was an additional cash fee payable.  Unlike in this DIP where if it's repaid in cash in an alternative plan, there is no cash fee payable.

Q    If this backstop fee were paid in cash, do you believe that would have been better or worse for the Debtors here?

A    In this case I think it would have been worse because here the backstop fee is paid in equity, that equity under the plan is otherwise going to the 1st lien lenders who are overwhelmingly supportive of the RSA as evidenced by the 93 percent support, and the 2nd lien lenders are also heavily supportive and no 1st lien or 2nd lien lenders have objected to the DIP.

        And if there's an alternative deal that we're able to identify that delivers more value for the estate, then the -- effectively the backstop falls away and there's no cost borne by the Debtors for securing this facility in terms of

the backstop.

Q    Let's talk more about the negotiations that led to this proposed DIP facility.  When the Debtors realized they might need to do an in-court restructuring back in July what did Moelis do first?

A    We worked with the Debtors' other advisors to develop a framework for a restructuring term sheet, that we socialize the company's capital -- the board's capital structure committee and then subsequently shared with the advisors to the ad hoc group.

Q    Did the Debtors provide an initial restructuring term sheet to certain of its lenders?

A    We did.

Q    And let's look at a document that shows the negotiations.

MS. MARKS:  If we could pull up Exhibit 17, please, Debtors' Exhibit 17.

BY MS. MARKS:

Q    Mr. Jamal, what is this document?

A    This document represents the back and forth -- I think if you move to the next page -- between the Debtors and the ad hoc group during the course of late July into the middle of August around the terms of the DIP as well as the overall negotiations of the RSA.

MS. MARKS:  And, Your Honor, I forgot, on the last slide -- we actually do have hard copies, these 2 exhibits are

very small.  If it would be helpful, we have some hard

copies -- you got one.  Okay.

THE COURT:  Thank you.

MS. MARKS:  Well, does the clerk need one?  Okay.

BY MS. MARKS:

Q    Let's walk back -- let's walk through these back and

forth negotiations.  How long did the negotiations last?

A    So the -- we made an initial proposal as evidenced here

in -- on July 24, and we substantively agreed the economic

terms of the deal by the middle of August.

Q    Were you able to negotiate any better terms from the ad

hoc group's initial counterproposal to the Debtors' opening

offer?

A    With respect to the DIP we were successful in lower the

interest rate and certain of the facility fees.

Q    As reflected on this slide did you try multiple times to

negotiate down the backstop fee?

A    We did.

Q    Did you succeed?

A    We did not.

Q    When was a final agreement reached on the key terms of a

restructuring agreement and DIP financing?

A    So we reached final agreement on the sort of the headline

economic terms around August 14 or 15, but the documentation

took up until the filing date to finalize, so around August

20.

Q    How did the Debtors' capital structure impact their ability to raise alternative post-petition financing?

A    So the Debtors had a significant amount of secured debt and we, as the company's investment banker, along with the company's other advisors, had concerns with our ability to prime that secured debt without the consent of the 1st lien lenders.  And so our ability to secure financing without their consent was really limited in our view to junior financing that would come in behind the secured debt.

Q    Did Moelis run a marketing process to try to find other options for post-petition financing?

A    We did.

Q    And can you describe that marketing process?

A    Yes, we went out to 18 lenders, including I think it was 3 lenders inside the company's capital structure and then 15 lenders outside the company's capital structure.  We asked them if they were prepared to provide junior financing behind the Debtors's secured debt on a post-petition basis.

Q    Did you receive any proposals back?

A    We did.

Q    And was this the Colosseum proposal that Mr. Shore referenced earlier?

A    We received -- yeah, we did receive one proposal from that alternative provider on a priming basis.

Q    Any other proposals?

A    No other proposals.

Q    At a high level can you describe that alternative proposal?

A    Yeah, so that proposal was strikingly similar to the proposal from the ad hoc group.  It had slightly lower costs in certain areas, but was otherwise structured with a backstop fee payable in equity and some of the other features the ad hoc proposal had.

Q    Why did the Debtors decide not to go with that proposal?

A    So in our view that proposal would present a number of challenges.  Firstly it would have required us to prime the secured lenders without their consent.  As I mentioned earlier, I think we collectively on the Debtors's side had concerns that we would be unable to demonstrate the necessary evidence to successfully prime them on a non-consensual basis.  If we failed in that effort, it would be catastrophic to the company's business operations.

In addition, the proposal from the ad hoc group rolled into a long term exit facility.  While the Colosseum proposal purported to do that, in order to do so it would have needed the consent of the lenders, and the lenders had indicated to us very clearly that they were not supportive of that proposal.  So that ability was also not available under the Colosseum proposal.

Q    Did you feel the Colosseum proposal was viable?

A    No.

Q    In your view is this DIP facility at issue today the only viable post-petition financing option available to the Debtors?

A    Yes.

Q    Did you review the Committee's objection to the DIP?

A    Yes.

Q    And have you reviewed the declaration of the Committee's financial advisor, Mr. McGreavy, that contains a comparable DIP analysis?

A    Yes.

Q    His comp set did not include one comp, *Joann Fabrics*. Are you aware of that?

A    Yes.

Q    Do you think it should have?

A    I mean generally I think if you're going to look at a set of comps, you should consider all the available data and then you can make an assessment as to which deals may be more or less comparable.  My understanding is he excluded that one because he deemed it an outlier.

         But I think you have to consider the facts and circumstances of each case and take into account what that means.  And so just throwing something out because it looks too high I don't think is an appropriate way to establish a

data set.

Q    And let's look at your comp set.

MS. MARKS:  Okay.  If we could pull Exhibit 18 back up.

(Pause in the proceedings.)

MS. MARKS:  And we may need to zoom in again, it's so small.

BY MS. MARKS:

Q    Is *Joann Fabrics* on your comp set?

A    I believe it is about, you know, 2/3 of the way -- or 1/3 of the way down.

Q    Okay.  In *Joann* there was a 20 percent PIK backstop fee that could convert to equity.  Is that right?

A    That's right.  You have to go Footnote 11 on the next page for all the details.

Q    Do you have any other observations about Mr. McGreavy's comp set?

A    Well, I think Mr. McGreavy only focused on the backstop fee with -- to the exclusion of all the other economic terms of this DIP when he compared it to other DIPs.  He also I don't think took into account the implications of this backstop fee on the RSA where the parties who are being diluted by the reorganized equity are overwhelmingly in support of the plan and the RSA.

And a number of the comparable DIPs he cited had

alternative -- you know, I'll call them liquidated damages or break fee provisions where if the DIP was repaid in cash and the equity wasn't issued, they received an incremental cash payment.  This DIP does not have that feature.

So if we do an alternative deal, if, you know, someone comes along with, you know, an offer to buy the company for a lot of money or a junior creditor or shareholders writes a large check to recapitalize the business, then we're not incurring any cost associated with the backstop, all of which I think is highly beneficial to the Debtors and to the estates.

Q    You testified that Mr. McGreavy only looked at the backstop fee.  Why is it important to look at the DIP facility as a whole and all terms together rather than just focusing on the backstop fee?

A    Because in the context of the overall negotiation there's always trade offs.  You know, as much as I would like to achieve success on every term at every point, you know, this is a difficult company to lend to, it was going through a lot of challenges and it was a hard-fought negotiation where we tried to get the best terms we could and at the end of the day you have to think about those terms in totality, and here I think we, under the circumstances, achieved a pretty good outcome.

Q    Does anything that Mr. McGreavy put together change your

view of this DIP facility?

A    It does not.

Q    What is your reaction to Mr. McGreavy's assertion that the backstop fee here is worth 154.9 million?

A    So I believe that math is just math based on using the Debtors' pre-petition debt.  I also think ascribing a dollar value to reorganized equity is not the right way to think about this fee because the equity's not the same thing as cash.

You know, it's an estimate of a range of values, it's not a guarantee, it's not a cash payment, it doesn't require someone to write a check, and someone's not receiving a check in return.  And so I think it's a math exercise but it's not taking into account really the true economic costs and benefits that the company's incurring here.

Q    Is there an out-of-pocket cost for the Debtors for the backstop fee here?

A    In cash there's not, no.

Q    In your view can you ascribe a dollar value to a backstop fee?

A    I think it depends.  In the circumstances in this case I think it would be the wrong way to think about the backstop fee.

Q    Okay.

MS. MARKS:  Thank you, Your Honor.  No further

questions.

THE COURT:  Okay.  Mr. Shore?

MR. SHORE:  Yes, sir.

CROSS-EXAMINATION

BY MR. SHORE:

Q    Good afternoon, Mr. Jamal.  Chris Shore from White & Case, the proposed counsel to the Committee.  I've got a few pages of questions.

A    Okay.

Q    And some of these were answered but I want to get a few of the details in that weren't in your answers.  Debtors first engaged Moelis, an investment banker, financial advisor and placement agent in December 2024.  Right?

A    We started working in November 2024, I think our engagement letter may have been signed in December.

Q    Okay.  And Moelis's work on the engagement was substantially completed in January 2025.  Right?

A    That's right.

Q    So it stopped being an investment banker, financial advisor and placement agent at that time.

A    Well, our active work stopped, I believe our letter had like a tail but we weren't really doing substantive work at that point.

Q    And during that initial engagement neither you nor anybody else at Moelis to your knowledge had any substantive

role in creating management projections of future revenues and expenses. Right?

A    We did not.

Q    Okay. And no role at all as far as you know by anyone at Moelis on creating a 2- or 5-year business plan?

A    No.

Q    Okay. But you do understand that the Debtors at that time -- or the company at that time, not a Debtor, was preparing forward business projections prior to the petition date. Right?

A    I believe they prepared some forecasts, yes.

Q    Okay. And you understand that they did prepare forecasts in connection with the up-tier transaction, or what people are now calling the 5th amendment.

A    They prepared -- yeah, we provided I believe a financial outlook for I think it was 2025 at the time.

Q    Okay. When you say we, you mean the company not Moelis.

A    That's right.

Q    Okay. In connection with Moelis's initial engagement Moelis did not make any effort to market the company for sale.

A    We did not market the company for sale, no.

Q    Okay. Even though you had been retained as an investment banker for the company during that initial engagement.

A    Yeah, I mean investment bankers do more than just sell companies.

Q    I understand.  Then we get to the second engagement, that occurred in June of 2025?

A    That's correct.

Q    Okay.  And just to be clear for the Record, between January and June of 2025 did Moelis do any substantive work for the Debtors?

A    No, we stayed in touch with the management team and were talking to various constituencies but were not actively engaged in any assignment.

Q    Okay.  When Moelis's engagement was resumed in June, Moelis helped the company to work on potential out-of-court financial solutions.  Right?

A    That's correct.

Q    And you engaged with existing lenders in July 2025 regarding their appetite.

A    Existing stakeholders, yes.

Q    Okay.  And I just want to be clear about this.  The senior lenders, that is the 1st lien lenders here, made clear to you that they were not willing to provide capital or provide the requested relief on an out-of-court basis.  Right?

A    The 1st lien lenders and a large majority of the 2nd lien lenders as well, yes.

Q    Okay.  And when these discussions were going on Moelis did not have a marketing process that had outreached to third party capital providers for any type of out-of-court

transaction.  Right?

A     No, we reached out to -- in addition to the members of the ad hoc group, other parts -- other members -- other participants of the Debtors' capital structure, unsecured noteholders and shareholders.

Q     But not to anybody who wasn't already a participant in the capital structure.

A     That's right.

Q     And Moelis never made any outbound calls to third parties to market the company for sale in connection with Moelis's second engagement.  Right?

A     That's correct.

Q     Leaving aside any potential sale process, Moelis did not reach out to third parties, other than existing stakeholders, regarding alternative out-of-court proposals.

A     That's correct.

Q     Okay.  For the Record, the Debtors are not currently contemplating a sale of any material portion of their business.  Right?

A     Under the RSA they are not, no.

Q     Okay.  They're not marketing any of their assets right now, are they?

A     Not that I'm aware of.

Q     And isn't that because the 1L lenders in the August 2025 time frame directed the company to pause all asset sales?

A    One of their concerns at the time we were negotiating the RSA was that the M&A processes that had been ongoing for 2 of the Debtors' assets, which were somewhat stalled, if they continued would muddy the waters and complicate the company's in-court restructuring process.

Q    Right.  And then I don't -- we'll find out from the 1L lenders why they thought that at some point when I have them, but the Debtors stopped that process because the 1L lenders asked them to stop the process.

A    Well, I think the Debtors also at the time concluded it was the right thing to do as well.

Q    And to close this out, after the petition date the Debtors have not made any effort to look for an alternative DIP.  Right?

A    Since the petition date we have not reached out to third parties, no.

Q    Okay.  And so if we were going to come to some determined value in this case, it's not going to be because some third party has been solicited by the Debtors to provide an indication of value for the company.  Right?

A    I'm not sure I --

Q    Well, Moelis isn't doing a sale process in which people are asked to make bids for the company and people can come forward and the market can speak as to what this company is worth.  There's no process like that that's going on.  Right?

A     There's no process of outbound outreach, no.

Q     Okay.  As part of either of the first or second engagement, so we're still pre-petition, Moelis never did a formal valuation of the company.  Right?

A     We did not.

Q     And to date have you seen any pre-petition valuation of any material portion of the Debtors' business?

A     Not that I recall.

Q     Have you seen any pre-petition solvency opinions?

A     Not that I recall.

Q     Have you seen any pre-petition fairness opinions?

A     Not that I recall.

Q     Okay.  But to be clear, there were these indications of value you talked about with the sale process.  Now this sale process never led to binding offers.  Right?

A     That's correct.

Q     Okay.  But Moelis did different analyses for the board of directors of the company around ways to think about value and the implications of value using various market data points. Right?

A     That's correct.

Q     And those data points were the proposals the company received pre-petition for certain of -- pre-petition for certain of its business units.

A     Yes.

Q    And that was for the RPM process and the PCS process. Right?

A    Yes.

Q    But you, you personally, never actually reviewed those proposals, did you?

A    No, I received that information from the parties that were running those processes.

Q    Well, actually you received that information orally from members of the board.  Right?

A    Yes, that were overseeing both processes.

Q    So you have never even looked at the bids that were made for the portions of the businesses themselves.

A    I have not.

Q    Okay.  Let's move post-petition.  We now have a valuation of the Debtors attached to the disclosure statement.  Right?

A    Yes.

Q    And you were one of the people at Moelis responsible for the valuation.  Right?

A    Yes.

Q    Okay.  Do we -- is there still a binder there, a black binder.

A    This one?  Yeah, this one?

Q    Yeah, that one.

A    Yes.

Q    Can you please turn to Exhibit 7, which is -- will be

Committee 24.  We're going to fix -- I think 23 was already in evidence, but let's just mark this as 24.  Can you identify what this document is?

A    Yes, this is the Moelis valuation analysis that was an exhibit -- or is an exhibit to the proposed disclosure statement.

Q    Okay.  And it provides 2 sets of values.  Right?  If you look on the first page?

A    Yes.

Q    Okay.  One is a value, the total enterprise value of the Debtors of 750 million to $925 million.  Right?

A    Yes.

Q    And the second is the implied equity value in the range between 400 million and 631 million.  Right?

A    Yes.

Q    Okay.  Just to be clear, what are the Debtors distributing under the plan on file to their creditors?

A    They're distributing equity and they're distributing debt.

Q    Okay.  And the equity they're distributing is equity that has a range of between 400 million and $631 million.  Right?

A    Under our valuation, that's correct.

Q    Right.  That's the primary distributable value in this case is pro forma reorganized equity of these Debtors.  Right?

A    Yes.

Q   Okay.  You're not aware of the Debtors publishing any other views of the value of the distributable asset in this case, are you?

A   I'm not.

Q   Okay.  Now do you know enough about the valuation to know what methodologies were used?

A   Yes.

Q   Okay.  Do you have an actual document that is a valuation that was presented to anybody that sets forth how your calculations were done?

A   Not in my hands, but --

Q   Well, is there such a document?

A   Yes.

Q   Okay.  Well, I'd be asking for it now so, and that sets forth the -- Moelis's views as to comp companies.  Does it use comp transactions?

A   Yeah, it uses selected present transactions.

Q   Okay.  And does it use a DCF?

A   It does.

Q   And are you intending to be the testifying expert?  You say, I have.  I thought -- sorry, who -- sorry, let me break that question apart.  Are you the person who's supporting the valuation at Moelis?

A    I assume so, but I don't know that we've made that determination yet.

Q    Okay.  But you do know enough about the methodologies that were used.  Do you know what the weighting you used?

A    Not off the top of my head.

Q    Okay.  Is there any reason you couldn't produce that document to the Committee?

A    Not that I'm aware of.

Q    Okay.  Are you aware that the Committee has asked for all the supporting valuation materials since the first day it was appointed?

A    I think the Committee's asked for a lot of information and which we've provided a lot of information.

Q    Okay.  Okay.  Now generally, we're not getting into the weeds of the valuation because that's a matter for I guess 6 weeks from now, unless we convince His Honor if we can have a little more time, the comp companies compares the company's projected -- well, actual EBITDA and projected EBITDA to the projected EBITDA and actual EBITDA of comparable companies.  Right?

A    I mean generally, yes, but there's --

Q    Yeah.

A    -- more to it than that.

Q    Well, of course.  Of course.  And what it does then is it derives from public comps the multiple that you would apply to a -- the EBITDA to come up with a total enterprise value.  Right?

A    Again, I think that's a somewhat simplistic way of describing what it does, but I mean that's sort of what it does.

Q    Okay.  Can you tell me today what the range of EBITDA multiples you came up with, or Moelis came up with for comp companies?

A    I don't recall it specifically.

Q    I'm not going to hold you to it, we'll get the document, we'll come back.  Do you recall generally is it 2 to 3, 5 to 7, 6.5 to --

A    We looked at it on a segment basis, I don't remember the specific range we applied to each segment off the top of my head.

Q    But you did apply a multiple to EBITDA to come up with a total enterprise value.

A    We did, yes.

Q    Okay.  When did you start the work on this valuation?

A    When did we start the work?  I think we were -- we'd been thinking about it for, I don't know, quite some time, but we didn't do the substantive work to put it on paper until we received the Debtors' 5-year forecast.

Q    Okay.  And when did you receive those?

A    It must have been a few -- a couple -- I think we initially -- received an initial draft a couple of weeks ago, but that it was updated along the way.

Q    Okay.  And when you say you'd been thinking about it for some time what does that mean, days, weeks, since the petition date, when?

A    I mean we'd been thinking about it in the context of the work that we'd been doing for a while as, you know, as we were putting together various analyses for the capital structure committee and the board, but we didn't do a formal valuation until we had the 5-year projections.

MR. SHORE:  Okay.  Before I forget can we move Committee 24 into evidence?

THE COURT:  Any objection?

MS. MARKS:  No objection.

THE COURT:  All right.  It's admitted.

(Committee Exhibit No. 24 received into evidence.)

BY MR. SHORE:

Q    All right.  And then we come to -- can you move back to Tab 6, please?

A    Tab 6?

Q    Yeah.  Do you recognize these to be the financial projections attached to the disclosure statement?

A    I do.

Q    Okay.  So focusing on comp -- the comp transactions methodology, in your analysis did you use the $126 million EBITDA forecast that's published here?

A    We did not.

Q    Did you move it up or down?

A    Well, we looked at it on a segment basis so we didn't use the aggregate EBITDA.

Q    Well, okay, so as I understand your question you looked -- how many segments did you analyze?

A    I'm sorry --

Q    You did this --

A     -- my apologies, but you asked me if I asked a question.

Q    I'm just breaking -- breaking it apart.  How many segments did you look at?

A    We looked at the company's 3 business segments.

Q    Okay.  And when you add up the EBITDA that you used for those 3 company segments did you come up with a $126.6 million?

A    For the transaction, present transaction analysis?

Q    Comp company transactions -- comp company analysis.

A    Well, for the comparable company analysis we looked at the company's 2025 EBITDA and 2026 EBITDA.

Q    Right.  So you used -- then what I'm saying is did you use -- I didn't say use it exclusively, did you use the $126.6 million figure as an aggregate of the 3 business segments?

A    That was a data point we looked at.

Q    Okay.  Now with respect to these projections that are on the last page of which I think we're marking as Committee 25 --

THE COURT:  No, this one -- this is already in --

MR. SHORE:  Oh, that's -- that one's already in?

THE COURT:   -- it's 22.

MR. SHORE:  Okay.  It's 22.

BY MR. SHORE:

Q    Did anyone at Moelis play a material role in creating these projections?

A    We did not.

Q    But to give the Court a sense of the tolerances here if the EBITDA is $10 million too light, that will have an affect on the valuation more than $10 million.  Right?

MS. MARKS:  Your Honor, at this point I'm going to object.  I tried to give some leeway, especially during Mr. Shandler's examination when he asked about the projections, but now asking about the valuation, I don't know how this is relevant to the DIP, but our view is these issues should be litigated once and now is not the appropriate hearing for it.

THE COURT:  What's the relevancy?

MR. SHORE:  There are really a couple of ways this comes in.  One is that the argument with respect to the priming fight, that they didn't want to have a priming fight, so we're going to have to deal with the valuation.  Another is to give a sense of just what needs to be done in the next 6 weeks under the Debtors' schedule to get ready for a contested valuation fight.

THE COURT:  But how is that a DIP objection?

MR. SHORE:  Because they've set a milestone that requires that the Committee have its case ready to go by November 18 or it's a DIP default and the lenders who benefit from this plan get to close the company.

THE COURT:  Well, I'm going to -- I'm going to sustain the objection.  That is not -- that's not a DIP objection.  So why don't you go ahead.

MR. SHORE:  Okay.

BY MR. SHORE:

Q    Let's focus on the priming fight.  What are the 1L lenders owed as of the petition date?

A    They -- I believe their -- I believe it's around $873 million.

Q    Right.  And the -- what is the high end of your range?

A    The high end of our range if I think $925 million.

Q    Right.  Which is -- which means that at the high end of your range, before we focus on the DIP and whether that was even necessary, the 1L lenders were over-secured.

A    I mean maybe.

Q    On the petition date if there -- the 1L lenders were owed $872 million and the high end of your range is above 872, doesn't that mean they're over-secured at the high end of the range?

A    I mean, again, I don't know if there are other claims

that would come in that they would assert or what else would happen so.

Q    Well, I asked you what the amount of the claim was, you said 872.  Right?

A    I think I said 873.

Q    873.  Okay.  And if we use your understanding of the amount, at the high end of your range they were over-secured.

A    There were also 2nd lien -- there were also 2nd lien claims that existed.

Q    Right.  But you were a priming -- your priming fight was with respect to the 1L claims.

A    Well, and the 2L claims.

Q    Okay.  What is the mid-point of your valuation?

A    I'd have to go back and look, I think it's like 800 and something.

Q    Okay.  And is it fair to say that this whole plan is premised upon the value breaking in the 1L?

A    It's my view the value breaks in the 1L.

Q    What -- is it your understanding that the plan is premised upon your view that the value breaks in the 1L?

A    Yes.

Q    Okay.  And at this point if we -- we've got to deal with the DIP, we're not going to raise issues with you on the DIP and the appropriateness of the DIP and everything else, but as of the petition date the 1L lenders were under-secured at your

mid-point valuation by like $35 million.  Right?

A    Something like that.

Q    Okay.  So the reason that the 1L lenders are so under-secured right now is the Debtors have borrowed $100 million and are planning on using that for various purposes during the case.  Right?

A    Yeah, to maintain the going concern of the business.

Q    So let's talk about the need for this DIP.  After the 1Ls said this summer they would not fund out-of-court, you started focusing on the Chapter 11 filing.  Right?

A    Well, not initially.  Initially we tried to think about ways we could keep the company out of court by raising junior capital.  Unfortunately events overtook us because of the cancelled contracts that precipitated the need to accelerate the in-court option.

Q    Just to be clear when you're talking about DIP sizing, Moelis reviewed the analysis prepared by management DIP, but Moelis did not drive the work with respect to the sizing of the DIP.  Right?

A    We didn't.

Q    Okay.  You are aware that the company had sought approval from the Court to pay and has paid a number of vendors on account of their pre-petition claims?

A    Yes.

Q    Okay.  But as far as you understand it, were the Debtors

ever ordered to pay those claims?

A    I'm not sure I understand your question.

Q    Okay.  And with respect to who was driving that analysis Moelis did not conduct any analysis with regard to which vendors should or should not be paid on account of pre-petition claims.  Right?

A    We did not.

Q    And as of your deposition you didn't have an understanding of what criteria, if any, the Debtors applied to the term in which vendors should or should not be paid on account of their pre-petition claims.  Right?

A    That's right.

Q    And you've worked as an investment banker in at least 30, if not more, Chapter 11 cases?

A    Yeah.

Q    You are familiar with the concept of payments to critical vendors to cover some or all of their outstanding pre-petition claims?

A    Yes.

Q    In all of the cases in which you've been involved as a banker, you can't recall any where the company treated all of its vendors as critical vendors and paid all of their outstanding pre-petition unsecured trade claims outside the plan.  Right?

A    I think at the time of my deposition I mentioned a case

where I thought substantially all the vendors were paid, which was *Aegean Marine*.

Q    Okay.  But I asked the question, have you ever seen all of them paid?

A    I don't know that I've seen all of them paid, but in that case it may have been all of them, I just don't remember if it was all or substantially all.

Q    Okay.  There were some questions about the back and forth with respect to the 1L lenders regarding the DIP and your role in that process.  The first is that -- sorry, first question, Moelis has a financing fee tied to the approval of the DIP. Right?

A    Yes.

Q    And that fee is $1 million.

A    Yes.

Q    Okay.  You also get a $10 million fee at the end of the case.  Right?

A    Yes, for -- yes, the restructuring fee.

Q    Okay.  So let's clear this up because the prior witness didn't get it right and I want to make sure the Record is right.  If you get the $10 million fee, what happens to your $1 million DIP fee?

A    I don't recall the exact crediting, but I think there's some crediting of one against the other.

Q    About half.  Right?

A    That might be the case.

Q    Okay.  Again, because Mr. Shandler I think got this wrong, you also get an arrangement fee --

MS. MARKS:  Your Honor, I object to the mischaracterization of a witness's testimony.

MR. SHORE:  Okay.  Fine, I'll ask the witness when I'm done.

BY MR. SHORE:

Q    Were you here when Mr. Shandler said that in your $10 million fee you're getting paid for arranging the post-petition revolver?

A    Yes.

Q    Okay.  Aren't you actually getting a separate fee for the payment of your pre-petition -- or, sorry, the arrangement of an exit revolver?

A    Yes, and I think there's some crediting of that fee as well against the restructuring.

Q    Okay.  Well, all that's going to be laid out in your engagement letter.  Right?

A    Yeah, I believe our retention application was filed with the Court last week or something like that.

Q    And so we're clear, the -- if you raise $250 million of exit revolver, what's your fee?

A    On what?

Q    What's your -- what's the arrangement fee you get for

arranging a $250 million exit facility?

A    Well, I believe it's $2.5 million but there's some crediting -- again, assuming the Court approves our retention on the terms there's some crediting of that against the restructuring fee, so I think it nets out to something less than that.

Q    Okay.  So if the prior witness testified that your 2.5 is included in the $10 million, that's not correct to your knowledge.

A    I think it's -- there's some crediting, I don't remember -- I can't remember the exact --

Q    But not -- but not 100 percent.

A    I don't think so.

Q    Right.  So let's just talk about for the $10 million fee also, is any of that $10 million reimbursing you for pre-petition work?

A    I'm not sure I follow your question.  I think our engagement terms here are no different than our engagement terms in a number of cases where we work with companies on prearranged plans where a lot of the work is done pre-petition and then some of the work on the implementation is done post-petition.

Q    Can you answer my question?  Is part of the $10 million fee to cover work that Moelis did for the Debtors pre-petition?

A    Again, our fee -- our restructuring fee is triggered upon the consummation of a restructuring.  Our engagement covers our work for the Debtors from the moment we were engaged until the consummation of our work.

Q    Okay.  So how much are you getting paid for your valuation work in this case?

A    We're not explicitly getting paid for our valuation work in this case.

Q    That comes out of the 10 million.

A    That's right.

Q    What other work comes out of the $10 million?

A    All the work we have done and continue to do with the Debtors around negotiating a plan, evaluating alternative proposals that are made, dealing with, you know, diligence from the ad hoc group from other parties in interest, working on various other financial analyses that we were asked to do by the board, participating in meetings, trying to negotiate a settlement with the Committee, and all the other work that an investment banker typically does for debtors in Chapter 11.

Q    Okay.  So there were some questions -- also some questions around the budgeting of fees.  Do you understand how the budgeting of the fees rolls into the 13-week cash flow?

A    Generally.

Q    Okay.  So how much are the Debtors and the 1L lenders budgeted to get for their work during the case?

A     I don't remember.

Q     About $25 million?

A     That could be right.  Again, I don't know the specifics, that's something Mr. Shandler is much closer to than I am.

Q     Do you have any understanding of whether the Moelis $10 million fee is included in that $25 million?

A     I don't believe it is.

Q     Right.  So it's 25 million plus to Moelis is the cost that the estate's being charged for the work that's being done during the case.

A     Again, I don't know what the total fee budget is for the case.

Q     Okay.  We'll get that in the 13-week cash flow.  Right?

A     I don't know if the 13-week cash flow has all the fees associated with the case --

Q     Well, that's -- we'll get the fees that the Debtors' professionals and the 1L's professionals will be charging, but when we have to find out what the banker fees or the tail fees come, that won't be in the 13-week cash flow.

A     I'm not sure what you mean by that.

Q     Okay.  Okay.  And Ms. Marks took you through the back and forth with respect to the backstop premium.  The Debtors first proposed that they would be paying a backstop premium in a bracketed amount of post-reorganization.  Right?

A     That's right.

Q    And at any time through that entire process Moelis didn't form a view as to the value of that 20 percent.

A    No, because as I said before, the way we thought about it was that -- and what was important to us was that there be no cost to the Debtors if we did an alternative deal, if someone was able to come forward with a plan that delivered more value, there'd be no breakage costs.  And importantly in this circumstance that -- because our view was that value broke in the 1st liens, the dilution that was being suffered as a result of the backstop fee was happening to the parties that were at the table negotiating the deal.

But if an alternative deal came forward and we were able to deliver something that got value beyond the 1st liens, that we could take the DIP out without incurring cash costs for the backstop.

Q    Okay.  But the Debtors aren't distributing cash to their creditors as part of this plan.  Right?

A    Well, we may distribute cash to certain creditors as part of this plan.

Q    Well, but under the terms of the plan as it exists right now is any creditor getting cash as part of its plan distribution?

A    I don't think any specific creditor is getting cash, no.

Q    Okay.  The only thing they're getting are, as you said, debt and post-reorg equity.  Right?

A    Yeah, the 1st lien lenders who are overwhelmingly supportive are getting cash and equity.

Q    I'm going to come -- I'm going to come back to the overwhelming support, but the post-reorg equity has value. Right?

A    We hope.

Q    Well, you published a view that the equity has a value in a range.  Right?

A    We have published a valuation range, yes.

Q    Now you gave testimony about means and medians of fees and anything else.  When you said that this fits within the mean and the median, that was because you valued the fee at zero.

A    I don't understand your question.

Q    Well, if you -- if you -- let's just do the math.  With the Debtors' range right now what is the value that the 1st lien lenders are getting in exchange for their DIP commitment, assuming the Debtors go forward with -- don't go forward with an alternate transaction, I'm going to come back to that.

A    Again, I'm not sure I understand your question.

Q    Okay.  Well, we went through the valuation, you said the post-reorg equity had a value between 4- and $600 million. Right?

A    Yes.

Q    What is 20 percent of $400 million?

A    $80 million.

Q    What's 20 percent of $600 million?

A    $120 million.

Q    Okay.  If you just converted the value of your post-reorg equity into dollars.  Right?  We just said, what is this worth in dollars, the -- and you had a backstop commitment fee of 80 to $120 million, would that fall in the mean and median of your comp set?

A    But the backstop fee's not paid in dollars.

THE COURT:  I really don't understand your question.

MR. SHORE:  Okay.

THE COURT:  Because under the plan the 1st liens are getting 90 percent of the equity, the 20 percent is basically diluting what they're getting, plus subject to dilution by the myth, you know, a whole series of things.  So I'm not quite sure that I understand -- follow your --

MR. SHORE:  Okay.

THE COURT:   -- questions.

MR. SHORE:  Okay.  I just wanted -- I want to get -- make one thing clear.

BY MR. SHORE:

Q    The Debtors are paying value, and if they came in and said, We're going to give 100 percent of the reorg equity, it would have value, and if they said it had no value, it would have a value.  Right?

THE COURT:  Okay.  That's an argument, that's not a question.

MR. SHORE:  I understand, but I just want to make sure the math is right.

BY MR. SHORE:

Q    If we converted to dollars, the fee that they are getting, that we're calling a fee, is between 80- and $120 million of value.

A    Again, equity is not dollars, equity is equity, dollars are dollars.

Q    I'm asking a question about value, that's all.

A    No, you asked me about dollars, you didn't ask me about value.  They're 2 different things.

Q    I said if we convert value into dollars.

A    Again, you can't necessarily convert value into dollars.

Q    Okay.  Now let's talk about an alternative transaction and this concept that no one's getting diluted.  The 2nd lien lenders are getting 2 percent of the equity.  Right?

A    That's right.

Q    Okay.  And they are getting diluted by the backstop fee under this plan.

A    Yes, and then they're also diluting the backstop fee with the warrants they have as well.

Q    I understand.  But they're getting 2 percent of 80 percent of the company, not 2 percent of 100 percent of the

company.  Right?

A    That's right.

Q    Okay.  Just assume I -- now your position is the 2L lenders are completely unsecured.  Right?

A    I'm sorry, I don't -- I don't understand the question.

Q    Under your valuation with value breaking in the 1Ls, the 2L lenders are completely under-secured.  Right?

A    I think that's a legal question.

Q    Is there enough value to first pay the 1L lenders in full and still have money to -- or value to distribute to the 2L lenders under the Debtors' valuation?

          MS. MARKS:  Objection, asked and answered.

          THE COURT:  Yeah, and again, I'm really not following how this is relevant to the DIP objection.

          MR. SHORE:  Well, one of the arguments they're making is why do we care about whether 80- to $120 million of value going out because it doesn't come out of unsecured's pockets.  It does come out of unsecured's pockets.  It comes out of the unsecured pockets of the 2Ls who the Committee speaks for.  Until they're proven to be in the money they're getting diluted.

          THE COURT:  Okay.  So that's a plan argument.  How is that a -- how is that a DIP objection?

          MR. SHORE:  Because the Debtors have taken the position in their papers that we shouldn't care about this

because it doesn't dilute our constituency.  It does.

THE COURT:  All right.  But again --

MR. SHORE:  I'm just trying to get the Record evidence in that the Debtors' position is that the 2L lenders are general unsecured creditors.

THE COURT:  I mean I'm not sure anybody's disputing that based on the existing valuation, which may or may not -- I mean may or may not find it accurate.

MR. SHORE:  I agree.

THE COURT:  So, okay.  Move on, I think you've made your point.

MR. SHORE:  Okay.

BY MR. SHORE:

Q    And just one other alternate scenario, because I need to understand whether this, in your view, is an alternate plan, and then we can have an argument about it.  What if I convince the Court that if the 2L lenders are unsecured, all unsecured creditors could get a share of that 2 percent.  Under that scenario it is coming out of general unsecured creditors' hides.  Right?

A    Sorry, that's a lot of hypotheticals that I'd have to parse, because I don't know if that's the case.

Q    You've talked about an alternate transaction, and this fee doesn't have to get paid unless there's an alternate plan. I want to know if the classification scheme of this plan has

changed such that the 2Ls get exactly the same thing as general unsecured creditors.  In your view as a business matter is that an alternate plan?

A    I'd have to --

MS. MARKS:  Objection, calls for hypothetical and vague.

THE COURT:  Sustained.

BY MR. SHORE:

Q    What is your definition of an alternate transaction, in your -- the answers you gave to Ms. Marks' questions --

A    A superior transaction.  And again, the hypothetical I gave was if someone came in and paid $1.3 billion for the company in cash, then in that hypothetical there would be no fee payable under the backstop.

Q    Okay.  So if it wasn't a superior transaction, it was just changing the distribution -- or the classification scheme, that would be -- would not be an alternative transaction?

MS. MARKS:  Objection.  Relevance.

THE COURT:  What's the relevance, I mean?

MR. SHORE:  If they want to take the position that you shouldn't be listening to me about whether this fee is $80 million or $120 million because it isn't coming out of my hide, I'm allowed to make a record that it is coming out of my hide.

Whether it's coming out of the hide of the two wells that are unsecured, or whether the general unsecured creditors are getting gored by this fee, they are.

THE COURT: Okay.

MR. SHORE: Okay?

THE COURT: But that assumes that I'm crediting their argument.

MR. SHORE: All I have is the Debtors' position about what's going on right now. My guys haven't done a valuation. We don't have the data to do the valuation, so we've got to work on where we are right now.

The Debtors have come forward and asked for the approval of the fee. The Debtors believe that that fee constitutes 80 to 120 million dollars of distributable value in the case. They want to say it's different, I get that, but if I'm getting gored, I'm allowed to make my record that I'm getting gored -- or my constituents are.

MS. MARKS: Your Honor, to me this still sounds like a valuation argument and (indiscernible).

THE COURT: I agree.

Go ahead.

MR. SHORE: Now, let's clean up some more testimony.

BY MR. SHORE:

Q    You do understand that one of the terms of the DIP is that DIP proceeds cannot be used to pay UCC professionals

above the budget of $1.75 million, right?

A    That's my general understanding, yes.

Q    Okay.  And to be clear, you understand then that from a business perspective, if Your Honor says the Committee is entitled to fees of $2.5 million, it would be a DIP default for the Debtors to pay that without the consent of the 1L Lenders?

A    I don't know if it would be a DIP default actually.

Q    Okay.  Can you see any reason why it should be a DIP default?

A    Sorry, why it should be?

Q    Yeah.

A    I don't know.

Q    What happens if it is a DIP default and the Debtors don't pay an allowed administrative expense?

A    Well, --

MS. MARKS:  Objection; calls for a legal conclusion and a hypothetical.

THE COURT:  I'll let him answer.  I mean.

THE WITNESS:  I mean, I think it also depends.  I mean, again, my understanding as a business person is in order for us to confirm a Plan, we have to pay administrative expenses in full.  And so we'll have to find a way to pay allowed administrative expenses, unless those parties make concessions in order to get a Plan confirmed; otherwise, the

Plan won't get confirmed.

BY MR. SHORE:

Q   Uh-huh.  And again, this would be the first DIP you've ever seen in which the DIP specifically limited the ability of proceeds to be used to pay UCC fees above a budget.

A   Yeah, I think in my deposition I said it would be the first DIP I've ever seen which allowed no UCC fees to be paid because I think that was the question at the time.

Q   Do you have any sense of what it costs to put together -- or cost a financial advisor to put together a valuation of a business like this?

A   A financial?  I don't.

Q   Okay.  Do you have any sense of what it's costing you to put together the valuation and show up in court and prepare for confirmation?

A   What it's costing me?  I don't -- that's now how we manage our business.

Q   Well, you are expending hours on it.  How many hours are you devoting to the valuation?

A   I don't think about our business on an hourly rate basis.

Q   Just finally, the questions about JoAnn's.  What was the percentage of equity that was awarded?

A   I'd have to go back and look at the comps.

Q   Okay.  So you're not providing testimony about what percentage of the equity was given?

A    No.   I just don't remember off the top of my head.  I'd have to go back and look at the data.

Q    Well, what was the -- well, you gave testimony today, so all I can do is question you about that.

What was the TEV of the Debtors in that case?

A    I don't recall.

Q    What the loan-to-value ratio of the DIP?

A    I don't recall.

Q    The loan-to-value ratio of this DIP is something like one to six or one to eight, right?

A    I mean, according to our valuation, I don't know that the Lenders would necessarily see it the same way.

Q    I'm sure they won't, but according to the Debtors and moving forward, you're seeking a hundred million dollar DIP on a company that you believe is worth, you know, between seven and eight hundred million dollars, right?

A    Yes.  But again, we're trying to get people to lend money to us and they may have a very different view.

Q    Okay.  And the last question is on the rollup.

Did the first lien lenders ever propose that they would rollup any portion of their debt?

A    They never made a formal proposal to that effect.

Q    Right and I take it you would agree with me that if the first lien lenders thought it was in their interest to get a rollup, they would have asked for it?

A    I don't know that that's necessarily the case.

Q    In your experience, have the first lien lenders shied away from asking you to give them more economics and more leeway in these cases?

A    I'm sorry.  From a creditors' standpoint?

Q    You've been negotiating with them.  In your experience have the first lien lenders and their professionals been shy about asking the Debtors for things that benefit them?

A    I think the first lien lenders have been extraordinarily supportive of the company in a series of very difficult circumstances where the business is undergoing a lot of pressure from its customers and trying to do the best it can to continue providing service.

Q    So you think the first lien lenders didn't ask for a rollup because it was just to benefit the Debtors?

A    I think that they were thoughtful about what they asked for under these circumstances because they knew the company was in a pretty fragile situation.

Q    Okay.  Well, we'll go through what they asked for in the DIP Order when we get to the argument point, but with respect to a rollup here, if it gets converted to -- some portion gets converted to pre-petition -- or sorry, to post-petition super administrative expense priority, right, what happens is that if a superior proposal comes in that DIP and the rollup has to be taken out in cash, right?

A     Amongst other things, yes.

Q     But in a case like this, there's no marketing process going on, right?

A     I think we're very receptive to inbound interest and we have received some.

Q     Right, but there's no marketing process going on like his Honor may have seen in other cases where you go out and you solicit bids for the company, right?

A     In these circumstances, no.  We think it's important to get the company out of bankruptcy quickly; otherwise, the business is in serious risk.

Q     Right.  And this is a four-month case for which you're providing a back -- the backstop fee in which you're distributing post-reorg equity of a value to these guys, right?

A     I'm not -- I'm not sure of that question.

            MR. SHORE:  Okay.  No further questions, Your Honor.

            MS. MARKS:  No Redirect, Your Honor.

            THE COURT:  All right.  Thank you.

            THE WITNESS:  Thank you.

        (Witness steps down.)

            THE COURT:  Anything further, Ms. Marks?

            MS. MARKS:  No, I don't think so.  Thank you.

            THE COURT:  All right.  Thank you.

            Mr. Zakia?

MR. ZAKIA:  Good evening, Your Honor.

THE COURT:  Evening.

MR. ZAKIA:  Jason Zakia of White & Case, proposed counsel for the Committee.

We have one witness today, so at this point the Committee calls David McGreevy.

(Pause in the proceedings.)

THE COURT:  Do you solemnly swear or affirm to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Okay.

DIRECT EXAMINATION

BY MR. ZAKIA:

Q    Mr. McGreevy, good evening.

A    Evening.

Q    Could you please introduce yourself to the Court and tell us what you do for a living, sir?

A    Sure.  David McGreevy, I work for AlixPartners.  I lead AlixPartners Creditor Services practice and I led the practice of their predecessor firm, Zolfo Cooper, so I've had this job for about 14 years.

It basically means I spend the majority of my time advising Official Committees in bankruptcies.

Q    So the hour is late, so I won't belabor it, but we do need to understand a little bit about what you do for a living

and your background.

Could you explain to the Court what kind of experience you have gained over the 14 years you've work as a restructuring advisor at AlixPartners and it's predecessor?

A    Yeah, I've been a restructuring advisor for about 25 years, but just in the past 14 years, I probably led about 75 engagements.  About 60 of those have been on behalf of Official Committees.

Q    And so, with regard to a few tasks that are specifically relevant to the testimony you're going to offer today, could you explain to the Court, what, if any, experience you have in evaluating proposed DIP facilities?

A    Sure.  I think in most of our cases, we'll see a DIP proposed by the Debtors and we will evaluate the terms and conditions of the DIP and we will evaluate the attached budget -- the associated budget for the case, and identify key issues and discuss them with the Committee and Counsel.

Q    And do you have a process that you typically follow in order to evaluate those proposed DIP facilities?

A    Sure.  Internally we review, obviously, the documents, as well as the budget.  We identify issues.  We compare our issues list with Committee Counsel, discuss them with the Committee.

Q    Now is one of the things you've been asked to do in connection with your work as proposed financial advisor the

Committee in this case to evaluate this Debtors' proposed DIP facility?

A   Yes.

Q   And could you explain to the Court the process that you followed with regard to that?

A   Sure.  Similar process.  We review the documents.  We review the budget.  In this case we created a set of similarly situated financings, which basically people are calling "comp set," right, the vernacular for it.

And standard analysis that we do in most cases when we evaluate a DIP.

MR. ZAKIA:  Your Honor, may I approach?

THE COURT:  Sure.

MR. ZAKIA:  I'm going to hand the Court and the witness what's been previously admitted as Committee Exhibit 20.

BY MR. ZAKIA:

Q   Mr. McGreevy, could you please tell us the document that's been marked -- or been admitted as Committee Exhibit 20, what is that?

A   This is a printout of our comp set analysis.

Q   Okay.  And could you please describe to the Court how you went about selecting the comparable companies that you evaluated in connection with your work here?

A   Sure.  Our initial screen was to look at DIP facilities

that were proposed between January 1st, 2023, and we started doing our work, which was about two weeks ago.

We looked at term loans and we looked at term loans with the new money component of 50 to 200 million dollars.

Q    And why did you select that date range?

A    We selected that date range because I felt that it was short enough that the financing markets would be consistent throughout, but long enough that we would find a sufficient sample size.

Q    And why did you select that range with regard to the size of the transaction?

A    Yeah, I mean, a spectrum of 50 to 200 million is effectively half the size of the proposed ModivCare DIP and to double the size of the proposed DIP.

Q    Now, what were the results of that screen?

A    That screen yielded 44 facilities.

Q    Did you include all of those 44 facilities in your comp set?

A    We did not.  We were examining a facility for ModivCare that had a backstop premium.  So we eliminated the 25 cases that didn't have a backstop and we isolated the 19 cases that did.

Q    And of the 19 cases that had a backstop, did you include all of those in your comp set?

A    We included 18 of the 19.

Q    And what was the 19th?

A    The 19th was JoAnn Fabrics.

Q    And why did you not include that case in your comp set?

A    When we observed the statistics of JoAnn, it was a clear outlier, all right, and so we decided to dig into that and try to understand why that was.  And we determined that the situation at JoAnn was so financially dire that it was really not comparable to the situation here and not instructive.

Q    Okay.  Now when you reviewed the economics of the Debtors' proposed DIP facility and compared them to the comparable transactions that are set forth in Committee Exhibit 20, did you identify any issues?

A    The one issue that jumps off the page is the size of the backstop premium relative to others observed in the comp set.

Q    And could you explain to us how you looked at that issue and how you compared this backstop to the comparable companies that you examined?

A    Sure.  Of the 18 comps, the form of consideration on the backstop premiums was not always the same, right?  Some of them are paid in cash.  Some of them are paid as incremental loans, right?  What they call PIC (phonetic) and some of them were paid in fixed equity dollar amounts and some of them were paid in fixed equity percentage amounts.

So to evaluate them all on an apples-to-apples basis, we reduced them all to a value.

Q    And how did you do that?

A    Well, cash is cash and PIC is incremental loans.  With respect to those where they received a dollar amount that was convertible into equity, we respected that dollar amount unless they were offered a discount and we respected the discount.

In situations where the DIP Lender was simply offered a straight percentage of equity with an undefined dollar amount, we converted that as appropriate generally based on Plan value.

Q    And was that the case with any of the companies identified in your comp set?

A    I would say the clearest example is EXCELLO (phonetic) where the Lenders received the 5 percent of equity backstop premium.

Q    And then how did you go about with regard to that comp determining what the dollar value was of the equity paid?

A    We looked at the Plan.  We observed the Plan value and the recoveries and we valued it based on the Plan value.

Q    Now with regard to the backstop fee proposed in this case, did you do anything to determine what value to ascribe to that fee?

A    We did.  We looked at the valuation that was provided as an exhibit to the Disclosure Statement on Tuesday night, and we used that Plan value to value the backstop equity premium

here.

Q    Okay.  And I want to talk about that more in a second, but first, I want to be clear.  At the time the Committee filed its objection to the DIP, did you have access to that valuation?

A    We did not, right?  So at the time we filed the objection to the DIP, we evaluated the backstop premium based on what we viewed as the last publicly available transaction value, right?

In March of 2025, the company went through a restructuring -- an out-of-court restructuring and we observed that about 1.2 billion in the company's debt participated in that restructuring.  So for illustrative purposes, just to get our heads around, you know, what the magnitude of value is here, we used that valuation.

Q    Okay.  And to be clear, AlixPartners has not to-date completed any valuation of these Debtors, right?

A    We have not.  The 1.2 billion was not a valuation.  It was just illustrative from, you know, public transaction, and now we're looking at the Debtors' valuation that's embeded in the Disclosure Statement and exhibits, but we have not had a chance to conduct our own valuation analysis.

Q    And as we sit here today, AlixPartners has not formed any view or opinion concerning the company's valuation, right?

A    We have not.

Q    Okay.  So then for purposes of evaluating the backstop fee, could you please tell us how you used the company's filed valuation and what you did in order to calculate a potential value for the fee?

A    Yeah.  We looked at the company's filed valuation, which has a range of 750 million to 925 million.  We backed out their assumed debt and we observed that their company's equity valuation was 400 million to 575 million.

We then took the 20 percent equity being offered to the backstop parties and we diluted it by the 8 percent MIP, which gets you to about 18.4 percent of fully diluted equity and we multiplied that through by the Debtors' assumed equity value of 400 million to 575 million.

Q    So assuming the Debtors filed valuation were accurate, what would that tell you about the value of the equity being paid under the backstop fee?

A    All right.  So based on the Debtors' Plan valuation, that backstop fee would be worth between 75 million and 105 millon.

Q    Now I want to be clear 'cause you were here when Mr. Jamal testified.  You are aware that the backstop fee is not being paid in cash, right?

A    I understand.

Q    Okay.  Could you explain to the Court why -- even though it was not being paid in cash, you felt it important to compute what value would be ascribed to the equity that is

being paid?

A     Well, they're getting consideration in the form of equity, right?  So I reduced that equity to a dollar value in accordance with the company's Plan valuation to understand what value the DIP Lenders are being provided.

Q     And how did that -- what did that calculation tell you with regard to how this backstop fee compares to the other comparable transactions that you evaluated?

A     So if you look at that, let's just take the mid-point, which would be about 87 or 88 million dollars -- maybe 90 million dollars, whatever the math is.  And you say 90 million dollars as a percentage of the 100 million dollars that the Lenders are advancing, it's effectively 90 percent fee.

Q     And how does the 90 percent fee compare to the comparable transactions that you evaluated?

A     I think the median backstop fee that we observed is 9 percent.

Q     So did this cause you to form any view as to the reasonableness of this fee?

A     Yeah.  I mean, a 90 percent backstop premium as compared to a median of 9 percent, you know, we concluded that it was unreasonable.

Q     Now in the course of your work, did you review any of the financial terms of the DIP other than the backstop fe?

A    We've got all of the various financial terms spread out here in our comps and compared it to the comp set.  And we observed that in the main, those other terms are at or below the median.

Q    Now how, if at all, did you weigh those other factors as compared to the backstop fee, with regard to your view as to the reasonableness of the DIP?

A    Well, we looked at the potential financial benefit of being slightly below the median for these other terms and those benefits were swamped, right, by the size of the backstop premium.

So in other words, a 90 million dollar backstop premium swamps a potential one or two million dollar benefit on an interest rate or an upfront fee or whatever.

Q    Okay.  I'd like to switch to another topic.

Could you tell the Court a little bit about the experience you have had as a financial advisor to evaluating Debtors liquidity situations?

A    Yeah, I would say in connection with almost all of our engagements, right?  Whether it's reviewing a DIP facility or a cash collateral motion, a company is going to have a liquidity budget attached to that.  And that's a budget that we will evaluate and stress test to understand what the true liquidity runway of the company is thorughout the case.

Q    And as part of your work in this case, were you asked to

evaluate any issues with regard to whether the Debtors had sufficient liquidity to extend the court of the case?

A    I was.  I was asked to opine on whether the Debtors did have sufficient liquidity to extend the cases.

Q    Okay.  And could you explain to the Court what the analysis was that you undertook in order to analyze that question?

A    Yes.  We wanted to understand whether the company had sufficient liquidity to make it past the milestones, and particularly whether they had sufficient liquidity to make them pass the milestones, up to and including a maturity, which is roughly the end of February, as I understand it.

And so we used -- to be conservative, we used the company's own analysis and then we layered on the incremental costs that would be incurred by extending the case.

So we used two files to do this.  We used the company's direct weekly cash flow projection that goes through December 31st and it then stops.  So in order to evaluate January and February, we then pulled out the company's three statement monthly model and we observed the data in that model.  We then layered on incremental professional fees for extending the case and for extending the Committee's budget. And we layered on incremental DIP interests that would be incurred by extending the case.

Q    And what was the result of that analysis?

A    So just observing the company's weekly cash flow projection, they note that their projected cash balance at December 31st is 76 million dollars.

We reduced that by about 4 million dollars to account for incremental fees, which gets you obviously to 72 million, and then we ran that through January and February and so we observed adjusted balances of 72 million dollars December 31st and then about 44 million January 31st and 51 million February 28th.

Q    What, if anything, did you do to determine whether those levels of cash were sufficient for the Debtors to be able to manage their business through an extension of the case?

A    I guess we did a couple of things.  The first thing is we observed that the company and the Lenders had set the minimum liquidity covenant to have 50 million dollars in the DIP, right?

And then second thing we did was to observe how the company behaved pre-petition before it had that covenant and whether they had any internal targets and frankly, how their cash performed pre-petition.

Q    And what did that analysis show you?

A    We found a presentation through production or in the data room, I think -- I think it was through production, that was from July of 2025.  And it appeared to us to be in connection with the size of the debt.  There was a presentation to

Lenders that included 100 million dollars of DIP financing coming in in September and there was a note that minimum liquidity would be 25 million dollars.

Q    Okay.  Now since you conducted your initial analysis concerning the Debtors' financial ability to extend the case, did you have access to any additional information that was relevant to that question that we didn't have at the time the Committee filed its objection?

A    Subsequent to the objection, the company filed exhibits to the Disclosure Statement.  And included in those exhibits were their financial projections.

Q    How, if at all, did that new information that you didn't have at the time the Committee filed its objection, impact your view with regard to the question of the Debtors' financial ability to extend the cases?

A    So on the following Friday -- I think a few days after they filed the exhibits, the company posted a backup document, a document that included backup to their financial projections.  And within that there appeared to be an updated three-statement model with updated projected cash balances.

So we observed that the cash balance at year end was -- in that document was 120 million as adjusted by our 4 million dollars would have been on 16, and that we observed running our same adjustments for professional fees, DIP interest, and what-not.  The January 31st balance as of -- based on this new

document, would be 80 million and February 28th would be 87 million.

Q   How, if at all, did that additional information impact your view with regard to the Debtors ability to finance an extended bankruptcy case?

A   Look, obviously that's a meaningful projected improvement in your cash balances, so it enhanced our comfort in the company's ability to afford an extension of the cases.

Q   And again, the extension period you're examining was through the maturity of the DIP?

A   It was through February 28th, which we used as a proxy. We didn't have mid-month data available.

Q   Okay.  Last subject.  I'd like to ask you a few questions about the information that you have had available to you since you've been retained as proposed financial advisor to the Committee.

First of all, when were you hired as proposed financial advisor to the Committee?

A   I believe our retention was as of September 10th.

Q   Now at the time you were hired, had the Debtors already filed the Disclosure Statement?

A   They had.

Q   And did the as filed Disclosure Statement make reference to any forthcoming exhibits?

A   It did.  We pulled up the Disclosure Statement as part of

our initial diligence and noted that the exhibits were marked "To be filed" -- something to the effect of "To be filed."

Q    Okay.  Did you as proposed financial advisor to the Committee make any request to the Debtors for any of that information?

A    Yes.

Q    What specifically did you request?

A    Well, as part of our standard due diligence request list, which I think we provided to the company a handful of days after being hired.  We included a request for projections and valuation data and a whole list of other things.

Q    Okay.  I want to talk first about the projections.

     Were the projections that you requested related to the company's forthcoming business plan?

A    Well, yes.  The contemporaneous projections of the case, right?  Which would be the business plan.

Q    Okay.  Why did you request that information?

A    Well, our team needs to evaluate that business plan and formulate our own view and advise our Committee on our view, advise the Committee of any -- whether we believe it's pessimistic, optimistic, right down the middle of the fairway, and specifically, you know, why?

          MS. MARKS:  Your Honor, I object again based on when I was covering the valuation, the projections are not appropriate at this time.

THE COURT: No. I don't think that's what he's covering.

MR. ZAKIA: It's not, Your Honor.

THE COURT: Yeah. Overruled.

BY MR. ZAKIA:

Q   Okay. With regard to -- I think you said that you requested that information shortly after you were retained?

A   Yes. I think it was a handful of days later, yeah.

Q   When -- have you -- as you sit here today, has the Committee received the projections?

A   So those projections were included in the exhibits filed with the Disclosure Statement exhibits on -- I think it was this past Tuesday night. And there was a backup file attached to those projections I just referenced. That was posted to the data room on Friday.

I don't know if the company intends on expanding that into like a strategy deck that sometimes we get, but as of now, that's what we have.

Q   What, if anything, has AlixPartners done with respect to that information, since it was posted to the data room last Friday?

A   We've gone through it with our industry folks and created a preliminary diligence list, which we provided to the company's advisors.

Q   And what, if anything, happened with regard to the

diligence list since you provided it?

A    My understanding -- and I was not on this call because I was here -- but my understanding is my team had a call with the FTI team earlier this afternoon to begin walking through those diligence items.

Q    And what was the outcome of that call -- just with regard to the process of how you're going to move forward concerning getting whatever additional information you need concerning those projections?

A    It sounded like, from my understanding from my team, that for the most part, we walked through our request with the FTI team and the FTI team endeavored to get us that information going forward.

Q    Okay.  And what is it that AlixPartners is going to have to do with that information between now and confirmation ?

A    Well, I mean, a couple of things.  One is, as I said, we want to advise our clients, the Committee, as to our own view on the Debtors' business plan and business.

And the second thing is to the extent that our valuation team will be doing evaluation during this case, they're going to want to use our own firm's view on the business.

Q    And do you have a view as to how long that work is likely to take?

A    It's something we do in a lot of cases.  And it typically takes a few months.

Q    Okay.  And when you say a few months, are you making any assumption concerning the cooperation you'll be getting from the Debtors during that few month period?

A    It's a fair question, so yes.  It assumes that you'll have reasonable cooperation from the company in terms of providing data, providing access to management, you know, hosting management calls to walk through their strategic rationale, their assumptions -- those types of things.

Q    And if you didn't, just hypothetically, get that cooperation, what would it do to your timeline?

A    It would just take longer, right.

Q    One of the other things I think you said you requested shortly after being retained was information related to the Debtors' valuation.

A    Yes.  My understanding is that we asked for any valuations conducted by the Debtors.

Q    And did you receive that at any point?

A    I think similar to the projections, the Debtors, as we just discussed, filed a valuation with their Disclosure Statement exhibits this past Tuesday.

Q    Is that the first time that you saw that?

A    Yes.

Q    As you sit here today, have the Debtors provided to AlixPartners or the Committee the backup analysis that I think you heard Mr. Jamal testify about, that underlies that

valuation?

A    We don't have any backup to that.  We just have what was filed with the exhibits.

MR. ZAKIA:  Thank you very much.

Your Honor, no further questions at this time.

THE WITNESS:  Mr. Zakia, do you mind if I have a water before we switch over here?

MR. ZAKIA:  For sure.

THE WITNESS:  Yeah, thank you.

MR. ZAKIA:  We'll make sure we give you a new one.

THE WITNESS:  I'll take anything at this point honestly.

Thanks, Jason.

CROSS-EXAMINATION

BY MS. MARKS:

Q    Good evening, Mr. McGreevy.

A    Good evening.

Q    You spend nearly 100 percent of your time representing Creditor Committees, including both Official Commitees and Ad Hoc Committees; is that right?

A    That's generally correct.

Q    And you can only remember with specificity one time where you represented a Debtor on a DIP; is that right?

A    That was correct, yes.

Q    And that was about 20 years ago?

A    Correct.

Q    In this case, the two issues that you were asked to evaluate to support the Committee's objection to the DIP were, number one, the backstop fee, and number two, whether the estate could afford to extend the case milestones?

A    That's correct.

Q    Let's focus on the backstop fee first.

The way that you chose to analyze the backstop fee was to create a set of DIP financings for similarly situated companies, compare them, and determine whether the backstop fee here is reasonable within that market; is that right?

A    That's correct.

Q    So in other words, to put it in more simple terms, you ran a DIP -- you can a comp analysis for DIPs?

A    And comps, that's right.

Q    And to pull you comp set together, you testified thatyou look at all term loans approved between January 1, 2023 and August 20th, 2025, with new money commitments between 50 and 200 million; is that right?

A    That's correct.

Q    And I think you testified that you found 44 DIP facilities with those parameters, but you excluded 25 from your comp set because they did not have the backstop fee and that left you with 19 term DIPs that fell within your parameters and that had a backstop fee; is that right?

A    That's correct.

Q    If we could pull up Exhibit 20?

And this is your comp slide, so I think everyone has it by hard copy, as well.

A    Okay.

Q    You testified about this slide on Direct.  These are your comps?

A    This looks like our file, correct.

Q    Okay.  And this shows 18 comps?

A    If it's our file, it has 18 comps, correct.

Q    And that 19th comp, there's already been some testimony about it, the 19th comp was JoAnn Fabrics, right?

A    That's right.

Q    And the DIP in JoAnn Fabrics had a backstop fee of 20 percent PIC with the option to convert to equity, right?

A    It had a 20 percent PIC fee; that's correct.

Q    It's not on your comp slide?

A    Correct.

Q    And you excluded it because you felt like it was an outlier statistically?

A    When we saw the statistics, it was a clear outlier, which led us to dig into a little bit and found that they were in a really dire financial situation --

Q    So you --

A    -- so which we didn't find to be comparable to this

situation or relate to the -- you know, to the average of our comp sets. And so we didn't feel like it would be instructive in making a conclusion here.

Q    You didn't think it was indicative of the market?

A    No.

Q    And you did not think that the high/low range at the bottom of your slide was sufficient to capture that JoAnn might be an outlier if you included it, right?

A    No. I think if it was part of the high/low, we would run the same analysis. It just would have been on the chart.

Q    Because you excluded JoAnn Fabrics, the proposed DIP in this case has the highest backstop fee paid in equity amongst your set, right?

A    Yes, although the JoAnn DIP backstop fee was paid in incremental PIC loans -- in incremental loans, which we call "PIC."

Q    And converted to equity as an option?

A    I don't believe it was automatically -- correct, I think it might have had an option and ultimately that was what happened.

Q    You don't know how much was converted to equity?

A    I believe the entire thing was converted to equity.

Q    There are five other comps on your slide that do have backstop fees paid in equity, whether as a percentage of the backstop commitment or as a percentage of the reorganized

equity, correct?

A    Correct.

Q    And those, if we look at them, it's Azela, Exact Tech, Mobolium, Kuro Group, and Thoracio (all phonetics)?

A    That's right.

Q    And I think on your Direct exam, you testified that Azela, you felt like Azela was a particularly close comp?

A    I think mechanically it's very similar to the ModivCare premium.

Q    And if we look at Azela, Azela had a rollup, right?

A    Azela has a rollup, correct.

Q    And some of these other comps also have a rollup.  In fact, more than half of the comps on the slide have a rollup?

A    I think 10 of the 18 have a rollup.

Q    And the DIP here has no rollup, right?

A    Correct.

Q    Typically having a rollup is not a favorable term for the Debtor, right?  All Debtors would prefer not to have a rollup?

A    I try not to say words like "all," but yes, I think most Debtors would certainly prefer not to have a rollup.

Q    Do you recall on your deposition yesterday, you testified that all Debtors would prefer not to have a rollup?  I'm happy to refresh your memory.

A    I won't disagree with you if that's what I said.  I just prefer not to say words like "all," but you're probably

correct.

Q    And that's because rollups add administrative burden to the estate and it could ask to add to the cost of the DIP, right?

A    That's correct.

Q    If you look at the interest rate for Azela and some of these other comps that are highlighted, they have higher interest rates than this DIP, right?

A    Are you asking about Azela or -- Azela, I think it's pronounced -- or are you asking about the comp set or just generically?

Q    So in Azela, the interest rate is 12 percent PIC, right?

A    So -- correct.  So it's, I think, a half a point higher than ModivCare, but paid in kind, as opposed to ModivCare is paid in cash.

Q    Okay.  And if we look down at Thoracio, there the new money is ask plus 8 percent and the rollup is ask plus 10 percent, right?

A    That's correct.

Q    Okay.

A    S plus 10 PIC and then the new money is S plus 8 cash, that's right.

Q    Okay.  Fair enough.

Your total on the right-hand side, the right-hand most column says, "Total," right?  That's total fees that you

calculated?

A    That is the value of the total fees, as compared to the new money lent.

Q    And when you calculated that column, you did not include the cost of either rollups or interest rates in these comps, right?

A    That's correct.

Q    If you look at the mean and average, the interest rate in most of the comps is higher than the interest rate for this DIP, right?

A    I think if you look at the mean -- well, you said mean and average, I think.  If you look -- is that what you meant or did you mean?

Q    Well, let's use your slide.

So if you look at the median and the average --

A    Okay.

Q    -- of the comps, the interest rate in this DIP is lower, right?

A    It is lower than both, yes.

Q    And if you look at other fees, if you look at the upfront fees, the exit fees, and the other fees, in most of the comps, those fees are higher than in this DIP, right?

A    If I look at the upfront -- and you said unused or no?

Q    Sure.  We can look at those, too.

A    Yes.  Both of those are lower than the median.

Q    And exit fee?  This exit fee is lower than the mean and the average, right -- median and average?

A    In the median and the average, yeah, that's right.

Q    And there's no other fee here, like there is in some of the comps, right?

A    Correct.

Q    And if we look at the size of this DIP, 100 million, that's at the low end of the comps when you look at total DIP size, including new money plus rollup, right?

A    It is kind of right between the median and the average of the comp set.

Q    But if you look at total facility, your total facility comp column, it's lower than both the median and the average, right?

A    Total facility is lower.

Q    And you do not recall if any of the 18 comps in your set rolled into an exit facility, right?

A    I don't recall.

Q    You did not look at that?

A    I didn't.  The team might have, but I don't recall.

Q    And you knew that this DIP included an exit facility, but you were not aware that it rolled into a five-year exit facility; is that fair?

A    That's correct.

Q    Based on this comp analysis, you formed the opinion that

this backstop fee is more expensive than the backstop fees in the comps, right?

A    Yes.

Q    And you're not offering any opinion about the reasonableness of the other fees and terms we just walked through, correct?

A    Correct.

Q    Your opinion is that you can assess the reasonableness of this DIP based on the backstop fee alone, correct?

A    Yes.

Q    And you're not offering any opinion as to the cost of this DIP as a whole compared to the comps, are you?

A    Well, it's on our chart, but no, that's not the opinion.

Q    You did not form an opinion on the cost of the DIPs in this comp set compared to the cost of this DIP, correct?

A    Total?

Q    Yes.

A    No.

Q    Under the current Plan, the parties who are going to get diluted by the 20 percent equity fee are the first lien and the second lien lenders, right?

A    Under the current Plan, I believe that's correct, yeah.

Q    But you don't know what percentage of the first lien and second lien lenders here are participating in the DIP or in the backstop, correct?

A    Correct.

Q    And you don't recall what percentage of the first lien and second lien lenders have signed onto the RSA, right?

A    Precisely?  No, I don't.

Q    And even though these first and second lien lenders are the ones getting diluted by the back fee -- the backstop fee, you did not think that those facts would be relevant when looking at the reasonableness of this DIP as a whole, right?

A    Correct.

Q    You did not look at the Plan to see what recovery the general unsecured creditors are going to get, correct?

A    And that's not correct.

Q    When did you look at the Plan?

A    When it was filed.  We discussed, I think that's in my deposition that the back -- sorry, that the unsecured creditors are going to get a participation right in the rights offering, isn't that correct?

Q    Well, we can look at your deposition.

A    Oh, that's fine.

        MS. MARKS:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MS. MARKS:

Q    You gave a deposition yesterday; is that right?

A    That's correct.

Q    And I was the one that deposed you?

A       You were.

Q       I'm going to read aloud from page 59, lines 15 to 19:

"Question:  So you didn't look at the Plan to see that the general unsecured creditors are going to get?

"Answer:  No."

You don't know what the Plan says about whether the general unsecured -- about what the general unsecured creditors are going to get, correct?

A       What's that?

Q       I'm asking you a new question now.

A       Go ahead.

Q       You don't know what the Plan says about the general unsecured creditors are going to get, correct?

A       That is correct.  We had a dialog about this yesterday. I was under the impression that the Plan says that similar to the RSA, that the unsecured creditors are getting a participation right of 200 million dollars of an equity rights offering.

Q       Assuming that the general unsecured creditors are entitled to no recovery under this Plan, a backstop fee paid in equity of the Reorganized Debtor does not impact the recovery of the general unsecured creditors, right?

A       If the unsecured creditors are going to get zero, then that's correct.

Q       And assuming that the general unsecured creditors are

going to get zero, the percentage of the equity is reduced that also has no impact on the general unsecured creditors recovery, right?

A    Correct.

Q    And assuming that the general unsecured creditors are entitled to no recovery under this Plan, converting the backstop fee in whole or in part to cash, also has no impact on the general unsecured creditors recovery, right?

A    I think in any scenario where the unsecured creditors are getting nothing, then it's not going to impact it.

Q    If the general unsecured creditors are entitled to a recovery and this Plan therefore is denied at the confirmation hearing by the Bankruptcy Court, you know that the backstop fee is not still payable in reorganized equity, right?

A    So I think there's language that says it's payable in a similar Plan.  And I didn't know what that meant.  I'm not a lawyer, so I didn't make a conclusion on that.

Q    Okay.  So you don't know?

A    Correct.

Q    In the event that that happens, that this Plan is not confirmed, you know that there's no cash backstop fee or liquidated damages that the Debtors would have to pay, right?

A    Correct.

Q    Now you testified earlier about ascribing a dollar value calculation of the backstop fee?

A    Yes.

Q    And your testimony is that the value of the backstop fee -- your opinion on this may have changed -- what is your current opinion as to the dollar value of the backstop fee?

A    We're now using -- now that it's available, we're using a company's plan value, which implies a value to the backstop premium of about 75 million to 105 million dollars.

Q    So your testimony is that you're now trying to value the backstop fee by looking at the valuation that the Debtors filed?

A    I don't think we're -- yeah, I mean, that's what we're doing.  We're trying to ascribe a value to the equity that's provided to these backstop parties.  The equity value in the Debtors' own Plan value was 400 to 575 million, so the diluted 18.4 percent that the backstop parties would be entitled to, is about 75 to 105 million dollars.

Q    When did you do that analysis?

A    I would say the day after the exhibits were filed.

Q    And when I asked you yesterday about how you calculated an illustrative enterprise value, you didn't explain that other valuation you did, did you?

A    Correct.  Yesterday we were looking at my Declaration, which the Plan value was not available at the time and we discussed how -- we looked at the last publicly available market transaction to come up with an illustrative value.

Q    And in your Declaration, the illustrative value you used was 1.2 billion, correct?

A    Correct.

Q    And to come up with that, you simply took the amounts that the first lien lenders and the second lien lenders loaned to the Debtors back in March and added them up, right?

A    Yes.

Q    You typically --

A    Sorry, say that again.  I don't think that's right.  You said they lent them to -- that they lent?  We just took the outstanding first lien and second lien debt that participated or that resulted from that transaction.

Q    Okay.  That's how you got to the 1.2 billion in your Declaration?

A    Correct.

Q    And then after that, you looked at the valuation filed by the Debtors?

A    When it was filed, yeah.

Q    You would not conducted your own valuation, have you?

A    No.

Q    The other opinion, the second opinion you're offering is that the Debtors can afford an extension of these cases, correct?

A    Correct.

Q    And your opinion is based on your view that the Debtors

minimum liquidity to maintain business operations is some amount reasonably lower than 50 million, right?

A    Yes.

Q    And that's because the Debtors have a debt covenant of 50 million and in the past, they've run lower than that

A    Correct.

Q    Before today's hearing, you were not aware that Mr. Shandler, the Debtors' Chief Transformation Officer, believes the minimum liquidity is between 65 to 75 million, right?

A    I think that was before my deposition yesterday.

Q    Right.  Did you -- were you sitting here for Mr. Shandler's testimony?

A    Yes.

Q    And did you hear him offer that testimony?

A    I did.

Q    But you didn't know that that was his view before this hearing, right?

A    You told me that it was his view in the deposition yesterday, I believe.

Q    All right.  So that's the first time you learned it was yesterday?

A    Correct.

Q    The cash that you forecast the Debtors will have in January and February 2026 is significantly below

Mr. Shandler's range for minimum liquidity to comfortably run the business, right?

A    Using the two files that -- using those two files, correct, the subject files, not using the file that was subsequently placed in the data room on Friday.

Q    You've not analyzed the risk to the business if the vendors do not get paid if there's not sufficient cash to pay them, have you?

A    No.

Q    And you've not analyzed the risk to the business if more customers cancelled their contracts with the Debtors because they're concerned about the Debtors' financial stability, have you?

A    No.

Q    You're aware that the case milestones in this DIP do not shorten the deadlines provided under the Code, right?

A    Yes.

        MS. MARKS:  Thank you.  No further questions.

        THE COURT:  All right.  Mr. Zakia?

        MR. ZAKIA:  Thank you, Your Honor.  Just briefly.

                    REDIRECT EXAMINATION

BY MR. ZAKIA:

Q    Okay.  First, I want to clear up something that Ms. Marks asked you, both yesterday at the deposition and again here today.

When you gave your testimony yesterday about the Plan and what the Plan provided with regard to recovery to unsecured creditors, did you have a view as to what that was?

A    I thought that the unsecured creditors were going to get participation rights in a 200 million dollar rights offering, which was consistent with the RSA, and I believe the RSA -- I believe that the RSA rolled into the Plan.  I have not subsequently checked the Plan, so I don't know if they have or have not mantained that right.

Q    Okay.  And that understanding was the same understanding you gave Ms. Marks at the deposition, right?

A    Correct.

Q    Okay.  And that's all set forth on page 59 of the transcript that she showed you, right?

A    Yes.  I think we had this dialog yesterday in full, yeah.

Q    Right.  And after Ms. Marks made the representation that the Plan, in fact, does not have a rights offering for unsecured creditors, which was different when you thought, that's when you answered her question about not having looked at it, right?

A    I took her word for it.  I still don't know if it's correct.  I have to go check the Plan myself, but yes, I took her word for it.

Q    Okay.  Just --

          MS. MARKS:  Objection.  I think that

mischaracterizes what I said on the Record (indiscernible).

MR. ZAKIA:  Okay.  Well, let's look.

BY MR. ZAKIA:

Q    Did she say, "If we look on page 59" -- after you gave your answer about the rights offering, line 7, Ms. Marks asked you:  "So I realize that may be part of the negotiations, but under the current Plan as filed, they" -- referring to the unsecured creditors -- "receive nothing.  Are you aware of that?"

Is that the question she asked you that caused you this confusion?

A    I believe so.

Q    Okay.  Now, Ms. Marks asked you some questions about JoAnn's and your decision not to include it in your comp set. If you did include JoAnn's in your comp set, how, if at all, would have impacted your analysis?

A    It would not have changed the conclusion.

Q    Why not?

A    Well, the ModivCare backstop premium, as we value it based on the Debtors' Plan value, is roughly 90 million dollars of value at the midpoint, right?  And if you look at that as compared to the value of any other comparable facility, it's off the charts.  It's ten times the median. And it's triple the other sort of -- what I think is the best comp -- which is Excello (phonetic).

Q    Now this backstop, the backstop fee is 20 percent of the reorganized equity, right?

A    Correct.

Q    And in JoAnn Fabrics the backstop was 20 percent of something?

A    20 percent of the loan.

Q    Right.  And are those two things comparable?

A    Totally different.

Q    Okay.  Ms. Marks also asked you a series of questions about certain other provisions of the DIP, like the interest rate, like the exit fee, like a rollup, right?

A    Yep, she did.

Q    And I think you acknowledged that certain of the provisions like the interest rate were better than the median or the mean of your comp set?

A    They are.

Q    When evaluating the reasonableness of a DIP that has several different economic components, do you just kind of count up how many components there are, and decide how many of them are good or how many of them are bad, or are there other factors that play into that analysis?

A    I think you want to ascribe a value to each one, to the extent that you can.  Some are more subjective.

Q    Is the magnitude of the fee is relevant, not just how many are above or below the median?

A    Yeah, you would want to value the difference, right?  You would want to say, you know, what's the value of that benefit that I am now below the median on whatever term you're talking about.

Q    So will you explain to the Judge why it is that you are comfortable that the backstop fee along led you to the conclusion that even if the other provisions of the DIP were reasonable, the DIP is always not.

A    Well, if you look at a couple of other terms in the DIP that are one, two points below the median, 1 or 2 percent of 100 million dollars is a million or two million dollars; whereas, this backstop fee, if we value it using the Debtors' Plan value, is worth about 90 million dollars.  So in my view that just swamps those other benefits.

Q    And just to be clear, because -- and I think this is one area where Ms. Marks and I agree.  With regard to your use of the Debtors' valuation, in order to ascribe a value to the backstop fee, you're not endorsing or adopting or drawing any view as to the validity of that valuation, right?

A    No.  We have done -- we have not done our own valuation analysis.

          MR. ZAKIA:  Thank you.

          No further questions, Your Honor.

          THE COURT:  Anything else?

          MS. MARKS:  No questions, Your Honor.

THE COURT:  All right.

MR. ZAKIA:  Your Honor, at this point, the Committee rests.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thanks, Your Honor.

(Witness excused.)

MR. SHORE:  Your Honor, I think the plan was generally to just make a few statements and then go figure out how we're going to deal with the DIP Order, based on the Judge's ruling.

Given the time -- I mean, we're -- we could do a quick closing.  It's up to Your Honor and participants, but I'm ready to start.

THE COURT:  Look.  I'm here as long as you-all want to be, so.

MR. SHORE:  Your Honor, our argument is this:  We think the Debtors are marked up on the DIP Order on September 19th.  We got their reply or their response yesterday while all of us were flying when they filed their reply.  We've obviously been preparing for the hearing and trying to go through the changes they made and stuff.

Look, obviously you've heard from the Record, there's some question about what an alternative transaction is that would cause the fee to be.  I think we can get some work done if we just take a break, have an opportunity for this

courtroom stuff to stop, sit and talk with people, come up with things and then see if we can't resolve some of this stuff and only have to submit to Your Honor the things that we can't resolve.

THE COURT:  I mean, I think that's fine.  I think the milestone is the 4th, so we've got -- if you-all could get back to your respective places, we could do it tomorrow or we could do it Thursday.

(Participants confer.)

MALE SPEAKER:  Your Honor, I have a question, too, is going to be to the extent we can't have resolution, there are some things we need rulings on, right?  Particularly around the issues that weren't discussed, like the liens and things like that.

THE COURT:  Sure.  Yeah, and we can do that virtually.  I mean, you don't have to come back.

(Participants confer.)

MALE SPEAKER:  Can we do it Friday?  Let's just work around the holiday now.  That was the issue.

MALE SPEAKER:  Yeah, I guess when you say, "it," you mean in terms of just come back to the Court?

THE COURT:  Well, to either --

MALE SPEAKER:  Well, obviously we can talk.  We can talk --

THE COURT:  Yeah.

MALE SPEAKER:  Yeah.

MALE SPEAKER:  -- we can start talking now.

THE COURT:  And I'm not going to need a long closing.  I mean, you can highlight your points.  I mean, I think I understand what the issues in dispute are.

So the question in my mind is -- I'm happy to take closings, you know, for you to highlight the key issues you want, number one.

Number two, I want to know what the areas of dispute are.  I mean, you know, I saw the chart that was put together and their responses.  It would be great if we had like a third line or a third row with kind of where you are and then I'm prepared -- you know, I'm preparing to rule once all of that comes to me.

MALE SPEAKER:  Right, so -- I mean, can we do closings tonight and then just to the DIP Order this week?  It could be like --

MALE SPEAKER:  But then we're --

MALE SPEAKER:  -- I could do it.

MALE SPEAKER:  -- arguing about things that we're not necessarily --

THE COURT:  It may not be.  That's the only problem. Then you'll be arguing that may not be an issue.

So as I said, if we could do it -- well, I mean, I'm available whenever you-all are available.  I'll make time,

whenever that is.

MALE SPEAKER:  Well, we -- to accommodate the holiday, we'd like to do it Friday morning.  I don't know whether if Your Honor is saying he's prepared to rule after we do that, then that kind of hits the milestone, we're fine.

We could maybe shuffle some stuff and do it late tomorrow, but how late could you do it tomorrow?  People are traveling in the morning.

MALE SPEAKER:  No, we can be respectful --

THE COURT:  Yeah.

MALE SPEAKER:  We have until Monday, right?  So I mean, if it's towards the end of the week.

THE COURT:  Oh, I thought it was until Saturday.

MALE SPEAKER:  We get the benefit of the weekend, I think.

THE COURT:  All right.  Mr. --

MR. HANSEN:  It's Kris Hansen with the Debtors.  We strongly prefer to get this over with, obviously, from our perspective.  If that's Friday morning, that's okay.  We would prefer it to be tomorrow afternoon, too, if it's possible.

I recognize you guys are flying.  I know that's going against a holiday, but --

THE COURT:  Yeah, I don't want to press anybody on the holiday.  I'm just not going to do that.

So all right.  How about I have a hearing at

11:00 o'clock on Friday that Mr. Koster will make go real short so we can do it at 12:00 o'clock.

(Laughter.)

MR. KOSTER:  Very good, Your Honor.

MALE SPEAKER:  12:00 Central, Your Honor?

THE COURT:  Yeah, 12:00 Central.

(Laughter.)

THE COURT:  Would that work for everyone?

MALE SPEAKER:  It does for me, Your Honor.

MALE SPEAKER:  It does for us, Your Honor.

MALE SPEAKER:  Yeah, we'll make it work.

MALE SPEAKER:  We'll try to resolve as much as possible.

THE COURT:  Yes.  That would be good.

MALE SPEAKER:  Yeah, and Your Honor, it's remote, right?

THE COURT:  Yeah, yeah, absolutely, yes.

Yes, you don't need to fly back in.  I know what you look like and where you live.

(Laughter.)

MALE SPEAKER:  Only some of us, Your Honor.

THE COURT:  Yeah.  And Mr. Zakia likes to work on holidays.

(Laughter.)

MR. ZAKIA:  Yeah, I'll come back.

180

THE COURT:  All right.  Okay.  So I think we're in recess until noon on Friday.

Just go ahead and sit down.  I've got to log out obviously.

MALE SPEAKER:  Thank you, Your Honor.

(Hearing concluded 8:33 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LL*

*JTT TRANSCRIPT #70101*

*DATE FILED:  October 1, 2025*