**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x
                :
In re:             :   Chapter 11
                :
MODIVCARE INC., *et al.*,     :   Case No. 25-90309 (ARP)
                :
       Debtors.[1]     :   (Jointly Administered)
                :
---------------------------------------------------------- x

**MOTION OF DEBTORS**
**FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019**
**(A) APPROVING A GLOBAL SETTLEMENT AGREEMENT BY AND**
**AMONG THE DEBTORS AND UHC AND (B) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

    ModivCare Inc. and its debtor affiliates in the above-captioned cases, as debtors and debtors in possession (collectively, the "***Debtors***" or "***ModivCare***"), respectfully state as follows in support of this motion (this "***Motion***"):

## **RELIEF REQUESTED**

    1.    By this Motion, the Debtors seek entry of an order (the "***Proposed Order***"), substantially in the form attached hereto as **Exhibit A**: (a) approving a global settlement agreement with UnitedHealthcare Insurance Company and certain of its affiliates (collectively, "***UHC***") and

---

[1]  A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/ModivCare. Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

that certain Amendment No. 14, which is annexed to the Proposed Order as **Exhibit 1** (the "***UHC Amendment***"), dated as of September 5, 2025 ("***Amendment Effective Date***"), to the Network Access Agreement, dated as of March 15, 2009, and related market specific addenda (as amended from time to time, the "***UHC Agreement***"), by and between Debtor ModivCare Solutions, LLC and UHC; and (b) granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.

3.      Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), rules 4001 and 9019 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

5.      On August 20, 2025 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  On September 5, 2025, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed an official committee of unsecured creditors (the "***Committee***") [Docket No. 124].  No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases.

2

6.      The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

7.      The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Chad J. Shandler in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***") [Docket No. 14].[2]

8.      ModivCare is a technology-based healthcare services company that helps people (especially those in vulnerable situations) get the care and support they need.  The Company works with government and private health insurance plans, as well as individuals, to provide: (a) transportation to and from medical appointments (non-emergency medical transportation totaling over 36 million rides per year); (b) in-home personal care (*e.g.*, helping with daily activities); (c) remote monitoring of patients' health from home; and (d) community health kiosks and wellness programs.  ModivCare employs approximately 23,675 people and operates across 48 states and the District of Columbia, including Texas, with corporate offices in Denver, Colorado.  ModivCare's goal is to make it easier for patients to get care, remove barriers that keep people from staying healthy, and improve overall health outcomes.

9.      As described in the First Day Declaration, the Debtors are party to that certain Restructuring Support Agreement (the "***RSA***") with certain creditors who collectively hold approximately 90% of the First Lien Claims and approximately 70% of the Second Lien Claims.  Pursuant to the RSA, the consenting creditors have agreed to provide $100 million in debtor-in-possession financing to fund the Chapter 11 Cases and support the comprehensive restructuring

---

[2]      Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the First Day Declaration or the UHC Amendment.

transactions set forth in the term sheet attached to the RSA (the "***RSA Term Sheet***").  The RSA Term Sheet contemplates, among other things: (a) the equitization of approximately $871 million in First Lien Claims and approximately $316 million in Second Lien Claims; (b) the commitment of the consenting creditors to provide exit financing through the Exit Term Loan Facility; (c) the reorganized Debtors' entry into an exit revolving credit facility to support ongoing operations; and (d) the discharge of the Unsecured Notes Claims and General Unsecured Claims; with holders of such claims entitled to participate in an equity rights offering of up to $200 million, subject to the terms of the RSA.  On September 4, 2025, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of ModivCare Inc. and its Debtor Affiliates* [Docket No. 119] (the "***Plan***") and corresponding disclosure statement [Docket No. 120] (the "***Disclosure Statement***") reflecting the terms of the RSA and RSA Term Sheet.  In total, the transactions contemplated by the Plan and the RSA Term Sheet are expected to reduce the Debtors' funded debt obligations by approximately $1.1 billion.

## PRELIMINARY STATEMENT

10.    ModivCare is the nation's largest non-emergency medical transportation ("***NEMT***") broker, coordinating more than 36 million trips each year on behalf of managed-care organizations, state Medicaid agencies, and Medicare Advantage plans.  These services ensure that vulnerable members timely reach critical healthcare appointments across the country.

11.    Since 2009, ModivCare has partnered with UHC to provide NEMT services for UHC's members.  In exchange, UHC pays ModivCare service fees.[3]  UHC has been one of ModivCare's biggest customers.  Under the UHC Agreement, ModivCare and UHC have entered into "market specific addenda" that govern the contractual arrangement between the parties in

---

[3]    The fees paid by UHC are based on a per member per month capped calculation.

4

various states across the U.S. These addenda and the Network Access Agreement are evergreen contracts that renew on or around either March or December of each year, barring notice of non-renewal from either party.

12.     The amount of and the way the service fees are paid to ModivCare under the UHC Agreement differs depending on where and what services are provided; however, for the most part, such fees are paid monthly in advance and are subject to an annual review and reconciliation process. The contracted fee amounts are capped at a set rate per member per month, and monthly payments are based on the estimated volume of services provided and members served. As such, the amounts paid in advance do not always accurately reflect the true amount of the fees UHC owes ModivCare (it could be more or less). Accordingly, under the UHC Agreement the parties must engage in an annual reconciliation process whereby the parties review the detailed encounter data to correct payments through "true-up" payments, as well as assess the trends in transportation utilization and costs to adjust the per member per month contracted fee.

13.     ModivCare estimates that it is entitled to a "true-up" payment in excess of $25 million for the period of January through June 2025; however, the reconciliation process does not begin until March 2026. Therefore, if ModivCare continues to provide the same volume of service to UHC at the same contracted rates until the end of 2025 (without entering into the UHC Amendment), ModivCare believes the amount to be reconciled will grow to over $50 million.

14.     This fee arrangement (not being fully compensated for services until after the annual reconciliation process) has considerably impacted ModivCare's liquidity. Recognizing this, ModivCare sought to negotiate with UHC to either (a) transition to a fee-for-service model, which would have ensured full and timely payment for all services rendered, or (b) have accrued "true-up" amounts paid early, however, the negotiations were unsuccessful. Instead, ModivCare

received notices prior to the Petition Date from UHC of their intent not to renew the UHC Agreement and the addenda thereunder, some of which would become effective December 31, 2025, and others on March 14, 2026.

15.     After receiving such notices, ModivCare and UHC engaged in extensive negotiations to: (a) avoid potential disputes over the substantial reconciliation payments that have and continue to accrue under the UHC Agreement; and (b) ensure continuity of service for those UHC members that rely on ModivCare's NEMT services.  The alternative would have been an abrupt end to a longstanding partnership, potentially harming ModivCare, UHC, and those who rely on both for NEMT services.  As a result of the negotiations, the parties reached a comprehensive agreement memorialized in the UHC Amendment.

## THE UHC AMENDMENT

16.     The UHC Amendment: (a) winds down the parties' relationship in two phases—phase 1 markets ending December 31, 2025, and phase 2 markets ending February 28, 2026; (b) secures immediate payment of $25 million for services rendered from January through June 2025 ("***Settlement Amount***"); (c) implements higher contracted payments for July through December 2025; and (d) imposes incremental reporting and transition obligations on ModivCare to ensure continuity of care for UHC members through the end of the contract term.

17.     In exchange, ModivCare agrees to forgo a modest portion of revenue—approximately $15 million—by terminating certain addenda to the UHC Agreement up to two and a half months before the end of their annual terms.  As noted above, ModivCare has also committed to increase the cadence of reporting and assist with certain transitional arrangements upon the non-renewal of the UHC Agreement.  The Debtors submit that the financial and operational impacts of

these concessions[4] pale in comparison to the significant utility that ModivCare obtains from the guaranteed payment of substantial revenue (*i.e.*, $25 million plus the higher services fees through the end of the year).

18.     The Debtors submit that entering into the UHC Amendment is clearly beneficial to the Debtors' estates.  First, it secures payment now of substantial amounts that would have otherwise not become due (if at all) until at least March 2026 when the next annual reconciliation process is complete.  Second, by agreeing to the Settlement Amount and the higher service fees going forward, ModivCare is able to mitigate the uncertainty of the reconciliation process.  That process is fact-dependent, subject to documentation, and may result in UHC disputing the amounts owing to the Debtors.  The risk of a dispute is particularly acute for the next reconciliation process, because at that time, the Debtors' and UHC's relationship will have ended and UHC will no longer have any incentive to support the Debtors.  As such, there is no guarantee of what the ultimate amount owed to the Debtors would be after the reconciliation process, and the Debtors consider it prudent to reinforce their entitlements and lock in payment now by entering into the UHC Amendment.

19.     Moreover, absent the UHC Amendment, ModivCare would be contractually obligated to continue providing NEMT services at the existing rates through the end of the contract term (December 2025 or mid-March 2026).  This would result in ModivCare being owed over $50 million, albeit subject to the outcome of the reconciliation process and UHC's rights to dispute such amounts.

---

[4]   In addition, these concessions benefit Medicare and Medicaid beneficiaries by ensuring a smooth transition that will enable uninterrupted services.

20.     The only other alternative open to the Debtors was to reject the UHC Agreement. The Debtors determined that rejecting the UHC Agreement would harm the estates, as terminating early would sacrifice all of the revenue that could be earned from the remainder of the contract term, and put at risk all accrued "true-up" payments.  Additionally, this option risks disrupting service to the thousands of UHC members who rely on ModivCare, a far worse outcome than the UHC Amendment.

21.     ModivCare has conferred with advisors to the First Lien Agent, the Consenting Creditors, and the lenders and agent to the DIP Financing regarding the settlement with UHC in advance of filing this Motion, and such parties are supportive of ModivCare entering into the UHC Amendment.

## **BASIS FOR RELIEF**

### I.     The UHC Amendment Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates

22.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate.  *See Off. Comm. of Unsecured Creditors v. Moeller* (*In re Age Refin.,Inc.*), 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, approval of a compromise is within the discretion of the bankruptcy court.  *See United States v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel* (*In re Jackson Brewing Co.*), 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity*, 624 F.2d at 602–03

(citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968)).

23.     The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts analyze proposed settlements*. Id.*  The factors courts consider are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin.*, 801 F.3d at 540 (internal citations omitted).

24.     Under the rubric of the third factor, the Fifth Circuit has specified two additional factors that bear on a decision to approve a proposed settlement.  First, the Court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mortg. Corp.*), 68 F.3d 914, 917 (5th Cir. 1995).  Second, the Court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Refin.*, 801 F.3d at 540; *Foster Mortg.*, 68 F.3d at 918 (citations omitted).

25.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Rather, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

26.     The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the UHC Amendment. *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Companies, Inc.*,

50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high;" rather, the Debtors "***need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'***" *In re Allied Properties, LLC*, 2007 WL 1849017, at \*4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489, at \*4 (S.D. Tex. Apr. 18, 2006).

27.     Here, weighing the foregoing factors demonstrates that the UHC Amendment is reasonable and supports finding that the Debtors' entry into the UHC Amendment is in the best interest of creditors and other stakeholders.

28.     *First*, the likelihood of success of litigating against UHC regarding UHC's alleged termination of the UHC Agreement, or regarding the Debtors' potential rejection of the UHC Agreement, is uncertain. Likewise, the likelihood of success of potential litigation regarding renegotiation of contracted payments or the reconciliation amounts, should the parties continue under the UHC Agreement rather than enter into the UHC Amendment, also is uncertain. In addition, litigation would likely require the expenditure of significant funds and cause substantial, detrimental impact to the Debtors. Having the benefit of certainty and prior agreement between the Debtors and UHC maximizes value for the Debtors' estates and avoids what could otherwise be costly and distracting litigation that would almost certainly harm the Debtors' estates.

29.     *Second*, the UHC Amendment is the product of good-faith, arm's-length bargaining between the Debtors and UHC, each of which were represented by counsel, and no party has asserted that the UHC Amendment was the product of fraud or collusion.

30.     *Third*, the UHC Amendment is reasonable and is in the best interests of the Debtors' estates. Under the UHC Amendment, ModivCare (a) immediately obtains considerable incremental liquidity, (b) preserves constructive relations with a key industry counterparty,

(c) safeguards high-quality transportation for the country's most vulnerable patient populations, and (d) avoids considerable uncertainty with respect to recovering over $50 million of receivables. By contrast, electing to provide services through the end of the contract term without any amendment would result in such receivables being subject to the reconciliation process, which, as noted above, is inherently uncertain.  Similarly, rejecting the UHC Agreement would have sacrificed considerable revenue (both going forward for the remainder of 2025 and through the reconciliation process), while also affecting those that require ModivCare's services.

31.     Accordingly, the Debtors respectfully submit that the Court should approve UHC Amendment based upon the factors considered by courts in the Fifth Circuit.

### DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

32.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

33.     With respect to all parties in interest in the Chapter 11 Cases other than ModivCare and UHC, nothing in this Motion is intended to be nor shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights

11

under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **NO PREVIOUS REQUEST**

34.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## **NOTICE**

35.     Notice of this Motion will be given to the parties on the Debtors' Master Service List, UHC, and all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

36.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov and (b) the website maintained by the Debtors' claims and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global, at https://www.veritaglobal.net/ModivCare.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:   October 3, 2025

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Catherine A. Rankin (Texas Bar No. 24109810)
Brandon Bell (Texas Bar No. 24127019)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@hunton.com
        catherinerankin@hunton.com
        bbell@hunton.com

-and-

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Keith A. Simon (NY Bar No. 4636007)
George Klidonas (NY Bar No. 4549432)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: ray.schrock@lw.com
        keith.simon@lw.com
        george.klidonas@lw.com
        jon.weichselbaum@lw.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 3, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

<u>*/s/ Timothy A. ("Tad") Davidson II*</u>
Timothy A. ("Tad") Davidson II