IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 25-90309-11 |
| | § HOUSTON, TEXAS |
| MODIVCARE, INC., ET AL., | § FRIDAY, |
| | § OCTOBER 3, 2025 |
| DEBTORS. | § 12:01 P.M. TO 12:30 P.M. |

**CONTINUED HEARING**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:                    AKEITA HOUSE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM)**:


FOR MODIVCARE, INC.:                    LATHAM & WATKINS, LLP
                                        George Klidonas, Esq.
                                        1271 Avenue of the Americas
                                        New York, NY 10020
                                        212-906-133

                                        LATHAM & WATKINS, LLP
                                        Elizabeth (Betsy) Marks, Esq.
                                        200 Clarendon Street
                                        Boston, MA 02116
                                        617-880-4654


FOR THE 1st LIEN AGENT                  PAUL HASTINGS, LLP
AND CONSENTING CREDITORS:               Kris Hansen, Esq.
                                        200 Park Avenue
                                        New York, NY 10166
                                        212-318-6400


FOR THE OFFICIAL COMMITTEE              WHITE & CASE, LLP
OF UNSECURED CREDITORS:                 Christopher Shore, Esq.
                                        Scott Greissman, Esq.
                                        1221 Avenue of the Americas
                                        New York NY 10020
                                        212-819-8394


(Please also see Electronic Appearances.)

**HOUSTON, TEXAS; FRIDAY, OCTOBER 3, 2025; 12:00 P.M.**

THE COURT:  Mr. Shore, you look like you have a halo coming out of the back of you.

MR. SHORE:  I'd like to say that's unintentional, but --

THE COURT:  Sure.  Sure.

(Laughter.)

MR. SHORE:  The beams of a very, very, very, very old house.  I will -- I'm going to turn my light off so it's less distracting.

THE COURT:  All right.  All right.  So it's noon on Friday, October 3, 2025.  We're in the continued hearing in Case Number 25-90309, ModivCare, Inc.  So why don't we get appearances of counsel and then we can proceed?

MR. KLIDONAS:  Good afternoon, Your Honor.  George Klidonas from Latham & Watkins on behalf of the proposed Debtors-in-Possession.

MS. MARKS:  Good afternoon, Your Honor.  Can you hear me?  Betsy Marks from Latham & Watkins on behalf of the Debtors as well.

THE COURT:  Yes, I can hear you.

MR. HANSEN:  Good afternoon, Your Honor.  It's Kris Hansen with Paul Hastings on behalf of the DIP lenders, the pre-petition lenders and the agents.

THE COURT:  Okay.

MR. SHORE:  And good afternoon, Your Honor.  Chris Shore from White & Case on behalf of proposed counsel.  I'm here with my partner Scott Greissman.  Both of us will be taking part of the argument today.

THE COURT:  Okay.  All right.  How do you want to proceed, just go down the list?  Or is there any other comments?

MR. KLIDONAS:  No, we -- Your Honor, yes, at Docket Number 429 we put down the open list of issues.

THE COURT:  Right.

MR. KLIDONAS:  And obviously that you want to hear from us generally just about the evidence and closing, we could do that.  But the issues are the key points.

THE COURT:  All right.  Okay.  So I think they start on -- at the bottom of Page 2?

MR. KLIDONAS:  That's right.  The first one is Item Number 8, 506(c), 552(b) and marshaling waivers.

THE COURT:  Right.  All right.  So I mean, do you want me just to rule on them?  I'm happy to go through and just rule on them.  Or people want to argue?  I mean -- I mean, normally like in a situation like this the -- in my experience the soft marshaling is in essence what -- what is the -- in this type of case I think the soft marshaling would be what I would rule, that they would have to go away from the avoidance actions, go to those last, but that -- but that

otherwise there would be the various waivers, except for the soft marshaling.  So that's the first one.

I really don't understand the issue -- so normally speaking what is the -- what I see with respect to --

(Electronic interference.)

THE COURT:  I think still we have some people from the last hearing.

Normally with respect to the challenge period and the standing we would have -- you know, we'd have a challenge deadline, the Committee would then file its motion, and the challenge deadline would be continued until the Court ruled on the challenge deadline.

So I'm not prepared to grant automatic standing, but I am also not prepared to allow the challenge period to expire without having a full hearing on the challenge first, so I think with respect to that, that's my ruling.

MR. SHORE:  And, Your Honor, can I interject?  I don't necessarily understand that.

THE COURT:  So --

MR. SHORE:  The interim DIP --

THE COURT:  Go ahead.

MR. SHORE:  Sorry.

(Electronic interference.)

MR. SHORE:  The interim DIP order --

(Electronic interference.)

THE COURT:  Go ahead.

MR. SHORE:  The interim order DIP order had stipulations.

THE COURT:  Correct.

MR. SHORE:  And it said this is the Debtors' position with respect to the 1L claims.  They've taken that out, I think we can kind of see why they took it out.  And they now have claimed doing an investigation.

Normally the Committee during the challenge period would make a request to the Debtors to grant standing and we get into the colorability and unjustifiable refusal issues.

THE COURT:  Right.

MR. SHORE:  The problem we have right now is that -- and I'm envisioning the world in which we go to Quinn (phonetic), or we go to the independent director who hired Quinn and say we'd like standing.  And the response we're going to get is, we're not refusing to bring any claims, we haven't identified whether any claims result.

And so we're going to be coming to confirmation, they're going to be issuing their -- they reserved to issue -- their right to issue their report, if they're going to do one of the confirmation.  And we're going to -- we're going to get there with the Debtors saying, I want to release claims and causes of action pursuant to the plan, the independent director will just have issues with the report or not, and the

whole schedule gets thrown into disarray because we don't know what the company's position -- even what the company's position is with respect to the 1Ls.

So either we should be able to come in and seek standing, and if they haven't issued their report, they're refusing to bring a claim, or as we said, automatic standing kind of fixes it.  I tend to think automatic standing in this case, given the time line we're working on and hopefully we're going to be adjusting it some, is the way to get around that problem.

But I haven't seen a case where this was done, where the Debtors took no position and then said the ball's up in the air, we've just got to resolve it by confirmation.

THE COURT:  Yeah, so I think -- you know, just to be clear, I think that if you -- if we want to get this plan confirmed -- if the Debtor wants to get this plan confirmed in a short period of time, I think they're going to have to be able to allow the Committee to do whatever, you know, whatever steps it needs to do in order to be able to satisfy its obligations.

So to the extent that you don't find out until, you know, the day before the confirmation hearing what the Committee -- what the Debtors' position is, and you come in and have a, you know, a motion for standing, then obviously that's not going to be very conducive to having a prompt

confirmation hearing.  So I think we need to --

MR. SHORE:  Okay.

THE COURT:   -- I think we need to -- you know, as I said, to the extent that you file a motion for standing, you -- the challenge period will not expire until after I rule on that -- on that motion.

MR. SHORE:  Okay.  Yeah, and I also think, Your Honor, it shouldn't be a situation -- I mean, first of all, if they want standing, they should seek it, but we also shouldn't be in a position where they're filing a motion right before confirmation to try to slow confirmation.  But like it shouldn't be automatic either.  Right?

If they think there are claims that are colorable, they should -- they should file a motion seeking standing.

THE COURT:  Well, you know, I think obviously it all depends on the, you know -- well, you know, the information provided and all of that.  And, you know, true, I mean it can --

MR. SHORE:  Yeah.

THE COURT:   -- it can be used both sides as a litigation tactic, and I think that I want to avoid that.  I want to rule -- I want to rule on the merits.

MR. SHORE:  Thank you.

MR. HANSEN:  Your Honor, it's Kris Hansen.  Can I be heard for a sec?

THE COURT: Sure, absolutely.

MR. HANSEN: Yeah, Your Honor, I just wanted to point out that as part of the process in connection with the Debtors' hiring Quinn, commissioning that exercise, we did agree to remove the fisk (phonetic), but we also removed the concept of the challenge period altogether. So the Committee actually has as much time as they need in order to do it.

So what we expect bottom line together, taking the point of view and the roles are somewhat reversed, is that the standing will be basically brought up in the context of confirmation. They may bring it up earlier, I don't know, it's up to them from a Committee prospective, but the idea here is that we're not timing them out.

THE COURT: Right. Okay. Look, as it relates to the budget on Committee fees, I've never liked putting a cap, and obviously to the extent that everyone wants a confirmed plan, you know, the administrative -- the reasonable administrative expenses are going to have to be paid. You know, I don't know whether a $2.8 million budget is sufficient. It may not be.

But if it's something more than that, I'm not going to confirm a plan without admin claims being paid, and I'm not going to cap the fees of the Committee. I mean you could put this -- you can put that in your budget, but I'm not bound by it. And, you know, the Committee fees will be what the

10

Committee fees are, and if they're reasonable, they will be -- they will be awarded.  And if you want to confirm a plan, they will have to be paid, so.

MR. SHORE:  Just to put on your radar, because it sounds like we're going to have to settle the order, there is a provision in the order the way it's drafted that would make it a violation of the order if the Debtors paid Committee fees, given the way that the language on the carve out is written.  So if we're stripping out the fees, we're going to have to address that as well.

MR. KLIDONAS:  Yeah, the issue, Your Honor, is --

MR. SHORE:  It's DIP default, it's a violation of the order.

MR. KLIDONAS:  Yeah, the issue I think you might encounter just practically is under the interim -- the proposed DIP and comp order, there's like the 80 percent payment along the way, and it goes over a certain number in the order, we'll be put in the position, right, of having to either pay or have an issue with the DIP, so we just (glitch in the audio).

MR. HANSEN:  Yes, I think it is --

THE COURT:  I think you can work through that.

MR. HANSEN:  I think we can work through it, Your Honor.

I think the issue obviously is that from a DIP

11

lenders' perspective to the extent that fees exceed the budget they have the right to call a default if it wants.  But we'll obviously deal with the consequence of that if that happens.

THE COURT:  Right.

MR. HANSEN:  All of us will.  But I am -- we understand your perspective that incurred administrative expenses in the context of the case have to be paid if you want to confirm a plan, and we --

THE COURT:  Right.

MR. HANSEN:   -- understand that, and it's -- well, we can work through the language.

The case then from the lenders' perspective, because we're financing this we're obviously extraordinarily sensitive to the incurrence of fees across the board (glitch in the audio) paying very close attention to.  We try to control it as best we can through budget, but then obviously beyond that there's the objection process.  So we'll all be mindful of that, Your Honor.

THE COURT:  All right.  So I don't understand the one -- Number 12, the stipulation regarding cash collateral.

MR. GREISSMAN:  Your Honor, Scott Greissman, White & Case.  Can you hear me?

THE COURT:  Yeah, I can hear you fine.

MR. GREISSMAN:  Okay.  Great.  I'm here just to address some of the more textual points.  If Your Honor's

ruling is all of the stipulations are subject to the -- to what you had said earlier, then I think we're probably okay. The problem is the way they drafted the filed version of the order.  They handled the cash collateral stipulation, which is in F, somewhat differently than they did with respect to the 1st lien stipulations in D and the 2nd lien stipulations in E.

So we can get into the wordsmithing on the Record. I don't think that makes a lot of sense.  I do think that they should all be treated the same and in the manner that you suggested earlier.

THE COURT:  Any concern about that, Mr. Klidonas or Mr. Hansen?

(No audible response.)

THE COURT:  Okay.  All right.  So --

MR. KLIDONAS:  No.

THE COURT:   -- well --

MR. KLIDONAS:  Thank you.

THE COURT:   -- you can do that.

Okay.  The backstop premium, and there was a lot of discussion about the backstop premium, I almost look at it as an option payment, and what I -- what I -- it's high, but I don't think it's inordinately high, and I think it's -- under the circumstances it's appropriate, especially because there's no liquidated damages or buy-out fee or anything like that. And to the extent somebody comes in with a better deal, paying

the DIP is all you have to do.  So I'm going to approve that.

All right.  Where are we with milestones?  Are we still --

MR. KLIDONAS:  Yeah, so the issues with the milestones, Your Honor, is, you know, for us if there's an issue with milestones, it shouldn't be dealt with upfront.  In our minds the milestones are deadlines, right, they're not goals.  They sort of set the outer boundaries of what should be acceptable.  And I think given what you've heard from Mr. Shandler about contracts, that they're critical, in terms of at will.  We just can't risk any delays --

THE COURT:  Yeah --

MR. KLIDONAS:   -- quite honestly.

THE COURT:   -- I'm not -- I'm not going to second guess the Debtors' business judgment on the milestones.  But what I will say is that the ability to have a process that provides the information necessary for all constituency to be able to, on a substantive basis, address whatever issues they may have is going to trump the milestones.  So --

MR. KLIDONAS:  Right.

THE COURT:   -- we can't -- we can't really say the milestones are inferior or fine, but that does not preclude me from listening to a legitimate concern about, you know, lack of access, lack of -- primarily lack of access and lack of information.  You know, people can always work harder, but you

14

can't work harder with things you don't have.  So that doesn't --

MR. KLIDONAS:  Understood.

THE COURT:   -- preclude me from -- from ruling on that.

MR. KLIDONAS:  Okay.  Thank you.

THE COURT:  And what's the issue with the professional fee escrow?  Is that different than the one we just talked about on --

MR. KLIDONAS:  No.

MR. SHORE:  Yeah, it is, Your Honor.

THE COURT:  Okay.

MR. KLIDONAS:  Yeah, let me -- go ahead, go ahead, Mr. Shore.  No, go ahead, it's okay, go, you go first.

MR. SHORE:  Okay.  Your Honor, if you look at the 13-week cash flow --

THE COURT:  Right.

MR. SHORE:   -- the -- every week the Debtor is taking cash and funding its escrow for professionals.  Not to pay their fees in the interim order or the subperiod at the end, but actually taking all the fees and putting them in there.  So over the projection period they're taking about $40 million of fees and putting them into an escrow, paying DIP borrowing fees on $40 million of DIP essentially.

Now it grows over time, right, because there's only

15

a couple of million in it now, but it will grow.

From our perspective it's just not an appropriate use of DIP money. None of the Counsel here on the phone are going to tell you, we're not going to work for these Debtors if we don't have fee escrow protecting ourselves. I think it sets a bad precedent.

I don't think lawyers should be made, and financial advisors, should be made agnostic through a Chapter 7 conversion, which is all this does. Right? All it does is say instead of the normal priorities in a Chapter 7 the funds are no longer property of the estate because they're in an escrow and the professionals can recover.

And I don't think it's consistent with the Code. If the Code says we get an administrative expense priority, what we're talking about is a super, super, super, super admin -- expense priority where assets are taken out of the estate and put in a trust.

So for a Debtor that's complaining that they need more liquidity and they need more money to pay people, I think we've got to put that aside. And I want the Court to not put weight on it. Some judges say, no way, and I've seen one judge say, okay, but it's up to Your Honor on it obviously.

THE COURT: Right. I remember when I first saw this after the situation with Kirkland and -- I'm sorry, Wachtell

and Carl Icahn, and, you know, and that's where I think PipelinePlus became the norm.  And so I -- you know, it's unfortunate that this has to be the situation, but I think in most of the situations that I've been in, it's been PipelinePlus and I think the professional fee escrow is intended to basically protect that.  So I'm going to go ahead and approve that.

MR. SHORE:  Just to make sure you're clear, Your Honor, though there is PipelinePlus in the -- in the order, it's just not PipelinePlus for the Committee.  The Committee is limited, that's the point I was making.

THE COURT:  Well --

MR. SHORE:  The Committee is limited because we don't get --

THE COURT:  Again, so I'm not going to treat professionals who have approved administrative expenses differently.

MR. SHORE:  Okay.

THE COURT:  So I'm just not going do that.  It would be a disincentive for people to, you know, to do the work that they need to do.

What's the issue with the DIP account?

MR. KLIDONAS:  I'll take that, Judge, very quickly.

And, George, you can --

MR. GREISSMAN:  George, we talked about it last

17

night, you can explain it too if you'd like as well.

MR. KLIDONAS:  Yeah, basically there's a DIP account that the company draws so when the interim comes in, it goes into a DIP account and then the company takes from that DIP account what it needs.  The balance that's sitting in the DIP account is outside of the hands of the lenders, in the hands of the estate so to speak, but just you would have to draw on it as needed.

And I think the issue is whether the company is paying interest in fees.  Obviously we, you know, we would like to pay less interest in fees, but I think logistically it becomes a little bit difficult and I'm not sure, like, if the quantum is all that large, but I think that's the central issue.

Scott, if you want to add to that?

MR. GREISSMAN:  That's fine.  It's similar to the fee escrow in the sense that there's a bunch of money that's getting pulling from the DIP and it's not available to the Debtors to use, and they're paying interest on it and it's sitting in an account.  I think (glitch in the audio).

THE COURT:  Yeah, unfortunately there's no lender going to put any money anywhere other than in their own pocket allowing it to earn interest elsewhere without charging interest.  So I think that's just kind of a fact of life.

Mr. Hansen, do you want to be more charitable?

MR. HANSEN:  No, Your Honor.  I mean and candidly the money that's going into the escrow can be any use.  It's not like the artificial argument here is while that money is being parsed in an escrow and it's just hanging out there earning interest but the Debtors doesn't need it, the Debtors mostly -- I think they've already drawn the 62-1/2 in escrow (indiscernible) 37-1/2 we're going to put in, that's projected to be drawn, too.

So these were -- and as we noted I think, or you heard from the witnesses, the interest rates as we stated with the DIP are below market.  So this isn't intended -- this is not abnormal.

THE COURT:  Okay.  And then with respect to the DIP liens and the adequate protection, doesn't that get resolved with my soft marshaling?  Isn't that the same issue?

MR. HANSEN:  I don't think --

MR. SHORE:  Your Honor --

MR. HANSEN:   -- I think, Your Honor, that you should hear from the Committee on that.

MR. SHORE:  So it doesn't -- it obviously doesn't resolve the Committee's objection, but we understand that your ruling applies --

THE COURT:  Right.

MR. SHORE:   -- to those, as well.

THE COURT:  Okay.  All right.  Mr. Greissman, I

think you're --

MR. GREISSMAN:  Your Honor, Scott --

THE COURT:   -- you're --

MR. GREISSMAN:  I'm sorry.

THE COURT:   -- you were on mute.  Go ahead.  No, go ahead.

MR. GREISSMAN:  Apologies.  Just one technical clean up matter and that's all.  I'm not really arguing anything.

The soft marshaling language they proposed stated that they are marshaling away from avoidance actions.  And our request was, and is that they marshal away from anything that was unencumbered on the petition date.

THE COURT:  I think that's reasonable.  I mean I think that's reasonable because you may have, you know, commercial tort claims or other things like that that were unencumbered.

MR. GREISSMAN:  Thanks, Your Honor.

MR. SHORE:  Your Honor, I have one or two more clean up points, if that's okay?

THE COURT:  Sure.

MR. SHORE:  I'm not really arguing anything.  With respect to the fees, we appreciate your ruling on the Committee's fees not being -- rolling into the budget necessarily.  The carve out we think is low, the investigation budget is impossibly low, 50,000, $250,000.  We ask for a

$2 million carve out and $500,000 investigation budget.

MR. HANSEN:  Your Honor, we -- from the lenders' perspective the 250 is kind of in line with a lot of cases that you see.  We've moved it up from 50 to the 250, we think the 500 is unreasonable.  It doesn't prevent them from doing their work, just like it doesn't prevent them -- you can release them from doing their work.

It's obviously -- you know, the use of our collateral for the investigation at a timing more effectively in the carve out, and from the carve out perspective we thought that the limitation that we applied is reasonable.

THE COURT:  All right.  Again, it -- this is what's in the cash collateral budget.  I am -- I'm not going to limit the Committee in terms of how much they can spend to do their job.  And again, you know, obviously I'm going to treat all professionals equally.

So for budgeting purposes, for the cash collateral usage that can be in there, but that's not a limitation on the Committee.

All right.  Anything else?

MR. HANSEN:  That's it.

MR. SHORE:  I think those were all the issues from our perspective, Your Honor.

MR. KLIDONAS:  I have -- Your Honor, if I may --

THE COURT:  Sure.

MR. KLIDONAS:   -- just one quick clarification with respect to the milestones.  I mean, it's not secret we're coming in on Monday to talk about the Disclosure Statement and the order that they're asking you to write setting confirmation for November 18.  The milestone in the DIP is that the confirmation order must be entered on November 18.

That means everything has to be done and Your Honor has to have ruled by that day.  I hear Your Honor, what Your Honor said with respect to the milestones.  But I just want to make clear that we're not coming in facing an argument on Monday that if Your Honor says the trial is on January 2, the DIP lenders can call a default because you've entered an order that says the milestones are in effect.

So it may be just a question of drafting language, but I'm a little concerned that the next few milestones, the confirmation hearing and the effective date of December 8, if you write it into a DIP order, we're just going to be faced with -- then, you know, you're being tied as to what is a reasonable time for you to try a case, you know.

THE COURT:  Look, the DIP order is going to -- is going to, you know, have the milestones, the DIP lender has to come in to get relief to be able to exercise rights, and I'm the one who controls that.  So I mean --

MR. KLIDONAS:  Understood.

THE COURT:   -- and are we -- are we still going

22

forward on the Disclosure Statement on Monday?

MR. SHORE:  We are, Your Honor.

MR. KLIDONAS:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Are you -- are you --

MR. HANSEN:  Your Honor, can I --

THE COURT:  Yes.

MR. HANSEN:   -- can we briefly revisit the question here, because I want to make sure that we get the drafting correct, because we're going to have to obviously do some work on the order before we submit it.  Go back to the investigation budget which we're moving 250,000, and then the point about the carve out.

Your comment was that you're not going to obviously limit the Committee from the perspective of doing its job. That being said, it is standard from a lender's, DIP lender's perspective (indiscernible) lenders who have consented not -- it was extended to me as being consented to use of cash collateral obviously in the event there's a carve out trigger to limit the amount of fees that can be paid as a result of this being borne from their collateral.

So effectively that 250 is kind of like a 506(b) surcharge on our collateral, and so that -- we want to make sure that --

THE COURT:  Yeah, no, I'm not --

MR. HANSEN:   -- that you were saying was that,

yeah.

THE COURT:  Yeah, I think that's -- that's correct. If there's a -- if for whatever reason there are no reimbursements starting next Thursday or whatever, then -- and the company, you know, has to shut down and there's a carve out trigger event, the order says what the order says.  But if you're -- but if we're going to be in a situation where I'm going to be awarding fees and we're in a plan situation, then everybody's going to have to get paid.

MR. KLIDONAS:  And if I could just make one additional clarification, and I think this is what Mr. Hansen's saying, particularly fees incurred during the pipeline period after a carve out trigger mode is issued, would (glitch in the audio) clients because Your Honor had indicated that previously.

THE COURT:  Right.

MR. KLIDONAS:  It's just I think what Mr. Hansen is concerned about is post-trigger effect --

THE COURT:  Right.

MR. KLIDONAS:   -- fees.  Okay, good.  Thank you.

MR. HANSEN:  Okay.  Well, I mean I am and I'm not. Like we -- the $250,000 investigation budget can -- that's what they get to spend if they have to surcharge my collateral in that default scenario.  That's not a unlimited amount.  If their pipeline exceeded that amount, they get it capped at

24

that amount.  That's how that -- that's how that functions.  I know Your Honor's familiar with it, I'm not --

THE COURT:  Yeah.

MR. HANSEN:  -- (indiscernible).  What I want to do is make sure that what we're not agreeing to here, because we're not and we have to go back and talk to the lenders, is that we've effectively removed that $250,000 investigation cap which we're not doing.

THE COURT:  Right.  I understand.  Yeah.

MR. HANSEN:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  So when you all, you know, have the language ready, just send it to me, I'll get it, I'll enter -- get it entered as soon as I see it if it comports with what -- and make sure to send me a redline.

MR. KLIDONAS:  Yes, of course, Your Honor.

THE COURT:  All right.  All right.  So we'll be in recess to my 2:00 o'clock hearing.  Thank you.

MR. KLIDONAS:  Thank you again, Your Honor.

MR. GREISSMAN:  See you on Monday, Your Honor.

MR. HANSEN:  Thank you, Your Honor.

MR. SHORE:  Thank you, Judge.

(Hearing adjourned 12:30 p.m.)

**\* \* \* \* \***

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

    /S./  MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70109*

*DATE FILED:  OCTOBER 6, 2025*