IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 25-90309 |
| | § HOUSTON, TEXAS |
| MODIVCARE, INC., ET AL., | § MONDAY, |
| | § OCTOBER 6, 2025 |
| DEBTORS. | § 9:00 A.M. TO 10:11 A.M. |

## **DISCLOSURE STATEMENT HEARING**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:                 AKEITA HOUSE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES**:


FOR MODIVCARE, INC.:                    LATHAM & WATKINS, LLP
                                        George Klidonas, Esq.
                                        Jonathan Weichselbaum, Esq.
                                        1271 Avenue of the Americas
                                        New York, NY 10020
                                        212-906-133

                                        LATHAM & WATKINS, LLP
                                        Elizabeth (Betsy) Marks, Esq.
                                        200 Clarendon Street
                                        Boston, MA 02116
                                        617-880-4654

FOR THE 1st LIEN AGENT                  PAUL HASTINGS, LLP
AND CONSENTING CREDITORS:               Matthew Warren, Esq.
                                        71 S. Wacker Drive
                                        45th Floor
                                        Chicago, IL 60606
                                        312-499-6045

                                        PAUL HASTINGS, LLP
                                        Kris Hansen, Esq.
                                        200 Park Avenue
                                        New York, NY 10166
                                        212-318-6400

FOR THE OFFICIAL COMMITTEE              WHITE & CASE, LLP
OF UNSECURED CREDITORS:                 Christopher Shore, Esq.
                                        Scott Greissman, Esq.
                                        Andrew Zatz, Esq.
                                        1221 Avenue of the Americas
                                        New York NY 10020
                                        212-819-8394

FOR THE UNITED STATES                   DEPARTMENT OF JUSTICE
TRUSTEE:                                OFFICE OF THE US TRUSTEE
                                        Jana Whitworth, Esq.
                                        515 Rusk Avenue
                                        Suite 3516
                                        Houston, TX 77002
                                        713-718-4650

**APPEARANCES (CONT'D):**


FOR PROPOSED LEAD PLAINTIFF LOWENSTEIN SANDLER, LLP
IN SECURITIES LITIGATION: Andrew Behlmann, Esq.
 One Lowenstein Drive
 Roseland, NJ 07068
 973-597-2332


(Please also see Electronic Appearances.)

**HOUSTON, TEXAS; MONDAY, OCTOBER 6, 2025; 9:00 A.M.**

THE COURT:  All right.  I'm going to activate the hand-raising feature, hit five star.

(Conference muted.)

THE COURT:  All right.  Who is from 585 area code?

MR. TREG:  My name is Ricardo Treg (phonetic), I'm from 585 area code.

THE COURT:  Okay.  Thank you.

All right.  Who is from the 843 area code?

MS. DAVIS:  Kelly L. Davis.

THE COURT:  Okay.  318?

MS. SASSON:  Cherry Sasson (phonetic).

THE COURT:  Okay.  All right.  516?

MR. WEICHSELBAUM:  Jonathan Weichselbaum, Your Honor.

THE COURT:  Okay.  347?

(No audible response.)

THE COURT:  347 area code?

(No audible response.)

THE COURT:  All right.  I'm going to mute that.

Okay.  Ms. Whitworth, Mr. Hansen.

All right.  312 area code?

MR. WARREN:  Matt Warren from Paul Hastings.

THE COURT:  Okay.  Ms. Marks, are you un-muted?

(No audible response.)

THE COURT:  Okay.  Hit five star one time.

All right.  All right.  Okay.

All right.  Anyone else wish to speak, hit five start one time.

MR. KRAUSE:  Yeah, hello, can you hear me?

THE COURT:  Yes, I can hear you.

MR. KRAUSE:  Yeah, my name is Matthew Krause (phonetic), I'm calling from North Carolina.

THE COURT:  Okay.

MR. KLIDONAS:  Judge, also George Klidonas from Latham & Watkins is on.

THE COURT:  Yep, I had you.

MR. KLIDONAS:  Okay.

UNIDENTIFIED SPEAKER:  Yes, my -- good morning, my name --

MS. BENNETT: Phyllis --

UNIDENTIFIED SPEAKER:  Don't forget.

BENNETT:   -- Phyllis Bennett in Wellsburg, West Virginia.

THE COURT:  Okay.

MS. LARRY:  Also Gertrude Larry (phonetic) from Jackson, Mississippi.

THE COURT:  All right.  Thank you.

All right.  So everyone please, we've got a lot of people on the -- we've got --

MR. JONES:  Laterian (phonetic) Jones --

THE COURT:  Go ahead.

MR. JONES:   -- from Lancaster, Virginia.  Latarian Jones from Lancaster, Virginia.

THE COURT:  All right.  Thank you.

All right.  Everyone, please mute their lines unless you're speaking because there's -- we're getting a lot of background noise.  All right.

MR. DIGGINS:  This is Nasar Diggins (phonetic) from Philadelphia, PA.

THE COURT:  All right.  Thank you.

All right.  Anyone else wish to be heard, just hit five star one time.

MS. SIMS:  Twyla Sims (phonetic), Tecumseh, Oklahoma.

THE COURT:  Okay.

MS. GILLIS:  Hello?

THE COURT:  Yes.

MS. GILLIS:  I'm Sheila Gillis (phonetic) from Lawrence, Kansas.

MR. CULLEN:  Julian Cullen (phonetic) from Florida.

THE COURT:  Okay.

MS. WALKER:  Gwendolyn Walker from Portsmouth, Virginia.

THE COURT:  All right.

MR. LAWSON:  Clinton Lawson (phonetic), Jackson, Mississippi.

THE COURT:  Ms. Whitworth?

MS. WHITWORTH:  Can you -- can you hear me, Judge?

THE COURT:  I can, Ms. Whitworth.

MS. WHITWORTH:  Okay.

UNIDENTIFIED SPEAKER:  (Indiscernible) from Florida.

THE COURT:  Yes.

MS. MARTINEZ:  Yes, Mamie Martinez (phonetic) --

UNIDENTIFIED SPEAKER:  (Indiscernible) from Florida.

MS. MARTINEZ:   -- Mamie Martinez, Albuquerque, New Mexico.

THE COURT:  All right.  Thank you very much.

All right.

MS. BENNETT:  Can you hear me, Judge?

THE COURT:  Yes, I can.

MS. BENNETT:  Okay.  This is Phyllis Bennett from West Virginia.

THE COURT:  All right.  Thank you very much.

All right.  Everyone, please keep your line muted and --

MS. RODRIGUEZ:  This is Esther Rodriguez.  I'm in Albuquerque, New Mexico.

THE COURT:  Okay.  Ms. House, can you put the call in number on the side, because there's -- in the chat box.

(Pause in the proceedings.)

THE COURT: All right. Everyone, please keep your phone muted because otherwise we can hear, I'm going to have to mute everybody again.

All right. So it's 9:00 o'clock on Monday, October 6, 2025. We're here in Case Number 25-90309, ModivCare, Inc., and the Disclosure Statement -- the hearing on the approval of the Disclosure Statement and the solicitation procedures.

So why don't we get appearances of Counsel and then we can go forward?

MR. KLIDONAS: Good morning, Your Honor. George Klidonas from Latham & Watkins on behalf of the proposed Debtors-in-Possession.

MS. MARKS: Good morning, Your Honor. Betsy Marks from Latham & Watkins on behalf of the Debtors -- proposed Debtors as well.

MR. WEICHSELBAUM: Your Honor, Jon Weichselbaum of Latham & Watkins, Counsel to the Debtors as well.

THE COURT: Yep.

MR. HANSEN: Good morning, Your Honor. It's Kris Hansen with Paul Hastings. I'm joined by my partner, Matt Warren at Paul Hastings as well. We're Counsel to the DIP agent, the pre-petition agent and the 1st and 2nd lien lenders.

THE COURT: Thank you. Good morning.

MR. SHORE: Good morning, Your Honor. Chris Shore from White & Case, proposed Counsel to the UCC. I'll be handling the Disclosure Statement objection, but also appearing are Andrew Zatz and Scott Greissman because I think we need to address the DIP order at the end of the hearing.

THE COURT: Okay.

MS. WHITWORTH: Good morning, Judge Perez. Jana Whitworth for the United States Trustee.

THE COURT: Good morning.

MR. BEHLMANN: Good morning, Your Honor. Andrew Behlmann from Lowenstein Sandler. With me is my colleague, Lindsay Sklar. We're on behalf of the proposed lead plaintiff in the securities litigation pending in the District of Colorado.

THE COURT: Good morning.

All right. Anyone else wish to be heard?

MR. CULLEN: Good morning --

MS. DAVIS: Kelly L. Davis from Marion, South Carolina.

THE COURT: Okay.

MR. CULLEN: Good morning.

THE COURT: Good morning.

MR. CULLEN: I'm Julian Cullen from Florida.

THE COURT: All right.

`          Okay.  Mr. Klidonas, are you taking the lead?

MR. KLIDONAS:  Yes, Your Honor, I'm going to start then turn it over to my colleague, Jon Weichselbaum.

THE COURT:  Okay.

MR. KLIDONAS:  Your Honor, we're here morning to report that we've achieved, or at least hoping to achieve the next big milestone in the case on the Disclosure Statement. We originally filed our Plan and Disclosure Statement on September 4the, which was consistent with the Restructuring Support Agreement that we agreed to.  And then it was also about two weeks after the case, after many discussions with parties in interest including the UCC, and frankly hearing some of the fears of the case from the UCC during the 5th hearing as well as the issue they raise in their reply, we amended the Plan and Disclosure Statement this weekend and over the past few weeks to add more disclosure and change the recovery slightly and make them incrementally better for creditors.

Frankly just, you know, as the company would like to exit Chapter 11 as soon as possible of course and so hopefully this is the first step to discussions around settlement, but that remains to be seen.

Just at a high level before I turn it over to Mr. Weichselbaum, as you may recall, the original Plan provided for 98 percent of the reorganized equity to go to the

1st liens, as well as take back debt; 2 percent going to the 2nd liens; and then equity rights offering going to the general unsecured creditors.

Now the 98 percent for the 1st liens is staying the same, as well as the take back debt; the 2nd liens will be treated the same as the (indiscernible), we're sort of flattening that out and they'll get 2 percent, the new warrants and an equity rights offering.  But it's your general unsecured creditors with less than 1 million to get a pro rata share of what we call the COV, Cash Out Value, of 32 million, or if the value is 32 million.

The unsecured --

(Electronic interference.)

MR. KLIDONAS:   -- the unsecured notes --

THE COURT:  Everyone, please mute their line -- everyone, please mute their lines.  We're getting a lot of background feedback.

Go ahead, Mr. Klidonas.

MR. KLIDONAS:  Thank you.

As for the unsecured notes, Your Honor, given that they only have guarantee claims that ModivCare (indiscernible) and because they're essentially contractually subordinate, they're still only getting the ERO and not the other recoveries.  However, the ERO has changed, I think the pricing has changed, but it's for the entire amount of the 1st lien.

So obviously people think there's value there beyond the 1st lien, that's something that should be considered valuable.

But at this time, Your Honor, I'd like to turn it over to Mr. Weichselbaum to go through the Disclosure Statement itself and its approval, and I will address certain objections from the UCC and other parties-in-interest.

THE COURT:  Okay.  Go ahead --

MR. WEICHSELBAUM:  Good morning, Your Honor.  For the Record --

THE COURT:  Go ahead.

MR. WEICHSELBAUM:   -- for the Record, Jonathan Weichselbaum with Latham & Watkins, proposed Counsel to the Debtors.

Your Honor, so I'm going to run through the Debtors' Disclosure Statement and solicitation procedures motion, which was filed on September 4th at Docket Number 122.  The Debtors' claims agent served the Disclosure Statement hearing notice on September 5th, which reflected at the Certificate of Service at Docket Number 354.

Your Honor, as Mr. Klidonas has mentioned, we filed an Amended plan and Disclosure Statement on Saturday evening. The Amended Plan is at Docket 445, the revised Disclosure Statement is at 446, and we filed the notice at Docket Number 447 including redlines of the Amended Plan and revised Disclosure Statement against the version we initial filed.

In addition, last night we filed the revised proposed order and related solicitation documents, which is at Docket Number 451.

Your Honor, pursuant to the Disclosure Statement motion the Debtors are seeking entry of an order approving their Disclosure Statement and solicitation procedures including approval of the form of the ballots and notices and the service of the same.  We're also seeking approval of the proposed confirmation schedule including the relevant objection deadlines and a proposed November 18 confirmation hearing date.

The Debtors are also seeking approval of the equity rights offering and to establish procedures relating to the potential assumption of contracts and leases under their Plan.

Your Honor, as noted, the Debtors did receive three formal objections, one from the Unsecured Creditors Committee, one from the Trustee, and an objection from the security plaintiffs.  We did also receive an informal comment from the SEC.  I will discuss each of these momentarily, but I would just like to note up front the Debtors believe that the vast majority of these objections are premature confirmation objections.

There are limited objections that relate to the actual Disclosure Statement and that are detailed in our reply and the charted cash flow reply at Docket 448.  We had revised

the Disclosure Statement to address these limited disclosure objections.

So, Your Honor, with respect to approval of the Disclosure Statement, the Debtors submit that the information contained in the Disclosure Statement is adequate under Section 1125 of the Bankruptcy Code.  They particularly include information on the approximate recovery percentages that creditors can expect to get under the Plan versus a liquidation, the Debtors' corporate history, their structure, their business operations and their pre-petition capital structure.

They include the events leading up to the commencement of these cases, the events that have taken place to date in the Chapter 11 cases, the classification and treatment of claims in interest under the Plan, how the Debtors intend to implement the Plan, the relief that's contemplated under the Plan, some securities law matters relating to the Plan, and federal income tax consequences of the Plan.

The Debtors submit that this information is more than sufficient and is consistent with the information contained in Disclosure Statements used in Chapter 11 cases in this District and elsewhere.

The Debtors do believe that the initial Disclosure Statement was adequate, however, as just mentioned, the

Debtors did make additional disclosures in response to some of the objections received.  For example, in response to the Committee's objection, we did include additional disclosures regarding our views on any pre-petition unencumbered assets, which we do not believe there are any; additional details on the equity rights offering; further details on the ongoing investigation into estate causes of action; and we've also included the Committee's statement that they do not support the Plan on Page 4 of the revised Disclosure Statement right after the Debtors' own recommendation to creditors.

Similarly, in response to the security plaintiffs' objection we have included further disclosures on the pending litigation.

We have also made revisions to the Plan to address concerns raised by the US Trustee, namely revising the exculpated parties definition to now only include the Debtors' independent directors, which is consistent with the law in this District and the 5th Circuit.  We've also included a carve out to the release to the US government and they've similarly accommodated the SEC's request for a similar carve out in the Plan.

Your Honor, the Debtors believe that the Disclosure Statement clearly contains adequate information that will enable a hypothetical investor to cast new vote on the Plan and therefore request the Court approve the Disclosure

Statement pursuant to the revised order filed at Docket Number 451.

As I noted, the Debtors -- the Debtors believe that the vast majority of the objections raised by the objecting parties are premature confirmation objections that should be taken up at the confirmation hearing and have no bearing on this Court's determination as to whether the Disclosure Statement should be approved.

Your Honor, we fully appreciate and understand that parties like to preview their objections so that no one can argue surprise and that these objections are somehow waived. However, Your Honor, we are not surprised by these objections, we understand the parties' positions, but these are not issues for today.

And just for the Record, we understand that every parties' rights are preserved to argue their Plan objection at the right time, and nothing we are doing here today is meant to impair the Committee's, the Trustee's, or any parties' rights to raise confirmation objections at the right time.  We just do not think it is appropriate to hash out these objections before Your Honor today.

So, Your Honor, before I turn it over to the objectors, I'll just briefly touch on the solicitation procedures, the remaining relief under the motion and the proposed confirmation timeline.

With respect to solicitation the Debtors are proposing to solicit votes from holders of claims in Class 3 which are the 1st lien note claims, Class 4 which are now the general unsecured claims and include the 2L notes, and Class 5 which are the subordinated unsecured note claims.

With respect to Class 4, as described in our reply and the revised Plan and Disclosure Statement the Debtors are treating the 2nd lien notes as unsecured given that the 1Ls are not receiving a 100 percent recovery, rendering the 2L notes entirely unsecured.

With respect to the Class 5 subordinated note claims, as Mr. Klidonas noted, they are receiving the same treatment as initially proposed which is the right to participate in the rights offering, but now at a more favorable valuation.

So with respect to the voting classes, the Debtors are proposing to send each claim holder a solicitation package which will include the Disclosure Statement and its exhibits, which is in the Plan, the Disclosure Statement order, the confirmation hearing notice, and the applicable ballots.

With respect to the non-voting classes, other than the intercompany claims in interest which are held by the Debtors and their affiliates, the Debtors are proposing to send the holders of the claims in interest in the non-voting classes a notice of non-voting status and a relief opt out

form to enable -- to enable the holders of such claims in interest to opt out of the Plan's third party release.

The Debtors are proposing to get out the notices and solicitation packages including the confirmation hearing notice within four days of Your Honor's entry of the Disclosure Statement order, and give the parties 28 days to return their forms and their ballots.  We are also seeking to publish the confirmation hearing notice in the New York Times to ensure robust notice is provided to all potential parties-in-interest.

With respect to the remaining relief we are seeking, we are seeking approval of the equity rights offering procedures and the related documents that are attached to the revised proposed order as Exhibit 7A and 7B.  As discussed, the Debtors are providing eligible holders of general unsecured claims, which include the 2L notes now and the subordinated unsecured notes, the right to participate in an equity rights offering.

The Debtors are also proposing to establish procedures relating to the potential assumption of the contracts and leases under their Plan.  So the Debtors' Plan is a default assumed Plan, so all contracts and leases that are not otherwise rejected previously or subject to a motion to reject are included on the contract lease schedules we filed with the Plan supplement will be deemed to be assumed.

Accordingly, to give parties notice of the potential assumption of their contracts and leases, including their proposed cure amounts, they're proposing to send out an initial contract list to give parties 14 days to object to the potential assumption of their contracts including a proposed cure amount.  The Debtors do reserve the right to amend or supplement this list and will include any new objection deadlines and any further notices.

With respect to the confirmation schedule, the Debtors are seeking to establish the dates and deadlines set forth in Paragraph 4 of the order, including scheduling a confirmation hearing for November 18th.

Your Honor, just to finish up, the Debtors believe that the solicitation procedures, including the timeline laid out in the order, is consistent with established precedent in this district, is in full compliance with all relevant noticing periods under the Bankruptcy Code and bankruptcy rules, and should be approved pursuant to the revised order filed at Docket Number 451.

So unless Your Honor has any questions, I'll turn it over to the objecting parties.

THE COURT:  I have a couple of questions.  So first question, in connection with the 2L solicitation there was a note that the 2L agent is not going to be involved.  How is that going to work?

MR. WEICHSELBAUM:  We confirmed with Verita (phonetic) and the agents, the ballots are going to go to nominees for the holders and they will send it on to beneficial holders so the agent, or the Trustee rather, is not involved in that process.

THE COURT:  Okay.  So with respect to the $1 million cap on the cash out portion, do you anticipate that there will be any non-eligible holders that hold more than $1 million of unsecured debt?

MR. WEICHSELBAUM:  Non-eligible holders?  I'd be happy to go back and check, but I think I understand what you're saying.  I would not assume the over 1 million are private notes, but would have to go back and check.  If I'm understanding your question correctly.

THE COURT:  Yeah, no, I think you did understand my question.  I mean so that should just be a piece of evidence at the confirmation hearing then.

Those were -- with respect to -- those were the -- actually the only two questions that -- there was one other question, hold on.

(Pause in the proceedings.)

THE COURT:  Now in connection with the revised solicitation order, those were the two main questions that I had.

All right.  Mr. Shore?

MR. WEICHSELBAUM:  Your Honor, before turning it over, I would just like to see if Paul Hastings would like to maybe say anything.  I'm not sure if they do, but we'll sort of get to the objectors.

THE COURT:  I usually let Mr. Hansen come back and clean up, but go ahead, Mr. Hansen.

(Laughter.)

MR. HANSEN:  Your Honor -- I'm good, Your Honor, I'm happy to wait till the end.

THE COURT:  All right.  Mr. Shore?

MR. SHORE:  Thank you, Your Honor.  Again, Chris Shore from White & Case, proposed Counsel to the Official Committee.

Let me start with some preliminary comments and then turn to our remaining objections that haven't been resolved, and not to bury the lead, our primary remaining objection is the proposed start and completion of the confirmation hearing in 45 days.

But let me start more generally, and particularly since we have a number of unrepresented unsecured creditors on line.  From the perspective of the Committee, a Disclosure Statement hearing is usually when parties come forward and say, we've had a lot of Plan negotiations, this is the best we can do, everybody get on board, we'll have some remaining objectors, and we'll clean them up at confirmation.

It's supposed to be the culmination of a process. It is remarkable -- and for the Record, the Committee has not had one sit down with the Debtors yet, much less one substantive Plan negotiation, and from the Committee's perspective it's more than a bit frustrating.  By my count the 1Ls to date have been willing to subordinate their liens to the payment of $212 million in unsecured claims, $180 million of pre-petition vendor payments and $32 million to general unsecured creditors.

Despite their claims that they are under-secured, there's 180 -- or, sorry, $212 million going out, and it's hard to believe that had we not -- had we had a single Plan discussion before the Debtors decided as to how they were going to allocate that money, we couldn't have been far along in a consensual Plan process.  Obviously $212 million is a lot of money.

But the Debtors' decision to not sit down with the Committee, not negotiate has two consequences.  For now the Committee's just playing Whack-a-Mole with the Debtors's Plan. Let me explain.  One of our key Disclosure Statement objections was asking for a better description of the various treatments given to unsecured creditors.  Without any discussion, literally we have not had a discussion, they filed the Plan.  Oh, we had one outbound went to one of our clients I think is the -- or one of our Committee members.

We got a new Plan which he just described.  It's unclear, but I think this is how this works, if there's 32,000 claimants with $1,000 claim and they're unsecured creditors, they get paid 100 cents on the dollar.  If there are 31,000 claims, it's unclear what happens to the million dollar overage, but it seems like that just goes back to the company.  In other words, that's not for distribution to any unsecured creditors at that point, it just goes back to the company.  And if you have 33,000 claimants with $1,000 claims I think they get a pro rata share or about 97 cents on the dollar.

So rather than fix the problem, we've got an even more disparate treatment of general unsecured creditors.  Again, the Debtors' position is that the 1Ls are under-secured and everything that -- under-secured and they have all asset valid liens, that means everything that's going to unsecured pre-petition claims is a gift from the secureds.

But this is how it gets handed out.  If you're a 2L holder above a million dollars, it's unclear with the million dollars whether you can pare your claim back to hit a million dollars, but you get rights and a warrant.  If you're an unsecured bond holder, that is you are one of the few 100-plus million dollars that didn't exchange, you get your treatment, but you're payment subordination is still in place, which is a -- which is an issue.  Right?  Because the subordinations that the Debtors keep talking about was created in the

exchange.

Now they're taking the position that the 1Ls are under-secured right now, but the company was totally secure -- or totally solvent in March.  In other words, the company is worth $850 million at midpoint now, but was worth more than $1.5 billion in March.  So that's -- when they talk about the subordination is in effect, they're in effect giving effect to the exchange which they are investigating now.

General unsecured claims of over a million dollars, as Your Honor pointed out depends on your status.  It's unclear what they're going to do with contingent unliquidated claims.  Some of the securities litigation or other unliquidated claims, are they going to be doing estimations, when are you going to find out if your claim has been allowed at a million dollars, do you get to elect in, all unspecified?

General -- general unsecured creditors below a million dollars get up to payment in full, but the problem is is that the rejection or assumption procedures could mean that a claim, either the cure amount dispute or a rejection damages claim, isn't set until after you get to elect into the million dollars.

They said this is the best our disclosure can be around it, but that's going to be a Plan objection and we're going to have to deal with the fact that all these peer

creditors are getting swinged between zero and 100 cents without -- without certainly an explanation from the Debtors at this point, much less evidence.

But really what's going on here, I think, is not generosity from the 1Ls, their decision to subordinate $212 million of their collateral to the payment of these general unsecured claims, but it's a function of the actual dispute, and what I want to get to which is the scheduling of the confirmation hearing.

Obviously at the DIP hearing I asked a number of questions that went to the Debtors' valuation and projections, both in January and March of this year at the time of the up-tier and now here to seek conclusions before we ever have seen the Debtors' actual valuation.

The pre-petition 1L claims were, at the petition date, $871 million.  That left about $500 million of 2L and unsecured bonds, plus whatever amount of general unsecured claims plus contingent claims.  The Debtors' PCV valuation at a midpoint leaves a $35 million deficiency in the allowed amount of the 1L claims as of the petition date.  Now that $35 million deficiency can either be billed by finding things in the collateral -- holes in the collateral package, which essentially lowers the claim amount, or in finding more value in the Debtors, for example putting value to things like claims and causes of action.

The January projection, that 8K that was entered into evidence at the DIP hearing which Mr. Shandler testified he thought were reasonable at the time, show that projected EBITDA was $40 million higher.  Now depending upon your multiple, the Debtors seem to be at 6 to 7, that is hundreds of millions of dollars of value shift which has occurred between the last published projections and the Debtors' projections in the Plan.  And in a rational, what I see as a rational multiple range, we're talking $4-500 million of value just in that business plan shift.

So this isn't -- this isn't, as the Debtors and the 1Ls would like to paint it, you know, a kind of foolish valuation trial.  We've got a real dispute over things like which projections are correct, what do the projections say about the $35 million hurdle, are there unencumbered assets?  And a $35 million swing is a crazy small tolerance in a case of this size, and I can't think -- I can think of maybe one case I've seen where the high end of the debtor's valuation showed that their, quote, "fulcrum class" was over-secured as of the valuation date.

And I see -- it's no secret I had a problem with the milestones, but they're still asking for the November 18 start and finish of the confirmation hearing to comply with the milestone.  That is somebody who's not getting ready for a fair fight.  And it's bad luck, I mean if we're forced to go

to trial and $500 million of funded debt gets cancelled by this Court, we're at crazy risk when those January projections turn out to be right and the Debtors beat the Plan by 40- or 50- or $60 million next year which shows that the unsecureds were in the money.

So it's no secret we are looking very hard and wanting to sit down with the Debtors both consensually and, if necessary, in discovery to understand the business plan, understand those drops. And if we can't get there, to present evidence to Your Honor as to what the right projections are.

But that -- all that work has to be done. That work has really not been started, and it, as I said, has monumental implications for the Debtors' Plan to cancel all of this debt. So I really am, when I get to this objection, imploring that the Court give us a fair fight and let the Committee be a real committee here.

So what does an actual schedule look like? Where we are right now, and I don't mean to criticize the Debtors, I'm really not, it is the fact that we're nowhere right now is more a reflection of the fact that process takes time. It took essentially two months from the filing of the DIP motion to the DIP hearing to try one contested issue, and that was on a limited record. They talk about we produced 50,000 pages in connection with that. That was three custodians in the two months prior to the petition date.

What the Debtors are doing now, seeking to release all claims and causes of action is a multi-year process, and the discovery into the business plan, if we looked at '24 numbers and '25 numbers, is going to be a very large undertaking.  It is going to take time.  There is the declaration of Aaron Smith, which is really just the attachment of all the emails, where we are, and the Debtors have not really rebutted that other than to say that they have produced some documents.

We're not anywhere where we need to be.  We have not finished the selection of custodians, we're going to need to add some.  We've received over the weekend 1800 pages of emails.  We did get that.  Which brings the total documents now for Plan discovery to I think around 2,000 documents, one custodian potentially, and the debt.  We have no -- we beside -- we besides the lawyers, AlixPartners has no engagement with respect to digging into the business plan and finding out what the right EBITDA number, given that we're so (indiscernible).

Where we need to get -- I think the Debtors' position is, which is to leave the confirmation step and we'll come back -- to have the Committee come back to you when we get there.  Respectfully I don't think that's the right way to approach it.  Among other things we all need to carve 10 days out of our schedules for this confirmation trial if we can't

29

get to resolution.  I've got my *Purdue* confirmation hearing that runs through this confirmation hearing.  We're all going to need to come up with a -- with a schedule and then work backwards.

What we have -- what we need to build into the schedule is after we get the documents, or at least a substantial flow of the documents, we're going to need 10 to 12 depositions.  That's hard to say because we haven't seen the documents.  We're going to have the valuations, unclear whether the 1Ls are going to submit a valuation.  We're going to need to be (indiscernible) the report.  As Your Honor said, they can't just drop that on us at the confirmation hearing and expect to go forward.

So what we propose, and maybe the Debtors can tell us what it's going go be, but I think 60 days from substantial completion of the documents we can work out a schedule.  And if they told us it will be substantially complete by next week, fine, we'll do it 60 days from then.  And we need really 30 days from the publishing of the claims report.  I mean that would be sort of what's necessary if what they do is to support the release of claims and causes of action based on a report we haven't seen either through a 9019 basis or some other abandonment procedure.

So I just -- far from being, you know, at the culmination of a process, what we called work here, I just

think -- I just think we -- I mean they can -- they can send out the Plan and Disclosure Statement, I don't have a problem with that.  I think they do have some problems with the general unsecured agreement, we're not waiving any objections with respect to what I think are six or seven different treatments of unsecured creditors.  But we need to have a discussion as informed by Your Honor as to how to come up with a rational trial schedule, given that the issue in dispute is extremely live.

Let me say one last thing.  The tendency is, when dealing with a Committee that's objecting to confirmation if the Debtors could throw up barriers.  We are not -- whatever the schedule is going to be, we're talking about 60 days from substantial completion for trial, which is lightning quick. We've got to have cooperation from the Debtors.  We can't just have them holding on to materials and bleeding them out slowly.

If they want to get out, they've got to treat the Committee like an Official Committee, give us real time access to information, and try to move this forward.  And if we can't get there, go to discovery rather than say to the Committee, if you're going to take discovery, then that's the only way you're get a solution.

So that's the Committee's view as to where we are now.  And so we do object to the setting of the confirmation

hearing on these things, and look forward to Your Honor's comments as to how we can better prepare you for a trial, because at the end of the day it's your day that you're going to need to get through.

THE COURT:  All right.  Ms. Whitworth?

MS. WHITWORTH:  Good morning, Judge Perez.  Jana Whitworth on behalf of the US Trustee.  Can you hear me, Judge?

THE COURT:  I can.

MS. WHITWORTH:  Thank you, Judge.

Your Honor, the US Trustee filed an objection to the confirmation -- excuse me, to the approval of the Disclosure Statement based on the issue that this Court is well familiar with, the third party releases obtained through the opt-out provision.  I understand the issue on exculpation has been resolved.

THE COURT:  Good.

MS. WHITWORTH:  And then the carve out for governmental units on the release has also been resolved.

Again, the US Trustee would just ask the Court to reserve the right to further argue all of the issues that we have with the third party releases obtained through the opt-out procedure, Judge, and accompanying gatekeeper provision and the injunction provision.

THE COURT:  Okay.  Thank you very much.

All right.  Mr. Behlmann, why don't you come up?  I guess you didn't get the memo.

MR. BEHLMANN:  I did not get the memo, Your Honor, although I am glad to be here, it's nice to be in front of Your Honor in person.

For the Record, Andrew Behlmann from Lowenstein Sandler on behalf of Christopher Scripsee (phonetic), who is the proposed lead plaintiff in the federal securities litigation pending in the District of Colorado.

Just as sort of a preliminary matter, Your Honor, we don't have the luxury that the US Trustee has, such as it is, of waiting until confirmation to raise our issues for the simple reason that the Plan contains what is I guess from our perspective a trapdoor type of provision.  It says, if you have opted out -- or, pardon me, If you have objected to the 3rd party release at confirmation, you're deemed to opt out.

Because we're seeking to opt out in a representative capacity we can't do that.  Right?  We opt out individually, we can't then say, you know, we want to represent these other people.  We expect the next argument we would hear from the Debtors is, you no longer have standing.

So we're before Your Honor today to try and hopefully find a resolution of what is a fairly nuanced issue but an issue that is specific to our constituents.

We are in the odd and unenviable position right now

of having competing plaintiff motions pending before the District Court in Colorado that have been fully briefed and pending since the beginning of May.  Not something that happens terribly frequently in these cases, there were four, two have withdrawn, there are now two.

We don't know when the District Court is going to rule, but what we have done is in response to the Debtors' notice of Suggestion of Bankruptcy we filed a response saying, you know, we're here, we're Bankruptcy Counsel, we're taking these steps but we need, you know, we need the District Court's assistance.  We don't know when the District Court is going to rule.

So as of right now Mr. Scripsee is proposed lead plaintiff.  We do anticipate that his motion will prevail, the other party has filed what they call a joinder to our response saying they would like to be appointed co-lead.  We haven't agreed to that, but that's all sort of out in limbo in Colorado.

The Debtors I think have resolved our pure disclosure issues that we raised.  They, you know, they made a number of changes late last week and over the weekend to the Disclosure Statement.  We think our pure disclosure issues are resolved.  The one issue that remains is a solicitation procedures issue.

We have a proposed class in the securities

litigation of purchasers during a specific time period, that I do not have in front of me, I think it was 2023 to 2024 --

THE COURT: 2022 to 2024.

MR. BEHLMANN: Sorry, '22 to '23, several years ago. You know, we don't see a procedure for those folks even getting an opt-out notice here, and we frankly think it would be a little bit unfair for them to, you know, at the very nascence of the securities litigation, have to read things and do things and take steps to preserve claims against other people. They're claims against the Debtors subordinated under 510(b), they're getting nothing under the Plan.

I think there is a simple path and I hope what I read in the confirmation -- pardon me, the disclosure objection reply charts last night is a window to that. The Debtors indicated in there for the first time that they're willing to try to work with us to resolve the issue. We have -- we made a proposal to them about two weeks ago, we haven't heard back not that yet, but, you know, perhaps the window is open.

But what we would propose to do, Your Honor, is similar to what the parties did in *Cutera*, 25-90088, in front of Your Honor I think back in April. The parties there reached a resolution that said, okay, we're going to get an order that says you can opt out on behalf of the proposed class if all of the hoops that have to get jumped through

35

subsequently in the District Court don't get jumped through. Right?  We don't get appointed lead, don't get a class certified, case gets dismissed, then an opt-out retroactively disappears.

But up until that point, you know, assuming those hoops get jumped through, that opt-out stays live and stays valid.  We think it's an elegant solution, we think it's a simple solution.  Frankly I think it was crafted with some guidance from Your Honor in *Cutera*.  It's the right result here for a group of parties that probably don't even realize they have claims against the Debtors, much less against other people and otherwise stand to get basically steamrolled by the third party release.

THE COURT:  Okay.  All right.  So why don't we set your motion for hearing.  When was that filed?

MR. BEHLMANN:  I believe it was filed on the 6th -- no, today's the 6th, the 1st -- the 1st.

THE COURT:  Filed on the 1st.  Let's -- we'll get -- we'll set that next week, and so we'll figure out a time.

I don't know who's going to take the lead. Ms. Marks, are you going to take the lead on this?

MS. MARKS:  Yes, Your Honor.

THE COURT:  Okay.  So we'll set it, but I do -- this sounds very similar to a situation like *Cutera* where we basically entered a conditional order which basically said

they can opt out, but to the extent they don't get class certification and all of those things, then it kind of goes away.  But see if you can agree on that form of order, otherwise we'll set a hearing on it some time next week so that they --

MS. MARKS:  Thank you, Your Honor.  We'll --

THE COURT:  Yeah, this should be -- this shouldn't be a heavy lift.

MR. BEHLMANN:  Understood.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MS. MARKS:  Exactly, yeah, we've been working on that internally and we plan to work with Counsel on that so --

THE COURT:  Yeah.

MS. MARKS:   -- that's our Plan already.

THE COURT:  I think Mr. Davidson was involved in *Cutera* so he -- I'm sure he has some background.  All right.

MR. BEHLMANN:  Thank you, Your Honor.

THE COURT:  All right.  Anyone else wish to be heard in connection with the Disclosure Statement.

Mr. Hansen?

MR. HANSEN:  Yes, Your Honor.  Again, it's Kris Hansen of Paul Hastings on behalf of the agents both on the DIP and pre-petition and the consenting 1st and 2nd lien creditors.

Your Honor, Mr. Shore said a lot.  I think trying --

we can address, if you'd like, all the specifics that he raised with respect to the claims.  We don't believe it's confusing, we think the Plan and Disclosure Statement are quite clear.

On those issues in terms of distribution, right, the 2L claims and general unsecured claims other than subordinated notes are now classified together.  They recover equally across the 2 percent plus the warrant package, and if you're a QIB, you have the right to participate in the ERO.  We say QIB, that's -- it's an accredited investor standard, somebody who has obviously participating from a securities law perspective in the purchase of new securities needs to meet that standard.  But the other, the primary distributions are available for all the parties.

With respect to the cash option, the way that it works is if you're under a million dollars in the claim amount, basically that's you have a pro rata share of the general unsecured class.  That's your claim number, you multiply that by about 32 and that effectively is your payout.  So it's not like you're -- it's not like everybody who's under a million is getting a million.  Right?  That's not how it works.

And it's pretty clear, the document is very straightforward.  But in truth, Your Honor, that really wasn't Mr. Shore's objection.  Mr. Shore's objection was this

litigation is going to take a really long time and so we need to move the timeline.  Two things on that, Your Honor, and obviously the Debtors can respond as well.

First, in terms of the litigation taking a long time, these are big firms, we have a lot of resources, and as long as information is provided to everyone, this can easily get done within the time that's been allotted.  We haven't heard yet -- we've heard a lot of discussion about, well, we are still getting documents.  Okay.  Well, documents will still be flowing probably on our way to confirmation and that's pretty normal for these types of situations.

In terms of preparing a valuation, you know, from an expert perspective on our side, valuation reports, et cetera, we can build all that time in and stay within our confirmation timeline.

So, you know, Your Honor, I think from our perspective what we haven't heard yet is, I'm getting no cooperation, it will be impossible to be able to do this. Well, that's not what we've heard.  And I think the perspective is we need to charge forward, we need to stay on the timeline that is applicable to this case, which by the way complies with the Code requirements.

And to the extent that Mr. Shore, or any other party who is contesting confirmation on a litigation basis, believes that they are not being provided with the information that

they need or that any of the other parties in the case are delaying or putting out tactics to try to prevent him from being able to present the case that he needs to present, well, then he'll come back to you and explain that to Your Honor, but we haven't heard that yet.

And again, Your Honor, I can't express enough from the lenders' perspective how critical it is to get this company out of bankruptcy. We had a DIP hearing the other day that -- I appreciate the way you handled it, you know, but we all had pretty lengthy presentations that we were going to, you know, use to reiterate a lot of what was in the pleadings that were filed that talk about the fragileness of this business, and this is a business with tens of thousands of employees, with tens of thousands of contract counterparties, it's a business that every day has to compete for new business against competitors who are not in bankruptcy.

I know that doesn't make it unique for a Chapter 11 Debtor, but we also haven't asked the Court to shorten time. We haven't done anything unique on that front. And so Mr. Shore's objections are largely Plan objections. He admits that. We should get the Disclosure Statement out, we should head towards confirmation. But what we shouldn't do today is say, let's just move the timeline because.

What we need to do is get going and get moving with all these professionals to bring to trial to bear, and if

along the way there is something that didn't work in the process through the Committee because they have -- again, there has been a delay, there has been some, you know, bad conduct, whatever, we'll bring it back before Your Honor and you can deal with it then.

So again, Your Honor, from the lenders' perspective we would ask that the Disclosure Statement be approved today.

The consequence by the way as an aside with respect to the unsecured notes being subordinated and having only one obligor, yes, that was part of the up-tier.  No one's hiding from that process, and that's something that the Debtors are looking into and that's something that the Committee's looking into as well.  And they can -- we presume that they will file a standing motion at some point, and we'll bring that on in the context of confirmation as well.  Again, nothing unique around any of those.  It's just simply the fact of how the process works.

So again, Your Honor, we really believe that there's plenty of time here and that the case needs to get out of bankruptcy.  And what you've heard a little bit of is, well, hey, the projections might show that there's liquidity to go beyond our proposed confirmation date.  That's not the standard.  The standard isn't, well, if there is liquidity there, we should use it all up.

And by the way, we on the lenders' side, are the

ones who are providing the bulk of that liquidity through our DIP loans. And from our perspective we worked with the Debtors to create these milestones, not to be Draconian on any other party, but to move the process quickly and comply with the Code requirements.

Thank you, Your Honor.

THE COURT: All right. Mr. Weichselbaum?

MS. MARKS: Your Honor, before Mr. Weichselbaum closes out, I did want to briefly address the comments on discovery.

We completely disagree with Mr. Shore's comments on the status of discovery. I know that you've heard information, in fact, about the thousands of documents that we've produced at the Second Day Hearing and the DIP motion, for the June to August pre-petition time period.

For weeks now we have running with multiple custodians, at least six custodians, along with the search terms and we've already started to review about 20,000 more documents for Plan discovery. It's not accurate that we've not even agreed on custodians. We're well into that document review already, and have staffed up a large team to be able to plow through them and make rolling production.

We're willing to add more custodians, they've requested some additional custodians just this morning and we have a call later this afternoon to discuss. So, you know, I

believe Mr. Shore is sort of preordaining that the timing won't work, but that's just, you know, that's not what's actually happening. I'm confident that we can finish our document production and get them what they need to take depositions in advance of the November 18 confirmation date.

THE COURT: All right. Thank you.

MS. MARKS: Thank you.

MR. WEICHSELBAUM: Your Honor, I'm going to start from the last objector just to, one, for me to give them comfort on ways to amend (indiscernible) seen on similar stipulation in a recent case before Judge Lopez, so I'm sure we'll be able to get there in advance of that hearing. So we will work on that after this hearing.

Based on Mr. Shore's remark that he believes we can send out the Plan and Disclosure Statement today, I will take him up on that offer and assume that we're good on the adequacy of the disclosures and that the only issue is the timeline.

As Ms. Marks just remarked, Mr. Shore seems to be clear that he doesn't have enough time. The Debtors submit that 45 days from today is ample time for Mr. Shore to come back to this Court and seek additional ample time if he believes that the Debtors are not working cooperatively with them on discovery. We have continued to provide documents, we will continue to do so.

And I would like to just correct the Record.  The Debtors had sent a proposal to the Committee on September 16th -- on September 26th for a potential settlement.  We did not really receive a substantive response on that.  Before we filed the revised Plan and Disclosure Statement this weekend, we tried to preview it with the Committee's Counsel.  At all times we are -- we continue to work and try to work with the Committee on the consensual path here, and nothing is stopping us from doing that.

This is -- this is the beginning of a process, that we have 45 days till the confirmation hearing.  We welcome the Committee's engagement on a potential deal and to stop litigation.  But we believe that this is sufficient time, and for the reasons that have been discussed before Your Honor previously, the more time in bankruptcy the more harm that can be done to this business.

So, Your Honor, we respectfully request that the Court do set the hearing for November 18th and approve the solicitation procedures and the Disclosure Statement pursuant to the revised order that was filed at Docket 451.

THE COURT:  All right.  Thank you.

So I have a few --

MR. SHORE:  Your Honor, may I --

THE COURT:  Sure, go ahead.

MR. SHORE:   -- I would just -- may I just respond

44

briefly just to make two points?

THE COURT:  Go ahead, go ahead.

MR. SHORE:  Okay.  Thank you.

THE COURT:  Yeah, absolutely.

MR. SHORE:  Let me just clarify because Mr. Hansen seemed unmoved.

I was being polite when I was saying we're not there yet.  Let's be clear, for the Record, we are not getting the cooperation needed to do a trial on November 18th.  The Debtors are moving too slowly, they took a month off from Plan discovery to deal with the DIP hearing.  They are not moving consistently with the efforts of somebody who wants a fair process here, and a November 18th confirmation hearing is not realistic or consistent with due process.

You just heard, we're confident that the documents will be produced before the confirmation hearing.  That's not due process in a trial like this.  If I've got 20,000 documents today, I can't get to trial.  What you didn't hear is any practical way to do that.  Are we going to take all our depositions before we see documents, are we going to get expert reports before we take a deposition.

Let's be realistic here.  The reason he set a realistic timeline is it makes the job easier for the Court so that we're not taking depositions on the stand in front of Your Honor because we got a document the day before

confirmation.

We're trying to run a fair process here that is streamlined.  No one's saying we want till April or May or June.  We'll move quickly, but the Debtors are not moving quickly.

THE COURT:  All right.  Okay.  So just a couple of more technical comments.

So there was an updated liquidation analysis that was filed this morning, which obviously needed to be filed.  The first page is -- reflects the new classification and treatment, but the second page still doesn't.  So I don't know whether that's going to be updated, because this appears to still be based on the old -- the first Plan, not the Amended Plan.  So just -- that -- put that for question.

Let me just go through my --

MR. WEICHSELBAUM:  We'll fix that, Your Honor.

(Pause in the proceedings.)

THE COURT:  So one of your procedures, Paragraph 54, it states that, you know, for purposes of serving solicitation materials, you can just rely on whatever books and records, or information you have in your books and records, and obviously that's in every Plan.  But I'm not making a finding on this that is -- that it's actual due process.

Obviously we're going to need to look at -- look at all of -- if somebody raises this issue, which I don't

anticipate, we're going to need to make sure that they -- that we look at all of the facts and circumstances.

MR. SHORE:  Understood.

(Pause in the proceedings.)

THE COURT:  So in your -- in your definition of released parties -- your definition of releasing parties, you do have the limitation that they may assert claims, causes of actions on behalf -- on behalf or in a derivative capacity. But in your definition of released parties, the related parties are just -- there's no limitation, and so I would insert after -- you know, where it says, and K, with respect to the foregoing clauses, A through J, all related parties, but only to the extent such related party would liable derivatively through a released party.

So in other words, if this is a situation where there's, you know, a car accident by one of the related parties, that that's not covered, it has to be something that's tethered to this case.  So it's an easy fix, right, it comes right before the notwithstanding, and it's similar to the language in releasing parties.  In this case it's only -- but only to the extent such related party would be liable derivatively through a released party.

MR. SHORE:  Understood, Your Honor.

(Pause in the proceedings.)

THE COURT:  All right.  And then the other -- the

other two comments I already mentioned.

So I think that the Plan that was filed over the weekend, you know, it greatly improves the treatment for unsecured creditors, especially by adding, you know, the additional $32 million to allow, you know, non-accredited investors to receive the equivalent of what they would otherwise be entitled to.  So but that, again, that's a Plan issue.

You know, I'm very concerned about the timeline here.  I think that the -- you know, we are moving quickly, I think there are good business reasons to move quickly, but incumbent upon moving quickly is providing the information.  So I'm going to go ahead and approve the Disclosure Statement, allow it to be sent out for solicitation.  But I really implore the parties to provide -- if we're going to have a contested confirmation hearing, to provide all of the information that's necessary in order to have a trial on the merits and not a trial that some -- that we ran out the clock.

And I don't anticipate that will happen.  You all are professionals and can address these issues.  But at this point I'm going to give the Debtors the benefit of the doubt and assume that we can do a fair process given the timeline that we're on.

So obviously to the extent that that's not working, I'll hear that and have to make adjustments, and if that blows

the milestones, that blows the milestones.  I would hope that there would be significant cooperation and a willingness to go above and beyond what's needed in order to have a fair process under the circumstances.

So give me a minute.

MR. WEICHSELBAUM:  Your Honor, I don't want to distract or -- I just want to correct one thing because I think there's a little bit of a misunderstanding and we may have to fix it in the documents.

The eligible holder distinction is only relevant for the equity rights offering.  All holders are getting the same treatment otherwise, the general unsecured creditors.

I just only mentioned it a couple of times, I just wanted to make sure I was clear.  And I think we made mistakes on some documents on our end, but I just wanted to be clear for the Record.

THE COURT:  Okay.  Say that again, I'm sorry.

MR. WEICHSELBAUM:  The eligible holders are only -- that only applies to the equity rights offering.  All holders of general unsecured claims in Class 4 are going -- still have the same right to -- well, it's a cash out option to get the new warrants, you don't have to be an eligible holder for that, it's only the equity rights offering component.

THE COURT:  Okay.

MR. HANSEN:  Your Honor, it's Chris Hansen, the

point I made before which the AI status of that, like a bulk of those who are purchasing equity, but from a distribution perspective they receive the primary plus the warrants, or they can like do the cash slot.

THE COURT: Okay. Got it. Okay. I did not -- I did not understand that, so I think that we probably -- that probably does need to be highlighted.

MR. WEICHSELBAUM: Yeah, we're going to fix it in the -- in the actual solicitation documents before they go out.

THE COURT: All right. I just un-muted someone. Mr. Zatz, did I just un-mute you?

MR. ZATZ: Yes, hi, Your Honor. Andrew Zatz from White & Case, proposed Counsel for the Committee.

I just want to flag with respect to the warrants, the Plan currently reads as though you have to be an eligible holder to receive them. So we can work with the Debtors to clarify that, but that's not how it reads.

MR. WEICHSELBAUM: Your Honor, as I just noted, we will -- we are making fixes --

THE COURT: Okay.

MR. WEICHSELBAUM:   -- to that.

THE COURT: All right. So I don't think that -- so you'll just file solicitation versions of the Plan and Disclosure Statement. I think that as it relates to the form

of order nothing -- nothing would change in the form of order. Is that correct?

MR. WEICHSELBAUM:  Correct, Your Honor.  I think the only thing we would need is a time on November 18th to fill in to the order.

THE COURT:  Yes.

MR. SHORE:  Well, actually, if we're -- if we're actually going to try this trial schedule, Your Honor, can we get maybe five consecutive dates for a confirmation hearing trial?  I mean, we all do have things to schedule.  As I said, I've got a *Purdue* confirmation hearing that has been many years in the waiting now.  We're going to have to come up with schedules.

If we could get contiguous days, that would be great since most of us will be traveling to Houston, but I think this isn't happening in one day.  And so we need to know that Your Honor has a full trial day that day and when you have other days that we can add to.

And again, if we come up with a consensual solution, we could take those days off, and if we don't get there, we'll find other days.

THE COURT:  All right.  Yeah, so the next -- so likely we could start on the 18th and then the -- we can do the 19th, can't do the 20th, can do the 21st, and then the next week is the week of Thanksgiving, we can basically do

every day that week except Thanksgiving.  And we can do it virtually so that people don't have to come to Houston for Thanksgiving.

MR. WEICHSELBAUM:  Thank you, Your Honor.

MR. SHORE:  Thank you, Your Honor.

THE COURT:  Yes.  So let's say that we can do 9:00 a.m. on Tuesday, the 18th.

MR. KLIDONAS:  Works for the Debtors, Your Honor.

THE COURT:  Okay.  And I may have a short panel at 1:00 o'clock, so we would have a late lunch and then I could do the panel and then move from there.

All right.  So let me go back.

(Pause in the proceedings.)

THE COURT:  All right.  So I'm just going to change it in the box, is that the only place it needs to be changed?

MR. WEICHSELBAUM:  Paragraph 3, Your Honor.

THE COURT:  Got it.  Okay.

We can start at 8:00 a.m. if that is easier.

(Pause in the proceedings.)

THE COURT:  All right.  That's been signed and sent to docketing.

So let's talk about the DIP order.

MR. WEICHSELBAUM:  Thank you, Your Honor.  I think Mr. Klidonas might be the one to talk about it.

MR. KLIDONAS:  Yeah, it seemed like -- Your Honor, I

thought we were -- the only issue that was left open I believe was just the carve out piece, and effectively, you know, like how much of the carve outs should the -- White & Case being (indiscernible) Committee professionals be included in.  I thought we were there on the order for that piece, but White & Case should also chime in if there's any other open points.

MR. ZATZ:  Your Honor, can you hear me?

THE COURT:  Yes, I can hear you.

MR. ZATZ:  Andrew Zatz again from White & Case.

We had sent Counsel for the Debtors and Counsel for the Ad Hoc Group comments shortly before this hearing, which I think would resolve this last outstanding point.  So unless Mr. Klidonas or anyone else feels like they need to get it front of the Court now, I suspect we can resolve it off line.

THE COURT:  All right.  So why don't we -- if you can't resolve it off line, why don't we come back at -- at 4:00 p.m. this afternoon Central Time?  If we can't -- if you can't --

MR. ZATZ:  Thank you.

THE COURT:   -- if we can't resolve it by then.

MR. HANSEN:  Your Honor, it's Kris Hansen with Paul Hastings.  Perhaps I could just ask Your Honor a question, it might perhaps --

THE COURT:  Yeah.

MR. HANSEN:   -- resolve the issue very quickly.

So at the hearing last week right at the end we were talking about the $250,000 investigation budget --

THE COURT:  Right.

MR. HANSEN:   -- after we had discussed the carve out at a larger level.  So I think the question that we all had, because we had Your Honor say loud and clear that you were going to pay allowed administrative expenses in connection with the case.

THE COURT:  Right.

MR. HANSEN:  And obviously you were not tripping people from a budget perspective, but the DIP lenders have their rights to the extent they want to call a default.

So the question is on the pipeline with respect to the carve outs, whether all Committee fees from a pipeline perspective would be part of the carve out or not.  And the pipeline is obviously those prior to the issuance of a carve out trigger notice, and that --

THE COURT:  Yeah.

MR. HANSEN:   -- and that's the question.

THE COURT:  Yeah, and I think all the Committee's fees with a cap of 250 on the investigation are in the pipeline, so all Committee fees are pipeline fees.

MR. HANSEN:  All right.  That was -- I believe that was the parties' understanding of your ruling, Your Honor, and with respect to the 250 obviously that's the, you know, their

cap there on the -- from a carve out perspective on trigger notice.

THE COURT:  But everything --

MR. HANSEN:  And on the admin -- and on the admin -- you know, okay, great.  Thank you, Your Honor.

THE COURT:  Yeah, on the admin if -- to confirm a Plan then it's everything.  There is no -- there is --

MR. HANSEN:  And obviously it's allowed fees.  Right?  I mean that's not --

THE COURT:  Right, exactly.  Obviously, allowed fees.  You are correct.

All right.  So if we need to come back at 4:00, we can come back at 4:00.

MR. HANSEN:  I don't think we will, Your Honor.  We appreciate the clarification.  I think Mr. Zatz probably agrees.

THE COURT:  Okay.  All right.  So we're in recess till my 1:00 o'clock hearing.  Thank you.

MR. KLIDONAS:  Thank you, Your Honor.

MR. BEHLMANN:  Thank you.

MR. WEICHSELBAUM:  Thank you.

(Hearing adjourned 10:11 a.m.)

**＊ ＊ ＊ ＊ ＊**

55

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the Zoom proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70115*

*DATE FILED:  OCTOBER 8, 2025*

JUDICIAL TRANSCRIBERS OF TEXAS, LLC