IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------------- x
:
In re:                                                     :   Chapter 11
                                                           :
MODIVCARE INC., *et al.*,                                  :   Case No. 25-90309 (ARP)
                                                           :
          Debtors.[1]                                :   (Jointly Administered)
                                                           :
---------------------------------------------------------- x

**DECLARATION OF CHAD J. SHANDLER
IN SUPPORT OF THE MOTION OF DEBTORS FOR ENTRY
OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 (A) APPROVING A
GLOBAL SETTLEMENT AGREEMENT BY AND AMONG THE
DEBTORS AND UHC AND (B) GRANTING RELATED RELIEF**

I, Chad J. Shandler, hereby declare as follows:

    1.    I submit this declaration (this "***Declaration***") in support of the *Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 9019 (A) Approving a Global Settlement Agreement by and Among the Debtors and UHC and (B) Granting Related Relief* [Docket No. 439][2] (the "***9019 Motion***"), filed on October 3, 2025.[3]

    2.    I am the Chief Transformation Officer of ModivCare Inc. ("***ModivCare***" or the "***Company***") and its debtor affiliates (collectively the "***Debtors***"). My background and qualifications are set forth in the First Day Declaration and incorporated herein by reference.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/ModivCare. Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

[2]    The version of the 9019 Motion filed at Docket No. 439 was filed under seal. A publicly-available version of the 9019 Motion was filed at Docket No. 440.

[3]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the (a) 9019 Motion and (b) *Declaration of Chad J. Sandler in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***") [Docket No. 14], as applicable.

US-DOCS\164464353

3. As set forth in my First Day Declaration, I am knowledgeable about, and familiar with, the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that led to the commencement of the Chapter 11 Cases. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, my own reasonable inquiry, and/or my discussions with the Debtors' other officers, directors, and restructuring advisors, including professionals at Latham & Watkins LLP, Hunton Andrews Kurth LLP, Moelis & Company, FTI Consulting, Inc., and Kurtzman Carson Consultants, LLC d/b/a Verita Global. If called upon to testify, I would testify to the facts set forth in this Declaration. I am authorized to submit this declaration.

## INTRODUCTION

4. ModivCare is the nation's largest non-emergency medical transportation ("*NEMT*") broker, coordinating more than 36 million trips each year on behalf of managed-care organizations, state Medicaid agencies, and Medicare Advantage plans. These services ensure that vulnerable members timely reach critical healthcare appointments across the country.

5. I understand that ModivCare has partnered with UHC to provide NEMT services for UHC's members since 2009 and that UHC pays ModivCare service fees in exchange for such services.[4] Additionally, I understand that UHC has historically been one of ModivCare's biggest customers. Under the UHC Agreement, ModivCare and UHC have entered into "market specific addenda" that govern the contractual arrangement between the parties in various states across the

---

[4] The fees paid by UHC are based on a per member per month capped calculation.

U.S.  These addenda and the Network Access Agreement are evergreen contracts that renew on or around either March or December of each year, barring notice of non-renewal from either party.

6. I understand that the amount of and the way the service fees are paid to ModivCare under the UHC Agreement differs depending on where and what services are provided; however, for the most part, such fees are paid monthly in advance and are subject to an annual review and reconciliation process.  The contracted fee amounts are capped at a set rate per member per month, and monthly payments are based on the estimated volume of services provided and members served.  As such, I understand that the amounts paid in advance do not always accurately reflect the true amount of the fees UHC owes ModivCare (it could be more or less).  Accordingly, under the UHC Agreement the parties must engage in an annual reconciliation process whereby the parties review the detailed encounter data to correct payments through "true-up" payments, as well as assess the trends in transportation utilization and costs to adjust the per member per month contracted fee.

7. I believe that ModivCare is entitled to a "true-up" payment in excess of $25 million for the period of January through June 2025; however, the reconciliation process does not begin until March 2026.  Therefore, if ModivCare continues to provide the same volume of service to UHC at the same contracted rates until the end of 2025 (without entering into the UHC Amendment), I believe that the amount to be reconciled will grow to over $50 million.

8. I have observed the considerable impact of this fee arrangement (not being fully compensated for services until after the annual reconciliation process) on ModivCare's liquidity. ModivCare sought to mitigate this by attempting to negotiate with UHC to either (a) transition to a fee-for-service model, which would have ensured full and timely payment for all services rendered, or (b) have accrued "true-up" amounts paid early, but that the negotiations were

unsuccessful. Instead, ModivCare received notices prior to the Petition Date from UHC of their intent not to renew the UHC Agreement and the addenda thereunder, some of which would become effective December 31, 2025, and others on March 14, 2026.

9. After receiving such notices, I understand that ModivCare and UHC engaged in extensive negotiations to: (a) avoid potential disputes over the substantial reconciliation payments that have and continue to accrue under the UHC Agreement; and (b) ensure continuity of service for those UHC members that rely on ModivCare's NEMT services. The alternative would have been an abrupt end to a longstanding partnership, potentially harming ModivCare, UHC, and those who rely on both for NEMT services. I believe that, as a result of the negotiations, the parties reached a comprehensive agreement memorialized in the UHC Amendment.

## UHC AMENDMENT

10. The UHC Amendment: (a) winds down the parties' relationship in two phases—phase 1 markets ending December 31, 2025, and phase 2 markets ending February 28, 2026; (b) secures immediate payment of $25 million for services rendered from January through June 2025 ("**Settlement Amount**"); (c) implements higher contracted payments for July through December 2025; and (d) imposes incremental reporting and transition obligations on ModivCare to ensure continuity of care for UHC members through the end of the contract term.

11. I understand that ModivCare agreed to forgo a modest portion of revenue in exchange—approximately $15 million—by terminating certain addenda to the UHC Agreement up to two and a half months before the end of their annual terms. I also understand that ModivCare has also committed to increase the cadence of reporting and assist with certain transitional arrangements upon the non-renewal of the UHC Agreement. I believe that the financial and

4

operational impacts of these concessions[5] pale in comparison to the significant utility that ModivCare obtains from the guaranteed payment of substantial revenue (*i.e.*, $25 million plus the higher services fees through the end of the year).

12.   I believe that ModivCare entering into the UHC Amendment is clearly beneficial to the Debtors' estates. First, it secures payment now of substantial amounts that would have otherwise not become due (if at all) until at least March 2026 when the next annual reconciliation process is complete. Second, by agreeing to the Settlement Amount and the higher service fees going forward, ModivCare is able to mitigate the uncertainty of the reconciliation process. I understand that the reconciliation process is fact-dependent, subject to documentation, and may result in UHC disputing the amounts owing to the Debtors. In my view, the risk of a dispute is particularly acute for the next reconciliation process, because at that time, the Debtors' and UHC's relationship will have ended and UHC will no longer have any incentive to support the Debtors. As such, I believe that there can be no guarantee of what the ultimate amount owed to the Debtors would be after the reconciliation process, and that it would be prudent for the Debtors to reinforce their entitlements and lock in payment now by entering into the UHC Amendment.

13.   Moreover, absent the UHC Amendment, ModivCare would be contractually obligated to continue providing NEMT services at the existing rates through the end of the contract term (December 2025 or mid-March 2026). I understand that this would result in ModivCare being owed over $50 million, albeit subject to the outcome of the reconciliation process and UHC's rights to dispute such amounts.

---

[5]   I believe these concessions benefit Medicare and Medicaid beneficiaries by ensuring a smooth transition that will enable uninterrupted services.

14. I understand that the only other alternative open to the Debtors was to reject the UHC Agreement. I believe that rejecting the UHC Agreement would harm the estates, as terminating early would sacrifice all of the revenue that could be earned from the remainder of the contract term, and put at risk all accrued "true-up" payments. Additionally, rejecting the UHC Agreement risks disrupting service to the thousands of UHC members who rely on ModivCare, which I believe to be a far worse outcome than the UHC Amendment.

15. I understand that ModivCare conferred with advisors to the First Lien Agent, the Consenting Creditors, and the lenders and agent to the DIP Financing regarding the settlement with UHC in advance of filing the 9019 Motion, and such parties are supportive of ModivCare entering into the UHC Amendment.

## MERITS OF THE COMPROMISE

16. I have reviewed and considered the impacts of the UHC Amendment and believe it is a fair and reasonable compromise, is in the best interest of the Debtors' estates, and is a sound exercise of the Debtors' business judgment for the following reasons.

17. *First*, the likelihood of success of litigating against UHC regarding UHC's alleged termination of the UHC Agreement, including litigation regarding the Debtors' potential rejection of the UHC Agreement, is uncertain. Likewise, the likelihood of success of potential litigation regarding the renegotiation of contracted payments or the reconciliation amounts, should the parties continue under the UHC Agreement rather than enter into the UHC Amendment, also is uncertain. In addition, litigation would likely require the expenditure of significant funds and cause substantial, detrimental impact to the Debtors. Having the benefit of certainty and prior agreement between the Debtors and UHC maximizes value for the Debtors' estates and avoids what could otherwise be costly and distracting litigation that would almost certainly harm the Debtors' estates.

18. *Second*, the UHC Amendment is the product of good-faith, arm's-length bargaining between the Debtors and UHC, each of which were represented by counsel, and no party has asserted that the UHC Amendment was the product of fraud or collusion.

19. *Third*, I believe the UHC Amendment is reasonable and is in the best interests of the Debtors' estates. Under the UHC Amendment, ModivCare (a) immediately obtains considerable incremental liquidity, (b) preserves constructive relations with a key industry counterparty, (c) safeguards high-quality transportation for the country's most vulnerable patient populations, and (d) avoids considerable uncertainty with respect to recovering over $50 million of receivables. By contrast, electing to provide services through the end of the contract term without any amendment would result in such receivables being subject to the reconciliation, which, as noted above, is inherently uncertain. Similarly, in my view, rejecting the UHC Agreement sacrificed considerable revenue (both going forward for the remainder of 2025 and through the reconciliation process), while also affecting those that require ModivCare's services.

## CONCLUSION

20. For all the reasons stated above, under the facts and circumstances of these Chapter 11 Cases, I believe that entry into the UHC Amendment is in the best interests of the Debtors' estates and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 14, 2025

*/s/ Chad J. Shandler*
Name: Chad J. Shandler
Title:  Chief Transformation Officer

**CERTIFICATE OF SERVICE**

    I certify that on October 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

                                        */s/ Timothy A. ("Tad") Davidson II*
                                        Timothy A. ("Tad") Davidson II

129214.0000001 DMS 353244321v2