IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 25-90309-11 |
| | § | HOUSTON, TEXAS |
| MODIVCARE, INC., ET AL, | § | THURSDAY, |
| | § | DECEMBER 11, 2025 |
| DEBTORS. | § | 11:35 A.M. TO 6:02 P.M. |

**CONFIRMATION AND STANDING MOTION HEARING**
**DAY FOUR**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:      YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**

FOR MODIVCARE, INC.:        LATHAM & WATKINS, LLP
                           Ray C. Schrock, Esq.
                           Jamie L. Wine, Esq.
                           Keith A. Simon, Esq.
                           George Klidonas, Esq.
                           Kamali Houston, Esq.
                           Jonathan J. Weichselbaum, Esq.
                           1271 Avenue of the Americas
                           New York, NY 10020
                           212-906-133

                           LATHAM & WATKINS, LLP
                           Elizabeth (Betsy) Marks, Esq.
                           200 Clarendon Street
                           Boston, MA 02116
                           617-880-4654

                           HUNTON ANDREWS KURTH, LLP
                           Timothy A. Davidson, II, Esq.
                           Brandon Bell, Esq.
                           600 Travis, Ste. 4200
                           Houston, TX  77002
                           713-220-3810

FOR THE 1st LIEN AGENT      PAUL HASTINGS, LLP
AND CONSENTING CREDITORS:   Kris Hansen, Esq.
                           200 Park Avenue
                           New York, NY 10166
                           212-318-6400

                           PAUL HASTINGS, LLP
                           Matthew Warren, Esq.
                           Lindsey Henrikson, Esq.
                           71 S. Wacker Drive
                           45th Floor
                           Chicago, IL 60606
                           312-499-6045

                           PAUL HASTINGS, LLP
                           Craig Stanfield, Esq.
                           609 Main Street
                           Suite 2500
                           Houston, TX 77002
                           713-860-7300

3

**APPEARANCES (CONT'D):**

FOR THE OFFICIAL COMMITTEE     WHITE & CASE, LLP
OF UNSECURED CREDITORS:         Christopher Shore, Esq.
                                Ashley Chase, Esq.
                                Colin T. West, Esq.
                                Erin Smith, Esq.
                                Andrew Zatz, Esq.
                                1221 Avenue of the Americas
                                New York NY 10020
                                212-819-8394

                                WHITE & CASE, LLP
                                Jason Zakia, Esq.
                                111 S. Wacker Drive
                                Suite 5100
                                Chicago, IL 60606
                                312-881-5400

                                WHITE & CASE, LLP
                                Charles R. Koster, Esq.
                                609 Main Street
                                Suite 2100
                                Houston, TX 77002
                                713-496-9700

FOR THE US TRUSTEE:            OFFICE OF THE US TRUSTEE
                                Jana Whitworth, Esq.
                                515 Rusk Street, Ste. 3516
                                Houston, TX  77002
                                713-718-4650

(Please also see Electronic Appearances)

4

**INDEX**

CLOSING ARGUMENTS:

| | |
|---|---|
| By Ms. Wine | 10 |
| By Mr. Klidonas | 26 |
| By Mr. Weichselbaum | 45, 163 |
| By Mr. Hastings | 54, 70 |
| By Mr. Stanfield | 58 |
| By Ms. Whitworth | 95 |
| By Mr. Shore | 98 |
| By Mr. Zatz | 132 |
| By Mr. West | 163 |

**\*\*\***

**HOUSTON, TEXAS; THURSDAY, DECEMBER 11, 2025; 11:35 A.M.**

(Audio begins abruptly)

THE COURT:  Motion to Extend Time to File Proof of Claim.

MR. BELL:  Good morning, Your Honor.  Brandon Bell of Hunton Andrews Kurth, co-counsel for the Debtors.

Your Honor, we've not had any luck getting in touch with Ms. Erin, but the Debtors have no opposition to a late-filed claim.

THE COURT:  Okay.  I thought you were coming over to pick up the boxes.

(Laughter)

MR. BELL:  That'll come soon, Your Honor.

(Pause in the proceedings)

THE COURT:  No, she did file a claim.  It's attached at 563-1.  So I'm just going to --

MR. BELL:  Correct.

THE COURT:  -- enter an Order saying that that was timely filed.

MR. BELL:  Thank you, Your Honor.

THE COURT:  Oh, wait a second.  I just sent it to docketing without signing it.

All right.  All right.  Thank you.

MR. BELL:  Thank you very much, Your Honor.

THE COURT:  You may be excused.

(Recess taken from 11:36 a.m. to 2:02 p.m.)

THE COURT:  All right.  It's 2:00 p.m. or so on Thursday, December 20 -- December 11th, 2025.  We're here in 25 dash -- Case Number 25-90309, ModivCare.

So, Mr. Klidonas?

MR. KLIDONAS:  Good afternoon, Your Honor.  For the Record, George Klidonas of Latham & Watkins on behalf of ModivCare and their affiliated Debtors.

Your Honor, we're here today for the closing arguments of the confirmation.  I'm joined today by my colleagues Ray Schrock, who's on the line, Jamie Wine, Keith Simon, Betsy Marks, and Jon Weichselbaum.

I just want to sort of set the stage as to what we think the plan -- the order is today.

Ms. Marks is going to address an evidentiary issue up front, and then Ms. Wine will provide some high-level themes on the confirmation and the evidence that we heard.

I'll go through the objections of the Committee.

And then Mr. Weichselbaum is prepared to talk about 1129 standards and the U.S. Trustee objection, to the extent that Your Honor wants to hear it.

And then, of course, we'll turn it over to the Consenting Creditors and then the Unsecured Creditors Committee.

There is also we filed an emergency motion last

night, in the middle of all this, for exit financing.  We were hoping to have it heard today, but I wanted to throw that in there, just in case.

(Laughter)

THE COURT:  So I did see that.  Have you heard from anybody with respect to it?

MR. KLIDONAS:  No, not that I know of.

THE COURT:  Does the Committee have a position?

MR. SHORE:  I'm not the -- I'm definitely not the exit finance person, but I can tell you it's going to have to be taken up after the confirmation hearing, so.

THE COURT:  Okay.

MR. KLIDONAS:  Like at the end, yeah.  Yep.

THE COURT:  That's fine.

MR. KLIDONAS:  It's short.

THE COURT:  Okay.

MR. KLIDONAS:  Thank you, Your Honor.

I'll turn it over to Ms. Marks.

MS. MARKS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. MARKS:  Betsy Marks from Latham & Watkins on behalf of the Debtors.

Earlier this morning, the Debtors filed their Sixth Amended Exhibit List, which contains two new exhibits. The Sixth Amended List is at Docket 1034, and the two new

exhibits are at Docket 1034-1 and -2.  Dash 2 is a supplemental plan that I believe the Court --

THE COURT:  Wait.  Hold on a second.

Mr. Schrock, why don't you hit five-star because there's quite a bit of noise?

AUTOMATED VOICE:  Conference muted.

THE COURT:  All right.  Are you on, sir?

MR. SCHROCK:  Yes, I am, Your Honor.  Thank you.

THE COURT:  Go ahead.

MS. MARKS:  Your Honor, the two new exhibits are DX-365 and 366.

THE COURT:  Okay.  So I've read 365, which is the certification --

MS. MARKS:  Yes.

THE COURT:  -- which was done at my request.

MS. MARKS:  Yes.  So we just wanted to move that into evidence, Your Honor.

MR. SHORE:  And I object to the certification of a witness coming in -- a trial witness coming in after the close of discovery.

As I understood it, Your Honor asked for a report on how many claims were paid.

THE COURT:  No.  I asked exactly what they did --

MR. SHORE:  Well, actually, what they did in the report is, not only add in that there were 462 claims that

were counted and paid in full and 24.35 million in amount, they also changed the way that those numbers were presented to you.

And they put in at the end evidence -- quote, "evidence" that the Debtors have told them that one claim in the amount of $90 million is subject to an agreement in principle, which is certainly that I would want to discuss with the witness.

THE COURT:  Yeah, I won't -- that I agree with you.  But just calculating who was paid and how that affected it, I'm going to go ahead and allow that.  But I agree with you on the ninety.

MR. SHORE:  I had no problem, I was willing to stipulate to that.

THE COURT:  Yeah.

MR. SHORE:  I just -- the rest of it was --

THE COURT:  I agree with that.

MS. MARKS:  Okay.  So the rest of it will be moved in, Your Honor?

THE COURT:  Yes.

(Exhibit DX-365 partially received in evidence)

MS. MARKS:  And DX-366 is the notice of filing of the fourth plan supplement.  We would ask the Court to take judicial notice of that.

THE COURT:  Okay.  Any objection?

MR. SHORE:  No, Your Honor.

THE COURT:  Okay.  That will be admitted.

MS. MARKS:  Thank you, Your Honor.

(Exhibit DX-366 received in evidence)

MS. WINE:  Good morning, Your Honor.  Jamie Wine on behalf of the Debtors.  Are you ready for us to proceed?

THE COURT:  I am ready.

MS. WINE:  Great.

I may have said good morning.  Good afternoon.  Did I already screw that up?  Sorry about that.

(Laughter)

MS. WINE:  I'm going to start our presentation today by focusing on the key evidence that was and was not presented during the hearing.

And then Mr. Klidonas, as you heard, will address the legal arguments around plan confirmation, and then, to the extent necessary, the standing motions.

Your Honor, in my opening statement, I said that the Committee will not be able to present evidence to support its positions, and we saw that unfold over the last several days.  The Committee's case comes down to throwing aspersions at the Debtors' management and its board, even though the Committee is not bringing any fiduciary duty claims.

It's an odd posture, we think, for the Committee.

And it's, frankly, insulting to management and the board for this Committee to show up and effectively say ignore everything that management and its experienced board have thought about and concluded and listen, instead, to outside third parties, who know very little about the company and who make unsubstantiated assumptions about its business. They're also saying ignore Mr. Shandler and FTI, who have been embedded in the company for the past year, and oh, by the way, then don't release these Directors and officers.

So, with that, let's get right into it with a prime example of this, with -- which is UnitedHealth. Mr. Shore said in his opening that this is a, quote, "case-determinative issue."  And we agree.  The valuation presented by the Committee's expert Mr. Brown is predicated on projections by its other expert Mr. Magrisi that include 40 to 50 percent of UnitedHealth revenue.

In no way was it reasonable to include that revenue based on the known facts that, fundamentally, have not changed for several months:

UnitedHealth terminated almost six months ago.

The Debtors have been telling the Committee consistently that there is every indication the UnitedHealth relationship really is terminating on the timing that UnitedHealth set out in its termination notice;

That there is a large de-implementation team at

the Debtors that has been working with UnitedHealth for weeks on the transition to new providers;

And that there is no indication that UnitedHealth is returning at any point.  We have consistently said that for the last several months, that has not changed.

And there is literally no evidence that would support including UnitedHealth revenues and projections for the Debtors.  When asked to identify any such evidence justifying his inclusion of the UnitedHealth revenues in his projections, Mr. Magrisi yesterday conceded that there wasn't any.  He cited only his own speculation that UnitedHealth must be using the threat of termination as a negotiation tactic, as it supposedly has in other unidentified, unrelated matters.

Now the Committee, throughout this case, has tried to point to ModivCare not knowing the identity of the replacement providers as evidence that the UnitedHealth relationship really isn't going to transition.  There, of course, was nothing to support that theory.  And it's typical for a company in ModivCare's position not to learn the identity of the replacement providers until near the competition of the transition process.

After ModivCare learned, last week, the identity of the new providers, the Committee's new talking point for the hearing became the secret is out, suggesting that some

secret was being kept from them.  And that's just not true. There was no secret.

The Debtors have been saying, all along, unequivocally, that the UnitedHealth relationship was transitioning.  UnitedHealth telling ModivCare last week the identities of the replacement providers was a recent development that simply further confirmed that fact on the exact timing that we anticipated all along.

Of course, during its extensive discovery efforts, the Committee could have asked UnitedHealthcare directly if the business really was transitioning and whether it is expected to come back at any point over the next several years, but the Committee deliberately never did so.  And we say it was deliberate.  They deliberately never did so.

Even after the excited utterance that was made in the 9019 hearing from UnitedHealth's counsel saying that the relationship was over, the Committee did not actually want to get an answer to the question of whether it was really over because that would call into question its own expert's inclusion of speculative UnitedHealth revenue in his projections.

Now let's talk about valuation and more about the projections that are feeding into the valuation analyses.

Your Honor heard from witnesses on the development of Debtors' projections, and that's where we should start.

The Debtors have a credible set of projections put together by an experienced management team who's been at the company for years, along with FTI and Mr. Shandler, who I noted have been embedded with the company for a year, and with the benefit of input from board members like Ms. Norwalk, who you heard from, a ten-year ModivCare Director with unmatched experience with the regulatory environment and Medicaid payer challenges that are impacting this company.

And this is the reason why management typically puts together things like projections and liquidation analyses. And those are not farmed out, typically, to outside third parties because the people inside the company are closer to it in its business, closest to it in its business.

And it's really quite remarkable that the Committee here tried to raise an objection to Mr. Shandler not having been properly disclosed as a Rule 26 expert. That just turns the usual paradigm on its head. The work that Mr. Shandler did was inherently non-expert work, more suited to management and its financial advisor. What is unusual is to have an outside third party come in and substitute its judgment for that of the Debtors, and then have a valuation expert rely on those alternate projections, rather than on Debtors' own, to come up with a total enterprise value.

The evidence showed that there is no reason here to doubt the sincerity of the Debtors' management.  There is no basis to question their projections as unreasonable.  There are no credible allegations against management; for example, there is no evidence that anyone tried to run this company into the ground.

All we know is that the Committee doesn't like Debtors' projections because of what those projections suggest about value.  The Committee wants rosier projections, something that will support its speculation that this company will perform better than reasonably could be expected in the future, so that the Committee can say just give us that value today.

The Debtors' projections are reasonable.  There is no evidence of bias.  There is no evidence that the projections were manipulated to get to a certain outcome.  Therefore, there is really no reason to even get to Mr. Magrisi's projections, but even if we do, they are easily rendered unreasonable.

The biggest flaw, of course, is the inclusion of 40 to 50 percent of UnitedHealth revenue.  Mr. Magrisi's projections, on which, by the way, he spent 80 hours total, are also based on simplistic solutions that could be said about almost any company; things like save money by firing people, take away their 401Ks, don't give them any bonuses,

and suggestions like just go get new customers and increase your margin, or make a bunch of technology improvements, but reduce your CapX spend.

On valuation, the Debtors presented, again, a credible valuation analysis put together by Mr. Jamal, an experienced investment banker, that appropriately considered this Debtor's business and its realistic prospects for growth.  There's no evidence of bias, again, or that the valuation was manipulated to get to a certain outcome.

There was one thirty-three-million-dollar mistake that was identified and immediately acknowledged by the Debtors, which does not materially impact the valuation.  It does not cause total enterprise value to exceed the first lien claims and there's no reason to conclude that the Debtors' valuation is not reasonable.

So, again, just like with the projections, we shouldn't even have to get to the Committee's valuation analysis.  But even if we do, the issues are just compounded when we get to Mr. Brown's opinions.

Perhaps, because of UnitedHealth, the Committee pivoted at trial on valuation and realized it needed to get away from its reliance on Mr. Magrisi's unreliable projections.  So Mr. Brown came here yesterday and he testified like he had done a full-blown qualitative valuation analysis using the Debtors' projections.  It was

the first slide in his presentation yesterday, in his demonstratives, and the first opinion that he discussed in his testimony.

But if we look back to his sixty-five-page expert report -- and I'm going to pull this up on the screen now, Joe -- you'll see -- oh, sorry.

Can we have sharing permission?

THE COURT:  Yep.

(Pause in proceedings)

MS. WINE:  So this is his report, it's 65 pages long.  And if we go to Page 18, 18 of 65, there is one line buried in the middle of Page 18 -- and we can highlight it now, thank you -- that shows that he apparently applied his valuation methodology to Debtors' projections.  That is it.  You can go back and look at the report yourself.  That's all you're going to find in there.

He had no slides in his report dedicated to this analysis, nor did he even show the math like he did on two of his demonstratives that he shared with you yesterday.  He wouldn't even give us his Excel spreadsheet showing his math; we still don't have it.

We can take that down.

But even looking at his belated, underdeveloped opinion, there is one glaring flaw that makes it, on its face, unreliable.  Prior to Mr. Brown testifying,

Mr. Magrisi, just before him, acknowledged in his testimony yesterday that his projections reflect a, quote:

"-- vastly healthier company than what the Debtors project."

Yet, Mr. Brown admitted in his testimony that he did not, in any way, change the valuation assumptions he applied to the Debtors' projections.

So, even though he was effectively valuating a different business, once he switched to using the Debtors' projections, he didn't reduce the multiple.  He still used the higher EBITDA multiples that he had applied to the Magrisi invented company.  He didn't change the growth rate. He didn't change the discount rate.  He didn't do any qualitative analysis; he just did math.

And if we look at his demonstrative from yesterday -- so if we could pull up Slide 2 from his demonstratives.

So this is it, this is the whole opinion, I guess. But if we even look at this, his unadjusted math, it has them barely clearing the combined DIP first lien debt of roughly a billion dollars.  So even the slightest tweaks to reflect the Debtors' actual business, when he did his valuation analysis, would have gotten them below the one billion.  He couldn't change any of that because it would have gotten them below the billion.

We can take that down.

I want to now turn our attention to the 2025 transactions for a moment and the Committee's attempt to unwind them.  This is a little brief pivot on standing just because I want to address one evidentiary issue on this, and then Mr. Klidonas will argue it more from a legal perspective.

The evidence showed that the 2025 transactions were entered into after careful thought and deliberation by ModivCare management, its board, its advisors, including Moelis, FTI, and Kirkland.  They concluded there was no other viable option for the company to pursue to solve its urgent need for funding.  No one else was coming forward with sufficient funds on the timing that was needed.

Ms. Norwalk testified about this during the hearing, as did Mr. Shandler and Mr. Jamal, and Mr. Silvers found the same in his investigation.  There is also consistent and uncontroverted testimony in the record from several other witnesses, including Mr. Shepard, who testified here live; and in the testimony submitted by deposition designation by Ms. Gutierrez, who was the former CFO, the CFO at the time; Mr. Kern, the head of business development; as well as Mr. Sampson, the CEO.

The fifth amendment and the related transactions indisputably provided substantial value to the company.  They provided $75 million in new money.  They reduced

ModivCare's minimum liquidity requirement.  They provided for a covenant holiday.  And they mandated certain governance improvements.

And remember, no one, not even the Committee itself, has alleged breach of the credit agreement or indenture, nor has any un-subordinated, unsecured -- sorry -- nor has any subordinated, unsecured noteholder commenced any action regarding these transactions.

To unwind the uptier, the Committee argues, among other things, actual fraudulent intent on the part of the Debtors.  And I challenged the Committee in opening, I noted then that its only purported evidence of actual intent to defraud was an email from Mr. Sampson.  I put that innocuous email on the screen, I'm going to put it here again today, so it's DX-307.  And I discussed how, in it -- and it's the top email.

Joe, if we want to blow it up.

I discuss how, in it, Mr. Sampson recognized two things:

First, that the company needed the $75 million.  I don't think that's really in dispute.

And second, that some on the capital stack would do better than others, which I said I think something to the effect of that's a self-evident truth.

He is not saying in this email anything like the

following:  Let's do this transaction because I want to hurt these creditors, in particular.  He's not saying anything like that.  He's simply stating the impact of securing a previously unsecured debt, that's all he's saying there.

Mr. Sampson himself was deposed.  He explained the context for this email in his deposition testimony.

We can take down the exhibit.

His testimony has been designated, it is before the Court, Your Honor may have read it.  At Pages 81 to 85, there's a discussion of this email.  I'm going to put up an expert on the screen.

But basically, Mr. Sampson, who is the CEO, but does not have a finance background, said, simply, he wanted to understand the structure, he had never dealt with an uptier before, so he wanted to understand how it was going to work.  And he explains that he was trying to understand the certainty of getting this done and that understanding the transaction structure made him more comfortable that hey, we're going to be able to get the 75 million to ensure that we solve our liquidity crunch.  And of course, as the CEO, that's what he was focused on, was getting the funding that they needed.

And we can take that down.

Think about this, Your Honor.  The Committee is trying to use as its supposed evidence of actual fraudulent

intent this email from an executive who didn't even understand the transaction. He didn't even understand it. How can that evidence the requisite mental state to defraud. And that's all they're pointing to.

Now one new theory seems to have surfaced this week through the Committee's questioning of witnesses: The suggestion that Lenders wanted to improve their unsecured position, so that they -- so they funded just enough to get past the ninety-day preference period.

First of all, I'm not sure how this could be evidence of the Debtors' intent to defraud. But in any event, this is just rank speculation.

The Committee's only purported evidence supporting this new theory is that thirteen-week cash flows were used, and that 13 weeks happens to be equal to 91 days. But there is nothing atypical about using thirteen-week cash flows. This is not an indicator of fraud. Thirteen-week cash flows are used all the time. There's a thirteen-week cash flow under this DIP loan facility. It's not evidence of any state of mind, let alone any actual intent to defraud.

Also, if the Committee really thinks the Debtors' management team acted with an intent to defraud in engaging in these transactions, how is it that the Committee is, on the other hand, not bringing any breach of fiduciary duty claims? That makes no sense. Clearly, if the Directors and

officers authorized or carried out some sort of actual fraud, it would seem that some fiduciary duty, at a minimum, would have been breached.

And lastly, I want to remind the Court of one thing:  That Jupiter, the chair of the Committee and a substantial subordinated, unsecured noteholder, itself wanted to participate in what became the 2025 transactions, and recognized that the transactions could be done with a simple majority vote.

This is evidenced in several emails that are before the Court, one of which I displayed during opening. We can pop it up here again; it's DX-342.

And there are also several others, which are cited in our briefing.  So, if you look at our pretrial brief, which is Docket 921, at Page 14, Footnote 21; Pages 23 and 24, we cite a number of other Jupiter-produced emails that basically say the same thing.

So -- and we can take that down.

So the Committee's own constituents know there was nothing inappropriate about the transactions, which, of course, all were disclosed publicly in proxy materials, filed in connection with the Colosseum vote, which, itself, received shareholder approval, including from Mr. Mounts Gonzales.

Okay.  During my opening statement, I also talked

about one other theme, which is that we have to ask ourselves on whose behalf is the Committee really advocating here, and is there a disconnect between what the Committee is advocating and how its constituents are acting.

There are even more questions and answers around this topic now given the odd testimony yesterday from the Committee's two experts, which left it unclear whether their analyses were ever even presented to or shared with the Committee members and the Committee's constituents.

The Debtors believe, in their valuation, that the first lien claims are the fulcrum.  But if the reorganized Debtors do outperform their projections at any time over the next five years, as we've noted to Your Honor, the plan presents the best protection here for the Unsecured Creditors, with the benefit of upside sharing through the warrants.

In the aggregate, the warrants here are for up to 45 percent of the reorganized equity, subject to dilution. The warrants provide material upside sharing.  It's not atypical for warrants to be something like five to ten percent of the reorganized equity over something like a three-year period.  But 45 percent for 5 years is a healthy package, one that the Committee barely acknowledges.

And if the Committee's constituents believe the company -- the Committee's valuation, then they would have

participated in the ERO, but they have not.

They had a chance to invest $200 million at a nine-hundred-and-seventy-million-dollar enterprise value, a terrific discount, and they didn't take it.  This is true even in the case of Jupiter, who I just mentioned, who, itself, wanted to participate in an uptier.  They had new money to investment and, yet, now is choosing not to do so with a supposedly great deal on the table, if you believe the Committee.

And if you think about this, Your Honor, if they had done the ERO, they could have paid off the hundred-million-dollar DIP facility and eliminated the 20 percent backstop fee.  That would have freed up even more value for them.  But as has been consistent, they have been willing to talk and speculate, but are unwilling to put in any capital, and have not provided an alternate plan.  They have no solution to offer.

Without this plan confirmed, the situation will be far worse, including for ModivCare's employees, its vendors, many of whom are the Committee's own constituents, and the many people in need who use ModivCare's services.  The Committee does not seem focused on any of that.  Rather, they think the Debtors should stop their short-term incentive plan, reduce staff, eliminate 401K matching.

It does seem, though, that the Committee's

constituents may be paying attention to all of this.  Given the lack of alternatives and the void created by no one else stepping up with capital, the general Unsecured Creditors are voting to accept the plan.  The plan has received the overwhelming support of the voting Class 4 creditors, which, as you know, includes both the second lien notes and the other general Unsecured Creditors.

And if we look at the Declaration that we submitted last night -- or the certification, DX-365, this is the second supplemental certification of Mr. James Lee of Verita Global.  And if we go to Page 4 and we look at the end of Paragraph 8, the chart there, as Your Honor requested, we removed from the voting results the fully satisfied claims and reduced the partially satisfied claims, as of the voting record date, October 6th, 2025.  Even with those changes, Class 4 voted to accept the plan with 84.2 percent in number and 78.5 percent in dollar amount. It is now clear that the Committee is simply doing the bidding of the subordinated, unsecured noteholders.

And with that, Your Honor, I'm going to turn it over to Mr. Klidonas to address the legal issues.

THE COURT:  All right.  Thank you.

MS. WINE:  Thank you.

MR. KLIDONAS:  Good afternoon, Your Honor.  For the Record, George Klidonas again on behalf of Latham -- on

behalf of the company, from Latham & Watkins.

We also have a presentation we want to put up on the screen.  We'll pass it to the UCC and the U.S. Trustee.

(Participants confer)

MR. KLIDONAS:  Your Honor, much of this is meant to be demonstrative for the Court, but I just want to talk the Court through a roadmap as to how we see the case.

Our view is that the Debtors have proven by the preponderance of the evidence that their valuation is consistent with the Bankruptcy Code.  The Committee has failed to demonstrate the Debtors' valuation is unreasonable through its objections.

The second piece is that the evidence is undisputed in support of the Debtor releases.  The Committee hasn't shown any evidence with respect to the Debtors' business judgment to grant the Debtor releases, and finally, we believe the Debtors have satisfied all the requirements for confirmation under the Plan.  You'll hear later where the evidence exists for the 1129 standard.

I do address the standing motion at the end.  We believe it's moot if the Court confirms the Plan, but I plan to at least very briefly go through the standing piece.

Your Honor, for valuation and projections, we believe and the standard is that the valuation and the projections of the company should be reasonable.  The

company did not show up with a set of numbers prepared for this hearing, right?  The projections were built by management who lives this business everyday with FTI's assistance.

You heard that FTI had been there for about a year helping management.  They were vetting by the board, including Independent Directors.  These projections weren't drafted, you know, a few weeks ago in a conference room. They've been lived through for quite some time in a few months.

And they're basically created by the people who run the business and you know, cut the paychecks of the employees here.

And so they're actual projections, they're not hypotheticals.  The DIP Lenders and the Consenting Creditors, they were willing to put real capital behind this business and no one else was, right, both on a pre-petition basis and a post-petition basis.

Similarly, Moelis used the standard of suite of tools that we usually see, DCF analysis, trading comps, precedent transactions.

The Committee labeled his work and Mr. Shandler's work as overly conservative, but we just call it responsible and reasonable -- again, according to the standard.

In fact, we believe that this is probably the

issue that is the most case dispositive for the case, which is what -- just like the projections in the valuation, no one was willing to write a check here.

The evidence reflected that no one is going to write a check on a pre-petition basis, no one is willing to write a check whether it was equity or debt on a pre-petition basis, no one is willing to put in a junior DIP, and even during these cases, which have been pretty public, no one has been willing to step up and cut a check and support the Committee's valuation.

The ERO, which you heard from Ms. Wine earlier, provided the opportunity to put real money in at the Debtors' lower valuation.  Right?  So you'd think it would be sort of a no-brainer, and if somebody believes it's almost double the value, they would put in value at the Debtors' valuation.

It would be one thing to say that the Committee, you know, has a new money check or there's some other offer or some proposal to terminate exclusivity and pursue another opportunity, pay off the first lien -- sorry, pay off the DIP, eliminate the objectionable 20 percent premium and cram up, for example, the 1Ls, that would be a different situation.

What we have here is a proposal -- is a restructuring that's been actually provided by the

Consenting Creditors and simply a hypothetical valuation that's been provided by the Committee.

The other issue for us -- you've heard about it, but what the valuation does and the projections that are being provided by the Committee, it doesn't give us a solution, right?  Their valuation is not to any actual alternative and what would happen is effectively be stuck in these cases for a certain period of time, but I'm not sure exactly what the Consenting Creditors would do.

I'm not saying that people shouldn't contest valuation if they think, you know, something is unreasonable.  I understand that, but we've seen legitimate valuation fights before and you usually see them with some real capital behind those valuation fights.

So we're simply asking the Court to approve the valuation and the projections that have been -- that the evidence as reflected is reasonable and has been provided in good faith.  That's the legal standard here.

Our projections and valuation, they're not speculation, they're not full of "what if's."   The Committee did not show that what Moelis or FTI did or the company did was unreasonable and there were actually -- there was some testimony reflecting that from their experts.

Conservatism, Your Honor, in projections or valuation for a company that's been on the decline for years

and has had a rough road ahead, is not an unreasonable approach.

And importantly, there was no evidence of any kind of bias or financial manipulation; and therefore, we believe that the evidence shows that the projections and the valuation as they stand are reasonable.

As far as the releases go, I want to frame it in three different ways. The first is there's no conflict there. The second is Mr. Silvers ran the correct process. And the third is that the substance supports the releases.

Your Honor, the board here exercised sound business judgment appointing Dan Silvers at the direction -- sorry, the board exercised sound business judgment by appointing Dan Silvers as the Director that reviewed any potential estate claims.

After the fifth amendment, the board received a list of Directors and interviewed a number of candidates. The board went through a rigorous process, and not only was the board the one that vetted Mr. Silvers, this actually went through a public equity shareholder process who he was approved by.

The board selected him because the record reflected that he had more than 25 years of experience as an investor, as an advisor, as a public company Director, and on August 14th of this year he was asked to review claims

for potential estate causes of action and see if the releases are in the best interest of the estate.

The evidence did not reveal any conflict whatsoever.  Instead, the Committee only points to sort of generalized relationships between parties, but there was no evidence of material financial benefit, no overlapping board seats, nothing where you would see in sort of a case law that shows that there's a conflict here.

The case law basically says, you know, there has to be some material indicia of bias here and we don't believe that the evidence suggested that.  The question is not whether Mr. Silvers had any relationship whatsoever, it's whether those relationships reasonably called into doubt decisions that he made.  And the Committee has no such evidence.

The other thing we've been harping on, we've been hearing consistently, is you know, these Directors were Lender appointed.  They were not Lender appointed.  There was a list.  It was vetted by the Directors, by the public company shareholders, and they were selected.  And again, there is case law we cite to that that says just because someone selects a Director or gives a list of Directors, doesn't make them hearsay biased.

For the process, Your Honor, just at a high level, I want to say that we believe Mr. Silvers ran a good

process.  He hired Quinn Emanuel.  Quinn Emanuel and Mr. Silvers looked at seven items that are in our brief for the investigation.  They did a handful of things in terms of reviewing 25,000 documents, a data room, requests for production.  They conducted tenant reviews.  They actually solicited input from the Committee.  They attended examinations and depositions, and they also prepared a report and two Declarations, and based on that process, there was a conclusion.  And the substance reflected that -- Mr. Silvers concluded that there were no viable causes of action here worth pursuing against the released parties.

Mr. Silvers found no factual or legal basis to bring any colorable claims and he said that these claims will be value destructive if you brought them.  Likelihood of success is low.  The cost in delay would be too high.  And the primary cause of action that is in the standing motion is really just the fraudulent transfer for the fifth amendment, which is what our Plan does effectively.

So there's no basis for bringing that claim if the result has already been provided for in the current Plan we're asking to have confirmed.

I also want to run quickly through a number of reasons, which are also in our presentation with the testimony that Mr. Silvers provided.  He believes that there was a substantial identity of interest between Debtors and

the Reorganized Debtors and the released parties, including the Directors and Officers.

The indemnities here are riding through.  There could be claims that the reorganized company, three Directors that are current Directors are sitting on the new board, the Officers are staying in place, and as a result, there could be claims back and at a minimum distraction back to the reorganized company.

There is substantial contributions being provided here.  Of course, you know, Directors and Officers and everybody discharged their responsibilities, but frankly they worked a second and/or maybe a third job while doing this restructuring over the past year -- or over a year.

The creditors here have also provided 2 percent equity, warrants and cash, to general Unsecured Creditors who are, in our view, totally out of the money.

And frankly, the subordinated notes, although they're getting nothing, they are getting a chance to participate in an ERO, which again, under their value would be very accretive and very valuable.

The last few things:  The releases are important to the Plan.  The Lenders wanted us to put it in there.  We negotiated them.  They were part of the restructurings so that they don't take this company on a go-forward basis and have to deal with unnecessary and wasteful litigation.

And then, Ms. Wine talked about our support.  We believe that the Plan is supported by -- the releases are supported by all the entities, except for ModivCare, Inc. at the top where the subordinated notes sit.  And in that situation, we talk about cram down a little bit later.

Your Honor, there were -- I want to turn for a second to, like, traditional Plan objections and hit each of them pretty quickly.  The first issue that the Committee raises in its Plan objection is that the first liens are not secured by all the assets.  We believe here that they are secure by all the assets.

I think it's important to understand, the assets here that are being secured, they are contracts.  The contracts have accounts receivable.  Accounts receivable turns into cash.  That's the general nature of the business. There are some cars, zero balance accounts, and equity interest in matrix that I'll get to in a minute, but it's basically an all asset pledge, right?

So our view is that the Committee has not met its burden of showing that even if the Court assumes some theoretical unencumbered pocket of value, there's not enough to get past the deficiency amount of the first lien -- I'm sorry, not enough to get past the DIP, the first lien and the second lien.  And frankly, the admin expenses.

And so we don't believe that they've been able to

have their objection sustained under that first ground.

The second one is that the first liens are getting more than the value of their allowed claim.  That is, in our view, simply a valuation argument.  And so if you don't buy into their valuation argument, it is not true.

I also just want to say that the Lenders here are taking a risk.  They're converting all their debt into equity.  They've taken a substantial risk in this company since January '25 and even before.  This company is highly regulated.  It's contract-driven.  It's got a number of headwinds coming up, given the regulatory environment, and so the Committee's numbers only works if you assume the higher growth rate than any historical performance, right?

The multiples that are sort of divorced from our projections and our valuation, and that there's no execution, regulatory or contract renewal risk at all.  And so we believe that under the valuation, this second objection should be overruled.

The third one is that the Plan fails the unfair discrimination test.  I think under this standard, Your Honor, the company -- the Debtors generally have wide latitude to classify claims.  We have legitimate justification for the classification that we proposed.

As a starting point, the Plan treats general Unsecured Creditors the same.  The second liens are out of

the money.  The value of their collateral isn't there under our analysis and so it's perfectly fair and reasonable to lump in side-by-side the unsecured -- the true Unsecured Creditors with the second liens here.  We believe it's the opposite of unfair discrimination.

As for the subordinated unsecured notes, given their subordination agreement and their position in the capital structure and where they have claims, we believe it was not unfairly discriminatory to put them at the ModivCare, Inc. level only.

The Committee has talked about sort of unwinding the transaction -- sorry, unwinding the fifth amendment, but in our view, we don't see anything that proves rescission, equitable remedies, anything that frankly this District has somewhat rejected, both in *Robertshaw* and *Wesco* recently.

And so we don't think that there's any remedy here.  It's sort of, quote/unquote, "unwind" the transaction and reinstate all the guarantees across the capital structure.

The fourth argument is that the Plan violates the classification scheme, which is somewhat of a similar argument I just raised.  Second 1122 requires that claims in the same class be substantially similar, but it doesn't say -- which is sort of where they're argument goes -- that substantially similar claims must be separately classified.

And so the Debtors here, they put legally and economically claims together.

We treated the second lien deficiency, which is basically the entire claim, and the GUC says effectively unsecured into one class.

The implication, I guess, is that we were manufacturing accepting impaired class, but frankly this structure at the time we did it, made life harder and more uncertain because if you'll see in the voting results, combining hundreds of trade creditors and other unsecured notes made the voting outcome less predictable at the time, and increased the possibility of that class to reject.  It's the opposite of us trying to manipulate anything.

There's also a concept of gerrymandering, but I don't think that word really applies here.  Gerrymandering would have been if we just cut out a sliver to get unimpaired consenting class.  We already had the first liens.

And so what we did was we had to classify the seconds and the GUCs together.  We thought they were economically similar and we did.

Your Honor, the last one, which I'll touch very briefly, is that the Plan fails the best interest test.  You heard Mr. Shandler and you've seen the liquidation analysis. We have some testimony and the presentation that reflects

what he said, but we believe that this Plan satisfies the best interest test because everybody is getting more than they would get in a Chapter 7.

Your Honor, for those reasons we believe the Plan should be confirmed -- at least as it relates to the objections.

On standing, if Your Honor were to analyze and review standing and come to a decision, we think it should be denied in full.  There are effectively two categories of standing arguments.  One is the fifth amendment and the fraudulent transfer.  The other is unencumbered assets and lien avoidance.

On the first piece, because Ms. Wine discussed some of these pieces, I'm not going to repeat them, but an actual fraudulent transfer, there is no evidence under the Rule 9(b) standard that shows that there's actual fraud here.

In fact, there's evidence, including in our presentation, which recites it.  As to what the benefit was of these transactions, and in fact, doing these transactions effectively better satisfy $270 million of unsecured notes, in exchange for the same amount of second lien notes.  It eliminate guarantees across the capital structure.  And it also allowed for the company runway to run a sale process, try to monetize either RPM or PCS, pay down the 75 million,

negotiate further covenant holidays, maybe get a little bit more extension in 2026, and see if you can avoid a freefall altogether.  That was the purpose.  Didn't happen, unfortunately.  But there's no evidence that there was anything nefarious or fraudulent at the time.

There's also -- it's not really a count, but you know, the complaint talks about unwinding -- the guarantees are unwinding subordination agreement.  Again, on the guarantees I'm not aware of a fraudulent transfer claim being able to re-impose claims across the capital structure.  I understand that there might be breaches associated with the agreements or something else, but nothing here amounts to equitable relief to effectively waive a magic wand and re-impose claims.

And on a subordination agreement, we are an acknowledging party -- we, being the company, but it's similar to an intercreditor agreement.  These are intercreditor disputes, and frankly, that's a fight between parties that are subordinating and those who are being subordinated.

I don't even think there would be standing here, so I think in terms of the subordination agreement and the arguments that Lenders would have amongst each other, that has nothing to do with standing.

On constructive fraud, you heard from Ms. Wine and

the evidence reflected -- and we have some slides in our chart -- some pages in our slides that talk about the benefit.  We think that given the case law on how value is defined -- reasonably equivalent value, we've satisfied that there would be value here in connection with the fifth amendment, and that alone would be a defense to try and bring these claims.

The other piece is -- I guess, going to another defense, there's an issue of the safe harbor and as far as the safe harbor goes, I know that maybe the argument is, well, you need more evidence to flesh out kind of all the elements, but the reality is, these financial institutions, I think any financial institution, has a vested interest in the safe harbor argument, and at a minimum that would be a long fight.

And the safe harbor is read pretty broadly, and given that it would be long, costly, expensive, probably a loser on the company's side, it's not worth bringing.  So it goes against making it a colorable claim.

The final piece of this -- at least as it relates to fraudulent transfer, is what I said early on, which is putting aside, you know, the elements and the defenses and all of the things that could be brought and whether it's a colorable claim, it doesn't do anything for the estate at the end of the day, given where our Plan structure is.  And

I think that's probably the easiest argument to make -- at least if you -- Your Honor adopts our valuation.

On the second standing motion, I do believe the Consenting Creditors will go into a little more detail, but it's really two categories. It's 552 and then unencumbered assets. And so 552 is frankly a little bit of a -- seems like a little bit of a novel argument to us, but again, the Lenders here have pledged all assets. The Committee is challenging that all post-petition revenues -- hundreds of millions of dollars are just unencumbered.

The theory is that somehow if an employee asserts any kind of action to generate AR or collect cash, then there's a risk of the Lender's lien being a lien on a post-petition basis because of 552. First of all, I'd be troubled to, you know, ask for DIP financing under that potential case being out there, at least -- and I recognize there are specific cases for specific liens and specific assets as to why that might be the case.

But here, I'm not aware of a situation where a contract services itself or a widget makes itself and the fact that a person intervenes and does those two things or one of those two things, just eviscerates the lien altogether.

The source of revenue here is the contract. Contract's encumbered. The AR is encumbered. The cash is

encumbered.  And so Lenders have liens on everything.

On the other assets, Your Honor, just a few clarifying points.  Matrix is -- and you see in our org chart, a little off to the right where ModivCare, Inc. is, there's Prometheus Holdco, which is unencumbered and not a Debtor, that holds 43-ish percent of matrix.  It's not a Debtor and the equity held above it between ModivCare, Inc. and Prometheus is encumbered.

And so the position that it's not encumbered we think is untrue, but even if it is unencumbered, we believe that the value is not 56 million as Mr. Jamal has in his report.

On the final piece, we'd probably have to concede that zero balance accounts of 400-plus-thousand and I think the $1.1 million in cars might be unencumbered, but we don't think it's enough to pass the hurdle of where they need to and so the standing motions should just be -- both standing motions should be denied in their entirety.

Your Honor, that concludes my part of the presentation.  I do want to just say that we believe that we've satisfied all of the elements for confirmation.  We don't believe you need to go to standing, but if you do, standing motions should be denied.

And we also believe that the fundamental nature of this case comes down to one simple theory, which is

hypothetical desktop valuations are great, but if they're not supported by capital from a -- by a company who needs capital, and no one is willing to put up that capital, it doesn't do anything for anybody, so unless someone is willing to put up new money, put their money where their mouth is, so to speak.  In terms of actual valuation, the only actual valuation where people have put their money where their mouth is twice, at least, are the Consenting Creditors.

And so that's the valuation.  That's the only actual valuation.

THE COURT:  Thank you.

MR. KLIDONAS:  At this time, Your Honor, I'd like to turn it over to my colleague, Mr. Weichselbaum.

THE COURT:  Okay.

MR. KLIDONAS:  But I do want to give you the --

THE COURT:  Well, no, no.  You guys have been here since 2:00 o'clock.

MR. KLIDONAS:  Yeah.

THE COURT:  I've been here since 1:00 o'clock, so let's take a ten-minute break.

MR. KLIDONAS:  Sure.  Thank you, Your Honor.

(Recess taken from 2:56 p.m. to 3:08 p.m.)

THE COURT:  Good afternoon.  Go ahead.

MR. WEICHSELBAUM:  Good afternoon, Your Honor.

Jonathan Weichselbaum of Latham Watkins on behalf of the Debtors.

Your Honor, as outlined today at the -- over the last week in our brief filed at Docket 921, the Debtors believe the Plan meets all the relevant requirements for Confirmation, including those set forth in Section 1129 of the Bankruptcy Code.

We do have a presentation to run through, but unless Your Honor has any questions, I would go straight -- unless you'd like me to, I'd go straight to the --

THE COURT: Just highlight whatever you think are the things. Either give me the presentation or if --

MR. WEICHSELBAUM: It was the presentation that we handed up, Your Honor, before.

THE COURT: Okay. Good, all right, so.

MR. WEICHSELBAUM: I can just go straight to the US Trustee's objection, if you want, or run through some of the highlights.

THE COURT: Why don't you hit some of the highlights, then go to that?

MR. WEICHSELBAUM: All right. No problem, Your Honor.

So Your Honor, the Debtors submit that the Plan complies with Section 1129(a)(1) of the Bankruptcy Code because the Plan complies with Section 1122 and 1123, as

well as other applicable provisions.

The Debtors' Plan classifies nine class of claims-in-interest.  There are four unimpaired classes, Class 1 the other secured claims, Class 2 the other priority claims, Class 6 intercompany claims, Class 8 intercompany interest.

There are two classes of impaired claims-in-interest that are deemed to reject the Plan, that's Class 7 subordinated claims.  Class 9 the existing equity interest and the remaining three classes are the first lien claims in Class 3, the general Unsecured Creditors in Class 4, and the subordinated unsecured notes in Class 5.

As Mr. Klidonas noted, the Debtors submit that the classification scheme is proper, given the different characteristics of the claims, and the Debtors had valid business and contractual reasons for classifying the claims in Class 4 together (microphone issues) classifying the unsecured notes in Class 5.

Your Honor, the Debtors also submit that 1129(a)(2) is satisfied.  The Debtors, through their claims and noticing agent, sent out the Plan, the DS, in accordance with Your Honor's DS Order.  The Debtors provided creditors approximately over 30 days to vote until November 25th and as you heard throughout the day today, Class 3 and Class 4

voted to accept the Plan.

Your Honor, as you also heard, the Debtors' Plan was proposed in good faith.  The Debtors negotiated the terms of the Plan at arm's-length with the Consenting Creditors.  The Plan preserves the going-concern value of the Debtors' business for the benefit of all stakeholders.

As Mr. Klidonas noted, the Plan satisfies 1129(a)(7), the best interest test, as evidenced by the Debtors' liquidation analysis.  All rejected holders of claims are receiving at least what they would get under Chapter 7.

Section 1129(a)(10) is satisfied.  There are two impaired consenting classes, Class 3 and Class 4.

No one is contesting whether or not 1129(a)(11) is satisfied.  The Debtors submit the Plan is feasible and that has not been contested.

Your Honor, as Mr. Klidonas noted, the Plan does not unfairly discriminate.  Each rejecting class is distinct in nature, properly classified with the treatment of each class based on the legally acceptable rationale and no class is junior to a non-accepting impaired class is to receive or to any property under the Plan, so the Debtors submit --

THE STENOGRAPH:  Ask to slow down, I mean, I'm not even capturing your -- it's crazy.

(Laughter)

MR. WEICHSELBAUM:  (Indiscernible).

THE STENOGRAPHER:  I don't know which is worse.

MALE SPEAKER:  Your Honor, seriously, that's one fallacy of court reporters in Houston.

MR. WEICHSELBAUM:  So I'll slow down and try and (indiscernible), but I can't promise both.  I'll try to do one of them.

THE STENOGRAPHER:  Please.  If you want a record, that's what you're going to have to do.  Oh, my God.

(Laughter)

MR. WEICHSELBAUM:  So the Debtors submit that we ---

THE COURT:  All right.

MR. WEICHSELBAUM:  -- the Debtors submit that we've satisfied the cram down environment in 1129(b)(8) of the Bankruptcy Code.

So unless Your Honor has any questions, I'll move on to the US Trustee's objection and hopefully slowly.

THE COURT:  Okay.

MR. WEICHSELBAUM:  So before I get into the objection, I would like to just thank Ms. Whitworth.  I know it's been a tough situation for the US Trustee's Office, but she's worked with us throughout this entire case.  She worked with us on the first supplemental Declaration we filed for Mr. James Lee, which gave her some of the data in

the Record regarding the balance and the odd GUC forms, and we also worked with Ms. Whitworth to narrow down the issues in her objection.

Your Honor, the United States Trustee continues to argue that *Purdue* has changed the law in this District or should change the law.  As this Court has noted previously -- and Judge Lopez agrees that *Purdue* did not change what is consent, did not opine -- the Court did not opine on what is consent, and the law in this District remains the same.

So I will try and spare the Court some of the issue because I know that Your Honor is very familiar with it, but the issue before the Court is whether or not the third party -- whether or not the opt-out process was reasonable and effective and whether or not the releases are narrowly tailored in accord to this case.

So turning to the process, on October 17th, Your Honor entered the Amended Disclosure Statement Order, which approved the Disclosure Statement and the solicitation procedures motion.  Thereafter on October 23rd, the Debtors caused the solicitation agent to serve the solicitation packages on voting creditors and the other Plan-related materials on non-voting parties-in-interest.

That can be found in Mr. Lee's voting Declaration at 916, and the Affidavit of Service at Docket 801.

Your Honor, the solicitation packages, including

the ballots, contain clear and conspicuous language regarding the third-party release, and the procedure for opting out, the consequences for not opting out, and similarly the notices and the lease opt-out forms that went to non-voting creditors and parties-in-interest contained clear instructions on the opt-out and the consequences for failing to opt-out.

The Debtors submit that the procedures filed here are the same tried and true procedures that have been used in this Court, both pre-*Purdue* and have been approved post-*Purdue* by Your Honor and by Judge Lopez.  A few examples are *In re: Robertshaw*, *Independence Contract Drilling, En Cantera (phonetic)*.  There's plenty of others that are cited in our brief.

I'm sure the US Trustee will raise the recent decision in the Southern District of New York in the case of *Go Airlines*, and and the US Trustee may point to some of the percentages that are in the supplemental voting Declaration as evidence that the opt-out procedure did not work.

Your Honor, I would submit that the opposite is actually true, based on the undisputed and uncontroverted evidence before the Court today.

The Debtors gave parties a choice:  Opt-out or grant the release.  The evidence shows -- which is not

disputed -- that Verita served the ballots and the notices to all parties that were entitled to receive these notices, parties received the forms, the forms contained the detailed instructions on how to opt-out, the terms of the releases, and the consequences for failing to opt-out.

While the percentages may be low for certain of the classes, Verita did receive over 350 opt-out forms.

What is clear from this Record is that what was supposed to happen, happened. The Debtors services the notices. The notices contained the relevant information, and creditors who wished to opt-out, they did so.

Why others did not opt-out, we don't know. It's mere speculation. It's a guess and there's nothing in the evidence to suggest why someone did or did not submit the ballot -- the opt-out form.

So in sum, Your Honor, the process here worked. People who wanted to opt-out, opted out. Guessing why others didn't is simply a guess.

So next, Your Honor, the releases are narrowly tailored. The claims that are being released relate to the Debtors in these cases. They follow established precedent in this District, and that is noted there in integral provisions of the Plan and no one is challenging the scope of the releases.

Your Honor, with respect to the related parties

and the releases, the Debtors' Plan provides that related parties are deemed to have granted the release to the extent that the primary person who is granting the release is able to force that release to be granted, which is the construct commonly used in this District and elsewhere.

I confirmed with Ms. Whitworth that the exculpation objection is resolved.  Our Plan complies with established precedent in this District.

The last remaining objection -- not the last one, but second to last objection is the gatekeeper provision. Your Honor, respectfully, the Debtors disagree with United States Trustee's application and interpretation of *Highland*. Here, the gatekeeper provision applies to otherwise permissible releases, injunction and discharge provisions. In the *Highland* case, I would submit that the issue there was that the gatekeeper was applied to an impermissible exculpation provision and that's why it was not approved.

Here, it applies to impermissible provisions and therefore the gatekeeper provision in the Debtors' Plan complies with applicable standards in this Court and should be approved.

Your Honor, the last objection, which is an objection made by the United States Trustee and the Unsecured Creditors Committee, is to our seeking of the waiver of the 14-day stay period.  As Your Honor has been

made aware from the outset of these cases, the Debtors' goal has always been to get in and out of Chapter 11 as quickly as possible so that the Debtors could get back to focusing on their business, which helps millions of Americans, but they're getting access to healthcare.

The Debtors wish to get the Plan confirmed and work expeditiously to consummate the transactions and emerge from Chapter 11.  As you've heard throughout this week, every day in Chapter 11 does harm to the Debtors' estates, costs money.  So the Debtors submit that sufficient cause exists for a waiver of the 14-day stay period.

And as a last point, the Debtors milestone to emerge from bankruptcy is December 24th, a little early Christmas present.  And at this time, we cannot have an extension of that, so the Debtors wish to emerge on or before that date.

Your Honor, as noted in our brief, there were certain objections that were filed and several informal comments received from parties.  We filed the Revised Confirmation Order.  I think it hit the Docket early this afternoon.

That included certain additional language to resolve some of the objections that were noted as expected to resolve.

There's one objection in there at Docket

Number 812.  We did not agree on language to put in the Confirmation Order.  It's a personal injury lawsuit.  We have agreed to enter into a stipulation that would allow their claims to continue against the insurance after we emerge from bankruptcy, which is, I believe, the law.

So we plan on entering that stipulation.  If not before this weekend, early next week.  I believe the Counsels on the line I wanted to make that known to the Court.

So with that, unless Your Honor has any questions, for all the reasons discussed throughout this whole week, the Debtors submit that the Plan should be confirmed.  The United States Trustee's objections should be overruled.  The UCC's objections should be overruled.  The standing motions denied.  The Court should enter the proposed Confirmation Order, but we'll get that hopefully.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

MR. HANSEN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. HANSEN:  Chris Hansen with Paul Hastings on behalf of the Consenting Creditors.

Your Honor, we didn't have an opportunity to make a notice of appearance at the start today, so I'm joined by my partners, Craig Stanfield, Matt Warren, and Lindsey

Henrikson.  You're going to be hearing from Mr. Stanfield and myself today, Your Honor.

THE COURT:  Okay.

MR. HANSEN:  I'm just going to start briefly, then I'll pass the podium to Mr. Stanfield.

Your Honor, we started from the premise from the Consenting Creditors' side that the Plan should be confirmed.  And that all objections should be overruled.

This Plan, as the evidence has shown over the last three days, was absolutely proposed in good faith.  It de-levers the Debtors' balance sheet, it enables the Debtors to exit bankruptcy in a financially healthy state, to be able to better compete in a very challenging financial and regulatory environment.

And it will enable them to do that for the benefit of their stakeholders, the benefit of their employees, the benefit of their contract counterparties without whom the business doesn't exist, and ultimately those contracting parties' beneficiaries, the people who actually receive the care from the company.

Standing in the face of what we believe is a confirmable Plan, is primarily the Committee's objection, Your Honor.  The Committee posits four basic arguments to try to overcome confirmation.

The first is that the Plan valuation is too low

and when it's increased to what the Committee's experts -- neither of whom have any experience with this business, say it should be.  The first lien claims are receiving more than 100 percent recovery, unless the Committee posits the Plan can't be confirmed.

They also posit that the liens of the first lien claims should be limited to the pre-petition liquidation value of their collateral under a truly tortured interpretation of Section 552 of the Bankruptcy Code and a never before advanced theory of claim calculation.

When combined with their valuation theory, the Committee posits that the Plan isn't confirmable because it doesn't properly distribute value to Unsecured Creditors and, again, overpays the first lien claims.

The third argument from the Committee is that despite the fact that the Plan treats the second lien claims as unsecured and respects the lawful subordination of those notes, the Committee should be granted standing nonetheless to challenge the uptier transaction to avoid the liens on the second lien notes, and somehow unwind the guaranteed releases and the contractual subordination of the unsecured notes, despite the fact that neither was a transfer of an interest in the Debtors.

And they say this in order to create a level playing field, where increased distributable value based on

the increased overall value can be had, and the decreased first lien claims will effectively yield value to be shared by all.

This is as I said in my opening, Your Honor, kind of this stacking argument. We're really like stacking one argument on top the other to try to arrive at the conclusion.

And the Committee ultimately on their fourth argument, argues that for the distribution to Unsecured Creditors needs to be enhanced by the value of unencumbered assets. They argue that the United Healthcare receivable is unencumbered on the same 552 basis. It's not.

They also argue that commercial tort claims are unsecured and that they have value, even though they ran an exhaustive investigation and no commercial tort claims have been found or acknowledged at this point.

And ultimately they look to $400,000 in a zero balance account and vehicles that were candidly too cumbersome and of too little value for the secured creditors to take a lien in them, to argue that they should also be distributed to Unsecured Creditors.

The reality, of course, is that the Plan makes a distribution to Unsecured Creditors that is far in excess of the value of those assets, and those assets are also encumbered by DIP liens and adequate protection liens and

we'll get into what the evidence showed in a few.

But Your Honor, as we'll discuss further during the closing, and as we've briefed extensively in our papers and all the parties have, we believe the Committee's arguments fail in total, and the evidence adduced during the last three days of trial -- and through the deposition designations, and in the documentary form that's been submitted to the Court, all provide facts that demonstrate the weakness of the Committee's position and buttress the strength of the Debtors' position, and the support of the Consenting Creditors.

So at this point, Your Honor, I'm going to yield the podium to my partner, Mr. Stanfield.  He's going to talk to you about the valuation issues and when he's done with those, I'll return and handle 552 and standing and the other issues.

THE COURT:  All right.

MR. HANSEN:  Thank you, Your Honor.

MR. STANFIELD:  Thank you, Your Honor.  May it please the Court?  Craig Stanfield from Paul Hastings on behalf of the Consenting Creditors.

I want to talk about valuation and I want to open my discussion in maybe a slightly unusual way because I actually think there is a tremendous amount of agreement between the witnesses and the parties in this courtroom when

it comes to ModivCare.

First, I think all of the parties agree that the contracts for ModivCare under which it operates and provides its services are vitally important to the company.  Without which, the company cannot actually make money.  And I think the parties agree, although some have evaluated them more carefully than others, that the structure of those contracts are also vitally important when evaluating how much money can ModivCare make and what projections are reasonable on EBITDA?

I also think there's a lot of agreement between the parties across the board that the management of ModivCare are people who are acting in good faith, that they are people with extraordinary experience and that they are not people who should be disregarded when evaluating what ModivCare has been and what it can be.

Specifically to the experts, I think between Mr. Magrisi and Mr. Shandler and the company, there's also a lot of agreement.  One, Mr. Magrisi agrees that the way that the Debtors do their projections is entirely valid.  He does not dispute their methodology.

In fact, when you evaluate Mr. Magrisi's testimony, he starts with a baseline of the Debtors' projections.  He then tries to boost those projections, but he adopts them.

Second, I think Mr. Magrisi agrees with the Debtors that they have done good work with Project Forward to save cost and streamline their business.

Mr. Magrisi also agrees that the Debtors need to upgrade their technology substantially in order to catch up with their peers who have overtaken them at this point, and to win work.

He also agrees that there is a current trend of ModivCare loosing contracts, both pre- and post-petition and frankly, both pre- and post-projections that were filed with the Court.

As to Mr. Brown and Mr. Jamal, they also have a lot of areas of agreement.  They use the same three valuation approaches, discounted cash flow, public company multiples, and transaction multiples.  So for whatever the questions Mr. Jamal received on the stand as to whether he had read a textbook in the last 25 years, it turns out that he and Mr. Brown used the same methodology.

He and Mr. Jamal also agree on many of the same comparators when they applied the public company multiples and the transaction multiples approach.  Now they don't use all the same comparators.  Mr. Brown dropped some. Mr. Jamal keeps some, but they have a lot of agreement and a lot of overlap, which is a good sign that Mr. Jamal must have done something right.

They agree that you should drop comparators if they are not on point to ModivCare and that dropping or adding comparators has a wild swing in the value that you attribute to this company.  Mr. Brown agrees that it is totally appropriate for Mr. Jamal to have gone segment-by-segment if he's got the right comparators -- of course, they disagree on whether that's true.

But ultimately the problem with Mr. Brown and Mr. Magrisi is that they boost their numbers by starting out where the company starts out on projections, by starting out in large measure where Mr. Jamal starts out on this valuation, and then engineering and pulling levers to wildly overvalue the projections and this company.

Before I get specific into exactly where the disagreements are, I wanted to set a little bit of a foundation about the company and the environment it's operating in.

ModivCare on the surface seems like a fairly simple business.  It provides rides to people who need to get to their appointments.  It provides individuals who can provide cleaning services, cooking services, bathing services.  It helps you monitor your devices.

But the way ModivCare makes money is not as simple as it seems on the surface.  There are three types of contracts that we heard about in this case, capitation which

is where you get paid up front for all of the people on the roll whether they use your services or not, hugely valuable to ModivCare during COVID, very, very un-valuable to ModivCare following COVID in terms of EBITDA.

Shared risk, sometimes called risk corridor agreements, these are the agreements that Mr. Shandler talked about where there's essentially a guardrail around how much money ModivCare can make off an agreement.  And then a fee for service agreement, which is not terribly common for ModivCare.

These contracts are vitally important and analyzing each of them specifically is important to Mr. Magrisi's and Mr. Brown's analysis.  Yet oddly enough, as Mr. Magrisi testified, he did not account for risk corridor agreements.  He did not account for the other guardrails that the insurers have, such as annual pricing reviews.  To ensure, at least from the payors' perspective, that ModivCare does not actually make too much money, that it does not make too great of EBITDA.

The other thing that is important here, but seems to have been lost in Mr. Brown's and Mr. Magrisi's analysis is that there are limited payors in the market.  For whatever the conversation may be about an aging population in this country, about the increase of chronic illnesses, all of which is true, those are not ModivCare's customers,

and I think it came out in this trial that that is the case. The number of payors in this country is limited.

And frankly, the amount of business is shrinking. As Ms. Norwalk testified, probably the most credible witness in this courtroom all week when it comes to how Medicare or Medicaid work, as she testified, one, the number of Medicare policies that are even offering these services is shrinking. The number of people who qualify under Medicaid has shrunk as a result of redetermination.  And the amount of money available under Medicaid is also under incredible pressure.

So the reality is the market for ModivCare is not growing, it is shrinking, and thus, as Ms. Norwalk testified, you can have a growth in our country, and you can even have a growth in healthcare consumers, but it does not equate to growth for ModivCare.

And those are important baselines to set when we start to think about the projections and we start to think about what Mr. Magrisi and what Mr. Brown stated.

So what about Mr. Magrisi?  Why should you disregard his testimony and accept the judgment of the board of directors, the management, and FTI for ModivCare? Frankly, Mr. Magrisi does not understand ModivCare.  He does not understand this business.

As he testified on the stand, he has been a healthcare consultant for a grand total of three years.  And

in that period of time, he has never consulted for a company like ModivCare probably because, as he admitted, ModivCare is one of a kind.  He has consulted for companies who provide emergency medical transport, very different with highly skilled personnel.  He's consulted for hospice companies, skilled nursing companies -- very different business.

He devoted a grand total of 80 hours of his life, including three one-hour video interviews with the company to learn this company and he evaluated what he said is lots of data, more than many of his customers give him, but in that 80 hours and those interviews and looking at the data, he did not come to understand the contracts and he did not model them.  That is a fatal flaw.

He relied on genericisms about the growth in the market, without regard to what Ms. Norwalk testified to.  He didn't know that they had lost Virginia.  He didn't know that ModivCare has lost the RFP for Pennsylvania.

And when asked, "In light of your great experience and your study of this company, what could ModivCare do differently to win those RFPs that it's losing?"  He had no idea.  He hadn't read the RFPs, he hadn't read the responses.  He doesn't know this business.

It is him on the one side with his 80 hours and it is the company and its great experience on the other.  You

should disregard Mr. Magrisi.

He did acknowledge that Humana, a $300 million contract was lost in 2024.  He acknowledged that pre-petition, United, a $215 million contract, was lost before bankruptcy.  We get those values from the other witnesses, but he acknowledged they were lost.

He acknowledged that post-projections, they've lost yet more contracts.  And yet, he didn't acknowledge there are go-gets and there is some upside in the projections.

Your Honor, we said in opening, Mr. Hansen did, that you were going to hear testimony that at least from the Consenting Creditors' perspective, we think the Debtors valuations are reasonable, but still optimistic.  We still have that view.

Why do we think they're optimistic?  Because frankly, this is a company that's been in decline and the projections show a company that is going to grow.

Mr. Magrisi looks at this and says, "It's conservative.  These are conservative projections."

Conservative is another word for achievable. Mr. Magrisi admitted on the stand that this company has had wild swings in its actual results compared to the projections, but he admitted those wild swings never swing above the projections, they always swing below.

Perhaps it is time to take notice of achievable projections, which is what this company has done in putting a projection in front of the Court.

Mr. Magrisi wants to cut capital expenditures, even though he knows they are necessary to win new work.  He even wants to cut the Christmas bonuses -- well, the annual bonuses, which is really unreal, given how important he says the people are to this company.

We are no longer in the heady days of COVID, where capitation works in favor of the company, and as the testimony before this Court has been, while the projections have attrition rates, that's been used.  It's already gone. There is no room for error.

And so perhaps the projections are actually still pretty optimistic and not too conservative.  United is not coming back.  It's going to take years -- that's what the testimony is, years to win back customers, not in the scope of a few months.

So in the end we agree with Mr. Magrisi, he has projected revenue and EBITDA for a company that simply does not exist.  As a result, it simply has no relevance, should be disregarded.

So that takes us to Mr. Brown.  Well, the first problem is Mr. Brown relies on Mr. Magrisi, so that falls apart.  It's a non-starter to rely on Mr. Magrisi.  So where

does he go?

Well, it's pretty telling.  I agree with Ms. Wine, it's pretty telling that when we look at the first slide of his demonstratives, we don't see Magrisi's work, we don't see what Mr. Brown did, we see a very narrow set -- well, if you didn't like that, maybe you'll like my adjustment of Mr. Jamal.

But it's no adjustment.  It's not even corrections, the word he used.  They are engineered ways of pulling levers to get a dramatically higher valuation, again, by a gentleman who may be very accomplished, but doesn't understand this industry and doesn't understand this company.

His list of companies takes out all of the other government paid transportation provides.  Not surprisingly, they all have very low multiples of EBITDA.  He did leave in one government paid provider of transportation, which of course, he couldn't use, DocGo, because it has a negative EBITDA.

Like ModivCare, DocGo lost an enormous contract and went negative.  Mr. Brown ignores that and says, you know, I can't use that, but why don't I go ahead and provide a generic growth rate to this company, not achieved, a company in decline.  Well, that doesn't work.

So what does he do?  He puts in Lyft.  He doesn't

know if Lyft provides a million rides, $425 million of NEMT rides, but he knows in his heart of hearts, that's the ride comparator.  It makes zero sense whatsoever.

While he may deride the bus companies in the UK and in the Nordic countries, they are government paid.  They are transactions on the public markets by sophisticated personnel like a trade ModivCare and those valuations should matter.

If you add back in Mr. Jamal's compensation comps to Mr. Brown's analysis, it is $100 million change to the lower.  If you take Lyft out, as you should, it's $150 million change to the lower, and that's just one lever.

Then he goes on to try to correct for the growth rate based upon supply and demand and inflation without regard to the reality of ModivCare.

As I think became apparent in his cross-examination when he said he hadn't heard over the last two days that Humana was lost, I guess he also didn't pay attention to Ms. Norwalk, although she's hard to ignore.

He applies the generic growth rates, despite what she testified to.  That's not reality.  He says that a company that's been shrinking is suddenly going to grow massively.  The reality is any growth in ModivCare over the next five years is an optimistic take.  We certainly hope it's true.

But that is going to be growth tied to the reality of ModivCare and not generic ideas that were come up with in his office. So if you change the growth rate back to Mr. Jamal, it is a 50 to $70 million swing in Mr. Jamal's favor for his valuation. That was the testimony on the stand.

No one in the market agrees with the UCC, not even their own constituents. $100,000 of the equity rights offering has been taken, but not by a single member of the UCC.

Now Mr. Brown and Mr. Magrisi, I guess hypothesize that perhaps their work product wasn't shared with their own constituents, that would be passing the strange. That can't be right. The reality is they don't believe it.

The equity rights offering is to the tune of $600 million in the money. Jupiter, Madison, the others -- Uber even, they have the capacity economically to take advantage of that massive upside, but they don't believe it. The market doesn't seem to believe it either.

As you heard on the stand, exit financing has been incredibly difficult to secure. And it is not been on the terms hoped for. In the end, the best path forward in this case is to side with the board, with management, with FTI and with Moelis, and reject these arm-chair quarterback analyses.

The Consenting Creditors still think that the Debtors' projections are optimistic and that they have optimism built in, but that doesn't mean they're unreasonable. So on the one side we see a risk of missing the projections, of not executing on the technology upgrades, and not even hitting what the Debtors hope they hit and we hope they hit.

And on the other hand, we have goosed up numbers, wildly optimistic and overly aggressive projections for a company who has never met their aggressive projections since COVID ended.

The Court should reject Mr. Magrisi, reject Mr. Brown, and adopt the Debtors' approach.

Thank you, Your Honor.

THE COURT: Thank you.

MR. HANSEN: Well, Your Honor, Chris Hansen with Paul Hastings again on behalf of the Consenting Creditors.

I'm going to start with the 552 argument.

In a nutshell, the Committee's assertion is that all going-concern value of the Debtors after the filing of the Chapter 11 cases is unencumbered in perpetuity. The Committee arrives here by saying that because people provide the services that the Debtors are reimbursed for under their contracts, the Debtors' revenues are thus not created by those contracts and are, instead, the product of human

action and thus cannot be a proceed of a pre-petition lien on the contracts and all other assets of the Debtors that are used by the employees, like company computers, software licenses, phones, office fixtures, et cetera.

The Committee takes the argument to the next extreme as well and posits that all of the human generated revenues continue not to be collateral, even when re-invested in the business to continue servicing, the very secured contracts that provide for the entirety of the Debtors' revenue stream, such that all future value of the Debtors on a going-concern basis just keeps getting unencumbered and growing in perpetuity.  This is part one of the Committee's position.

Part two of the Committee's position is that they seek to bifurcate the valuation result that we believe we just discredited, a going concern value into two components. One that allegedly represents the pre-petition value of collateral securing the first lien claims, and one that represents the post-petition value of the business, which is available for Unsecured Creditors.

However, in doing so -- and I'll come back to this in a minute -- the Committee applies a liquidation value to the secured claims and a going-concern value to the unsecured claims.  It's entirely inconsistent.

Your Honor, if part one fails, there's no reason

to look at part two.  And the Consenting Creditors believe that part one does fail, both legally and hearing the evidence over the last three days, factually as well.

Other than the zero balance accounts, the vehicles that I mentioned before and the commercial tort claims that don't exist, the Committee's literally exhaustive investigation proved that the Lenders enjoyed liens on every other Debtor asset, including goodwill, intellectual property, general intangibles, cash, receivables, and the literal lifeblood of the Debtors' businesses, the Medicare, Medicaid, and private payor contracts, as well as the proceeds, products, offspring and profits of all of that collateral.

To rule in favor of the Committee on part one of its 552 theory, you need to find that none of that collateral generates the Debtors' post-petition revenue, especially the Debtors' contracts.  Said another way, you have to find that all revenue created on a post-petition basis is purely created anew and untethered from the contracts that dictate what the revenue is.

Every witness who testified during the last three days, including the experts, noted that the Debtors' revenue stream does not exist without its contracts.  Each witness either directly testified or it was implicit in their testimony about the contractual source of revenue and the

value of the business and in the projections that without the contracts, there would be no ModivCare.

As Your Honor heard, when contracts are lost, why use the Debtors' declines, and when contracts are won or they're renewed or they're re-priced, the value of the Debtors go up.

You heard extensive testimony on the impacts to the Debtors' value from the loss the United Healthcare contract.  You heard about the Humana contract.  And the Committee on cross-examination in via its own witnesses, hark endlessly on the notion that those contracts might come back and might be repriced higher, and that as a result of that, the value of the Debtors would improve dramatically as well.

As Ms. Wine pointed out, Mr. Shore called it a case determinative outcome in his opening statement that the United Healthcare contracts would come back and if it didn't, it might be case determinative.

You also heard a lot about the repricing of the New Jersey contract and the impact it would have on projections.  Witness after witness kept making the same points.

Ms. Norwalk -- you know, Mr. Stanfield will just refer to it, Your Honor, but Ms. Norwalk explained the process during the COVID period with a capitation contract.

Remember, what she said was that one of the factors leading to the Debtors' financial difficulties was that their revenue grew dramatically during COVID because they had a capitation contraction where a payment was made month after month after month under the contract and they didn't have to provide the service at all because no one was traveling.

And as a result of that, their revenues swelled. So they incurred debt, they went out and made acquisitions, and then obviously when the pandemic ended, right, what happened?  Everybody needed to travel again and suddenly they needed to pay out on those expenses and their financial situation flipped.

So Your Honor, if -- again, if Medicare, Medicaid and private pay customers that contract with the Debtor -- for example, transportation services, don't make those payments?  There is no company.  If they do make those payments when no service was provided, like during the COVID period, then obviously the company's revenue swells.

If that doesn't demonstrate that the value of this business exists in the contracts, the Consenting Creditors don't know what does.

Mr. Shepard also described a process by which the Debtors win and lose contracts and the impact on the Debtors of those wins and losses and price redeterminations.  He specifically discussed the impact of the United Healthcare

contracts and the New Jersey process, and highlighted who is replacing United Healthcare.  It takes multiple parties to do it.  That means ModivCare is not getting it back and as Mr. Stanfield just pointed out, that has an impact to the negative on value.

And while the Committee kept trying to get all of the Debtors' witnesses to say that people had to arrange for a ride or people had to provide the service and isn't that true?  The witnesses all acknowledge that, but then acknowledged that those services are provided pursuant to a contract and that if you didn't have the contract to provide for the service, you wouldn't have the service and they continually prove the point over and over and over again.

The same is true for the Debtors' valuation expert, Mr. Jamal, who noted that the valuation of the business gets impacted by the value of the contracts.

Mr. Magrisi did the same in discussing how he would reduce costs to meet lower contract demand, right?  Or how he would add back contract revenue to improve the projections.  Those are all examples, even by the Committee's own witnesses to demonstrate the value of the contracts and ultimately, Your Honor, the Debtors -- the Committee's valuation expert, Mr. Brown, literally noted that there wouldn't be a business without ModivCare's contracts and he noted further that ModivCare was not akin

to a restaurant business where customers walk in the door and order a la carte services.

He specifically noted that ModivCare is a contracted for revenue business. The reason I raise that, Your Honor, is that as the Court is aware, Section 552(a) says if you have a pre-petition lien, it doesn't extend to post-petition property, other than is provided for in Section 552(b). And Your Honor, as an aside, I didn't think you and I would be discussing 552 twice in the course of just a few months in two different cases, but things happen.

In 552(b), it states very clearly the presumptive rule that if you have a pre-petition security interest in collateral and you also have an interest in the proceeds, the products, the offspring and the profits of that collateral, the presumptive rule is that that extends post-petition unless the equities of the case provide otherwise.

And here, it was a contested situation, but Your Honor ruled in the Final DIP Order and Cash Collateral Order that the equities of the case component of 552(b) was waived and that it was eliminated. So that argument doesn't exist for the Committee.

So what happens is the Committee comes back and says, "Well, listen, in the face of that, we have to argue that these just aren't proceeds." It's not an equitable

argument, it's just straight up that it's not a proceed of the collateral that the Lenders have.

And again, they say it's purely rendered by the employees and can't constitute a proceed as a result of that. We've just pointed out it's not true. And as Mr. Brown pointed out, this isn't a restaurant situation. And the reason it was really helpful for us that Mr. Brown pointed that out and I wanted to come back to it, is that the Committee's legal precedent that they largely latch onto is premised on basically restaurant case theory. There were some other cases in there that include other facts, but it's basically the restaurant case theory.

And the restaurant case theory kind of goes like this: If a Lender has a lien on the inventory, so the food in a restaurant, but a customer walks into the restaurant and orders a meal, somebody has to take those elements, put them together and present the meal to the customer, and then wash the dish that the customer ate the meal off of.

And the customer is technically paying for the prepared meal, they're not paying for the ingredients, or they'd go to the grocery store and buy the ingredients themselves. That's kind of the logic behind the restaurant cases.

And the idea is that, sure, part of the proceed of the collateral, right, is you have to put the ingredients

into the meal, so some of the collateral is being used and some of the cases find that, as well.

But the courts largely find that the revenue created by the sale of the meal to the customer is not entirely a proceed product or offspring.

As the Committee's own expert noted, ModivCare is not a restaurant operator. Medicare, Medicaid, and private insurers don't just call ModivCare out of the blue to arrange for a ride here or there. They negotiate sophisticated contracts with ModivCare. ModivCare only provides its services to the beneficiaries of the counterparties under the contracts pursuant to the contract, and every witness repeatedly stated.

So Your Honor, as I noted, the contracts dictate the amounts paid for the services that ModivCare provides and without them, there's no revenues and there is no ModivCare.

And those contracts and their proceeds and their products and their offspring are all pledged to the Lenders. Using a final simple example drives the point home here. If you are a Lender and you had a blanket lien with a proceeds clause to a widget company that fulfills contractual orders, the Lenders don't lose their lien on the post-petition revenues simply because an employee takes the widgets, puts them in a box, puts a postage on it, and mails it out. Yes,

there's an action that occurs to deliver the product, but the product is the subject of delivery under a contract and that's what generates the revenue, Your Honor.

Myriad companies who borrow money and find themselves in Chapter 11 of fulfilled contracts and none of them fall victim to the 552 argument advanced by the Committee and it simply cannot be the business rule than any business that has employees who provide a service pursuant to contract, can have all of its post-petition value declared to be unsecured.

And I will also say, Your Honor, the Committee also tries to make an argument that says, well, you know, if the Lenders were to foreclose on their contracts, that would cause the counterparties to terminate them and the contracts would be valueless.  And they try to say that as a way to show that the value is really in the services and it's not in the contract.

Besides being factually wrong, it's nonsensical. Lenders foreclose on contracts all the time in service industries.  Right?  My colleagues and I have done them many times in this year alone for our clients and Lenders use either existing employees or they hire new employees to fulfill the contracts and they move on.

And simply because a contract could be terminated for performance doesn't mean that the only value to the

contract is the human performance thereunder.  It's actually the opposite, Your Honor.  There's actually nothing to perform if you don't have the contract.

There's also the adequate protection here, Your Honor, that gets ignored.  The pre-petition Lenders are entitled to replacement liens as adequate protection, it's in the Cash Collateral Order.

With a $100 million DIP that was fully drawn, as Mr. Shandler testified to, and the cash that's been used to fund both operations and an estimate of at least $30 million of unfunded professional fees to be paid at the estimated close the case, that's at least $130 million of collateral use and claim diminution.

And as I noted earlier, there's also the DIP itself, which has liens on all post-petition assets.

There's also no way for the Committee, Your Honor, if you think about, okay, well why are we advancing this 552(a) argument, right?  We'll get to this on standing, but it really seems to be -- to be driving value, if they can, to the subordinated noteholders.  But they can't get around the claim subordination of the unsecured notes, and I'll explain that in a second.

So even if the Committee is right on 552 and its valuation, the money paid to the unsecured noteholders, they're contractually subordinated.  They have to pay that

money back.

Again, whether you remove the lien or not, they have to pay it back until payment in full of the claim because that's how claim subordination works.

So to close on 552, Your Honor, the Committee is simply wrong on the facts as each witness testified and they're wrong on the law, and their argument that the Lenders' liens don't extend to the post-petition value, should be rejected in full.

To address Part 2 of their argument very briefly, Your Honor, I just want to point out the Committee says that the way that you value the pre-petition portion of the Secured Lenders' claim, is to give them the mid-point of the liquidation value.  They don't give the contracts or all the collateral to the Lenders, they just say we need to fix your claim, there.

And then they use a going-concern value to ascribe to the unsecured value on a go-forward basis and that unsecured value is inclusive of all of the Lenders' collateral.  It's really a wild concept, Your Honor, that has no precedent and is very intellectually inconsistent.

As we all know, valuations are provided for a purpose and they cannot be mixed and matched to fit an argument of convenience.

So Your Honor, I'll come to standing.

As I said in my opening, the facts would show clearly that there was no Lender conspiracy as part of the uptier transaction and there would be no evidence whatsoever of an intent to drive this company into bankruptcy and steal value.  And that is just what you heard from Ms. Norwalk, from Mr. Shephard, Mr. Shandler, and Mr. Jamal, and it was uncontroverted.  And you also heard it from Mr. Silvers, and it was uncontroverted there, as well.

It's an unfortunate liquidity crisis that drove the company to reach out to the Lenders and ask for supplemental financing to avoid a potentially disastrous freefall filing.

What did the Lenders in *Coliseum* do?  They stepped up.  They combined provided $105 million of financing to stabilize the company after a very difficult, but quick arm's-length negotiation.  And everyone hoped -- you heard all the witnesses say it, that the company would avoid the need to file this case; however, as is extremely normal in these types of crisis situations, the Lenders require the Debtors to bring in Independent Directors and to test the waters to see if the businesses could be sold.

There's nothing unique about any of this, and despite the bluster, there's no question about the independence of Mr. Silvers.  Of course he had prior dealings with one of the Lenders.

As the Court knows, most referrals come from a positive prior experience or a personal relationship.  That doesn't create a lack of independence.

As further evidence of the acceptance of these Independent Directors, they were voted in by the company shareholders at the next shareholder meeting after their appointment, including by AI Catalyst, who was the activist investor who put Mr. Mounts Gonzales on the board.

In the negotiation to elevate the unsecured notes to second lien status by the Lenders who provided the emergency financing was also standard and all the witnesses testified to that.

As the documents submitted in evidence in the case show, every noteholder whose unsecured notes became secured provided financing to the Debtors.

And as the Record is clear, there was absolute corporate authority with a majority of the noteholders to release guarantees on the unsecured notes to the Debtors' benefit and to enter into a subordination agreement.

The Record is also crystal clear that no left behind subordinated noteholder filed a lawsuit against the uptiering parties.  And as far as the Record goes, there's not even a shred of evidence that any of them wrote a letter to complain about it to their Trustee, to the Debtors, to other noteholders, to anyone.

As evidenced in the Record, the Committee chairperson itself sought to participate in the transaction or sponsor its own uptier transaction.

Again, based on the evidence, no conspiracy, nothing untoward to any of the fifth amendment actions.

And I should also note that in their exhaustive investigation the Committee never raised a single claim against the Lender, a Director, or an Officer for breach of fiduciary duty or fraud in connection with any of the actions that they allege smacked of intent or were part of a larger conspiracy.

As you know, Your Honor, the standard to award standing is that a colorable claim must exist, the Debtors must have unjustifiably refused to bring that claim and there must be value to the estate in bringing the claim on a cost benefit basis.

Here, the Committee seeks to eliminate the second lien granted to the uptiered notes and to unwind these guarantee releases and the entry into the subordination agreement to effectively create an unsecured class of all notes and general Unsecured Creditors, but they cannot free the subordinated noteholders from valid corporate action.

As the Court know, Your Honor, the general unsecured claim class actually accepted the Plan, so one on our side, the Consenting Creditors also kind of think to

themselves, well, what is it that the Committee is even doing at this point?  We have a general unsecured class accepting the Plan and they are lambasting the Plan and on whose behalf are they acting?  We get it.  They're working for the subordinated unsecured noteholders at this point.

But Your Honor, if they're right and if they succeed, what do they wind up doing?  They wind up leaking value, unless this stacking arguments all work out where everybody suddenly gets paid in full, they wind up leaking value away from the distribution to the general unsecured claims, so the subordinated noteholders, and they harm the 2L claims and the other GUC claims, unless there is more value to go around, and then again, we're back to that stacking argument.

In any event, Your Honor, before getting to the attack on the lien granted to the noteholders, I want to address the guarantee release on the subordination which keep getting swept under the rug by the Committee in some kind of amorphous unwind theory.

The guarantee release and the subordination are not transfers of an interest in the Debtors.  The guarantee release was actually in favor of the Debtors.  They received value there because many of the Debtors wound up no longer being obligated on the unsecured notes.

As such, they can't be reversed or restored under

a fraudulent transfer theory in this case.  As we noted in our papers, those actions are the actions of the subordinated noteholders.  They have to pursue them themselves.  They have to argue a breach of contract or some other similar theory, and the sub notes have thus far chosen not to do it.  And as we all know, Your Honor, those types of claims are for money damages.

So the Committee here is trying to contort themselves to step into the shoes of a third party to advance an action against another third party claiming the benefit of a fraudulent transfer theory under the Bankruptcy Code when none of it is applicable to this situation.

And Your Honor, just this past week, the Southern District of Texas ruled in the *Wesco* appeal and it makes it very clear that actions taken under the clear provisions of a contract that comport with it are valid and enforceable and the remedy for that is a money damages claim, to the extent that you can prove that there was a breach.

So all the UCC can really seek here, Your Honor, is the avoidance of the second lien, and again, there they assert actual fraud and constructive fraud as fraudulent transfer theories to eliminate them.

On the Record before the Court from all the witness testimony there simply cannot be a claim for an actual fraudulent transfer.  The requisite intent just

doesn't exist.

As Ms. Wine noted, there's zero evidence in the Record of any intent to hinder, delay or defraud another party in connection with the uptier transactions by the Debtor or any other party.

And as I noted earlier, Your Honor, the facts actually show the opposite.

There's also no claim for a constructive fraudulent transfer on the uptier.  First, we have plenty of reasonably equivalent value provided in numerous forms.  We have $105 million of new financing given to the company.  We have the waiver of certain defaults under the loan documents.  We have the conversion of cash pay interest to PIK interest on the uptiered notes.  We have the release of liabilities, the guarantee releases on the unsecured notes, to mention a few.

And in addition, Your Honor, the Debtors were actually able to make a cash interest payment to the subordinated noteholders in the period from the time that the fifth amendment was done to the bankruptcy filing.  So it allowed the Debtors to continue to operate their businesses, pay their obligations in the ordinary course, even to the point of making cash interest payments to the sub notes, which the uptiered notes themselves did not enjoy.

There's also no evidence in the Record of insolvency.  And the Committee would have the Court believe that they were insolvent prior to filing, but after going through a bruising bankruptcy case, having lost many contracts along the way, they now should have a much higher valuation and get to a midpoint of about $1.67 billion in Chapter 11.  You simply can't have it both ways and there's no evidence in the Record to demonstrate that the Debtors were insolvent pre-petition.

There's also the *per se* rule, Your Honor, recognized by many courts in this Circuit and around the country where the securing of an antecedent debt simply isn't a fraudulent transfer because there's no newly incurred obligation.

You'll hear from the Committee as we have in their papers that they believe that the newly issued second lien notes is a new debt issuance and it's not the securing of antecedent debt, but the securing of an antecedent debt is exactly what happened here.

And then, Your Honor, you have the absolute 546(e) defense to what were clearly settlement payments on securities contracts.  Of course, that's subject to litigation, too, but what we're looking at here is:  Are these claims colorable?  Did the Debtors unjustifiably refuse to bring them?

On a cost benefit basis, is it a valid exercise to be able to pursue these claims?  And then when evaluating that, you have to look at the practical issue, which is the second liens, which the Committee seek to eliminate, are already being treated under this Plan as if they were eliminated.  They share ratably with the general unsecured claims in that class.  And the reason those claims are in their own class and the subordinated notes are in another class is because the subordinate notes enjoy only one obligor where everyone else has all the rest of the obligors because the notes had their guarantees stripped.

So Your Honor, in the end, the uptier claims are simply not colorable.  The Debtors, whose Independent Director, Mr. Silvers, reviewed the claims with outside counsel, determined they weren't actionable and they didn't -- and that the Debtors didn't unjustifiably elect to bring the claims, and on a cost benefit analysis believe that they weren't worthy of being pursued either, and the Consenting Creditors agree, Your Honor, and nothing that's been presented in the evidentiary record over the last three days supports any different conclusion.

So Your Honor, standing should be denied and the releases of the claims should be granted.

I know I've been going on for a while, Your Honor, I do need to just cover the unsecured assets because the

Committee seeks standing to declare the $25 million that was received in payment of the United Health -- from United Healthcare in the amendment of its contract to be distributed to Unsecured Creditors and not part of the Lenders' collateral.  They do this under 552, as well, so all the arguments I made before apply.

But here, there really are no -- there is no colorable claim here at all, Your Honor.  As the Court heard at the time of approval of the amendment into the UHC contracts here in court, which you'll recall unfortunately required witness testimony, Your Honor, the $25 million payment is a payment by United Healthcare to the Debtors on account of pre-petition services that were rendered from January to June of 2025, provided under the United Healthcare contract, all of which is part of the Lenders' collateral.  Those contracts were pledged to the Lenders as collateral.  The receivables thereunder were pledged to the Lenders as well, as was the Debtors' cash.

And the bulk of the negotiations that were ultimately recognized by the Court here in approving the Order, all occurred on a pre-petition basis.  The Committee at one point tried to say, well, those negotiations must have happened post-petition.  And under our 552 theory, you don't have a lien on, you know, the negotiations that resulted in the payment.  But those negotiations largely

happened pre-petition.  We don't agree with their position, but -- factually and legally, but even if you buy it on the legal side, the facts are actually the opposite.

So there's no claim here that's even remotely colorable and the $25 million is clearly collateral of the Lenders and they should be denied standing to pursue that, as well, Your Honor.

And on the -- again, with respect to the 185 heavily used vehicles that Mr. Shandler testified probably worth around a million dollars, and the zero balance account that had $400,000 in it, the Lenders chose not to take liens in those assets.  The Committee is right, they're unsecured.

But the value associated with them is far below the value that's being distributed to general unsecured creditors in the Plan, so there's really no point to the distribution of those, and the other point, Your Honor, is they are collateral for the Debtor-in-Possession financing and they are also subject to the liens that have been granted in connection with the adequate protection that I pointed out before.

So when I say they're not subject to the liens on a pre-petition basis, that's right, but on a post-petition basis they are.

And Your Honor, with respect to commercial torts where the Committee has asked for standing to say that

they're unencumbered and they want to, you know, pursue them, the exhaustive analysis here I guess lent itself to look at the Debtors' Schedules because no other claims have been found and there's about $11 million of affirmative lawsuits that the Debtors has.  There are two claims there. Both of those claims are on account of breach of contract claims in connection with what the Debtor believes was the contract counterparties' failure to pay under the contracts. Those are not commercial tort actions, and so we believe that the Lenders have liens in those, as well.

In the end, Your Honor, we look at what the Committee and its members did not do here and we find that to be telling as well.  There was an equities rights offering under the Plan.  It was priced at basically the value of the first lien debt and if the Committee is right that its value is -- call it, you know, almost $700 million higher than the value of the first lien lenders' debt, you in theory would exercise that equity rights offering option all day long because the day that you invested in it, on the next day if you really believed what the Committee's valuation was, you'd be almost $700 million in the money by exercising that right.

And unfortunately only three parties took up the equity rights at an amount of $100,000.  And none of them was the chair of the Committee or the other noteholder

that's on the Committee.  And remember, the chair of the Committee was prepared to invest in the uptier on a pre-petition basis.

So, Your Honor, we look at that and we say to ourselves, what's really going on here?  Like if no one takes up an equity rights offering, and that's kind of a marketing -- it's been marketed, it's been pushed out to every creditor, you know, in the case, and subordinated noteholders have seen it and it's an option for the subordinated noteholders and they don't take it up.  That's a pretty good indication of where the value really is here, Your Honor.

And the market trading prices, they're -- you know, Judge, those also reflect very limited value associated with the claims.  And you can look at them on a pre-petition basis as well.  And it's supported also by the testimony provided by the Debtors' witnesses about the difficulty in obtaining exit financing.  This is unfortunately not a healthy company.  And I don't want to retread the ground that Mr. Stanfield covered.

The Committee also never found any junior DIP financing to eliminate the 20 percent backstop fee, you know, in equity.  They also couldn't find junior DIP financing to relieve the Debtors of their milestones.  Nor did they make any effort to seek to terminate exclusively

and propose a new plan based on value to cram up the secured debt and unlock value as they claim their valuation does. Those are all really telling exercises. If you believe the value of the business is almost, you know, $1.7 billion, then that provides the opportunity to really do things under the Bankruptcy Code. But the silence here is deafening.

So in the end, Your Honor, standing in stark contrast to the Committee's unfounded attacks and lack of any alternative is the plan that's been proposed to the Court. The plan was clearly proposed in good faith. As all witnesses testified, it was negotiated at arms length. The plan provides material benefits to the Debtor, it eliminates more than $1.3 billion of debt and all that associated interest expense, it takes the company private which saves more costs and allows for a more streamlined operating and reporting environment.

And the plan also treats creditors fairly and offers general Unsecured Creditors a recovery of 2 percent in stock and three tiers of warrants at 15 percent each that Ms. Wine talked about for a class that's out of the money. And so obviously if value improves in the future, there's an opportunity to recoup that through the warrants.

And unfortunately for the subordinated noteholders, Your Honor, they can't get out from under the subordination, so that value doesn't flow to them, so it

goes to the general Unsecured Creditors.  Your Honor, the plan also though, as I just mentioned, provided the right for an investment for the subordinated noteholders, and they didn't take it up.

So in the end, and most importantly, the plan provides, as I -- I end where I started, Your Honor, with the opportunity for the Debtors to clean up their balance sheet, to get out of this bankruptcy quickly, to compete in a challenging economic and regulatory environment for the benefit of their contract counterparties, their new owners, their employees, and the patients that receive the services through the contracts.

Your Honor, this plan meets all of the tests for confirmation set forth in the Code, and the Consenting Creditors request that the Court overruled the objections and confirm the plan.  Thank you, Your Honor.

THE COURT:  Thank you.

MS. WHITWORTH:  Good afternoon.

THE COURT:  Good afternoon.

MS. WHITWORTH:  Judge Perez, Jana Whitworth for the US Trustee.  I won't take up a lot of time this afternoon, Judge.

THE COURT:  Take as much time as you want.

MS. WHITWORTH:  First of all, I just wanted to go over some of the points that Mr. Weichselbaum mentioned on

the resolution of some of the Trustee's objections.  Yes, the language that the Trustee requested on government releases to preserve police power and regulatory power is included in the confirmation order, so strike that off our objection.  With regard to the definition of exculpated parties, that's also resolved.

So what -- that leaves us standing with three issues.  The first -- the first two are pretty much tangled up together, is the third party releases.  As Mr. Weichselbaum highlighted for the Court for me, the Southern District of New York has agreed with the US Trustee's position and argument that the consent, as required by *Purdue*, is -- cannot be imputed from silence, the silence of the parties receiving the opt-out form.

And again, the US Trustee's very grateful for the information that was provided by the declarant that proves our point, Judge.  If you look at the evidence that was admitted under Document 993, the little chart that shows there were -- there were 19-, almost 20,000 opt-out forms that went out -- well, actually ballots -- a combination of ballots and opt -- no, that's opt-outs, I'm sorry, opt-outs, and a total 388 were returned.

So that would show that silence -- the silent creditors who did -- that did not respond have now been deemed to -- those third party releases to have those

imposed on them.  That's 98 percent of the people who received these did not respond.  I'd just ask the Court to take notice of that.

I'm not going to argue, Judge, the whole -- we briefed that and you've read it many times over the last year and a half.  And we just ask the Court to take judicial notice of that briefing in our objection that was filed originally at 397 and then re-asserted in Document 810.  So, Your Honor, we believe the US Trustee's position is that the silence, the opt-out provision, isn't sufficient to deem consent under the plan to the imposition of those third party releases.

And hand-in-glove with that is the use of the gatekeeper and injunction provision to enforce the third party release claims.  We don't believe that it's proper, it's not -- it doesn't comport with *Highland II*.  I know the Court -- you issued an opinion in *Container Store* that's obviously on appeal.  I don't want to say anything that's going to jeopardize the briefing and go off course for that, so we'll just wait for that, Judge.

The third thing is the waiver of the 20 -- the 3020(e) 14-day stay.  I understand that everybody wants to get done with this and move on, but I did not hear any facts or legal argument that shows that there is an existential issue, that this needs to be waived.  In fact, if -- the

24th I think is what Mr. Weichselbaum said, it's like 13 days, so one day -- well, I guess that would be Christmas -- but it would -- I just don't believe that there's any circumstances that have been proved to the Court that would deem the waiver substantiated.  Thank you, Judge.

THE COURT:  Okay.  Thank you.

MR. SHORE:  All right.  Good afternoon, Your Honor.

Can we get screen privileges for Laura Donna Miranda (phonetic), please?

(Pause in the proceedings)

MR. SHORE:  And while we're bringing that up, unlike an opening where I'm just trying to tell you what the evidence is, we have prepared a closing demonstrative so that we could walk you through the evidence, as best we can cite to the transcripts in the form they're in, and I'll try to be slow when I do this.

First, I'd like to thank the Court and your staff.  You know, this has been an incredibly full 90 days for the Committee.  There has been a lot of work you all have had to do, just getting ready for this and sitting through this, so we'd like of course to thank you.

Where I want to start -- let me see if I can get this to move, there we go -- it is our -- oops, I have to go back one now -- an overview of how the argument is going

to -- oops -- how the argument's going to be done.  We have two primary objections to confirmation, one is that the 1Ls are slated to recover in excess of the amount of their claims.  And that breaks down in various ways, one is that TEV exceeds the fully loaded amount of the claim, and I'm going to walk through the evidence on that.

One is that the fully loaded 1L claim is too high, and Mr. Zatz is going to handle that in the context of the 552 objection.  Unencumbered assets are not being shared ratably.  Again, that's going to be Mr. Zatz and that comes in the context of the standing argument.  And then the plan's releases are unwarranted and Mr. West is going to be handling that.  And then we need to -- we have some comments to the confirmation order, so if we get that far today, Mr. Zatz will be handling it.

Let me start with the concept that the 1Ls are being paid in full.  If that's the case, the plan fails. Where it goes after that, after the 1L plans are paid in full, is to Class 4 or Class 5, that is the constituents of the Unsecured Creditors Committee which is why we're here.

We believe, after having had our opportunity to take informal and formal discovery, hire experts, get their views and prepare a case, that the total enterprise value of these Debtors, when you take various levers into consideration, show that the 1Ls are being paid more than

full.  Once we show that, we're talking about different plans.  What happens with 2Ls and subordinated notes and everything else?  This plan requires Your Honor to find that the TEV is below 991, $881 million of fully loaded claims and $100 million of DIP.

And in talking about that issue I'm going to focus on evidence.  I'm not going to be showing you things that were never entered into the Record like Mr. Brown's report, or talk about things that are not.  I'm going to live with the Record that we created in front of Your Honor over the last few days.

In the evidentiary record, Mr. Magrisi showed you various versions of this slide.  Looking at what the Debtors' business plan was broken down into segments.  We saw one for NEMT, and PCS, et cetera.  It shows actually lots of common ground between the parties, with the Debtors and I think with the 1Ls, but obviously we're in a trough.

Everything we're looking at in the context of this case is a trough.  No one gets back to the 2024 revenue heyday.  Not the Debtors, not Mr. Magrisi.  We're all living, if you looked at the left side when it was still going up, the pre-Humana world, the pre-COVID world, or the in-COVID world, or the pre-redetermination world, this business had a ton of equity value.

We're not here talking about distributions to

equity.  We're talking about whether or not this business is worth less than its 1L debt.  It has all gone through all of its general unsecured claims, all of the subordinated notes, all of the 2L notes, and has fallen so much that it can't pay it's 1L Lenders in full and will never trend back up.

But really this question, the question before Your Honor, everybody showing a V is how deep is the V and how high is the slope coming out.  That's it.  We don't need to argue -- and we can go to the next slide.  We started with Mr. Norwalk.  Okay.  I'm going to talk about why we're here with experts.

Ms. Norwalk, she was certainly a polished witness, and she said to Your Honor something I said you would hear, and you heard from every witness, every witness has qualified their support of this company with, Here are our headwinds, here are all the problems, this is why we can't do it.  And Ms. Norwalk gave you a story that the business can't even be sold.  We have so many things going on that we couldn't sell PCS, we couldn't sell RPM, this business can't be sold, we basically have to turn it over to the 1L Lenders.

Okay.  That's not what the Record showed.  What the Record showed, if you look at it, and it is in the board materials, right.  In fact, Ms. Smith -- we can go to the next page, please -- Ms. Smith asked a bunch of questions

about -- of Mr. Norwalk about the board record and the importance of the board record, and the fact that the board decks and the board minutes would reflect what actually happened.

In August 2020 the board deck makes very clear why these companies were not sold, why they weren't sold pre-petition, and why they aren't being sold now.  Each proposed -- sorry, the company has pursued asset sales for several months and received multiple indications of interest.  Each proposed transaction requires Lender consent, which the Lenders have declined to provide.  In fact, the Lenders have directed the company to pause all asset sales.

The reason we're here with experts is because the 1L Lenders didn't want a market test.  They didn't want the assets put on the block.  So the reason we don't have parties coming in here and saying, I want to buy this business, I'll buy it for the 1L debt, is because this case was set up as, We're turning the keys over to the 1Ls, this is a terrible business, we are going to fall apart if we are in bankruptcy for more than 90 days, and, Your Honor, we need a confirmation hearing then in November.

That's why we have experts here, and, in fact, Mr. Jamal testified that he always understood that he would need to testify on the subject of valuation.  This case was

set up for what you heard over the last 3 days.  So for people to complain about the fact that we have experts and you need desktop valuation, that's a problem of everybody's own making.

Where we are right now is in a contested matter. The federal rules of evidence apply.  Rule 702 applies, *Daubert* applies.  You are required to make findings of fact based upon valuation science, three generally accepted methodologies for forming a view of TEV.  There is no bankruptcy exception to Rule 702, there is no soft factor exception to 702.  If you find that the report, one report or another as presented by a witness who lacks the requisite credibility, then we can start talking about ignoring desktop valuations.  But quite frankly, that's all Your Honor has in order to value the business.

So let's talk about Step 1 in that valuation science, starting with reasonable projections.  We have heard over time all sorts of adjectives about the business projections, overly conservative, relatively low, overly optimistic.  I heard a new one today, goosed up.  The first step in the valuation process as both Mr. Jamal and Mr. Brown said, is start as reasonable projections.

And for a valuation expert what does reasonable mean?  Mr. Brown testified to it.  It is financial projections that take -- that consider the inherent risk in

a particular company.  And what do -- Is that correct?  -- what does he mean by that and what do I mean about it -- telling you about it?  Businesses have different risk profiles.  There are hydroelectric dams and there are tech startups.  They both have very different risk profiles.

The question is, what's the right risk profile for this company, because we could make a business plan in an hour that shows that you can't pay the DIP in full?  And we can make a business plan in an hour that shows that the unsecured -- sorry, the equity is in the money.  The question is what's the right risk profile?  And included in the Record is the 10K from the end of last year.  Okay.  This is the last year's -- sorry, it should be 2024 10K -- but it's as of December 31, 2024.

They have page after page after page about what the business is, and how it makes money and what's its growth opportunities are, and what the other opportunities are in the market and everything else.  And they have risk factors too.  And the first risk factor about the business is we generate a significant amount of our revenue from a limited number of payors under a relatively small set of contracts.  And the loss of, reduction in amounts generated by or changes in methods or regulations government payments for our services under these contracts could have a material adverse impact on our revenue and results of operations.

What people are complaining about of the risks in the business is exactly what all the creditors advanced credit against, including the 1Ls.  They did not lend money to a hydroelectric dam, and they did not lend money to a tech startup, but they did lend money, as did all of our constituency, to a business that has contracts, they gain them, they lose them, and the business still is able to operate, the business is still able to thrive, the business is, according to everybody, everybody's still able to grow.

But what we can't do is try to take projections and make them agnostic to risk.  We'll just take everything that's out, everything that we don't -- definitely have all the way into the future and that's out of our business plan.  Because what you're doing then is you're skewing the valuation.

This is not -- and I'll come to it in a bit -- we're not trying to find out whether or not this company will file for bankruptcy again.  That's a -- I mean that's a feasibility argument.  We're trying to find out what is the right set of projections to effectuate all of, in this instance since we're really talking about creditor recoveries, all creditors' expectations of what they were lending against.

So Mr. Magrisi gave his analysis, and I think we'd agree he did great for the first time testifying, especially

in front of everybody here.  But importantly, you know what's really hard to do the first time you testify, make up a bunch of fake financial projections for litigation purposes and then try to sell them.  This is what this man does for a living.  He gave his honest answers with respect to what he thought the growth prospects were and the ability to cut expenses were with respect to this business.

He says that the appropriate amount of new revenues and reduced expenses should be there.  He's not getting back to 2024 revenue numbers.  He's just growing the business at a rate which is more commensurate with the risk profile of the people who are arguing that they are or are not in the money.  It's what ModivCare is.  He says it does not fairly represent the anticipated earnings capacity of the Debtors through the projection period.

That's all he's trying to do, put the risk back in the plan that Mr. Shandler took out.  And it's not -- if we go to the next page -- it's not outrageous or highly aggressive or overly rosy or full of genericisms.  He gave you detailed analysis of what he did to either increase revenues or decrease expenses or touch on CapX over the period.

And on this slide, when we talk about the aggressiveness of the projections, he has 14- to $20 million in new 2026 EBITDA.  Those are his extra gets.

I'll get to it, Mr. Shandler says 6, that would mean he has between 20- and $26 million of gets for 2026.

Did that -- did he happen to peg it to UHC there? Yes.  And they are still a get, I'll come to that in a bit. But this business is in the business of going out and getting new business.  As everybody has said on the other side since the beginning of this case, these are contracts that are terminable at will and they're short duration and everything else.  Yes, that's why the business has to be in the business of going out and getting new contracts and opening up new relationships.

And he also looked at the expense reductions.  And as an expense reduction person, certainly he thinks things can be cut.  And of course that's not popular, I get it. Any management team has a hard time, it's always easier to say I'm going to grow revenues and I don't want to cut expenses.  Every once in a while you need to bring someone in and actually cut expenses.  It's not (microphone interference) taking away Christmas bonuses or cutting into 401Ks or anything else.

This is a business like almost every business in the United States which with the advent of AI is going to have reductions.  But what we're not going to do is not make those reductions because it's unfair to either trade creditors or other employees or anything else.  If the work

needs to be done, it needs to be done.  And as the answer was on the stand, this management team is not guaranteed to stay here, and I suppose that if the 1Ls come in, they're going to put in a new management team and they're going to do the things that Mr. Magrisi said to be done.

And importantly with this, notwithstanding the arguments that the great big beautiful bill is out there and there are all these Medicare and Medicaid issues that are going on in the United States, any business can cut this. This has nothing to do with legislation or anything else.

So what we've got on the other side was what Mr. Shandler described as his realism approach.  He testified in response to Mr. Zakia's questions that he came in to knock the projections down.  That's what he viewed his job as doing.  Management has risk in the process, and I'm coming in to provide realism.

Yeah, I get it.  Anybody -- anybody, and management included, wants to put the lowest plan possible out there.  Why?  Because then no one criticizes you for missing the plan.  I get that.  And if you put a low one in and you get it past the board, your MIP, right, will come in at better numbers.  You'll get bonuses, targeted off sales numbers that are lower.

We're not trying to take the reach out of the plan.  We're trying to reflect an appropriate amount of

reach.  And so when he says, I'm coming in with my realism approach, he came up with a business plan which it has -- so low ball it doesn't make any sense.  As I said in the opening, this business plan on a revenue basis is lagging inflation.

And he can say, I'm taking the wild swings out of the business, but this is a business that does wild swings.  It's opportunity to attract capital is because it can enter into new relationships.  It will lose new relationships, it may pay higher for debt but the equity markets love a business that's high vol like this.  They're the largest in the market.  So to say that what we're going to do is -- my job is to come in and make sure we never miss projections again is not thinking about the job right.  That's the disconnect here.

Your Honor's supposed to be looking at a business plan which reflects what the business is.  It is not a business which could only get $6 million in business next year.  Think about that.  This is a business that has contracts, the contracts can be terminated, they're short term contracts, and the market is fluctuating wildly.  Mr. Shandler's assumption is, if they work as they should, they can add $6 million of EBITDA to the bottom line.  That's also with the cost reductions too.

He then says, But we do need to build in

$12 million of EBITDA loss next year.  That is regardless of whether it's conservative or anything else.  That's not reasonable for the purposes of performing a total enterprise valuation of these Debtors.  And I said it at the beginning, what's remarkable about this case is the willingness of the Debtors to come in and said, "This business has no prospects."

Notice we didn't have Heath Sampson, the CEO, come.  Right?  That's CEO better think he can beat $6 million of EBITDA.  He likes the business, other people like the business, but these Debtors kept -- Your Honor, I just want to point on direct they would volunteer all the problems with the business, like the Mr. Chub (phonetic) conversation with -- now we know who's not there anymore.

They volunteered time after time after time that this business was having problems.  And it had to come out on cross-examination, well, that's not really true.  Right?  You won the appeal in South Carolina, you actually got your gubernatorial candidate -- I'll come back to this is a bit -- you're not changing your projections, you're not changing your 2025 EBITDA.  Those are all good things.  All you heard was witness after witness and question after question from counsel talking about the negative parts of the business as if that's evidence.  The evidence is the business plan.  That's the first step in the plan.

Now as I mentioned, Mr. Chub, and I said it to my younger colleagues when that came up, trials are amazing things because of what comes out.  Okay.  There are always eye-opening experiences in trial.  And I want to talk about the July 21 board meeting which opened the eyes of counsel to the 1Ls in an amazing objection.

You'll recall the illustrative valuation hurdle slide from the July 21 board meeting where Mr. Jamal said, This is what I showed the board members, they could all reverse engineer their views of where value broke based upon the $145 million of EBITDA embedded in this, and Mr. Jamal had not done a valuation at the time, he just wanted to educate them.  If he had, the implied 2025 EBITDA multiples at the mid-point of Mr. Jamal's unadjusted formal valuation, that is if you just took his valuation, what he uses for a multiple on 2025 EBITDA is 6 to 7.4.

If he had done his valuation by this time and gone to the board, had the board said, I'm not approving an RSA until I get a valuation, at the low end of the range he would have been beyond the 1Ls.  That would have showed that the full -- the 1L claim is paid in full.  And at 7.4 we're way into the 1L -- sorry, into the 2L claims.

Okay.  That's the importance of the next slide. The record came in, okay, and then a Director came to me, Mr. Cunningham, and he said, Because of political

instability in New Jersey I want you to take out the EBITDA that would come in from the price redetermination and we knock it down by $27 million.  And that's exactly what happened.

And then it was sent to the Lenders.  Again, the date on this slide is the important part, this is -- this was done on January -- sorry, July 24, three days after the meeting.  And if you look at the impact, just using Mr. Jamal's -- assume he got it all right, all his multiples and everything else.  On his concluded multiples it took 162- to $200 million out of the business.

And I'll be brief on this, but I want to focus on the mountain the Committee has had to climb since the beginning of this case.  What does it mean that they made this adjustment?  When they were negotiating the RSA and the DIP it presented a materially different company.  It had $27 million in less EBITDA and 162- to $200 million in less TEV.  They didn't go out to market this company.  They went out to market the Cunningham-adjusted company.

They -- had Mr. Jamal done his valuation before they signed that RSA and the DIP, they would see they're paying the backstop fee, that 20 percent, out of junior creditor recoveries.  They made it impossible to -- for a more equitable split of monies in Unsecured Creditors.  As I said before, I mean they took $100 million DIP to make

$180 million distribution to Unsecured Creditors.

And I'm not violating my duties to my constituencies by saying if we had access to that money, we could have come up with a plan that provided for material unsecured recoveries and still paying most of that trade almost in full.

It caused the Debtors -- Mr. Jamal's failure to do a valuation at the time of that board meeting caused the Debtors to file and prosecute a plan, to start this engine down the tracks, that paid the 1L Lenders more than in full. And, and by having not done the valuation then, it allowed the 1L Lenders to dictate the case milestones in the DIP and say, We want the case out in 90 days.

And you know what, we're good.  I mean this is a fantastic team, Your Honor.  But you know what we can't figure out?  We can't figure out a Cunningham adjustment if the document isn't produced.  The document was produced in October, after the whole 2nd days are done.

That's when we see that they just took this adjustment out of EBITDA, pushed it aside, never told anybody about it, and told you, Don't worry about the backstop fee, it doesn't get paid out of anybody else's equity; don't worry about the case milestones, this is really the DIP Lender's case to run; don't worry about that we're moving down the road on a plan that pays, at that

time, Unsecured Creditors zero because at the end of the day it's the 1L's money.  It's not.  It never was from the start.

So the first stop is the business plan.  Okay. The second stop is that it's fashioned at viewer of TEV, the valuation expert.  No one can contend that Mr. Brown doesn't know how to do this, no one can contend that a person who does this as often as he does can do this with bias.  That's the fallacy I hear people say all the time.  Well, it's just a litigation view.  You know how many times you get to do a litigation view and get smoked on the stand on cross-examination?  Like one or two times.  Or they have a court exclude your opinion because it's obviously valuation driven.

This guy knows what he's doing, he does it for a living, he does it in court, he does it out of court, people rely on him for deals, there's no questioning Mr. Brown. And the only thing -- well, let's -- yeah, let's go here. Mr. Brown, TEV assuming the Debtors' plan, a billion to 1.25.  Okay.  TEV assuming Magrisi projections, 1.4 to 1.6. Those are his views.

Now Ms. Wine stood up and said, well, wait a minute that one on the left, that's very close.  Let's be clear, that's just the top of the waterfall.  I'm going to show you all the adjustments Mr. Jamal had to make as you go

down the waterfall to show that that doesn't pay off everything.  Remember, the claim is 881 of the 1Ls.

So Mr. Brown did not skew his results.  In fact, I didn't even hear it, I was prepared, I guess I did hear about lift, one of the -- some of the questioning was around how he used home healthcare companies as a direct comparable.  And I just want to make sure Your Honor was clear about this.  And it is, he took the home healthcare companies and then he discounted them.

And how did he discount them?  He said, I looked at the way ModivCare was just last year, trading against home healthcare comps and they were trading at a 20 to 25 percent discount.  The market perceived that the differences between ModivCare and a pure play home healthcare company resulted in this discount, so he discounted them all.

And you heard again today about lift and he testified actually -- the inclusion of lift in his comp set actually drove his valuation down.  It is -- he didn't want to take it out, I guess we could raise this thing, but you know what he did, he had not taken it out.  Right?  I guess he could have said, I will take it out, but then he would show, those are not my comparables.  I'm willing to give up comparables when they help me and leave them in when they don't.

Let's talk about Mr. Jamal.  Look, he's such a nice guy, I like him.  But he was the investment banker hired by the company, right, to pursue strategic alternatives.  He was the primary negotiator of the 5th amendment.  He was the primary negotiator of the plan and RSA.  He was the company's primary negotiator of the DIP and the backstop fee and the exit finance.

He was the company's settlement -- one of the representatives with the stakeholders.  He knows what everybody's confidential settlement positions are as the testifying expert.  He was designated as the corporate representative on all of these things.  In other words, his word would bind the company to all issues like exit finance, valuation, the uptier, everything was put in Mr. Jamal's hands, and he was also put forward as the valuation expert.

And here's the disconnect number too.  People keep saying, "How can two respected professionals come to such different views of value?"  And I'm saying it's because Mr. Jamal put himself in an impossible position.  They definitely could have brought another Moelis professional to court.  Moelis has many, many, many valuation experts.  He did not do his valuation until after negotiating the DIP and RSA after the case was filed, after the 1st days and even after the second days as Your Honor heard when we did that second day hearing.

The consequences -- he kept saying, I exercised my judgment, the consequences of him exercising his judgment and coming to a value of more than 991 meant that the plan that he had negotiated for his client would fall apart. That was it. He negotiated the plan, he told you, "I'll get you out of bankruptcy." Nope, I'm wrong.

He gave away 20 percent of the post-reorganization equity to the wrong constituency. He hits 991, that's where it starts coming out of everybody else's hide. The company has said, I know, you need to get out of bankruptcy, I'm going to get you through this bankruptcy, would stay in bankruptcy and he gets no plan release or success fee.

And I'm not saying that -- I mean you hear it often, everybody hears it, the valuation expert is going to get paid if the valuation is done. But he doesn't get a release of claims on his prior engagement. He had a prior engagement. Right? That period he advised on the uptier, he got paid $4.3 million in fees. If he came up with a value of less than 991 exercising his judgment, that came out of his pocketbook.

THE COURT: Do you really think his valuation was driven by getting release?

MR. SHORE: No, I'm saying --

THE COURT: Thank you. Thank you. Let's not go there.

MR. SHORE:  Okay.

THE COURT:  Go ahead.

MR. SHORE:  Okay.  Well, I'm just saying -- look --

THE COURT:  No, no, just keep going.

MR. SHORE:  Okay.  Let's talk about his judgments in that context.  Okay.  His valuation range, his professional judgment, when he testified, there's no math to support that, if you look at his Demonstrative 3, the summary of preliminary financial analysis.  Okay.  I don't know what preliminary means there.  He says that -- he says -- remember -- recall, I didn't do any math, I just kind of looked at the football field and came up with my view of value.

He said, $750 million is the low end of his range.  The lowest derived value he got from any of his methodologies was $736 million.  He then says, 925 is the high end of his range.  The derived ranges are all at least $50 million above the highest end of his range.  In other words, there was no math that was ever going to get him to his range because the low end tracked the low end, and the high end was all $50 million above his derived range, and in some cases $100-plus million above his derived range.  So that's -- where he got to exercise his judgment.

The LTM without readjusting for New Jersey, I just

went through that, up to a $200 million change in the TEV just using his multiples.  That is he used LTM, that $27 million adjustment comes into play.  The use of the Debtors' disclosure statement projections, because of his multiples, every $10 million in EBITDA, is a 60- to $75 million increase in value.

Residual growth rate below inflation.  You recall I asked the question why did he use 1.5, the number below inflation.  All Mr. Brown did is bring it up to 2, 2 to 3.5.  And that was a -- that became a 50- to $70 million change to his -- the low end of his DCF range.

The inclusion of the UK transport companies, look, they're two bus companies, I get it, but they're not in the American market and not dealing with American consumers and American healthcare.  Those were 70-, 120-, $140 million of value changes just taking those two companies and leaving them in his comp sets.  Matrix worth zero.  He testified that he his zero range was not a generally accepted valuation methodology.  There's no such thing as a best case, good case bookend analysis.  The analysis was it was worth 56, it should be left at 56.

The 2026 net working capital mistake.  He admitted on the stand.  The DCF is low by $33 million and he didn't show you that.  Okay.  That's the impact of non-math.  If he had done math to come up to his derived valuation range,

you'd have an increase and the DCF would necessarily flow through the bottom.  But when you say, I'm not using math here, I'm not weighting my analysis, I'm just kind of looking at this and saying it's kind of over here.  You can't do what he did there.  Yeah, $33 million, it'd done. I don't need to take that into consideration at all.

The termination net working capital was up to $25 million and the beta error in his DCF was 50- to $100 million.  All those he answered were done in his professional judgment, the selection of the beta, the terminal working capital, all of that was his judgment.  And I'm not -- look, as I said, there are times when it's easy to make a judgment and there are times when it's hard to make a judgment.  But you can't ignore the context in which a judgment is being made.

He put himself in a position where coming up with 881 or 981 was going to blow his whole plan up.  So Your Honor has to pay attention to the exercise of his judgment and the reasons he gave.  So answers like, "There's no math, trust me, I can't show you where that comes from, I don't know why, all of that plays into Your Honor's assessment of this."  And it does explain at the end of the day why the two valuation experts are so far apart from each other.

I'll go over this -- the Mounts Gonzales' sideshow because no one seemed to be closing on it when they said

they were going to open on it.  So I don't know when they thought they were going to give Your Honor their views on Mr. Mounts Gonzales.

All I really wanted to show Your Honor, this guy spent more than 1000 hours on ModivCare, he thinks it's an interesting company, he thinks they've got a great mission.  And then the flames came out, starting out with Mr. Norwalk who, if Your Honor cares about the sideshow, there's some obvious dispute between the two of them on who should be a board member and who should not be a board member, but the fact that someone says that a Director -- or that a Director says, I believe in the mission of the company, you know, it's not a credibility fight.  That's all he was offered for, but then we get a lot of soft evidence of value.

Okay.  As I said at the beginning, Federal Rule of Evidence 702 limits the type of valuation evidence the Court can take.  Contrary to the statements made in the Debtors' opening, there is no bankruptcy case exception.  There's no, "We've got to get this out of bankruptcy so you should just ignore the experts."

And -- well, I guess I'll come to some of these.  The trading prices are not used in either valuation.  Neither expert said that's an accepted use of valuation.  The market reactions to the expert testimony are not evidence of value.  We keep hearing this.  Right?  If the

market knew what this was worth, then the market would show up.  That's not a valuation methodology.

First of all, everything has been sealed, the Debtors have done no marketing of the assets, the Debtors' plan cadence is such that if anybody was asked to spend any time putting together a bid for this company, it was going to be 1 hostile and 2 on a time frame which from the beginning of the case would have required bids and APAs in the month of November.

Difficulties in obtaining financing.  I would expect difficulties in obtaining financing if I went out to the market with a business which lagged inflation, with all of the professionals saying, this is a dog business that is going to go out of business, it's just trending down.  But again, we have actually no evidence of the DIP finance because they aren't done there yet.

And the Committee's failure to subscribe to the equity rights offering.  We keep -- we keep hearing that. Let me pause on the Committee here.  Throughout this hearing, throughout prior hearings there have been a lot of discussions about who the Committee, and who the Committee's advisors owe their duty to and what should be done.  Okay. The chair of a Committee offered to enter into a pre-petition contract, and LME.  It's not evidence of the Committee.  That's evidence that there was a creditor, and

the fact that that creditor became the chair doesn't impute that to the Committee.

The fact that we say there's a better way to spend critical vendor money isn't a disservice.  It's trying to find a balance between trade creditors and funded debt creditors and litigation claimants.  The fact that the Committee is putting -- is putting forward an expert -- that one came in questioning -- putting forward an expert that said that we might cut costs and that would impact our constituents, totally misunderstands what a Committee is doing.

We are fiduciary of creditors of the estate.  When this company comes out of bankruptcy there's no more estate, and those creditors are to fare on their own and we wish them all well.  Our job is to maximize value for the creditors.  And the Committee putting its money where its mouth is, first of all, this is definitely not a jurisdiction in which the Committee is going to be using Committee information to -- to enter into transactions in the market.

But more importantly, the Committee has no money to put where its mouth is.  There's no such thing as a 363 motion for the Committee to get financing to take down an equity rights offering.  That's all a red herring.  So too are the statements about the fragility of the business.  And

we just heard that again, this company has to get out, we're hemorrhaging, we're not doing well, all of that stuff.

There's no evidence.  In fact, the witnesses made clear, there is no 13-week cash flow that's been done.  Our cash flows end in December.  They did not come to you and even show you what happens in the next 10 weeks of the company into January.

But you did hear there has been no change to the estimated 2025 EBITDA, there has been no change to the estimated cash in emergence, there's been no change to the financial projections, notwithstanding all the questions about isn't this company constantly losing contracts and trending down.  The data in front of Your Honor shows that this company is existing.  Yes, it needs to get out of bankruptcy, we heard Your Honor, that you wanted this trial done now.

Everybody's moved heaven and earth to get this trial and get their opportunity to exit this year.  We have. But the notion that you have to now get this all done quickly because the company is hemorrhaging cash or is losing business or anything else isn't reflected in what the evidence was in front of Your Honor.

Let's talk about another soft factor of valuation. And we heard this again, the Debtors' evidence of overwhelming creditor support.  There is class acceptance,

and we've got arguments with respect to classification and I can go into those if you want, but what I really want to focus here is that the evidence of creditor acceptance is hardly overwhelming.

The first thing to note is that the Class 4 GUC participation rate was 5.68 percent.  And that's probably just a function of having a bar date so early in the process.  But there are 94 percent of the creditors who are never heard from on this.

The number on the left, the 737 that just showed up, has now been brought down because 462 have been paid in full by the voting record date.  I did this slice before I got the new -- the new doc.  The $170 million accepted, again, $100 million is subject to a pending objection, $46 million -- or sorry, and 24.5 was the number that came in.  So 46 million net in claims accepting in the GUC.

And then we get the 2L claim, $312 million accepted.  But Mr. Jamal testified, and I was glad he did, that 98 percent of the 2L claims are subject to the RSA.  So to try to infer whether Unsecured Creditors like this plan when the RSA parties represent the lion's share of that "unsecured creditor" isn't particularly probative.  If I were a 1L creditor who held 2L paper, I'd be happy with a result that paid me more than in full on my 1L claim as well.

And this is why the 1L creditors -- oops -- this is why the 1L creditors like the plan.  This was the slide you got from Mr. Brown.  And this is the distributable value waterfall that shows Mr. Jamal's waterfall on the left making -- and making valuation corrections.  Okay.  One with the payment of the DIP fee, and 1 without payment of the DIP fee.  It's just correcting the methodological errors, Mr. Brown saying that's not the way you value things, okay, you can't put these comps in, you can't put a zero value in for an asset and those things.

And this is accepting the waterfall, and I'll come to that in a bit.  You'll see that at the top, the $111 million comes out.  Okay.  This is the Debtors' business plan.  The Debtors' business plan corrected shows that the DIP Lenders are receiving a 243 to 259 percent recovery on their claims because of the DIP, and 763 to 826 is going to the 1L claim.

When I said at the beginning about how incredibly close this is, that's what I'm talking about.  And that's before we get to the waterfall adjustments and that's before you make any change to the business plan.  And that's with recognizing the 20 percent DIP.

What the valuation corrections chart on the right shows is that by recognizing the 20 percent DIP backstop fee 1L creditors are getting 102.6 to 111.6 percent of their

claim. That is showing that the 20 percent DIP backstop fee is boring the ox of the junior creditors. That's what's happening.

Now let's go to the next slide because this is a little bit easier and I want to focus Your Honor on why I asked a bunch of questions. This is a page from Mr. Jamal's close -- or report which I marked and used for identification, but you can see some important things on this document.

You start with a total enterprise value, his range of 750 to 925. And I'm going to come back to this in a bit, that's the valuation of the whole business including claims and causes of action, general and tangibles that are moving have to come in at the top of the waterfall. And I'll come back to that.

The $111 million deduction. As Your Honor heard, that's cash that's going to be backing LCs and the -- backing the LCs which are backing the Debtors' surety obligations and insurance obligations, which the Debtors are not projecting that they're going to pay out on. So it is under the plan and the construct of the plan $100 million of cash security for an event that the Debtors don't think is going to happen.

But the Debtors did testify that they expect that money will come back, that they will get an opportunity to

talk to the insurers and return to the status quo as it existed 11 months ago when they were not posting collateral with their sureties.  They're going to be de-levered by a billion dollars.

The problem with Mr. Jamal's inclusion of the 111 is he doesn't value that.  The effect of this is the Debtors have $111 million of cash and they have a reversionary interest in that cash.  Mr. Jamal assumes away that reversionary interest.  Obviously if the cash came back in 2 years, you could take the value of that cash and say, this is our reversionary value.  He just assumed that they have no reversionary interest at any point.  Any amount of value that comes there hits the bottom line of the valuation.

The presentation shows, and this is -- you know, he does not put in the DIP claim, doesn't show that the DIP claim is getting paid.  He does it by saying that the pro forma equity going to the 1Ls is 78.4.  So he just doesn't show how much money, 80- to $120 million under his valuation, that's flowing to the DIP Lenders on account of the claim.

And the 881 is the fully loaded claim, and Mr. Zatz is going to address if that number drops, that also brings down value, right?  It just flows more in the process.

Finally, the structure of the waterfall itself

assumes that all assets are liened, which is, of course, what we just heard contrary to the evidence. There are unencumbered value, so in that part of the waterfall, you'd have to take a little detour around the secured claim and the 2L claim, and calculate their deficiency claims and then split that unencumbered value with the 1L deficiency claim, 2L deficiency claim, and general unsecured claims.

But the structure of the waterfall just assumes liens on everything. The reason I paused on retained causes of action is you saw DX-358, 24, I think, pages of claims of tax refunds, insurance claims, commercial tort claims, the claim against Mr. Mounts Gonzales, all of that.

Let's not confuse. That doesn't all have to be subject to a lien. Some of it would be subject to a lien, a tax refund. But it does need to come into the waterfall. The Debtors can't say that we have 24 pages of claims, call those claims material, and then leave them out of the waterfall because Mr. Jamal, who is the 30(b)(6) testifier, to talk about his valuation, we're putting in the total enterprise value of the Debtors, said he did no analysis on that, he did no work to determine those claims.

And Mr. Shandler said the same thing. He did no analysis of those claims.

The Debtors have one giant assumption in the case, which is -- long history -- affected a lot of people in

ResCap (phonetic), just everybody assume there's nothing in those claims and causes of action. No one came in front of you and said the claims against the -- for tax refunds are completely worthless. The claims against the insurers are completely worthless. No one said that.

So they're going to have -- there has to be some fix that goes on with respect to that because if those claims are -- as I showed -- $50 million to get over his hurdle, then we have a real problem.

Then I want to address UHC and this notion that our case was UHC. No, I said at the beginning, UHC is a case dispositive issue. There's no question about that.

There are more than a dozen case dispositive issues in this case. That's why I said what the anomaly here is, how close Mr. Jamal is on a corrected valuation with all of these other issues. There is no question that if we use Magrisi's projections, the Plan fails.

There's no question that if you use the Debtors -- we showed it -- Debtors' business plan and Mr. Brown's valuation. It's not accepted.

But things like the Debtors' business plan with just the adjustments and the $111 million in restricted cash is valued. Remember, they only had a little bit, even accounting for the DIP backstop. But if you take the DIP backstop out, that is -- you know, you get over.

We could add more and more and more.  You add 27 -- or New Jersey back in the 2025 EBITDA and his valuation, blows the Plan.  2026 EBITDA gets bumped by $15 million, either through cuts or revenues.  The Plan blows.  They pay the first lien creditors more than in full.

So at the end of the day, as I said, this day was always going to come.  There were always going to be two, if not three valuation experts.  I still don't know why the 1Ls didn't bring somebody in to back up their views that even Mr. Jamal is overstated.

But the two experts were in front of you.  You've got really two issues before I hand it off.  The business plan, as I said, there has to be risk in the business plan. Disconnect number one was the notion that what Mr. Shandler was trying to do or was supposed to do, is de-risk the Plan.

Take out the gives -- the gets and add in the gives because what that does is that means that the new equity holders get all the upside.

And the second disconnect is -- again, Your Honor reacted.  I'm not saying he did this because of the release. He's just in an environment in which the consequence of when he's exercising his judgment is a consequence that a valuation expert usually doesn't put themselves in.

If the issue which people raise is, well, he won't get his fee paid, that's not the kind of influence I'm

talking about.  Every expert has to have their fee paid for testifying, but there are exogenous pressures on the exercise of judgment which he never should have been put in, that's what I'm saying.

So let me hand it off to Mr. Zatz to handle the 552 and unencumbered asset issues.

THE COURT:  All right.  Thank you.

MR. ZATZ:  Hello, Your Honor.  Andrew Zatz from White & Case on behalf of the Official Unsecured Creditors Committee.

Let me see if this thing works.

(Pause in the proceedings)

MR. ZATZ:  No, went too far.

Okay.  The Committee has identified a number of categories of assets that are no encumbered by the pre-petition secured facilities.  Neither the Debtors nor the Consenting Creditors dispute this.

Those categories of assets are avoidance actions, commercial tort claims, which the Debtor ascribe about $11.2 million of value to, that's only reflected in the claims that are listed in the Debtors' Schedules and SOFAs does not include the many retained causes of action that Mr. Shore referred to in the Debtors' Plan Supplement.

Number three, the unencumbered accounts, which the Debtors value at approximately $400,000, for the Debtors'

vehicles, which the Debtors value at approximately $1.1 million.

And five, the Debtors' minority interest in the matrix joint venture, which is worth up to $56 million.

There was some talk by Mr. Klidonas about equity pledges at that entity, but you have to consider that asset in the totality of our arguments because as we argue, the valuation is well in excess of the first lien claims and that unencumbered value could very well come into play.

So this is a slide from Debtors' opening presentation. It's attempting to demonstrate that the undisputed unencumbered assets that we've identified, pale in comparison to other claims that are going to eat that value up. Those claims include DIP claims, adequate protection claims, and administrative claims, and I'll address each of those.

First, with respect to DIP claims, this ignores that these DIP claims are not recovering any assets from the Debtors under the Plan. Rather, they are converting into an exit facility. Moreover, the DIP claims are subject to explicit language in the DIP Order that requires the DIP Lenders to recover, first, from assets that were encumbered on the petition date before seeking to recover from unencumbered assets.

So even if the DIP claims were to recover in cash,

the DIP Lenders would not have access to these unencumbered assets.

Next, the Debtors and the Consenting Creditors argue that unencumbered assets would be distributed on account of adequate protection claims, but there are no adequate protection claims proven here.

The pre-petition secured creditors have never properly asserted any. And they certainly have not made the necessary evidentiary showing to demonstrate that they have suffered a diminution in value, which is the prerequisite to an adequate protection claim, both under applicable law and under the DIP Order.

To do that, the secured creditors would have had to present evidence of the value of their collateral on the petition date and the value of their collateral as of date they assert the adequate protection claim, and they have done neither.

Mr. Hansen's closing remarks providing some rough math in an attempt to prove one out, does not qualify. And note that this is the secured creditors' burden, not the Debtors.

Therefore, any notion that an adequate protection claim would eat into unencumbered value is entirely speculative and should be given no weight.

Further, any adequate protection claims of the

first lien lenders, if they were to exist, are subject to the same language in the DIP Order requiring the first lien lenders to marshal away from assets that were unencumbered as of the petition date.

Finally, we get to the argument about administrative expenses.  The Debtors have not put on any evidence that the quantum of outstanding administrative expenses will exceed cash on hand as of the effective date, nor can they, given that the Debtors have been escrowing for all estate professional fees on a weekly basis, pursuant to the DIP Order throughout these cases.

In any event, there is no expectation that the Debtors will be using or liquidating the avoidance actions, commercial tort claims, their vehicles or their interest in matrix to satisfy administrative claims.

So the Committee has demonstrated that there are a number of sources of unencumbered value here, that under the proposed Plan will be preserved for the benefit of the first lien lenders, because they would receive the vast majority of the reorganized equity, particularly if you consider that they also own 98 percent of the second lien note claims.

The Debtors have not included any of these assets in their valuation analysis; therefore, in considering our arguments that the first lien lenders are receiving more than the value of their claims, those unencumbered assets

put the first lien lenders into territory even further north of a 100 percent recovery.

In addition to unencumbered assets that the Debtors and the Consenting Creditors concede are not part of the pre-petition collateral package, the Committee has identified other assets of material value that came into being post-petition and are thus unencumbered under Section 552(a) of the Bankruptcy Code.

The Committee has objected to the secured parties' claims at Docket Number 729 on the basis that the secured portion of their claims asserted in their Proofs of Claim and in the Plan, is overstated, given the effects of Section 552 of the Bankruptcy Code.

And it is firmly the burden of the secured creditors to prove the value of their secured claims. I'm going to come back to that burden that the case law is abundantly clear, including the cases that the Consenting Creditors cite to in support of their argument.

Section 552(a) of the Bankruptcy Code says that assets that are acquired by a Debtor post-petition are not subject to security agreement entered into prior to the bankruptcy filing, even if it extends to after-acquired property.

ModivCare has earned hundreds of millions of dollars of revenue during these cases. Much of this revenue

has been spent to keep the business operating and maintain its going-concern value.  The rest of that post-petition revenue is currently held by the Debtors.  That cash by virtue of being created post-petition is unencumbered under Section 552(a).

All of these revenues that ModivCare has earned during the Chapter 11 cases are a product of the labor of the Debtors' employees.  The Debtors' employ over 20,000 people.  As Mr. Schrock stated in his opening statement, ModivCare is a service business and is asset-light.

In its briefing, the Committee has explained in great detail how the human efforts of ModivCare's employees is the main driver of its revenues.  This is the case for each of the Debtors' four business segments:  Non-Emergency Medical Transportation or NEMT, Personal Care Services or PCS, Remote Patient Monitoring or RPM, and corporate, the hedging business.

Without giving a full recitation of our briefing on the issue, I will point out a few things about the Debtors' business and their employees that supports our position.

First, the Debtors' employees are directly responsible for the Debtors providing the services on which their business is predicated.  At NEMT that involves roughly 2500 full-time employees working at the company's call

centers facilitating rides for customers.

At PCS approximately 14,000 caregivers are working at people's homes.  In 2024, those employees provided about 28 million hours of patient care.

In the RPM segment, ModivCare's employees actively monitor patient's vitals and respond to emergency situations and at HIGGI (phonetic), ModivCare's employees service the health monitoring stations.

Second, the efforts of those employees are directly responsible for ModivCare's revenues.  Mr. Sampson, the company's CEO, has stated that ModivCare's most valuable asset is its people.

When asked what drives the PCS business, Mr. Shandler, ModivCare's Chief Transformational Officer, said hours -- hours worked by our caregivers.

With respect to RPM, Mr. Sampson said that what customers are paying for is to make sure that if a member needs help, a person that works for ModivCare is going to be monitoring that situation and is going to provide help.

Multiple of the Debtors' witnesses have conceded that if ModivCare's employees did not perform their duties, ModivCare's business would fail.

Given the services-oriented nature of ModivCare's business, it is no surprise that it is its employees' human efforts that primarily drive revenues.

Third, the Debtors' contracts have little to no intrinsic value.  They establish relationships with customers, but are nothing more than framework agreements that dictate how much the Debtors will be paid for services as they are performed, and they are terminable for convenience, not just failure to perform.

The Debtors have not demonstrated any value in the contracts themselves, nor have the Consenting Creditors.  There is no indication by the Consenting Creditors that the contracts could be sold in a liquidation or otherwise.

At PCS in particularly services are paid for hourly only as delivered.  It's a fee for service arrangement.  And this is not the rare type of contractual arrangement.  This is the sole type of contractual arrangement that PCS operates under and this segment of the business makes up between 20 to 30 percent of the Debtors' EBITDA, according to Mr. Jamal's valuation materials.

In sum, it is almost entirely the efforts of ModivCare's employees that results in ModivCare staying competitive and earning revenues in this service-oriented space.  Without the continued efforts of ModivCare's employees, ModivCare would not have been able to obtain any of its post-petition revenues or continue operating at a going-concern.

Why does this matter?  Because of the implication

of Section 525(b) of the Bankruptcy Code, this provides an exception to 522(a) stating that certain types of pre-petition liens on certain types of post-petition assets are not cut off.  The test of whether 522(b) applies comes from the *TH New Orle*ans case.  Two parts are:  There must be a pre-petition security agreement that extends to the after-acquired property upon which the creditor seeks to lien, and two, the after-acquired property must be proceeds, products, offspring, rents or profits of pre-petition properties subject to the lien.

The first part of the test is satisfied here, but the second is not.  Cases cited by the Committee made clear that in service-oriented businesses, post-petition revenues are not a proceed of any pre-petition asset, but rather, are the proceed of human labor, which a creditor cannot get a security interest on.

Cases such as *Corpus Christi Hotel Partners,* *Cafeteria Operators,* and *Premier Golf Properties* make this abundantly clear.

Mr. Klidonas calls this a novel theory. Mr. Hansen calls it torture, but not so.  There are multiple cases that demonstrate the post-petition accounts receivable can, in fact, be cut off by Section 522(b).

Now, the Debtors and the Consenting Creditors rely on cases outside the Fifth Circuit arguing that ModivCare's

post-petition revenue is not a proceed of the hard work of ModivCare's employees, but rather, of pre-petition assets, namely the company's contracts.

This notion ignores the holdings of the cases cited by the Committee where in many cases secured creditors had liens on other assets that employees relied on to do their jobs and yet courts held that the service-oriented nature of the company's business resulted in the severing of post-petition liens under Section 522(a).

Cases like *Rumker (phonetic), Johnson, Premier Golf, Black Jewel,* and *Emergency Monitoring Technologies* that specifically includes liens on pre-petition contracts, yet the courts held that the liens did not extend to post-petition revenues.

Now we hear, I think from Mr. Klidonas and Mr. Hansen, this example of the company that makes widgets. That's exactly where I think the distinction lies. Now I'll get to that shortly because ultimately case law shows that a Section 522 analysis is a highly situation-dependent analysis. There is no one size fits all rule.

Courts have held Section 522 to cut off pre-petition liens even when secured creditors have blanket liens. In cases like *Cafeteria Operators, ResCap, Premier Golf, S-Tech One,* and *Johnson,* and courts have held Section 552 to cut off pre-petition liens even when secured

creditors have consented to the use of their cash collateral to support the business.

Now here's where I want to come back to the burden. Mr. Hansen says that the contracts create the revenues, but he offers no evidence, only argument. It's easy for him to say that Lenders foreclose on contracts like this all the time, but he offers no proof.

He tries to flip the burden on us, the Committee, but we are the ones who have to raise the 522 argument. It is on the secured creditors to prove up the secured portion of their claim.

For his part -- and I should say for the Consenting Creditors' part, they don't even try to define proceeds. They rely on a quote from a case that says that the definition of proceeds is more expansive than under the Uniform Commercial Code, but they never actually go through the analysis that is their burden to go through to show why assets over which -- that have materialized post-petition are, in fact, proceeds of their pre-petition liens.

Our view is that this issue requires a careful read of the cases cited on both sides. If the Consenting Creditors' position is to be believed, the Court would have to hold that the roughly dozen or so cases cited by the Committee in support of its position, including several in the Fifth Circuit, were incorrectly decided.

Instead, the Court can find a way to reconcile the disparate holdings.  Our view is that the difference between cases where liens on post-petition revenues are deemed subject to the Section 552(b) exception and those that are not, depends on the nature of the Debtors' business and the extent of the human efforts that created the post-petition asset.

And this is not just restaurants.  These are complex businesses and other industries where courts have applied 552 and cut off pre-petition liens on post-petition assets.

But Mr. Hansen accuses us of relying on the restaurant genre of cases, but if you read cases dealing with restaurants, the distinction is not that someone can just walk in.  The Courts rely on the extent of the human effort over which you cannot get a lien, that's the crux of the holding in those cases.

Here, the Committee has demonstrated that ModivCare's business is entirely dependent on the performance of its employees and that this labor is the primary driver of the post-petition revenues in question here.

Because those human efforts are not the proceed of any pre-petition asset, the company's post-petition revenues are unencumbered under Section 552.

I want to speak for a moment about the UHC settlement.  I think here is where the *ResCap* case is very informative.  That's a case that stands for the proposition that a Debtors' post-petition efforts to generate new assets, even if there is a blanket lien, can result in post-petition asset cut off by pre-petition liens.  And I think the UHC settlement is no different than what the Court found in *ResCap*, which there was goodwill to be unencumbered.

Now if the Court agrees with the Committee, the Debtors' post-petition revenues are unencumbered.  As a result, -- well, we've lost the slides.  But that's okay.

As a result -- they're back -- the going-concern value above liquidation value should be deemed unencumbered because the post-petition revenues of ModivCare and the business that has been preserved during these Chapter 11 cases were only earned -- were only preserved by the labor of the company's employees.

So therefore, the first lien lenders' secured claim should be capped at the Debtors' liquidation value midpoint of $299 million and the rest considered a deficiency claim.  This is the natural extension of Section 506 of the Code and Mr. Hansen says this is illogical to have liquidation value cap the claim and yet we're relying on going-concern value when we talk about

distributable value.

But again, I come back to the burden. The Consenting Creditors have to demonstrate the value of their secured claim. Liquidation value midpoint is a datapoint. It's indicative of the fact that the post-petition revenues that are attributable to employee labor had maintained the going-concern value and it gives credit to the pre-petition Lenders for their liens on the hard assets, but if the Consenting Creditors have a better idea, it's their responsibility to prove it up.

If Section 552 cuts off the pre-petition liens in this way, the first lien lenders would receive vastly more under the Plan than they are entitled to and unsecured creditors would receive substantially more in a hypothetical liquidation than they would under this Plan. That includes all unsecured creditors, not just the unsecured noteholders, and if, as the Debtors and the Consenting Creditors argue, the subordination agreement would hold up and we do not get standing to or are successful in avoiding it, it would only inure to the benefit of the unsecured noteholders until value pays off all of the second lien claims.

THE STENOGRAPHER: Please (indiscernible).

MR. ZATZ: Apologies.

Because the first lien lenders are receiving more than the entire -- than they are entitled on their secured

claim and unsecured creditors would receive more in a hypothetical liquidation if the Committee is correct about the effect of Section 552, the Plan cannot be confirmed.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. WEST:  Your Honor, I'd like to offer you and your staff a break, if you'd like one at this point?

THE COURT:  Well, no, let's keep going --

MR. WEST:  Sure.

THE COURT:  -- because I don't know how much longer we're going to go today and I'd like to get people out of here.

MR. WEST:  Well,

THE STENOGRAPHER:  Are you Colin West?

MR. WEST:  Colin West, yes.

(Pause in the proceedings)

MR. WEST:  Your Honor, I'm going to present a little bit on the issue of releases and that includes the related issue of standing.

This is the release provision in the Plan, the released parties and all of the released claims.  It's not intended to be legible, it's intended to show you the breadth and scope of the releases that are in the Plan.

Debtors have a burden to show that all of the releases are appropriate.  Here, the Debtors have not shown

that for all of the releases that they are essential to the Plan or that the released party made a substantial contribution to the Plan or gave any other adequate consideration.

Practically speaking, for each one of the releases the Debtors needed to look at what they're giving up, weigh that against what they're getting in return and reasonably conclude based on that analysis that it's in the best interest of the Debtors to grant that release.

On the first point, Your Honor, what the Debtors are giving up, to be clear, Mr. Silvers' investigation was not merely a datapoint, which is how the Debtors tried to hedge in their opening remarks.  It is the one single thing that the Debtors point to in their confirmation brief or anywhere else as the basis for the board's consideration of whether they were viable claims.

So I want to talk about that investigation.  Your Honor, we have our privilege objection and I won't reiterate it or belabor it, but fundamentally our position is that we were not provided the basis upon which Mr. Silvers made his recommendation to the board or the basis upon which the board ultimately made his decision.  They made those decisions based on advice -- legal advice from Quinn Emanuel in exercising their business judgment and that advice was withheld, and so our position is the Court should disregard

any evidence that the board exercised reasonable judgment in connection with evaluating the viability of the claims.

Second, Your Honor, Mr. Silvers independence, this is not a personal attack on Mr. Silvers or an attack on his character, but it is simply an acknowledgment of the fundamental fact that Mr. Silvers is not a truly impartial person when it comes to evaluating the viability of the claims, given his role, given how he came to be on the board.

And certainly not with respect to an investigation of claims against the first lien lenders.  You heard the testimony.  Mr. Silvers didn't have Quinn interview any of the first lien lenders.  Mr. Silvers didn't have Quinn serve document requests on any of the first lien lenders on the questionable basis that the Committee's requests were adequate.

And then, even as to Lender documents produced to the Committee, those documents had not even been reviewed by the time he got the 90-page Quinn report.  He didn't know that was the case and he never made any effort to make sure that Quinn had reviewed the first lien lender documents.

Separately, Your Honor, the process was inadequate from a process perspective.  Again, Quinn has withheld from us the information that would have allowed us to test the breadth and depth of that investigation, but we do know some

things.

This was the first time that Mr. Silvers had ever led an investigation. He wasn't particularly hands on. He wasn't in any of the interviews, didn't review interview notes, and he wasn't even sure if there were any.

In part because of that and in part because the details were withheld from us that we learned only in Mr. Shandler's deposition that his interview was 20 to 25 minutes.

Also learned at trial that one email that we think is fairly important was presented to Mr. Silvers in the Quinn report in a way that he testified minimized its importance.

He testified that if he had seen the actual email, it probably would have stuck out to him. And we'll get to that email later.

And then last, Your Honor, on the other side of the ledger what the Debtors received in terms of consideration for the releases, Mr. Silvers testified that he was unaware of any consideration provided by former Directors and Officers or equity holders. And as to current Directors and Officers, the only consideration was that they continued to work for the company during the bankruptcy, for which they were separately compensated.

Mr. Silvers talked about the distraction factor,

potentially bringing claims against, for example, former Officers and Directors.  Completely contradicting that, Your Honor, you've heard that for one Director who actually dissented from the views that the Debtors espoused throughout this case, including at his November 10th deposition, Mr. Mounts Gonzales.

The Debtors carved him out of the releases and a Plan supplement filed shortly after his deposition, and have retained causes of action against him for, among other things, civil conspiracy, racketeering and slander.

It seems like it might be fairly distracting.

That's the releases generally.

But setting all of that aside, the releases are particularly inappropriate as they relate to the claims that the Committee identified in their standing motion.

There are strong indications that the Debtors did not give serious consideration to the claims that we raise in our standing motion.  And I want to start somewhere that might seem odd because it's the safe harbor defense -- not because it's the most important issue, but it is indicative of the Debtors' overall approach to the claims.

The Debtors argued in their confirmation brief, or I should say in their opposition to the standing motion, that the 546(e) safe harbor standing alone is an absolute bar to pursuing these claims.  They don't say it's a

possibility. They don't say they weighed it. They say the 2025 transaction falls squarely within the Section 546(e) defense.

One of the critical elements of that defense as applicable here, according to the Debtors, is that the Debtors say that the transferees in the 2025 transactions, including all of the 2L noteholders are financial participants. They don't argue financial institutions, Your Honor, they argue financial participants and I suspect that some of their clients might object to being described as financial institutions.

In one sentence of their brief, Paragraph 269, with no evidentiary support, the Debtors say the second lien noteholders and the applicable Trustees are clearly financial participants.

Your Honor, the question of whether an entity qualifies as a financial participant is extremely complex. You have a certain dollar value threshold of certain specified qualifying financial instruments at specified times.

I have spent more time than I care to admit litigating the question of whether an entity qualified as a financial participant. In other cases it involved dueling experts with different opinions about calculation methodology, arguments about whether the specific contracts

counted, and arguments about which was the applicable measurement date.

We went through the exchange agreement which governs the notes exchange.  There are 62 individual exchanging noteholders.  It's not like it's Birch Grove.  It's Birch Grove CLO3, HG bore a special opportunities fund number something.  The Debtors have apparently decided that every single one of those 62 noteholders -- second lien noteholders, qualifies as a financial participant meets this definition.

Which type of financial instruments do each of those 62 entities hold that are among those listed in Section 561(a) (1) through (6) of the Code.  What's the conclusion as to the quantity for each of those 62 entities?

Are they measuring based on gross notion or on mark-to-market because to qualify, one would have to have a billion dollars for gross notional or a hundred million dollars for mark to market.  What's the calculation methodology?  What's the measurement date?  Did the Debtors retain an expert to perform those calculations?

They don't answer any of those questions.  They give a bald conclusion.  They're all financial participants, so you can't bring these claims.  Or we couldn't bring these claims, we, the Debtors.

Clearly they haven't done any of that analysis,

let alone for all 62 exchanging noteholders; otherwise, I'm sure they would have shared it.

So without having done that work, how could they possibly make the statement in their brief, articulating on behalf of the first lien lenders, who are also mostly the 2Ls, an affirmative defense that is tenuous at best?

So let's get this out of the way.  That clearly the Debtors have given you nothing to conclude that the safe harbor bars the claims.  But the reason I raise this first is that it reflects a troubling approach by the Debtors in a troubling dynamic between the Debtors and the first lien lenders here because what it appears happened is that the Debtors are reasoning backwards from a pre-determined decision not to bring the claims and throwing every argument they can think of at the issue.

So having started with safe harbor, which is only applicable to constructive fraudulent transfer, I'll continue with constructive fraudulent transfer.

First, Your Honor, we have the issue of the Debtors objecting to our collapsing of the elements of the transaction.  The notes exchange, together with the subsidiary guarantees, the new pledges, the subordination agreement, even together with the new money, the Debtors argue that you have to look at everything separately.

So the Debtors say it's unbelievable.  The

Committee is trying to restore subsidiary guarantees, which will be bad for Unsecured Creditors.

Looking at that aspect in isolation, no, we're trying to unwind the whole transaction, which would include the unwinding of new secured guarantees that the subsidiaries gave with respect to the notes. And yes, as part of that unwinding, restoring the original unsecured guarantees with respect to the unsecured notes.

On a net basis, that clearly benefits Unsecured Creditors as a whole.

Debtors also want to have it both ways. They don't want you to look at the note exchange in isolation because in looking at reasonably equivalent value, they say you also have to look at the benefits of the new money that came in.

But that's a new loan, Your Honor, governed by a separate document from the -- a document that's separate from the notes exchange agreement, so they can't have it both ways.

It's clear from the Debtors' perspective, as Mr. Silvers investigated these claims, that they viewed them as a single integrated transaction or a series of transactions, which all function together.

And then the last point on constructive fraudulent transfer, this issue of securing antecedent debt, Your

Honor, clearly the notes exchange did not secure antecedent debt.  It's just a fact.  It secured new debt.  It was an exchange of two sets of market tradeable debt securities.  It did not secure the old unsecured notes, and here we see Mr. Silvers' testimony admitting this because it's just what happened.

This is the exchange agreement.  It says what the total consideration was in the notes exchange.  The holders transferred to the company the old notes, and the company issues to them the exchange consideration, which is defined as the "New Secured Notes."

So rather than securing existing notes -- or paying them down, which I'll come to -- the company transacted in the market to acquire the notes.  The effect of that exchange is not the extinguishment of the notes.  It's true that they don't owe the debt to a third party anymore, but the exchange itself doesn't extinguish the notes, and the fact that the company subsequently chose to cancel the notes is beside the point.  That was not the consideration of the exchange agreement.

In fact, the fact that the Debtors took the subsequent step of cancelling the notes after the exchange, after the consideration was exchanged, proves that the exchange of the notes itself didn't extinguish them.

Why does this matter?

Well, first, it matters because as a factual matter the exchange didn't actually secure or satisfied antecedent debt.  But the reason why they did this this way, is extremely important here.  They couldn't actually satisfy the notes because under the governing indenture, the means by which you satisfy the notes doesn't allow you to just pick a select group of noteholders who you want to pay down.

The way you satisfy notes before maturity is a redemption and the redemption provision recited here doesn't permit you to choose.  If you do a partial redemption, less than all of the notes, it has to be pro rata -- as it says here for certain kinds of notes, or for other types of notes under the requirements of the DTC, the Depository Trust Company.

And we cited to Your Honor at Footnote Number 44 of our reply brief, the DTC's requirements for partial redemptions, which says it has to be done either pro rata or by lottery, but you don't get to do what the Debtors wanted to do here, which is pick a subset of notes to pay down.

So to get around those requirements, the Debtors chose to structure the transaction by going outside the indenture and buying the notes, rather than paying them down.  That is, they chose to deal with the noteholders, not in their capacity as the Debtors' creditors, but as sellers of those debt securities in the market.

Having chosen that structure, the Debtors don't get to take advantage of the case law that says that securing or satisfying antecedent debt is reasonably equivalent value.

So they looked at the claim from the -- at the wrong way from the outset.  They don't make -- the Debtors don't make the backup argument, Your Honor, that you know, if you were to look at the actual fair market value of the property exchange, the two sets of notes in the market, the Debtors don't argue that if you look at it like that, that it would constitute reasonable equivalent value.

And Mr. Silvers' testimony was clear that he didn't look at it like that either.

They put all their eggs in the basket of this is securing or satisfying antecedent debt.

(Pause in the proceedings)

MR. WEST:  Turning now to actual fraudulent transfer.

First of all, Your Honor, we have not alleged actual fraudulent intent.  We have not.  The Debtors are either misunderstanding the standard again, mischaracterizing the claim, or both.

We've alleged the hindrance prong of Section 548(a)(1)(A) and the related State law, and contrary to the Debtors' position, hindrance does not need to be the

specific purpose of the transferring entity.

And I'll just quote from one of the cases we cited in our brief, which is *In re: Thornburg*, Paragraph 11 from our reply.  Section 548(a)(1)(A) intent is established if the actor believes, appreciates or knows with substantial certainty that creditors will be hindered, delayed or defrauded as a natural consequence of the transfer, even if the actor's motive is not to hinder, delay or defraud such creditors.

And that's directly contrary to what you -- what the Debtors' counsel told you was the standard.

And so again, we're concerned that the Debtors started from the wrong standard and worked from there.

I want to set the stage for the negotiations leading up to the uptier transaction under the proper standard.

First of all, you've heard the argument that somehow the alternative to this transaction was a freefall bankruptcy.  That is not the case.  There is extensive evidence that the decision at that point in time was between a funded bankruptcy with a DIP and this transaction, not only in this slide, which I'll come to, but also under, for example, JX-52.

Turning to this email, from one of the first lien lenders to the Debtors' advisors while the negotiations were

taking place, first of all, again it makes clear that the alternative is a DIP, but second, it tells you what the negotiation dynamic is.

The specific issue here, Your Honor, is about board composition that certainly sets its own, what we want or what we will sue Officers and Directors personally.

Now as I said, a decision was between a funded bankruptcy and the fifth amendment transactions.  But the fifth amendment allowed the Lenders to do that an immediate bankruptcy did not was to uptier their unsecured notes.  And you heard extensive testimony that the Lenders wouldn't put in new money under the fifth amendment without the uptier.

They can't uptier and then immediately file because even under their incorrect theory about securing or satisfying antecedent debt, the first lien lenders would have preference exposure.  They have to allow the preference period to pass and the notes exchange doesn't happen until March, so they have to wait at least three months after that to shed their preference exposure, even under their theory.

That's what the Lenders get out of this.  And with this being the negotiating dynamic, the Debtors allow it to happen.

But in allowing it to happen, they know exactly what it means for Unsecured Creditors.  At a time of insolvency, which we have clearly, Your Honor, adequately

pleaded, and the Debtors don't even argue to the contrary. At a time of insolvency, the Debtors are granting a property interest in their assets, a second lien that they know will diminish the property available to pay Unsecured Creditors.

Mr. Sampson understood that, the market understood it, Mr. Sampson understood that the market would understand that.  That's what he says in this email.

And again, we've cited extensive case law that the hindrance to the creditors doesn't have to be the specific purpose of the transaction.

It's enough that the transferor knows the consequences to a substantial certainty, or believes or appreciates that that will be the consequence.

Mr. Sampson knew it.

Debtors' advisors knew it.  They know Unsecured Creditors are being harmed by this transaction.  They say here we're already treating them harshly through the uptier. Please don't subordinate on top of that.

This is a request to the first lien lenders not to subordinate the non-participating Unsecured Creditors on top of the uptiering, but again we know they eventually allowed it to happen because the tone has been set.

The response to all of this, Your Honor, is the alternative was freefall and this bought us runway.  Well, as I said before, there's no actual evidence that freefall

was the alternative.

And as for runway, the evidence is that there was no realistic prospect of avoiding bankruptcy through the fifth amendment transaction.

There was no evidence that the board was presented with forecast that showed the company would have adequate liquidity beyond 13 weeks.

The nearest maturity is now moved up significantly to the beginning of 2026.  The cash collateral requirements that the company has told us were so harmful to the company in terms of liquidity and value in 2025, they were having those discussions at the end of 2024.

They didn't factor into the liquidity forecast that the Debtors were -- they didn't factor the cash collateral requirements into the liquidity forecast that the Debtors considered and analyzed at the time of the fifth amendment transaction.

The runway was supposed to give them time to sell one or both of PCS or RPM, but the evidence is that they didn't actually intend to sell PCS, and as to RPM, there was no actual analysis done at the time of the fifth amendment transactions that showed that it would be feasible to sell RPM in 2025 or what the value would be.  It was, at best, a hope.

And from the perspective of the first lien

lenders, it's not clear that it was even a hope.  There was at least one indication of interest that was not acted on, and then, once the 90-day preference period had passed after the March 2025 notes exchange, the 1Ls shut down the sale process.

And at least one Director was of the belief that all of this was exactly what was going on, that the entire process was a path to bankruptcy.

Now again, Your Honor, we don't know what analysis the Debtors or Quinn Emanuel did to evaluate the viability of the actual fraudulent transfer claims, because it was all withheld from us, but we have at a minimum colorably alleged that what happened here was that the first lien lenders entered into the uptier transaction to position themselves for an inevitable bankruptcy and the Debtors knew and understood this and knew that the estate would be harmed by the transaction, but allowed it to happen.

Under these circumstances, the claims should not be released.  They should be preserved for the State.  And the Liquidating Trustee should be given the opportunity to decide whether to assert them.

And that's all I have, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

MR. KLIDONAS:  Your Honor, we on our side are done.  We just need for the exit financing to talk about

that for a second.

THE COURT:  Yes, let's do that quickly.

MR. KLIDONAS:  Mr. Weichselbaum will come up and present it real quick.

(Pause in the proceedings)

(Laughter)

MR. WEICHSELBAUM:  Good evening now, Your Honor.

THE COURT:  Good evening.

MR. WEICHSELBAUM:  So we filed --

(Laughter)

MR. WEICHSELBAUM:  We filed last night an emergency motion for authority to enter into a term sheet Docket 10 - 1017.

Your Honor, we're seeking authority to enter into the term sheet and pay the expense reimbursement thereunder in order for us to get the exit financing contemplated under our Plan.

If you'll recall, we filed the prior motion for entry into expense and reimbursement letters.  This is part of the same marketing process.  We're hoping to go forward with this financing providers, as long we're able to get this Order entered and make the advance expense reimbursement payment.

The Debtors submit that in order for us to get the financing in place by emergence, we're required to move

quickly and to provide the financing. And the exit facility provider will not be able to do the work it needed to do unless Your Honor grants the authority under the motion.

We did preview it with the Committee, but obviously with everything going on, it's understandable that we weren't able to get agreement.

With that, unless Your Honor has any questions?

THE COURT: No, I don't have any questions.

MR. ZATZ: Your Honor, Andrew Zatz from White & Case for the Unsecured Creditors Committee.

Obviously one way or another, the company is going to need exit financing. We've evaluated the work fee with Alix, its market, so you know, if they feel it's appropriate to pay, we don't object at this time.

THE COURT: All right. All right. I will -- I'll go ahead and approve it.

So the -- I only have the motion under seal, so what I'm going to do is I am going to enter the Order, but just delete the term sheet.

MR. ZATZ: Okay. That's great.

(Pause in the proceedings)

MALE SPEAKER: Thank you for the Order, the name is Paragraph 2, there's three letters before the word, "fees."

MR. ZATZ: Why don't we just submit a new Order?

THE COURT:  I tell you, why don't you submit an Order that cleans --

MR. ZATZ:  Why don't we submit a new Order?

(Laughter)

MALE SPEAKER:  I'm not sure what that was.

(Laughter)

THE COURT:  I only had about 500 pages to read last night.  So I missed those three letters.

MR. ZATZ:  Yeah, and Your Honor, of course, just in conclusion we want to thank you and your chambers and everybody in your office.

THE COURT:  Okay.

MR. ZATZ:  And of course, the court reporter and the US Trustee and everybody for the last four hours and the last four days, so we genuinely appreciate it.

THE COURT:  All right.  So what I'm going to do is I need -- I really need a little bit of time to think about this.

So I know you-all are going to disperse, but tomorrow at 11:00 o'clock if you-all call in, I think I'll be able to have a ruling at that time.

MALE SPEAKER:  Okay.  Thank you, Your Honor.  Appreciate it.

THE COURT:  Okay.

MALE SPEAKER:  Thank you, Your Honor.

THE COURT:  All right.  All right.  We'll be in recess.

MALE SPEAKER:  Thank you.

(Proceedings concluded at 6:02 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70329A*

*DATE FILED:  DECEMBER 13, 2025*