IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                          §      CASE NO. 25-90309-11
                                §      HOUSTON, TEXAS
MODIVCARE, INC., ET AL,         §      FRIDAY,
                                §      DECEMBER 12, 2025
        DEBTORS.                §      11:00 A.M. TO 11:27 A.M.


**CONFIRMATION AND STANDING MOTION HEARING**
**DAY FIVE – COURT'S RULING**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE


   APPEARANCES:                     SEE NEXT PAGE

   COURTROOM DEPUTY/ERO:            YESENIA LILA


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**

FOR MODIVCARE, INC.:          LATHAM & WATKINS, LLP
                             Ray C. Schrock, Esq.
                             Jamie L. Wine, Esq.
                             Keith A. Simon, Esq.
                             George Klidonas, Esq.
                             Kamali Houston, Esq.
                             1271 Avenue of the Americas
                             New York, NY 10020
                             212-906-133

                             LATHAM & WATKINS, LLP
                             Elizabeth (Betsy) Marks, Esq.
                             200 Clarendon Street
                             Boston, MA 02116
                             617-880-4654

                             HUNTON ANDREWS KURTH, LLP
                             Timothy A. Davidson, II, Esq.
                             600 Travis, Ste. 4200
                             Houston, TX  77002
                             713-220-3810

FOR THE 1st LIEN AGENT        PAUL HASTINGS, LLP
AND CONSENTING CREDITORS:     Kris Hansen, Esq.
                             200 Park Avenue
                             New York, NY 10166
                             212-318-6400

                             PAUL HASTINGS, LLP
                             Matthew Warren, Esq.
                             Lindsey Henrikson, Esq.
                             71 S. Wacker Drive
                             45th Floor
                             Chicago, IL 60606
                             312-499-6045

                             PAUL HASTINGS, LLP
                             Craig Stanfield, Esq.
                             609 Main Street
                             Suite 2500
                             Houston, TX 77002
                             713-860-7300

**APPEARANCES  (VIA ZOOM - CONT'D):**

FOR THE OFFICIAL COMMITTEE        WHITE & CASE, LLP
OF UNSECURED CREDITORS:           Kristopher Shore, Esq.
                                  Ashley Chase, Esq.
                                  Colin T. West, Esq.
                                  Erin Smith, Esq.
                                  1221 Avenue of the Americas
                                  New York NY 10020
                                  212-819-8394

                                  WHITE & CASE, LLP
                                  Jason Zakia, Esq.
                                  111 S. Wacker Drive
                                  Suite 5100
                                  Chicago, IL 60606
                                  312-881-5400

                                  WHITE & CASE, LLP
                                  Charles R. Koster, Esq.
                                  609 Main Street
                                  Suite 2100
                                  Houston, TX 77002
                                  713-496-9700

FOR THE US TRUSTEE:               OFFICE OF THE US TRUSTEE
                                  Jana Whitworth, Esq.
                                  515 Rusk Street, Ste. 3516
                                  Houston, TX  77002
                                  713-718-4650


(Please also see Electronic Appearances)

4

**HOUSTON, TEXAS; FRIDAY, DECEMBER 12, 2025; 11:00 A.M.**

THE COURT:  All right.  Why don't we just get quick appearances of Counsel, and then I'll go into my ruling?

MR. KLIDONAS:  Good morning, Your Honor.  George Klidonas from Latham & Watkins on behalf of the company.

THE COURT:  All right.  Thank you.

MS. WINE:  Good morning, Your Honor.  Jamie Wine also on behalf of the Debtors.

MR. SCHROCK:  Good morning, Your Honor.  Ray Schrock on behalf of the Debtors.

MR. KOSTER:  Good morning, Your Honor.  Charles Koster of White & Case for the Committee, joined on the phone by several colleagues, including Kris Shore.

THE COURT:  Okay.  Thank you.

MR. HANSEN:  Good morning, Your Honor.  Kris Hansen of Paul Hastings on behalf of the Consenting Creditors.  I'm also joined by my colleagues, Craig Stanfield, Matt Warren and Lindsey Henrikson.

THE COURT:  All right.  All right.  So I'm going to -- this is the 11:00 o'clock Docket, Case Number 25-90309, ModivCare, Inc.  There were several matters pending.

First of all, I want to thank everyone for their presentations and their professionalism.  I think I was

very, very happy with the level of the quality of the briefs, the quality of the arguments, and I commend everybody for in a very, very short period of time being able to do that.

You gave me a lot to consider, a lot to read and to digest.  So -- and literally there are -- there could be thousands of issues here.  So in my ruling, I'm going to try to simplify matters to the extent that I can and only rule on those matters in which I believe that are outcome determinative.

You know, I find that I have jurisdiction over these matters.  The Confirmation Hearing, the Motions for Derivative Standing, they're core matters and I have constitutional authority.

Before me today is the Debtors' Plan of Reorganization.  There are many issues that are not disputed, and there are only a few issues which are heavily disputed and I'm going to focus on those issues.

And as several of you said during the hearing, I think the first issue that I have to determine is the reasonableness of the Debtors' projections because I think that that is, in my mind, the key to the rest of the -- of my rulings.

So with respect to the projections, let me just state that I don't view my role as substituting my business

judgment for that of the Debtors, but to defer to the Debtors' business judgment, so long as I don't find it unreasonable.

And this is particularly true in light of the nature of this company, having faced significant headwinds, being in a situation where it is subject to significant regulatory and contractual issues, a redetermination, legislative challenges, and just the history.  I'm not in a position to substitute my judgment.

Basically the Committee has presented three main objections as to the reasonableness of the Debtors' business projections.

First, they state that the Debtors should have additional revenue, particularly based on the stickiness of the United Health contract.

Nevertheless, all of the testimony that has been presented indicates otherwise.  There's simply no basis in the Record to show that it's reasonable to assume that in the face of all of the evidence to the contrary by the Debtors -- and by the witnesses who are on the ground dealing with this situation would indicate that there should be additional revenue.

Second, there's the notion that you need additional cuts to both SGNA and service costs.  Again, the Debtor has already had a $25 million cut in Project Forward.

The other cuts are relating to offshoring jobs, not giving current employees raises, not giving them 401K matching contributions, and doing those types of things.

Those are things that all businesses do.  And I think that I found management to be responsive, to be credible, and I believe that all managements are always doing that.

Mr. Shandler I think that the opportunities will be there, but I don't believe that I can, again, substitute my judgment for the judgment of the company with respect to which cuts are achievable.

Finally, the next aspect or criticism is that there was excess CapX involved in the projections.  I think everybody agrees that at least for the next couple of years, the $40-plus-million of CapX is necessary because the Debtors have underspent.

But again, the testimony of the people who have to manage the CapX indicate that not only do they have to have the CapX in order to meet their business needs, but also just to maintain the contracts because they have traditionally underspent.

And again, this is before we know the impact of the One Big Beautiful Bill, which may significantly affect Medicaid and which is a substantial part of the company.

And let me say that I don't -- I didn't find any

evidence that somehow the projections were results oriented. The fact that the Debtor had missed their projections and then tried to project in a way that allowed them to meet their projections, if that is conservatism.

Again, I'm not here to substitute my business judgment.  I don't find any indication, any evidence whatsoever that the Debtors did this, other than because this is the way that they want to manage their business.  It was not -- there's no evidence to indicate that somehow this was intended to manipulate the valuation or to do anything other than to run the business.

And furthermore, if that were the case, then you wouldn't have the remote monitoring business being at levels -- growth levels significantly above what they would have been projected otherwise.  They would have also been, you know, skewed down.

So again, I don't find any indication at all that these projections are anything other than reasonable based on the business and based on the inputs from the company that they're doing.

So the next question I have to determine what these projections lead you to believe in terms of valuation? So I listened to the testimony of both Mr. Jamal and Mr. Brown.  I found them both to be credible.  The testimony indicated that Mr. Jamal was acting on behalf of the Debtors

in their best interest.

I don't find any evidence -- credible evidence that Mr. Jamal acted in any other way than as a professional giving the Debtors his best advice.  Any hint that he was conflicted or results oriented is just simply not supported by any credible evidence.

So since I have found that the Debtors' projections are reasonable, I'm going to focus with respect to Mr. Brown only on his criticisms of Mr. Jamal's valuations.  They have both different approaches.  I believe the approaches are both valid.  One of them values the company as a whole.  One of them values the company in segments.

And as you would expect when you have two experts, the main point of difference in most of these cases are going to be the assumptions.  What comps can you use?  What discount rate do you use?  What terminable value do you use?

And then my question is to determine, was Mr. Jamal's assumptions, were they reasonable?

So outside of the $33 million error in the first year EBITDA, which Mr. Jamal admittedly -- he recognized.  I don't think that his approach was at all discredited.  If you add back some of the -- something for the $33 million error, I think the value still breaks in the first lien.

The Committee offers, you know, several criticisms

of Mr. Jamal applying Mr. Brown's assumptions, growth rate, terminable value and comps, but it's still uncontroverted that Mr. Brown took the assumptions based on Mr. Magrisi's view of the new ModivCare and applied them back to a fundamentally different company.

It was an apples to oranges comparison.

Recognizing that the Court could find Mr. Jamal's valuation persuasive, the Committee argues that the secured debt is only 399 million, instead of 881 million.  I'll address that later.

So once we determined that value breaks in the first lien, what does that do for the standing motions?

So again, having determined that value breaks in the first liens, I'm not sure that I need to address the standing motions because the fifth amendment treats and the Plan treats the second lienholders as unsecured debt.

Nevertheless, I'm going to address some of the issues.

With respect to the derivative standing motions under the Fifth Circuit standard, you have to have a colorable claim and there has to be unjustifiable refusal.

With respect to the colorability of the claims, I'm not going to address those in great deals, except to mention that as it relates to the intentional fraudulent conveyance claim, which I guess is limited to the hindrance

part -- at least that's what the argument was yesterday.

I find the credible evidence to simply not indicate that that would happen.  I think the testimony, especially the deposition testimony from Ms. Gutierrez, the other testimony indicated that they all thought that the fifth amendment would give them sufficient runway, so -- especially when they got the additional 30 million from Coliseum.

As it relates to the reasonably equivalent value, there are certainly many arguments that there was -- that there was an exchange.  There were additional considerations, but I'm not going to talk about that at length.

I am going to talk about the unjustifiable refusal and I find that there was no unjustifiable refusal.  The participants in the second liens are being treated as Unsecured Creditors.  The cost benefit analysis based on the evidence clearly indicates that the Debtors were incurring significant costs and may have to indemnify people that as a practical matter the net effect would be less than the treatment that they're getting under the Plan.

And if the Debtors did prosecute those claims, doing so would not be an economically efficient transaction because the Debtors have already in essence achieved that result.

And let me talk a little bit about the subordination agreement and the release of the guarantees. And I think it's telling that no one has challenged those transactions, that no participant has brought a claim, that there's been no allegation of fiduciary duty breaches.

And simply, I'm not sure that I would have the jurisdiction to rule as it relates to the subordination agreement because that's between parties that are not before me.

The notion that if granted standing and the Committee was able to bring the claims, that somehow the transaction would be unwound, I just don't find that any basis-in-fact or in law to do that.

As I said, you know, I really question whether I would have jurisdiction to address the subordination questions.

So then the -- let me go back to the issue that I raised before, which is whether 552 cuts off the company's revenue generated post-petition.

Again, I don't -- based on my review of the cases and my knowledge of the business and how this business works, based on the testimony, I don't believe that the receivable generated by the contracts that the first lien lenders have a lien on the most valuable asset of the estate are not subject to 552(b).

And let me just put that another way.  I find that the receivables generated by the contract are the proceeds of those contracts and that they are covered by 552(b) and that they form the collateral of the first lien lenders.  That's not even to say that, you know, you have the replacement liens under the Cash Collateral Order, you have the DIP liens, you have the potential diminution in value liens, obviously that's not before me.

The Final DIP Order waived the equities of the case exceptions.  Again, I'm very familiar with the *Cafeteria Operators* case, the hotel cases, and this is not that case.  These receivables were generated by contracts that were subject to a lien.

You know, much was made of the unencumbered assets in the case, you know, the $400,000 in a deposit account, the cars, the commercial torts, the retained causes of action.  There was really -- other than the deposit account and the cars, there was really no testimony as to the value of these amounts.  The Debtors listed on their Schedules 11 million for the commercial torts.

The retained causes of action, you know, when I looked at them closely, most of the claims were claims in which the Debtors were Defendants, not Plaintiffs.  So I don't -- there's no value that I can ascribe, actual value, any testimony as to actual value in front of me.

But what I do know is that based on the Plan, the Unsecured Creditors are receiving a significant recovery, not only in the 2 percent, the ability to get cash, as well as the resets of warrants with a five-year period.

So having said that, let me address the 1129 factors.  And again, most of these really were not disputed.  I find that the Debtors proposed the Plan in good faith.  The company intends to reorganize.  It's doing it for a proper purpose.  The classification was appropriate and does not unfairly discriminate.

And again, I don't think there's any question but that this Plan meets the best interest test.  I think a Chapter 7 liquidation would be disastrous for this company.  So I don't think anyone seriously disputes that.

As it relates to the Debtor releases, again, I think the Debtor exercised their business judgment.  Mr. Silvers conducted an investigation, found no viable causes of action, other than the Coliseum preference, which is dealt with by treating Coliseum as an Unsecured Creditor.

He had the assistance of Quinn and although much was made of Mr. Silvers' alleged impartiality, based on his testimony, I find him to be credible, not conflicted and independent.

Next, let me address the third party releases.

You know, I review them very carefully in every

case.  In fact, I have a case in which I suggested that the releases needed to be opt-in because it was a fraud case.  So in many cases I limit the releases to just post-petition actions.

In this case I think the third party releases are appropriate.  They were certainly given for value by the recipients.  There are over 300 opt-outs, so it worked.

And with respect to both the gatekeeping function and the injunction, again, unlike I think the Plan's gatekeeping function and injunction follow *Highland Capital*.  In *Highland Capital*, as I've said before, what the Court found that was not appropriate was a gatekeeper or a gatekeeping function or an injunction for non-consensual exculpations.

Here, we have consensual releases and so I find that to be appropriate.

And so I think, you know, especially the contribution made by the first lienholders in both with respect to the DIP and the potential exit financing or potential take back debt, which is going to finance this company.  I think -- and the fact that they're going to be the 98 percent owners makes these releases appropriate.

So that is my ruling.

I know there was a question about a proposed form of Order and so I guess -- I don't know, Mr. Schrock,

Mr. Simon, if you could get with Mr. Koster and figure out if we have an agreed form of Order reflecting -- as to form only -- reflecting my ruling or -- and if there's competing form of Order, just each one submit it and I'll review them simultaneously.

But thank you very much and that is my ruling.

MR. SCHROCK:  Thank you very much, Your Honor. This is Ray Schrock from Latham for the Debtors.

We'll take care of it and thanks again for your Court and your Chambers for everything.  We greatly appreciate it.

THE COURT:  All right.  We'll be in recess.

MR. KOSTER:  Your Honor, Charles Koster?

THE COURT:  Yes.

MR. KOSTER:  Very briefly.

I thank you to you and your staff for obviously very carefully reviewing the evidence and listening to the presentations this week.

A few questions that we may need your guidance on as we discuss the Order with the parties.

One, our objection, we included a request for a waiver.  The Debtors request a waiver of the 14-day stay, which we've objected to.  We, of course, are going --

THE COURT:  I forgot to mention that.

So as a practical matter, the current milestone is

12/24.  I don't want to second-guess the Debtors' business judgment with respect to that.  I don't mind granting a stay till like maybe Tuesday of next week.  I don't think anything is going to happen by Tuesday of next week.

But I'm not going to -- I am going to waive it so that they can close before the 24th -- based on the evidence.

MR. KOSTER:  Thank you.

MALE SPEAKER:  Thank you, Your Honor.

MALE SPEAKER:  Thank you, Your Honor.

THE COURT:  As a practical matter, I don't think -- I mean, you'd still have to do the DIP financing, you still have to, you know, corral people, you know, the week before Christmas -- the two weeks before Christmas.

All right.  Anything else?

MR. SCHROCK:  Nothing further, Your Honor, from the Debtors.

THE COURT:  All right.  All right.  We'll be in recess.

(The parties thank the Court)

(Proceedings concluded at 11:27 a.m.)

*  *  *  *  *

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70370*

*DATE FILED:  DECEMBER 31, 2025*