**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MODIVCARE, INC., *et al.*[1] | ) |
| | ) Case No. 25-90309 (ARP) |
| Reorganized Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**WHITE & CASE LLP'S REPLY IN SUPPORT OF ITS FINAL APPLICATION FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM SEPTEMBER 9, 2025 THROUGH DECEMBER 29, 2025**

White & Case LLP ("White & Case"), counsel for the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned chapter 11 cases of the debtors and debtors in possession (the "Debtors" and after the Effective Date, collectively, the "Reorganized Debtors"), respectfully submits this reply ("Reply") in further support of *White & Case LLP's Final Application for Allowance of Compensation and Reimbursement of Expenses for the Period From September 9, 2025 Through December 29, 2025* [Docket No. 1290] (the "W&C Fee Application") and in response to the Reorganized Debtors' *Objection to Final Fee Application Filed by White & Case, LLP* [Docket No. 1354] (the "Objection").[2]

**PRELIMINARY STATEMENT**

1.     As this Court has already seen, these chapter 11 cases were the result of a failed liability management transaction completed just six months before the filing, through which the

---

[1]     A complete list of each of the Reorganized Debtors in these chapter 11 cases and the last four digits of each Reorganized Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Reorganized Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/ModivCare. Reorganized Debtor ModivCare Inc.'s principal place of business and the Reorganized Debtors' service address in these chapter 11 cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the W&C Fee Application.

Debtors' secured creditors, led by the Consenting Creditors,[3] obtained security over substantially all of the Debtors' assets.  Whether or not this uptier transaction had any realistic hope of avoiding chapter 11, once it failed, the unmistakable and oft-stated goal of the newly secured lender group was to take the keys to the company as quickly and inexpensively as possible.  Their challenge was that the Bankruptcy Code creates procedural safeguards that must be respected in a chapter 11 case, even if a secured creditor group finds those requirements inconvenient, inefficient, or expensive.

2.      The existence of an official committee to represent the interests of all unsecured creditors, especially in a case like this with millions in funded unsecured debt and thousands of trade vendors, is one such fundamental safeguard.  And, once the Committee was appointed and represented, the process run in these chapter 11 cases worked exactly as the Bankruptcy Code envisions (and Congress intended).  The Consenting Creditors and the Debtors had one view of where enterprise value broke.  Under their view, unsecured creditors were out of the money and were legally entitled to nothing.  Not surprisingly, the Committee, as an estate fiduciary specifically charged with advocating for the interests of unsecured creditors, developed a different view.  And because the Debtors' Plan did not include any market test to set an objective view of value—a direct result of the strategy chosen by the Plan supporters—the question of where enterprise value broke had to be presented to this Court through a classic battle of the experts.  This

---

[3]     "Consenting Creditors" refers to Q Global Advisors, LLC, HG Vora Capital Management, LLC, Redwood Capital Management, LLC, TCW Investment Management Company LLC, Metropolitan West Asset Management, LLC and TCW Asset Management Company LLC.  The Consenting Creditors were represented by Paul Hastings LLP ("Paul Hastings") and included all entities listed in Exhibit A to the *Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 791].   The Consenting Creditors became the largest shareholders of the Reorganized Debtors as they had the right to appoint the Reorganized Debtors' board of directors. *See Notice of Filing of Plan Supplement for the First Amended Joint Chapter 11 Plan of Reorganization of ModivCare Inc. and Its Debtor Affiliates* [Docket No. 725], Ex. C-1.

is standard practice in complex chapter 11 cases, and one that all parties understood would be expensive.

3.      At the Debtors' request, this Court approved a fast but fair process in which both sides had the opportunity to take discovery and make their case at a five-day confirmation hearing. At the conclusion of the confirmation hearing, the Court found that the Committee's valuation expert was "credible" and that his approach was "valid."  The Court also stated that it was "very happy with the level of the quality of the briefs [and] the quality of the arguments."  But, this Court ultimately ruled for the Debtors and Consenting Creditors and confirmed the Plan.

4.      None of this is remarkable.  What is remarkable and, as far as we can tell, unprecedented, is that post-emergence, the Reorganized Debtors (now controlled by the Consenting Creditors) have taken the position that the Committee's professionals, whose retentions were approved by this Court without objection, should be paid ***nothing*** for their work.[4] The Objection, together with the overbroad discovery served on White & Case,[5] is a transparent and vindictive attempt to force the Committee professionals to incur economic pain in order to be paid for their service to the estates.

5.      This Court should reject this effort.  But before we delve into the many particularized reasons as to why the Objection fails, it bears noting who filed the pleading—the Reorganized Debtors, ***not*** the Consenting Creditors.  The Consenting Creditors' decision as controlling shareholder to cause the Reorganized Debtors to hire their former counsel and to object was presumably done to fund this fee fight out of their new portfolio company.[6]  That strategic

---

[4]    The Reorganized Debtors have also objected to the fees and expenses incurred by the Committee's financial advisor, AlixPartners, LLP ("AlixPartners"), further evidencing the retaliatory nature of their fee objections. *See Objection to Final Fee Application Filed by AlixPartners, LLP* [Docket No. 1351].

[5]    The Reorganized Debtors' document requests are attached as **Exhibit A**.

[6]    *See infra* n.8.

decision has one key practical consequence here: everything the Debtors did (or did not do) in *these cases* is, one way or another, binding on the only objecting party before this Court.[7]  In that regard, the sole objector—the Reorganized Debtors—dictated the scope and extent of the fight and never once protested the Committee's staffing or spend for that fight as laid out in weekly budgets provided to them by the Committee.  Nor could the Debtors protest because, as explained below, the Debtors were voluntarily paying significantly more to their own professionals to support their efforts to secure confirmation, all without comment, much less objection.

6.      Turning back to the substantive objections framed in the pending matter, White & Case respectfully requests that this Court bifurcate its consideration of the Objection and first consider the Reorganized Debtors' arguments on the law and the already extensive evidentiary record developed in *these cases*, without any additional discovery (which the Objection explicitly points out will be uncompensable under the Bankruptcy Code).[8]  The core of the Reorganized Debtors' argument is that the Committee's counsel should be paid nothing because they advanced a frivolous litigation position as part of some alleged extortion threat to force the estates to pay unnecessary professional fees.  This Court can and should dispose of this without any additional factual record.  ***First***, the Objection's reliance on the so-called "extortionist threat" represents a clear violation of Federal Rule of Evidence 408 that this Court should not permit.  Putting aside the fact that the cost of defense is a legitimate consideration that is (and should be) discussed in

---

[7]     Pursuant to the Plan, the "rights, benefits, and obligations" from the Plan are binding on any successor of the Debtors.  *See* Plan, Art. XII, 10.1, 12.15.

[8]     Given the Court's prior rulings, the absence of any support for the proposition that the entirety of the Committee's advisor fees should be disallowed or subordinated, the inflammatory and deliberate mischaracterization and disclosure of statements made during privileged settlement discussions, and the fuzzy and misleading math contained therein raise the issue of potential sanctions on account of the Objection.  *See Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d 944, 950 (E.D. Cal. 2005) (imposing sanctions on attorneys for submitting pleadings and objections for improper purposes).  Moreover, it is unclear whether the fact that the Reorganized Debtors filed the Objection would in this situation insulate the Consenting Creditors from sanctions, especially considering that counsel for the Reorganized Debtors appeared earlier in these cases on behalf of the Consenting Creditors.  *See* [Docket No. 753].  If the matter proceeds to discovery, this will all have to be fully explored.

every settlement negotiation, this is exactly why the law does not allow the admission of settlement discussions as evidence. If discovery is allowed, it would need to include all parties and include the full context of these negotiations, including:

 a) the unreasonable "settlement offers" the Committee was responding to;

 b) the written and oral statements made by Latham (Debtors' counsel) and Paul Hastings (Consenting Creditors' counsel) concerning the Consenting Creditors' settlement proposals, their approach to *these cases* and their treatment of professionals;

 c) the written and oral statements of the Consenting Creditors made directly to members of the Committee; and

 d) the Debtors' own attempts to broker a deal.

7. While this expensive and expansive exercise would debunk the absurd allegations of wrongdoing in the Objection, it is unnecessary because none of that back-and-forth should be considered. Rule 408 shields such discussions, and that rule should be respected for all parties.

8. *Second*, the unstated premise of the Objection's extraordinary position—that White & Case should be paid nothing—seems to be that White & Case incurred these fees in support of purportedly frivolous positions taken before the Court. This contention can likewise be disposed of based on the existing record of those contested matters. The Court already presided over all of the disputes in *these cases*. There is no need for an additional trial to reopen contested matters, in effect, to award sanctions not sought on the first instances. In particular, because the entire confirmation fight turned on value, the fact that the Committee put forth credible opinions showing unsecured creditors to be in the money precludes any argument that White & Case's efforts to

5

contest the Plan were frivolous.  If the Reorganized Debtors  want to explain why that is not true, they do not need discovery to do so.

9.     ***Finally***, the Objection's criticisms of White & Case's invoices can also be disposed of on the existing record without any discovery, as is the case with any final fee application. Among other things, this Court has already adjudicated the reasonableness of the Reorganized Debtors' counsel's own fees and expenses in this case, and Latham was litigating the same exact issues as White & Case on the same schedule.  Latham's pre-confirmation fees were approved by this Court without objection from any party and, importantly, without a peep from the party paying them.  A comparison of Latham's fees and expenses, which have already been approved as reasonable, to White & Case's fees and expenses, establishes that White & Case's fees and expenses are even more reasonable.  In every area where the Reorganized Debtors now criticize, White & Case spent far less than the Reorganized Debtors' own counsel for the same task.  To be clear, this is not a criticism of Latham or any of the other Debtor professionals.  It is simply proof of the amount of work required in these cases.  Like the Reorganized Debtors' own advisors, White & Case deserves to be paid for its work.

10.     For all of these reasons, the Objection should be overruled.

## **ARGUMENT**

### I.     **This Court Should Bifurcate Consideration of the Objection**

11.     Courts have the sole discretion to bifurcate consideration of any claims or issues "[f]or convenience, to avoid prejudice, or to expedite and economize."  *See* Fed. R. Civ. P. 42(b); *Conkling v. Turner*, 18 F.3d 1285, 1293 (5th Cir. 1994) ("[T]he decision to bifurcate is a matter within the sole discretion of the trial court."); *see also EEOC v. Lawler Foods, Inc.*, 128 F. Supp. 3d 972, 974 (S.D. Tex. 2015) (holding that bifurcating discovery was appropriate because it is "the best means to secure the just, speedy, and efficient resolution of this action").  This Court should

exercise its discretion and first consider the Reorganized Debtors' arguments on the law and the already extensive evidentiary record without any additional discovery. Aside from the alleged statements made during settlement negotiations—which are inadmissible and represent a clear violation of Rule 408 (as discussed below)—the Objection does not present any factual issues that warrant discovery.[9] *See In re Assadi*, 2025 WL 1576801, at *2 (5th Cir. June 4, 2025), *cert. denied sub nom. Assadi v. Osherow*, 2026 WL 79771 (U.S. Jan. 12, 2026) (noting that the fee objections "concern the legal conclusions the court should draw from the record" and holding that the objectors "fail[ed] to assert disputed factual issues that would benefit from 'testimony of witnesses' . . . ."). Courts in this District routinely find that time entries and fee applications are sufficient evidence to determine the reasonableness of attorney fees. *See In re Lawler*, 807 F.2d 1207, 1211-12 (5th Cir. 1987) (upholding the bankruptcy courts finding that "the time logs presented by the applicants with their application describe the services rendered by the applicants in sufficient detail and, together with the record of this case, adequately inform the Court as to the extent and quality of the applicants' services"); *Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577, 591 (E.D. La. 2008) ("[T]he Fifth Circuit has ruled that the submission of legal invoices is sufficient evidence to affirm a district court's fee award . . . . [T]he Court finds sufficient evidence

---

9   Despite this, a week after filing the Objection, the Reorganized Debtors served White & Case with a set of sixteen formal document requests. *See* Ex. A. These requests seek extensive discovery, including "[a]ll deposition outlines" White & Case prepared in these chapter 11 cases, and "[a]ll Communications among White & Case Personnel concerning the preparation, drafting, or review of the Final Fee Application." *See* Ex. A at 4-7. White & Case served its responses and objections on April 2, 2026, attached as **Exhibit B**, which declined to produce documents "subject to a meet and confer between the parties and absent an order from the Court regarding the need for, or appropriate scope of, discovery in this contested matter." During a meet and confer on April 2, 2026, White & Case requested the Reorganized Debtors consent to bifurcating discovery such that the parties only pursue discovery if the Court deems it necessary to resolve the W&C Fee Application. The Reorganized Debtors rejected that proposal, confirmed their view that all 54 timekeepers should be document custodians, and noted their intent to file a motion to compel. Just prior to the filing of this Reply, the Reorganized Debtors filed *ModivCare Topco, LLC's Motion to Compel White & Case, LLP to Respond to Discovery Requests* [Docket No. 1409] (the "Motion to Compel"). White & Case will respond to the Motion to Compel separately.

of legal invoices, billing, and record keeping to uphold the Bankruptcy Court's award.") (citing *K3C Inc. v. Bank of Am., N.A.*, 204 F. App'x 455, 466-67 (5th Cir. 2006)); *see also Montalvo v. Tower Life Bldg.*, 426 F.2d 1135, 1150 (5th Cir. 1970) ("The rule that a trial court may award attorneys' fees without receiving evidence concerning the proper amount is not grounded in judicial arrogance.  There is simply no good reason why a court should be required to subordinate its own expertise in the matter to that of others.  A trial court has firsthand knowledge of the proceedings before it and is thus clearly qualified to place a value on (the attorney's) services without opinion evidence of an expert witness on the subject.") (internal quotations omitted).  This Court can adjudicate White & Case's fees based on the record in these chapter 11 cases, including the W&C Fee Application, the Monthly Fee Statements, and the attached time entries.

12.    Avoiding discovery into the parties' settlement discussions respects Rule 408 and will avoid an extensive, painful, and ultimately irrelevant discovery.  If the Court were to consider the alleged "threats" made in the course of settlement discussions, it would need to consider the full scope of the entire settlement negotiation to put those statements into context.  But every effort should be made to clear the underbrush first, particularly where fees spent in discovery may not be compensated.  The only reason that the Reorganized Debtors would fight bifurcation here would be to ensure that the Committee's professionals had to spend time and resources that the Bankruptcy Code will not cover.  And it is not just the Committee professionals' fees at issue—developing a full record would entail discovery of numerous other parties, including the Debtors, Latham, Paul Hastings, and the Consenting Creditors.  This is not necessary to adjudicate the Objection.  *See Associated Builders & Contractors of La., Inc. v. Orleans Par. Sch. Bd.*, 919 F.2d 374, 379 (5th Cir. 1990) ("A request for attorney's fees should not result in a second major litigation.").

II.     **The Reorganized Debtors' Accusations Regarding Settlement Negotiations Violate Federal Rule of Evidence 408 and Are Meritless**

13.     The centerpiece of the Reorganized Debtors' Objection is their mischaracterization of statements made by White & Case in a settlement meeting as amounting to a coercive "threat." Obj. ¶¶ 15-22.  The Reorganized Debtors allege that White & Case demanded that the Consenting Creditors "pay $30 million to the unsecured class, or the estate professionals would generate $30 million in fees through litigation" and threatened to "bury the estate in professional fees" if the parties did not reach a settlement.  *Id.* ¶¶ 9, 15-21.  The Court should not permit the Reorganized Debtors to weaponize settlement discussions.

14.     ***First***, Federal Rule of Evidence 408 prohibits the use of offers or statements made during compromise negotiations to prove or disprove the validity or amount of a disputed claim, or to impeach a party through a prior inconsistent statement or contradiction.  *See* Fed. R. Evid. 408; *see also Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 299 (5th Cir. 2010) ("Effective dispute resolution requires frank and full discussion of relevant evidence.  Making the content of such a discussion available for use in related litigation would invite the very situation that Rule 408 is designed to avoid.").  Rule 408 cannot be evaded simply by relabeling a settlement communication as "coercive," "extortionate," made in "bad faith," or as evidence of fiduciary misconduct.  *See Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106-07 (5th Cir. 1981) (affirming the trial court's refusal to permit the introduction of evidence prepared to facilitate settlement negotiations under Rule 408); *Blu-J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637, 642 (11th Cir. 1990) (rejecting use of settlement-related evidence because the evidence in question "was intended to be part of negotiations toward compromise").[10]

---

[10]    The limited exceptions found in Rule 408(b) do not apply as the statements are not being used to prove a witness's bias or prejudice, negate a contention of undue delay, or prove an effort to obstruct a criminal investigation or prosecution.  *See* Fed. R. Evid. 408.

15. The meeting referenced in the Objection was a settlement meeting conducted in the context of negotiating creditor recoveries under the Debtors' Plan. *See* Obj. ¶ 19 (confirming that the challenged communications occurred in the context of settlement demands over value distribution to unsecured creditors). The Reorganized Debtors violate Rule 408 by attempting to use a statement made during those negotiations as evidence of the invalidity of the positions taken by the Committee in the chapter 11 proceedings. *See Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 444 (6th Cir. 2010) ("[admitting settlement discussions] would also run contrary to the purposes of Rule 408, as it would invite undue caution in settlement negotiations, and would facilitate the admission of communications that contain puffing, posturing, and various irrelevancies.").

16. ***Second***, separate from the inadmissibility of settlement communications, the Reorganized Debtors' characterization of the statements in question is misleading. What the Reorganized Debtors now describe as an "ultimatum" was nothing more than a recognition of litigation reality: if the parties could not resolve the Committee's concerns consensually, the Committee would continue investigating, litigating, and incurring professional fees in fulfilling its duties to its creditor constituents until it was able to put its best foot forward. Far from being "extortionate," such a statement reflects the simple reality that a contested chapter 11 case will result in significantly higher professionals' fees than a non-contested case.

17. ***Third***, the circumstances further confirm that the Reorganized Debtors' decision to label ordinary settlement discussions as "extortion" is nothing more than a weak justification for their retaliatory Objection. The Reorganized Debtors claim that, as early as October 28, 2025, they knew that the Committee's "real strategy" was to "bury the estate in exponentially expanding professional fees." *See* Obj. ¶ 2. Yet, despite purportedly possessing this knowledge for months,

the Debtors never moved to curtail White & Case's engagement, sought to impose sanctions, or filed a motion, letter, or even a reservation of rights challenging the Committee's litigation positions as frivolous or sanctionable. On the contrary, the Debtors responded to White & Case's weekly DIP budget submissions with "thanks" and without objection. *See, e.g.*, Email Chain from White & Case to Debtors' Professionals, dated Oct. 8, 2025 (the "Budget Emails"), attached as **Exhibit C**. Moreover, as discussed further below, the Debtors never objected to any of White & Case's monthly fee statements or its interim fee applications. The Objection is the first time the Debtors or their successors have characterized the Committee's litigation strategy as "extortionate" or anything similar. Obj. ¶ 16.

18. **Fourth**, the Reorganized Debtors unsurprisingly cite no authority for the proposition that referencing the reality of professional fee exposure is improper in the context of settlement negotiations. *See* Obj. *passim*. Settlements are favored in bankruptcy precisely because they avoid the cost and burden of continued litigation. *See In re Johns*, 667 B.R. 322, 324 (Bankr. N.D. Tex. 2025) ("Compromises are favored in bankruptcy as they minimize litigation costs and promote an efficient administration of the debtor's estate.") (internal quotations and citations omitted); *In re Hudson's Coffee, Inc.*, 2008 WL 4837285, at *2 (Bankr. D.N.J. Oct. 31, 2008) ("Settlements are favored in bankruptcy in order to minimize litigation costs and to expedite administration of the estate.") (internal citations omitted); *In re Mallows*, 344 B.R. 207, 216 (Bankr. D. Mass. 2006) ("Settlement agreements are especially desirable in bankruptcy cases as a means to avoid the litigation of claims which would otherwise be unduly costly and therefore detrimental to the bankruptcy estate."). The Reorganized Debtors cannot complain about the fact that litigation materially increased costs to the estate and at the same time argue that it was somehow improper for the Committee's counsel to raise this obvious reality as a factor to consider

11

in setting any baseline recovery for unsecured creditors during settlement discussions.  Obj. ¶¶ 9-10, 18, 21.

19.     ***Finally,*** underlying the Reorganized Debtors' entire argument is the false premise that the Committee's litigation position was frivolous.  *See* Obj. ¶¶ 15-22.  The Court already has more than sufficient evidence to dispose of this baseless allegation.  The Court presided over this entire case, culminating with a five-day valuation trial.  The Court heard and considered the evidence on which the Committee's valuation position was based, primarily the expert opinion work of two highly qualified experts from AlixPartners*.  See* Hr'g Tr. (Dec. 10, 2025), *passim*.  There is no dispute that if these experts were correct, the Plan could not have been confirmed and unsecured creditors' recoveries would have to have been materially greater.  *See Objection of the Official Committee of Unsecured Creditors to Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of ModivCare Inc. and its Debtor Affiliates* [Docket No. 851].  While this Court ultimately did not accept the Committee's valuation position and confirmed the Plan, it did not find that the Committee's position was frivolous.  Instead, it found that the Committee's valuation expert was "credible" and that his approach was "valid."  *See* Hr'g Tr. (Dec. 12, 2025), at 8:21-24, 9:7-11.  The Debtors' own expert witness agreed.  *See*  Zul Jamal Dep. Tr. (Nov. 20, 2025), at 28:9-13, relevant excerpts attached as **Exhibit D** ("Q: I'll get to this later, but in your view, do you view either report as having been prepared in bad faith? . . . A. Bad faith? I don't think so.").  This Court also recognized everyone's "professionalism" and stated that he was "very, very happy with the level of the quality of the briefs, the quality of the arguments, and [ ] commend[ed] everybody for in a very, very short period of time being able to do that."  Hr'g Tr.

(Dec. 12, 2025), at 4:24-5:4.  In the face of this record and this Court's prior findings, there is no basis to contend that the Committee's litigation position was frivolous.[11]  *See* Obj. ¶¶ 62-76.

## III.   White & Case's Fees and Expenses Are Reasonable Under Section 330 of the Bankruptcy Code

20.   The Objection also argues that White & Case's rates and practices were excessive and divorced from what the market demands for complex chapter 11 representation.  *See* Obj. *passim*.  They were not.  The W&C Fee Application, detailing White & Case's fees and expenses, readily meets the standards of section 330 and applicable Fifth Circuit case law for compensation for services rendered on behalf of the Committee.  *See* 11 U.S.C. § 330(a)(1)(A)-(a)(1)(B) (stating that a court may award a professional employed under section 1103 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered . . . [and] reimbursement for actual, necessary expenses").  As the Reorganized Debtors concede, under the Fifth Circuit's prospective "good gamble" standard articulated in *In re Woerner*, professional services are compensable if, at the time rendered, they were either necessary to the administration of the case or reasonably likely to benefit the estate "even when those gambles do not produce an identifiable, tangible, and material benefit."  *See* 783 F.3d 266, 273-74, 276 (5th Cir. 2015) (internal citations and quotations omitted); *In re Cmty. Home Fin. Servs., Inc.*, 990 F.3d 422, 427 (5th Cir. 2021) ("In awarding fees, hindsight is irrelevant; retrospect is irrelevant; 'material benefit to the bankruptcy estate' is irrelevant.  What matters is that, prospectively, the choice to pursue a course

---

[11]   As the Reorganized Debtors recognize, their newly-concocted equitable subordination theory, premised on section 510(c) and the *Mobile Steel* framework, requires a showing of inequitable conduct, resulting in injury to creditors, and consistency with the provisions of the Bankruptcy Code.  *In re Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir. 1977) (reversing the lower Court and holding that there was not sufficient evidence support finding that the officers and directors had engaged in inequitable conduct to warrant subordination of their claims).  As discussed herein, the only conduct alleged—a lawyers's statement during settlement negotiations that professional fees would be substantial if no deal was reached—does not constitute inequitable conduct within the meaning of *Mobile Steel*.  The Reorganized Debtors do not cite to any case where a court equitably subordinated a committee professional's fees for any reason, and this Court should decline the Reorganized Debtors' invitation to do so here, particularly in the absence of a required adversary proceeding.  *See* Obj. ¶¶ 121-133.

of action was reasonable. . . . The district court was wrong to vacate the bankruptcy court award based on its own retrospective assessment of the propriety of the adversary proceedings.") (internal citations and quotations omitted).  Courts in this District have noted that "once the applicant establishes the reasonableness of the fees, the objecting party has the burden of demonstrating what part of the application is unreasonable." *In re MLCJR, LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex.), Hr'g Tr. (Sept. 25, 2024), [Docket No. 2259], at 7:22-24.

21.     White & Case's rates, fees, and expenses are all consistent with the standards that govern fee allowance under section 330 of the Bankruptcy Code.  When measured against those of the Debtors' own counsel and against the prevailing national market for large-case restructuring counsel, White & Case's compensation is reasonable for a case of this size and complexity.  White & Case's rates, which were already approved by the Court when White & Case was retained, reflect the reality that chapter 11 cases like these involve great complexity, high stakes, and severe time pressures—all of which were manifestly present here.  *See* Retention Order.  The Reorganized Debtors have failed to satisfy their burden to show that White & Case's fees and expenses are unreasonable.

A.     **A Comparison to the Debtors' Counsels' Fee Applications Demonstrates the Reasonableness of White & Case's Fees**

22.     Without protest, the Reorganized Debtors paid equivalent (and sometimes higher) going-rate fees and expenses of their own attorneys—including for large teams sent to the confirmation hearing, case monitoring, fee application work, and travel and lodging expenses.  *See* Latham Fee Application *passim*.[12]  Having allowed the Court to approve those practices from their own counsel without objection and having used estate assets to pay those fees in full, the

---

[12]   "Latham Fee Application" references the *First and Final Application of Latham & Watkins LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Bankruptcy Co-Counsel to the Debtors for the Period of August 20, 2025 Through December 29, 2025* [Docket No. 1268].

14

Reorganized Debtors cannot credibly challenge identical, standard practices by the Committee's counsel as "unreasonable." *See* Obj. *passim*. Reasonableness under section 330 does not vary based on which side of the table the professional sits on.

### i. White & Case's Fees are Comparable to the Debtors' Counsels' Fees

23. What the Reorganized Debtors paid their own counsel for the same or similar workstreams in this case proves the reasonableness of the Committee's counsel's fees.[13] The aggregate fees and expenses paid by the Reorganized Debtors to their counsel far exceeds that requested by White & Case. *Compare* W&C Fee Application at 2 (showing total fees and expenses of $14,193,990) *with* Latham Fee Application at 2 (showing total fees and expenses of $23,134,030); Quinn Fee Application at 2 (showing total amount of fees and expenses of $2,073,759); Hunton Fee Application at 2 (showing total fees and expenses of $1,510,952).[14] The table below compares (1) White & Case's fees in certain of the billing categories that the Reorganized Debtors have now contested are "unreasonable" with (2) Latham's fees for those same categories.

| Workstream | W&C | Latham |
|---|---|---|
| DIP Financing | $917,755[15] | $1,559,541[16] |

---

[13] White & Case was the Committee's sole counsel in the case. On the other hand, the Debtors retained Latham as principal bankruptcy co-counsel, Hunton Andrews Kurth LLP ("Hunton") as bankruptcy co-counsel, and Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn") as counsel to the Debtors' special committee. *See generally* Latham Fee Application; *Quinn Emanuel Urquhart & Sullivan, LLP's First and Final Application for the Payment of Compensation and the Reimbursement of Expenses for the Period September 1, 2025, Through December 29, 2025* [Docket No. 1273] (the "Quinn Fee Application"); *First and Final Application of Hunton Andrews Kurth LLP as Bankruptcy Co-Counsel for the Debtors for Allowance and Payment of Fees and Expenses Incurred for the Period of August 20, 2025 Through December 29, 2025* [Docket No. 1269] (the "Hunton Fee Application").

[14] All specific dollar amounts discussed in this Reply are rounded down to the nearest whole dollar.

[15] The total amount is derived from billing category B11 (DIP Financing & Cash Collateral) plus certain of the related tasks in billing category B15 (Hearings & Court Matters). *See* W&C Fee Application, Ex. B; First Monthly Fee Statement, Ex. C; Second Monthly Fee Statement, Ex. C.

[16] The total amount is derived from the billing category "Financing and Cash Collateral" and certain of the related tasks in "Hearings." *See* Latham Fee Application, Ex. B, E. This amount does not take into account Latham's fees incurred prior to the Petition Date, which are most likely substantial.

| Workstream | W&C | Latham |
|---|---|---|
| **Firm's Retention Applications and Fee Statements** | $184,752[17] | $252,046[18] |
| **Meetings & Communications with Clients** | $364,318[19] | $414,595[20] |
| **Plan Confirmation** | $3,227,845[21] | $3,737,509[22] |

24.     The Objection includes various charts with an alleged total amount of fees for various workstreams. *See, e.g.*, Obj. ¶ 72. White & Case has significant concerns that those amounts are not accurate as they do not fully align with the amounts in W&C Fee Application's respective billing categories. White & Case, therefore, is unable to meaningfully comment as to nearly any of the Objection's numerical characterizations. The Reorganized Debtors' failure to include any specific time entries or methodology on how the Reorganized Debtors reached such amounts is fatal. *See Castorena v. Mendoza*, 2011 WL 13315708, at *5 (S.D. Tex. Mar. 14, 2011) ("Generalized statements that time spent was unreasonable or unnecessary are not particularly helpful and not entitled to much weight.").

---

[17]   The total amount is derived from billing category B20 (Professional Retention & Fees – W&C). *See* W&C Fee Application, Ex. B.

[18]   The total amount is derived from the billing category "Fee and Retention Applications (LW)." *See* Latham Fee Application, Ex. B.

[19]   The total amount is derived from billing category B08 (Committee Meetings & Communications). *See* W&C Fee Application, Ex. B.

[20]   The total amount is derived from specific time entries from the following billing categories: "Assumption and Rejection of Leases and Contracts," "Business Operations/Strategic Planning," "Communications with Creditors Committee," "Compliance & Investigations," "Corporate Governance, Board, and Regulatory Matters," "Employee Benefits and Pensions," "Financing and Cash Collateral," "General Case Strategy," "Hearings," "Insurance," "Litigation," "Plan and Disclosure Statement/Confirmation/Implementation/Plan Supplement," "Securities Matters," and "Vendor and Customer Matters." *See* Latham Fee Application, Exs. B, E.

[21]   The total amount is derived from billing category B13 (Exclusivity, Plan & Disclosure Statement) plus certain of the related tasks in B15 (Hearings & Court Matters) and B19 (Non-Working Travel). *See* W&C Fee Application, Ex. B; Fourth Monthly Fee Statement, Ex. C.

[22]   The total amount is derived from the billing category "Plan and Disclosure Statement /Confirmation/Implementation/Plan Supplement" and certain of the related tasks in "Hearings" and "Non-Working Travel Time." *See* Latham Fee Application, Exs. B, E. This amount does not take into account Latham's fees incurred prior to the Petition Date, which are most likely substantial.

25.     The Reorganized Debtors also generally allege that White & Case "overstaffed" the matter by having 54 timekeepers over 111 days.  Obj. ¶ 48.  In a chapter 11 case involving simultaneously contested DIP financing, Plan confirmation, investigation of potential claims and causes of action, discovery, and multiple contested hearings, the use of a full litigation and restructuring teams is not overstaffing—it is competent case management.[23]  The Debtors' own counsel deployed more than double the number of team members (132 timekeepers) throughout the same period.  *See* Latham Fee Application, Exs. A, E (93 timekeepers and 7 practice support staff);[24] Hunton Fee Application, Ex. A (17 timekeepers); Quinn Fee Application, Ex. C (15 timekeepers).

26.     The Reorganized Debtors also complain about the fees of Mr. Greissman, a key senior restructuring partner in these cases.  *See* Obj. ¶¶ 22, 36, 50, 74.  For its part, Latham, had *four* senior partners who each billed significantly more than Mr. Greissman during the cases— Jamie Wine billed 622.8 hours for $1,500,625, Keith Simon billed 648.6 hours for $1,484,512, George Klidonas billed 789.1 hours for $1,608,645, and Elizabeth Marks billed 894.8 hours for $1,744,479.  *See* Latham Fee Application, Ex. A.  The Debtors and the Reorganized Debtors viewed these fees to be reasonable and this Court accepted that position, allowing them to pay their professionals.  *See Final Order Allowing Compensation and Reimbursement of Expenses* [Docket No. 1344].  The same should be true for White & Case.

27.     The Objection's generalized challenge to deposition attendance is contradicted by the practices of the Debtors' own professionals.  *See* Obj. ¶¶ 36, 50, 74-75.  A review of the

---

[23]    For instance, the Debtors and the Consenting Creditors produced documents after depositions began, necessitating a large team to simultaneously review documents and prepare for imminent depositions.

[24]    Latham does not list its practice support staff in its timekeeper summary table, *see* Latham Fee Application, Ex. A, and instead treats their work as an "expense." *See* Latham Fee Application, Ex. E.  A manual review of Latham's expense invoices reveals that seven practice support staff billed time to the matter. *See* Latham Fee Application, Ex. E.

appearances recorded in certain deposition transcripts show that Latham sent a minimum of five attorneys to each deposition and usually had eight or nine attend.[25]  *See, e.g.*, Dep. Trs., Exs. B-F; *The Official Committee of Unsecured Creditors' Deposition Designations of Daniel B. Silvers* [Docket No. 1023] at Ex. A.  The deposition of David Mounts Gonzales is illustrative.  *See* Dep. Trs., Ex. B.  The deposition transcript (and related time entries) for the first day of David Mounts Gonzales' deposition reflects that the Committee, as part of what the Reorganized Debtors assail as "overstaffed and duplicative efforts," had nine professionals attend in total, including the questioning attorney and financial professionals.  *See id.*; Third Monthly Fee Statement, at 38; Alix Third Monthly Fee Statement,[26] at 44-45.  This is in comparison to nine professionals from Latham, four from Quinn, one from Hunton, four from Moelis, and two from FTI, for a total of *twenty* Debtor professionals.  *See* Dep. Trs., Ex. B, at 2-4.  That same deposition transcript showed that the Consenting Creditors, who were legally aligned with the Debtors, sent an additional five attorneys from Paul Hastings.  *See id.* at 3.

28.    More specific comparisons also disprove the Reorganized Debtors' baseless criticism that White & Case had restructuring attorneys attend depositions.  *See* Obj. ¶¶ 22, 50. This criticism is absurd and again disproven by the Debtors' own professionals.  Three to four Latham partners, including restructuring partners, regularly attended depositions and billed for their time.  *See, e.g.*, Dep. Trs., Exs. B-F.  This included George Klidonas, a Latham restructuring partner, who attended all sixteen depositions and billed $170,742 for that work, and Keith Simon, a Latham restructuring partner, who attended fifteen depositions and billed $134,617 for that work.

---

[25]  "Deposition Transcripts" refers to *The Official Committee of Unsecured Creditors' Deposition Designations of David Mounts Gonzales, Heath Sampson, Barbara Gutierrez, and Scott A. Kern* [Docket Nos. 1019, 1020].

[26]  "Alix Third Monthly Fee Statement" refers to *Third Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred for the Period From November 1, 2025 Through November 30, 2025* [Docket No. 1086].

*See, e.g.*, *id.*; Latham Fee Application, Ex. E.  Again, this is not a criticism of Messrs. Klidonas and Simon or any of the Debtors' professionals.  It is simply proof that the work necessary in these cases, particularly given their lightning speed , required large teams to focus on multiple disciplines to stay on top of the workflow.

29. A comparison of the Debtors' counsels' and the Committee's counsels' staffing for hearings yields the same conclusion.  Latham's time entries show that seventeen timekeepers (including five partners) billed for attending the DIP hearing, *see* Latham Fee Application, at 142-43, and that at least nineteen timekeepers billed for attending the first three days of the confirmation hearing, *see* Latham Fee Application, at 669-72.  This is in comparison to the nine White & Case timekeepers who billed for attending the DIP hearing, *see* First Monthly Fee Statement, at 55, and the eight White & Case timekeepers who billed for attending the confirmation hearing, *see* Fourth Monthly Fee Statement, at 34-38.  This objectively demonstrates that White & Case's lower attendance at depositions and hearings was not "overstaffing" or "duplicative," but rather consistent with what the Debtors themselves understood was reasonable and necessary for a case of this complexity.  Obj. ¶ 49.

30. Perhaps most tellingly, White & Case billed significantly less than the Debtors' counsel for trial preparation and the confirmation trial itself.  From December 1 (one week before trial started) through December 11 (the last day of the evidentiary portion of trial), White & Case, using 30 timekeepers, billed $2,780,850 in fees to billing categories associated with trial preparation and trial.  *See* Fourth Monthly Fee Statement, Ex. C.[27]  Over this same period, Latham, Quinn, and Hunton, using 60 timekeepers, billed $4,111,315 in fees to similar billing categories.

---

[27] The total amount is derived from billing categories B13 (Exclusivity, Plan & Disclosure Statement), B15 (Hearings & Court Matters), and B16 (Investigation of Causes of Action) from December 1 to December 11, 2025.

*See* Latham Fee Application, at 620-733;[28] Quinn Fee Application, at 102-107;[29] Hunton Fee Application, at 151-173.[30]  This is nearly 34% more than White & Case who was representing the sole party on the other side of the courtroom aisle.  This comparison does not even take into account that the Debtors' positions at trial were supported by the Consenting Creditors' own separate counsel, Paul Hastings, whose trial fees were not disclosed.  In light of this comparison, the Reorganized Debtors' assertion that White & Case's fees are the product of "systemic overbilling" is neither genuine nor credible.  *See* Obj. ¶ 35.

### ii.    White & Case's Travel Expenses Incurred for Confirmation Mirror those Incurred by the Debtors' Counsel

31.    The Reorganized Debtors also object to the "entirety" of White & Case's expenses, ostensibly contending that White & Case should go significantly out of pocket for its work in these cases.  *See* Obj. ¶ 86.  The Objection, when it comes to even attempting to satisfy the heavy burden of such an egregious ask, singles out certain White & Case attorneys' hotel stays at the Four Seasons in Houston and the Ritz-Carlton in Boston, and a group dinner during trial, as its only evidence of unreasonable "extravagance."  *Id.* ¶¶ 2, 87.[31]  But, again, a comparison with the Debtors' counsel's expenses, which this Court approved and the Reorganized Debtors paid, shows that White & Case's expenses are well within the bounds of reasonableness.  ***First***, various Latham attorneys also stayed at the Four Seasons in Houston.  *See* Latham Fee Application, at 597, 605-06, 612-14.  In total, Latham's hotel expenses are directly comparable to those expenses now

---

[28]    The total amount is derived from billing categories "Hearings," "Litigation," and "Plan and Disclosure Statement/Confirmation/Implementation/Plan Supplement" from December 1 to December 11, 2025.

[29]    The total amount is derived from billing categories project categories 03 (Plan/Disclosure Statement) and 04 (Investigation) from December 1 to December 11, 2025.

[30]    The total amount is derived from billing categories B110 (Case Administration) and B320 (Plan and Disclosure Statement, including Business Plan) from December 1 to December 11, 2025.

[31]    The Reorganized Debtors did not find that payment of a $366 hair dryer for their own counsel was "extravagant." *See* Latham Fee Application, at 586.

challenged by the Reorganized Debtors for the Committee. *Compare* Latham Fee Application, Ex. C (showing Latham spent $76,625 in hotel accommodations) *with* W&C Fee Application, Ex. E (showing White & Case spent $47,561 in hotel accommodations). **Second**, the Reorganized Debtors allege that "one attorney billed $1,877 for a single dinner," failing to mention that this dinner was for the entire trial team on the day the evidentiary portion of the trial ended. *See* Obj. ¶ 88. And in fact, Latham billed $1,239 for a dinner at a restaurant on December 4 or 8, 2025 and had at least three other dinners for over $800 each. *See* Latham Fee Application at 591-92. This is not unreasonable; it just shows the reality of meal expenses during a trial in Houston. *Compare* Latham Fee Application, Ex. C (showing that Latham spent $25,277 in various meal types) *with* W&C Fee Application, Ex. E (showing that White & Case spent $13,562 in various meal types). On the record that already exists, White & Case's expenses were not just "actual and necessary," they were proportionate to those incurred by the objecting party's own counsel. *See* 11 U.S.C. §330(a)(1)(B). This Court should reject the Reorganized Debtors' request to apply a selective standard of reasonableness to the Committee's counsel's expenses.

**B.      The Committee Benefitted the Debtors' Estates**

32.      The Reorganized Debtors object to literally "each and every time entry and expense" of White & Case, which the Reorganized Debtors say was all "the product of a coercive threat"– *i.e.*, taking issue with every single action that White & Case took in furtherance of the unsecured creditors' statutory duties. Obj. ¶¶ 56-83. As explained above, the Reorganized Debtors are apparently of the view that it was unreasonable for the Committee's counsel to perform any work at all.[32] The only conceivable bases for such a ridiculous position would be if (1) everything

---

[32]    Despite these post-hoc statements, the Debtors' own expert and investment banker found that the Committee's actions, including forming views on the distributable value under a plan and a debtor's business plan, objecting to debtor-in-possession financing, and serving discovery, were not uncommon actions for unsecured creditors' committees. *See* Jamal Dep. Tr. (Nov. 20, 2025), at 20:15-21:9, 22:2-34:19, attached as Ex. D.

the Committee was doing was frivolous, which as explained above, was certainly not the case, or (2) these cases did not warrant a Committee with counsel.  This Court has already rejected the latter contention, stating "the Committee fees will be what the Committee fees are, and if they're reasonable, they will be -- they will be awarded.  And if you want to confirm a plan, they will have to be paid . . . ."  *See* Hr'g Tr. (Oct. 3, 2025) at 9:25-10:3.[33]  The Court can, and should, dispose of this argument based on the existing record and its prior findings. *See supra* ¶¶ 11-12.

      **C.**      **The Prevailing Market Rate Under Section 330 Is the National Market for Complex Reorganization Counsel**

33.      In an attempt to have this Court disallow a wide swath of legal fees without going line-by-line through the W&C Fee Application, the Reorganized Debtors argue that White & Case's fees are off-market.  *See* Obj. ¶¶ 30-32.  The controlling "community" for assessing prevailing market rates under section 330 in a case of this complexity is not the geographically local market (*i.e.*, Houston or the Southern District of Texas), it is the national bankruptcy market for large, sophisticated chapter 11 cases. *See In re Fieldwood Energy LLC*, 2024 WL 4713011, at *4 (Bankr. S.D. Tex. Nov. 7, 2024) ("Reasonable hourly rates 'are to be calculated according to the prevailing market rates in the relevant community.'") (quoting *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374 (5th Cir. 2011)); *In re ASARCO LLC,* 2011 WL 2975691, at *13 (Bankr. S.D. Tex. July 20, 2011) (holding that the factors under section 330 "must also include a determination of the 'relevant market' in which these fees are determined and the fees billed compared").  As disclosed in the Retention Application, White & Case is a nationally recognized participant in representing stakeholders in chapter 11 cases and its rates are consistent with those of peer firms, including Latham.  *See* Retention Application ¶ 8; Latham Fee Application, Ex. D (showing

---

[33]    The Court also explained "to the extent that everyone wants a confirmed plan . . . the reasonable administrative expenses are going to have to be paid . . . I'm not going to confirm a plan without admin claims being paid, and I'm not going to cap the fees of the Committee. . . ."  *See* Hr'g Tr. (Oct. 3, 2025), at 9:14-25.

comparable and in several instances higher rates);[34] *see, e.g.*, *In re LifeScan Global Corp.*, Case No. 25-90259 (ARP) (Bankr. S.D. Tex. Jan. 6, 2026), [Docket No. 653], Ex. C (showing comparable 2025 hourly billing rates), *approved in full* [Docket No. 683]; *In re Wellpath Holdings, Inc.*, Case No. 24-90533 (ARP) (Bankr. S.D. Tex. June 6, 2025), [Docket No. 2956], Ex. C (showing comparable 2025 hourly billing rates), *approved in full* [Docket No. 3191]; *In re NorthVolt AB*, Case No. 24-90577 (ARP) (Bankr. S.D. Tex. May 1, 2025), [Docket No. 10], Ex. E (showing comparable 2025 hourly billing rates), *approved in full* [Docket No. 22].

34.     In any event, this Court has already approved White & Case's billing rates upon retention through its unopposed Retention Application.  *See* Retention Order.  To the extent the Reorganized Debtors' arguments rest on the premise that those rates were unreasonable, those arguments are barred by the Court's prior approval.  *See id.*  The Court pre-approved White & Case's hourly rates under section 328(a),[35] which provides that any later inquiry into the reasonableness of fees at the conclusion of employment is limited to whether the "terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a); *see also Feilitech*, 2023 WL 8855666, at *14 (citing *In re ASARCO, L.L.C.*, 702 F.3d 250 (5th Cir. 2012)) ("[Case law] makes clear that § 328 prohibits the award of fees *above* the amount previously agreed absent circumstances not capable of being anticipated.  Logic dictates that § 328 does not permit this Court to *reduce* agreed upon hourly rates under similar circumstances.").  The Objection's

---

[34]   While complaining about the disclosed rates of White & Case's senior partners, four partners from Latham have even higher hourly rates—*e.g.*, Joseph Kronsnoble, Joel Trotter, Michele Anderson's rates are all $2,650 per hour and Ray Schrock's rate is $2,550 per hour.

[35]   Both the Retention Application and the entered Retention Order explicitly refer to approval of White & Case's employment under section 328(a) of the Bankruptcy Code.  *See* Retention Application, at 1, ¶¶ 1, 3, 11, 17; Retention Order, at 1-2, ¶ 1; *see also In re Feilitech US LLC*, 2023 WL 8855666, at *11 (Bankr. N.D. Miss. Dec. 21, 2023) ("[B]oth the Employment Applications and the Employment Orders explicitly refer to approval of the Applicants' employment under § 328.").

failure to contend at all with the governing "improvidence" standard forecloses any belated complaint about White & Case's hourly rate.

> **D.** **This Court Should Reject the Reorganized Debtors' Flawed Blended Rate Comparison**

35. The Reorganized Debtors blended-rate argument—characterizing White & Case's blended rates here as evidence of a "bankruptcy surcharge"—misunderstands how blended rates are calculated and applies a methodology that no court in this Circuit has adopted as grounds for categorical fee reduction. *See* Obj. ¶¶ 2, 30-32.[36] Their argument is flawed on two independent grounds. ***First***, the blended rate comparison is inherently distorted by the composition of the timekeeping pool. White & Case calculated its "Non-Bankruptcy Blended Rate" by dividing the total dollar amount billed to non-bankruptcy matters by all timekeepers in the applicable offices by the total number of hours billed to non-bankruptcy matters during the comparable period. Non-bankruptcy matters at a firm like White & Case encompass a broad range of work, including work that, by its nature, is comparatively weighted toward junior associates at lower rates, which dilutes the blended figure downward. The Committee engagement, by contrast (and aligned with both debtor engagement and committee engagements in large, complex commercial chapter 11 cases—especially those on expedited timelines), drew heavily on senior partners, a necessary reality given the compressed time frame insisted upon by the Debtors. A higher blended rate is the natural and expected result of a more senior-weighted, specialized team—not evidence of a surcharge. Indeed, Latham's own blended rate disclosures illustrate a similar difference between their firm-wide, non-restructuring work and the necessities of this complex, chapter 11 case. *Compare* Latham Fee

---

[36] Consistent with the Objections' numerous inaccuracies, the Objection in one sentence notes the White & Case's blended paraprofessional rates for this matter of $500 and non-bankruptcy matters at $462, and then in the next sentence refers to "a 10% to 22%" differential. Obj. ¶¶ 32-33. The difference for paraprofessionals is only 8.2%.

Application, Ex. D (showing that the aggregate blended rate was $1,426) *with* W&C Fee

Application, Ex. F (showing that the aggregate blended rate was $1,414).[37]

36.    ***Second***, the "bankruptcy premium" framing ignores what section 330 actually

requires: "reasonable" compensation taking into account "the nature, the extent, and the value of

such services."  11 U.S.C. § 330(a)(3).  In applying this standard, the relevant question is whether

the average rates billed are consistent with the customary market rate charged by comparably

skilled practitioners in comparable non-bankruptcy matters.  *See In re ASARCO, L.L.C.*, 751 F.3d

291, 301 (5th Cir. 2014) (holding that "there is no litmus test to determine the comparability of

professional services in bankruptcy and other practice areas.") (citations omitted).

E.    **White & Case's Time Entries Comply with the U.S. Trustee Guidelines and Sufficiently Demonstrate the Reasonableness of the Work Performed**

37.    Eventually, the Reorganized Debtors make their way to actual criticisms of White

& Case's time entries, but these objections also are misleading and without merit.  *See, e.g.*, Obj.

¶¶ 41-47.  ***First***, the Reorganized Debtors allege that White & Case's time entries were "vague"

and amounted to "block billing."  *Id.* ¶ 41.  But the only specific time entry they point to shows

the exact opposite.  *Id.* ¶ 43.  That example is of an attorney who billed 18.6 hours *on the day*

*before trial began.*  *Id.* ¶ 43.  The Reorganized Debtors concede that this single entry lists "12

distinct tasks," including "drafting cross outlines, reviewing exhibits, reviewing liquidation

research, drafting memos, and holding multiple calls."  *Id.* ¶ 43.  That is the opposite of block

billing and "vague" time entries.  The attorney specifically listed out each task and the amount of

---

37    While the details of Paul Hastings' rates for representing the Consenting Creditors are unknown, Paul Hastings' blended rates for representing an unsecured creditors committee in a different case pending in this Court are even higher.  *In re LifeScan Global Corp.*, Case No. 25-90259 (ARP) (Bankr. S.D. Tex. Jan. 6, 2026), [Docket No. 667], Ex. C (showing that the aggregate blended rate was $1,753).

time that each task took. *See* Fourth Monthly Fee Statement, Ex. C at 20.[38] Intensive single-day billing leading up to a contested confirmation trial simply reflects the demands of the cases. The reasonableness of such time entries is further evidenced by the Debtors' attorneys' time entries showing multiple 18-hour plus days. *See, e.g.*, Latham Fee Application at 468, 672, 689, 693, 707, 719 (showing attorneys billing in one day (i) 18.7 hours for four tasks, (ii) 19 hours for four tasks and traveling to Houston, (iii) 21.5 hours for two tasks, and (iv) 18.6 hours for seven tasks).

38.      ***Second***, White & Case's time entries in the "Case Strategy" category are not vague. *See* Obj. ¶¶ 81-83. The Reorganized Debtors selectively copy and paste parts of time entries to allege that any time entry with the word "strategy" is vague and does not provide sufficient information for this Court to determine the reasonableness of such fees. *Id.* ¶¶ 81-83. They are wrong. Even the excerpts of the time entries cited in the Objection state when the call took place, who the call was with, what the call was about, and how long the call took. *See League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997) (holding that in determining the reasonableness of fees, a court regularly focuses on whether the records contain the "date, the number of hours spent (calculated to a tenth of an hour), and a short but thorough description of the services rendered"); *see also, e.g.*, Fourth Monthly Fee Statement, Ex. C, at 3-5. Not disclosing attorney work-product and other privileged information about the Committee's strategy in public fee application filings does not make a time entry vague.[39]

---

[38]   The time entry stated: "Revise C. Shandler cross-examination outline for confirmation hearing (2.2); review exhibits re: same (1.3); confer with C. Shandler re: same (0.8); review research re: liquidation analysis (1.9); conduct legal research re: same (1.6); draft memo re: same (1.1); prepare for confirmation hearing trial (2.2); review exhibits for confirmation trial (2.6); confer with A. Chase and E. Smith re: same (0.7); call with W&C re: standing motion reply (0.9); conduct legal research re: colorability for standing motion reply (0.4); emails with W&C re: workstreams for standing motion reply (0.9); review bench memos for confirmation hearing (1.4); confer with J. Zakia re: bench memos (0.4); email with Alix re: confirmation trial (0.2)."

[39]   Further, the alleged "admitted category overlap" is misleading, as this disclosure was merely to indicate that certain of the attorney's specific time entries fell into various billing categories. *See* Obj. ¶¶ 44-47. This is a technical clarification for purposes of the W&C Fee Application, but does not mean that any time entry is duplicative, considered "block billing" or "gang-billing." *Id.* ¶¶ 44-47.

39.     Ultimately, the Reorganized Debtors have failed to identify a single time entry that is not compensable or that does not comply with the U.S. Trustee's guidelines.  Throughout these chapter 11 cases, White & Case has filed thousands of pages of detailed time entries and has been consistently transparent in its fee applications, providing the information and detail necessary for a presumption of reasonableness.  *See generally* W&C Fee Application; Interim Fee Application; First Monthly Fee Statement; Second Monthly Fee Statement, Third Monthly Fee Statement; Fourth Monthly Fee Statement.  White & Case has satisfied the standards for final allowance and payment of its fees.

**IV.     The Debtors Never Objected to, or Reserved Rights Regarding White & Case's Rates, Budget, or Fees**

40.     While the Reorganized Debtors now seek to deny all fees, during the chapter 11 cases, the Debtors sat silent through every one of White & Case's monthly fee statements and interim fee application.[40]  They never objected, filed a reservation of rights, or otherwise complained to the Court that such fees were in any way improper.  And, contrary to the Reorganized Debtors' assertions, White & Case provided the Debtors' professionals with an overall budget at the beginning of the cases—approximately $18 million for a contested case.  *See* Budget Emails.  Ultimately, White & Case billed approximately $5 million lower than the budgeted amount.  *See* W&C Fee Application; Budget Emails.  The Committee also sent the Debtors weekly budgets and estimates throughout the chapter 11 cases.  *See, e.g.*, Budget Emails. The Debtors never protested or objected to the Committee's initial budget or the weekly budget estimates.  Rather, the Debtors agreed to adjust their DIP budget for professional fees based on the contested nature of the chapter 11 cases.  This Objection, raised for the first time at the final fee

---

[40]     No other party in interest has objected to White & Case's fees, including the U.S. Trustee, who is the statutory watchdog for professional fee matters in chapter 11 cases. *See* U.S.C. s 586(a)(3)(A).

stage, is inconsistent with the Debtors' conduct throughout the chapter 11 cases. *See supra* ¶¶ 5, 17.

## RESERVATION OF RIGHTS

41.     White & Case expressly reserves all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Reply, to seek discovery, to introduce evidence and to raise additional arguments at any hearing to consider the W&C Fee Application.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Reply and in the W&C Fee Application, White & Case requests that this Court (i) overrule the Objection, and (ii) enter an order granting final allowance and payment of compensation for professional services as provided in the proposed order attached to the W&C Fee Application.

*[Remainder of Page Intentionally Left Blank]*

April 3, 2026
Houston, Texas

/s/ Charles R. Koster

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Facsimile:     (713) 496-9701
Email:          charles.koster@whitecase.com

**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Scott Greissman (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113
Email:          cshore@whitecase.com
                sgreissman@whitecase.com
                azatz@whitecase.com

- and -

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:     (312) 881-5400
Facsimile:     (312) 881-5450
Email:          gregory.pesce@whitecase.com

*Counsel for the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 3, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles R. Koster*