**EXHIBIT D**

HIGHLY CONFIDENTIAL

**Page 1**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

-------------------------------x

IN RE:                          Case No.: 25-90309

MODIVCARE INC., et al.,

        Debtors.

-------------------------------x

\*\*\* HIGHLY CONFIDENTIAL \*\*\*

VIDEOTAPED DEPOSITION

OF

ZUL JAMAL, Individually and

As Corporate Representative of

MOELIS & COMPANY

Thursday, November 20, 2025

Reported by:

Frank J. Bas, RPR

JOB NO. 7757482

HIGHLY CONFIDENTIAL

Page 2

November 20, 2025

10:06 a.m. EST

Videotaped Deposition of ZUL JAMAL, held at the law offices of WHITE & CASE LLP, 1221 Avenue of the Americas, New York, New York, before Frank J. Bas, a Registered Professional Reporter and Notary Public of the State of New York.

HIGHLY CONFIDENTIAL

Page 3

A P P E A R A N C E S:

WHITE & CASE LLP
Attorneys for Official Committee of Unsecured
Creditors
        1221 Avenue of the Americas
        New York, New York 10020

BY:   J. CHRISTOPHER SHORE, ESQ.
        cshore@whitecase.com
        ALICE HONG, ESQ.  (Via Zoom)
        alice.hong@whitecase.com
        CHARU CHITWAN, ESQ.  (Via Zoom)
        charu.chitwan@whitecase.com
        LOREDANA B. MIRANDA, ESQ.
        loredana.miranda@whitecase.com

LATHAM & WATKINS LLP
Attorneys for Debtors
        1271 Avenue of the Americas
        New York, New York 10020
BY:   JAMIE WINE, ESQ.
        jamie.wine@lw.com
        GEORGE KLIDONAS, ESQ. (Via Zoom)
        george.klidonas@lw.com
        JONATHAN J. WEICHSELBAUM, ESQ. (Via Zoom)
        jon.weichselbaum@lw.com
        KEITH SIMON, ESQ. (Via Zoom)
        keith.simon@lw.com

PAUL HASTINGS
Attorneys for Consenting Creditors
        609 Main Street
        Suite 2500
        Houston, Texas 77002
BY:   CRAIG STANFIELD, ESQ.
        craigstandfield@paulhastings.com
        MATT WARREN, ESQ.  (Via Zoom)
        mattwarren@paulhastings.com
        LINDSEY HENRIKSON, ESQ.  (Via Zoom)
        lindseyhenrikson@paulhastings.com

HIGHLY CONFIDENTIAL

Page 4

A P P E A R A N C E S (Continued):

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Attorneys for the Special Committee
295 Fifth Avenue
New York, New York 10016

BY:  EMILY MOORE, ESQ.  (Via Zoom)
emilymoore@quinnemanuel.com

ALSO PRESENT VIA ZOOM:
LEE WEST, Lazard
ANDREW CARLSON, Moelis
JACKSON GUILFORD, Latham & Watkins
NICO CORTI, Latham & Watkins
CATHERINE RANKIN, ESQ.
PAUL BAKER, IT Concierge
MIGUEL MEDINA, Videographer
DAVID KIYOSAKI, FTI Consulting
JILL SHAPIRO, FTI Consulting
SOHAIL YOUSUF, Q Investments
KIM FANG, Moelis
SIMON SHNAYDER, TCW

HIGHLY CONFIDENTIAL

Page 20

Z. JAMAL

Q.   So is Mr. Mounts Gonzales just wrong?

A.   I mean, I think so.

Q.   Okay.  Good, I'm glad to say.

Do you believe that the committee is approaching this case as a terrorist?

MS. WINE:  Object to the form.

A.   I don't know what -- I don't know what that really means.

Q.   Okay.  Well, you agree with me that "terrorist" is a fairly pointed word?

MS. WINE:  Object to the form.

A.   Yes.

Q.   So let's see if we can maybe bring down the temperature in the case.

You understand that official committees of unsecured creditors have duties that they need to fulfill in the case, right?

A.   Yes.

Q.   Okay.  And how would you describe your understanding, if any, of those duties generally?

A.   They are supposed to act as fiduciaries on behalf of all unsecured

HIGHLY CONFIDENTIAL

Page 21

Z. JAMAL

creditors.

Q.   Okay.  And would you agree that those duties to act as fiduciaries typically play out in certain acts taken by committees?

MS. WINE:  Objection to form.

A.   Yes.  The committee does -- always does certain things.  What they do I think would vary case to case.

Q.   Now let's draw a distinction with respect to ad hoc groups of creditors.

You've interacted with ad hoc groups of creditors, right?

A.   I have.

Q.   And is it your understanding, just as a business perspective, that ad hoc groups of creditors bear the same duties with respect to a class of creditors as a whole?

MS. WINE:  Objection to form.

A.   They don't.

Q.   Right.  So, for example, the consenting creditors in this case, is it your understanding that they owe duties to all secured creditors in these cases?

A.   I don't believe they do.

HIGHLY CONFIDENTIAL

Page 22

Z. JAMAL

Q.   Okay.  Let's talk about what this particular UCC has done.

In your experience, is it common for a UCC to seek to form views on distributable value in a Chapter 11 case?

MR. STANFIELD:  Objection to the form of the question.

A.   It could be something they do, yes.

Q.   Okay.  Have you done it when you've been an advisor to a committee, formed views as to distributable value under a plan?

MR. STANFIELD:  Hold on a second.

Objection to the form of the question.

A.   Yes.

Q.   Okay.  And as part of that exercise of determining distributable value, is it common in your experience for committees to hire advisors?

MR. STANFIELD:  Object to the form of the question.

A.   In my experience UCCs typically hire advisors, yes.

Q.   Okay.  And have you ever heard of

HIGHLY CONFIDENTIAL

Page 23

Z. JAMAL

Alix Partners being described as a terrorist in any case?

MR. STANFIELD:  Object to the form of the question.

A.   Not that I can recall.

Q.   In your experience, has Alix Partners ever taken extreme views that you would find to be outside the bounds of normal FA behavior?

MS. WINE:  Objection to form.

A.   I don't know what that means.

Q.   Okay.  In a case in which -- in a big Chapter 11, is it common for, in your experience, for a financial advisor for a committee to perform valuations?

A.   It might be something they do.

Q.   Okay.  And where did the distributable values -- have you been involved in other cases where distributable value is post-reorganization stock?

A.   Yes.

Q.   And that's the distributable value largely in this case, right?

MR. STANFIELD:  Objection; form.

HIGHLY CONFIDENTIAL

Page 24

Z. JAMAL

A.   Yes.   Primarily the recovery that creditors are receiving here is in the form of equity in the reorganized company.

Q.   Right.   And then there's a cash component?

A.   Yes.   A modest one.

Q.   Right.   Is there any other value being distributed under the current plan on file other than post-reorg equity and cash?

A.   Yes.

Q.   What's that?

A.   Debt.

Q.   And that's the takeback debt to the 1L?

A.   That's correct.

Q.   Let me rephrase my question.

Is there any distributable value that's being offered under the current plan to general unsecured creditors other than post-reorg equity and cash?

A.   Yes.

Q.   What's that?

A.   Warrants.

Q.   Okay.   And is it, in your view, in

HIGHLY CONFIDENTIAL

Page 25

Z. JAMAL

a plan which provides for warrants for distribution, that you would expect an unsecured creditors' committee to form views with respect to the value of such warrants?

A.   It might be something they do, yes.

Q.   Okay.  Well, you say it "might be."

Would it be outside the bounds of expected behavior for a committee to value warrants if warrants are being offered to unsecured creditors?

A.   No.

MR. STANFIELD:  Objection; form.

THE WITNESS:  Sorry.

BY MR. SHORE:

Q.   Can you think of any reason why a UCC financial advisor would not want to blindly -- sorry.  Let me -- I missed a question here.

As part of a valuation exercise of post-reorg equity, would you expect that any committee FA will analyze a debtor's business plan?

MS. WINE:  Objection to form.

A.   That certainly might be something

HIGHLY CONFIDENTIAL

Page 26

Z. JAMAL

they do for sure, yes.

Q.   That's something you did when you represented committees, right; formed views with respect to the appropriateness of the business plan to be used in a valuation?

A.   Yes.

Q.   Okay.  And can you think of any reason why a financial advisor to UCC would not want to blindly rely on a business plan prepared by debtors' management?  Can you think of reasons?

MS. WINE:  Object to the form.

A.   Sorry.  Can you -- I just want to make sure.

Q.   Sure.

A.   Can you ask the question again?

Q.   Sure.  In your experience, do unsecured creditors committees' FAs blindly rely on business plan projections prepared by management in connection with a Chapter 11 case?

MS. WINE:  Objection to form.

A.   I don't think anyone blindly relies on stuff prepared by management.

Z. JAMAL

Q.   Can you explain some of the reasons why you wouldn't want to -- why no one would blindly rely on management projections?

MS. WINE:  The same objection.

A.   Well, because in order to analyze something, whether for performing valuation or otherwise, you need to understand it.  And blind reliance suggests, at least the way you used it, and maybe I'm misunderstanding your use, that you just take it as given and don't even understand what it means.

And it's hard to do something when you don't understand what it means.

Q.   Okay.  Did you have any expectation when you were preparing your valuation in this case that the committee would be looking at the debtors' valuation?

A.   I expected they would look at it.

Q.   And did you expect that the committee would also be looking at the business plan?

A.   Yes.

Q.   And you know that Alix has now formed views on both, right?

HIGHLY CONFIDENTIAL

Page 28

Z. JAMAL

A.    That's my understanding.

Q.    And that those views have been laid out in two expert reports which have been circulated to the debtors and the other creditors, subject to the confi in this case, right?

A.    That's correct.

Q.    Okay.  I'll get to this later, but in your view, do you view either report as having been prepared in bad faith?

MS. WINE:  Objection to form.

A.    Bad faith?  I don't think so.

Q.    Well, you have no reason to believe that either Mr. Brown or Mr. Magrisi set forth views that they don't actually hold?

MR. STANFIELD:  Objection; form.

A.    I haven't talked to them.  I have no reason to believe it one way or the other.

Q.    Now, in your experience dealing with creditors committees, is it common for financial advisors to a committee to engage in periodic calls with the debtors' management or financial advisors to discuss things like business plan?

HIGHLY CONFIDENTIAL

Page 29

Z. JAMAL

MS. WINE:  Objection to form.

A.   Yes, they typically do.

Q.   And that's happened here, right? The Alix team has met periodically with the Moelis and FTI teams to discuss aspects of the case?

A.   Yes.

Q.   Okay.  Have you participated in those?

A.   I think maybe a couple of them.

Q.   Okay.  And in your experience was Alix doing anything that you thought was appropriate -- sorry -- inappropriate?

A.   Nothing comes to mind sitting here right now.

Q.   In addition to the exchange of information and calls, is it common in your experience for committees to issue document requests and deposition notices?

A.   I would say it's common to ask for diligence.  I don't know that I would describe deposition notices as common.

Q.   Okay.  Have you experienced cases where deposition notices and document requests

HIGHLY CONFIDENTIAL

Page 30

Z. JAMAL

have been served?

A.   Yes.

Q.   Okay.  And are you aware that that has happened in this case?

A.   Yes.

Q.   And are you aware of whether or not the debtors have voluntarily agreed to produce documents and witnesses in response to the requests?

MS. WINE:  Objection to form.

MR. STANFIELD:  Objection; form.

A.   Yes.

Q.   Okay.  Let's talk about the schedule for a bit.

All of that discovery has been taking place, to your knowledge, on an accelerated timeline, right?

A.   I don't know what "accelerated" means in this context.  I think it's been taking place on a timeline that we have.

Q.   Okay.  And that was pursuant to a scheduling order that was entered in the case, right?

MS. WINE:  Objection to form.

HIGHLY CONFIDENTIAL

Page 31

Z. JAMAL

Q.   Do you know?

A.   I don't actually know whether a scheduling order was entered in this case or not.

Q.   Do you know when the debtors were originally seeking to have their confirmation hearing?

A.   I believe before Thanksgiving.

Q.   Okay.  And you're aware that the Court has now pushed that to next month?

A.   I am.

Q.   Okay.  In your experience is one of the things that committees do when appointed is form views with respect to the motions that a debtor has filed on the first day of the case?

MS. WINE:  Objection to form.

A.   Yes.

Q.   Okay.  Do you have a recollection of what the committee actually objected to with respect to the first-day motions that were heard on the second-day hearing?

A.   Yes.

Q.   What?

HIGHLY CONFIDENTIAL

Page 32

Z. JAMAL

A.   The DIP.  And then I believe there was some objection to I think the critical vendor payments.

Q.   Okay.  Did you think that there was anything untoward or unexpected about the committee's objection to the DIP?

MR. STANFIELD:  Objection to form.

MS. WINE:  Objection to form.

A.   Yes.

Q.   What?

A.   I thought it was unexpected that they would object to the company obtaining financing when without the financing it wouldn't have been able to operate the business on an ongoing basis.

Q.   Is it your understanding that the committee sought to have the entire DIP not approved or just certain terms?

A.   Well, I think that because the DIP financing was an all-or-nothing proposition, objecting to certain terms was effectively or tantamount to objecting to the whole thing.

Q.   Did the terms actually change in the DIP from the time it was proposed to the

HIGHLY CONFIDENTIAL

Page 33

Z. JAMAL

Court and the time the DIP order was entered?

A.   Yes.

Q.   Okay.  And why did that happen?

MS. WINE:  Objection to form.

A.   I --

Q.   If you know.

A.   I don't know the specifics of why it happened.

Q.   At the time of the DIP, had you prepared any views of total enterprise value of the debtors?

A.   I think our valuation work at the time was ongoing, but, um, the timeline is, you know, was such that I don't know what was done when.  And so I would have to go back and try and remember exactly when we were done with our valuation relative to the DIP.  But, you know, so I don't remember the specifics.

Q.   Prior to the final DIP order being entered did you provide or Moelis provide any advice to the board with respect to what 20 percent of the post-reorg equity of the debtors was worth, which would be paid in the form of a DIP backstop fee?

HIGHLY CONFIDENTIAL

Page 34

Z. JAMAL

A.   I don't believe so.  Again, I would have to go back and refresh my recollection on that.

Q.   Okay.  In your experience in connection with DIP objections, have you seen objections where an official committee has objected to a DIP?

A.   Yes.

Q.   Okay.  And have you ever seen a committee object to a critical vendors motion in another case?

A.   Not that I recall.

Q.   Would you consider the objections to the DIP and the critical vendor motion to have been a committee acting as a terrorist?

MS. WINE:  Objection to form.

A.   As a terrorist?  No.  I don't think so.

Q.   I think the only other real objection in the case so far has been to the UHC settlement.

Did you form any views with respect to the appropriateness of the committee objecting to the UHC settlement?