**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MODIVCARE INC., et al., | Case No. 25-90309 (ARP) |
| Reorganized Debtors. | (Jointly Administered) |

**REORGANIZED DEBTORS' AMENDED OBJECTION TO THE FINAL FEE
APPLICATION FILED BY WHITE & CASE, LLP**

### I.      SUMMARY OF FACTS AND RELIEF REQUESTED

ModivCare TopCo ("**Reorganized Debtors**" or "**TopCo**") hereby files this *Amended Objection to the Final Fee Application filed by White & Case LLP* ("**White & Case**"), counsel for the Official Committee of Unsecured Creditors (the "**Committee**"), seeking $13,893,521.00 in fees and $300,469.13 in expenses for 111 days of work.

White & Case was retained as a fiduciary. It did not act as one. Soon after its retention, Scott Greisman, a partner at White & Case, delivered an ultimatum to the Reorganized Debtors: pay $30 million to the unsecured class, or the estate professionals would generate $30 million in fees through litigation. Pay the class or pay the professionals.

On October 28, 2025, before the bulk of White & Case's billing occurred, the Consenting Creditors warned this Court that "the Committee's real strategy appears to be to bury the estate in exponentially expanding professional fees in order to extract an outsized settlement where it otherwise has no viable legal strategy." They identified the Committee's valuation theory as "completely unsupportable," requiring a 65% swing above the Debtors' midpoint valuation, an impossible burden.

White & Case executed that strategy anyway. It billed the estate nearly $14 million, including charges for stays at the Ritz Carlton and Four Seasons. It never submitted a budget. As a result of its baseless pleadings, the remaining estate professionals incurred millions of dollars in additional fees that the Reorganized Debtors were also required to pay, pushing total professional costs beyond the $30 million threat. This was exactly the threat White & Case made and then pursued.

ModivCare requests the following relief, in the alternative. First, because White & Case announced in advance its intention to bury the estate in professional fees if its demands were not met and then carried out that threat through every billing category in this case, the Court should deny White & Case's Final Fee Application in its entirety under 11 U.S.C. §§ 328(c), 330(a)(4)(A), and 105(a), and award no compensation whatsoever.

Second, in the alternative, the Court should substantially reduce White & Case's fees and expenses under 11 U.S.C. § 330 and equitably subordinate the remainder to the claims of unsecured creditors under 11 U.S.C. § 510(c). Third, in the further alternative, the Court should substantially reduce White & Case's fees and expenses under § 330.

After TopCo filed its Original Objection to the Final Fee Application, it served White & Case with basic discovery requests. In response, White & Case produced no documents and argued that it is not required to produce a single piece of paper to support its request for nearly $14 million in fees. White & Case has further taken the position that it is not required to provide this Court with any evidence whatsoever and that no factual dispute exists. Longstanding Fifth Circuit precedent says otherwise.

## II.     RELEVANT FACTS

### A.     FEE APPLICATION AND ORIGINAL OBJECTION

1.     On February 12, 2026, White & Case filed its Final Application for Allowance of Compensation and Reimbursement of Expenses for the Period from September 9, 2025 through December 29, 2025 [ECF No. 1290] (the **"WC Fee Application"**), seeking allowance of approximately $14 million in fees and expenses.[1]

2.     On March 5, 2026, TopCo filed its Objection to the WC Fee Application [ECF No. 1354] (the **"WC Objection"**).[2]

3.     The WC Objection presents three tiers of alternative relief: (a) complete denial of fees under § 328(c); (b) reduction and equitable subordination under §§ 330 and 510(c); and (c) reduction under § 330 alone. Each tier depends on the same core factual record: the alleged $30 million demand made by White & Case partner Scott Greissman; White & Case's subsequent execution of that demand through its billing practices; and specific, granular challenges to the reasonableness and necessity of more than $14 million in fees and expenses billed in approximately 111 days.

4.     On April 3, 2026, White & Case filed its Reply to the WC Objection (the **"Reply"**) [ECF No. 1410][3]. In its Reply, and without filing a separate motion, White & Case requested that the Court address purportedly "legal" issues first and defer or preclude factual development until a later phase.

---

[1] Exhibit A: Final Fee Application filed by White & Case
[2] Exhibit B: Objection to WC Fee Application
[3] Exhibit C: Reply filed by White & Case

**B.** **DISCOVERY SERVED BY TOPCO**

5.     On March 12, 2026, TopCo served narrowly tailored Requests for Production on White & Case directed to the issues raised in the WC Objection (the **"RFP"**).[4]

6.     On April 2, 2026, White & Case served its Responses and Objections to the RFP (the **"Response"**).[5]

7.     In its Response, White & Case refused to produce a single document, failed to conduct any search for responsive materials, and asserted across-the-board objections while withholding all information. White & Case has taken the position that it is entitled to recover more than $14 million in purported fees without providing any meaningful transparency into how those purported fees were generated.

8.     On April 3, 2026, TopCo filed a Motion to Compel White & Case, LLP to Respond to Discovery Requests (the **"Motion to Compel"**).[6]

9.     On April 24, 2026, White & Case filed its Objection to the Motion to Compel (the **"Objection to Motion to Compel"**).[7]

10.    In its Objection to Motion to Compel, White & Case argues, among other things, that it should not be ordered to produce any discovery until "the Court has determined whether it can dispose of the WC Fee Objection based on the law and existing factual record."

---

[4] Exhibit D: Request for Production served on White & Case
[5] Exhibit E: White & Case's Responses and Objections to Discovery
[6] Exhibit F: Motion to Compel
[7] Exhibit G: Objection to Motion to Compel

## C.     COURT HOLDS STATUS CONFERENCE

11.     On April 6, 2026, the Court held a status conference and, among other things, *sua sponte* ordered that the WC Objection be bifurcated into two phases: Phase 1, addressing legal issues, and Phase 2, addressing factual issues (the **"Status Conference"**). The Status Conference was continued to April 30, 2026 (the **"Continued Status Conference"**).

12.     Although the Court never entered an order bifurcating the issues into phases, TopCo, out of an abundance of caution, filed a Motion to Reconsider the Court's oral ruling bifurcating the matter into two phases on April 9, 2026 (the **"Motion to Reconsider"**).[8]

13.     In the Motion to Reconsider, TopCo argued that the Court's decision to bifurcate the WC Objection would require the Court to resolve purported "legal issues" in a first phase before conducting any evidentiary hearing. TopCo argued that such a procedure conflicts with Federal Rule of Bankruptcy Procedure 9014(d), which mandates that testimony concerning disputed material factual issues "must be taken in the same manner as testimony in an adversary proceeding."

14.     TopCo further argued in its Motion to Reconsider that bifurcation contravenes the Fifth Circuit's categorical rule, most recently reaffirmed in *In re Assadi,* 2025 U.S. App. LEXIS 13678 (5th Cir. June 4, 2025), that an evidentiary hearing is required whenever objections to a fee application raise disputed issues of material fact.

## D.     BIFURCATION ORDER

15.     On May 9, 2026, the Court entered a Scheduling and Bifurcation Order at ECF No. 1520 (the **"Bifurcation Order"**).[9]

---

[8] Exhibit H: Motion to Reconsider
[9] Exhibit I: Bifurcation Order

16.     Pursuant to the Bifurcation Order, the Court held that in Phase 1 the Court will adjudicate the reasonableness of the WC Fee Application under 11 U.S.C. § 330 based solely on judicial notice of the evidentiary record already established in the underlying bankruptcy case, the WC Fee Application, the WC Objection, and Reply, without any discovery and without an evidentiary hearing.

17.     The Bifurcation Order further provides that Phase 1 shall include the following issues: (a) whether TopCo may object to the reasonableness of any time entry or expense item not specifically identified in the WC Objection; (b) whether White & Case's hourly rates were predetermined at the time of its retention; and (c) whether there is a basis to apply a different standard in assessing the reasonableness of the fees sought in the Fee Application than the standard applied to the Debtors' professionals' fees, which were approved by the Court without objection.

### III.     TOPCO'S GENERAL RESPONSE TO THE BIFURCATION ORDER

18.     TopCo continues to oppose the Bifurcation Order. The issues identified therein are not purely legal questions capable of resolution from the face of the pleadings. Rather, each issue arises from the same underlying dispute: White & Case seeks allowance of approximately $14 million in fees and expenses under 11 U.S.C. § 330 while simultaneously refusing to produce any discovery concerning the factual basis for its fee request.

19.     The Bankruptcy Code places the burden of proof squarely on the fee applicant. *In re WNS*, Inc., 150 B.R. 663, 664 (Bankr. S.D. Tex. 1993); See also *Matter of Lawler,* 807 F.2d 1207, 1212 (5th Cir. 1987). White & Case, not TopCo, bears the burden of establishing that the services for which it seeks compensation were actual, necessary, reasonable, efficiently staffed, and reasonably

likely to benefit the estate at the time they were rendered. Once those elements are challenged, they present factual issues that can be resolved only through evidence.

**IV.     THE REASONABLENESS OF THE WHITE & CASE FEE APPLICATION CANNOT BE ADJUDICATED ON JUDICIAL NOTICE OF THE EXISTING RECORD ALONE; IT PRESENTS CONTESTED FACTUAL ISSUES THAT REQUIRE DISCOVERY AND AN EVIDENTIARY HEARING.**

20.     The Bifurcation Order provides that the Court will adjudicate the reasonableness of the WC Fee Application under section 330 based solely on judicial notice of the evidentiary record already established in these cases, together with the Fee Application, the Objection, and the Reply, without any discovery and without an evidentiary hearing.

21.     It cannot do so.

22.     As discussed in greater detail below, reasonableness under section 330 is a question of fact on which White & Case bears the burden of proof, and the Reorganized Debtors have raised specific, concrete factual disputes, about the necessity of staffing, the duplication of effort, and the value of particular services, the purpose of the billing. Neither the record in this case nor the pleadings filed answer these questions and judicial notice cannot address this either.

**A.     JUDICIAL NOTICE CANNOT RESOLVE CONTESTED FACTS**

23.     Judicial notice is a narrow evidentiary device, not a substitute for proof. A court may judicially notice an adjudicative fact only if it is "not subject to reasonable dispute" because it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)

24.     Judicial notice is appropriate when there is no actual asserted factual dispute. *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011).

25.     A court may take judicial notice of its own docket and of the papers filed in a case, but a Court cannot take judicial notice of facts that are in dispute. *Taylor v. Charter Med. Corp.,* 162 F.3d 827, 829–31 (5th Cir. 1998).

26.     The reasonableness of White & Case's fees, whether its staffing was necessary, whether its effort was duplicative, and what value particular services added, are facts subject to reasonable dispute, and cannot be judicially noticed.

**B.      THE RECORD SHOWS THE OUTPUTS OF WHITE & CASE'S WORK, NOT THE INPUTS SECTION 330 REQUIRES.**

27.     Section 330 requires the Court to determine "the nature, the extent, and the value of [the] services," and it forbids any allowance for "unnecessary duplication of services" or for services that were not "reasonably likely to benefit the . . . estate" or "necessary to the administration of the case." 11 U.S.C. § 330(a)(3), (a)(4)(A).

28.     Each of those inquiries is factual, and the burden is White & Case's. *In re WNS, Inc.,* 150 B.R. 663, 664 (Bankr., S.D. Tex. 1993); *Hensley v. Eckhart,* 461 U.S. 424, 437 (1983).

29.     The difficulty for White & Case's proposed procedure is that the existing record reveals only the outputs of its work, that a hearing occurred, that a deposition was taken, that a pleading was filed, while the section 330 inquiry turns on inputs the record does not contain: who did what, whether it was necessary, why it was done whether it was duplicative, and whether it was actually done.

30.     The point is concrete. For example, the Court may take judicial notice that a hearing was held and that 12 White & Case professionals appeared. But neither the record nor judicial notice

can establish whether all 12 were necessary, what each did beyond two attorneys who questioned a witness or argued, or whether their attendance added value or instead duplicated one another.

31.     These are the precise question section 330(a)(4)(A) poses. So too with the entries in which one timekeeper repeatedly billed to "monitor" another White & Case attorney during a deposition: the face of the entry cannot establish what "monitoring" a colleague entailed or whether it duplicated the questioning attorney's work. And the Court may take judicial notice that a pleading was filed and that it ran to a certain length, but not whether it was reasonable for ten separate timekeepers to bill for reviewing and revising that single pleading.

32.     These are facts that must be proven and tested, not assumed; they are detailed in TopCo's substantive objections contained below and in **Exhibit J**.

**C.     AS A CONTESTED MATTER, THE REORGANIZED DEBTORS ARE ENTITLED TO DISCOVERY AND AN EVIDENTIARY HEARING.**

33.     An objection to a final fee application is a contested matter governed by Bankruptcy Rule 9014, which makes the Part VII discovery rules applicable, see Fed. R. Bankr. P. 9014(c), and entitles the parties to a hearing.

34.     Where, as here, material facts are genuinely disputed, TopCo is entitled to take discovery, to require White & Case to carry its burden with evidence, and to test that evidence through cross-examination; resolving contested material facts on the papers. Denying TopCo with the opportunity to conduct basic discovery and cross-examination, would be improper.

**V.     THE COURT NEED NOT "AMEND" THE RETENTION ORDER, BECAUSE WHITE & CASE WAS NOT RETAINED UNDER SECTION 328(a) AND THE REASONABLENESS OF ITS RATES IS GOVERNED BY SECTION 330.**

35.     TopCo objected to the WC Fee Application on the ground, among others, that White & Case's hourly rates exceed the reasonable market rate under section 330 of the Bankruptcy Code.

36.     In its Reply, White & Case advances (for the first time) the contention that this Court "pre-approved" its hourly rates under section 328(a) when it authorized the firm's retention, such that the rates are insulated from reasonableness review and may be revisited only for "improvidence."

37.     That contention is wrong as a matter of statutory structure, controlling Fifth Circuit law, and the plain terms of the Retention Order.

38.     White & Case cannot have it both ways. It devotes the bulk of its Reply to proving that its rates and fees are "reasonable" under section 330, then argues in a single paragraph that section 328(a) makes reasonableness irrelevant. Both positions cannot be true. The retention record resolves the conflict: White & Case was employed under sections 327 and 1103(a); its compensation was made expressly "subject to sections 330 and 331"; the Court reserved section 330 review of its rates; and the firm never sought, and the Court never made, a section 328(a) pre-approval of fixed terms.

39.     The reasonableness of White & Case's rates is therefore governed by section 330 and remains to be determined on its Final Fee Application based on an evidentiary record, with the burden on White & Case.

A.     THE STATUTORY FRAMEWORK: SECTIONS 328(A) AND 330 ARE DISTINCT REGIMES GOVERNED BY DIFFERENT STANDARDS.

40.     The Bankruptcy Code separates the authorization to employ a professional from the allowance of compensation to that professional, and it assigns those questions to different provisions governed by different standards. Section 327(a) and 1103(a) govern whether a professional may be employed at all; it addresses disinterestedness and the absence of an adverse interest and says nothing about the reasonableness of any rate. 11 U.S.C. §§ 327(a), 1103(a).

41.     Sections 328(a) and 330 then supply two alternative paths for fixing and reviewing compensation, and which path governs has significant consequences.

42.     Section 328(a) permits a court, at the retention stage, to approve the employment of a professional "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Its defining feature is advance approval of specified terms. When a court approves particular terms under section 328(a), it fixes them prospectively, and it may later "allow compensation different from the compensation provided under such terms and conditions . . . only if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

43.     The improvidence standard is demanding. A court may depart from section 328(a)-approved terms only on a showing that intervening developments were truly incapable of being anticipated; the mere fact that a development was unforeseen does not suffice. *ASARCO, L.L.C. v. Barclays Capital, Inc.* (In re ASARCO, L.L.C.), 702 F.3d 250, 257–60 (5th Cir. 2012).

44.     That high bar is deliberate because section 328(a) is designed to provide certainty to professionals who agree to fixed terms up front, so that they are not later second-guessed based on the outcome of their work. The corollary is equally important here: section 328(a)'s protection, and its improvidence limitation on the court's review, attaches only where the court actually approved an agreed, fixed term. *See Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co.* (In re Nat'l Gypsum Co.), 123 F.3d 861, 862–63 (5th Cir. 1997); *Daniels v. Barron (In re Barron),* 325 F.3d 690, 691–92 (5th Cir. 2003).

45.     Section 330, by contrast, operates at the allowance stage, when compensation is sought. It authorizes the court to award "reasonable compensation for actual, necessary services rendered"

and "reimbursement for actual, necessary expenses," determined by reference to "all relevant factors," including the time spent, the rates charged, the necessity and benefit of the services, and "the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(1), (a)(3).

46.	Section 330 review is, by definition, undertaken when a fee application is filed and not when employment is authorized.

47.	The Fifth Circuit implements section 330 through the lodestar method. *Trevino v. U.S. Bank Trust, N.A.* (*In re Trevino*), 509 (Bankr. S.D. Tex. 2021) (citing *Transamerican Nat. Gas Corp. v. Zapata P'ship* (*In re Fender*), 12 F.3d 480, 487 (5th Cir. 1994)). The lodestar amount is calculated by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. *In re Trevino,* 633 B.R. at 509.

48.	A court computes the lodestar by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community, and may then adjust the result based on the section 330 factors and the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974).

49.	Because sections 328(a) and 330 impose different standards, only one can govern a given compensation determination. Which regime applies turns on what the professional sought and the court approved at retention, and the governing rule is one of clarity: section 328(a) treatment attaches only where the professional unambiguously invoked section 328 to fix its terms.

50.	"[U]nless . . . a professional's retention application unambiguously specifies that it seeks approval under § 328, it is subject to review under § 330." *In re Circle K Corp.* 279 F.3d 669, 671, (9th Cir. 2002).

**B.**     **THE OPERATIVE RETENTION DOCUMENTS SUBJECT WHITE & CASE'S COMPENSATION TO SECTION 330.**

51.     White & Case told this Court, in its own words, that the allowance of its compensation would proceed under section 330. It specifically asserted that it "shall apply to this Court for allowance of compensation for professional services rendered and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code."[10]

52.     The Retention Order says the same. It provides that White & Case "shall be compensated and reimbursed for expenses in accordance with, and will file, interim and final fee applications for allowance of its compensation and expenses incurred in connection with these Chapter 11 Cases[,] and shall be subject to sections 330 and 331 of the Bankruptcy Code."[11]

53.     The Retention Order forecloses White & Case's reading on its face, because the Court did not merely route compensation to section 330, it affirmatively reserved section 330 review.

**C.**     **BECAUSE SECTION 330 GOVERNS, THE REASONABLENESS OF WHITE & CASE'S RATES—INCLUDING THE RELEVANT MARKET—IS A DISPUTED FACTUAL QUESTION.**

54.     White & Case's own briefing in its Reply concedes that the rate question is governed by section 330. It argues that "[t]he controlling 'community' for assessing prevailing market rates under section 330 . . . is . . . the national bankruptcy market," and that "[i]n applying [the section 330(a)(3)] standard, the relevant question is whether the average rates billed are consistent with the customary market rate charged by comparably skilled practitioners". Those are section 330 reasonableness arguments, and they confirm that the reasonableness of the rates is squarely before the Court under section 330.

---

[10] Exhibit K: White & Case Application to Employ
[11] Exhibit L: Retention Order

55.     Under section 330, the reasonable hourly rate is the prevailing market rate in the relevant legal community, and "[t]he relevant legal market is where the district court sits." *McClain v. Lufkin Indus., Inc.,* 649 F.3d 374, 381 (5th Cir. 2011). Reasonable hourly rates "are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Further, *Blum* noted, "the burden is on the applicant to produce satisfactory evidence... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."

56.     The hourly fee awarded must be supported by the record; the district court may not simply rely on its own experience in the relevant legal market to set a reasonable hourly billing rate." *League of United Latin Am. Citizens v. Roscoe I.S.D.,* 119 F.3d 1228, 1234 (5th Cir.1997).

57.     The presumptive benchmark is therefore the Houston market, where the Debtors chose to file.

58.     The Fifth Circuit has held that in unusual cases where out-of-district counsel are proven to be necessary to secure adequate representation, the rates charged by that firm are the starting point for the lodestar calculation.  *McClain v. Lufkin Indus., Inc.,* 649 F.3d 374, 384 (5th Cir. 2011).

59.     White & Case's contention that the relevant market is "national" is an invocation of the exception, which first requires evidence that out of district counsel is necessary to secure adequate representation. *McClain, 649 F.3d at 384.*

60.     That showing is not merely unmet here; it is affirmatively rebutted by White & Case's own staffing. Lead counsel of record is Charles R. Koster of White & Case's Houston office. White &

Case staffed this matter with Houston partners performing the same work for which its New York partners billed higher rates.

61.     The burden of proving the reasonableness of its compensation rests on White & Case and that burden is carried through evidence, not argument.

62.     Therefore, no amendment of the Retention Order is required, only its enforcement.

## VI.     TOPCO MAY OBJECT TO TIME ENTRIES AND EXPENSE ITEMS BEYOND THOSE SPECIFICALLY ENUMERATED; LINE-BY-LINE ITEMIZATION IS NOT REQUIRED, AND THE REORGANIZED DEBTORS HAVE NONETHELESS IDENTIFIED EACH ENTRY.

63.     The Bifurcation Order asks whether TopCo may object to the reasonableness of any time entry or expense item not specifically identified in the WC Objection. The answer is yes.

64.     Because White & Case bears the burden of proving the reasonableness of its own fees, TopCo was entitled to raise categorical objections (vagueness and block billing, lumping, interoffice conferences, duplication and overstaffing, and off-market rates, etc.) without marching entry-by-entry through every line of the Fee Application, and the Court's independent reasonableness review under section 330(a)(2) is not limited to the entries an objector singles out.

65.     A fee application must be sufficiently detailed to allow the Court to make an independent evaluation of whether the hours claimed are justified. *Matter of Lawler,* 807 F.2d 1207, 1212 (5th Cir. 1987).

66.     The question is, in any event, now academic: TopCo attached as Exhibit J a spreadsheet identifying each time entry and expense item in the Fee Application and the specific ground or grounds on which it is objectionable.

67.     TopCo provides the attached Exhibit J to assist the Court, not to limit the Objection or to assume a burden the law places on White & Case. To the extent any entry or expense is not individually marked—whether through inadvertence or because the defect (such as duplication, overstaffing, or excessive aggregate time) is apparent only when entries are viewed together—that entry or item remains subject to the categorical objections already raised, to White & Case's continuing burden to prove the reasonableness of every entry, and to the Court's independent review under section 330(a)(2).

## VII.   THERE IS NO BASIS FOR A DIFFERENT STANDARD: SECTION 330 GOVERNS BOTH SETS OF PROFESSIONALS, AND THE COURT'S UNOPPOSED APPROVAL OF THE DEBTORS' PROFESSIONALS' FEES NEITHER ESTABLISHES THE REASONABLENESS OF WHITE & CASE'S FEES NOR WAIVES THE OBJECTION.

68.     The Bifurcation Order asks whether there is a basis to establish a different standard for assessing the reasonableness of the Debtors' professionals' fees, which the Court approved without objection, and the Committee's professionals' fees sought in the WC Fee Application.

69.     The answer is no, and that answer defeats White & Case's position rather than supporting it as one standard governs both: Section 330.

70.     But that single standard requires an independent, record-specific reasonableness determination for each applicant and it places on each applicant the burden of proving the reasonableness of its own fees. This review is mandatory and non-waivable.

71.     The unopposed approval of the Debtors' counsel's fees is therefore neither a benchmark establishing the reasonableness of White & Case's fees nor a waiver of TopCo's objection to them.

**A.      THE SAME STANDARD (SECTION 330) GOVERNS BOTH SETS OF PROFESSIONALS.**

72.      Section 330 governs the compensation of every professional retained in these cases, whether employed under section 327 (the Debtors' counsel) or section 1103 (the Committee's counsel). 11 U.S.C. § 330(a)(1).

73.      The same lodestar method and the same section 330(a)(3) factors apply to each. White & Case agrees to this principal as stated in its Reply: "Reasonableness under section 330 does not vary based on which side of the table the professional sits on."

74.      There is no separate or heightened standard for committee counsel, and none for debtor's counsel. That concession cuts against White & Case: because a single standard governs, White & Case is held to the same burden and the same record-based proof as any other applicant, and it cannot invoke the "same standard" to import the result of a different professional's fee allowance while escaping the showing that the standard requires of it.

75.      Section 330 directs the Court to award reasonable compensation based on "the nature, the extent, and the value of such services," the time spent, and the rates charged—an inquiry into the applicant's own services, hours, and rates. 11 U.S.C. § 330(a)(3).

76.      The lodestar is computed from the applicant's own reasonable hours multiplied by the prevailing market rate. That is an application-specific, record-specific determination, not a relative comparison to one adversary's bill.

77.      A comparison to the fees of the Debtors' counsel is therefore not the section 330 test.

78.      The standard measures reasonableness against the prevailing market rate and the customary compensation of comparably skilled practitioners, not against what a single opposing firm

happened to charge in the aggregate. That Latham & Watkins LLP (**"Latham"**) may have billed more in total says nothing about whether White & Case's specific rates and hours were reasonable.

79.     Indeed, White & Case's own authority confirms that the applicant bears the initial burden to establish the reasonableness of its own application before any burden shifts to the objector. (quoting *In re MLCJR, LLC* for the proposition that "once the applicant establishes the reasonableness of the fees, the objecting party has the burden of demonstrating what part of the application is unreasonable").

80.     White & Case does not discharge that threshold burden by pointing to Latham; it must prove its own fees on its own record.

**B.      THE PRIOR FEE APPROVALS WERE UNOPPOSED AND SET NO BENCHMARK AND HAVE NO PRECLUSIVE EFFECT.**

81.     White & Case repeatedly emphasizes in its Reply that the Debtors' professionals' fees were "approved by this Court without objection."

82.     But an unopposed allowance is not a litigated determination that those fees were reasonable on a contested record; it reflects the absence of an objection, not a merits finding tested against an adversary. An unopposed order entered as to one professional, in a separate fee matter, sets no benchmark and has no preclusive effect as to a different professional's application. Issue preclusion requires that the identical issue have been actually litigated and determined; claim preclusion requires the same claim between the same parties. Neither is present across separate fee applications.

83.     White & Case cannot bootstrap an unexamined, unopposed allowance of Latham's fees into a market benchmark or a finding that binds the Court's independent determination here.

**C.      THE REORGANIZED DEBTORS DID NOT WAIVE THEIR OBJECTION, AND REASONABLENESS REVIEW IS MANDATORY AND NON-WAIVABLE.**

84.     White & Case appears to suggest that the WC Fee Objection is waived because the Debtors did not object to their own counsel's fees and because the conduct of the Debtors binds their successor. That is wrong twice over.

85.     First, there is no such thing as cross-application waiver. A party's decision not to contest one professional's compensation is not a waiver of its statutory right to contest another professional's compensation at final allowance; they are separate contested matters, with separate applicants and separate records.

86.     Second, and dispositively, section 330 review does not depend on any objection at all. The Court "may, on its own motion or on the motion of the United States Trustee . . . or any other party in interest, award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2). The U.S. Trustee is the independent statutory watchdog for professional-fee matters. 28 U.S.C. § 586(a)(3). Because the Court must assess reasonableness regardless of any objection, no party's silence can establish White & Case's reasonableness or waive the Court's review of it.

**D. FAILURE TO OBJECT TO INTERIM FEE STATEMENTS DOES NOT WAIVE OBJECTION AT FINAL ALLOWANCE.**

87.     White & Case's reliance in its Reply on the Debtors' silence during interim billing misapprehends the interim/final distinction. Interim compensation under section 331 is interlocutory. The Fifth Circuit holds that "interim awards are interlocutory, and as such are always subject to reexamination and adjustment during the course of the case," and remain "always subject

to the court's reexamination and adjustment during the course of the case." *In re Evangeline Refining Co.,* 890 F.2d 1312, 1321–22 (5th Cir. 1989).

88.     Final allowance under section 330 is the stage at which the Court conclusively determines reasonableness, and the Code requires the final award to be reduced by any interim compensation already awarded. 11 U.S.C. § 330(a)(5).

89.     Failure to object at the interim stage therefore does not waive an objection at final allowance, and *Evangeline Refining* rejected the contention that interim awards are insulated from later reduction as "law of the case." 890 F.2d at 1321–22.

90.     Therefore, TopCo's objection, raised at the final-allowance stage, is timely and proper.

## VIII.   SYSTEMIC BILLING PRACTICES AND SPECIFIC OBJECTIONS TO THE FEES

91.     Subject to the foregoing, and without waiving TopCo's position that the reasonableness of these fees cannot be adjudicated without discovery and an evidentiary hearing, TopCo sets forth below its substantive objections to the WC Fee Application.

92.     These objections are stated by category to demonstrate the existence of genuine factual disputes; they are supported, on an entry-by-entry basis, by the schedule attached as Exhibit J.

### A.     UNREASONABLE HOURLY RATES

93.     As discussed above, the hourly rates in the Fee Application do not comport with the section 330 standard, under which the reasonable hourly rate is the prevailing market rate in the relevant legal community which is the community where this Court sits. The burden of proving that its rates are reasonable rests on White & Case, not on TopCo.

94.     Bankruptcy Courts in the Southern District of Texas, including Judge Isgur, have held that

"the burden is on the fee applicant to produce evidence that the rates are in line with the prevailing

rates in the community for similar services by lawyers of reasonably comparable skill, experience

and reputation." *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez),* 517 B.R. 724, 731

(Bankr. S.D. Tex. 2014)

95.     Judge Isgur further explained that, under Fifth Circuit precedent, out-of-town counsel may

be entitled to the rates they charge in their home districts under **"certain limited circumstances"**

*(emphasis added). Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez),* 517 B.R. 724,

731 (Bankr. S.D. Tex. 2014) (citing *McClain v. Lufkin Indus., Inc.,* 649 F.3d 374, 382 (5th

Cir.2011). Specifically, Judge Isgur held as follows:

> The Fifth Circuit has held that out-of-town counsel may be entitled to the rates they charge
> in their home districts under certain limited circumstances. *Id.* at 382. Courts must first
> determine whether hiring out-of-town counsel was reasonable in the first instance, and then
> determine whether the rates sought by the out-of-town counsel are reasonable for an
> attorney of his or her degree of skill, experience, and reputation. *Id.* This two-prong test
> should be applied cautiously, with the Fifth Circuit noting that even in cases where out-of-
> town counsel was found to be necessary, reduced fees were often awarded. *Id.* Where there
> is abundant and uncontroverted evidence showing the necessity of out-of-town counsel,
> such counsel's "home" rates should be considered as a starting point for calculating the
> lodestar amount. *Id.*
>
> In *McClain,* the court found that hiring out-of-town counsel was reasonable where it was
> clearly established that no lawyers in Texas were willing or able to commit the time and
> resources necessary to associate as co-counsel. *McClain v. Lufkin Indus., Inc.,* 649 F.3d at
> 378. In *In re ASARCO, LLC,* the court's finding that a local firm could charge national rates
> was based on its determination that: (1) there were no firms of the size and experience
> capable of handling the case in Corpus Christi; and (2) there were no individual lawyers in
> Corpus Christi capable of representing the debtor. *In re ASARCO, LLC,* 2011 WL
> 2975691, at *15 (Bankr. S.D.Tex. July 20, 2011).
>
> *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez),* 517 B.R. 724, 731 (Bankr.
> S.D. Tex. 2014)

96.     Therefore, White & Case has the burden to show why their New York rates should apply to a case filed in Houston, Texas.  Furthermore, there are numerous Houston law firms, with comparable experience and ability, who routinely perform this type of work at lower rates, including White & Case's own Houston bankruptcy partner, Charles Koster who bills at $1,900.00 per hour (in this case) rather than the higher rates sought here.

97.     This is a fact question, not a legal issue, and it cannot be resolved without an evidentiary record.

**B.      UNREASONABLE RATE PREMIUM**

98.     White & Case asserts that its requested compensation is "reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." White & Case's own data contradicts that assertion and reveals that the firm seeks a substantial "bankruptcy premium" from this estate.

99.     The premium appears at every level of the staffing structure, and it appears even when like is compared to like:

- **Partners:** the Committee blended partner rate in this case is $2,221.00 per hour, against the firm's own non-bankruptcy blended partner rate of $1,816.00 which $405.00 more per hour for the same tier of timekeeper.

- **Counsel:** a premium of $194.00 per hour.

- **Associates:** $1,169.00 per hour, against a non-bankruptcy rate of $1,063.00, a premium of $106 per hour.

- **Paraprofessionals:** $500 per hour, against a non-bankruptcy rate of $462.

100.     Across timekeeper levels, the premium ranges from approximately 8% (paraprofessionals) to approximately 22% (partners), with partners bearing the largest surcharge.

101.     White & Case's Reply does not dispute these tier-by-tier figures. It argues instead that any comparison of blended rates is distorted because non-bankruptcy work is weighted toward more junior timekeepers, so that a higher blended rate reflects a more senior team rather than a surcharge. That argument is answered by the comparison itself. TopCo does not rely on an aggregate blended rate that mixes timekeeper levels; they compare the same tier to the same tier, partner to partner, counsel to counsel, associate to associate, and paraprofessional to paraprofessional.

102.     The composition of the broader timekeeping pool is irrelevant when the identical seniority level is billed more in this case than the firm charges for the same level outside bankruptcy. White & Case offers no explanation for why its own partner commands $405.00 more per hour here than in the firm's non-bankruptcy matters.

103.     Its comparison of its aggregate blended rate to that of Debtors' counsel does not answer the point, because it compares two different firms rather than White & Case's own bankruptcy and non-bankruptcy rates for the same work.

104.     Section 330(a)(3)(F) makes a relevant factor "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(F).

105.     White & Case has not justified why this estate should pay a surcharge of up to approximately 22% above the firm's standard commercial rates for partner time. That inflation, considered with the firm's overall billing pattern, supports TopCo's contention that the fee request

was designed to execute the firm's stated objective rather than to provide reasonable and necessary services to the estate.

## C.      VAGUE TIME ENTRIES

106.      The WC Fee Application contains numerous entries too vague to permit a reasonableness determination. A recurring example is entries that identify only the participants in an internal communication "internal strategy meeting," "internal strategy call," and "confer with team" without identifying the subject, the issue addressed, or any work product.

107.      Others recite only that an attorney "conducted research" or "prepared for a hearing," without identifying the topic or the task performed. The specific vague entries are identified in Exhibit J.

108.      Simply identifying the participants on a call and its duration is not a description of the services rendered. An entry that names the lawyers on a call but not its subject does not allow the Court or TopCo to determine whether the service was necessary, whether it duplicated work performed by others, or whether the time was reasonable. Whether these entries are adequately descriptive is itself a contested question that cannot be resolved on their face.

109.      Courts in this district have consistently reduced or denied compensation where billing records obscure the nature of the services rendered.  Courts in the Fifth Circuit have consistently applied percentage-based reductions to attorney fee applications that contain lumped or vague entries, recognizing that such billing practices impede meaningful judicial review. *In re Amigo Pat Tex., LLC,* 579 B.R. 779, 785 (Bankr. S.D. Tex. 2017).(citing *La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir. 1995).

**D.    LUMPED TIME ENTRIES**

110.    The Fee Application also contains entries that lump multiple discrete tasks into a single time charge. Block billing of this kind prevents the Court and parties in interest from assessing the reasonableness of the time spent on any individual task, and it allows substantial time to be aggregated into single entries that cannot be tested task-by-task. The lumped entries are identified in Exhibit J. The recognized remedy for block billing is a reduction of the affected time, with the burden on the applicant to establish that the lumped time was reasonable.

111.    Additionally, lumped entries prevent a court from accurately determining how many hours were reasonably billed. *See In re 900 Corp.,* 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005) ("When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the Applicant has not met its burden to show that its fees are reasonable."); *In re Saunders,* 124 B.R. 234, 237 n.1 (Bankr. W.D. Tex. 1991) ("In order for the court to determine whether time spent on an activity was reasonable, multiple services cannot 786*786 be `lumped' together under one time entry."). Indeed, lumping activities on fee statements violate the U.S. Trustee's Fee Guidelines,[7] and this Court has repeatedly made it known in prior opinions over the past several years that it adheres to these Guidelines and expects the practicing bar to follow them. *See, e.g., Digerati Techs., Inc.,* 537 B.R. 317, 334 (Bkrtcy.S.D.Tex. 2015); *In re Ritchey,* 512 B.R. 847, 870-72 (Bankr. S.D. Tex. 2014); *In re Jack Kline Co.,* 440 B.R. 712, 752-53 (Bankr. S.D. Tex. 2010); *In re Energy Partners, Ltd.,* 422 B.R. 68, 89 (Bankr. S.D. Tex. 2009).

**E.    INTEROFFICE CONFERENCES**

112.    A significant volume of the Fee Application consists of time billed by multiple White & Case timekeepers for the same internal conferences, calls, and meetings among lawyers at the firm.

Section 330(a)(4)(A)(i) provides that the court "shall not allow compensation for . . . unnecessary duplication of services." 11 U.S.C. § 330(a)(4)(A)(i).

113.     Courts applying that provision have long held that a conference or meeting between lawyers in the same firm can constitute an unnecessary duplication of services, and that generally no more than one attorney may bill for time spent in an intra-office conference.

114.     Specifically, courts within the Southern District of Texas, including Judge Isgur on at least two separate occasions has found that with respect to interoffice communications, fees for interoffice conferences are allowed so long as there is not an inordinate number of interoffice conferences, and so long as multiple attorneys do **not** bill for the same conference. *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez),* 517 B.R. 724, 731 (Bankr. S.D. Tex. 2014) and *In re Pape,* 2014 WL 2567443, at *4 (Bankr.S.D.Tex. June 6, 2014).

115.     Here, White & Case routinely billed several timekeepers, frequently including multiple partners, for the same internal conference. The estate should not pay multiple senior-rate charges for a single meeting. The duplicative interoffice entries are identified in Exhibit J.

F.     ADMITTED CATEGORY OVERLAP

116.     White & Case acknowledges in its Fee Application that its project categories overlap, including an acknowledged overlap between its Investigation categories, and its statement (at footnote 25) that the categories are "interconnected" and "overlap."

117.    That admitted overlap matters because it prevents the Court and the parties from determining whether work billed under one category duplicates work billed under another.

### G.    OVERSTAFFING AND DUPLICATIVE EFFORT

118.    White & Case staffed this engagement with a large number of timekeepers and applied that staffing model across both the most consequential and the most routine matters in the case. The overstaffing was not episodic; it was systematic. At hearings, the firm dispatched numerous attorneys to attend matters that required only a few. At depositions, it sent multiple attorneys including senior partners who billed substantial time to "monitor" a deposition conducted by another lawyer.

119.    In drafting, a single filing routinely passed through layers of timekeepers: a junior attorney drafted, a senior associate revised, a partner reviewed, a second partner reviewed the first partner's review, and additional attorneys then "conferred" about the result. Even routine administrative tasks, and routine Committee update calls, were staffed with far more timekeepers including multiple partners) than the work required. The specific entries are identified in Exhibit J.

120.    Section 330(a)(4)(A)(i) bars compensation for unnecessary duplication, and the Retention Order required White & Case to "use its reasonable efforts to avoid any duplication of services." The billing records reflect the opposite.

121.    In addition, White & Case billed the estate for the same work performed by Alix Partners and significant hours for numerous partners to confer with Alix Partners.

122.    White & Case defends its staffing by comparing the number of timekeepers it deployed to the number deployed by the Debtors' counsel. That comparison is not the test. The question under section 330 is not how many professionals the other side used; it is whether White & Case's own

staffing was necessary and non-duplicative—and whether each timekeeper who billed for a given hearing, deposition, or conference contributed in a meaningful way.

## H.   CLERICAL AND OVERHEAD

123.   A portion of the time billed in the Fee Application was spent on clerical and ministerial tasks that are not compensable as professional services at professional rates. Section 330(a)(1) authorizes compensation only for "actual, necessary services," and the lodestar compensates an applicant for professional work at market professional rates. Purely clerical and secretarial work is not professional work. As the Supreme Court has held, "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them," Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989), and the same is true, a fortiori, of billing such tasks at an attorney's rate. The cost of clerical and secretarial work is part of a firm's overhead, which is presumed to be built into its hourly rates; billing it again, as though it were professional time, is a form of double recovery. Id. at 285–88.

124.   Here, White & Case billed attorney and paraprofessional time, at professional rates, for tasks that are clerical in nature. For example, filing and uploading documents on the Court's CM/ECF system, calendaring and docketing deadlines, organizing and assembling exhibits and binders, downloading and saving documents, scheduling, and coordinating logistics.

125.   Whether a given entry reflects compensable professional work or non-compensable clerical work turns on the nature of the task, not on the title or hourly rate of the person who performed it.

126.   The same principle governs the firm's expense reimbursement requests. Section 330(a)(1)(B) permits reimbursement only of "actual, necessary expenses." A firm's overhead, the routine cost of maintaining its office and support staff and of doing business, is subsumed within the professional hourly rates the firm charges and is not separately reimbursable from the estate.

127.    To the extent White & Case seeks reimbursement for items that constitute overhead rather than actual, necessary case expenses, those charges should be disallowed.

## IX.    OBJECTIONABLE CATEGORIES BY SUBJECT MATTER

128.    TopCo objects to each and every time entry and expense contained in the Fee Application on the ground that White & Case's fees are the product of a coercive threat, and they hereby preserve all objections under 11 U.S.C. §§ 328(c), 330(a)(3), 330(a)(4)(A), and 105(a).

129.    The categories, entries, and examples identified below identify the broad topics that are detailed in the attached Exhibit J.

### DIP FINANCING

130.    The Committee's objection to the DIP financing, a facility for which there was no competing alternative, was White & Case's first significant opportunity to execute its billing strategy.

131.    White & Case deployed a large team, including multiple partners, to oppose the financing, and billed substantial amounts across several project categories to do so. TopCo objects to this work as overstaffed and duplicative and as not reasonably likely to benefit the estate.

### OBJECTION TO CONFIRMATION

132.    The Committee's confirmation objection is the centerpiece of the Reorganized Debtors' objection under section 330(a)(4)(A). White & Case pursued a multi-day confirmation fight whose legal and valuation theories were not reasonably likely to succeed or to benefit the estate when the work was performed.

133.    On October 28, 2025, the Consenting Creditors warned the Court that the Committee's strategy rested on a "completely unsupportable" valuation theory: to drive any recovery to the subordinated unsecured notes, the Committee had to prove an enterprise value at least 65% above the Debtors' midpoint valuation, a swing the market never reflected, as none of the Debtors' secured debt traded at or near par at any time in 2025. The valuation gap did not narrow as the case progressed; it widened, as the Debtors lost significant customer contracts that further reduced enterprise value. The theory also required the Committee to prevail simultaneously on multiple independent and untenable legal theories, the failure of any one of which defeated the whole.

134.    *Under In re Woerner,* 783 F.3d 266 (5th Cir. 2015) (en banc), services are compensable only if, judged at the time they were rendered, they were reasonably likely to benefit the estate or necessary to the administration of the case. The contemporaneous market pricing, the widening valuation gap, and the structural implausibility of the Committee's theories were all knowable to White & Case in real time. On that record, the confirmation work was not a reasonable "good gamble"; it was the pursuit of an objectively unreasonable theory and was not reasonably likely to benefit the estate.

135.    White & Case responds in its Reply that the Court described the Committee's valuation expert as "credible" and its approach as "valid," and did not find the position frivolous. Those observations do not answer the section 330(a)(4)(A) question. That an expert was found credible, or that a theory was not sanctionably frivolous, is not a determination that the work was reasonably likely to benefit the estate when performed.

**UNITEDHEALTHCARE (UHC) SETTLEMENT OBJECTION**

136.    White & Case pursued an objection to the UnitedHealthcare settlement with little prospect of success and significantly continued to bill substantial amounts on UHC-related work after the objection had already failed at hearing.

**COMMITTEE MEETINGS**

137.    White & Case routinely staffed routine Committee update calls with many timekeepers, including multiple partners on a single call without identifying a topic. The cost of these calls reflects the number of timekeepers the firm chose to put on the line, not the topic in many instances or the complexity of the matters discussed.

**CASE STRATEGY ENTRIES**

138.    A substantial number of entries in the Case Strategy category identify no legal issue, no substantive topic, and no work product and only identify the names of the participants on a call (for example, "strategy call with [name]," "internal strategy call," "weekly strategy meeting").

139.    Section 330(a)(3)(A) requires that compensation be for actual, necessary services, and the burden of proof is White & Case's. An entry disclosing only who was on a call does not permit the Court to determine whether the service was necessary, whether it duplicated other work, or whether the time was reasonable.

140.    These entries are a category-specific instance of the vagueness objection identified above, and the specific entries are identified in Exhibit J.

### PRO HAC VICE APPLICATIONS AND NOTICE OF APPEARANCE

141.     White & Case billed the estate for a series of routine pro hac vice motions and Notice of Appearance. These are standard forms and they routed them through multiple timekeepers across multiple billing categories, transforming a routine administrative task into a disproportionate billing event. The specific entries and amounts are identified in Exhibit J.

### RETENTION APPLICATION

142.     White & Case billed the estate an extraordinary amount to prepare and file its own retention application which is a short motion consisting largely of boilerplate statutory disclosures. They did this by routing it through numerous timekeepers, including layered partner review of a document a single associate had already drafted. The work was grossly disproportionate to the routine nature of the filing.

### PLAN SUPPLEMENT / ASSET ANALYSIS

143.     White & Case billed multiple timekeepers, across several different billing categories, to review the same set of documents. This is a pattern that both overstaffs the task and illustrates the category overlap described above.

### AUTOMATIC STAY ISSUES

144.     White & Case billed multiple attorneys, including several partners, to review and confer about motions for relief from the automatic stay on which the Committee took no position and filed no response. Billing multiple senior timekeepers to monitor uncontested motions is duplicative and not necessary to the administration of the case.

FEE APPLICATIONS AND REVIEWING TIME RECORDS

145.    White & Case billed the estate significantly to review its own time entries and to prepare its own monthly fee statements and interim and final fee applications, routing the same time entries through successive layers of reviewers who each performed overlapping privilege and compliance reviews, followed by additional partner and counsel review.

146.    The layering is duplicative, and much of the work could have been performed by a single billing professional.

147.    Furthermore, the review did not prevent White & Case from filing time records that appear on their face to be problematic. For example, Dominic Litz, an attorney who billed the estate nearly $278,000.00 in total, recorded time for conferring with "himself" regarding potential litigation issue research. [12]

148.    This is precisely the type of time entry that should raise concern. It is one thing to mistakenly record the wrong topic or date, but it is difficult to characterize as a mere mistake a time entry reflecting that an attorney conferred with himself.

CLAIMS ADMINISTRATION, BASIC RULES, BASIC LEGAL RESEARCH AND REVIEW OF TO-DO LIST

149.    White & Case billed the estate to review proofs of claim that were not yet being litigated and to research routine claim-objection procedures which are foundational procedures that a firm holding itself out as a leading restructuring practice, and billing at premium rates, would not need

---

[12] See ECF. No. 684, Page 27:  9-15-2025: D. Litz bills 0.10 "Confer with D. Litz re: potential litigation issue research 0.10).

to research at the estate's expense. The work was also duplicative, with multiple attorneys conducting parallel research on the same issues.

150.    White & Case further billed the estate to educate itself regarding local rules and basic bankruptcy issues that a law firm of its caliber, particularly one represented by Houston counsel, should already have understood.

151.    Below is a sampling of such time entries identified above and contained in Exhibit J:

- 12-3-2025:    Review complex case procedures re: exhibits

- 9-10-2025:    Review Rule 2004 requests precedent and local rules

- 9-25-2025:    Conduct legal research re: Bankruptcy Rules re: service and notice

- 9-28-2025:    Review local rules re: emergency hearing

- 11-26-2025:    Review local rules re make-whole objection

- 11-26-2025:    Review local rules for claim objection

- 12-5-2025:    Research on Court's evidentiary rules

152.    Finally, White & Case routinely billed for partners, associates, and paralegals to review and update internal to do lists. Such work is not compensable.

UNNECESSARY AND LUXURY EXPENSES

153.     Section 330(a)(1)(B) limits reimbursement to actual, necessary expenses.   In its Final Fee Application, White & Case asserts that the expense reimbursements represent "necessary" expenses incurred in the amount of $300,469.13.[13]

154.     TopCo identifies the following expenses which it asserts are neither necessary nor reasonable:

- In December 2025, over a three-day period, Greissman billed over $1,500.00 for catering.

- In total, White & Case billed the estate $13,562.46 for food, and categorizes meals in four separate ways: (a) business meals, (b) conference room dining, (c) overtime meals, (d) travel meals.

- Although White & Case billed the estate thousands of dollars to upload documents, download documents, store documents and technical assistance, it also billed the estate expenses for document research, e-discovery data hosting/storage, e-discovery processing, e-discovery production, e-discovery technical time, e-discovery user fees.

- White & Case billed the estate for premium accommodations including stays at the Four Seasons in Houston and the Ritz-Carlton in Boston and for extravagant meals.

---

[13] ECF No. 1290, Page 1

155.     TopCo further object to the entirety of the expenses under 11 U.S.C. § 105 as a product of the coercive threat described above.   When White & Case's expenses are being paid by the Reorganized Debtors, it deploys over 8 attorneys to appear in person, incurs expenses, and bills for non-working hours. It is telling that when White & Case appears at a hearing to defend its own fees in this dispute, it has chosen either to appear remotely or to send only one attorney in person.

## CONCLUSION

For the foregoing reasons, TopCo respectfully requests that the Court: (i) reject White & Case's contention that its hourly rates were pre-approved and fixed under section 328(a), and decline to treat the Retention Order as foreclosing review of those rates under section 330; (ii) determine that the same section 330 standard governs both the Debtors' and the Committee's professionals, and that the unopposed approval of the Debtors' professionals' fees neither establishes the reasonableness of White & Case's fees nor waives this Objection; (iii) determine that TopCo may object to time entries and expense items beyond those specifically enumerated; (iv) determine that the reasonableness of the White & Case Fee Application cannot be adjudicated on judicial notice of the existing record alone and that it requires discovery and an evidentiary hearing; (v) following discovery and an evidentiary hearing, grant the relief requested in this Objection, namely, (a) deny the Final Fee Application in its entirety under 11 U.S.C. §§ 328(c), 330(a)(4)(A), and 105(a); (b) in the alternative, reduce White & Case's fees and expenses under 11 U.S.C. § 330 and equitably subordinate the remainder to the claims of unsecured creditors under 11 U.S.C. § 510(c); or (c) in the further alternative, reduce the fees and expenses under Section 330; and (vi) grant such other and further relief as is just and proper.

Dated: <u>June 3, 2026</u>

By: <u>*/s/ Miriam T. Goott*</u>
Miriam T. Goott
SBN 24048846
Attorney For TopCo


OF COUNSEL:
**WALKER & PATTERSON, P.C.**
Miriam Goott
SBN 24048846
P. O. Box 61301
Houston, TX 77208-1301
(713) 956-5577 (telephone)
(713) 956-5570 (fax)
mgoott@walkerandpatterson.com


## <u>CERTIFICATE OF SERVICE</u>

I, Miriam T. Goott, hereby certify that on June 3, 2026, Amended Objection was filed by

using the CM/ECF system, and all parties will be served by the CM/ECF system.

By:<u>*/s/ Miriam T. Goott*</u>

Miriam T. Goott