**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **MODIVCARE, INC.,** *et al.,* | Case No. 25-90309 (ARP) |
| *Debtors.* | (Jointly Administered) |

**AMENDED OBJECTION TO FINAL FEE APPLICATION
FILED BY ALIXPARTNERS, LLP**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

ModivCare Topco, LLC ("ModivCare") files this Amended Objection (the "Objection") to the *Final Fee Application of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred for the Period from September 10, 2025 Through December 29, 2025* [Docket No. 1288] (the "Fee Application") filed by AlixPartners, LLP ("AlixPartners"), and respectfully show as follows:

**SUMMARY OF FACTS AND RELIEF REQUESTED**

1. The reorganization of ModivCare Inc. and its seventy debtor affiliates (collectively, the "Debtors") was characterized by an aggressive, expedited timeline that saw the enterprise transition from its voluntary chapter 11 filing on August 20, 2025 to confirmation of its Second Amended Joint Chapter 11 Plan of Reorganization on December 15, 2025, with an effective date of December 29, 2025.

2. The Official Committee of Unsecured Creditors (the "Committee") retained AlixPartners as its financial advisor to provide valuation, business-plan assessment, and litigation support.

1

3.  In its Fee Application, AlixPartners seeks total compensation and expense reimbursement of $5,022,757.29 for its service as financial advisor to the Committee, comprising $4,955,847.00 in professional fees (4,671.3 hours), $41,910.29 in expenses, and up to $25,000.00 in post-effective-date fees.

4.  AlixPartners attempts to insulate this request from review by pointing to a recital of section 328(a) in the order approving its retention. That reliance is misplaced. As set forth below, the order fixed no specific terms within the meaning of section 328(a); it expressly subjected AlixPartners' compensation to the ordinary fee-application procedures of sections 330 and 331; and AlixPartners' own Fee Application invokes sections 327, 330, and 331 as the basis for relief and quotes the section 330(a)(3) factors. The section 328 reference is a label that cannot substitute for the substantive reasonableness review that AlixPartners itself has invoked. The requested compensation must be evaluated, and reduced, under section 330.

5.  A comprehensive audit of AlixPartners' time records reveals a pattern of top-heavy staffing, excessive internal conferencing, the billing of clerical tasks at professional rates, duplication of the services of the Committee's counsel, and the pursuit of a litigation strategy that lacked an objective prospective benefit to the estate.

6.  While ModivCare does not contest that AlixPartners performed services during the case, the fees and expenses sought are unreasonable, excessive, and insufficiently justified under the standards of 11 U.S.C. § 330 and controlling Fifth Circuit authority.

7.  Specifically, the requested compensation should be significantly reduced because: (a) AlixPartners charged hourly rates exceeding prevailing market rates for financial-advisory services in this District; (b) AlixPartners engaged in systematic overstaffing and "gang billing" of routine internal coordination calls, inflating billable hours well beyond what was actual and

necessary; (c) AlixPartners duplicated the services of White & Case LLP ("White & Case"), counsel to the Committee, in violation of the express terms of the Retention Order; (d) AlixPartners performed services that were neither reasonable nor necessary and provided no benefit to the estate; (e) AlixPartners submitted vague, lumped, and clerical time entries; and (f) AlixPartners seeks reimbursement of unreasonable expenses and impermissible post-effective-date fees.

7.1. **Hourly Rates Exceeding The Prevailing Market/Local Rate:** The "prevailing market rate" rule is part of the lodestar's "reasonable hourly rate" prong: lodestar uses "the prevailing hourly rate in the community for similar work." *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987); *Transamerican Natural Gas Co. v. Zapata Partnership (In re Fender)*, 12 F.3d 480, 487 (5th Cir. 1994); *In re Cahill*, 428 F.3d 536, 540 (5th Cir. 2005); *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010). The leading statement is *ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.)*, 751 F.3d 291, 297 (5th Cir. 2014), aff'd sub nom. *Baker Botts v. ASARCO*, 576 U.S. 121 (2015): because "reasonable attorneys' fees in federal court have [not] been 'nationalized,'" it is improper to measure a Texas firm's rates against "general hourly rates of out-of-state firms and rates charged in cases pending in other circuits". A professional billing out-of-market rates in a Texas/Louisiana/Mississippi case is exposed to a rate reduction down to the local prevailing rate. Rate-component reduction example: *Caplin & Drysdale Chartered v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 526 F.3d 824 (5th Cir. 2008) affirmed cutting national counsel's non-working travel time to 50% of full rate, disallowing $135,685.80, where the firm failed to prove the market custom. Rate reductions are factual and reviewed for clear error.

7.2. **Systematic Overstaffing and "Gang Billing":** *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (superseded by statute on other grounds) ("Cases may be overstaffed… exclude … hours that are excessive, redundant, or otherwise unnecessary"); § 330(a)(1) ("actual, necessary services"); § 330(a)(4)(A)(i) ("unnecessary duplication of services"). *Cahill*, 428 F.3d at 540-42 (reduction for attorneys who "duplicated each other's efforts" and "performed unnecessary work"); *Lawler*, 807 F.2d at 1211 (lodestar on "nonduplicative" time only); *Tow v. Speer*, No. H-II-3700, 2015 U.S. Dist. LEXIS 108553, *18 (S.D. Tex. 2015). The U.S. Trustee Guidelines (28 C.F.R. Part 58, App. A (1996) & App. B (2013) for "larger" Chapter11 cases — $50M+ assets and $50M+ liabilities) direct scrutiny of staffing and intra-office conferences.

7.3. **Duplication Among Estate Professionals:** Section 330(a)(4)(A)(i) bars "unnecessary duplication of services"; *Hensley* bars" redundant" hours; *Cahill*, 428 F.3d at 540 (duplication finding affirmed); *Lawler*, 807 F.2d at 1211 ("nonduplicative work time"). Duplication between separate firms/professionals (counsel vs. financial advisor; multiple firms): *Tow v. Speer*, No. H-II-3700, 2015 U.S. Dist. LEXIS 108553, *23-24 (S.D. Tex. 2015) (citing *In re Cendant Corp. Sec. Litig*., 404 F.3d 173, 191 (3d Cir. 2005)) (work "duplicative of the efforts of lead counsel … will not normally be compensated.

7.4. **Services Neither Reasonable Nor Necessary/No Benefit:** § 330(a)(1) ("actual, necessary services"); § 330(a)(3); § 330(a)(4)(A)(ii) (no compensation for services "not reasonably likely to benefit the debtor's estate" or "necessary to the administration of the case"). *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015)  (en banc), overruling Pro-Snax; the "material benefit" test "conflicts with the language and legislative history of § 330, diverges from … other circuits, and has sown

confusion." Prospective factors include "the probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer … would have performed …,whether the … services could have been rendered by the Trustee …, and any potential benefits to the estate." The bankruptcy court below allowed only $19,409 of a >$130,000 request (~85% reduction).

7.5. **Vague, Lumped, and Clerical Time Entries**: *In re First Colonial Corp.*, 544 F.2d 1291, 1300 (5th Cir. 1977)(superseded by statute on other grounds) (each hour's expenditure must be described); *Hensley*, 461 U.S. at 433 (reduction where "documentation of hours is inadequate"); 28 C.F.R. Part 58, App. B ("The United States Trustee will object to block billing or lumping," subject to a *de minimis* exception "not exceed[ing] .5 hours on that day"). Fifth Circuit percentage-cut cases: *Saizan v. Delta Concrete Prods.Co.*, 448 F.3d 795, 800 (5th Cir. 2006) (10%); *Cambridge Toxicology Group v. Exnicios*, 495 F.3d 169, 181–82 (5th Cir. 2007) (12.5%); *Hopwood v. Texas*, 236 F.3d 256, 279-81 (5th Cir. 2000) (25%). *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989); *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974) ("Its dollar value is not enhanced just because a lawyer does it")."

**JURISDICTION AND STANDING**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. ModivCare is a party in interest with standing to object. Under the Plan and Confirmation Order, ModivCare bears ultimate responsibility for the payment of allowed professional fees.

## I.   FACTUAL BACKGROUND

3.   On August 20, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.   On September 5, 2025, the United States Trustee appointed the Committee [Docket No. 124].

5.   On October 8, 2025, the Committee filed its application to retain AlixPartners [Docket No. 473] (the "Retention Application").

6.   On November 4, 2025, the Court entered the *Order Authorizing the Official Committee of Unsecured Creditors to Employ and Retain AlixPartners, LLP as its Financial Advisor Effective as of September 10, 2025* [Docket No. 654] (the "Retention Order").

7.   On December 15, 2025, the Court entered the order confirming the Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1055] (the "Confirmation Order") and denying the Committee's motions for leave, derivative standing, and authority to commence and prosecute certain causes of action. The Plan became effective on December 29, 2025.

8.   On February 11, 2026, AlixPartners filed the Fee Application [Docket No. 1288], seeking a final allowance of $5,022,757.29.

9.   On March 4, 2026, TopCo filed its Objection to the AlixPartners Fee Application [ECF No. 1351] (the **"Objection"**).

10.   On April 6, 2026, the Court held a status conference and, among other things, *sua sponte* ordered that the Objection be bifurcated into two phases: Phase 1, addressing legal issues, and Phase 2, addressing factual issues (the **"Status Conference"**). The Status Conference was continued to April 30, 2026 (the **"Continued Status Conference"**).

11. Although the Court never entered an order bifurcating the issues into phases, TopCo, out of an abundance of caution, filed a Motion to Reconsider the Court's oral ruling bifurcating the matter into two phases on April 9, 2026 (the **"Motion to Reconsider"**).

12. In the Motion to Reconsider, TopCo argued that the Court's decision to bifurcate the Objection would require the Court to resolve purported "legal issues" in a first phase before conducting any evidentiary hearing. TopCo argued that such a procedure conflicts with Federal Rule of Bankruptcy Procedure 9014(d), which mandates that testimony concerning disputed material factual issues "must be taken in the same manner as testimony in an adversary proceeding."

13. TopCo further argued in its Motion to Reconsider that bifurcation contravenes the Fifth Circuit's categorical rule, most recently reaffirmed in *Assadi v. Osherow (In re Assadi)*, 2025 U.S. App. LEXIS 13678 (5th Cir. June 4, 2025), that an evidentiary hearing is required whenever objections to a fee application raise disputed issues of material fact.

14. On May 9, 2026, the Court entered a Scheduling and Bifurcation Order at ECF No. 1520 (the **"Bifurcation Order"**).

15. Pursuant to the Bifurcation Order, the Court held that in Phase 1 the Court will adjudicate the reasonableness of the Fee Application under 11 U.S.C. § 330 based solely on judicial notice of the evidentiary record already established in the underlying bankruptcy case, the Fee Application, the Objection, and Reply, without any discovery and without an evidentiary hearing.

16. The Bifurcation Order further provides that Phase 1 shall include the following issues: (a) whether TopCo may object to the reasonableness of any time entry or expense item not specifically identified in the Objection; (b) whether White & Case's hourly rates were predetermined at the time of its retention; and (c) whether there is a basis to apply a different

standard in assessing the reasonableness of the fees sought in the Fee Application than the standard applied to the Debtors' professionals' fees, which were approved by the Court without objection.

17. TopCo continues to oppose the Bifurcation Order. The issues identified therein are not purely legal questions capable of resolution from the face of the pleadings. Rather, each issue arises from the same underlying dispute: AlixPartners seeks allowance of approximately $5 million in fees and expenses under 11 U.S.C. § 330 without the ability to pursue discovery concerning the factual basis for its fee request.

18. The Bankruptcy Code places the burden of proof squarely on the fee applicant. AlixPartners, not TopCo, bears the burden of establishing that the services for which it seeks compensation were actual, necessary, reasonable, efficiently staffed, and reasonably likely to benefit the estate at the time they were rendered. Once those elements are challenged, they present factual issues that can be resolved only through evidence.

19. The Bifurcation Order provides that the Court will adjudicate the reasonableness of the Fee Application under section 330 based solely on judicial notice of the evidentiary record already established in these cases, together with the Fee Application, the Objection, and the Reply, without any discovery and without an evidentiary hearing.

20. It cannot do so.

21. As discussed in greater detail below, reasonableness under section 330 is a question of fact on which AlixPartners bears the burden of proof, and the Reorganized Debtors have raised specific, concrete factual disputes, about the necessity of staffing, the duplication of effort, and the value of particular services, the purpose of the billing. Neither the record in this case nor the pleadings filed answer these questions and judicial notice cannot address this either.

22. Judicial notice is a narrow evidentiary device, not a substitute for proof. A court may judicially notice an adjudicative fact only if it is "not subject to reasonable dispute" because it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)

23. Judicial notice is appropriate when there is no actual asserted factual dispute. *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011).

24. A court may take judicial notice of its own docket and of the papers filed in a case, but a Court cannot take judicial notice of facts that are in dispute. *Taylor v. Charter Med. Corp.,* 162 F.3d 827, 829–31 (5th Cir. 1998).

25. The reasonableness of AlixPartners' fees, whether its staffing was necessary, whether its effort was duplicative, and what value particular services added, are facts subject to reasonable dispute, and cannot be judicially noticed.

26. Section 330 requires the Court to determine "the nature, the extent, and the value of [the] services," and it forbids any allowance for "unnecessary duplication of services" or for services that were not "reasonably likely to benefit the . . . estate" or "necessary to the administration of the case." 11 U.S.C. § 330(a)(3), (a)(4)(A).

27. Each of those inquiries is factual, and the burden is AlixPartners'. *In re WNS, Inc.,* 150 B.R. 663, 664 (Bankr., S.D. Tex. 1993)(citations omitted); *Hensley v. Eckhart,* 461 U.S. 424, 437 (1983).

28. The difficulty for AlixPaerners' proposed procedure is that the existing record reveals only the outputs of its work, that a hearing occurred, that a deposition was taken, that a pleading was filed, while the section 330 inquiry turns on inputs the record does not contain: who did what,

9

whether it was necessary, why it was done whether it was duplicative, and whether it was actually done.

29. The Court may take judicial notice that a hearing was held and that multiple AlixPartners professionals appeared. But neither the record nor judicial notice can establish whether all were necessary, what each did beyond two attorneys who questioned a witness or argued, or whether their attendance added value or instead duplicated one another.

30. These are the precise question section 330(a)(4)(A) poses. So too with the entries in which one timekeeper repeatedly billed to "monitor" another professional during a hearing or deposition: the face of the entry cannot establish what "monitoring" a colleague entailed or whether it duplicated the other professionals work. And the Court may take judicial notice that a pleading was filed and that it ran to a certain length, but not whether it was reasonable for several separate timekeepers to bill for reviewing and revising that single pleading.

31. These are facts that must be proven and tested, not assumed; they are detailed in TopCo's substantive objections contained below and in the attached exhibits.

32. An objection to a final fee application is a contested matter governed by Bankruptcy Rule 9014, which makes the Part VII discovery rules applicable, see FED. R. BANKR. P. 9014(c), and entitles the parties to a hearing.

33. Where, as here, material facts are genuinely disputed, TopCo is entitled to take discovery, to require AlilxPartners to carry its burden with evidence, and to test that evidence through cross-examination; resolving contested material facts on the papers. Denying TopCo with the opportunity to conduct basic discovery and cross-examination, would be improper.

## II.  LEGAL STANDARD[1]

### A.  Section 330, Not Section 328(a), Governs the Review of AlixPartners' Fees.

34. AlixPartners may suggest that the Retention Order's recital of "sections 328(a) and 1103" subjects its fees to the deferential "improvident" standard of section 328(a), under which pre-approved terms may be revisited only if they "prove to have been improvident in light of developments not capable of being anticipated." 11 U.S.C. § 328(a). That argument fails for three independent reasons.

35. **First, the Retention Order itself subjects AlixPartners' fees to section 330 review.** The Retention Order expressly provides that AlixPartners' "Fee Applications shall comply with the procedures set forth in sections 330 and 331 of the Bankruptcy Code," the applicable Rules, "and the Fee Guidelines," and that AlixPartners shall keep its time in one-tenth-hour increments. Retention Order ¶ 4. The requirement of detailed, increment-level time records reviewed under the sections 330 and 331 procedures is fundamentally inconsistent with a section 328(a) pre-approval that would foreclose reasonableness review. The Court did not relieve AlixPartners of the obligation to demonstrate the reasonableness of its hours; it required precisely the opposite.

36. **Second, AlixPartners has invoked section 330.** AlixPartners cannot claim the benefit of section 330 to obtain payment while disclaiming its burdens to avoid review. The Fee Application states that "[t]he bases for relief requested herein are Sections 327, 330 and 331" of the Bankruptcy Code—not section 328. Fee Application ¶ 3. It represents that the Retention Order "authorized AlixPartners to be compensated and reimbursed pursuant to section 330 of

---

[1] Topco incorporates the legal arguments contained in its *Objection To The Final Fee Application of White & Case*, as amended.

the Bankruptcy Code." Fee Application ¶ 13. And it devotes its substantive argument to the section 330(a)(1) standard and the section 330(a)(3) factors, asserting that its fees are "reasonable, actual and for necessary services." Fee Application ¶¶ 23–24. Having sought allowance under section 330, AlixPartners is bound by it. The invocation of section 328 is a post hoc device to circumvent the reasonableness review that section 330 requires and that AlixPartners itself has placed before the Court.

37. **Third, the Retention Order fixed no specific terms.** The protection of section 328(a) attaches only where the court has actually "fixed" specific terms and conditions of compensation—such as a contingency percentage, a fixed transaction fee, or a defined fee cap—at the outset, so that the professional obtains advance certainty in exchange for forgoing later reasonableness review. Here, the Retention Order approved only AlixPartners' ordinary hourly-rate schedule, which the Retention Application itself described as "standard hourly rates, subject to periodic adjustments," and which the order permitted AlixPartners to increase on notice. Retention Application ¶¶ 17–18; Retention Order ¶ 9. An open-ended hourly engagement with adjustable rates is the paradigm of a section 330 engagement; it is not a fixed term that locks in the section 328(a) standard. A professional that wishes to claim the benefit of section 328(a) must obtain pre-approval of specific terms; a bare recital of the statute, untethered to any fixed compensation, does not suffice.

38. The hourly fee awarded must be supported by the record; the district court may not simply rely on its own experience in the relevant legal market to set a reasonable hourly billing rate." *League of United Latin Am. Citizens v. Roscoe I.S.D.,* 119 F.3d 1228, 1234 (5th Cir.1997).

39. The presumptive benchmark is therefore the Houston market, where the Debtors chose to file.

40. The Fifth Circuit has held that in unusual cases where out-of-district counsel are proven to be necessary to secure adequate representation, the rates charged by that firm are the starting point for the lodestar calculation. *McClain v. Lufkin Indus., Inc.,* 649 F.3d 374, 384 (5th Cir. 2011).

41. AlixPartners's contention that the relevant market is "national" is an invocation of the exception, which first requires evidence that out of district counsel is necessary to secure adequate representation. *McClain, 649 F.3d at 384.*

42. That showing is not merely unmet here; it is affirmatively rebutted by AlixPartners's own staffing, utilizing Houston professionals while billing national, New York rates.

43. The burden of proving the reasonableness of its compensation rests on AlixPartners and that burden is carried through evidence, not argument.

44. Therefore, no amendment of the Retention Order is required, only its enforcement.

## B.   The Section 330 Standard.

45. Under 11 U.S.C. § 330(a)(1), the Court may award a professional "reasonable compensation for actual, necessary services rendered" and reimbursement for "actual, necessary expenses." Section 330(a)(3) directs the Court to consider, among other factors, the time spent, the rates charged, whether the services were necessary to the administration of—or beneficial at the time rendered toward the completion of—the case, and whether the services were performed within a reasonable amount of time. Section 330(a)(4)(A) provides that the Court shall not allow compensation for services that were not reasonably likely to benefit the estate or necessary to the administration of the case.

46. In *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015) (en banc), the Fifth Circuit overruled the retrospective "actual benefit" standard of *Pro-Snax* and adopted a prospective "reasonably likely to benefit" test, holding that services are

compensable if they were "necessary to the administration" of the case or "reasonably likely to benefit" the estate "at the time at which [they were] rendered." *Id.* at 273–76. The *Woerner* standard is not a shield for inefficiency or overzealousness; in assessing the likelihood of benefit, courts consider the probability of success at the time of the service and the reasonable cost of pursuing it. "Whether the services were ultimately successful is relevant to, but not dispositive of," the compensation inquiry. *Id.* at 276.

47. ModivCare contends that AlixPartners' pursuit of a doubling of enterprise value—from the Debtors' midpoint of $837.5 million to approximately $1.66 billion—lacked objective reasonableness given contemporaneous market data and the Debtors' operational realities, including the non-renewal of material contracts. The Plan was confirmed over the Committee's objection, and the Committee's related standing motions were denied. Confirmation Order [Docket No. 1055].

48. The lodestar method—evaluating whether the hours billed were reasonable, whether the rates are consistent with prevailing market rates, and all other relevant equitable factors—remains the proper analytical framework, and the Court possesses broad discretion to adjust the award based on the *Johnson* factors. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Those factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the service properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the professional; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship; and (12) awards in similar cases. Courts in this Circuit have repeatedly reduced or disallowed

14

professional fees for overstaffing, duplication of services, excessive rates, and billing for services that are not actual and necessary. *See, e.g., In re Digerati Techs., Inc.*, 537 B.R. 317 (Bankr. S.D. Tex. 2015); *In re 900 Corp.*, 327 B.R. 585 (Bankr. N.D. Tex. 2005).

49. The Retention Order imposes an affirmative obligation: "AlixPartners shall use its reasonable efforts to avoid any duplication of services provided by any of the other retained professionals in these Chapter 11 Cases." Retention Order ¶ 13. AlixPartners' Retention Application acknowledged this obligation, representing that "AlixPartners will work closely with White & Case to ensure that there will be no duplication of efforts or unnecessary overlap." Retention Application ¶ 15.

## III. OBJECTION TO THE FEE APPLICATION

50. The Fee Application should be reduced for six principal reasons: (a) excessive hourly rates; (b) systemic overstaffing and internal "gang billing"; (c) duplication of White & Case's services in violation of the Retention Order; (d) services that were neither reasonable nor necessary and provided no benefit to the estate; (e) vague, lumped, and clerical time entries; and (f) unreasonable expenses and impermissible post-effective-date fees.

### A. AlixPartners' Hourly Rates Were Unreasonable.

51. AlixPartners staffed this engagement with 33 individual timekeepers across the following levels and rates:

| Title / Level | Rate Range (per hour) | Representative Timekeepers |
|---|---|---|
| Partner / Managing Director | $1,250 – $1,460 | MacGreevey ($1,460); Nystrom ($1,430); McGlynn ($1,415); Brown ($1,415); Magrisi ($1,250) |
| Partner | $950 – $1,225 | Rubel ($1,225); Wang ($1,225); Lee ($1,225); Kardos ($950) |
| Director | $715 – $1,150 | Panda ($1,150); Amico ($1,150); Gates ($1,120); Nelson ($1,120); Komendowski ($1,080); Root ($1,000); Wicker ($1,000); McClarren ($715) |

15

| Title / Level | Rate Range (per hour) | Representative Timekeepers |
|---|---|---|
| Senior Vice President | $565 – $980 | Lemack ($980); Prince ($950); Tutty ($950); Clark ($910); Cuomo ($910); Morimoto ($910); Hood ($850); Braverman ($565) |
| Vice President | $445 – $835 | Lovatto ($835); Allshouse ($810); Bonito ($580); Carafi ($445) |
| Analyst | $535 | Olohan ($535) |

52. The blended hourly rate ranged from $1,032.83 (October) to approximately $1,115 (November), with a composite average of $1,060.91 across the Final Period. Fee Application at 6. Industry data confirms that AlixPartners already commands among the highest blended hourly rates of any financial advisor to unsecured creditors' committees, recorded at approximately $1,013/hour in recent comparable cases, and the rates in this case exceed even that benchmark. These rates are unreasonable under sections 330(a)(3)(B) and (F).

**B.   The Rates Rival or Exceed Counsel's Rates.**

53. Multiple AlixPartners partners and managing directors billed at $1,415–$1,460 per hour—rates that rival or exceed those of senior restructuring partners on a per-unit basis when one considers that financial-advisory work does not require a law license and does not carry the same professional-responsibility obligations. That AlixPartners directors billing at $1,080–$1,150 per hour and senior vice presidents billing at $850–$980 per hour exceed the rates of many experienced attorneys in this District is itself an indication of unreasonableness.

**C.   The Engagement Featured an Excessive Number of High-Rate Billers.**

54. The engagement featured nine professionals billing at partner or managing-director rates ($950–$1,460), eight directors ($715–$1,150), eleven senior vice presidents ($565–$980), four vice presidents ($445–$835), and one analyst ($535), many of them billing at substantially full-time levels during peak months. *See* Fee Application at 5–6. For example, in October 2025 alone, Ashutosh Panda (Director, $1,150) billed 215.0 hours; Susan Clark (Senior Vice

President, $910) billed 212.3 hours; Ryan Komendowski (Director, $1,080) billed 189.1 hours; and Lucas Lovatto (Vice President, $835) billed 162.4 hours. This staffing model is inconsistent with a reasonable, efficient engagement.

## D.   Systemic Overstaffing and Internal "Gang Billing."

55. The time records reveal a pervasive, recurring pattern of billing large numbers of AlixPartners professionals for the same internal coordination calls. This practice dramatically inflated hours and is not the "actual, necessary" service contemplated by section 330. Representative examples, drawn from AlixPartners' own time detail, include the following:

| Date | Internal Call (Subject) | Profs. | Hours | Approx. Fees |
|---|---|---|---|---|
| 10/06/25 | Ongoing workstreams, coordination, and next steps | 13 | 6.5 | $7,310 |
| 10/07/25 | Priority tasks and next steps | 11 | 6.6 | $7,725 |
| 10/14/25 | Priority tasks and next steps | 11 | 5.5 | $6,162 |
| 10/21/25 | Work plan, strategy, and next steps | 13 | 9.1 | $10,742 |
| 10/28/25 | Ongoing workstreams and next steps | 12 | 8.4 | $9,650 |
| 11/04/25 | Ongoing workstreams and next steps | 11 | 8.8 | $10,048 |
| 11/11/25 | Work plan and strategy | 10 | 7.0 | $7,560 |
| 11/18/25 | Strategy and next steps | 10 | 5.6 | $6,860 |
| 12/02/25 | Priority tasks and next steps | 8 | 3.2 | $3,706 |

56. The foregoing is only a sample. These internal coordination calls occurred weekly or more frequently throughout AlixPartners' engagement, and each call routinely included eight or more professionals. No reasonable basis exists for requiring ten to thirteen financial advisors on a single internal coordination call. At most, two or three senior professionals should attend such calls, with the remaining team members briefed by memorandum or brief follow-up. The excess hours generated by this practice are conservatively estimated at 300 or more hours over the course of the engagement, representing approximately $300,000–$350,000 in excessive fees.

57. ModivCare requests disallowance of all time charged by professionals in excess of three attendees for any internal-only AlixPartners coordination call or, in the alternative, a 20% across-the-board reduction to the "Planning, Coordination and Case Management" category (101.3 hours / $116,057.50) and the "Meetings & Communication with UCC and Creditors" category (256.6 hours / $306,727.50) to account for the systematic overstaffing. Fee Application at 7.

### E.   Duplication of White & Case's Services.

58. Paragraph 13 of the Retention Order expressly requires AlixPartners to use reasonable efforts to avoid duplicating the services of the Committee's other retained professionals, and AlixPartners represented that it would work closely with White & Case to ensure no duplication or unnecessary overlap. The time records demonstrate a systematic failure to honor these obligations across multiple categories.

59. **Plan and confirmation work.** AlixPartners billed 85.5 hours ($89,377.50) for "RSA, Disclosure Statement & Plan of Reorganization" work, including reviewing and providing comments on draft confirmation-related pleadings, plan supplements, and other legal documents. Fee Application at 9, 18. For example, Chase Hood (Senior Vice President, $850/hour) participated in meetings and calls concerning the draft confirmation objection on November 23 and November 25, 2025. Reviewing, revising, and commenting on draft confirmation objections is quintessential legal work product and was White & Case's core function. While a financial advisor may reasonably review the financial aspects of plan documents, the detailed review and revision of legal briefs by a financial advisor at $850/hour is duplicative of counsel's work.

60. **Litigation support and investigations.** AlixPartners billed 398.4 hours ($469,325.50) for "Litigation Support & Investigations," which the Fee Application describes as including detailed investigations into the Debtors' insiders' and other parties' prepetition actions and the preparation of related expert reports. Fee Application at 9, 17. White & Case simultaneously conducted its own investigation of causes of action during the same period. The combined investigative effort of both firms was extraordinary for a case that ultimately produced no filed adversary proceeding, and whose derivative-standing motions were denied at confirmation.

61. **Overlapping deposition preparation.** Multiple AlixPartners professionals attended the same deposition-preparation sessions as White & Case attorneys. For example, on November 7, 2025, AlixPartners professionals MacGreevey, Magrisi, Amico, Komendowski, and Rubel attended a discussion alongside White & Case attorneys Zakia, Smith, and Chase in preparation for the ModivCare CEO deposition.

62. **Overlapping hearing attendance.** AlixPartners billed 201.9 hours ($240,499.50) for "Court Hearings and Status Conferences," with multiple AlixPartners professionals attending the same hearings at which White & Case was already present and advocating, including the September 30, 2025 DIP hearing and the December 8–11, 2025 confirmation hearing. While AlixPartners' testifying experts needed to attend for their testimony and one or two professionals could reasonably observe, the attendance of multiple additional AlixPartners professionals at every hearing session was unreasonable. Fee Application at 7.

63. **Claims, DIP, and cash-collateral work.** AlixPartners billed 152.4 hours ($147,204.50) for "Claims Analysis" and 215.0 hours ($228,903.50) for "DIP Financing and Cash Collateral," categories in which White & Case also performed substantial work. Fee Application at 7. While the preparation of the MacGreevey declaration supporting the DIP objection was a

legitimate financial-advisory function, much of the remaining work in these categories overlapped with counsel's role as lead on the DIP objection and claims matters.

**F.   Services That Were Neither Reasonable Nor Necessary.**

64. A substantial portion of AlixPartners' fees was incurred in the "Valuation and Solvency Analysis" category (829.4 hours / $902,168.50) and the "Business and Strategic Plan" category (1,304.9 hours / $1,335,818.50)—together more than $2.2 million and nearly half the entire request. Fee Application at 7. This work supported the Committee's contention that the Debtors' enterprise value should be nearly doubled to approximately $1.66 billion. Under *Woerner*, the burden is on the professional to show that the time billed was a "good gamble" at the time it was made. The magnitude of the resources devoted to a valuation position roughly double the Debtors' own expert valuation—a position the Court ultimately rejected at confirmation—was disproportionate to its prospect of success and was not objectively reasonable when incurred.

**G.   Excessive Fee-Application Preparation Time.**

65. AlixPartners billed 83.0 hours ($60,713.00) for "Fee Statements & Fee Applications"— preparing four monthly fee statements and this final Fee Application. Fee Application at 7. While the Supreme Court confirmed in *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015), that preparing fee applications is compensable, section 330(a)(6) requires that such compensation be "reasonable in relation to the level and skill required." Over 83 hours to prepare four monthly statements and a final application that is largely a compilation of those statements with a brief narrative is unreasonable. Notably, Lisa Marie Bonito (Vice President, $580/hour) alone billed 62.3 hours within this category.

**H.  Vague, Lumped, and Clerical Time Entries.**

66. Under *Woerner*, the burden is on the professional to show that any billed service was a "good gamble" at the time it was made, and it is impossible to assess the objective reasonableness of a "workstream" if the professional does not adequately describe the work performed. The U.S. Trustee Fee Guidelines require that each time entry describe a single, distinct task. AlixPartners' records are replete with vague entries (*e.g.*, recurring "weekly case updates and ongoing workstreams" and "review discovery documents for each segment") and with "lumped" entries combining disparate activities into a single block of time, including all-day "testimony preparation" sessions billed at 11.0 hours each by Greg Magrisi (Partner & Managing Director, $1,250/hour) on December 8 and December 9, 2025. The accompanying entry-by-entry analysis, submitted as a supporting exhibit, identifies these objectionable entries individually.

67. **Clerical and ministerial tasks.** Professionals are not entitled to compensation at professional rates for essentially clerical or secretarial work; such tasks are overhead absorbed by the firm's rates. The records include numerous such entries. For example: on September 10, 2025, Kathryn B. McGlynn (Partner & Managing Director, $1,415/hour) billed 0.9 hours to "Prepare case set-up items"; Chase Hood (Senior Vice President, $850/hour) billed time on September 10 and 11, 2025 to "Prepare team internal datasite and email distribution group" and to "Prepare working group list for counsel"; and Lisa Marie Bonito (Vice President, $580/hour) billed extensive time formatting fee-statement schedules and exhibits. Fee Application at 6. Billing the estate at professional rates—up to $1,415 per hour—for setting up internal files and managing email distribution lists is inherently unreasonable, and these entries should be disallowed in their entirety.

21

## I.  Unreasonable Expenses.

68.  AlixPartners seeks $41,910.29 in total expenses. Fee Application at 8. ModivCare objects to the following categories:

69.  **Excessive research reports.** In October 2025 alone, AlixPartners purchased three third-party market-research reports totaling $9,400.00: "US Home Care Services Market Outlook" ($2,000.00), "US Remote Patient Monitoring Market Outlook" ($4,950.00), and "US Non-Emergency Medical Transportation Market to 2031" ($2,450.00). Combined with $2,253.63 in September research costs, AlixPartners charged the estate $11,973.63 for "Client Research." Fee Application at 8. The necessity of nearly $12,000 in off-the-shelf industry research has not been demonstrated, particularly where AlixPartners' represented sector expertise justified its retention.

70.  **Luxury lodging for travel to AlixPartners' own office.** In October 2025, the records reflect $1,500 per person for lodging in New York City—the Westin New York Grand Central (Amico) and The Benjamin Royal Sonesta (Komendowski)—in connection with travel to AlixPartners' own New York office. The estate should not bear lodging costs for AlixPartners professionals traveling to their firm's own headquarters. Total lodging was $3,000.00 in November 2025, and lodging was the single highest expense component in December 2025.

## J.  Post-Effective-Date Fees.

71.  AlixPartners requests up to $25,000.00 for fees incurred or expected to be incurred after the Effective Date in connection with the preparation and prosecution of the Fee Application. Fee Application at 6 n.2, 10. The Retention Order provides that "AlixPartners shall not seek reimbursement from the Debtors' estates for any fees incurred in defending any of AlixPartners' fee applications in these Chapter 11 Cases." Retention Order ¶ 5. To the extent

the $25,000.00 includes any fees for *defending* the Fee Application against this Objection, such fees are expressly prohibited. AlixPartners should be required to submit an itemized statement of actual post-effective-date fees, limited strictly to preparation and not defense, before any such amount is allowed.

**PRAYER**

WHEREFORE, ModivCare respectfully prays that the Court **deny the requested fees and expenses**, or in the alternative reduce the allowed compensation and expenses consistent with this Objection; deny or strictly limit the requested post-effective-date fees as set forth above; and grant such other and further relief as the Court deems just and proper.

Dated: June 3, 2026.

Respectfully submitted,

**WALKER & PATTERSON, P.C.**

By: */s/ Johnie Patterson*
Johnie Patterson
SBN 15601700
jjp@walkerandpatterson.com
Miriam T. Goott
SBN 24048846
mgoott@walkerandpatterson.com
4815 Dacoma Street
Houston, TX 77092
713.956.5577 (telephone)
713.956.5570 (fax)

**COUNSEL FOR MODIVCARE**

## CERTIFICATE OF SERVICE

I, Johnie Patterson, hereby certify that a true and correct copy of the foregoing Amended Objection was served electronically upon all parties entitled to notice pursuant to this Court's CM/ECF electronic noticing platform on June 3, 2026.


By: */s/ Johnie Patterson*
Johnie Patterson